1  Mark Punzalan (State Bar No. 247599)
   mpunzalan@finkelsteinthompson.com
2  **FINKELSTEIN THOMPSON LLP**
3  100 Bush Street, Suite 1450
   San Francisco, California 94104
4  Telephone: (415) 398-8700
   Facsimile: (415) 398-8704
5
6  [Additional Counsel Listed on Signature Page]
7  Lead Counsel

8
   **UNITED STATES DISTRICT COURT**
9
   **NORTHERN DISTRICT OF CALIFORNIA**
10
   **SAN FRANCISCO DIVISION**
11

| | |
|---|---|
| PETER RUDOLPH, individually and on behalf of all others similarly situated, | ) Case No. 3:07-CV-04578-SI |
| | ) |
| Plaintiff, | ) **AMENDED CLASS ACTION** |
| | ) **COMPLAINT** |
| vs. | ) |
| | ) |
| UTSTARCOM, HONG LIANG LU, YING WU, MICHAEL SOPHIE, FRANCIS BARTON, AND THOMAS TOY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

I.      INTRODUCTION ....................................................................................1

II.     NATURE OF THE ACTION .................................................................6

III.    JURISDICTION AND VENUE ..........................................................10

IV.     THE PARTIES ......................................................................................11

        A.      LEAD PLAINTIFF ....................................................................11

        B.      THE DEFENDANTS..................................................................11

                1.      The Company.................................................................11

                2.      The Officer Defendants ................................................12

                3.      The Director Defendant ...............................................13

V.      CLASS ACTION ALLEGATIONS ....................................................14

X.      THE FRAUDULENT SCHEME........................................................16

        A.      THE UTSTARCOM STOCK OPTION PLANS.....................17

        B.      THE BACKDATING SCHEME ...............................................18

                1.      Defendants' Manipulation of Option Grants.............18

                2.      Defendants' Understating of Expenses, Improper Tax Treatment of Options and Misrepresentation of the Company's Financial Results 21

                3.      Defendants' Participation in the Understanding and Misrepresentation of Officer Compensation..........................................................22

                4.      Defendants' False and Misleading Statements Regarding the Company's Tax Withholding Obligation ................................................22

XI.     UTSTARCOM ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD....................................................24

XI.     THE TRUTH BEGINS TO EMERGE .................................................36

        A.      VOLUNTARY REVIEW OF GRANT PRACTICES....................36

        B.      THE RESTATEMENT ..............................................................37

        C.      THE RESTATEMENT'S IMPACT ON FINANCIAL RESULTS .................41

XIII.   ADDITIONAL FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...........................................................................44

       A.    DEFENDANTS CERTIFIED FALSE AND MISLEADING ..........................44

XIV.  ADDITIONAL ALLEGATIONS OF SCIENTER.........................................47

       A.    THE COMPANY'S ADMISSIONS AND RECENT ACTIONS
            ESTABLISH DEFENDANTS' SCIENTER.......................................47

       B.    DEFENDANTS' SPECIFIC PARTICIPATION IN THE
            BACKDATING  ESTABLISHES THEIR SCIENTER.......................49

       C.    DEFENDANTS' PERSONAL ENRICHMENT THROUGH
            LUCRATIVE STOCK OPTION GRANTS AND INSIDER
            TRADING SUPPORTS A FINDING OF SCIENTER ......................49

       D.    THE PERVASIVENESS FO THE FRAUDULENT CONDUCT
            AND THE NATURE OF THE ACCOUNTING RULES AT ISSUE
            FURTHER SUPPORTS A STRONG INFERENCE OF
            SCIENTER.........................................................................................51

       E.    THE FACT THAT PURPORTED COMPLIANCE WAS
            ESSENTIAL  TO MAINTAINING UTSTARCOM'S
            PROFITABLE PERFORMANCE  SUPPORTS A STRONG
            INFERENCE OF SCIENTER........................................................51

XV.    LOSS CAUSATION ............................................................................52

XVI.  INAPPLICABILITY OF STATURY SAFE HARBOR ........................53

XVII. PRESUMPTION OF RELIANCE ......................................................54

XVIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT.........................55

I.    **INTRODUCTION**

1.    Court-appointed Lead Plaintiff, James Bartholomew ("Mr. Bartholomew" or "Lead Plaintiff"), brings this federal securities law class action on behalf of himself and all other persons or entities, other than Defendants and their affiliates, who purchased or acquired the common stock of UTStarcom, Inc. ("UTStarcom" or the "Company") between September 4, 2002 through and including July 24, 2007 (the "Class Period"), and were damaged by the conduct asserted herein.  Lead Plaintiff alleges the following facts upon knowledge, with respect to his own acts, and with respect to all other facts, including evidence obtained from several confidential witnesses, based on an investigation conducted by his counsel.

2.    This action involves a fraudulent scheme that spanned more than seven years. At the crux of the fraudulent scheme was a practice whereby the Defendants intentionally manipulated stock option grants to the Company's officers, directors and employees in order to provide the recipients with a more profitable exercise price and to underreport Company expenses.  As a result of this scheme, ***the Company has been forced to restate its previously filed financial statements for fiscal years 2000 through 2006 by approximately $25.5 million to account for the additional stock-based compensation expenses*** (the "Restatement").

3.    The Defendants' scheme caused the Company's financial statements issued during the Class Period to be materially false and misleading, resulting in an artificial inflation of the Company's stock price.  By engaging in this scheme, the Defendants concealed that UTStarcom was not recording material compensation expenses and was materially overstating its net income and earnings per share, resulting in the Company understating its net losses and losses per share, in violation of generally accepted accounting principles ("GAAP").  When these backdated grants and the improper accounting concealing them were finally revealed to the public, the price of UTStarcom stock declined dramatically, causing substantial damage to investors.

1    4.    As a result of the Defendants' false statements, contrivances and manipulative

2    acts, UTStarcom's publicly traded securities traded at artificially inflated prices during the

3    Class Period, with its common stock reaching a high of $45.36 per share on August 21, 2003,

4    as UTStarcom reported outstanding financial results.  As the artificial inflation of

5    UTStarcom's stock price began to be removed, UTStarcom's stock price declined to a low of

6    $3.88 per share on July 24, 2007.

7    5.    A stock option granted to an employee of a corporation allows the employee to

8    purchase the specified number of shares of company stock at a specified price – referred to as

9    the "exercise price" or "strike price" – for a certain period of time.  Stock options are granted

10   by public companies as part of compensation packages for executes – supposedly to create

11   incentives for them to boost long-term corporate performance and profitability.  When the

12   executive exercises the option, he or she purchases the stock from the company at the exercise

13   price, regardless of the stock's price at the time the option is exercised.  Options are generally

14   priced at the market price on the date of grant – so if the stock price goes up *over time*

15   (typically ten years), the executive makes a profit.  If the system is abused by "backdating,"

16   which refers to picking an option-grant date earlier than the actual date the option was granted

17   when the stock price was lower than the actual grant date, or by "spring – loading," which

18   refers to granting the stock option just before the company issues positive news which will

19   likely push the stock price up, the executive gets an instant, guaranteed and riskless profit.

20   6.    Stock option manipulation and, in particular, the practice of granting an option

21   with an exercise price tied to a date prior to the actual grant date is fraudulent where: (a) the

22   backdating of grant dates violates the terms of the company's stock option plan; (b) the

23   company misrepresents how the options are priced; or (c) the company fails to properly

24   record expenses associated with these option grants under GAAP.  All three of these

25   circumstances existed here.

26   7.    As Harvey Pitt, former Chairman of the Securities and Exchange Commission

27   ("SEC") stated in an article in May of 2006, "[t]hose who backdate options grants violate

28   federal and state law.  And those on whose watch this conduct occurs are also potentially

Amended Class Action Complaint
3:07-CV-04578-SI

2

1  liable: If they knew about the backdating, they're participants in fraudulent and unlawful

2  conduct.  If they didn't know about the backdating, the question will be:  Should they have

3  done more to discover it?"

4         8.      The Defendants' manipulation of – and, in particular, the backdating  of –

5  stock option grants was not permitted under the contractual terms of the Company's stock

6  option plans.  Instead the Defendants' manipulation of UTStarcom's stock option grants was

7  the linchpin of a broader fraudulent scheme to personally profit from increases in the

8  Company's stock price with the benefit of hindsight, and to misrepresent and hide material

9  information from the public about the Defendants' backdating of options.  In furtherance of

10  this fraudulent scheme, the Defendants engaged in the following misconduct:

11         (a)      In direct contravention of fundamental GAAP principles, the

12        Defendants failed to report expenses associated with the backdated options and

13        thereby materially understated UTStarcom's expenses and materially overstated its net

14        income and earning per share.  If options are priced below a stock's fair market value

15        when they are awarded, there is an instant gain.  Pursuant to Accounting Principles

16        Board ("APB") Opinion No. 25, "*Accounting for Stock Issued to Employees*" ("APB

17        25"), which was in effect through June 2005, the Company was obligated to recognize

18        this gain as a compensation expense over the vesting period of the option.  After June

19        2005, Statement of Financial Accounting Standards ("SFAS") 123, "*Accounting for*

20        *Stock-Based Compensation*" ("SFAS 123"), required that the Company recognize the

21        entire value of all option grants on the grant date amortized over the vesting period of

22        the option.  However, as the Company has now admitted, "incorrect measurement

23        dates for certain stock option grants were used for financial accounting and disclosure

24        purposes based on the requirements of Accounting Principles Board Opinion No. 25,

25        Accounting for Stock Issued to Employees."  In a later Form 8-K, the Company

26        admitted that "[a] later date, when all such actions had taken place, should have been

27        used as the measurement date for these stock options."

28

(b)      By retroactively pricing the options, the Defendants caused the Company to issue options with terms that violated the express requirements of the Company's stock option plans, which rendered the Company's public representations that options were issued in compliance with the Company's stock option plans materially false and misleading.  Specifically, the Company's stock option plans expressly state that the exercise price of incentive stock options shall not be less than 100% of the fair market value of the stock on the date of grant.  However, where, as here, options are backdated, the exercise price of the stock options is lower than the fair market value on the true date of the grant.

(c)      The Company Defendants repeatedly mislead investors by affirmatively representing in the Company's SEC filings that the purpose of its stock option plans and stock option grants to executives was "to attract and retain the best available personnel for positions of substantial responsibility and to provide additional incentive to Employees, Directors and Consultants and promote the success of the Company's business."

(d)      The Company Defendants expressly misrepresented the value of officer compensation in various Company filings.  Specifically, in identifying specific options granted to officers, the Company Defendants falsely stated that such options were granted with an exercise price equal to the fair market value of the stock on the grant date when, in fact, the options were backdated and "in-the-money" when granted.

9.      UTStarcom's Restatement of November 9, 2007 effectively acknowledges that its previously reported financial results were materially false and misleading when made because such statements omitted material facts regarding, and failed to take account of, the financial effect of the backdated option grants.  Moreover, the Company has expressly admitted in its quarterly report on Form 10-Q for the quarter ending on September 30, 2007 ("2007 3rd Quarter 10-Q"), that the fraud has had a material impact on the Company and its shareholders.  Among other things, the Company now acknowledges:

1
2
3

4
5
6
7
8
9

10
11

12
13
14
15
16
17
18

19
20
21
22
23

24

25

26

- During the Review Period, the Company granted stock options on approximately 34 million shares of the Company's common stock at 197 grant dates.
- A total of 17.9 million stock options were granted at the 53 tested grant dates during 2000 through 2005 where the Governance Committee's[1] review found the Company used incorrect measurement dates.  Using the corrected measurement dates, 10.3 million stock options had intrinsic value because their exercise prices were below the closing price of the Company's Common Stock at the corrected measurement date.
- These 10.3 million stock options resulted in an increase in non-cash stock-based compensation expense of $24.3 million during 2000 to 2005.
- The Review Team[2] found that in certain instances there was a lack of formal documentation in the stock option granting process and/or expected documentation is missing from the stock option administration files.  In addition, the Review Team found that in many instances, there was a lack of self-authenticating evidence to corroborate that cash exercises were contemporaneous.  As a result, the findings on the issue of backdating of cash exercises were inconclusive.
- The Company has assumed responsibility for all additional payroll taxes plus related penalties and interest arising from the restatement of stock-based compensation, including amounts otherwise payable by stock option recipients, and the Company's restated financial statements include a $1.5 million accrual for this estimated expense.

27
28

[1] The Governance Committee consisted of three members of the Board of Directors.
[2] The Review Team consisted of independent outside legal counsel and forensic accountants.

Amended Class Action Complaint
3:07-CV-04578-SI

5

- A key finding of the Governance Committee was that there were deficiencies with the process by which stock options were granted during the period from the Company's initial public offering in 2000 through at least 2005.

- The Governance Committee concluded that certain members of management bear varying degrees of responsibility for the deficiencies in the process by which options were granted.

10. This extensive fraud injured Lead Plaintiff and members of the Class. The market reacted strongly to the news of UTStarcom's Restatement, and the Company's stock prices have fallen as the prior artificial inflation has been removed from the value of UTStarcom's securities.

## II.     NATURE OF THE ACTION

11. On November 7, 2006, the Company issued a press release announcing that it had commenced a voluntary review of its historical equity award grant practices under the direction of the Nominating and Corporate Governance Committee of the Board of Directors (the "Committee").

12. On November 9, 2006, the Company announced that the Company was delaying the filing of the Form 10-Q in order to (i) complete its voluntary review of its historical equity award grant practices under the direction of the Committee and (ii) assess any impact of the review on the Company's financial statements related to prior equity grants and the Company's internal control over financial reporting.

13. On December 18, 2006, Hong Lu, President and Chief Executive Officer of the Company, received a "Wells notice" from the SEC in connection with an ongoing investigation into trading activities by third parties. The Wells notice stated that the staff intended to recommend to the SEC that it file a civil injunctive action alleging that Mr. Lu violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").

