Mark Punzalan (State Bar No. 247599)
mpunzalan@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone:  (415) 398-8700
Facsimile:  (415) 398-8704

[Additional Counsel Listed on Signature Page]

Lead Counsel

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER RUDOLPH, individually and on behalf of all others similarly situated, | ) ) ) | Case No. 3:07-CV-04578-SI |
| Plaintiff, | ) ) ) | **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT** |
| vs. | ) ) | |
| UTSTARCOM, HONG LIANG LU, YING WU, MICHAEL SOPHIE, FRANCIS BARTON, AND THOMAS TOY, | ) ) ) ) | Date:  April 4, 2008 Time:  9:00 a.m. |
| Defendants. | ) ) ) | Before:  Hon. Susan Illston |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... i

INTRODUCTION ............................................................................................................. 1

ISSUES TO BE DECIDED (LOCAL RULE 7-4(a)(3) ............................................................. 2

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT .................................................................................................................. 8

I.    STANDARDS OF LAW ON A MOTION TO DISMISS ..................................... 8

II.   LEAD PLAINTIFF HAS STATED A CLAIM FOR SECURITIES
      FRAUD  UNDER SECTION 10(b) AND RULE 10b-5 ........................................ 9

      A.    Lead Plaintiff has Alleged the Fraud With Sufficient Particularity ........... 9

      B.    Lead Plaintiff has Alleged Facts Giving Rise to a Strong Inference of
            Scienter ....................................................................................... 11

            1.    The Pervasive and Systematic Accounting Violations Admitted
                  by UTStarcom In Its Restatement Contribute to a Strong
                  Inference of Scienter .......................................................... 12

            2.    Lead Plaintiff's Confidential Witness Allegations Contribute to
                  a Strong Inference of Scienter ............................................. 14

            3.    The Sarbanes-Oxley Certifications Contribute to a Strong
                  Inference of Scienter .......................................................... 15

            4.    Lead Plaintiff Adequately Alleges the Individual Defendants'
                  Involvement in the Stock Option Granting Process ..................... 16

            5.    The Individual Defendants' Insider Trades Contribute to a
                  Strong Inference of Scienter ................................................ 16

III.  LEAD PLAINTIFF HAS ADEQUATELY PLED LOSS CAUSATION ............ 17

      A.    The November 7, 2006 Revelation was a Corrective Disclosure and
            Caused a Loss to Lead Plaintiff and the Class. ....................................... 19

      B.    Defendants Ask the Court to Draw Impermissible Inferences
            Concerning the July 24, 2007 Disclosure ............................................. 20

IV.   LEAD PLAINTIFF HAS STATED A CLAIM FOR PROXY FRAUD
      UNDER SECTION 14(a) ........................................................................... 21

1
2          A.      Lead Plaintiff has Identified the Misleading Statements in the
                   Company's Proxy Statements........................................................21

3          B.      Lead Plaintiff Has Alleged the Link Between the Misrepresentations
                   and Shareholder Votes.................................................................22
4
5          C.      Lead Plaintiff has Adequately Alleged Defendants' Knowledge and
                   Recklessness With Regard to the Misrepresentations ...............................24

6          D.      Lead Plaintiff's Claims regarding the 2002-2006 Proxies Are Not Time
                   Barred ....................................................................................24
7
8   VI.    LEAD PLAINTIFF HAS STATED A CLAIM FOR CONTROL
           PERSON LIABILITY PURSUANT TO SECTION 20(a) ...................................25
9
    VI.    CONCLUSION ...............................................................................25
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2
*Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000) ----------------------------------------- 22

3
*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ------------------------------------- 17, 19

4
*Franklin v. Ernst*, 571 F. Supp. 829 (N.D. Ohio 1983) --------------------------------------- 22

5
*Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000)------------------------------------- 25

6
*In re Adaptive Broadband Sec. Litig.*, No. 01-1092,

7
    2002 WL 989478  (N.D. Cal. April 2, 2002) ------------------------------------------ 12, 13

8
*In re Amtel Corp. Deriv. Litig.*, No. C06-4592,

9
    2007 WL 2070299 (N.D. Cal. July 16, 2007) -------------------------------------------- 24

10
*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ---------------------- 10

11
*In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir.2002) -------------------------------------------- 14

12
*In re CNET Networks, Inc.*, 483 F. Supp. 2d 947 (N.D. Cal. 2007) ------------------------------ 13

13
*In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069 (N.D. Cal. 2005)------ 12, 17

14
*In re Credit Suisse-AOL Sec. Litig.*, 465 F.Supp.2d 34 (D. Mass. 2006) ----------------------- 21

15
*In re Cylink Sec. Litig.*, 178 F.Supp. 2d 1077 (N.D. Cal. 2001)------------------------------ 10, 12

16
*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005)---------------------------------- 14, 17, 18-20

17
*In re Ditech Networks, Inc. Derivative Litig.*, No. 06-5157,

18
    2007 WL  2070300 (N.D. Cal. July 16, 2007) -------------------------------------------- 25

19
*In re Immune Response Sec. Litig.*, 347 F.Supp.2d 983, 1025 (S.D. Cal. 2005) ------- 8, 18, 21

20
*In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255, 2006

21
    U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006)-----------------------------------------------15

22
*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000) ----- 13, 15, 24

23
*In re National Golf Properties, Inc.*, No. 02-1383,

24
    2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ------------------------------------------ 10

25
*In re Omnivision Tech.*, No. 04-2297,

26
    2005 U.S. Dist. LEXIS 16009 (N.D. Cal. July 29, 2005) --------------------------------- 18

27
*In re Ramp Networks, Inc. Sec.*, 201 F. Supp.2d 1051 (N.D. Cal. 2002) ----------------------- 10

28

*In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810 (N.D. Cal. 2000) ------------ 10

*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999) --------------------------- 17

*In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F.Supp.2d 1063 (N.D. Cal. 2002) ---------------- 10

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002) ---------------------------------- 16

*In re Zoran Corp. Derivative Litig.*, 511 F. Supp.2d 986 (N.D. Cal. 2007) -------- 10, 21, 23-24

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994)--------------------------------------------------------- 25

*Livid Holdings Ltd. c. Salomon Smith Barney*, 416 F.3d 940 (9th Cir. 2005)------------------- 24

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970)-------------------------------------------- 21, 22

*No. 84 Employer-Teamster Join Council Pension Trust-Fund v. Am. West Holding Corp.*,

    320 F.3d 920 (9th Cir. 2003)-------------------------------------------------------------------------- 8, 9

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,

    380 F.3d 1226 (9th Cir. 2004) ------------------------------------------------------------------------- 8, 14

*Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697 (M.D.N.C. 1992)-------------------------- 22

Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.,

    411 F.2d 1172 (N.D. Cal. 2005) ------------------------------------------------------------------------ 18

*Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) --------------------------------- 20

*Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998 (N.D. Cal. 2006)------------------ 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007)------------------- 8-9, 11-12

*TSC Indus. V. Northway, Inc.*, 426 U.S. 438 (1976)------------------------------------------------- 23

*Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007) ------------------------------ 19-20

### **Statutes**

109 Stat. 737 -------------------------------------------------------------------------------------------------- 8

28 U.S.C. § 1658(b)----------------------------------------------------------------------------------------- 24

IRC § 422 ------------------------------------------------------------------------------------------------------ 5

Pub. L. No. 104-67------------------------------------------------------------------------------------------- 8

### **Rules**

Federal Rule of Civil Procedure 8(a)(2)----------------------------------------------------------------- 17

# INTRODUCTION

1        Lead Plaintiff, James R. Bartholomew, filed his Amended Class Action Complaint

2 (the "Complaint") on January 25, 2008.  The Complaint specifically details how UTStarcom,