14. On December 22, 2006, the Company disclosed that Hong Lu, who previously notified the Company of his intent to resign effective December 31, 2006, would stay as the

1 Company's President and Chief Executive Officer until the completion of the Company's

2 exploration of strategic alternatives.

3       15.    On January 4, 2007, the Company announced that although the Company's

4 review of its historical equity award grant practices remained ongoing and no conclusions had

5 been reached in connection with the review, each of Hong Liang Lu, President and Chief

6 Executive Officer, Ying Wu, Executive Vice President, and Chief Executive Officer for

7 China, Fran Barton, Executive Vice President and Chief Financial Officer, and Bill Huang,

8 former Executive Vice President and Chief Technology Officer, and each of the Company's

9 independent directors, Thomas Toy, Jeff Clark, Larry Horner and Allen Lenzmeier, had

10 elected to amend any of their previously granted stock options that might in the future be

11 determined to be discounted stock options under Section 409A of the Internal Revenue Code

12 of 1986, as amended ("Section 409A"). The Company further stated that it "and its officer

13 and directors making such elections, believe that this is an equitable solution to avoid

14 potential adverse tax consequences both to the individuals and the Company associated with

15 any options that are determined to have been granted at a discount to the fair market value of

16 the underlying stock on the date of grant."

17       16.    On February 1, 2007, the Company issued a press release stating that although

18 the review of the Company's historical equity award grant practices was ongoing, the

19 Governance Committee had reached a determination that "incorrect measurement dates for

20 certain stock option grants were used for financial accounting and disclosure purposes."

21 Additionally, the press release stated that:

22             Following the Governance Committee's determination, on February 1, 2007,
the Audit Committee of the Board of Directors (the "Audit Committee") has

23             determined, in consultation with and upon the recommendation of the
Company's management, that the effect fusing incorrect measurement dates

24             will result in the need to record additional stock-based compensation charges
in the previously issued financial statements, and that the amount of those

25             charges is expected to be material. Any such charges would have the effect of
decreasing net income or increasing net loss and increasing accumulated

26             deficit as reported in the Company's historical financial statements.

27             Accordingly, on February 1, 2007, the Audit Committee, after consultation
with management, determined that the Company's  previously issued financial

28             statements for each of the three fiscal years in the period ended December 31,

2005, which are included in the Company's Annual Report on Form 10-K/A for the year ended December 31, 2005, the financial statements for the interim periods contained in the Quarterly Reports on Form 10-Q filed with respect to each of these years, and the financial statements included in the Company's Quarterly Report of Form 10-Q for the first two quarters of 2006, should no longer be relied upon.  In addition, the restatement is currently expected to affect financial statements for the fiscal years prior to fiscal 2003 and, therefore, financial statements for the fiscal years prior to fiscal 2003 also should no longer be relied upon.

Because the Governance's Committee's investigation is on-going, it has not yet determined the final aggregate amount of additional stock-based compensation charges that may need to be recorded in any specific prior periods or in any future periods.  Although the Company is not yet able to determine with finality the amount of additional non-cash stock-based compensation charge to be recognized, based on preliminary information the Company expects to record additional compensation charges of approximately $50 million.

17.    On May 16, 2007, the Company announced that after further investigation and review of the Company's practices, the Company now believed the estimated non-cash compensation and related charges arising from the investigation into its historical equity award grants practices would amount to approximately $35 million.

18.    On June 6, 2007, the Company announced that as of June 1, 2007, the employment relationship of UTSI with Ying Wu, the Company's Executive Vice President, Vice Chairman of the Board of Directors and Chairman and Chief Executive Officer of UTStarcom China Co., Ltd., had terminated.  His severance included the following: (i) 12 months of his base salary payable in a lump sum within 30 days of termination; (ii) 100% of the bonus for the year in which termination occurs; (iii) all equity awards, including stock options, becoming fully vested or exercisable to the extent they were outstanding and/or unexercisable at the time of termination.

19.    On July 24, 2007, the Company stated in a press release that the independent review of historical equity award practices found that "in certain instances all actions that establish a measurement date under the requirements of APB No. 25, had not occurred at the grant date, which had been used as the measurement date in accounting for Company stock option grants.  *A later date*, when all such actions had taken place, should have been used as the measurement date for these stock options."  The Company therefore announced that "its

1  previously issued financial statements for the years 2000 through 2006, including interim

2  periods within these fiscal years, should no longer be relied upon."  Approximately $28

3  million would need to be restated over the years 2000 though 2006 as a result.

4      20.     On July 24, 2007, Ying Wu, former employee and member of the Board of

5  Directors of the Company, notified the Company that he was resigning as a director of the

6  Company for personal reasons, effective July 24, 2007.

7      21.     As SEC Chairman Christopher Cox testified before the U.S. Senate Committee

8  on Banking, Housing and Urban Affairs on September 6, 2006, backdating is a practice

9  whereby companies "granted in-the-money options – that is, an option with an exercise price

10  lower than that day's market price.  They did this by misrepresenting the date of the option

11  grant, to make it appear that the grant was made on an earlier date when the market value was

12  lower…The purpose of disguising an in-the-money option through backdating is to allow the

13  person who gets the option grant to realize larger potential gains – without the company

14  having to show it as compensation on the financial statements."

15      22.     Lynn Turner, the SEC's former Chief Accountant, described backdating as

16  follows: "It's like allowing people to place bets on a horse race after the horses have crossed

17  the finish line."  Similarly, U.S. District Court Judge James M. Rosenbaum, in denying

18  defendants' motions to dismiss a securities class action captioned as *In re UnitedHealth*

19  *Group PSLRA Litig.*, 2007 U.S. Dist. LEXIS 40623 (D. Minn. June 4, 2007), regarding

20  similar practices at UnitedHealth, compared backdating to "playing a game with a stacked

21  deck.  When awarded (sic) options, with deliberately selected grant dates which were already

22  in the money, defendants were playing a game they knew they could not lose; and

23  unsurprisingly, defendants won."

24      23.     Arthur Levitt, former Chairman of the SEC, described backdating as stealing:

25  "[i]t is ripping off shareholders in an unconscionable way" and "represents the ultimate in

26  greed."

27      24.     Harvey Pitt, former Chairman of the SEC, opined that "backdating" plainly

28  violates both the federal securities law and state corporate fiduciary laws:

1  What's so terrible about backdating options grants?  For one thing, it likely
2  renders a company's proxy materials false and misleading.  Proxies typically
   indicate that options are granted at fair market value.  But if the grant is
3  backdated, the options value isn't fair – at least not from the vantage point of
   the company and its shareholders.

4  For another, backdating means a corporate document used to permit access to
   corporate assets has been falsified, a violation of the Foreign Corrupt Practices
5  Act.  Moreover, if backdating occurs without the compensation committee's
   knowledge, illegal insider trading may also have occurred.

6

7  Securities law violations are not the only potential problems with backdating
   options grants.  Backdating may violate the Internal Revenue Code, and
8  companies may not be able to deduct the options payments.  On the state level,
   backdating could involve a breach of fiduciary duty, a waste of corporate
   assets and even a usurpation of a corporate opportunity.
9                                        *        *        *
   More fundamentally, the financial statements of a company that has engaged in
10 backdating may require restatement.  The options may not be deductible, and
   the expenses, as well as the various periods to which they may have been
11 allocated, may also be incorrect…

12 More to the point, what does this kind of conduct say about those who do it
   and those who allow it to occur (either wittingly or unwittingly)?
13 Harvey Pitt, "The Next Big Scandal," Forbes.com, May 26, 2006.

14     25.    Defendants' backdating scheme not only surreptitiously and illegally lined

15 certain Individual Defendants' pockets and caused UTStarcom to issue materially false

16 financial statements, but undermined the key purpose of stock option–based executive

17 compensation: to provide incentives to executives to improve the Company's performance.

18 By manipulating options such that they carried a strike price lower than the trading price of

19 the stock on the date of grant, UTStarcom insiders profited immediately upon the award of the

20 options without doing anything to improve the Company's business or financial condition.

21     26.    Lead Plaintiff brings this action seeking to recover damages caused by

22 UTStarcom's and the Individual Defendants' violations of Sections 10(b), 14(a) and 20(a) of

23 the Exchange Act, and the rules and regulations promulgated thereunder, including SEC Rule

24 10b-5.

25 III.    JURISDICTION AND VENUE

26     27.    This action arises under Sections 10(b), 14(a), and 20(a) of the Exchange Act,

27 as amended, 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rules 10b-5 and 14a-9 promulgated

28
_____

1    thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. §§240.10b-5 and

2    240.14a-9.

3        28.    This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§

4    1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

5        29.    Venue is proper in this district pursuant to Section 27 of the Exchange Act and

6    28 U.S.C. § 1391(b).  UTStarcom's corporate headquarters are located in Alameda,

7    California, which is in this District.  Furthermore, Defendants transact business in this

8    District, and many of the acts and transactions constituting the violations of law alleged

9    herein, including the preparation, issuance and dissemination of materially false and

10   misleading statements to the investing public, occurred in this District.

11       30.    In connection with the acts alleged in this complaint, Defendants, directly or

12   indirectly, used means and instrumentalities of interstate commerce, including but not limited

13   to the mails, interstate telephone, and communications.

14   **IV.    THE PARTIES**

15       **A.    LEAD PLAINTIFF**

16       31.    Lead Plaintiff James Bartholomew is an individual investor who purchased

17   UTStarcom's securities during the Class Period and suffered damages as a result of the

18   wrongful acts of Defendants as alleged herein.  His purchases and sales of UTStarcom

19   common stock are reflected in his Certification, filed herewith.  On December 18, 2007, the

20   Court appointed Mr. Bartholomew as Lead Plaintiff for this litigation.

21       **B.    THE DEFENDANTS**

22           **1.    The Company**

23       32.    Defendant UTStarcom, at the time of the wrongs complained of herein,

24   maintained its corporate headquarters in the United States at 1275 Harbor Bay Parkway,

25   Alameda, CA 94502.  UTStarcom manufactures, integrates and supports IP-based, end-to-end

26   networking and telecommunications solutions.  The Company sells converged broadband

27   wireless and wireline products, an integrated IPTV solution, and a comprehensive line of

28   handset and customer premise equipment to operators in both emerging and established

1  telecommunications markets worldwide.  UTStarcom common stock trades on the NASDAQ

2  under the symbol "UTSI."

## 2.  The Officer Defendants

4  33.  Hong Liang Lu ("Lu") has served as the President, Chief Executive Officer, as

5  a director of the Company since June 1991, and as Chairman of the Board since March 2003.

6  In June 1991, Mr. Lu co-founded the Company under its prior name, Unitech Telecom, Inc.,

7  which subsequently acquired StarCom Network Stems, Inc. in September 1995.  As an

8  executive and a member of the Board of Directors, Lu authorized and approved certain

9  backdated stock option grants at issue in this case.  Lu signed UTStarcom's false Forms 10-K

10 for fiscal years 2002 through 2006, the Company's reports on Forms 10-Q for each quarter

11 from 2002 through 2006 and made false and misleading statements regarding UTStarcom's

12 executive compensation, stock option plans and financial results.  As an executive, Lu

13 received certain backdated stock options that are at issue in this case.  During the Class

14 Period, Lu reaped proceeds of $ 7,213,002 from his stock sales.

15 34.  Ying Wu ("Wu") has served as the Company's Executive Vice President and

16 Vice Chairman of the Board from October 1995 through July 24, 2007 and until February

17 2004, as President of one of the Company's subsidiaries, UTStarcom Chine Co., Ltd.  As an

18 executive and a member of the Board of Directors, Wu authorized and approved certain

19 backdated stock option grants at issue in this case.  Wu signed UTStarcom's false Forms 10-K

20 for fiscal years 2002 through 2005, the Company's reports on Forms 10-Q for each quarter

21 from 2002 through 2005 and made false and misleading statements regarding UTStarcom's

22 executive compensation, stock option plans and financial results.  As an executive, Wu

23 received certain backdated stock options that are at issue in this case.  During the Class

24 Period, Wu reaped proceeds of $ 22,882,119 from his stock sales.

25 35.  Michael Sophie ("Sophie") served as Vice President of Finance and Chief

26 Financial Officer of the company from August of 1999 until August of 2005.  As an executive

27 and a member of the Board of Directors, Sophie authorized and approved certain backdated

28 stock option grants at issue in this case.  Sophie signed UTStarcom's false Forms 10-K for

1   fiscal years 2000 through 2004, the Company's reports on Forms 10-Q for each quarter from

2   2000 through 2004 and made false and misleading statements regarding UTStarcom's

3   executive compensation, stock option plans and financial results.  As an executive, Sophie

4   received certain backdated stock options that are at issue in this case.  During the Class

5   Period, Sophie reaped proceeds of $ 4,042,720 from his stock sales.

6        36.     Francis Barton ("Barton") has served as the Executive Vice President and

7   Chief Financial Officer of the Company since August of 2005. As an executive and a member

8   of the Board of Directors, Barton authorized and approved certain backdated stock option

9   grants at issue in this case.  Barton signed UTStarcom's false Forms 10-K for fiscal years

10  2005 through 2006, the Company's reports on Forms 10-Q for each quarter from 2005

11  through 2006 and made false and misleading statements regarding UTStarcom's executive

12  compensation, stock option plans and financial results.  As an executive, Barton received

13  certain backdated stock options that are at issue in this case.

14       **3.     The Director Defendant**

15       37.     Thomas Toy ("Toy") currently has served as the Chairman of the Board since

16  January 1, 2007.  Prior to this, he served as an independent director, beginning in 1995.  Toy

17  signed UTStarcom's false Forms 10-K for fiscal years 2002 through 2006 and made false and

18  misleading statements regarding UTStarcom's executive compensation, stock option plans

19  and financial results.  As a member of the Audit and Compensation Committees, Defendant

20  Toy enabled the stock option backdating scheme to succeed.  During the Class Period, Toy

21  reaped proceeds of $ 2,727,762 from his stock sales.