3 Inc. ("UTStarcom" or the "Company") and certain officers and directors -- Hong Liang Lu

4 (Chief Executive Officer and Chairman of the Board), Ying Wu (Executive Vice President

5 and Vice Chairman of the Board), Michael Sophie (Vice President of Finance and Chief

6 Financial Officer), Francis Barton (Executive Vice President and Chief Financial Officer),

7 and Thomas Toy (current Chairman of the Board)[1] carried out a pervasive scheme of

8 backdating and improper accounting for stock option grants.  Backdating enabled the

9 Defendants to utilize hindsight in choosing option grant dates with favorable exercise prices.

10 Defendants carried out this scheme in direct violation of the publicly disclosed terms of

11 UTStarcom's various stock option plans.  When the backdating scheme became public,

12 UTStarcom was forced to restate years of financial statements (the "Restatement").

13        UTStarcom's backdating scheme gives rise to claims under the federal securities laws

14 because, as part of the scheme, Defendants issued a series of false and misleading statements

15 regarding: (a) the terms of option grants; (b) the expenses associated with option grants; and

16 (c) the strength of UTStarcom's internal controls.  Thus, Defendants, intentionally misled

17 class members regarding, *inter alia,* the value of officer and director compensation, the

18 Company's compliance with Generally Accepted Accounting Principles ("GAAP"), the

19 accuracy of the Company's financial results (including net earnings and earnings per share),

20 and the Company's tax liabilities.  ¶¶ 3, 9, 55-56, 64-72, 119-120.[2] The Complaint details

21 precisely how the Defendants carried out their scheme and how it resulted in GAAP

22 violations that rendered false and misleading ***each and every*** financial statement that

23 UTStarcom issued during the Class Period.

---

[1] Lu, Wu, Sophie, Barton and Toy are collectively referred to as the "Individual Defendants."
[2]  References to "¶ ___" are to paragraphs of the Complaint.

1    Despite the Complaint's specifically alleged facts and the powerful inferences that can

2    be drawn therefrom, Defendants still argue that neither scienter nor loss causation is

3    adequately pled.  Defendants' challenges not only overlook the well-pled allegations of

4    securities fraud contained in the Complaint, but also blatantly ignore the Company's own

5    admissions and its own public filings.

6    UTStarcom has made known in the Restatement that the Company "did not use the

7    proper date as the measurement date," and therefore, stock options were granted with exercise

8    prices below the fair market value of the Company's common stock.  ¶ 118.   Further, the

9    Company has conceded that an ***additional $25.5 million of stock-based compensation***

10   ***expenses*** should have been recognized from 1998-2005.  *Id*.  Moreover, the Company has

11   admitted to backdating ***no less than 57%*** of all UTStarcom stock option grants from 2000

12   through 2005.  ¶ 120.  The Restatement tellingly states that "[a] key finding of the

13   Governance Committee was that there were deficiencies with the process by which stock

14   options were granted during the period from our initial public offering in 2000 through at least

15   2005, which resulted in accounting errors."  *Id*.  The Governance Committee concluded that

16   "certain members of management bear varying degrees of responsibility for the deficiencies

17   in the process by which options were granted."  ¶ 121.  These admissions cannot be

18   disregarded or explained away on a motion to dismiss.  Thus,  Defendants' motion must be

19   denied.

20   **ISSUES TO BE DECIDED (LOCAL RULE 7-4(a)(3)**

21   1.    Has Plaintiff alleged fraud with sufficient particularity where he has specified

22   each misstatement alleged to be misleading and the reason why the statement is misleading?

23   2.    Has Plaintiff alleged with particularity facts that give rise to an inference of

24   scienter that is cogent and compelling, or at least as compelling as any opposing inference one

25   could draw from the facts?

26   3.    Has Plaintiff provided Defendants with an indication of the loss and its causal

27   connection where he has specifically pled corrective disclosures and subsequent share price

28   drops?

1    4.    Has Plaintiff adequately alleged that the misrepresentations were material to

2  the shareholders in deciding to vote and that the proxy was necessary for the vote in

3  question?

4    5.    Has Plaintiff adequately alleged that the Defendants acted negligently by

5  pleading particularized facts establishing Defendants' scienter?

6    6.    Does Section 804 of Sarbanes-Oxley extend the statute of limitations for

7  Plaintiff's § 14(a) claim for fraudulent conduct?

8    7.    Has Plaintiff pled a cause of action under § 20(a)?

9                                **STATEMENT OF FACTS**

10    In a five-year scheme to wrongfully increase the remuneration of the officers, directors

11  and employees of UTStarcom[3] and inflate the Company's net income by underreporting

12  compensation expenses, the Individual Defendants intentionally manipulated stock option

13  grants by falsely "backdating" the grants so that the options were always "in the money."  The

14  Governance Committee of UTStarcom's Board of Directors, set up to internally investigate

15  backdating of stock options at the Company, concluded that "certain members of management

16  bear varying degrees of responsibility for the deficiencies in the process by which options

17  were granted [during the period from UTSI's initial public offering in 2000 through at least

18  2005, which resulted in accounting errors]."  In fact, the Individual Defendants directly and

19  intentionally participated in this scheme, going so far as to personally alter, and order their

20  subordinates to alter, documentation to support the backdating of options.

21    When this backdating scheme finally was disclosed, the Company was forced to

22  restate its financial statements to increase its reported expenses and decrease its net income

23  for the last five years.  UTStarcom ultimately restated its previously filed financial statements

24  for fiscal years 2000-2006 by approximately $25.5 million to account for these material

25  compensation expenses.  As a result of Defendants' wrongful conduct, the Company's stock

26  _____

27  [3] UTStarcom manufactures, integrates and supports IP-based, end-to-end networking and
    telecommunications solutions.  ¶ 47.

28  _____

1   price plummeted from a Class Period high of $45.36 per share on August 21, 2003 to a low of

2   $3.88 per share on July 24, 2007 when the full truth about Defendants' manipulation of stock

3   options was disclosed.

4           Throughout the Class Period, Defendants represented to the investing public that all

5   option grants[4] were made at the fair market value of UTStarcom stock on the date of the

6   grant, *i.e.,* the closing price of UTStarcom common stock on the date of grant, which could

7   not be "in-the-money," and that, indeed, UTStarcom's various stock option plans ***required***

8   option grants at the fair market value of the stock.  ¶¶ 48, 52, 66, 75, 85, 95, 105.  In fact,

9   however, as the Company has now admitted, Defendants, contrary to their representations to

10  investors, granted options using exercise prices tied to prior dates, *i.e.*, ***already in-the-money***.

11  ¶¶ 8, 9, 16, 19 113-21.   In addition, in proxy statements dated April 2, 2003; August 22,

12  2003; April 7, 2004; April 18, 2004; June 16, 2006; and June 21, 2006 (as conceded by

13  Defendants (*see* Def. Mem. at 25)), the Defendants misrepresented officer and director

14  compensation by stating that the exercise price of the options granted was the same as the fair

15  market price of the stock on that day, thereby omitting to state the true value of said

16  compensation and that option grants were in fact backdated.  ¶¶ 66, 161-66.

17          This pervasive scheme extended over a period of five years and was well-known

18  throughout the Company and by UTStarcom's accountants.  ¶¶ 2, 57-60, 62, 63, 130-31, 138.

19  Indeed, as alleged, the Individual Defendants directly participated in the backdating of

20  options: far from Defendants' mischaracterization of the Complaint (Def. Mem. at 18-19),

21  Confidential Witness No. 1 (CW#1), a former UTStarcom Human Resources Coordinator

22  from 2005 through 2007 (¶ 57), ***directly witnessed defendants Barton and Sophie personally***

23  ***backdating options***.  ¶¶ 62, 131.  CW#1, further, was ***directly instructed*** to backdate

---

[4] As do many companies, UTStarcom, at the direction of its Board of Directors, used stock options as a form of compensation to recruit and retain key executives and employees.  ¶50. Each of the Company's stock option plans gave the Board of Directors the power to interpret and administer the plans, including the power to decide to whom grants would be awarded and at what strike price.  ¶¶49-51.