22       38.     Lu, Wu, Sophie, Barton, and Toy are collectively referred to herein as the

23  "Individual Defendants."  Because of the Individual Defendants' positions within the

24  Company, they had access to adverse undisclosed material information about its business,

25  operations, financial statements and stock option grants.  They were privy to such undisclosed

26  information from internal corporate documents, communications with other officers and

27  employees of the Company, and attendance at and documents received during management

28  and Board of Directors meetings.

1    39.    The Individual Defendants, as officers and/or directors of the Company, had a

2  duty to disseminate complete, accurate, and truthful information about UTStarcom's financial

3  condition, business operations and executive compensation.  The Individual Defendants had a

4  duty to correct promptly any public statements issued by UTStarcom that had become false or

5  misleading.  Because of their positions, their ability to exercise power and influence with

6  respect to UTStarcom's course of conduct and their access to material inside information

7  about UTStarcom's, the Individual Defendants were, at the time of the wrongs alleged herein,

8  controlling persons within the meaning of Section 20(a) of the Exchange Act.

9  **V.    CLASS ACTION ALLEGATIONS**

10    40.    Lead Plaintiff brings this action as a class action under Rules 23(a) and

11  23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of persons and entities

12  who purchased UTStarcom securities from September 4, 2002 through July 24, 2007,

13  inclusive (the "Class Period") and were damaged thereby (the "Class").

14    41.    Excluded from the Class are (i) Defendants; (ii) members of the immediate

15  family of each of the Defendants; (iii) any person who was an executive officer and/or

16  director of UTStarcom during the Class Period; (iv) any person, firm, trust, corporation,

17  officer, director, or any other individual or entity in which any Defendant has a controlling

18  interest or which is related to or affiliated with any of the Defendants; (v) any person who

19  profited from or actively participated in the wrongdoing at issue; and (vi) the legal

20  representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded

21  party.

22    42.    The Class is so numerous that joinder of all members is impracticable.

23  According to UTStarcom's August 9, 2006 Form 10-Q filed with the SEC, UTStarcom had

24  121,287,498 shares of common stock issued and outstanding as of October 31, 2007.  These

25  shares were actively traded on the NASDAQ GS.  For this reason, Lead Plaintiff believes that

26  the proposed Class is comprised of thousands, if not tens of thousands, of investors.

27    43.    Lead Plaintiff will fairly and adequately protect the interests of the members of

28  the Class, and Plaintiff has no interests which are contrary to, or in conflict with, the interests

1    of the Class members that they seek to represent. Lead Plaintiff has retained competent

2    counsel, experienced in class action litigation under the federal securities laws to ensure such

3    protection, and intends to prosecute this action vigorously.

4         44.    A class action is superior to all other available methods for the fair and

5    efficient adjudication of this controversy since joinder of all members is impracticable.

6    Furthermore, as the damages suffered by individual members of the Class may be relatively

7    small, the expense and burden of individual litigation make it impossible for the members of

8    the Class to individually seek redress for the wrongs done to them.  There will be no difficulty

9    in the management of this action as a class action.

10        45.    Questions of law and fact common to the members of the Class predominate

11   over any questions that may affect only individual members in that Defendants have acted on

12   grounds generally applicable to the entire Class.  Among the questions of law and fact

13   common to the Class are:

14             a.    whether the federal securities laws were violated by Defendants' acts as

15                   alleged herein;

16             b.    whether Defendants' publicly disseminated releases and statements

17                   during the Class Period, omitted and/or misrepresented material facts,

18                   and whether Defendants breached any duty to convey material facts or

19                   to correct material facts previously disseminated;

20             c.    whether Defendant participated in and pursued the common course of

21                   conduct complained of herein;

22             d.    whether Defendants acted with scienter in omitting and/or

23                   misrepresenting material facts;

24             e.    whether Defendants improperly manipulated the terms of the stock

25                   option grants;

26             f.    whether Defendants engaged in a scheme to defraud by manipulating

27                   the terms of stock options granted to them and others;

28

---

Amended Class Action Complaint                                    15
3:07-CV-04578-SI

1    g.    whether the market prices of UTStarcom securities during the Class

2          Period were artificially inflated because of Defendants' conduct

3          complained of herein; and

4    h.    whether the members of the Class have sustained damages and, if so,

5          what is the proper measure of damages.

6    46.    Lead Plaintiff's claims are typical of the claims of the members of the Class.

7    Further, both Lead Plaintiff and members of the Class sustained damages arising out of

8    Defendants' wrongful conduct in violation of federal law as complained of herein.

9    **X.    THE FRAUDULENT SCHEME**

10    47.    UTStarcom manufactures, integrates and supports IP-based, end-to-end

11    networking and telecommunications solutions.  The Company sells converged broadband

12    wireless and wireline products, an integrated IPTV solution, and a comprehensive line of

13    handset and customer premise equipment to operators in both emerging and established

14    telecommunications markets worldwide.  During the Class period, the Company enjoyed

15    steady growth in both sales and the size of its operations.  To recruit and retain key executives

16    and employees, UTStarcom, at the direction of its Board of Directors, made liberal use of

17    stock options as a form of compensation.

18    48.    Each option gave the recipient the right to buy one share of UTStarcom

19    common stock from the Company at a set price, called the "exercise" or "strike" price, on a

20    future date after the option vested.  The option was "in-the-money" whenever the trading

21    price of UTStarcom common stock exceeded the option's exercise price.  The option was "at-

22    the-money" whenever the trading price of UTStarcom common stock and the exercise price

23    were the same.  The option was "out-of-the-money" or "underwater" whenever the trading

24    price of UTStarcom common stock was less than the exercise price.  At all relevant times,

25    Defendants represented that UTStarcom's incentive stock option grants were made at fair

26    market value, *i.e*, the closing price of UTStarcom common stock on the date of grant ("at-the-

27    money" and certainly not "in-the-money").

28

**A.     THE UTSTARCOM STOCK OPTION PLANS**

49.     Between 2000 through 2006, UTStarcom granted stock options to its officers, directors and employees pursuant to at least five different stock option plans:  the 1997 Stock Option Plan ("1997 Plan"), the 2001 Director Plan ("2001 Plan"), Equity Based Compensation ("Equity Plan"), the 2003 Non-Statutory Stock Option Plan ("2003 Plan") and the 2006 Equity Incentive Plan ("2006 Plan").  Each plan was prepared by UTStarcom's management, adopted by the Board of Directors and voted upon and approved by UTStarcom shareholders.

50.     The stated purpose of each plan was to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to Employees, Directors and Consultants and to promote the success of the Company's business. *See* 1997 Plan, 2001 Plan, Equity Plan and 2006 Plan.  Each plan gave the Board of Directors or any of its Committees the full power to interpret and administer the plans, to select the specific employees to whom awards would be granted under the plans, the type and amount of the award to be granted to such employees, and the terms of the option agreements to be entered into with such employees.  *See* 1997 Plan ¶ 4, 2001 Plan ¶ 4, and 2006 Plan ¶ 4.

51.     Under the 1997 Plan and the 2006 Plan, the Board of Directors or any of its Committees was responsible for determining ht exercise price of each option grant, within certain limitations.  *See* 1997 Plan ¶8 and 2006 Plan ¶5(d).

52.     Stock options could not have an exercise price less than the fair market value of a share of UTStarcom common stock on the date of grant.  *See* 1997 Plan ¶8(a)(i)(B), 2001 Plan¶ 4(a)(vi)(C), Equity Plan and 2006 Plan ¶ 6(d)(i).  The plans defined fair market value to be the closing sales price of a share of UTStarcom common stock on the last market trading day prior to the time of determination as published by the <u>Wall Street Journal</u> or some other reliable source.  *See* 1997 Plan ¶ 2(m), 2001 Plan¶ 2(i),.  The 2006 Plan defines fair market value as the price of such stock on any established stock exchange or national market system on the day of determination.  2006 Plan ¶ 2(v).

1    53.    UTStarcom also utilized a stock option plan to attract and retain directors of

2  the Company which similarly specified that "[t]he exercise price per Share shall be one

3  hundred percent (100%) of the Fair Market Value per Share on the date of grant of the First

4  Option.

5    **B.    THE BACKDATING SCHEME**

6    54.    As detailed below, Defendants each knowingly or with deliberate recklessness

7  employed devices, schemes and artifices to defraud, made untrue statements of material fact

8  and/or omitted to state material facts necessary to make statements made not misleading, and

9  engaged in acts, practices and a course of business which operated a fraud and deceit upon

10  Class members including: (i) causing and/or permitting the manipulation of stock option

11  grants by, *inter alia*, retroactively selecting exercise prices for option grants in order to

12  understate compensation expenses and personally obtain larger than reported compensation;

13  (ii) exercising backdated options and selling the shares obtained therefrom; (iii) preparing,

14  approving and signing SEC filings that overstated the Company's results and understated its

15  expenses and tax liabilities in its financial results; (iv) preparing, approving and signing SEC

16  filings that understated and misrepresented officer compensation; (v) failing to properly

17  withhold taxes when employees exercised options; and/or (vi) taking steps to ensure that the

18  Company lacked sound internal controls and contained deficiencies and material weaknesses.

19    **1.    Defendants' Manipulation of Option Grants**

20    55.    The Company has conceded in its Restatement that approximately 57% of the

21  17.9 million stock options granted between 2000 and 2006 had a grant date that preceded the

22  appropriate measurement date.  The Individual Defendants each backdated the option grants

23  for the principal purpose of furthering the fraudulent scheme as evidenced by the following

24  facts.

25    56.    In its 2007 3rd Quarter 10-Q, the Company concluded that "there were

26  deficiencies with the process by which stock options were granted during the period from the

27  Company's initial public offering in 2000 through at least 2005."  The Company also stated

28  that "[b]ased on available evidence, the review found that the number of shares an individual

Amended Class Action Complaint                                    18
3:07-CV-04578-SI

1    employee was entitled to receive and/or the exercise price for stock option grants was not

2    determined with finality at the stated grant date at 53 tested grant dates, and the Company

3    should have used a later date as the measurement date."

4         57.     According to Confidential Witness #1, a former Human Resources Coordinator

5    at the Company from 2005 through 2007, UTStarcom actively backdated its stock option

6    grants to senior executives in order to assure that these executives received the highest

7    possible margins related to their sale of options.  She was directed, at various times, to

8    purposefully and intentionally alter documents for this purpose.  She also recalls that this

9    practice was commonly discussed and acknowledged as a general practice within the

10   Company.  This is confirmed by Confidential Witness #2, who was an Administrative

11   Support Representative from October 2006 through September 2007.

12        58.     Confidential Witness #1 recalled that the Company engaged auditors from

13   Deloitte and Touche ("D&T") to ready the Company for its audit by Price Waterhouse

14   Coopers ("PWC").  D&T personnel frequently requested that the witness backdate various

15   employment papers in order to bring the Company into compliance, but the witness would not

16   cooperate.

17        59.     Confidential Witness #1 indicated that all of the paperwork associated with the

18   backdating of options first went through the approval of the Company's General Counsel and

19   Stock Administrator.  The Company's stock option grant reports and all executive bonus

20   information were maintained within an ADP HRIS system up until September 2005.  At that

21   time, the information was transferred into an Oracle based system.  Prior to that, the newly

22   awarded option information was maintained within a "Stock ISO (Initial Stock Option) Grant

23   Screen."  This screen, according to the witness, recorded the amount of the stock granted and

24   the price at which it was granted.  The Company maintained a hard copy backup within the

25   personnel files.

26        60.     The backdating at UTStarcom, however, was not due simply to deficiencies in

27   process.  Instead, the Individual Defendants who served on the Board of Directors,

28   intentionally and knowingly granted options with strike prices well below market on the date

of grant.  For example, Confidential Witness #1 recalled an occasion she was directed to backdate employment paperwork and option grants to a new employee to a date three months prior to his actual employment date.

61.     Further evidence of the back dating scheme by the Individual Defendants exists in the fact that stock option grants to the Individual Defendants were consistently correlated to days with yearly-low closing prices, quarterly-low prices or directly in advance of sharp increases in the price of UTStarcom stock.  For example:

a.     In the fiscal year ending on December 31, 2002, UTStarcom made two option grants to Lu: first, a grant of 150,000 options purportedly on February 28, 2002.  On February 28, 2002, UTStarcom stock closed at its lowest price of the year to date, $ 20.25.  On March 1, 2002, the Company's stock price took a turn and began to rise steadily.  Second, UTStarcom granted 75,000 options to Lu purportedly on July 25, 2002. On July 25, 2002, UTStarcom stock closed at $ 15.72, the lowest closing price for the year to date.  July 25, 2002 immediately preceded a rise in UTStarcom stock.

b.     In the fiscal year ending on December 31, 2002, UTStarcom made two option grants to Wu: first, a grant of 100,000 options purportedly on February 28, 2002.  On February 28, 2002, UTStarcom stock closed at its lowest price of the year to date, $ 20.25.  On March 1, 2002, the Company's stock price took a turn and began to rise steadily.  Second, UTStarcom granted 50,000 options to Wu purportedly on July 25, 2002.  On July 25, 2002, UTStarcom stock closed at $ 15.72, the lowest closing price for the year to date.  July 25, 2002 immediately preceded a rise in UTStarcom stock.

c.     In the fiscal year ending on December 31, 2002, UTStarcom made two option grants to Sophie: first, a grant of 100,000 options purportedly on February 28, 2002.  On February 28, 2002, UTStarcom stock closed at

1    its lowest price of the year to date, $ 20.25.  On March 1, 2002, the

2    Company's stock price took a turn and began to rise steadily.  Second,

3    UTStarcom granted 50,000 options to Lu purportedly on July 25, 2002.

4    On July 25, 2002, UTStarcom stock closed at $ 15.72, the lowest

5    closing price for the year to date.  July 25, 2002 immediately preceded

6    a rise in UTStarcom stock.