1  employment documents in order to assure that options were granted "in-the-money."  ¶¶ 57-

2  58, 60.  Moreover, CW#1 has stated that all paperwork associated with option grants was first

3  approved by UTStarcom's Stock Administrator and its General Counsel.  ¶ 59.

4      These backdated grants directly led to a material overstatement of UTStarcom's net

5  income and earnings per share ("EPS").  For every quarter and fiscal year from the fiscal year

6  ended December 31, 2002 through the quarter ended March 31, 2005, UTStarcom showed

7  increasing net income and EPS.  ¶¶ 74, 78, 80, 82, 84, 88, 90, 92, 94, 98.  However, these

8  financial numbers were falsely buoyed by the backdating of options granted to UTStarcom

9  officers, directors and employees.  Even the periods where UTStarcom showed a net loss (¶¶

10  102, 104, 110) would have been substantially worse but for Defendants' manipulation of

11  option grants.

12      Under GAAP, if options are priced *below* a stock's fair market value when they are

13  awarded, there is an instant gain that obligated the Company, pursuant to Accounting

14  Principles Board ("APB") Opinion No. 25, "*Accounting for Stock Issued to Employees*"

15  ("APB 25"), to recognize that gain as a compensation expense over the vesting period of the

16  option.  After June 2005, Statement of Financial Accounting Standards ("SFAS") 123,

17  "*Accounting for Stock-Based Compensation*" ("SFAS 123"), required that the Company

18  recognize the entire value of all option grants on the grant date amortized over the vesting

19  period of the option.  ¶ 8.  However, in violation of GAAP, as set forth above, Defendants,

20  contrary to their representations to investors that options were granted at the market value of

21  UTStarcom stock on the grant date, actually used exercise prices tied to prior dates.  By doing

22  so, Defendants understated UTStarcom's compensation expenses which consequently -- and

23  in violation of Lu and Sophie's Sarbanes-Oxley Act certifications -- propped up the

24  Company's net income (loss) and earnings (loss) per share, which then led to the artificial

25  inflation of UTStarcom's stock price, throughout the Class Period.

26      Not only did the backdating of options cause UTStarcom to violate GAAP, it also

27  caused the Company to understate its tax liabilities.  ¶¶ 67-71.  Section 421 of the Internal

28  Revenue Code ("IRC") allows special treatment for stock options ***not granted at a discount***.

1  Under IRC § 422, such options are considered Incentive Stock Options ("ISO"), and, when

2  the grantee exercises the option, any gain is not taxed as ordinary income, and, therefore, the

3  Company is not responsible for any withholding associated with that gain. ¶¶ 68-70.

4  However, if the option granted does not qualify as an ISO, it is considered a Non-Statutory

5  Option ("NSO"), and the Company incurs withholding obligations on the employee's gain.

6  *Id.*  When Defendants instituted their scheme to backdate options, they treated the options as

7  ISOs, with the attendant benefit of eliminating the withholding obligation, when they should

8  have treated the options as NSOs.  ¶ 71.  This had the effect of understating the Company's

9  tax liabilities.  *Id.*

10        It is important to note that the Individual Defendants directly and personally profited

11  from the backdating of options.  They were granted over 800,000 total options in 2002 and

12  2003, and the Company has confirmed that the vast majority of options received by

13  employees during that time period were backdated.  ¶¶ 9, 19, 118-21, 133-35.  As a result,

14  they wrongfully reaped proceeds of over $38.8 million from stock sales during the Class

15  Period. ¶¶ 33-37.

16        In the wake of the growing options backdating scandals of late 2006 and early 2007,

17  on November 7, 2006, UTStarcom announced that it had begun a voluntary review of its

18  historical equity award grant practices.  ¶¶ 11, 113.  On this news, UTStarcom's stock price

19  fell 9% from $10.23 per share on November 7, 2007 to a closing price of $9.32 per share on

20  November 9, 2006.  ¶ 113.  On February 1, 2007, with no final results of the Company

21  inquiry in hand, the Company updated the investigation, announcing that incorrect

22  measurement dates for certain stock option grants were used; the investing community could

23  no longer rely on UTStarcom's financial statements for each of the three fiscal years in the

24  period ended December 31, 2005 and financial statements for fiscal years prior to fiscal 2003;

25  and that the Company expected to record additional compensation charges of approximately $

26  50 million .  ¶ 115.  The Company's stock price dipped to $8.90 per share on February 2,

27  2007.

28

1    Finally, on July 24, 2007, the full truth was disclosed.  As a result of Defendants'

2    manipulation of option grants, a restatement of Company financials of approximately $28

3    million in fact would be necessary:

4        . . . [I]n certain instances all actions that establish a measurement date under
         the requirements of Accounting Principles Board No. 25, Accounting for Stock

5        Issued to Employees, had not occurred at the grant date, which had been used
         as the measurement date in accounting for Company stock option grants. A

6        later date, when all such actions had taken place, should have been used as the
         measurement date for these stock options.  The Audit Committee . . . then

7        determined, in consultation with and on the recommendation of the Company's
         management, the effect of using incorrect measurement dates would require

8        the Company to record material additional stock-based compensation charges
         in its previously issued financial statements.

9

10       The Company therefore announced its previously issued financial statements
         for the years 2000 through 2006, including interim periods within these fiscal

11       years, should no longer be relied upon.

12
         The Company has now determined that the amount of the non-cash restatement

13       will be approximately $28 million over the years 2000 through 2006.

14   ¶ 116.  As a result of this disclosure, UTStarcom's stock price dropped by 22%, from $4.73

15   per share on July 23, 2007 to $3.70 per share on July 25, 2007.  ¶ 117.

16       On October 10, 2007, upon issuing its Form 10-Q for the quarter ending on September

17   30, 2007 (the "2007 3rd Quarter 10-Q"), the Company announced that its Governance

18   Committee found that 17.9 million stock options of the 28.8 million options granted during

19   2000 through 2005 -- or 62% -- had incorrect measurement dates. ¶¶ 9, 120.  Out of the 17.9

20   million option grants that used the wrong date, 10.3 million used exercise prices below

21   UTStarcom's closing price on the date of the grant, resulting in an increase in compensation-

22   related expenses of over $32 million, including $6.1 million of additional non-cash stock-

23   based compensation expense from 2.0 million options that were granted to officers and

24   directors.  ¶¶ 9, 120.   The Company further conceded that it was liable for an additional $1.5

25   million in additional taxes as a result of its failure to properly date option grants and that it

26   "has assumed responsibility for all additional payroll taxes plus related penalties and interest

27   arising from the restatement of stock-based compensation, including amounts otherwise

28

1  payable by stock option recipients, and the Company's restated financial statements include a

2  $1.5 million accrual for this estimated expense."  ¶¶ 72, 120.

3      As a result of the uncovering by the Company's internal investigation of Defendants'

4  wrongful backdating of options, UTStarcom and the Individual Defendants acted to "correct"

5  their wrongful behavior:  Lu, Wu, Barton, Huang, Toy, along with three other officers and

6  directors, elected to amend any of their previously granted stock options that might in the

7  future be determined to be discounted stock options.  ¶¶ 15, 129.  On June 6, 2007, in the

8  midst of the investigation, the Company announced that it was terminating its employment

9  relationship defendant Wu. ¶¶ 18, 129.