7    62.    Confidential Witness #1 had first-hand knowledge and witnessed the

8    fabrication of documents for the purpose of backdating of options by Defendant Barton and

9    Defendant Sophie.

10    63.    In addition to the arbitrary, inconsistent grant dates and grant dates at or near

11    the lows for the quarter to date or year to date, UTSI stock prices for the backdated options

12    follow the classic pattern of losses prior to the grant date immediately followed by gains.

13    These return loss-to-gain, negative-to-positive sign reversals, are significant and far exceed

14    the largest published significance thresholds.  For example, the five day cumulative return for

15    the 7/25/02 grant date was -26% followed by a cumulative five day return after the grant date

16    of 6.2%, a 32% swing.  This significant swing from a cumulative loss followed by a gain far

17    exceeds the largest published statistical threshold of a 10% swing or a cumulative -5% loss

18    followed by a +5% gain.  The five day cumulative return up to the 5/11/05 grant date was a

19    negative -30% followed by a five day cumulative return gain after the grant date of +2.7%.

20    More than a 32% swing.  The magnitude of the significant sign reversals from negative

21    returns (or losses) before the grant date to positive returns (or gains) following the grant dates

22    provides strong evidence of intentional backdating activities.

23    **2.    Defendants' Understating of Expenses, Improper Tax Treatment of**

24    **Options and Misrepresentation of the Company's Financial Results**

25    64.    As detailed above, Defendants reported inflated net income figures of

26    UTStarcom by failing to properly account for stock option grants made to UTStarcom senior

27    officers and employees.  Specifically, UTStarcom's expenses were understated and income

28    was overstated due to the Company's failure to record the compensation expense from the

1  backdated stock options that were granted to officers and employees and its improper tax

2  treatment of the options.

3      65.    Each of the Defendants issued false and misleading statements for the principal

4  purpose of furthering the backdating scheme by preparing, approving or signing the SEC

5  filings that understated and misrepresented officer compensation.

### 3.    Defendants' Participation in the Understanding and Misrepresentation of Officer Compensation

8      66.    UTStarcom's annual Proxy Statements for fiscal years 2002 through 2006

9  contained false statements about the compensation of UTStarcom's officers because they

10  stated among other things that the exercise price of the stock options was equal to the price of

11  the stock on the date of the grant.  Because of these false statements, shareholders were

12  mislead about the total compensation of UTStarcom's officers and about the level of oversight

13  the Board of Directors were exercising over UTStarcom's officers.  As such, shareholders had

14  false information when they were asked to vote for and approve the election of directors.

### 4.    Defendants' False and Misleading Statements Regarding the Company's Tax Withholding Obligation

17      67.    In addition to failing to properly report its tax liabilities, the Company also

18  violated tax laws by failing to properly withhold tax liabilities upon the exercise of options as

19  required by IRC § 422.

20      68.    The September 6, 2006 testimony of Linda Thomsen, Director of the SEC's

21  Division of Enforcement, before the U.S. Senate Committee on Finance, explained the

22  withholding obligations:

> When an employee exercises a non-statutory option, the difference between the exercise price and the fair market value of the company's stock on the date of exercise is treated as ordinary compensation and the employee is generally taxed on the gain at his or her ordinary income tax rates.  The company incurs employee withholding obligations on this gain, but also is entitled to an associated tax deduction on the gain.  When companies backdate option grants to a lower exercise price, employees can obtain a larger taxable gain upon the exercise of an NSO and companies can obtain a correspondingly larger tax deduction and withholding obligation on that gain.

Unlike the exercise of NSOs, incentive stock options, or ISOs, afford employees favorable tax treatment because any gain at exercise is not taxed as ordinary income, although the gain may be subject to alternative minimum tax. Accordingly, a company does not obtain any corresponding tax deductible (or incur withholding obligations) at the time of the exercise.  In addition, in an employee holds the stock for the statutory holding period prior to sale – one year after exercise and two years after grant – the sale is considered a "qualifying disposition" and the entire gain on sale is taxed at favorable capital gains rates.  However, among the statutory requirements of ISOs is that they be granted at-the-money.  An ISO that is granted in-the-money loses its favorable status and is instead treated under the tax code as a non-statutory option (NSO), including ordinary income recognition by the employee on any gain at exercise and a corresponding tax deduction by the company on that gain. Backdating allows an employee to treat what is in fact a non-qualified option as an incentive option, which can result in the employee underpaying taxes while causing the company to lose the tax deduction to which it otherwise would have been entitled.

69.     Specifically, for a stock option to qualify as an Incentive Stock Option ("ISO") (and thus receive the special tax treatment described above under IRC Section 421(a), it must meet the requirements of IRC Section 422 when granted and at all time beginning from the grant until its exercise.  Under IRC Section 422, the option price must equal or exceed the fair market value of the underlying stock at the time of the grant; *i.e.*, the option cannot be in-the-money when granted.  A backdated stock option that has been granted at a discount, therefore, would violate one of the requirements that apply to ISOs and would not qualify as an ISO.

70.     If the requirements for an ISO have not been followed, the option will be treated under the tax rules as a non-qualified option.  ISOs are subject to taxation only upon the sale of the stock.  Non-qualified options, however, are subject to income tax and Federal Insurance Contributions Act ("FICA") withholding upon exercise.  The backdated stock options granted to UTStarcom officers and employees did not qualify as ISOs because they were granted at a discount, and, therefore, they should have been classified as non-qualified options.

71.     Because the backdated stock options constituted non-qualified options, UTStarcom was liable for the income tax and payments under FICA that it failed to withhold upon the recipient's exercise of the discounted options.  Defendants, as well as others, exercised options during the Class Period that were granted between 2000 and 2006, the

1  period during which the options were backdated.  Accordingly, UTStarcom should have, but

2  failed to, withhold monies when these backdated options were exercised.

3      72.  The Company's 2007 3rd Quarter 10-Q strongly supports an inference that

4  UTStarcom issued ISOs that were disqualified because of the backdated option prices, but

5  failed to withhold monies:

> In some cases, in correcting the measurement date for previously granted stock
> options additional taxable income to employees arises on which additional
> payroll taxes are due from the employee as well as the Company.  The
> Company has assumed responsibility for all additional payroll taxes plus
> related penalties and interest arising from the restatement of stock-based
> compensation, including amounts otherwise payable by stock option recipients,
> and the Company's restated financial statements include a $1.5 million accrual
> for this estimated expense.

## XI.  UTSTARCOM ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

13      73.  During the Class Period, Defendants issued a series of false and misleading

14  statements in violation of sections 10(b), 14(a), and 20(a) of the Exchange Act and Rule 10b-

15  5.  These statements fall within several categories.  First, the Defendants issued false and

16  misleading statements regarding the Company's financials.  Second the Defendants issued

17  false and misleading statements regarding the terms and value of the options granted to

18  officers, directors and employees.  Third, the Defendants issued false and misleading

19  statements regarding the Company's internal controls relating to stock option grants and

20  related financial reporting.

21      74.  On February 21, 2003, the Company filed with the SEC its Form 10-K for the

22  fiscal year ending on December 31, 2002 (the "2002 Form 10-K").  In the Form 10-K,

23  UTStarcom stated a net income of $ 107,862,000 for fiscal year 2002 and stock based

24  compensation expenses of  $2,209,000.  Defendants Lu, Wu, Sophie and Toy signed the 2002

25  Form 10-K.  The certifications that Defendants Lu and Sophie each signed pursuant to § 906

26  of the Sarbanes-Oxley Act of 2002, which were included in the 2002 Form 10-K, falsely

27  stated that information contained in the 2002 Form 10-K fairly presents in all material

28  respects the financial condition and results of operations of UTStarcom.

1    75.    The 2002 Form 10-K also stated the following with regards to the Company's

2  1997 Stock Option Plan:  "[t]he exercise price of ISOs granted under the 1997 plan may not

3  be less than 100% of the fair market value of common stock on the grant date."  With regards

4  to the Company's 2001 Director Plan, the 2002 Form 10-K stated:  "[u]nder the terms of the

5  2001 Director Plan, the exercise price of each option granted is the market value of the

6  common stock on the date of grant."

7    76.    The Company's 2002 Form 10-K also contained the following Sarbanes-Oxley

8  certification signed by Defendants Lu and Sophie:

9          In connection with the Report, we, Hong Liang Lu and Michael J. Sophie,
        certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906
10       of the Sarbanes-Oxley Act of 2002, that: (1) The Report fully complies with
        the requirements of section 13(a) or 15(d) of the Securities Exchange Act of
11       1934; and (2) The information contained in the Report fairly presents, in all
        material respects, the financial condition and results of operations of the
12       Company.

13   77.    The statements set forth above in ¶ 79-81 were materially false and misleading.

14  As was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because

15  UTStarcom had backdated options, causing them to have intrinsic value on the date of grant,

16  the Company underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had

17  these options been properly accounted for, the Company would have recognized additional

18  stock-based compensation expenses in 2002 totaling $ 8,769,000.  The Sarbanes-Oxley

19  certifications signed by Lu and Sophie were materially false and misleading because

20  UTStarcom underreported its expenses, net income and accumulated deficit and therefore its

21  financial statements did not fairly present its financial condition and results of operations.

22  Further these statements were false and misleading because they state that options were

23  granted with an exercise price of at least 100% of the fair market value of the Company's

24  stock on the date of grant, when in fact they were backdated.  The statements were

25  additionally false and misleading because they state that the Company properly accounted for

26  stock grants pursuant to APB 25.

27   78.    On May 12, 2003, the Company filed with the SEC its quarterly report on

28  Form 10-Q for the period ending March 31, 2003.  For the three month period ending March

1   31, 2003, the Company reported net income of $ 41,168,000 ($0.37 per diluted share).  The

2   Form 10-Q was signed by Lu and Sophie.

3           79.     The statement set forth above in ¶ 82 was materially false and misleading.  As

4   was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

5   had backdated options, causing them to have intrinsic value on the date of grant, the Company

6   underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

7   been properly accounted for, the Company would have recognized additional stock-based

8   compensation expenses in 2003 of $ 6,560,000 totaling $ 13,260,000.    The 2007 3rd Quarter

9   Form 10-Q further discloses that such amounts were required to be amortized over the related

10  service period, demonstrating that the quarterly report understated net losses for the quarterly

11  period.

12          80.     On August 4, 2003, the Company filed with the SEC its quarterly report on

13  Form 10-Q for the period ending June 30, 2003.  For the three month period ending June 30,

14  2003, the Company reported net income of $ 43,450,000 ($0.36 per diluted share).  For the six

15  month period ending June 30, 2003, the Company reported a net income of $ 84,168,000

16  ($0.72 per diluted share). The Form 10-Q was signed by Lu and Sophie.

17          81.     The statement set forth above in ¶ 84 was materially false and misleading.  As

18  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

19  had backdated options, causing them to have intrinsic value on the date of grant, the Company

20  underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

21  been properly accounted for, the Company would have recognized additional stock-based

22  compensation expenses in 2003 totaling $ 13,260,000.    The 2007 3rd Quarter Form 10-Q

23  further discloses that such amounts were required to be amortized over the related service

24  period, demonstrating that the quarterly report understated net losses for the quarterly period.

25          82.     On November 12, 2003, the Company filed with the SEC its quarterly report

26  on Form 10-Q for the period ending September 30, 2003.  For the three month period ending

27  September 30, 2003, the Company reported a net income of $ 65,204,000 ($0.50 per diluted

28  share).  For the nine month period ending September 30, 2003, the Company reported a net

1    income of $ 149,822,000 ($1.23 per diluted share). The Form 10-Q was signed by Lu and

2    Sophie.

3        83.    The statement set forth above in ¶ 86 was materially false and misleading. As

4    was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

5    had backdated options, causing them to have intrinsic value on the date of grant, the Company

6    underreported expenses. The 2007 3rd Quarter Form 10-Q discloses that, had these options

7    been properly accounted for, the Company would have recognized additional stock-based

8    compensation expenses in 2003 totaling $ 13,260,000.  The 2007 3rd Quarter Form 10-Q

9    further discloses that such amounts were required to be amortized over the related service

10   period, demonstrating that the quarterly report understated net losses for the quarterly period.

11       84.    On March 9, 2004 and restated on April 13, 2004, the Company filed with the

12   SEC its Form 10-K for the fiscal year ending on December 31, 2003 (the "2003 Form 10-K").

13   In the Form 10-K, UTStarcom stated a net income of $ 215,532,000 for fiscal year 2003 and

14   stock based compensation expenses of  $3,071,000. Defendants Lu, Wu, Sophie and Toy

15   signed the 2003 Form 10-K. The certifications that Defendants Lu and Sophie each signed

16   pursuant to § 906 of the Sarbanes-Oxley Act of 2002, which were included in the 2003 Form

17   10-K, falsely stated that information contained in the 2003 Form 10-K fairly presents in all

18   material respects the financial condition and results of operations of UTStarcom.

19       85.    The 2003 Form 10-K also stated the following with regards to the Company's

20   1997 Stock Option Plan:  "[t]he exercise price of ISOs granted under the 1997 plan may not

21   be less than 100% of the fair market value of common stock on the grant date." With regards

22   to the Company's 2001 Director Plan, the 2003 Form 10-K stated:  "[u]nder the terms of the

23   2001 Director Plan, the exercise price of each option granted is the market value of the

24   common stock on the date of grant."