10                          **ARGUMENT**

11  **I.    STANDARDS OF LAW ON A MOTION TO DISMISS**

12      When considering a motion to dismiss, a court must accept the allegations as true and

13  construe them in the light most favorable to the plaintiffs.  *Tellabs, Inc. v. Makor Issues &*

14  *Rights, Ltd.*, 127 S. Ct. 2499, 2509 n.4 (2007); *Shurkin v. Golden State Vintners Inc.*, 471 F.

15  Supp.2d 998, 1011 (N.D. Cal. 2006) (citing *Schwarz v. U.S.*, 234 F.3d 428, 435 (9th Cir.

16  2001)).  These well-settled standards apply with equal force to cases brought under the Private

17  Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 ("PSLRA").[5]

18      The basic purposes of the securities laws mandate that reasonable inferences suffice

19  and that evidence need not be pleaded.  *No. 84 Employer-Teamster Joint Council Pension*

20  *Trust-Fund v. Am. West Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003); *see also In re*

21  *Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005) ("Courts must be

22  careful not to set the [post-PSLRA pleading] hurdles so high that even meritorious actions

23  cannot survive a motion to dismiss.  Such a regime would defeat the remedial goals of the

24  _____

25  [5] *See, e.g.*, *In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005) ("We accept
   the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs.")

26  (citation omitted), *cert. denied*, 546 U.S. 1172 (2006); *Nursing Home Pension Fund, Local*
   *144 v. Oracle Corp.*, 380 F.3d 1226, 1229 (9th Cir. 2004)("The general rule for 12(b)(6)

27  motions is that allegations of material fact made in the complaint should be taken as true and
   construed in the light most favorable to the plaintiff").

28

federal securities laws.") (citation omitted).  Moreover, a complaint must be construed as a

whole on a motion to dismiss.  *See Tellabs*, 127 S. Ct. at 2509 ("courts must consider the

complaint in its entirety"); *see also Am. West*, 320 F.3d at 945 (reversing a district court

dismissal because "although…some of Plaintiffs' allegations are individually lacking…the

allegations in their totality are sufficient to meet the stringent pleading standard set forth in

the PSLRA.").

## II.    LEAD PLAINTIFF HAS STATED A CLAIM FOR SECURITIES FRAUD UNDER SECTION 10(b) AND RULE 10b-5

### A.    Lead Plaintiff has Alleged the Fraud With Sufficient Particularity

Lead Plaintiff has alleged with minute detail the precise false and misleading

statements and omissions made by Defendants throughout the Class Period, and the reasons

why these statements or omissions were false and misleading.  The false and misleading

statements alleged include but are not limited to the following:

- that the Company had granted stock options in accordance with its 1997 Stock Option Plan and 2001 Director Plan, and that the exercise prices of the options that were granted under these plans were not less than the fair market value of UTStarcom's common stock on the grant dates; ¶¶ 52, 53, 75, 85, 95, 105

- all statements regarding the amount of UTStarcom's net income and EPS made from February 21, 2003 through August 9, 2006 in the Company's Annual Reports (Form 10-K) and Quarterly Reports (Form 10-Q); ¶¶ 74, 77-84, 87-94, 97-104, 107-111

- all statements regarding the amount of UTStarcom's expenses made from February 21, 2003 through August 9, 2006; ¶¶ 74, 77-84, 87-94, 97-104, 107-111

- that the stock options granted to Lu, Wu, Sophie, Barton and Toy had exercise prices not less than the fair market value of UTStarcom's common stock on the grant dates; ¶¶ 52, 53, 66

- that UTStarcom's financial statements were prepared in accordance with GAAP; ¶¶ 118-120.

- that UTStarcom properly accounted for stock option grants pursuant to APB 25; ¶¶ 74-111

- that UTStarcom maintained appropriate internal disclosure controls and procedures; ¶¶ 118-120

- that UTStarcom's SEC filings were free of material misstatements or omissions; ¶¶ 76, 86, 96, 106

- that UTStarcom's SEC filings complied with the requirements of the securities laws and fairly presented the financial condition and results of the Company;  ¶¶ 76, 86, 96, 106

This is all that is required.  *See In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp.2d 980, 985 (N.D. Cal. 2001) (stating that the PSLRA requires that the complaint specify each statement alleged to have been misleading that the reason of reasons why the statement is misleading); *see also In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F.Supp.2d 1063, 1069 (N.D. Cal. 2002).

Moreover, given the fact that Defendants have restated the Company's financials by *$25.5 million* for a multi-year period the materiality of these misrepresentations is not subject to dispute.[6]  The materiality of these facts is further corroborated by the UTStarcom share price drops in reaction to the disclosures of Defendants' backdating.[7]

---

[6] *See In re Zoran Corp. Derivative Litig.*, 511 F. Supp.3d, 984, 1011 (N.D. Cal. 2007) (finding materiality adequately pled where plaintiff alleged that Zoran had to restate its financials and recognize a charge of twelve to fifteen million dollars in compensation expenses);  *In re Ramp Networks, Inc. Sec.*, 201 F. Supp.2d 1051, 1066 (N.D. Cal. 2002) (finding that a restatement provides evidence that statements made about revenue and accounting principles were false when coupled with specific allegations about practices that violate GAAP); *In re Cylink Sec. Litig.*, 178 F. Supp.2d 1077, 1084 (N.D. Cal. 2001) (stating that "the mere fact that…statements were restated at all" is sufficient to establish falsity at the pleading stage).

[7] *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425(3d Cir. 1997) (holding that when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement in the period immediately following the disclosure); *In re National Golf Properties, Inc.*, No. 02-1383, 2003 WL 23018761, *5 (C.D.

1

2

### B.    Lead Plaintiff has Alleged Facts Giving Rise to a Strong Inference of Scienter

Lead Plaintiff's allegations, when properly considered in their entirety, give rise to a

3

strong inference that Defendants acted with the requisite scienter throughout the Class Period.

4

In addressing the proper standard to be applied in considering whether a plaintiff's allegations

5

give rise to such an inference, the Supreme Court has held that:

6

7

8

9

> [C]ourts must consider the complaint in its entirety, as well as other sources
> courts ordinarily examine when ruling on Rule 12(b)(6) motions to
> dismiss…The inquiry, as several Courts of Appeals have recognized, is
> whether *all* of the facts alleged, taken collectively, give rise to a strong
> inference of scienter, not whether any individual allegation scrutinized in
> isolation, meets that standard.

10

*Tellabs,* 127 S.Ct. at 2509 (2007) (citing *Gompper v. VISX. Inc.*, 298 F.3d 893, 897 (9th Cir.

11

2002)).  The alleged facts must give rise to an inference of scienter that is "cogent" and

12

"compelling," in other words "at least as compelling as any opposing inference one could

13

draw from the facts alleged."  *Id.*

14

Lead Plaintiff's Complaint satisfies this standard, setting forth particularized

15

allegations regarding UTStarcom's pervasive backdating scheme and misrepresentations that

16

give rise to a strong inference of scienter as to each Defendant.  This inference is not only

17

"cogent" and "compelling" – *it is the only logical inference to be drawn*.  Defendants fail to

18

suggest any facts that give rise to an inference of plausible non-fraudulent intent, instead

19

taking each of Lead Plaintiff's allegations one by one, and claiming that each one, viewed in

20

isolation, is insufficient.  This tactic is flatly inconsistent with the *Tellabs* standard, and

21

should not be countenanced.  Instead, the scienter analysis requires courts to consider all

22

circumstances and all allegations, *in toto*.  When taken as a whole (as they must be), the

23

scienter facts pled in the Complaint paint an overwhelming and detailed portrait of

24

Defendants' scienter.

25

26

27

28

Cal. Mar. 19, 2003) (finding materiality had been alleged at the pleading stage where drop in
stock price followed a restatement of financials).