25       86.    The Company's 2003 Form 10-K also contained the following Sarbanes-Oxley

26   certification signed by Defendants Lu and Sophie:

27       In connection with the Report, we, Hong Liang Lu and Michael J. Sophie,
         certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906
28       of the Sarbanes-Oxley Act of 2002, that: (1) The Report fully complies with

Amended Class Action Complaint                                27
3:07-CV-04578-SI

the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

87.     The statements set forth above in ¶ 89-91 were materially false and misleading. As was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options been properly accounted for, the Company would have recognized additional stock-based compensation expenses in 2003 of $ 10,189,000 totaling $ 13,260,000.  The Sarbanes-Oxley certifications signed by Lu and Sophie were materially false and misleading because UTStarcom underreported its expenses, net income and accumulated deficit and therefore its financial statements did not fairly present its financial condition and results of operations.  Further these statements were false and misleading because they state that options were granted with an exercise price of at least 100% of the fair market value of the Company's stock on the date of grant, when in fact they were backdated.  The statements were additionally false and misleading because they state that the Company properly accounted for stock grants pursuant to APB 25.

88.     On May 10, 2004, the Company filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2004.  For the three month period ending March 31, 2004, the Company reported net income of $ 54,766,000 ($0.40 per diluted share).  By signing the Form 10-Q and certifications, pursuant to the Sarbanes-Oxley Act, Sophie certified that the information contained in the quarterly report fairly presented in all material respects UTStarcom's financial condition and results.  Sophie further certified that they had disclosed all instances of fraud involving management or other employees who had a significant role in the Company's internal control financial reporting.

89.     The statement set forth above in ¶ 93 was materially false and misleading.  As was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, the Company over-reported stock-based compensation expenses for 2004.  The 2007 3rd Quarter Form 10-Q

1  discloses that, had these options been properly accounted for, the Company would have

2  recognized a reduction stock-based compensation expenses in 2004 amounting to $ 160,000

3  reducing the total stock-based compensation expenses for the year to $ 210,000.   The 2007

4  3rd Quarter Form 10-Q further discloses that such amounts were required to be amortized over

5  the related service period, demonstrating that the quarterly report understated net losses for

6  the quarterly period.

7       90.     On August 16, 2004, the Company filed with the SEC its quarterly report on

8  Form 10-Q for the period ending June 30, 2004.  For the three month period ending June 30,

9  2004, the Company reported net income of $ 43,863,000 ($0.33 per diluted share).  For the six

10  month period ending June 30, 2004, the Company reported net income of $ 98,629,999 ($0.73

11  per diluted share).  By signing the Form 10-Q and certifications, pursuant to the Sarbanes-

12  Oxley Act, Sophie certified that the information contained in the quarterly report fairly

13  presented in all material respects UTStarcom's financial condition and results.  Sophie further

14  certified that they had disclosed all instances of fraud involving management or other

15  employees who had a significant role in the Company's internal control financial reporting.

16       91.     The statement set forth above in ¶ 95 was materially false and misleading.  As

17  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, the Company over-

18  reported stock-based compensation expenses for 2004.  The 2007 3rd Quarter Form 10-Q

19  discloses that, had these options been properly accounted for, the Company would have

20  recognized a reduction stock-based compensation expenses in 2004 amounting to $ 160,000

21  reducing the total stock-based compensation expenses for the year to $ 210,000.   The 2007

22  3rd Quarter Form 10-Q further discloses that such amounts were required to be amortized over

23  the related service period, demonstrating that the quarterly report understated net losses for

24  the quarterly period.

25       92.     On November 9, 2004, the Company filed with the SEC its quarterly report on

26  Form 10-Q for the period ending September 30, 2004.  For the three month period ending

27  September 30, 2004, the Company reported a net income of $ 4,897,000 ($0.04 per diluted

28  share).  For the nine month period ending September 30, 2004, the Company reported a net

1    income of  $ 103,616,000 ($0.78 per diluted share).  By signing the Form 10-Q and

2    certifications, pursuant to the Sarbanes-Oxley Act, Sophie certified that the information

3    contained in the quarterly report fairly represented in all material respects UTStarcom's

4    financial condition and results.  Sophie further certified that they had disclosed all instances of

5    fraud involving management or other employees who had a significant role in the Company's

6    internal control financial reporting.

7    　　　　93.　　The statement set forth above in ¶ 97 was materially false and misleading.  As

8    was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, the Company over-

9    reported stock-based compensation expenses for 2004.  The 2007 3rd Quarter Form 10-Q

10   discloses that, had these options been properly accounted for, the Company would have

11   recognized a reduction stock-based compensation expenses in 2004 amounting to $ 160,000

12   reducing the total stock-based compensation expenses for the year to $ 210,000.   The 2007

13   3rd Quarter Form 10-Q further discloses that such amounts were required to be amortized over

14   the related service period, demonstrating that the quarterly report understated net losses for

15   the quarterly period.

16   　　　　94.　　On April 15, 2005, the Company filed with the SEC its Form 10-K for the

17   fiscal year ending on December 31, 2004 (the "2004 Form 10-K").  In the Form 10-K,

18   UTStarcom stated a net income of $ 69,824,000 ($0.54 per diluted share) for fiscal year 2004,

19   as restated in its 2006 Form 10-K and stock based compensation expenses of  $ 2,154,000.

20   Defendants Lu, Wu, Sophie and Toy signed the 2004 Form 10-K.  The certifications that

21   Defendants Lu and Sophie each signed pursuant to § 906 of the Sarbanes-Oxley Act of 2002,

22   which were included in the 2004 Form 10-K, falsely stated that information contained in the

23   2004 Form 10-K fairly presents in all material respects the financial condition and results of

24   operations of UTStarcom.

25   　　　　95.　　The 2004 Form 10-K also stated the following with regards to the Company's

26   1997 Stock Option Plan:  "[t]he exercise price of ISOs granted under the 1997 plan may not

27   be less than 100% of the fair market value of common stock on the grant date."  With regards

28   to the Company's 2001 Director Plan, the 2003 Form 10-K stated:  "[u]nder the terms of the

1  2001 Director Plan, the exercise price of each option granted is the market value of the

2  common stock on the date of grant."

3        96.     The Company's 2004 Form 10-K also contained the following Sarbanes-Oxley

4  certification signed by Defendants Lu and Sophie:

5           In connection with the Report, we, Hong Liang Lu and Michael J. Sophie,
         certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906
6        of the Sarbanes-Oxley Act of 2002, that: (1) The Report fully complies with
         the requirements of section 13(a) or 15(d) of the Securities Exchange Act of
7        1934; and (2) The information contained in the Report fairly presents, in all
         material respects, the financial condition and results of operations of the
8        Company.

9        97.     The statements set forth above in ¶ 99-101 were materially false and

10  misleading.  As was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q,

11  because UTStarcom had backdated options, causing them to have intrinsic value on the date

12  of grant, the Company underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses

13  that, had these options been properly accounted for, the Company would have recognized a

14  reduction stock-based compensation expenses in 2004 amounting to $ 160,000 reducing the

15  total stock-based compensation expenses for the year to $ 210.   The Sarbanes-Oxley

16  certifications signed by Lu and Sophie were materially false and misleading because

17  UTStarcom underreported its expenses, net income and accumulated deficit and therefore its

18  financial statements did not fairly present its financial condition and results of operations.

19  Further these statements were false and misleading because they state that options were

20  granted with an exercise price of at least 100% of the fair market value of the Company's

21  stock on the date of grant, when in fact they were backdated.  The statements were

22  additionally false and misleading because they state that the Company properly accounted for

23  stock grants pursuant to APB 25.

24        98.     On May 10, 2005, the Company filed with the SEC its quarterly report on

25  Form 10-Q for the quarter ending on March 31, 2005.  For the three month period ending

26  March 31, 2005, the Company reported net income of $ 37,044,000 ($0.29 per diluted share).

27  By signing the Form 10-Q and certifications, pursuant to the Sarbanes-Oxley Act, Sophie

28  certified that the information contained in the quarterly report fairly presented in all material

1  respects UTStarcom's financial condition and results. Sophie further certified that they had

2  disclosed all instances of fraud involving management or other employees who had a

3  significant role in the Company's internal control financial reporting.

4    99.    The statement set forth above in ¶ 103 was materially false and misleading. As

5  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

6  had backdated options, causing them to have intrinsic value on the date of grant, the Company

7  underreported expenses. The 2007 3rd Quarter Form 10-Q discloses that, had these options

8  been properly accounted for, the Company would have recognized additional stock-based

9  compensation expenses in 2005 of $ 2,793,000 totaling $ 4,947,000. The 2007 3rd Quarter

10  Form 10-Q further discloses that such amounts were required to be amortized over the related

11  service period, demonstrating that the quarterly report understated net losses for the quarterly

12  period.

13    100.    On August 9, 2005, the Company filed with the SEC its quarterly report on

14  Form 10-Q for the period ending June 30, 2005. For the three month period ending June 30,

15  2005, the Company reported net loss of $ 73,948,000 ($0.64 per diluted share). For the six

16  month period ending June 30, 2005, the Company reported net loss of $ 36,904,000 ($0.32

17  per diluted share). By signing the Form 10-Q and certifications, pursuant to the Sarbanes-

18  Oxley Act, Sophie certified that the information contained in the quarterly report fairly

19  presented in all material respects UTStarcom's financial condition and results. Sophie further

20  certified that they had disclosed all instances of fraud involving management or other

21  employees who had a significant role in the Company's internal control financial reporting.

22    101.    The statement set forth above in ¶ 105 was materially false and misleading. As

23  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

24  had backdated options, causing them to have intrinsic value on the date of grant, the Company

25  underreported expenses. The 2007 3rd Quarter Form 10-Q discloses that, had these options

26  been properly accounted for, the Company would have recognized additional stock-based

27  compensation expenses in 2005 of $ 2,793,000 totaling $ 4,947,000. The 2007 3rd Quarter

28  Form 10-Q further discloses that such amounts were required to be amortized over the related

1    service period, demonstrating that the quarterly report understated net losses for the quarterly

2    period.

3         102.    On November 9, 2005, the Company filed with the SEC its quarterly report on

4    Form 10-Q for the period ending September 30, 2005.  For the three month period ending

5    September 30, 2005, the Company reported net loss of $ 402,661,000 ($3.40 per diluted share).

6    For the nine month period ending September 30, 2005, the Company reported net loss of $

7    439,367,000 ($3.79 per diluted share).  By signing the Form 10-Q and certifications, pursuant

8    to the Sarbanes-Oxley Act, Sophie certified that the information contained in the quarterly

9    report fairly presented in all material respects UTStarcom's financial condition and results.

10   Sophie further certified that they had disclosed all instances of fraud involving management or

11   other employees who had a significant role in the Company's internal control financial

12   reporting.

13        103.    The statement set forth above in ¶ 105 was materially false and misleading.  As

14   was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

15   had backdated options, causing them to have intrinsic value on the date of grant, the Company

16   underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

17   been properly accounted for, the Company would have recognized additional stock-based

18   compensation expenses in 2005 of $ 2,793,000 totaling $ 4,947,000.   The 2007 3rd Quarter

19   Form 10-Q further discloses that such amounts were required to be amortized over the related

20   service period, demonstrating that the quarterly report understated net losses for the quarterly

21   period.

22        104.    On June 1, 2006, the Company filed with the SEC its Form 10-K for the fiscal

23   year ending on December 31, 2005 (the "2005 Form 10-K").  In the Form 10-K, UTStarcom

24   stated a net loss of $ 487,359,000 ($4.16 per diluted share) for fiscal year 2005 and stock

25   based compensation expenses of  $2,154,000.  Defendants Lu, Wu,Barton, and Toy signed the

26   2005 Form 10-K.  The certifications that Defendants Lu and Barton each signed pursuant to §

27   906 of the Sarbanes-Oxley Act of 2002, which were included in the 2002 Form 10-K, falsely

28

1   stated that information contained in the 2002 Form 10-K fairly presents in all material

2   respects the financial condition and results of operations of UTStarcom.

3         105.    The 2005 Form 10-K also stated the following with regards to the Company's

4   1997 Stock Option Plan: "[t]he exercise price of ISOs granted under the 1997 plan may not

5   be less than 100% of the fair market value of common stock on the grant date." With regards

6   to the Company's 2001 Director Plan, the 2002 Form 10-K stated: "[u]nder the terms of the

7   2001 Director Plan, the exercise price of each option granted is the market value of the

8   common stock on the date of grant."

9         106.    The Company's 2005 Form 10-K also contained the following Sarbanes-Oxley

10   certification signed by Defendants Lu and Barton:

11         In connection with the Report, we, Hong Liang Lu and Francis Barton, certify,
12         pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the
Sarbanes-Oxley Act of 2002, that: (1) The Report fully complies with the
requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934;
13         and (2) The information contained in the Report fairly presents, in all material
respects, the financial condition and results of operations of the Company.

14

15         107.    The statements set forth above in ¶ 109-111 were materially false and

16   misleading. As was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q,

17   because UTStarcom had backdated options, causing them to have intrinsic value on the date

18   of grant, the Company underreported expenses. The 2007 3rd Quarter Form 10-Q discloses

19   that, had these options been properly accounted for, the Company would have recognized

20   additional stock-based compensation expenses in 2005 of $2,793,000 totaling $ 4,947,000.

21   The Sarbanes-Oxley certifications signed by Lu and Barton were materially false and

22   misleading because UTStarcom underreported its expenses, net income/losses and

23   accumulated deficit and therefore its financial statements did not fairly present its financial

24   condition and results of operations. Further these statements were false and misleading

25   because they state that options were granted with an exercise price of at least 100% of the fair

26   market value of the Company's stock on the date of grant, when in fact they were backdated.

27   The statements were additionally false and misleading because they state that the Company

28   properly accounted for stock grants pursuant to APB 25.