1    The magnitude, duration and materiality of UTStarcom's admitted GAAP violations

2  and the Restatement, combined with the Individual Defendants' knowledge of the faulty

3  accounting practices and direct involvement in the stock option granting process, and the

4  information provided by the confidential witnesses all combine to provide a cogent and

5  compelling inference of scienter.  As such Defendants' Motion to Dismiss should be denied.

6          **1.  The Pervasive and Systematic Accounting Violations Admitted by
               UTStarcom In Its Restatement Contribute to a Strong Inference of
7              Scienter**

8          UTStarcom argues that "a restatement, by itself, indicates only that a company's

9  financials were incorrect, not the existence of an attempt to defraud."  Def. Mem. at 10.  As

10  stated above, UTStarcom's attempt to address this allegation in isolation is improper under

11  *Tellabs*.  It is clear that the pervasive and systematic accounting violations detailed in the

12  Restatement contribute to a strong inference of scienter.  Further, Defendants' contention that

13  the Company's Governance Committee found that "none of the current or former employees

14  or directors of the Company engaged in intentional wrongdoing" is unavailing.  Def. Mem. at

15  11.  It comes as no surprise that the Company's internal investigative committee did not admit

16  that its own officers and directors had engaged in fraud.

17          UTStarcom's Restatement admits that every financial statement and accompanying

18  press release issued by the Company and signed by Lu, Wu, Sophie, Toy and Barton during

19  the Class Period and prior to the Class Period were materially false and misleading when

20  made.  ¶ 118-121.  Indeed the Restatement details that Defendants backdated no fewer than

21  10.9 million options or 57% of all option grants during the period in question.  *Id*.

22          The pervasive, long term, repeated financial misstatements which gave rise to

23  UTStarcom's Restatement and admitted accounting violations thus contribute mightily to a

24  strong inference that Defendants acted with intent or deliberate recklessness.[8]  Moreover,

25  _____

26  [8] *See Cylink*, 178 F. Supp.2d at 1084 (finding that the mere fact that the financials had to be
    restated supports an inference of scienter); *see also In re Cornerstone Propane Partners, L.P.*,
27  355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005)(holding that allegations of GAAP violations
    provide support for plaintiffs' allegations of scienter); *see also In re Adaptive Broadband Sec.*
28

1    "when significant GAAP violations are described with particularity in the complaint, they

2    may provide powerful indirect evidence of scienter. After all, books do not cook themselves."

3    *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp.2d 1248, 1273 (N.D. Cal. 2000).

4             This is particularly true in cases of options backdating, because options simply do not

5    date themselves. Rather, it requires a specific act of will on the part of the officers and

6    directors of a corporation to assign a date to the issuance of an option. Further, it requires a

7    conscious, intentional act to date such options on a day other than that in which they are

8    actually being authorized. *See In re CNET Networks, Inc.*, 483 F. Supp.2d 947, 956 (N.D.

9    Cal. 2007). Thus, and to paraphrase from *McKesson*, just as "books do not cook themselves,"

10   ***options do not (indeed, cannot) backdate themselves***. Indeed, statistical analysis indicates

11   that the cumulative share price drops prior to UTStarcom option grants and cumulative gains

12   in share price following the dates of option grants provides strong evidence that these dates

13   were intentionally selected with the benefit of hindsight to enrich the grantees. ¶ 63. This

14   was no coincidence.

15            Significantly, UTStarcom does not deny that its historical financial statements were in

16   error as a result of a failure to properly account for stock option grants. Indeed, Defendants

17   have admitted that no fewer than 10.3 million options granted during the five year period

18   were misdated. ¶ 120. Therefore, neither the GAAP violations, the materiality of those

19   violations, nor the falsity of the financial statements is in dispute. ¶ 118-121. The magnitude,

20   pervasiveness and duration of these admitted GAAP violations contributes compellingly to

21   the strong inference of scienter.[9]

22

23   _____

24   *Litig.*, No. 01-1092, 2002 WL 989478, at *14 (N.D. Cal. April 2, 2002) (finding that a
     restatement is sufficient to support a scienter inference when coupled with strong evidence of
25   deliberately reckless accounting).

26   [9] The Ninth Circuit unequivocally has held that allegations of widespread or systematic
     GAAP violations such as those stated in the Complaint support a strong inference of scienter.
27   *Daou*, 411 F.2d at 1018, 1020; *see also Adaptive Broadband,* 2002 U.S. Dist. LEXIS 5887, at
     ** 39, 42 ("While it is true that conclusory allegations of GAAP violations *standing alone*
28

**2. Lead Plaintiff's Confidential Witness Allegations Contribute to a Strong Inference of Scienter**

The Complaint contains allegations based upon direct, eye-witness observations of confidential witnesses who have related to Plaintiff's counsel their experiences in connection with UTStarcom's backdating scheme. These confidential witnesses disclosed that options backdating was a common practice at the Company and that at various times, CW#1 was directed to purposefully and intentionally alter documents for this purpose. ¶ 57-62.

In light of the PSLRA's heightened pleading standard, plaintiffs relying on confidential witnesses to raise an inference of scienter must meet certain requirements. First, plaintiffs must describe each confidential witness "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Daou,* 411 F.3d at 1015 (quoting *Nursing Home,* 380 F.3d at 1233) (internal quotation marks omitted). If a plaintiff adequately describes a confidential witness, the court then proceeds to a determination of the witness's reliability by evaluating "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources [and] the reliability of the sources . . . . " *Id.* (quoting *In re Cabletron Sys., Inc.,* 311 F.3d 11, 29-30 (1st Cir.2002)).

Here, the Complaint clearly alleges sufficient information to support the probability that the respective witnesses possessed the information alleged. ¶ 57-62. For example, Lead Plaintiff indicates that CW#1 was the Human Resources Coordinator at the Company from 2005 through 2007. ¶ 57. The complaint further details CW#1's first hand account of the mechanics of stock option grant reports, where the Company maintained this information,[10]

---

cannot be used to prove intentional or reckless misconduct, if pled in detail and read in context, GAAP violations may support an inference of scienter.")

[10] CW#1 further described in detail how the paper trail of the backdated options was kept. ¶ 59. After approval by the Board of Directors, the backdated options would then be approved by the Company's General Counsel and Stock Administrator. *Id.* According to CW#1, the Company maintained all information relating to the granting of the backdated options within

1    how the witness was involved in the backdating process and the involvement of outside

2    auditors in the backdating scheme.[11]  ¶ 57-62.  These details are more than sufficient to allow

3    the Court to credit these allegations.

4            Indeed, the witnesses' detailed accounts of the backdating scheme as it operated

5    within UTStarcom are nothing short of damning.  CW#1 disclosed that during her time at the

6    Company, UTStarcom actively backdated its stock option grants to senior executives to assure

7    that they would receive the highest possible margins in the exercise and sales of their options.

8    ¶ 57.  She revealed that she was directed to purposefully and intentionally alter documents for

9    this purpose.  *Id*.  In fact, CW#1 stated that she actually witnessed Defendants Barton and

10   Sophie, at different times, fabricating and altering documents for the purpose of backdating

11   options.  Further, she indicated that the backdating scheme was a commonly discussed

12   practice within the Company.  *Id*.  Confidential Witness #2, an Administrative Support

13   Representative, corroborated and confirmed this statement.  *Id*

14           Fact-specific, detailed, eye-witness accounts of Defendants' active, intentional role in

15   a fraud obviously suffices at the pleading stage to give rise to a strong inference of scienter –

16   particularly when pled in conjunction with other indicia of fraudulent intent.  *See McKesson*,

17   126 F. Supp.2d at 1271.  That is exactly what the Complaint pleads.