1    108.    On June 22, 2006, the Company filed with the SEC its quarterly reports on

2  Form 10-Q for the period ending April 30, 2006.  For the three month period ending March

3  31, 2006, the Company reported net loss of $ 10,635,000 ($0.09 per diluted share).  By

4  signing the Form 10-Q and certifications, pursuant to the Sarbanes-Oxley Act, Barton

5  certified that the information contained in the quarterly report fairly presented in all material

6  respects UTStarcom's financial condition and results.  Barton further certified that they had

7  disclosed all instances of fraud involving management or other employees who had a

8  significant role in the Company's internal control financial reporting.

9    109.    The statement set forth above in ¶ 113 was materially false and misleading.  As

10  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

11  had backdated options, causing them to have intrinsic value on the date of grant, the Company

12  underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

13  been properly accounted for, the Company would have recognized a reduction in net income

14  in the first quarter of $671,000.

15    110.    On August 9, 2006, the Company filed with the SEC its quarterly reports on

16  Form 10-Q for the period ending June 30, 2006.  For the three month period ending June 30,

17  2006, the Company reported net loss of $ 21,443,000 ($0.18 per diluted share).  For the six

18  month period ending June 30, 2006, the Company reported net loss of $ 32,078,000 ($0.27

19  per diluted share).  By signing the Form 10-Q and certifications, pursuant to the Sarbanes-

20  Oxley Act, Barton certified that the information contained in the quarterly report fairly

21  presented in all material respects UTStarcom's financial condition and results.  Barton further

22  certified that they had disclosed all instance of fraud involving management or other

23  employees who had a significant role in the Company's internal control financial reporting.

24    111.    The statement set forth above in ¶ 115 was materially false and misleading.  As

25  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

26  had backdated options, causing them to have intrinsic value on the date of grant, the Company

27  underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

28

1    been properly accounted for, the Company would have recognized a reduction in net income

2    in the second quarter of $510,000.

3         112.    UTStarcom's 10-Ks, 10-Qs, and proxy statements during the Class Period

4    were false and misleading as a result of Defendants having either knowingly, or with

5    deliberate recklessness, manipulated the grant dates on stock options in order to enrich the

6    Individual Defendants by receiving favorable backdated exercise prices on the options.

7    Defendants thereby under-reported the Company's compensation expenses while inflating the

8    Company's net income during the Class Period.  Furthermore, the Company's financial

9    statements did not comply with Generally Accepted Accounting Principles on account of the

10   understatement of expenses and the overstatement of net income.  Each dollar diverted to the

11   Individual Defendants via the backdating of options has come at the expense of the Company.

12   This was the result of deficient and defective controls.

13   **XI.    THE TRUTH BEGINS TO EMERGE**

14        **A.    VOLUNTARY REVIEW OF GRANT PRACTICES**

15        113.    On November 7, 2006, UTStarcom announced in a press release that it had

16   commenced a voluntary review of its historical equity award grant practices.  The Nominating

17   and Corporate Governance committee of the board directed the review.  They were assisted

18   by independent legal counsel and independent accounting counsel.  In reaction to this news,

19   the Company's share price fell 9% from a closing price of $ 10.23 on November 7, 2007 to a

20   closing price of $ 9.32 on November 9, 2006 after the market had absorbed the information.

21        114.    After this announcement, Forbes.com noted that UTStarcom's stock had been

22   rising since early October, but after the November 7th announcement that the Company was

23   investigating grants of stock option grants, the share price tumbled.

24        115.    On February 1, 2007, the Company provided an update on the equity grant

25   review in a press release.  Although the review was ongoing at that point, the Company

26   indicated that incorrect measurement dates for certain stock option grants were used for

27   financial accounting and disclosure purposes.  The Company determined that its financial

28   statements for each of the three fiscal years in the period ended December 31, 2005 and

1    financial statements for fiscal years prior to fiscal 2003 should no longer be relied upon.  At

2    this time, the Company expected to record additional compensation charges of approximately

3    $ 50 million.

4          116.    On July 24, 2007, UTStarcom announced the preliminary results of its review

5    of historical equity award practices.  The press release stated, in relevant part:

> As previously communicated on February 1, 2007, the independent review by the Nominating and Corporate Governance Committee of the Company's Board of Directors (the "Governance Committee") found that in certain instances all actions that establish a measurement date under the requirements of Accounting Principles Board No. 25, Accounting for Stock Issued to Employees, had not occurred at the grant date, which had been used as the measurement date in accounting for Company stock option grants. A later date, when all such actions had taken place, should have been used as the measurement date for these stock options.  The Audit Committee of the Company's Board of Directors (the "Audit Committee") then determined, in consultation with and on the recommendation of the Company's management, the effect of using incorrect measurement dates would require the Company to record material additional stock-based compensation charges in its previously issued financial statements.

> The Company therefore announced its previously issued financial statements for the years 2000 through 2006, including interim periods within these fiscal years, should no longer be relied upon.

> The Company has now determined that *the amount of the non-cash restatement will be approximately $28 million over the years 2000 through 2006*.  (emphasis added)

17

18          117.    Based in substantial part on these revelations, the market responded sharply to

19    this announcement and UTStarcom stock plummeted by 22% from a closing price of $ 4.73

20    on July 22, 2007 to a closing price of $ 3.70 on July 25, 2007, when the market had fully

21    absorbed the news.  The stock price continued to fall in the subsequent days.

22    **B.**    **THE RESTATEMENT**

23          118.    On October 10, 2007, UTStarcom filed its 2007 3rd Quarter Form 10-Q, signed

24    by Barton.  The Company, in relevant part, detailed:

> We also conducted a voluntary review of historical stock option practices under the direction of the Nominating and Corporate Governance Committee of our Board of Directors ("Governance Committee"). This review considered all option grant awards made in the period from February 29, 2000, shortly before the initial public offering of our Common Stock, through August 2006 for compliance with the various stock-based compensation accounting standards applicable during this period as well as the rules of our stock option plans. *We*

*found that in a number of instances we did not use the proper date as the measurement date in determining whether stock options had been issued with exercise prices below the fair value of our common stock.* Therefore, we have restated our previously issued financial statements for the years ended December 31, 1998 through 2005 to account for an additional $25.5 million of stock compensation expense that should have been recognized over the period together with an equal increase in additional paid-in capital to recognize the intrinsic value assigned to these issuances of equity securities. Related adjustments of payroll and income taxes resulted in an additional $0.5 million of expense being recognized for the 1998 through 2005 period and total stockholders' equity being reduced by a total of $2.1 million at December 31, 2005. During the first six months of 2006 an additional $1.2 million of stock compensation expense was recognized, which reduced our previously reported operating results for this period. During the three and nine months ended September 30, 2005 (in thousands), stock compensation expense totaling $76 and ($1,470), respectively, was recognized.

119. With regard to the Governance Committees' review, the Company described the process, stating, in relevant part:

In November 2006, we announced we had commenced a voluntary review of historical stock option practices under the leadership of the Governance Committee following a preliminary review by management which identified potential deficiencies and discrepancies in the documentation of stock option grants. The review considered all option grant awards made in the period from February 29, 2000, shortly before the initial public offering of our Common Stock, through August 2006 ("Review Period") for compliance with the various stock-based compensation accounting standards applicable during the Review Period as well as the rules of our stock option plans. The Governance Committee engaged independent outside legal counsel to assist in the review who, in turn, engaged forensic accountants. (Separate law firms and separate forensic accounting firms were engaged by the Audit Committee and the Governance Committee for the China sales investigation and the stock option accounting review.) In the rest of this discussion, this group collectively is referred to as the Stock Option Review Team and their actions and activities are referred to as the Stock Option Review. The Stock Option Review Team members spent over 11,000 hours in this review, and the Governance Committee met with the Stock Option Review Team on more than a dozen occasions to receive, discuss, and consider the Stock Option Review Team's information and findings.

At the time the review commenced, the Governance Committee consisted of three members of the Board of Directors, all of whom are independent directors. The Committee decided to delegate supervision of the review to Mr. Jeff Clarke, its Chairman, who joined our Board in 2005 and had not served on the Compensation Committee of the Board of Directors ("Compensation Committee") during the period under review. The Governance Committee also consisted of two other independent directors, Mr. Larry D. Horner and Mr. Thomas Toy, who also serve on the Board's Compensation Committee. Mr. Allen Lenzmeier was appointed to the Governance Committee on April 27, 2007.

Review procedures included:

- interviews of individuals involved with granting, advising, administering, or accounting for stock options, including current and former: management, members of the Board of Directors, employees, and non-employee professionals;

- review of relevant stock administration, human resource, legal, and finance department files and records;

- review of stock option grant information in select employee personnel files;

- review by at least 30 attorneys and 15 forensic accountants of approximately 250,000 potentially relevant e-mails and documents in electronic format selected through electronic discovery techniques from over 1.8 million electronic documents processed;

- review of the electronic database of the Company's stock option activity maintained by a third party along with communications to and from this service provider;

- reconciliation of grant activity from approval documents executed by the Compensation Committee with the electronic database;

- reconciliation of stock option grant, exercise, and cancellation information from SEC filings with select employee personnel files and the electronic database;

- statistical and judgmental pattern analysis;

- follow-up on matters raising questions about the option granting process and its history, conduct of those involved with granting, advising, administering, or accounting for stock options, or the accounting treatment for stock options; and

- follow-up on items or issues requested or identified by management or the Company's independent registered public accounting firm.

The Stock Option Review Team, management, and the Governance Committee decided to group stock option grants into six award categories based on differences in what constituted substantive approval for each category under our stock option granting practices as well as giving consideration to the risk of intentional misstatement of the grant date. Guidance in a September 19, 2006 letter publicly issued by the SEC's Chief Accountant focuses on the concept that a measurement date under Accounting Principles Board Opinion No. 25 *Accounting for Stock Issued to Employees* ("APB 25"), the accounting standard governing our stock option accounting through 2005, does not occur until the number of shares an individual employee is entitled to receive and the exercise price is determined with finality (i.e., no longer subject to change). This is the date on which substantive approval occurred, and depending on a company's facts and circumstances the guidance from the SEC discussed above recognizes a company may determine that the measurement date for some stock option grants may occur before all required granting actions have occurred — such as final approval by the Compensation Committee. This alternative is available only when a review of all facts and circumstances supports a conclusion that substantive approval occurs earlier than when all

required granting actions have occurred and there is no evidence of fraudulent or manipulative conduct in the company's option granting practices.

In determining the measurement date to be used, the Stock Option Review Team, management, and the Governance Committee agreed to use the following definitions as constituting the proper measurement date, and generally these dates were used in testing the stated grant dates or establishing corrected measurement dates:

| | |
|---|---|
| **Discretionary Director and Officer Grants** | The date of a Compensation Committee meeting where the grant was approved or the date the final Compensation Committee signer approved the grant when approval occurred through unanimous written consent documents ("UWC"). |
| **Automatic Director Grants** | The date specified in the relevant stock option plan. |
| **Broadbase** | The date the grantee list, including the allocation of shares to individual grantees, was complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **Acquisition** | The first Compensation Committee meeting following the acquisition, provided grantees had received employment offer letters stating the number of stock options to be granted before such date, because this was the date at which the option exercise price was established. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **New Hire** | The first scheduled Compensation Committee meeting following the first day of employment, because this was the date at which the option exercise price was established. The number of options was based on either grant amounts specified in an employment offer letter or, in some cases, on a matrix that assigned grant amounts based on position and level within the Company. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **Other Merit** | The date the grantee list, including the allocation of shares to grantees, was substantially complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |

For 12 tested grant dates where a corrected measurement date was required, the Stock Option Review Team and management were unable to locate sufficient evidence to establish a corrected measurement date using our established

criteria for the applicable option grant type. In these situations alternative available evidence was used to establish the corrected measurement date.

During the period covered by the Stock Option Review, we granted stock options on approximately 34 million shares of our Common Stock at 197 grant dates. The review specifically examined the appropriateness of the stated grant date for approximately 90% of the stock options granted, including all stock option grants made to directors and officers, all broadbase grants and all option grants made in connection with business acquisitions.

120.    The results of the Governance's Committees' review are summarized, in relevant part, by the following:

> *The Governance Committee's review found 17.9 million stock options of the 28.8 million options granted on our Common Stock during 2000 through 2005 had incorrect measurement dates*. Using the corrected measurement dates, 7.6 million stock options had exercise prices that exceeded the closing price of our Common Stock and therefore had no intrinsic value to be accounted for under APB 25, *and 10.3 million stock options had intrinsic value because their exercise prices were below the closing price of our Common Stock. These 10.3 million stock options resulted in an increase in additional non-cash stock-based compensation expense of $24.3 million, and an additional $1.5 million of payroll tax related expenses during 2000-2005* partially offset by $0.5 million of income tax benefit as shown in the above table. *Of the 10.3 million stock options resulting in additional non-cash stock-based compensation expense, 2.0 million options were granted to officers and directors and resulted in $6.1 million of additional non-cash stock-based compensation expense*.

121.    The Governance Committee also concluded that: "[a] key finding of the Governance Committee was that there were deficiencies with the process by which stock options were granted during the period from our initial public offering in 2000 through at least 2005, which resulted in accounting errors. The Governance Committee concluded that certain members of management bear varying degrees of responsibility for the deficiencies in the process by which options were granted."