18
                    **3.  The Sarbanes-Oxley Certifications Contribute to a Strong Inference of**
19                       **Scienter**
                    Throughout the Class Period. the Individual Defendants certified the Company's
20
     financial reports**.**  Indeed, pursuant to these certifications, the Individual Defendants have
21
     admitted reviewing and being familiar with the Company's financial reports.  ¶76, 86, 96,
22
     106, 123.
23

24   _____

25   an ADP HRIS system until September 2005 when they transitioned to an Oracle based
     system.  *Id.*
26

27   [11]  During her interview, CW#1 recalled that the Company's pre-audit accountants, Deloitte &
     Touche, frequently requested that the witness backdate various employment papers in order to
     bring the Company into apparent compliance for its audits by PriceWaterhouseCoopers.  ¶
28   58.

These certifications, signed pursuant to § 906 of Sarbanes-Oxley, can give rise to a strong inference of scienter. *In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255, 2006 U.S. Dist. LEXIS 262, at **45-50 (D. Or. Jan. 3, 2006). Although Sarbanes-Oxley does not create a scheme of strict liability, the statements contained in the certifications themselves can constitute evidence of actual knowledge or deliberate recklessness on the part of the certifying officers. *Id.* This is so because the certifications create a presumption that the signators were familiar with, and responsible for, the preparation of the financial statements and certified their veracity. *Id.* Here, the certifications contribute to a strong inference of scienter because there is no dispute regarding the falsity of UTStarcom's certified financial statements. ¶¶ 118-21.

### 4.  Lead Plaintiff Adequately Alleges the Individual Defendants' Involvement in the Stock Option Granting Process

Lead Plaintiff has pled "specific contemporaneous conditions known to the defendants that would strongly suggest that the defendants understood" their statements to be false. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002). Lead Plaintiff's complaint specifically alleges that the Officer Defendants, Lu, Wu, Sophie and Barton, as executives and members of the Board of Directors, personally authorized and approved the backdated stock option grants at issue. ¶ 33-36. Further, the Complaint alleges that Defendant Toy, as a member of the Audit and Compensation Committees, enabled the stock option backdating scheme to succeed. ¶ 37. Lead Plaintiff has thus clearly specified the roles that the Individual Defendants played in authorizing and approving backdated stock option grants.[12] Plainly, allegations of the Defendants direct participation in this fraud contribute significantly to a strong inference of scienter.

---

[12] Each of the Company's stock option plans gave the Board of Directors or any of its Committees the full power to interpret and administer the plans. ¶ 50. Thus, the Board and, in particular, the Compensation Committee, were intimately involved in the process of granting (and, necessarily, dating) these options.

### 5. The Individual Defendants' Insider Trades Contribute to a Strong Inference of Scienter

The Individual Defendants directly and personally profited from the backdating of options: they were granted over 800,000 total options in 2002 and 2003, and the Company has confirmed that the vast majority of options received by employees during that time period were backdated. ¶¶ 9, 19, 118-21, 133-35. As a result, they wrongfully reaped proceeds of over $38.8 million from their stock sales during the Class Period. ¶¶ 33-37.

"Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *Daou*, 411 F.3d at 1022. These massive insider sales, stemming from the exercise of backdated options and taking place while the Company was materially understating compensation expenses and overstating net income, certainly provide even more credence to a cogent, strongly compelling inference of Defendants' scienter.[13]

## III.    LEAD PLAINTIFF HAS ADEQUATELY PLED LOSS CAUSATION

The Supreme Court has held that pleading loss causation is governed by the notice pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Thus, a plaintiff must provide a short and plain statement giving "notice of what the relevant economic loss might be or what the causal connection might be between" the loss and the misrepresentation. *Id.* at 347. However, a plaintiff need only "provide a defendants with *some indication* of the loss and the causal connection that the plaintiff has in mind." *Id.* (emphasis added).

Under *Dura*, loss causation is sufficiently pled when the complaint alleges a causal link between the disclosure of previously undisclosed information and the decline in stock price. *Id.* at 336. In the Ninth Circuit, a complaint satisfies the loss causation pleading

---

[13] *See Cornerstone*, 355 F. Supp. 2d at 1095 n.7 (finding that insider sales can form a basis for inferring scienter where the sales were unusual or suspicious); s*ee also In re Silicon Graphic. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (stating that "unusual" or "suspicious" stock sales by insiders can constitute circumstantial evidence of scienter).

1    requirement when it alleges "a causal connection between the deceptive acts that form the

2    basis for the claim of securities fraud and the injury suffered by the plaintiff." *Daou*, 411

3    F.3d at 1025.  This causal connection is established where, as here, the revelation of the true

4    facts which had been previously omitted or misrepresented causes the stock price to fall.  *See*

5    *id.*; *see also Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F.

6    Supp.2d 1172, 1177 (N.D. Cal. 2005) (finding loss causation adequately alleged where a drop

7    in stock price followed a corrective disclosure).  Further, under *Daou*, in order to show loss

8    causation, a plaintiff need not show that a misrepresentation was the sole reason for the

9    investment's decline.  411. F.3d at 1025.

10          Lead Plaintiff's specific loss causation allegations meet the pleading requirements.  In

11   particular, the Complaint alleges: (a) Plaintiff purchased UTStarcom stock during the Class

12   Period, ¶ 31; (b) the stock prices during the Class Period were artificially inflated due to

13   Defendants' undisclosed options backdating scheme, ¶¶ 3, 4, 45, 142, 145; (c) when the truth

14   about Defendants' backdating and its implications became known by the market,

15   UTStarcom's stock price declined, ¶¶ 3-4, 142-148; and (d) the disclosure of Defendants'

16   backdating scheme was a cause of the stock price declines, ¶¶ 3-4,142-148.  Lead Plaintiff

17   details facts regarding the misstatements and omissions and how the market negatively

18   reacted to revelations of the fraud.  These allegations satisfy the loss causation pleading

19   requirements.

20          Simply stated, and as more fully discussed below, the Complaint directly pleads that

21   information revealed to investors the truth about the previously undisclosed backdating and

22   proximately caused the fall in UTStarcom's stock price on November 7, 2006 and July 24,

23   2007.  As such, Lead Plaintiff has properly pled loss causation for each disclosure detailed in

24   the Complaint.[14]

25   _____

26   [14] *See Immune Response*, 375 F. Supp.2d at 1025 (finding that allegations that the corrective
27   disclosures caused the drop in stock price satisfies *Dura*); *see also Plumbers &Pipe*, 411 F.
     Supp. 2d at 1177-78 (finding stock declines following partial disclosures sufficient to plead
28   loss causation under *Dura*); *In re Omnivision Tech.*, No. 04-2297, 2005 U.S. Dist. LEXIS

**A.  The November 7, 2006 Revelation was a Corrective Disclosure and Caused a Loss to Lead Plaintiff and the Class.**

Lead Plaintiff adequately pled loss causation with respect to the November 7, 2006 revelation of previously undisclosed bad news regarding the Company's internal investigation into its stock option grant practices.  On that date, after the close of trading, the Company filed an SEC report on Form 8-K disclosing that the Company had commenced a review of its historic equity award grant practices.  ¶ 147.  The Form 8-K indicated that the Company had informed the SEC about the commencement of the review.  *Id*.  The Company claimed uncertainty in regard to the review's effect on prior financial statements, and admitted that this stock option investigation would interfere with UTStarcom's ability to timely file its SEC reports. ¶¶ 11-12, 147.  The next trading day, UTStarcom's stock dropped 9% as a result of this news.  *Id*.  Thus, the Amended Complaint alleges: (1) the disclosure of previously concealed negative facts related to the backdating scheme; and (2) an immediate drop in UTStarcom's stock price due to the disclosure of this new information.  Plainly, Lead Plaintiff has properly and sufficiently alleged loss causation in connection with this revelation.  *See Dura*, 544 U.S. at 347; *see also Daou*, 411 F.3d at 1025; *Cisco*, 411 F. Supp.2d at 1177-78.