## C.    THE RESTATEMENT'S IMPACT ON FINANCIAL RESULTS

122.    The Restatement had a significant and material effect on UTStarcom's financials.  With regard to the impact that such discoveries by the Governance Committee would have on the Company's financial condition, the Company stated:

The corrections for the stock option restatement were to increase (reduce) previously reported non-cash compensation expense, payroll taxes, income taxes and net income by the following amounts (in thousands of dollars):

| Year ended December 31, | Non-cash stock compensation | Payroll taxes | Income taxes | Net income |
|---|---|---|---|---|
| 1998 | $ 1,244 | $ — | $ (448) | $ (796) |
| 1999 | — | — | — | — |
| 2000 | 556 | — | (104) | (452) |
| 2001 | 4,870 | — | (942) | (3,928) |
| 2002 | 8,110 | — | (1,550) | (6,560) |
| 2003 | 12,470 | 900 | (2,281) | (11,089) |
| Totals through December 31, 2003 | 27,250 | 900 | (5,325) | (22,825) |
| 2004 | (410) | 541 | 250 | (381) |
| 2005 | (1,290) | 60 | 4,083 | (2,853) |
| 2000-2005 Total | 25,550 | 1,501 | (992) | (26,059) |
| 2006 quarter ended | | | | |
| March 31 | 662 | 9 | — | (671) |
| June 30 | 504 | 6 | — | (510) |
| | $ 26,716 | $ 1,516 | $ (992) | $ (27,240) |

***Summary of Restatement Amounts***

The following table presents the decrease in net earnings from the restatement for each restated year:

| Year ended December 31 | Net income (loss), as previously reported | Restatement adjustments | | | Net income (loss), as restated |
|---|---|---|---|---|---|
| | | China Sales | Stock Options | Total | |
| | | (in thousands) (Decrease) Increase | | | |
| 1998 | | $ — | $ (796) | $ (796) | |
| 1999 | | — | — | — | |
| 2000 | | (4,781) | (452) | (5,233) | |
| 2001 | | (5,779) | (3,928) | (9,707) | |
| 2002 | $ 107,862 | (19,697) | (6,560) | (26,257) | $ 81,605 |
| 2003 | $ 209,856 | (6,382) | (11,089) | (17,471) | $ 192,385 |

| | | | | | |
|---|---|---|---|---|---|
| Totals through December 31, 2003 | | | (36,639) | (22,825) | (59,464) |
| 2004 | $ | 69,824 | (18,594) | (381) | (18,975) $ 50,849 |
| 2005 | $ | (487,359) | (42,433) | (2,853) | (45,286) $ (532,645) |
| 2000 - 2005 Total | | | (97,666) | (26,059) | (123,725) |
| 2006 quarter ended | | | | | |
| March 31 | $ | (10,635) | 1,360 | (671) | 689 $ (9,946) |
| June 30 | $ | (21,443) | (371) | (510) | (881) $ (22,324) |
| | | | $ (96,677) $ | (27,240) $ | (123,917 |

The cumulative effect on stockholders' equity at December 31, 2003 from the above corrections was as follows (in thousands):

| | |
|---|---|
| Increase (decrease) in paid-in capital and deferred stock compensation: | |
| Values assigned to stock options | $   27,250 |
| Reduction of previously recorded income tax benefits from stock options | (1,278) |
| Net increase in paid-in capital and deferred stock compensation | 25,972 |
| (Increase) decrease in accumulated deficit: | |
| Revenue and related cost of sales deferral for China system sales | (36,639) |
| Additional non-cash compensation expense from stock options | (27,250) |
| Payroll taxes for values assigned to stock options | (900) |
| Income tax benefit from additional compensation and payroll tax expense | 5,325 |
| Net increase in accumulated deficit | (59,464) |
| Net decrease in stockholders' equity at December 31, 2003 | $   (33,492) |

1

2

3      **XIII.    ADDITIONAL FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

4              **A.        DEFENDANTS CERTIFIED FALSE AND MISLEADING**

5                          **FINANCIAL RESULTS**

6              123.    Defendants Lu, Barton and Sophie knowingly certified false and misleading

7      financial statements.  Defendants Lu, Barton and Sophie certified the following financial

8      statements during the Class Period:

| Type of Filing | Filing Period | Filing Date | Signed/Certified by CEO | Signed/Certified by CFO |
|---|---|---|---|---|
| 10-Q | Quarterly period ended 9/30/2002 | 11/8/2002 | Lu | Sophie |
| 10-K | Fiscal year ended 12/31/2002 | 2/21/2003 | Lu | Sophie |
| 10-Q | Quarterly period ended 3/31/2003 | 5/12/2003 | Lu | Sophie |
| 10-Q | Quarterly period ended 6/30/2003 | 8/4/2003 | Lu | Sophie |
| 10-Q/A | Quarterly period ended 3/31/2003 | 9/8/2003 | Lu | Sophie |
| 10-K/A | Fiscal year ended 12/31/2002 | 9/8/2003 | Lu | Sophie |
| 10-Q | Quarterly period ended 9/30/2003 | 11/12/2003 | Lu | Sophie |
| 10-K | Fiscal year ended 12/31/2003 | 3/9/2004 | Lu | Sophie |
| 10-Q | Quarterly period | 5/10/2004 | Lu | Sophie |

| | | | | |
|---|---|---|---|---|
| | ended 3/31/2004 | | | |
| 10-Q | Quarterly period ended 3/31/2004 | 5/14/2004 | Lu | Sophie |
| 10-Q | Quarterly period ended 6/30/2004 | 8/16/2004 | Lu | Sophie |
| 10-Q | Quarterly period ended 9/30/2004 | 11/9/2004 | Lu | Sophie |
| 10-K/A | Fiscal year ended 12/31/2003 | 4/13/2005 | Lu | Sophie |
| 10-K | Fiscal year ended 12/31/2004 | 4/15/2005 | Lu | Sophie |
| 10-Q | Quarterly period ended 3/31/2005 | 5/10/2005 | Lu | Sophie |
| 10-Q/A | Quarterly period ended 3/31/2004 | 6/3/2005 | Lu | Sophie |
| 10-Q/A | Quarterly period ended 6/20/2004 | 6/3/2005 | Lu | Sophie |
| 10-Q/A | Quarterly period ended 9/30/2004 | 6/3/2005 | Lu | Sophie |
| 10-Q | Quarterly period ended 6/30/2005 | 8/9/2005 | Lu | Sophie |
| 10-Q | Quarterly period ended 9/30/2005 | 11/9/2005 | Lu | Barton |
| 10-K | Fiscal year ended 12/31/2005 | 6/1/2006 | Lu | Barton |
| 10-Q | Quarterly period ended 3/31/2006 | 6/21/2006 | Lu | Barton |

| 10-Q/A | Quarterly period ended 3/31/2006 | 6/26/2006 | Lu | Barton |
|--------|----------------------------------|-----------|-----|--------|
| 10-K/A | Fiscal year ended 12/31/2005 | 6/26/2006 | Lu | Barton |
| 10-Q | Quarterly period ended 6/30/2006 | 8/9/2006 | Lu | Barton |

124.    These financial statements were not in accordance with GAAP and SEC rules. Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") and SEC Rules 13a-14(a) and 15d-14(a) of the Exchange Act required Defendant Lu as the CEO and Defendants Sophie and Barton as the CFO, to certify to the SEC and investors both the fairness of the financial information in each quarterly and annual report.  In their certifications, Defendants Lu, Sophie and Barton stated that the Company's financial reports did not contain any untrue statements of material fact or omit to state a material fact.  In addition, Defendants Lu, Sophie and Barton stated that UTStarcom had established and maintained disclosure controls and procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized, and reported within the specified time periods.

125.    Defendants Lu, Sophie and Barton knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules.  In accordance with § 906 of SOX and 18 U.S.C. § 1350, Defendants Lu, Sophie and Barton were required to certify each periodic report that included financial statements.  Their signed certifications falsely stated that: (i) the report fully complied with the requirements of §13(a) or §15(d) of the Exchange Act; and (ii) the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of UTStarcom.

126.    On the dates noted in the Schedule of Certified Financial Statements at ¶ 129 above, Defendants Lu, Sophie and Barton signed and filed with the SEC certifications under SEC Rules 13a-14(a)/15d-14(a) of the Exchange Act and § 906 of SOX attesting to the accuracy and truthfulness of the corresponding Forms 10-K and 10-Q for UTStarcom.  At the time, Defendants Lu, Sophie and Barton signed these certifications, they knew or recklessly disregarded that they were false for the reasons alleged herein.

## XIV.    ADDITIONAL ALLEGATIONS OF SCIENTER

127.    As alleged herein, the Individual Defendants acted with scienter in that they (a) had access to all internal data concerning the Company's stock option plans; (b) directed and/or participated in establishing the terms of the option grants, including the choice of grant dates and exercise price; (c) knew or with deliberate recklessness disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false, incomplete or misleading; (d) knew or with deliberate recklessness disregarded that such statements of documents would be issued or disseminated to the investing public; and (e) knowingly or with deliberate recklessness participated or acquiesced in the issuance of dissemination of such statements or documents as primary violations of the federal securities laws.

128.    Additional facts provide actual and strong circumstantial evidence of the Individual Defendants scienter including: (a) the Company's concessions and admissions; (b) the Individual Defendants' roles and responsibilities for granting and administering option grants; (c)the Individual Defendants' desire to personally obtain greater compensation without public scrutiny; and (d) the pervasiveness and nature of the fraud.

### A.    THE COMPANY'S ADMISSIONS AND RECENT ACTIONS ESTABLISH DEFENDANTS' SCIENTER

129.    Most notably, the Company has made admissions and taken actions that establish without resort to circumstantial evidence, the scienter of the Individual Defendants:

(a)    In its 2007 3rd Quarter 10-Q, the Company admitted that options were backdated, stating that "the review found that the number of shares and individual

1   employee was entitled to receive and/or the exercise price for stock option grants was

2   not determined with finality at the stated grant date at 53 tested grant dates, and the

3   Company should have used a later date as the measurement date.

4       (b)    The Company's restated financials make clear that some backdating

5   occurred after fiscal year 2002.  In fact, the Company noted that almost $13 million in

6   additional stock-based compensation expenses were related to fiscal years 2003

7   through 2005.  This is a tacit admission that some backdating occurred after 2002,

8   which is after SOX changed the requirements for reporting option grants.  After

9   August 29, 2002, option grants had to be reported to the SEC within two days of the

10  grant.  In most cases, this did not occur at UTStarcom.  The fact that the options

11  misconduct occurred both before and after this SOX provision was enacted suggests a

12  knowing violation of securities laws or at least severe recklessness.

13      (c)    During the pendency of the Governance Committees' review of the

14  stock options, on January 4, 2007, the Company announced that Defendants Lu, Wu,

15  Barton, Huang, Toy, Clarke, Horner and Lenzmeier had elected to amend any of their

16  previously granted stock options that might in the future be determined to be

17  discounted stock options under Section 409A of the Internal Revenue Code of 1986,

18  as amended ("Section 409A").

19      (d)    During the pendency of the Governance Committees' review of the

20  stock options, on June 6, 2007, the Company announced that as of June 1, 2007, the

21  employment relationship of UTSI with Ying Wu, the Company's Executive Vice

22  President, Vice Chairman of the Board of Directors and Chairman and Chief

23  Executive Officer of UTStarcom China Co., Ltd.

24      (e)    On the date that the truth regarding the extent of options backdating at

25  UTStarcom was revealed by the Company to the public, July 24, 2007, Ying Wu,

26  former employee and member of the Board of Directors of the Company, notified the

27  Company that he was resigning as a director of the Company for personal reasons.

28

B.     **DEFENDANTS' SPECIFIC PARTICIPATION IN THE BACKDATING ESTABLISHES THEIR SCIENTER**

130.     The Company also concluded that "there were deficiencies with the process by which stock options were granted during the period from the Company's initial public offering in 2000 through at least 2005." As described above, Defendants Lu, Wu, Barton, Sophie, and Toy were responsible for approving the grant dates and exercise prices of the vast majority of option grants during the Class Period.

131.     Confidential Witness #1 personally witnessed Defendants Barton and Sophie backdating stock options.

132.     As alleged above, the Individual Defendants each participated in the actual selection of backdated grant dates for the principal purpose of furthering the fraud.

C.     **DEFENDANTS' PERSONAL ENRICHMENT THROUGH LUCRATIVE STOCK OPTION GRANTS AND INSIDER TRADING SUPPORTS A FINDING OF SCIENTER**

133.     The Officer Defendants were motivated to commit the fraudulent scheme in order to reap significant personal profits. The Individual Defendants provided themselves with a direct form of compensation, which amounted to undisclosed and unaccounted for compensation in a number of ways.

134.     First, the Officer Defendants each personally obtained backdated options. The following chart sets for the options granted to the Officer Defendants in calendar years 2002 and 2003 as reported in the Company's Proxy Statements and Forms 4 filed with the SEC. As UTStarcom's 2007 3rd Quarter Form 10-Q makes clear, 69% of the total $24.3 million charge taken by UTStarcom related to fiscal years 2002 and 2003.

| NAME | GRANT DATE | NUMBER OF OPTIONS GRANTED | EXERCISE PRICE | 10 Day Stock Return Reversal[3] |
|------|-----------|---------------------------|----------------|------------------------------|
|      |           |                           |                |                              |

---

[3]     Stock return reversal totals the 10 day cumulative return prior to the grant date with the 10 day cumulative return following the grant date.

| Lu | 2/28/2002 | 150,000 | $20.25 | 31% |
| Wu | 2/28/2002 | 100,000 | $20.25 | 31% |
| Sophie | 2/28/2002 | 100,000 | $20.25 | 31% |
| Lu | 7/25/2002 | 75,000 | $15.72 | 25.6% |
| Wu | 7/25/2002 | 50,000 | $15.72 | 25.6% |
| Sophie | 7/25/2002 | 50,000 | $15.72 | 25.6% |
| Lu | 2/2/2003 | 120,000 | $19.04 | -5%[4] |
| Wu | 2/2/2003 | 85,000 | $19.04 | -5% |
| Sophie | 2/2/2003 | 75,000 | $19.04 | -5% |

135.    While UTStarcom has not identified precisely which options were backdated, it has confirmed that options granted during this period had been retroactively priced for all employees who received such grants.  Based on these admissions, there is a strong inference that all of the options granted to the Officer Defendants during the Class Period were backdated options.