Nevertheless, Defendants argue that the November 7th revelations were not a "corrective disclosure".  Def. Mem. at 6-7.  This is ludicrous.  Defendants were informing the market (and the SEC) of an internal investigation relating to options backdating that might (and eventually would) cause the Company to restate its financial reports.  The market was obviously aware that companies do not announce such investigations, possible restatements and delays in future financial reports and filings unless there is substantial cause for concern – and the drop in the share price reflected this fact.  This was, plainly, a corrective disclosure under *Daou*, which merely requires the allegations to provide "some indication that the drop in . . . stock price was causally related to . . . financial misstatements."  *Daou*, 411 F.3d at 1026.

---

16009, at **18-19 (N.D. Cal. July 29, 2005)(alleging that plaintiffs suffered damages when revelation of the true facts caused a decline in the value of their investments satisfies *Dura*).

1    Defendants' reliance on *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz.

2    2007), is unavailing.  There, the plaintiff failed to sufficiently plead loss causation because

3    Amkor's stock price went up, not down, after corrective disclosures were issued regarding

4    options backdating.  *Id*. at 945-46.  In this case, Lead Plaintiff alleges that disclosures

5    regarding possible and actual backdating at UTStarcom caused temporally proximate declines

6    in UTStarcom's stock price.[15]   Nothing more is required.

7    **B.  Defendants Ask the Court to Draw Impermissible Inferences Concerning the
         July 24, 2007 Disclosure**

8         On July 24, 2007, at the close of trading, Defendants revealed for the first time that the

9    Company would be definitively forced to restate its financial results by over $28 million due

10   to the backdating of employee stock options.  ¶ 148.  The next day, following this

11   announcement, the Company's share price dropped 22%.  ¶ 148.  Allegations such as this

12   more than satisfy the loss causation pleading requirements of *Dura* and *Daou*.

13        Defendants' argument that this news was positive is meritless.  It is inconceivable that

14   the need to restate $28 million can be considered "good news," as Defendants would like to

15   characterize it.  Rather, this was a revelation that an internal investigation had definitively

16   found that the Company had backdated options, and had consequently under-reported

17   compensation expenses and overstated income by $28 million over a period of several years.

18   The notion that the market would react to this with anything other than a punitive share price

19   drop is unsupportable.

20        Moreover, to the extent that Defendants improperly contend that other disclosures on

21   July 24, 2007 caused or contributed to UTStarcom's share price drop, they ignore the legal

22   reality that, at this phase of the litigation, a plaintiff is not required to show "that a

23   misrepresentation was the *sole* reason for the investment's decline in value" in order to

24   establish loss causation.  *Daou*, 411 F.3d at 1025 (quoting *Robbins v. Koger Props., Inc.*, 116

25   _____

26   [15] *Amkor* is also inapposite as the court ruled there that plaintiffs could not allege loss
     causation based on an investigation of the stock option grants because the real discussion in
27   the press release was the second quarter financial results.  *Id*. at 946.  Defendants' November
     6, 2007 had no discussion other than the stock option grant review.
28

1   F.3d 1441, 1447 n.5 (11th Cir. 1997) (emphasis added).  Nevertheless, Defendants ask the

2   Court to decide improperly (or at least prematurely) this precise issue of fact, contending that

3   other disclosures on July 24, 2007 were the cause of the Company's share price drop.   This is

4   not an appropriate question for this phase of the litigation.[16]

5   **IV.     LEAD PLAINTIFF HAS STATED A CLAIM FOR PROXY FRAUD**

6            Lead Plaintiff has more than adequately alleged each element of a §14(a) claim – that

7   is, "that: (1) defendants made a material misrepresentation or omission in a proxy statement;

8   (2) with the requisite state of mind; and (3) that the proxy statement was the transaction cause

9   of harm of which plaintiff complains."  *Zoran.*, 2007 U.S. Dist. LEXIS 43402, *63 (N.D.

10  Cal. June 5, 2007) (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384 (1970)).  The

11  Complaint specifically identifies false and misleading statements contained in the proxy

12  statements and adequately alleges that the Defendants' misrepresentations caused the injury

13  suffered by Lead Plaintiff and the Class.  As such the Motion must be denied on this count.

14      **A.      Lead Plaintiff has Pled Misrepresentations in the Proxies**

15           Defendants claim that Lead Plaintiff's complaint "does not quote a single statement

16  from any of the Company's proxies that are alleged to be misleading."  Def. Br. at 21.  This

17  contention is utterly (and obviously) false.  The complaint specifically alleges that

18  UTStarcom's annual proxy statements for fiscal years 2002-2006 falsely stated that "the

19  _____

20  [16] *See Immune Response*, 347 F. Supp.2d at 1025 ("[W]hether the alleged omissions and
    misstatements actually were the cause-in-fact of the [decline in] price of [defendant's] stock
21  raises an issue of fact and, as such, is a question properly reserved for a motion for summary
    judgment or for the trier of fact.");  *see also In re Openwave Sys. Sec. Litig.*, No. 07-1309,
22  2007 U.S. Dist. LEXIS 80558, at **41-44 (holding that where Openwave had disclosed other
    negative news on the same dates as one of the announcements regarding the backdating was
23  not fatal to plaintiffs' claim since, the issue of whether these disclosures actually caused all or
    part of the price drop was a matter left for proof at trial); *In re CMS Energy Sec. Litig.*, No 02-
24  072004, 2005 Dist. LEXIS 439, at *5 (E.D. Mich. Jan. 7, 2005) ("[T]he court should not
    speculate on what degree of the price decline is attributable to the disclosure of [a particular
25  fact].");  *In re Credit Suisse-AOL Sec. Litig.*, 465 F.Supp.2d 34, 55 (D. Mass. 2006)
    ("Whatever the truth of the matter is, isolating the myriad causal factors that affect stock price
26  is a factual question that should be decided at trial, with the help of qualified experts.  It is not
27  an issue appropriate for a motion to dismiss.").

28

1   exercise price of the stock options was equal to the price of the stock on the date of the grant."

2   ¶ 66, 162.  The Complaint further details the specific elements of each of the Company's

3   stock option plains detailed in the Proxy Forms.  ¶ 49-53.

4       **B.**    **Lead Plaintiff Has Alleged the Link Between the Misrepresentations and**
              **Shareholder Votes**

5                Defendants argue that Lead Plaintiff has failed to satisfy the "essential link" element

6   required to plead a § 14(a) violation conveniently focusing on only one allegation in Lead

7   Plaintiff's complaint.  Rather than support their argument with facts and case law, Defendants

8   choose to illustrate how certain directors were still able to exercise stock options, despite

9   share holder votes.  Def. Mem. at 22-23.  This has no bearing on how Defendants'

10  misstatements in their 2002-2006 proxy forms were essential links in the "accomplishment of

11  the proposed transaction" in the proxy at issue.  *Desaigoudar v. Meyercord*, 223 F.3d 1020,

12  1022 (9th Cir. 2000).

13         The question is not whether Lead Plaintiff can allege and prove that the false

14  statements in the proxy led to the vote in question, but rather (i) whether the alleged

15  misrepresentations were material to the shareholders in deciding to vote; and (ii) whether the

16  proxy was necessary for the vote in question.[17]

17         Defendants do not dispute that the proxies were an essential link to the shareholders'

18  votes.  Lead Plaintiff's Complaint specifically alleges that in order for the Company's various

19  stock option plans or amendments to such plans to have been approved, the board required

20  shareholder approval.  ¶ 49.  Where, as here, the board required shareholder approval for

21  implementation of or an amendment to a stock option plan or similar compensation plan, the

22  essential link element is established.   *See*, *e.g.. Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp.