136.    Second, the Officer Defendants actually exercised backdated options, thereby cashing in on their fraudulent scheme.  In total, the Individual Defendants received proceeds totaling $36,865603 from selling shares of stock during the Class Period.

137.    The Individual Defendants clearly had the motive and opportunity to perpetrate the fraudulent scheme described herein by virtue of their positions at the Company and roles in the backdating scheme as alleged herein in addition to the fact that they personally profited from the scheme.

---

[4] Although this return reversal is not significant, the stock price rose steadily in the following months, reaching the Class Period high in August of 2003.

**D.    THE PERVASIVENESS FO THE FRAUDULENT CONDUCT AND THE NATURE OF THE ACCOUNTING RULES AT ISSUE FURTHER SUPPORTS A STRONG INFERENCE OF SCIENTER**

138.    The duration, magnitude and pervasiveness of the scheme support a strong inference of fraudulent conduct on the part of the Individual Defendants.  UTStarcom admits that the backdating occurred from 2000 forward, and that the retroactive pricing of stock options affected many employees who received options.  Further, as a result of the Individual Defendants' improper reporting of backdated options, ***the financial results for fiscal years 2000 through 2006 have been restated***, and the Company recorded additional pretax, non-cash, stock-based compensation expense of $24.3 million through 2005.

139.    A strong inference of scienter is further supported by the nature of the accounting rules at issue.  The primary accounting rules at issue – APB no. 25 and SFAS 123(R) are simple and straightforward in application.

**E.    THE FACT THAT PURPORTED COMPLIANCE WAS ESSENTIAL TO MAINTAINING UTSTARCOM'S PROFITABLE PERFORMANCE SUPPORTS A STRONG INFERENCE OF SCIENTER**

140.    Given the enormous amount of stock options issued as compensation to UTStarcom's workforce, the Individual Defendants were keenly award of the potentially devastating impact on UTStarcom's financial condition that would result if the Company failed to comply with APB 25 and was required to record compensation expenses for gains incurred in connection with its option grants.  For example, had UTStarcom properly recorded its net income for the fiscal years 2002 and 2003, it would have reported $ 101,302,000 and $ 204,443,000 respectively.  This would have decreased UTStarcom's reported net income by $6,560,000 in 2002 and $11,089,000 in 2003, causing the Company to fall short of market earnings expectations and suffer a declining share price.

141.    Accordingly, it was of enormous significance to UTStarcom's earnings and business model that the Company qualify for favorable tax treatment under APB 25.  By disguising backdated options by manipulating their grant dates, the Individual Defendants

1    were able to receive additional immediate value for their options while the Company

2    continued to claim (albeit improperly) favorable accounting treatment, thereby inflating

3    earnings.

4    **XV.    LOSS CAUSATION**

5         142.    During the Class Period, as detailed herein, Defendants engaged in a scheme to

6    deceive the market and a course of conduct that artificially inflated UTStarcom's securities

7    prices and operated as a fraud or deceit on Class Period purchasers of UTStarcom securities

8    by misrepresenting the Company's business condition.  Defendants achieved this façade of

9    success, growth and strong future business prospects by misrepresenting the Company's

10   financial results and compensation practices.  Later, however, when Defendants' prior

11   misrepresentations and fraudulent conduct began to be disclosed and became apparent to the

12   market, UTStarcom stock fell precipitously as the prior artificial inflation was removed from

13   UTStarcom's securities prices.  As a result of their purchases of UTStarcom securities during

14   the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*,

15   damages, under the federal securities laws.

16        143.    During the Class Period, the Defendants presented a misleading picture of

17   UTStarcom's business and prospects.  Instead of truthfully disclosing that UTStarcom's

18   business was not as healthy as represented, Defendants caused UTStarcom to misrepresent the

19   Company's earnings and compensation and tax expenses, among other important metrics.

20   During the Class Period, Defendants also repeatedly, but falsely, emphasized that

21   UTStarcom's compensation practices aligned the interests of management with shareholders,

22   and that UTStarcom's compensation and accounting practices were overseen by independent,

23   competent directors.

24        144.    These false and misleading representations concerning UTStarcom's financial

25   results and management compensation – plus Defendants' non-disclosure of material facts

26   concerning the Company's compensation practices, which facts demonstrate that Defendants

27   were not acting in the best interests of shareholders, but, rather were acting dishonestly and in

28   violation of Company, NASDAQ and SEC policies and regulations – caused and maintained

1   the artificial inflation in UTStarcom's securities prices throughout the Class Period and until

2   the truth was ultimately revealed to the market.

3        145.    Defendants' false and misleading statements had the intended effect and

4   caused UTStarcom's common stock to trade at artificially inflated levels throughout the Class

5   Period, reaching a high of $45.36 on August 21, 2003.

6        146.    Starting on November 7, 2006 through the end of the Class Period on July 24,

7   2007, investors began to learn the truth through a number of disclosures.  These revelations

8   did not happen all at once, but rather were the result of two specific pronouncements from the

9   Company.  As investors and the market became aware of the true facts, which had been

10  obfuscated for over seven years by Defendants, the prior artificial inflation came out of

11  UTStarcom's securities prices, damaging investors.

12       147.    On November 7, 2006, UTStarcom announced in a press release that it had

13  commenced a voluntary review of its historical equity award grant practices.  The Nominating

14  and Corporate Governance committee of the board directed the review.  They were assisted

15  by independent legal counsel and independent accounting counsel.  In reaction to this news,

16  the Company's share price fell 9% from a closing price of $ 10.23 on November 7, 2007 to a

17  closing price of $ 9.32 on November 9, 2006 after the market had absorbed the information.

18       148.    On July 24, 2007, UTStarcom announced the preliminary results of its review

19  of historical equity award practices, requiring the Company to restate approximately $ 28

20  million of non-cash compensation expenses over the years 2000 through 2006.  Based in

21  substantial part on these revelations, the market responded sharply to this announcement and

22  UTStarcom stock plummeted by 22% from a closing price of $ 4.73 on July 22, 2007 to a

23  closing price of $ 3.70 on July 25, 2007, when the market had fully absorbed the news.  The

24  stock price continued to fall in the subsequent days

25  **XVI.   INAPPLICABILITY OF STATURY SAFE HARBOR**

26       149.    The statutory safe harbor for certain forward-looking statements does not apply

27  to the misrepresentations and omissions alleged in this complaint.  Many of the statements

28  were not specifically identified as "forward-looking statements" when made.  To the extent

1    that there were any properly identified forward-looking statements, there were no meaningful

2    cautionary statements identifying the important, then-present factors that could and did cause

3    actual results to differ materially form those in the purportedly forward-looking statements.

4    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking

5    statements pleaded herein, Defendants are nonetheless liable because at the time each of the

6    misrepresentations was made, the particular speakers knew that the statement was false or

7    misleading at that time.

8         150.    Any warnings or other cautionary language contained in the press releases and

9    other public statements described herein were generic, "boilerplate" statements of risk that

10   would affect any similar company, and misleadingly contained no factual disclosure of any of

11   the problems with the Company which placed the ability of the Company to accurately depict

12   its own financial situations into serious question.  As such, any forward-looking statements

13   complained of herein were not accompanied by meaningful cautionary language.

14        151.    Any relevant purported risk disclosures were, in fact, false and misleading in

15   and of themselves, by virtue of the fact that the events which the risk disclosures purported to

16   warn against as contingencies had frequently already become a reality or a certainty.

17   **XVII.  PRESUMPTION OF RELIANCE**

18        152.    At all relevant times, the market for UTStarcom securities was an efficient

19   market for the following reasons, among others:

20             a.   At all relevant times during the Class Period, UTStarcom's common stock

21                 was listed and actively traded either over the counter or on the NASDAQ

22                 GS, a highly efficient National Market.

23             b.   As a registered and regulated issuer of securities, UTStarcom filed periodic

24                 reports with the SEC, in addition to the frequent voluntary dissemination of

25                 information described in this Complaint.

26             c.   The Company's stock was followed by numerous financial analysts.  Thus,

27                 the Company's stock reflected the effect of information disseminated in the

28                 market.

153.    As a result of the above, the market for UTStarcom securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' prices.  Under these circumstances, all purchasers of UTStarcom securities during the Class Period suffered similar injury through their purchase of securities at prices which were artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## XVIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### Promulgated Thereunder Against All Defendants)

154.    Lead Plaintiff incorporates by reference and realleges all preceding paragraphs though fully set forth herein.

155.    During the Class Period, Defendants engaged in a plan, scheme, and course of business which operated as a fraud upon Plaintiff and Class Members, and made various untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and other Class Members as set forth above.  The purpose and effect of this scheme was to induce Plaintiffs and members of the Class to purchase the Company's securities during the Class Period at artificially inflated prices.

156.    By reason of the foregoing, Defendants knowingly or recklessly violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they themselves or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of the Company's common stock during the Class Period.

157.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the representations described above, Plaintiff and other members of the Class relied, to their detriment, directly on the misstatements or the integrity of the market both as to price and as to whether to purchase these securities.  Plaintiff and other members of the Class would not have purchased UTStarcom stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements and omissions.  At the time of the purchase of UTStarcom securities by Plaintiff and the other members of the Class, the fair market value of said securities was substantially less than the prices paid.  Plaintiff and the other members of the Class have suffered substantial damages as a result.

## COUNT TWO

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

158.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

159.    The Individual Defendants are liable for the material misrepresentations and omissions complained of herein under § 20(a) of the Exchange Act in that they functioned as control persons of UTStarcom by virtue of their executive and directorial positions with UTStarcom, their knowledge and involvement in the business of the Company, their daily access to confidential information regarding the operations and finances of the Company, and their power and ability to make public statements on behalf of UTStarcom to shareholders, potential investors, and the media.  As such, they had the power and ability to control the Company's actions.

## COUNT THREE

### (Violations of Section 14(a) of the Exchange Act and Rule 14a-9
### Promulgated Thereunder Against All Defendants)

160.    Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

161.    UTStarcom's proxy statements were required to disclose the Company's executive officers' and directors' direct and indirect compensation, including a description of stock options granted to these individuals by the Company.

162.    The proxy statements during the Class Period misrepresented that the stock options' exercise prices would be the Company's market price on the date of grant, when in fact the options were backdated to a time when the Company's market price was lower than that on the actual grant date.  Thus, by backdating options, the Company received less for the stock when exercised.  The Company should have disclosed the difference between the Company's stock price on the actual date of the option grant, and the lower, backdated price should have been disclosed as additional compensation to the Individual Defendants.  Therefore, the amounts of compensation to the Individual Defendants were materially understated.

163.    Defendants solicited proxies from shareholders for the election of directors each year during the Class Period.  Since the proxy statements failed to set forth the material information that the option grants were being and had been backdated, the proxy statements misrepresented material information about the exercise price of the stock options granted to the Company's executive officer and directors and their executive compensation.

164.    Defendants negligently omitted the material facts about option grant backdating and negligently misrepresented the terms of the Individual Defendants' compensation and management integrity.  These facts would have been material to a reasonable investor or shareholder in considering how to vote.

165.    In reliance on the false and misleading proxy statements, Plaintiff and other members of the Class voted for the Individual Defendants as directors, which allowed the Individual Defendants to cash in their backdated options, to the detriment of the Company and its shareholders.

1    166.    At the time of the materially false and misleading proxy statements regarding

2    stock options and executive compensation, Plaintiff and other members of the Class were

3    ignorant of the true facts.  Had Plaintiff and the other members of the Class known the facts

4    that were not disclosed by Defendants, Plaintiff and other members of the Class would not

5    have voted for the Individual Defendants as directors.

6    167.    By virtue of the foregoing, Defendants have violated Section 14(a) of the

7    Exchange Act and Rule 14a-9 promulgated thereunder.

8    168.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

9    and the other members of the Class suffered injury in correlation with their proxy voting

10    during the Class Period.

11    **PRAYER FOR RELIEF**

12    WHEREFORE, Plaintiff, on behalf of himself and on behalf of the Class, prays

13    for judgment as follows:

14    A.    Declaring this action to be a class action pursuant to Rules 23(a) and 23(b)(3)

15    of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

16    B.    Awarding Plaintiff and members of the Class recissory or compensatory

17    damages in an amount which may be proven at trial, together with interest

18    thereon;

19    C.    Awarding Plaintiff and the members of the Class pre-judgment and post-

20    judgment interest, as well as their reasonable attorneys' fees and expert witness

21    fees and other costs; and

22    D.    Awarding such other and further relief as this Court may deem just and proper

23    including any extraordinary equitable relief and/or injunctive relief as

24    permitted by law or equity to attach, impound or otherwise restrict the

25    Defendants' assets to assure Plaintiff and the members of the Class have an

26    effective remedy.

27    **JURY DEMAND**

28    Plaintiff hereby demands a jury trial.

Amended Class Action Complaint    58
3:07-CV-04578-SI

1

2    Dated: January 25, 2008                    Respectfully submitted,

3

4                                               By:_____/s/_____
                                                Mark Punzalan
5                                               FINKELSTEIN THOMPSON LLP
                                                100 Bush Street
6                                               Suite 1450
                                                San Francisco, California 94104
7                                               Telephone: 415.398.8700
                                                Facsimile: 415.398.8704
8

9                                                    - and -

10
                                                Donald J. Enright, Esq.
11                                              Elizabeth K. Tripodi
                                                FINKELSTEIN THOMPSON LLP
12                                              1050 30th Street, NW
                                                Washington, D.C. 20007
13                                              Telephone: 202.337.8000
                                                Facsimile: 202.337.8090
14

15                                              *Counsel for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28