23  697 (M.D.N.C. 1992); *Franklin v. Ernst*, 571 F. Supp. 829, 842 (N.D. Ohio 1983) ("In this

24  _____

25  [17] *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384-85 (1970) (explaining that where
there has been a finding of materiality, a shareholder has made a sufficient showing of causal

26  relationship between the violation and the injury for which he seeks redress if, as here, he

27  proves that the proxy solicitation itself, rather than the particular defect in the solicitation
materials, was an essential link in the accomplishment of the [corporate] transaction).

28

1    case, the plan, by its terms, required shareholder approval.  The solicitation of proxies,

2    therefore, was 'an essential link in the accomplishment of the transaction.'  Accordingly, if

3    the proxy statement contains a material misstatement or omission, the causation requirement

4    is met.").

5         The 2003-2006 Proxies were also an essential link to the vote on the election and re-

6    election of Lu, Wu and Toy.[18]  Courts routinely find that the essential link element is met

7    where, as here, the proxy seeks a vote for the election of directions.  *See*, *Zoran,* 2007 U.S.

8    Dist. LEXIS 43402,  **67-68.

9         There can also be little doubt that the misrepresentations in UTStarcom's Proxies were

10   material to shareholders' voting decisions.  The Supreme Court long ago established that a

11   misrepresentation or omission is material if "there is a substantial likelihood that a reasonable

12   shareholder would consider it important in deciding how to vote."  *TSC Indus. v. Northway,*

13   *Inc.*, 426 U.S. 438, 449 (1976); *see also Zoran*, 2007 U.S. Dist. LEXIS 43402, at *63.

14   Applying this test, courts have confirmed that facts regarding the nature, purpose, value and

15   recipients of stock option grants and past practices are important factors to be considered by

16   shareholders solicited to vote on an amendment to a stock option plan.  *See*, *e.g.*, *Parson*, 789

17   F. Supp. at 702 ("If an omissions or misstatement of one of these elements is made, the

18   omission or misstatement is deemed material as a matter of law.").  Most recently, the court in

19   *Zoran*, faced with a similar backdating case reiterated that "[h]ad shareholders known that

20   defendants had not followed the dictates of the plan in the past, this likely would have

21   changed their votes" regarding their authorization of stock options plans.  2007 U.S. Dist.

22   LEXIS 43402, at **66-68.

23        Accordingly, Lead Plaintiff has adequately alleged the materiality of Defendants'

24   misrepresentations regarding how they granted stock options, the terms of option grants to

25   _____

26   [18] The 2003 Proxy solicited shareholder votes for the re-election of Lu for a three year term on
     UTStarcom's Board.  The 2004 Proxy solicited shareholder votes for the re-election of Toy
27   and Wu for a three year term on UTStarcom's Board.  The 2006 Proxy solicited shareholder
     votes for the re-election of Lu for a three year term on UTStarcom's Board.
28

1  officers and directors and executive compensation.  ¶ 8, 49-53, 66, 161-66.  Whether the

2  statements were indeed material is a question of fact for the jury.  *Livid Holdings Ltd. c.*

3  *Salomon Smith Barney*, 416 F.3d 940, 947 (9th Cir. 2005).

4    **C.    Lead Plaintiff has Adequately Alleged Defendants' Knowledge and**
       **Recklessness With Regard to the Misrepresentations**

5        Defendants contend that Lead Plaintiff has not adequately pled that Defendants acted

6  negligently.  This contention is without merit as Lead Plaintiff has pled particularized facts

7  establishing Defendants's scienter, as discussed above.  This higher standard covers negligence.

8  *McKesson*, 126 F.Supp. 2d at 1268 n.10;  *Zoran*, 511 F. Supp.2d at 1015.

9    **D.    Lead Plaintiff's Claims regarding the 2002-2006 Proxies Are Not Time**
       **Barred**

10

11        Defendants' argument that § 14(a) claims for the admitted misrepresentations

12  contained in the 2002-2006 Proxies are time barred ignores the fact that Lead Plaintiff alleges

13  his § 14(a) claim for fraudulent conduct.  Section 804 of Sarbanes-Oxley provides for a 5-2

14  limitation period for any fraud based claim brought under the Exchange Act.  By its express

15  terms, § 804 applies not only to § 10(b) claims, but to claims brought under a number of

16  statues including the Exchange Act or the Securities Act.  28 U.S.C. § 1658(b).  The sole

17  limitation is that the claim must be "a private right of action that involves a claim of fraud,

18  deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning

19  the securities law."  Thus, § 804 clearly applies to any claim sounding in fraud that is brought

20  under the Exchange Act for contravention of a regulatory requirement concerning the

21  securities laws.[19]

22

23

24

_____

25  [19] The Ninth Circuit has not yet opined on the issue of whether Sarbanes-Oxley applies to §

26  14(a) claims.  While a few district courts across the country have declined to apply § 804 to §
    14(a) claims sounding in negligence, they are inapposite because they did not address the

27  issue of whether § 804 applies to § 14(a) claims sounding in fraud.  *See, e.g.*, *In re Amtel*
    *Corp. Deriv. Litig.*, No. 06-4592, 2007 WL 2070299, at *8 (N.D. Cal. July 16, 2007).

28

1  Lead Plaintiff's § 14(a) claims sounds in fraud, and therefore, § 804 applies.

2  Consequently, Defendants' argument that Lead Plaintiff's § 14(a) claims with respect to the

3  2002, 2003 and 2004 Proxies are time barred is mistaken.

4  **VI.   LEAD PLAINTIFF HAS STATED A CLAIM FOR CONTROL PERSON LIABILITY PURSUANT TO SECTION 20(a)**

5  Lead Plaintiff has adequately plead primary violations of the securities laws on behalf

6  of Defendants Lu, Wu, Sophie, Barton and Toy, as control persons.  As such, Lead Plaintiff

7  has adequately stated a claim under Section 20(a).  *See In re Ditech Networks, Inc. Derivative.*

8  *Litig.*, No 06-5157, 2007 WL  2070300, at *9 (N.D. Cal. July 16, 2007) (holding that "to state

9  a claim under Section 20(a), a plaintiff must allege (1) a primary violation of federal securities

10  law; and (2) that the defendant exercised actual power or control over the primary violator.").

11  Whether the Individual Defendants actually are "controlling persons" under § 20(a) is a

12  question for the jury.[20]

13  **VII.   CONCLUSION**

14  For the foregoing reasons, the motion to dismiss should be denied in its entirety.

15  Dated:  March 14, 2008                    Respectfully submitted,

16                                            By:_____/s/_____

17                                            Mark Punzalan

18                                            FINKELSTEIN THOMPSON LLP
                                              100 Bush Street

19                                            Suite 1450
                                              San Francisco, California 94104

20                                            Telephone: 415.398.8700
                                              Facsimile: 415.398.8704

21
                                                  - and -
22

23                                            Donald J. Enright, Esq.
                                              Elizabeth K. Tripodi

24                                            FINKELSTEIN THOMPSON LLP
                                              1050 30th Street, NW
25

26
[20] *See Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000)(quoting *Kaplan v. Rose*,
27  49 F.3d 1363, 1382 (9th Cir. 1994) ("Whether [the defendant] is a controlling person is an
    intensely factual question, involving scrutiny of the defendant's participation in the day-to-
28  day affairs of the corporation and the defendant's power to control corporate actions." ).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Washington, D.C. 20007
Telephone: 202.337.8000
Facsimile: 202.337.8090

*Counsel for Plaintiffs*