Mark Punzalan (State Bar No. 247599)
mpunzalan@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone:  (415) 398-8700
Facsimile:  (415) 398-8704

[Additional Counsel Listed on Signature Page]

Lead Counsel

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER RUDOLPH, individually and on behalf of all others similarly situated, | ) Case No. 3:07-CV-04578-SI |
| | ) |
| Plaintiff, | ) |
| | ) **SECOND AMENDED CLASS** |
| | ) **ACTION COMPLAINT** |
| vs. | ) |
| | ) |
| UTSTARCOM, HONG LIANG LU, YING | ) |
| WU, MICHAEL SOPHIE, FRANCIS | ) |
| BARTON, AND THOMAS TOY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

I.      INTRODUCTION ................................................................................ 4

II.     NATURE OF THE ACTION ................................................................ 9

III.    JURISDICTION AND VENUE .......................................................... 11

IV.     THE PARTIES .................................................................................. 11

        A.     LEAD PLAINTIFF .................................................................. 11

        B.     THE DEFENDANTS ................................................................ 11

               1.     Obligations and Duties of the Individual Defendants ......................... 14

V.      CLASS ACTION ALLEGATIONS ..................................................... 16

VI.     SUBSTANTIVE ALLEGATIONS ...................................................... 18

        A.     UTSTARCOM'S COMPENSATION PHILOSOPHY
               EMBRACED THE  WIDE USE OF STOCK OPTIONS ............... 18

        B.     THE UTSTARCOM STOCK OPTION PLANS ........................... 20

        C.     ACCOUNTING AND TAX TREATMENT OF STOCK OPTIONS ........... 21

        D.     THE BACKDATED OPTION GRANTS .................................... 23

VII.    UTSTARCOM ISSUED MATERIALLY FALSE AND MISLEADING
        STATEMENTS DURING THE CLASS PERIOD .................................. 28

        A.     FALSE AND MISLEADING PROXY STATEMENTS ................. 28

               1.     The 2003 Proxy Statement ............................ 29

               2.     The 2004 Proxy Statement ............................ 30

               3.     The 2005 Proxy Statement ............................ 31

               4.     The 2006 Proxy Statement ............................ 32

        B.     FALSE AND MISLEADING FINANCIAL STATEMENTS ........... 33

               1.     The 2003 Financial Statements ...................... 33

               2.     The 2004 Financial Statements ...................... 35

               3.     The 2005 Financial Statements ...................... 40

               4.     The 2006 Financial Statements ...................... 43

VIII. ADDITIONAL FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....................................................................45

    A. DEFENDANTS CERTIFIED FALSE AND MISLEADING FINANCIAL  RESULTS ...............................................45

IX. THE TRUTH BEGINS TO EMERGE ................................................48

    A. VOLUNTARY REVIEW OF GRANT PRACTICES ..................48

    B. THE RESTATEMENT ...........................................................51

    C. THE RESTATEMENT'S IMPACT ON FINANCIAL RESULTS ...............55

    D. THE SEC REACHES SETTLEMENT WITH DEFENDANTS LU AND  SOPHIE ..................................................57

X. ADDITIONAL ALLEGATIONS OF SCIENTER ................................58

    A. THE COMPANY'S ADMISSIONS IN ITS RESTATEMENT CONTRIBUTE TO A STRONG INFERENCE OF DEFENDANTS'  SCIENTER ...........................................59

    B. DEFENDANTS' VIOLATIONS OF THE COMPANY'S STOCK OPTION PLANS CONTRIBUTE TO A STRONG INFERENCE OF  SCIENTER .......................................................60

    C. THE DURATION, MAGNITUDE AND PERVASIVENESS OF THE  WRONGDOING CONTRIBUTE TO A STRONG INFERENCE OF  SCIENTER ...........................................61

    D. THE FACT THAT PURPORTED COMPLIANCE WITH APB 25 WAS ESSENTIAL TO MAINTAINING UTSTARCOM'S PROFITABLE  PERFORMANCE SUPPORTS A STRONG INFERENCE OF   SCIENTER ..................................62

    E. THE FALSE CERTIFICATIONS UNDER SOX CONTRIBUTE TO A  STRONG INFERENCE OF SCIENTER ...............................62

    F. INDIVIDUAL DEFENDANTS' PROFITS FROM THE BACKDATED  OPTION GRANTS AND INSIDER TRADING CONTRIBUTE TO A  STRONG INFERENCE OF SCIENTER ...............64

    G. CONFIDENTIAL WITNESS ACCOUNTS CONTRIBUTE TO A STRONG INFERENCE OF SCIENTER ................................66

XI. LOSS CAUSATION ...........................................................................69

XII. INAPPLICABILITY OF STATURY SAFE HARBOR ............................71

**XIII.   PRESUMPTION OF RELIANCE** ....................................................................................72

**XIV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT** ........................................73

# I.      INTRODUCTION

1.      Court-appointed Lead Plaintiff, James Bartholomew ("Mr. Bartholomew" or "Lead Plaintiff"), brings this federal securities law class action on behalf of himself and all other persons or entities, other than Defendants and their affiliates, who purchased or acquired the common stock of UTStarcom, Inc. ("UTStarcom" or the "Company") between September 4, 2002 through and including July 24, 2007 (the "Class Period"), and were damaged by the conduct asserted herein.  Lead Plaintiff alleges the following facts upon knowledge, with respect to his own acts, and with respect to all other facts, including evidence obtained from several confidential witnesses, based on an investigation conducted by his counsel.

2.      This action involves a fraudulent scheme that spanned more than seven years.  At the crux of the fraudulent scheme was a practice whereby the Defendants intentionally manipulated stock option grants to the Company's officers, directors and employees in order to provide the recipients with a more profitable exercise.  As a result of this scheme, ***the Company has been forced to restate its previously filed financial statements for fiscal years 2000 through 2006 by approximately $24.3 million to account for the additional stock-based compensation expenses*** (the "Restatement").

3.      The Defendants' scheme caused the Company's financial statements issued during the Class Period to be materially false and misleading, resulting in an artificial inflation of the Company's stock price.  By engaging in this scheme, the Defendants concealed that UTStarcom was not recording material compensation expenses and was materially overstating its net income and earnings per share and understating its net losses and losses per share, in violation of generally accepted accounting principles ("GAAP").  When these backdated grants and the improper accounting concealing them were finally revealed to the public, the price of UTStarcom stock declined dramatically, causing substantial damage to investors.

4.      As a result of the Defendants' false statements, contrivances and manipulative acts, UTStarcom's publicly traded securities traded at artificially inflated prices throughout the Class Period, with its common stock reaching a high of $45.36 per share on August 21,

1  2003, as UTStarcom reported outstanding financial results.  As the artificial inflation of

2  UTStarcom's stock price was removed, UTStarcom's stock price declined to a low of $3.88

3  per share on July 24, 2007.

4       5.     A stock option granted to an employee of a corporation allows the employee to

5  purchase the specified number of shares of company stock at a specified price – referred to as

6  the "exercise price" or "strike price" – for a certain period of time.  Stock options are granted

7  by public companies as part of compensation packages for executives – supposedly to create

8  incentives for them to boost long-term corporate performance and profitability.  When the

9  executive exercises the option, he or she purchases the stock from the company at the exercise

10  price, regardless of the stock's price at the time the option is exercised.  Options are generally

11  priced at the market price on the date of grant – so if the stock price goes up *over time*

12  (typically ten years), the executive makes a profit.  If the system is abused by "backdating,"

13  which refers to picking an option-grant date earlier than the actual date the option was granted

14  when the stock price was lower than the actual grant date, the executive gets an instant,

15  guaranteed and riskless profit.

16       6.     Stock option manipulation and, in particular, the practice of granting an option

17  with an exercise price tied to a date prior to the actual grant date is fraudulent where: (a) the

18  backdating of grant dates violates the terms of the company's stock option plan; (b) the

19  company misrepresents how the options are priced; or (c) the company fails to properly

20  record expenses associated with these option grants under GAAP.  All three of these

21  circumstances existed here.

22       7.     As Harvey Pitt, former Chairman of the Securities and Exchange Commission

23  ("SEC") stated in an article in May of 2006, "[t]hose who backdate options grants violate

24  federal and state law.  And those on whose watch this conduct occurs are also potentially

25  liable: If they knew about the backdating, they're participants in fraudulent and unlawful

26  conduct.  If they didn't know about the backdating, the question will be:  Should they have

27  done more to discover it?"

28

8.      The Defendants' the backdating of stock option grants was not permitted under the contractual terms of the Company's stock option plans.  Instead the Defendants' manipulation of UTStarcom's stock option grants was the linchpin of a broader fraudulent scheme to personally profit from increases in the Company's stock price with the benefit of hindsight, and to misrepresent and hide material information from the public about the Defendants' backdating of options.  In furtherance of this fraudulent scheme, the Defendants engaged in the following misconduct:

(a)      In direct contravention of fundamental GAAP principles, the Defendants failed to report expenses associated with the backdated options and thereby materially understated UTStarcom's expenses and materially overstated its net income and earning per share.  If options are priced below a stock's fair market value when they are awarded, there is an instant gain.  Pursuant to Accounting Principles Board ("APB") Opinion No. 25, "*Accounting for Stock Issued to Employees*" ("APB 25"), which was in effect through June 2005, the Company was obligated to recognize this gain as a compensation expense over the vesting period of the option.  After June 2005, Statement of Financial Accounting Standards ("SFAS") 123, "*Accounting for Stock-Based Compensation*" ("SFAS 123"), required that the Company recognize the entire value of all option grants on the grant date amortized over the vesting period of the option.  However, as the Company has now admitted, "incorrect measurement dates for certain stock option grants were used for financial accounting and disclosure purposes based on the requirements of Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees."  In a later Form 8-K, the Company admitted that "[a] later date, when all such actions had taken place, should have been used as the measurement date for these stock options."

(b)      By retroactively pricing the options, the Defendants caused the Company to issue options with terms that violated the express requirements of the Company's stock option plans, which rendered the Company's public representations that options were issued in compliance with the Company's stock option plans

materially false and misleading.  Specifically, the Company's stock option plans expressly state that the exercise price of incentive stock options shall not be less than 100% of the fair market value of the stock on the date of grant.  However, where, as here, options are backdated, the exercise price of the stock options is lower than the fair market value on the true date of the grant.

      (c)     The Company Defendants repeatedly mislead investors by affirmatively representing in the Company's SEC filings that the purpose of its stock option plans and stock option grants to executives was "to attract and retain the best available personnel for positions of substantial responsibility and to provide additional incentive to Employees, Directors and Consultants and promote the success of the Company's business."

      (d)     The Company Defendants expressly misrepresented the value of director and officer compensation in various Company filings.  Specifically, in identifying specific options granted to officers, the Company Defendants falsely stated that such options were granted with an exercise price equal to the fair market value of the stock on the grant date when, in fact, the options were backdated and "in-the-money" when granted.

      9.     UTStarcom's Restatement of November 9, 2007 effectively acknowledges that its previously reported financial results were materially false and misleading when made because such statements omitted material facts regarding, and failed to take account of, the financial effect of the backdated option grants.  Moreover, the Company has expressly admitted in its quarterly report on Form 10-Q for the quarter ending on September 30, 2007 ("2007 3rd Quarter 10-Q"), that the fraud has had a material impact on the Company and its shareholders.  Among other things, the Company now acknowledges:

- During the Review Period, the Company granted stock options on approximately 34 million shares of the Company's common stock at 197 grant dates.

- A total of 17.9 million stock options were granted at the 53 tested grant dates during 2000 through 2005 where the Governance Committee's[1] review found the Company used incorrect measurement dates.  Using the corrected measurement dates, 10.3 million stock options had intrinsic value because their exercise prices were below the closing price of the Company's Common Stock at the corrected measurement date.

- These 10.3 million stock options resulted in an increase in non-cash stock-based compensation expense of $24.3 million during 2000 to 2005.

- The Review Team[2] found that in certain instances there was a lack of formal documentation in the stock option granting process and/or expected documentation is missing from the stock option administration files.  In addition, the Review Team found that in many instances, there was a lack of self-authenticating evidence to corroborate that cash exercises were contemporaneous.  As a result, the findings on the issue of backdating of cash exercises were inconclusive.

- The Company has assumed responsibility for all additional payroll taxes plus related penalties and interest arising from the restatement of stock-based compensation, including amounts otherwise payable by stock option recipients, and the Company's restated financial statements include a $1.5 million accrual for this estimated expense.

- A key finding of the Governance Committee was that there were deficiencies with the process by which stock options were granted during the period from the Company's initial public offering in 2000 through at least 2005.

---

[1]     The Governance Committee consisted of three members of the Board of Directors.
[2]     The Review Team consisted of independent outside legal counsel and forensic accountants.

- The Governance Committee concluded that certain members of management bear varying degrees of responsibility for the deficiencies in the process by which options were granted.

10.    This extensive fraud injured Lead Plaintiff and members of the Class.  The market reacted strongly to the news of UTStarcom's Restatement, and the Company's stock prices have fallen as the prior artificial inflation has been removed from the value of UTStarcom's securities.

## II.    NATURE OF THE ACTION

11.    As SEC Chairman Christopher Cox testified before the U.S. Senate Committee on Banking, Housing and Urban Affairs on September 6, 2006, backdating is a practice whereby companies "granted in-the-money options – that is, an option with an exercise price lower than that day's market price.  They did this by misrepresenting the date of the option grant, to make it appear that the grant was made on an earlier date when the market value was lower…The purpose of disguising an in-the-money option through backdating is to allow the person who gets the option grant to realize larger potential gains – without the company having to show it as compensation on the financial statements."

12.    Lynn Turner, the SEC's former Chief Accountant, described backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line."  Similarly, U.S. District Court Judge James M. Rosenbaum, in denying defendants' motions to dismiss a securities class action captioned as *In re UnitedHealth Group PSLRA Litig.*, 2007 U.S. Dist. LEXIS 40623 (D. Minn. June 4, 2007), regarding similar practices at UnitedHealth, compared backdating to "playing a game with a stacked deck.  When awarded (sic) options, with deliberately selected grant dates which were already in the money, defendants were playing a game they knew they could not lose; and unsurprisingly, defendants won."

13.    Arthur Levitt, former Chairman of the SEC, described backdating as stealing: "[i]t is ripping off shareholders in an unconscionable way" and "represents the ultimate in greed."

1       14.     Harvey Pitt, former Chairman of the SEC, opined that "backdating" plainly

2   violates both the federal securities law and state corporate fiduciary laws:

> What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders.
>
> For another, backdating means a corporate document used to permit access to corporate assets has been falsified, a violation of the Foreign Corrupt Practices Act.  Moreover, if backdating occurs without the compensation committee's knowledge, illegal insider trading may also have occurred.
>
> Securities law violations are not the only potential problems with backdating options grants.  Backdating may violate the Internal Revenue Code, and companies may not be able to deduct the options payments.  On the state level, backdating could involve a breach of fiduciary duty, a waste of corporate assets and even a usurpation of a corporate opportunity.
>
> *    *    *
>
> More fundamentally, the financial statements of a company that has engaged in backdating may require restatement.  The options may not be deductible, and the expenses, as well as the various periods to which they may have been allocated, may also be incorrect…
>
> More to the point, what does this kind of conduct say about those who do it and those who allow it to occur (either wittingly or unwittingly)?

Harvey Pitt, "The Next Big Scandal," Forbes.com, May 26, 2006.

15.     Defendants' backdating scheme not only surreptitiously and illegally lined certain Individual Defendants' pockets and caused UTStarcom to issue materially false financial statements, but it undermined the key purpose of stock option–based executive compensation: to provide incentives to executives to improve the Company's performance.  By manipulating options such that they carried a strike price lower than the trading price of the stock on the date of grant, UTStarcom insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

16.     Lead Plaintiff brings this action seeking to recover damages caused by UTStarcom's and the Individual Defendants' violations of Sections 10(b), 14(a) and 20(a) of the Exchange Act, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5.

III.    JURISDICTION AND VENUE

17.    This action arises under Sections 10(b), 14(a), and 20(a) of the Exchange Act, as amended, 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. §§240.10b-5 and 240.14a-9.

18.    This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.    Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  UTStarcom's corporate headquarters are located in Alameda, California, which is in this District.  Furthermore, Defendants transact business in this District, and many of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance and dissemination of materially false and misleading statements to the investing public, occurred in this District.

20.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone, and communications.

IV.    THE PARTIES

    A.    LEAD PLAINTIFF

31.    Lead Plaintiff James Bartholomew is an individual investor who purchased UTStarcom's securities during the Class Period and suffered damages as a result of the wrongful acts of Defendants as alleged herein.  His purchases and sales of UTStarcom common stock are reflected in his Certification, filed herewith.  On December 18, 2007, the Court appointed Mr. Bartholomew as Lead Plaintiff for this litigation.

    B.    THE DEFENDANTS

32.    Defendant UTStarcom, at the time of the wrongs complained of herein, maintained its corporate headquarters in the United States at 1275 Harbor Bay Parkway, Alameda, CA 94502.  UTStarcom manufactures, integrates and supports IP-based, end-to-end networking and telecommunications solutions.  The Company sells converged broadband

1    wireless and wireline products, an integrated IPTV solution, and a comprehensive line of

2    handset and customer premise equipment to operators in both emerging and established

3    telecommunications markets worldwide.  UTStarcom common stock trades on the NASDAQ

4    under the symbol "UTSI."

5            33.    Hong Liang Lu ("Lu") has served as the President, Chief Executive Officer, as

6    a director of the Company since June 1991, and as Chairman of the Board since March 2003.

7    In June 1991, Mr. Lu co-founded the Company under its prior name, Unitech Telecom, Inc.,

8    which subsequently acquired StarCom Network Stems, Inc. in September 1995.  As an

9    executive and a member of the Board of Directors, Lu authorized and approved certain

10   backdated stock option grants at issue in this case.  Lu signed UTStarcom's false Forms 10-K

11   for fiscal years 2002 through 2006, the Company's reports on Forms 10-Q for each quarter

12   from 2002 through 2006 and made false and misleading statements regarding UTStarcom's

13   executive compensation, stock option plans and financial results.  As an executive, Lu

14   received certain backdated stock options that are at issue in this case.  During the Class

15   Period, Lu reaped proceeds of $ 7,212,700 from his stock sales.

16           34.    Ying Wu ("Wu") has served as the Company's Executive Vice President and

17   Vice Chairman of the Board from October 1995 through July 24, 2007 and until February

18   2004, as President of one of the Company's subsidiaries, UTStarcom Chine Co., Ltd.  As an

19   executive and a member of the Board of Directors, Wu authorized and approved certain

20   backdated stock option grants at issue in this case.  Wu signed UTStarcom's false Forms 10-K

21   for fiscal years 2002 through 2005, the Company's reports on Forms 10-Q for each quarter

22   from 2002 through 2005 and made false and misleading statements regarding UTStarcom's

23   executive compensation, stock option plans and financial results.  As an executive, Wu

24   received certain backdated stock options that are at issue in this case.  During the Class

25   Period, Wu reaped proceeds of $ 22,882,150 from his stock sales.

26           35.    Michael Sophie ("Sophie") served as Vice President of Finance and Chief

27   Financial Officer of the company from August of 1999 until August of 2005.  As an executive

28   and a member of the Board of Directors, Sophie authorized and approved certain backdated

1  stock option grants at issue in this case.  Sophie signed UTStarcom's false Forms 10-K for

2  fiscal years 2000 through 2004, the Company's reports on Forms 10-Q for each quarter from

3  2000 through 2004 and made false and misleading statements regarding UTStarcom's

4  executive compensation, stock option plans and financial results.  As an executive, Sophie

5  received certain backdated stock options that are at issue in this case.  During the Class

6  Period, Sophie reaped proceeds of $ 4,142,157.90 from his stock sales.

7     36.     Francis Barton ("Barton") has served as the Executive Vice President and

8  Chief Financial Officer of the Company since August of 2005. As an executive and a member

9  of the Board of Directors, Barton authorized and approved certain backdated stock option

10  grants at issue in this case.  Barton signed UTStarcom's false Forms 10-K for fiscal years

11  2005 through 2006, the Company's reports on Forms 10-Q for each quarter from 2005

12  through 2006 and made false and misleading statements regarding UTStarcom's executive

13  compensation, stock option plans and financial results.  As an executive, Barton received

14  certain backdated stock options that are at issue in this case.

15     37.     Thomas Toy ("Toy") currently has served as the Chairman of the Board since

16  January 1, 2007.  Prior to this, he served as an independent director, beginning in 1995.  Toy

17  signed UTStarcom's false Forms 10-K for fiscal years 2002 through 2006 and made false and

18  misleading statements regarding UTStarcom's executive compensation, stock option plans

19  and financial results.  As a member of the Audit and Compensation Committees, Defendant

20  Toy enabled the stock option backdating scheme to succeed.  During the Class Period, Toy

21  reaped proceeds of $ 2,727,700 from his stock sales.

22     38.     Lu, Wu, Sophie, Barton, and Toy are collectively referred to herein as the

23  "Individual Defendants."  Because of the Individual Defendants' positions within the

24  Company, they had access to adverse undisclosed material information about its business,

25  operations, financial statements and stock option grants.  They were privy to such undisclosed

26  information from internal corporate documents, communications with other officers and

27  employees of the Company, and attendance at and documents received during management

28  and Board of Directors meetings.

1    **1.    Obligations and Duties of the Individual Defendants**

2    39.    By reason of their positions as directors and/or officers of UTStarcom, and

3    because of their ability to control the business, corporate and financial affairs of UTStarcom,

4    each Individual Defendant was obligated to exercise due care and diligence in the

5    management and administration of the affairs of the Company, including administration of the

6    Company's stock options and incentive plans and in ensuring that UTStarcom operated in

7    compliance with all applicable federal and state laws, rules and regulations, including the

8    federal securities laws.

9    40.    To discharge their duties, the Individual Defendants were required to exercise

10   reasonable and prudent supervision over the management, policies, practices, controls and

11   financial and corporate affairs of UTStarcom.  By virtue of these duties, Individual

12   Defendants were required, *inter alia*, to:

13          a.    manage, conduct supervise, and direct the employees, businesses and

14                affairs of UTStarcom in accordance with laws, rules and regulations,

15                and the charter and by-laws of the Company;

16          b.    manage and supervise the administration of UTStarcom's carious stock

17                option and incentive plans in a manner consistent with the plans'

18                objectives; and

19          c.    supervise the preparation, filing, and/or dissemination of any SEC

20                filing, registration statement, press release, audit, report, or other

21                information disseminated by UTStarcom and to examine and evaluate

22                any reports of examinations or investigations concerning the practices,

23                products, or conduct of officers of UTStarcom.

24   41.    Moreover, Sarbannes-Oxley (SOX) requires an issuer (UTStarcom) and its

25   chief executive officer (Lu) and chief financial officer (Sophie and Barton) to certify publicly

26   the accuracy of the corporation's financial statements and the adequacy of its internal controls.

27   More specifically, the executives were required to and did certify that:

28

1    a.  the Company's reports of Forms 10-K and 10-Q do not contain any

2       untrue statements or omit any material fact, and the financial statements

3       contained therein fairly present the Company's financial condition,

4       results  of operations and cash;

5    b.  they have designed or caused to be designed disclosure controls and

6       procedures (i) to ensure that material information is made known to

7       them, and (ii) to provide reasonable assurance as to the reliability of

8       financial reporting and the preparation of the financial statements in

9       accordance with GAAP;

10    c.  they have evaluated the effectiveness of the Company's disclosure

11       controls and procedures and presented their conclusions and disclosed

12       any changes in internal controls in these reports; and

13    d.  they have disclosed to the auditors and the audit committee (i) all

14       material weaknesses in the design or operation of internal controls over

15       financial reporting; and (ii) any fraud , whether or not material, that

16       involves management or other employees who have a significant role in

17       the Company's internal control over financial reporting.

18   42.  Further, the Individual Defendants generally, and members of the

19 Compensation Committee (Toy) specifically, were responsible for administering the

20 Company's stock option plans.  According to the Company's definitive proxy statement on

21 Schedule 14A dated April 10, 2002 (the "2002 Proxy Statement"), the Compensation

22 Committee is responsible for reviewing and recommending for approval by the Board of

23 Directors the Company's compensation practices, including executive salary levels and

24 variable compensation programs, both cash-based and equity based.  The Compensation

25 Committee administers an option grant pursuant to which members of management, including

26 the Company's executive officers, may receive annual option grants as of the time of their

27 review each year from a pool of shares set aside by the Company.

28

43.     The Individual Defendants generally, and members of the Audit Committee (Toy) specifically, were responsible for maintaining and establishing adequate internal controls for the Company and ensuring that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure.

44.     UTStarcom's Audit Committee Charter provides that the Audit Committee shall, among other things make recommendations to the Board of Director regarding the selection of independent auditors, review the results and scope of audit and other services provided by the independent auditors and review the accounting principles and auditing practices and procedures to be used in the Company's financial statements.  It goes on to state that "[m]anagement is responsible for the Company's financial reporting process including its system of internal control, and for the preparation of consolidated financial statements in accordance with generally accepted accounting principles."

45.     The members of the Audit Committee (Toy) and the other Individual Defendants, considered management (Lu, Wu, Sophie and Barton) failed to comply with these obligations, thereby permitting the systematic falsification of the Company's financial statements for more than six years.

## V.     CLASS ACTION ALLEGATIONS

46.     Lead Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of persons and entities who purchased UTStarcom securities from September 4, 2002 through July 24, 2007, inclusive (the "Class Period") and were damaged thereby (the "Class").

47.     Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each of the Defendants; (iii) any person who was an executive officer and/or director of UTStarcom during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; (v) any person who

1  profited from or actively participated in the wrongdoing at issue; and (vi) the legal

2  representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded

3  party.

4         48.     The Class is so numerous that joinder of all members is impracticable.

5  According to UTStarcom's Form 10-K for the fiscal year ending December 31, 2007, filed

6  with the SEC on March 3, 2008, UTStarcom had 123,468,496 shares of common stock issued

7  and outstanding as of February 8, 2008.  These shares were actively traded on the NASDAQ

8  GS.  For this reason, Lead Plaintiff believes that the proposed Class is comprised of

9  thousands, if not tens of thousands, of investors.

10         49.     Lead Plaintiff will fairly and adequately protect the interests of the members of

11  the Class, and Plaintiff has no interests which are contrary to, or in conflict with, the interests

12  of the Class members that they seek to represent. Lead Plaintiff has retained competent

13  counsel, experienced in class action litigation under the federal securities laws to ensure such

14  protection, and intends to prosecute this action vigorously.

15         50.     A class action is superior to all other available methods for the fair and

16  efficient adjudication of this controversy since joinder of all members is impracticable.

17  Furthermore, as the damages suffered by individual members of the Class may be relatively

18  small, the expense and burden of individual litigation make it impossible for the members of

19  the Class to individually seek redress for the wrongs done to them.  There will be no difficulty

20  in the management of this action as a class action.

21         51.     Questions of law and fact common to the members of the Class predominate

22  over any questions that may affect only individual members in that Defendants have acted on

23  grounds generally applicable to the entire Class.  Among the questions of law and fact

24  common to the Class are:

25            a.       whether the federal securities laws were violated by Defendants' acts as

26                   alleged herein;

27            b.       whether Defendants' publicly disseminated releases and statements

28                   during the Class Period, omitted and/or misrepresented material facts,

1    and whether Defendants breached any duty to convey material facts or

2    to correct material facts previously disseminated;

3    c.   whether Defendant participated in and pursued the common course of

4    conduct complained of herein;

5    d.   whether Defendants acted with scienter in omitting and/or

6    misrepresenting material facts;

7    e.   whether Defendants improperly manipulated the terms of the stock

8    option grants;

9    f.   whether Defendants engaged in a scheme to defraud by manipulating

10    the terms of stock options granted to them and others;

11    g.   whether the market prices of UTStarcom securities during the Class

12    Period were artificially inflated because of Defendants' conduct

13    complained of herein; and

14    h.   whether the members of the Class have sustained damages and, if so,

15    what is the proper measure of damages.

16    52.    Lead Plaintiff's claims are typical of the claims of the members of the Class.

17  Further, both Lead Plaintiff and members of the Class sustained damages arising out of

18  Defendants' wrongful conduct in violation of federal law as complained of herein.

19  **VI.    SUBSTANTIVE ALLEGATIONS**

20    **A.    UTSTARCOM'S COMPENSATION PHILOSOPHY EMBRACED THE**

21    **WIDE USE OF STOCK OPTIONS**

22    53.    The use of stock options surged in the late 1990s, as fledgling firms such as

23  UTStarcom, that had bright prospects but little revenues, used them to attract and pay

24  executives.  As dot-com and telecom share prices soared, stock options became a source of

25  vast wealth for company executives as well as employees who received lucrative stock option

26  packages in connection with their hiring.

27

28

54.     From it's inception as a public company in March 2000, UTStarcom adopted a policy of compensating defendants Lu, Wu, Sophie, Barton, and other employees in large part through stock options.

55.     The Company also exclusively used stock options to compensate non-management directors for their services.

56.     UTStarcom described its option granting philosophy in a proxy statement filed with the SEC on Schedule 14A dated April 10, 2002 (the "2000 Proxy Statement"), as follows:

> The Committee administers an option program pursuant to which members of management, including the Company's executive officers, may receive annual option grants as of the time of their reviews each year from a pool of shares set aside by the Company. *The purpose of the option program is to provide additional incentive to executives and other key employees of the Company to work to maximize long-term return to the Company's stockholders.* The allocation of the option pool, other than the shares allocated to the Chief Executive Officer, is recommended by the Chief Executive Officer for approval by the Committee. The allocation of shares from the option pool to the Chief Executive Officer is determined solely by the Committee. In granting stock options to the executive officers and the Chief Executive Officer, the Committee consider a number of objective and subjective factors, including the executive's position and responsibilities at the Company, such executive's past and anticipated individual performance, current survey data with respect to market rates for option compensation and other factors that they may deem relevant. Options generally vest over a four year period to encourage option holders to continue in the employ of the Company. *The exercise price of options is the market price on the date of grant, ensuring that the option will acquire value only to the extent that the price of the Company's Common Stock increases relative to the market price at the date of grant.* (Emphasis added).

57.     Each option gave the recipient the right to buy one share of UTStarcom common stock from the Company at a set price, called the "exercise" or "strike" price, on a future date after the option vested.  The option was "in-the-money" whenever the trading price of UTStarcom common stock exceeded the option's exercise price.  The option was "at-the-money" whenever the trading price of UTStarcom common stock and the exercise price were the same.  The option was "out-of-the-money" or "underwater" whenever the trading price of UTStarcom common stock was less than the exercise price.  At all relevant times, Defendants represented that UTStarcom's incentive stock option grants were made at fair

1    market value, *i.e*, the closing price of UTStarcom common stock on the date of grant ("at-the-

2    money" and certainly not "in-the-money").

3              **B.    THE UTSTARCOM STOCK OPTION PLANS**

4              56.     Between 2000 through 2006, UTStarcom granted stock options to its officers,

5    directors and employees pursuant to at least five different stock option plans:  the 1997 Stock

6    Option Plan ("1997 Plan"), the 2001 Director Plan ("2001 Plan"), Equity Based

7    Compensation ("Equity Plan"), the 2003 Non-Statutory Stock Option Plan ("2003 Plan") and

8    the 2006 Equity Incentive Plan ("2006 Plan").  Each plan was prepared by UTStarcom's

9    management, adopted by the Board of Directors and voted upon and approved by UTStarcom

10   shareholders.

11             57.     The stated purpose of each plan was to attract and retain the best available

12   personnel for positions of substantial responsibility, to provide additional incentive to

13   Employees, Directors and Consultants and to promote the success of the Company's business.

14   *See* 1997 Plan, 2001 Plan, Equity Plan and 2006 Plan.  Each plan gave the Board of Directors

15   or any of its Committees the full power to interpret and administer the plans, to select the

16   specific employees to whom awards would be granted under the plans, the type and amount of

17   the award to be granted to such employees, and the terms of the option agreements to be

18   entered into with such employees.  *See* 1997 Plan ¶ 4, 2001 Plan ¶ 4, and 2006 Plan ¶ 4.

19             58.     Under the 1997 Plan and the 2006 Plan, the Board of Directors or any of its

20   Committees was responsible for determining ht exercise price of each option grant, within

21   certain limitations.  *See* 1997 Plan ¶8 and 2006 Plan ¶5(d).

22             59.     Stock options could not have an exercise price less than the fair market value

23   of a share of UTStarcom common stock on the date of grant.  *See* 1997 Plan ¶8(a)(i)(B), 2001

24   Plan¶ 4(a)(vi)(C), Equity Plan and 2006 Plan ¶ 6(d)(i).  The plans defined fair market value to

25   be the closing sales price of a share of UTStarcom common stock on the last market trading

26   day prior to the time of determination as published by the <u>Wall Street Journal</u> or some other

27   reliable source.  *See* 1997 Plan ¶ 2(m), 2001 Plan¶ 2(i),.  The 2006 Plan defines fair market

28

1    value as the price of such stock on any established stock exchange or national market system

2    on the day of determination.  2006 Plan ¶ 2(v).

3        60.    UTStarcom also utilized a stock option plan to attract and retain directors of

4    the Company which similarly specified that "[t]he exercise price per Share shall be one

5    hundred percent (100%) of the Fair Market Value per Share on the date of grant of the First

6    Option.

7        **C.    ACCOUNTING AND TAX TREATMENT OF STOCK OPTIONS**

8        61.    UTStarcom's stated policy of issuing at-the-money stock options under its

9    Plans was designed to enable the Company to receive favorable treatment under the then-

10   existing GAAP and IRS rules.

11       62.    Options are a form of employee compensation.  Prior to January 1, 2006,

12   issuers typically accounted for options-related compensation expenses pursuant to the

13   "intrinsic value method" described in APB 25.  Under the intrinsic value method, the

14   compensation expense attributed to a stock option grant is calculated as the difference of: (a)

15   the exercise price and (b) the quoted market price of the underlying stock on the measurement

16   date, which is defined as the "first date on which are known both (1) the number of shares that

17   an individual employee is entitled to receive and (2) the option or purchase price, if any."

18   Pursuant to most stock option plans, including UTStarcom's, the measurement date is the date

19   that the stock option grants are formally approved and documented by the Board or its

20   designated committees.

21       63.    Under the intrinsic value method, if the issuer grants an at-the-money option

22   with an exercise price at or above the quoted market price of the stock on the grant date, then

23   the issuer is not required to recognize any compensation-related expense for the option.  In

24   fact, the issuer could provide compensation to its executives without incurring any related

25   compensation expense for the life of the option as long as grants are priced at the money.

26       64.    In contrast, an issuer that granted an in-the-money option, *i.e.* an option with

27   an exercise price below the quoted market price of the stock on the grant date, was not

28   eligible for favorable treatment under GAAP.  Under APB 25, if the stock's market price on

1   the date of the grant exceeds the exercise price of the option, the company must recognize the

2   difference as an expense during the vesting period, which directly reduces the issuer's net

3   income.

4          65.     One critique of the intrinsic value method is that it does not take into account

5   the possibility that an option granted with an exercise price at or above the quoted market

6   price would someday increase in value as the security's market price rose.  Consequently, in

7   October 1995, the Financial Accounting Standards Board ("FASB") offered an alternative

8   method for valuing stock-based awards, FAS Statement 123, "Accounting for Stock-Based

9   Compensation."  FAS 123 allowed issuers to either continue valuing options using the

10   intrinsic value method, or use the "fair value" method and employ option pricing models such

11   as the Black-Scholes pricing model.  If an issuer continued using the intrinsic value method, it

12   had to disclose in the footnotes to its financial statements a pro forma income calculation of

13   the compensation expense that would have been incurred using the fair value method.

14          66.     Over the next decade, the vast majority of companies, including UTStarcom

15   continued to use APB 25's intrinsic value method in connection with option grants, because

16   using the fair value accounting method would have required that some compensation

17   expenses be recorded, as compared to the intrinsic value method, where no compensation

18   expenses were required to be recorded for at-the-money options.

19          67.     As reflected in UTStarcom's annual and quarterly financial statements from

20   2001 through 2005, the differential in reported earnings under the intrinsic value and the fair

21   value accounting methods amounted to hundreds of millions of dollars.  Accordingly, the

22   Defendants were well aware of the importance to UTStarcom's bottom line of satisfying the

23   requirements of APB 25.

24          68.     UTStarcom was also entitled to take tax deductions under the Internal Revenue

25   Code ("IRC") for at-the-money options, but was not eligible for this favorable tax treatment if

26   the options were granted in-the-money.  For example, IRC Section 162(m), 28 U.S.C. §

27   162(m) ("Section 162(m)"), provides that compensation in excess of $1 million per year

28   (including gains on stock options) paid to a corporation's five most highly compensated

1  officers is tax-deductible only if certain conditions are met.  One of those conditions is that

2  the compensation must be payable solely on account of the attainment of one or more

3  performance goals, such as increasing the value of the Company's stock in the future.  Tax

4  experts have opined that in-the-money options do not qualify for a Section 162(m) deduction

5  since such grants are not deemed performance-based compensation.  As such, UTStarcom and

6  other companies that backdated options face the prospect of paying significant sums to revise

7  prior years' tax returns, plus interest and penalties.

8          69.     In this case, UTStarcom did not expense the stock option compensation to

9  UTStarcom executives and employees, even though the backdated stock options at issue were

10  priced below the fair market value of the Company's stock at the date of grant and issuance.

11  As a result, UTStarcom's financial statements materially inflated margins and earnings in

12  violation of GAAP, which ultimately resulted in requiring that the Company take a $24.3

13  million charge to account for compensation expenses and restate its financial results.

14          **D.     THE BACKDATED OPTION GRANTS**

15          70.     The Executive Defendants repeatedly received stock option grants from

16  UTStarcom on unusually favorable dates from at least October 2000 through July 2002.  The

17  grants were numerous and consistently made at or near yearly lows and/or were just before a

18  large increase in the stock price.  UTStarcom has now admitted that, unbeknownst to public

19  investors, millions of option shares had exercise prices below the closing price of the

20  Company's common stock at the corrected measurement date.

21          71.     The 2000 Proxy Statement indicated that a total of 205,000 stock options at an

22  exercise price of $15 per share, were purportedly granted to Defendants Lu, Wu and Sophie

23  on October 18, 2000.  Director Defendant and Compensation Committee member Toy

24  received 10,000 stock options at an exercise price of $15 per share, purportedly on this date.

25          72.     Notably, October 18, 2000, the date of the grants in question was not only the

26  lowest closing price of the Company's stock during that month, but also was the lowest

27  closing price of the Company's stock for the year to date.  Even more remarkable, the value of

28  the Company's stock increased considerably during the days following the stock option grants

of October 18, 2000.  By the close of trading at the end of October, UTStarcom's stock stood at $20, a 33% increase.

73.     A table showing the reported stock options, and comparing their value on the purported grant date of October 18 with their value on October 31, evidences a $1,025,000 increase in less than two weeks:

| Date | Executive | No. of Securities Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant & Oct. 31 | Gain in Intrinsic Val. Between Date of Grant & Oct. 31 |
|------|-----------|-----------------------------------|-------------------------------------------------------------------|--------------------------------------------------------|
| 10/18/2000 | Lu | 100,000 | $ 5.00 | $ 500,000 |
| 10/18/2000 | Wu | 55,000 | $ 5.00 | $ 275,000 |
| 10/18/2000 | Sophie | 50,000 | $ 5.00 | $ 250,000 |
| 10/18/2000 | Toy | 10,000 | $ 5.00 | $  50,000 |

74.     The 2000 Proxy Statement also indicated that a total of 205,000 stock options at an exercise price of $12.50 per share, were purportedly granted to Defendants Lu, Wu and Sophie on December 21, 2000.  Director Defendant and Compensation Committee member Toy received 7,500  stock options at an exercise price of $12.50 per share, purportedly on this date.

75.     Notably, December 21, 2000, the date of the grants in question was not only the lowest closing price of the Company's stock during that month, but also was the lowest closing price of the Company's stock for the year to date.  Even more remarkable, the value of the Company's stock increased considerably during the days following the stock option grants of December 21, 2000.  A little over one month later, on February 1, 2001, UTStarcom's stock stood at $25.62, **a 105% increase**.

76.     A table showing the reported stock options, and comparing their value on the purported grant date of December 21 with their value on February 1, evidences a $2,033,600 increase in less than five weeks:

| Date | Executive | No. of Securities Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant & Feb. 1 | Gain in Intrinsic Val. Between Date of Grant & Feb. 1 |
|------|-----------|-----------------------------------|-------------------------------------------------------------------|--------------------------------------------------------|
| 12/21/2000 | Lu | 100,000 | $ 13.12 | $ 1,312,000 |
| 12/21/2000 | Wu | 55,000 | $ 13.12 | $ 721,600 |
| 12/21/2000 | Sophie | 50,000 | $ 13.12 | $ 656,000 |
| 12/21/2000 | Toy | 7,500 | $ 13.12 | $ 98,400 |

77.     The 2002 Proxy Statement indicated that a total of 350,000 stock options at an exercise price of $20.25 per share were purportedly granted to Defendants Lu, Wu and Sophie on February 28, 2002.

78.     Notably, February 28, 2002, the date of the grants in question was not only the lowest closing price of the Company's stock during that month, but also was the lowest closing price of the Company's stock for the year to date.  Even more remarkable, the value of the Company's stock increased considerably during the days following the stock option grants of February 28, 2002.  A one month later, on March 28, 2002, UTStarcom's stock stood at $26.23, a 30% increase.

79.     A table showing the reported stock options, and comparing their value on the purported grant date of February 28 with their value on March 28, evidences a $ 2,093,000 increase in one month:

| Date | Executive | No. of Securities Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant & Mar.28 | Gain in Intrinsic Val. Between Date of Grant & Mar.28 |
|------|-----------|-----------------------------------|-------------------------------------------------------------------|--------------------------------------------------------|
| 2/28/2002 | Lu | 150,000 | $ 5.98 | $ 897,000 |
| 2/28/2002 | Wu | 100,000 | $ 5.98 | $ 598,000 |
| 2/28/2002 | Sophie | 100,000 | $ 5.98 | $ 598,000 |

80.     The 2002 Proxy Statement indicated that a total of 175,000 stock options at an exercise price of $15.72 per share were purportedly granted to Defendants Lu, Wu and Sophie on July 25, 2002.

81.     Notably, July 25, 2002, the date of the grants in question was not only the lowest closing price of the Company's stock during that month, but also was the lowest closing price of the Company's stock for the year to date.  Even more remarkable, the value of the Company's stock increased considerably during the days following the stock option grants of July 25, 2002.  Only six days later at the month's end, on July 31, 2002, UTStarcom's stock stood at $17.45, an 11% increase.

82.     A table showing the reported stock options, and comparing their value on the purported grant date of July 25 with their value on July 31, evidences a $ 302,750 increase in five days:

| Date | Executive | No. of Securities Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant & July 31 | Gain in Intrinsic Val. Between Date of Grant & July 31 |
|---|---|---|---|---|
| 7/25/2002 | Lu | 75,000 | $ 1.73 | $ 129,750 |
| 7/25/2002 | Wu | 50,000 | $ 1.73 | $ 86,500 |
| 7/25/2002 | Sophie | 50,000 | $ 1.73 | $ 86,500 |

83.     The Governance Committee's review defined the different types of stock option grants to executives and directors as the following:

In determining the measurement date to be used, the Review Team, management, and the Governance Committee agreed to use the following definitions as constituting the proper measurement date, and generally these dates were used in testing the stated grant dates or establishing corrected measurement dates:

| **Discretionary Director and Officer Grants** | The date of a Compensation Committee meeting where the grant was approved or the date the final Compensation Committee signer approved the grant when approval occurred through unanimous written consent documents ("UWC"). |
|---|---|
| **Automatic Director Grants** | The date specified in the relevant stock option plan. |
| **Broadbase** | The date the grantee list, including the allocation of shares to individual grantees, was complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |

| | |
|---|---|
| **Acquisition** | The first Compensation Committee meeting following the acquisition, provided grantees had received employment offer letters stating the number of stock options to be granted before such date because this was the date at which the option exercise price was established. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **New Hire** | The first scheduled Compensation Committee meeting following the first day of employment because this was the date at which the option exercise price was established. The number of options was based on either grant amounts specified in an employment offer letter or, in some cases, on a matrix that assigned grant amounts based on position and level within the Company. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **Other Merit** | The date the grantee list, including the allocation of shares to grantees, was substantially complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |

84.     The Governance Committee reviewed not only discretionary option grants, but also grants linked to particular events and specific dates, *i.e.* the "acquisition" grants and the "new hire" grants.  Thus, the review of the stated grant date for 90% of the options granted on 34 million shares during the Review Period was not solely based on discretionary grants.

85.     The Company has conceded in its Restatement that approximately 57% of the 17.9 million stock options granted between 2000 and 2006 had a grant date that preceded the appropriate measurement date.  The Company does not indicate which of the tested grant dates preceded the appropriate measurement date.

86.     All of the options granted to executives, namely Defendants Lu, Wu and Sophie during the years 2000 and 2002 were granted by the Compensation Committee at unusually favorable dates, consistently made at or near yearly lows and/or were just before a large increase in the stock price – *every single one*.  This consistency clearly and unequivocally indicates an intentional pattern and practice of purposefully backdating option grant dates during this time frame in order to financially benefit the Company's leading

1   executives.  Not coincidentally, the reporting rules on employee stock options changed on

2   August 29, 2002, requiring Companies to disclose options grants to the SEC just two days

3   after their grant, rather than reporting within ten days after the end of the calendar month

4   during which the transaction occurred as had previously been required.  Thus, prior to this

5   rule change, while the time lag between option grants and their required disclosure allowed

6   greater manipulation, Defendants had consistently backdated options for UTStarcom's

7   executives.  After the rule change, the backdating became more sporadic – clearly, because it

8   became harder to conceal.

9   **VII.   UTSTARCOM ISSUED MATERIALLY FALSE AND MISLEADING**

10          **STATEMENTS DURING THE CLASS PERIOD**

11          87.     During the Class Period, Defendants issued a series of false and misleading

12  statements in violation of sections 10(b), 14(a), and 20(a) of the Exchange Act and Rule 10b-

13  5.  These statements fall within several categories.  First, the Defendants issued false and

14  misleading statements regarding the Company's financials.  Second the Defendants issued

15  false and misleading statements regarding the terms and value of the options granted to

16  officers, directors and employees.  Third, the Defendants issued false and misleading

17  statements regarding the Company's internal controls relating to stock option grants and

18  related financial reporting.

19          **A.      FALSE AND MISLEADING PROXY STATEMENTS**

20          88.     UTStarcom's annual proxy statements from 2000 through 2008, which were

21  disseminated to shareholders and filed with the SEC, contained material misstatements and

22  omissions falling into four general categories: (a) misstatements that the options granted

23  under the Plans were priced at the fair market value on the date of the grant; (b) misstatements

24  that stock options would not provide value to executive officers until the price of

25  UTStarcom's stock increased over the exercise price, when in fact many options were issued

26  in the money; (c) misstatements relating to the compensation received by the Executive

27  Defendants prior to and during the Class Period; and (d) statements failing to disclose that the

28  stated purpose of option grants to UTStarcom executives – *i.e.*, linking a significant portion of

their compensation to the future performance of the Company – was significantly undermined because the option grants described in the proxies were backdated and in the money.

### 1.   The 2003 Proxy Statement

89.   The 2003 Proxy Statement provides that:

**Equity-based Compensation**

The Committee administers an option program pursuant to which members of management, including the Company's executive officers, may receive annual option grants as of the time of their reviews each year from a pool of shares set aside by the Company. *The purpose of the option program is to provide additional incentive to executives and other key employees of the Company to work to maximize long-term return to the Company's stockholders.* The allocation of the option pool, other than the shares allocated to the Chief Executive Officer, is recommended by the Chief Executive Officer for approval by the Committee. The allocation of shares from the option pool to the Chief Executive Officer is determined solely by the Committee. In granting stock options to the executive officers and the Chief Executive Officer, the Committee considers a number of objective and subjective factors, including the executive's position and responsibilities at the Company, such executive's past and anticipated individual performance, current survey data with respect to market rates for option compensation and other factors that they may deem relevant. Options generally vest over a four year period to encourage option holders to continue in the employ of the Company. *The exercise price of options is the market price on the date of grant, ensuring that the option will acquire value only to the extent that the price of the Company's common stock increases relative to the market price at the date of grant.* (Emphasis added).

90.   The foregoing representation was materially misleading in failing to disclose the backdating scheme involving in-the-money options from at least October 2000 through July 2002 which undermined the goal of linking a significant portion of the Executive Defendants' compensation to the future performance of the Company.

91.   Further, the foregoing representation was materially false and misleading in providing that the exercise price of options is the market price on the date of grant, when in fact, options were backdated.

92.   The 2003 Proxy Statement also materially misstated the Expiration Date of the option grants in the chart entitled "Option Grants in Last Fiscal Year."  The Expiration Date reflect the future expiring of the backdated option.

93.     Finally, the "Summary Compensation Table" included in the 2002 Proxy materially misstated the compensation of, and failed to disclose, the illicit compensation received from the Company by Defendants Lu, Wu and Sophie in fiscal years 2000 through 2002 as a result of their receipt of fraudulently backdated stock options at less than fair market value.

### 2.     The 2004 Proxy Statement

94.     The 2004 Proxy Statement provides that:

**Equity-based Compensation**

The Committee administers an option program pursuant to which members of management, including the Company's executive officers, may receive annual option grants as of the time of their reviews each year from a pool of shares set aside by the Company. *The purpose of the option program is to provide additional incentive to executives and other key employees of the Company to work to maximize long-term return to the Company's stockholders.* The allocation of the option pool, other than the shares allocated to the Chief Executive Officer, is recommended by the Chief Executive Officer for approval by the Committee. The allocation of shares from the option pool to the Chief Executive Officer is determined solely by the Committee. In granting stock options to the executive officers and the Chief Executive Officer, the Committee considers a number of objective and subjective factors, including the executive's position and responsibilities at the Company, such executive's past and anticipated individual performance, current survey data with respect to market rates for option compensation and other factors that they may deem relevant. Options generally vest over a four year period to encourage option holders to continue in the employ of the Company. *The exercise price of options is the market price on the date of grant, ensuring that the option will acquire value only to the extent that the price of the Company's common stock increases relative to the market price at the date of grant.* (Emphasis added).

95.     The foregoing representation was materially misleading in failing to disclose the backdating scheme involving in-the-money options from at least October 2000 through July 2002 which undermined the goal of linking a significant portion of the Executive Defendants' compensation to the future performance of the Company.

96.     Further, the foregoing representation was materially false and misleading in providing that the exercise price of options is the market price on the date of grant, when in fact, options were backdated.

97.     Finally, the "Summary Compensation Table" included in the 2004 Proxy materially misstated the compensation of, and failed to disclose, the illicit compensation

1    received from the Company by Defendants Lu, Wu and Sophie in fiscal years 2001 through

2    2002 as a result of their receipt of fraudulently backdated stock options at less than fair

3    market value.

### 3.    The 2005 Proxy Statement

98.    The 2005 Proxy Statement provides that:

**Equity-based Compensation**

The Committee administers an option program pursuant to which members of management, including the Company's executive officers, may receive annual option grants as of the time of their reviews each year from a pool of shares set aside by the Company. *The purpose of the option program is to provide additional incentive to executives and other key employees of the Company to work to maximize long-term return to the Company's stockholders.* The allocation of the option pool, other than the shares allocated to the Chief Executive Officer, is recommended by the Chief Executive Officer for approval by the Committee. The allocation of shares from the option pool to the Chief Executive Officer is determined solely by the Committee. In granting stock options to the executive officers and the Chief Executive Officer, the Committee considers a number of objective and subjective factors, including the executive's position and responsibilities at the Company, such executive's past and anticipated individual performance, current survey data with respect to market rates for option compensation and other factors that they may deem relevant. Options generally vest over a four year period to encourage option holders to continue in the employ of the Company. *The exercise price of options is the market price on the date of grant, ensuring that the option will acquire value only to the extent that the price of the Company's common stock increases relative to the market price at the date of grant.* (Emphasis added).

99.    The foregoing representation was materially misleading in failing to disclose

the backdating scheme involving in-the-money options from at least October 2000 through

July 2002 which undermined the goal of linking a significant portion of the Executive

Defendants' compensation to the future performance of the Company.

100.    Further, the foregoing representation was materially false and misleading in

providing that the exercise price of options is the market price on the date of grant, when in

fact, options were backdated.

101.    Finally, the "Summary Compensation Table" included in the 2005 Proxy

materially misstated the compensation of, and failed to disclose, the illicit compensation

1   received from the Company by Defendants Lu, Wu and Sophie in fiscal year 2002 as a result

2   of their receipt of fraudulently backdated stock options at less than fair market value.

**4.      The 2006 Proxy Statement**

3

4   102.    The 2006 Proxy Statement provides that:

5   **Equity-based Compensation**

6   The Compensation Committee administers the Company's equity incentive
    program, pursuant to which members of management, including the Company's
7   executive officers, may receive annual stock option grants and/or restricted stock
    purchase rights from a pool of shares set aside by the Company on an annual basis.
8   *The purpose of the equity incentive program is to provide additional incentive to
    executives and other key employees of the Company to work to maximize long-term*
9   *return to the Company's stockholders.* The allocation of stock options and restricted
    stock purchase rights to the Company's employees, other than the President and Chief
10  Executive Officer, are recommended by the President and Chief Executive Officer for
    approval by the Compensation Committee. The allocation of stock options and
11  restricted stock purchase rights to the President and Chief Executive Officer is
    determined solely by the Compensation Committee. In granting equity incentive
12  awards to the executive officers and the President and Chief Executive Officer, the
    Compensation Committee considers a number of objective and subjective factors,
13  including the executive's position and responsibilities at the Company, such
    executive's past and anticipated individual performance, current market survey data
14  with respect to equity compensation practices at other peer companies in the
    Company's industry and the level of achievement by such executive of the
15  performance objectives (as described below) set by the Compensation Committee.
    Options and restricted stock purchase rights generally vest over a four-year period to
16  encourage executive officers to continue in the employ of the Company. Beginning in
    2006, options and restricted stock purchase rights granted to executive officers may
17  also be subject to performance vesting, such that the shares underlying the equity
    award will only vest if the performance objectives set by the Compensation
18  Committee are achieved, as described further below. *The exercise price of options is
    the market price on the date of grant, ensuring that the option will acquire value only*
19  *to the extent that the price of the Company's common stock increases relative to the
    market price at the date of grant.* The restricted stock purchase rights entitle the
20  executive officers to purchase the Company's common stock at par value.  (Emphasis
    added).

21

22  103.    The foregoing representation was materially misleading in failing to disclose

23

24  the backdating scheme involving in-the-money options from at least October 2000 through

25  July 2002 which undermined the goal of linking a significant portion of the Executive

26  Defendants' compensation to the future performance of the Company.

27

28

104.    Further, the foregoing representation was materially false and misleading in providing that the exercise price of options is the market price on the date of grant, when in fact, options were backdated.

**B.      FALSE AND MISLEADING FINANCIAL STATEMENTS**

### 1.      The 2003 Financial Statements

105.    On February 21, 2003, the Company filed with the SEC its Form 10-K for the fiscal year ending on December 31, 2002 (the "2002 Form 10-K").  In the Form 10-K, UTStarcom stated a net income of $ 107,862,000 for fiscal year 2002 and stock based compensation expenses of  $2,209,000.  Defendants Lu, Wu, Sophie and Toy signed the 2002 Form 10-K.  The certifications that Defendants Lu and Sophie each signed pursuant to § 906 of the Sarbanes-Oxley Act of 2002, which were included in the 2002 Form 10-K, falsely stated that information contained in the 2002 Form 10-K fairly presents in all material respects the financial condition and results of operations of UTStarcom.

106.    The 2002 Form 10-K also stated the following with regards to the Company's 1997 Stock Option Plan:  "[t]he exercise price of ISOs granted under the 1997 plan may not be less than 100% of the fair market value of common stock on the grant date."  With regards to the Company's 2001 Director Plan, the 2002 Form 10-K stated:  "[u]nder the terms of the 2001 Director Plan, the exercise price of each option granted is the market value of the common stock on the date of grant."

107.    The Company's 2002 Form 10-K also contained the following Sarbanes-Oxley certification signed by Defendants Lu and Sophie:

> In connection with the Report, we, Hong Liang Lu and Michael J. Sophie, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that: (1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

108.    The statements set forth above in ¶ 105-107 were materially false and misleading.  As was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q,

1    because UTStarcom had backdated options, causing them to have intrinsic value on the date

2    of grant, the Company underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses

3    that, had these options been properly accounted for, the Company would have recognized

4    additional stock-based compensation expenses in 2002 totaling $ 8,769,000.  The Sarbanes-

5    Oxley certifications signed by Lu and Sophie were materially false and misleading because

6    UTStarcom underreported its expenses, net income and accumulated deficit and therefore its

7    financial statements did not fairly present its financial condition and results of operations.

8    Further these statements were false and misleading because they state that options were

9    granted with an exercise price of at least 100% of the fair market value of the Company's

10    stock on the date of grant, when in fact they were backdated.  The statements were

11    additionally false and misleading because they state that the Company properly accounted for

12    stock grants pursuant to APB 25.

13          109.    On May 12, 2003, the Company filed with the SEC its quarterly report on

14    Form 10-Q for the period ending March 31, 2003.  For the three month period ending March

15    31, 2003, the Company reported net income of $ 41,168,000 ($0.37 per diluted share).  The

16    Form 10-Q was signed by Lu and Sophie.

17          110.    The statement set forth above in ¶ 109 was materially false and misleading.  As

18    was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

19    had backdated options, causing them to have intrinsic value on the date of grant, the Company

20    underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

21    been properly accounted for, the Company would have recognized additional stock-based

22    compensation expenses in 2003 of $ 6,560,000 totaling $ 13,260,000.   The 2007 3rd Quarter

23    Form 10-Q further discloses that such amounts were required to be amortized over the related

24    service period, demonstrating that the quarterly report understated net losses for the quarterly

25    period.

26          111.    On August 4, 2003, the Company filed with the SEC its quarterly report on

27    Form 10-Q for the period ending June 30, 2003.  For the three month period ending June 30,

28    2003, the Company reported net income of $ 43,450,000 ($0.36 per diluted share).  For the six

1    month period ending June 30, 2003, the Company reported a net income of $ 84,168,000

2    ($0.72 per diluted share). The Form 10-Q was signed by Lu and Sophie.

3         112.    The statement set forth above in ¶ 111 was materially false and misleading.  As

4    was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

5    had backdated options, causing them to have intrinsic value on the date of grant, the Company

6    underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

7    been properly accounted for, the Company would have recognized additional stock-based

8    compensation expenses in 2003 totaling $ 13,260,000.    The 2007 3rd Quarter Form 10-Q

9    further discloses that such amounts were required to be amortized over the related service

10   period, demonstrating that the quarterly report understated net losses for the quarterly period.

11        113.    On November 12, 2003, the Company filed with the SEC its quarterly report

12   on Form 10-Q for the period ending September 30, 2003.  For the three month period ending

13   September 30, 2003, the Company reported a net income of $ 65,204,000 ($0.50 per diluted

14   share).  For the nine month period ending September 30, 2003, the Company reported a net

15   income of $ 149,822,000 ($1.23 per diluted share).  The Form 10-Q was signed by Lu and

16   Sophie.

17        114.    The statement set forth above in ¶ 113 was materially false and misleading.  As

18   was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

19   had backdated options, causing them to have intrinsic value on the date of grant, the Company

20   underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

21   been properly accounted for, the Company would have recognized additional stock-based

22   compensation expenses in 2003 totaling $ 13,260,000.    The 2007 3rd Quarter Form 10-Q

23   further discloses that such amounts were required to be amortized over the related service

24   period, demonstrating that the quarterly report understated net losses for the quarterly period.

### 2.    The 2004 Financial Statements

26        115.    On March 9, 2004 and restated on April 13, 2004, the Company filed with the

27   SEC its Form 10-K for the fiscal year ending on December 31, 2003 (the "2003 Form 10-K").

28   In the Form 10-K, UTStarcom stated a net income of $ 215,532,000 for fiscal year 2003 and

1  stock based compensation expenses of $3,071,000.  Defendants Lu, Wu, Sophie and Toy

2  signed the 2003 Form 10-K.  The certifications that Defendants Lu and Sophie each signed

3  pursuant to § 906 of the Sarbanes-Oxley Act of 2002, which were included in the 2003 Form

4  10-K, falsely stated that information contained in the 2003 Form 10-K fairly presents in all

5  material respects the financial condition and results of operations of UTStarcom.   T

6      116.    The 2003 Form 10-K also stated the following with regards to the Company's

7  1997 Stock Option Plan:  "[t]he exercise price of ISOs granted under the 1997 plan may not

8  be less than 100% of the fair market value of common stock on the grant date."  With regards

9  to the Company's 2001 Director Plan, the 2003 Form 10-K stated:  "[u]nder the terms of the

10  2001 Director Plan, the exercise price of each option granted is the market value of the

11  common stock on the date of grant."

12      117.    The Company's 2003 Form 10-K also contained the following Sarbanes-Oxley

13  certification signed by Defendants Lu and Sophie:

14      In connection with the Report, we, Hong Liang Lu and Michael J. Sophie, certify,
        pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the
15      Sarbanes-Oxley Act of 2002, that: (1) The Report fully complies with the
        requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2)
16      The information contained in the Report fairly presents, in all material respects, the
        financial condition and results of operations of the Company.
17

18      118.    The statements set forth above in ¶ 115-117 were materially false and

19  misleading.  As was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q,

20  because UTStarcom had backdated options, causing them to have intrinsic value on the date

21  of grant, the Company underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses

22  that, had these options been properly accounted for, the Company would have recognized

23  additional stock-based compensation expenses in 2003 of $ 10,189,000 totaling $ 13,260,000.

24  The Sarbanes-Oxley certifications signed by Lu and Sophie were materially false and

25  misleading because UTStarcom underreported its expenses, net income and accumulated

26  deficit and therefore its financial statements did not fairly present its financial condition and

27  results of operations.  Further these statements were false and misleading because they state

28

1   that options were granted with an exercise price of at least 100% of the fair market value of

2   the Company's stock on the date of grant, when in fact they were backdated.  The statements

3   were additionally false and misleading because they state that the Company properly

4   accounted for stock grants pursuant to APB 25.

5          119.    On May 10, 2004, the Company filed with the SEC its quarterly report on

6   Form 10-Q for the period ending March 31, 2004.  For the three month period ending March

7   31, 2004, the Company reported net income of $ 54,766,000 ($0.40 per diluted share).  By

8   signing the Form 10-Q and certifications, pursuant to the Sarbanes-Oxley Act, Sophie

9   certified that the information contained in the quarterly report fairly presented in all material

10  respects UTStarcom's financial condition and results.  Sophie further certified that they had

11  disclosed all instances of fraud involving management or other employees who had a

12  significant role in the Company's internal control financial reporting.

13         120.    The statement set forth above in ¶ 119 was materially false and misleading.  As

14  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, the Company over-

15  reported stock-based compensation expenses for 2004.  The 2007 3rd Quarter Form 10-Q

16  discloses that, had these options been properly accounted for, the Company would have

17  recognized a reduction stock-based compensation expenses in 2004 amounting to $ 160,000

18  reducing the total stock-based compensation expenses for the year to $ 210,000.   The 2007

19  3rd Quarter Form 10-Q further discloses that such amounts were required to be amortized over

20  the related service period, demonstrating that the quarterly report understated net losses for

21  the quarterly period.

22         121.    On August 16, 2004, the Company filed with the SEC its quarterly report on

23  Form 10-Q for the period ending June 30, 2004.  For the three month period ending June 30,

24  2004, the Company reported net income of $ 43,863,000 ($0.33 per diluted share).  For the six

25  month period ending June 30, 2004, the Company reported net income of $ 98,629,999 ($0.73

26  per diluted share).  By signing the Form 10-Q and certifications, pursuant to the Sarbanes-

27  Oxley Act, Sophie certified that the information contained in the quarterly report fairly

28  presented in all material respects UTStarcom's financial condition and results.  Sophie further

1  certified that they had disclosed all instances of fraud involving management or other

2  employees who had a significant role in the Company's internal control financial reporting.

3         122.    The statement set forth above in ¶ 121 was materially false and misleading.  As

4  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, the Company over-

5  reported stock-based compensation expenses for 2004.  The 2007 3rd Quarter Form 10-Q

6  discloses that, had these options been properly accounted for, the Company would have

7  recognized a reduction stock-based compensation expenses in 2004 amounting to $ 160,000

8  reducing the total stock-based compensation expenses for the year to $ 210,000.    The 2007

9  3rd Quarter Form 10-Q further discloses that such amounts were required to be amortized over

10  the related service period, demonstrating that the quarterly report understated net losses for

11  the quarterly period.

12         123.    On November 9, 2004, the Company filed with the SEC its quarterly report on

13  Form 10-Q for the period ending September 30, 2004.  For the three month period ending

14  September 30, 2004, the Company reported a net income of $ 4,897,000 ($0.04 per diluted

15  share).  For the nine month period ending September 30, 2004, the Company reported a net

16  income of  $ 103,616,000 ($0.78 per diluted share).  By signing the Form 10-Q and

17  certifications, pursuant to the Sarbanes-Oxley Act, Sophie certified that the information

18  contained in the quarterly report fairly represented in all material respects UTStarcom's

19  financial condition and results.  Sophie further certified that they had disclosed all instances of

20  fraud involving management or other employees who had a significant role in the Company's

21  internal control financial reporting.

22         124.    The statement set forth above in ¶ 123 was materially false and misleading.  As

23  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, the Company over-

24  reported stock-based compensation expenses for 2004.  The 2007 3rd Quarter Form 10-Q

25  discloses that, had these options been properly accounted for, the Company would have

26  recognized a reduction stock-based compensation expenses in 2004 amounting to $ 160,000

27  reducing the total stock-based compensation expenses for the year to $ 210,000.    The 2007

28  3rd Quarter Form 10-Q further discloses that such amounts were required to be amortized over

1  the related service period, demonstrating that the quarterly report understated net losses for

2  the quarterly period.

3       125.   On April 15, 2005, the Company filed with the SEC its Form 10-K for the

4  fiscal year ending on December 31, 2004 (the "2004 Form 10-K").  In the Form 10-K,

5  UTStarcom stated a net income of $ 69,824,000 ($0.54 per diluted share) for fiscal year 2004,

6  as restated in its 2006 Form 10-K and stock based compensation expenses of  $ 2,154,000.

7  Defendants Lu, Wu, Sophie and Toy signed the 2004 Form 10-K.  The certifications that

8  Defendants Lu and Sophie each signed pursuant to § 906 of the Sarbanes-Oxley Act of 2002,

9  which were included in the 2004 Form 10-K, falsely stated that information contained in the

10  2004 Form 10-K fairly presents in all material respects the financial condition and results of

11  operations of UTStarcom.

12       126.   The 2004 Form 10-K also stated the following with regards to the Company's

13  1997 Stock Option Plan:  "[t]he exercise price of ISOs granted under the 1997 plan may not

14  be less than 100% of the fair market value of common stock on the grant date."  With regards

15  to the Company's 2001 Director Plan, the 2003 Form 10-K stated:  "[u]nder the terms of the

16  2001 Director Plan, the exercise price of each option granted is the market value of the

17  common stock on the date of grant."

18       127.   The Company's 2004 Form 10-K also contained the following Sarbanes-Oxley

19  certification signed by Defendants Lu and Sophie:

20       In connection with the Report, we, Hong Liang Lu and Michael J. Sophie, certify,
     pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the

21       Sarbanes-Oxley Act of 2002, that: (1) The Report fully complies with the

22       requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2)
     The information contained in the Report fairly presents, in all material respects, the

23       financial condition and results of operations of the Company.

24       128.   The statements set forth above in ¶ 125-127 were materially false and

25  misleading.  As was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q,

26  because UTStarcom had backdated options, causing them to have intrinsic value on the date

27  of grant, the Company underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses

28

1    that, had these options been properly accounted for, the Company would have recognized a

2    reduction stock-based compensation expenses in 2004 amounting to $ 160,000 reducing the

3    total stock-based compensation expenses for the year to $ 210.   The Sarbanes-Oxley

4    certifications signed by Lu and Sophie were materially false and misleading because

5    UTStarcom underreported its expenses, net income and accumulated deficit and therefore its

6    financial statements did not fairly present its financial condition and results of operations.

7    Further these statements were false and misleading because they state that options were

8    granted with an exercise price of at least 100% of the fair market value of the Company's

9    stock on the date of grant, when in fact they were backdated.   The statements were

10   additionally false and misleading because they state that the Company properly accounted for

11   stock grants pursuant to APB 25.

12                          **3.       The 2005 Financial Statements**

13               129.     On May 10, 2005, the Company filed with the SEC its quarterly report on

14   Form 10-Q for the quarter ending on March 31, 2005.  For the three month period ending

15   March 31, 2005, the Company reported net income of $ 37,044,000 ($0.29 per diluted share).

16   By signing the Form 10-Q and certifications, pursuant to the Sarbanes-Oxley Act, Sophie

17   certified that the information contained in the quarterly report fairly presented in all material

18   respects UTStarcom's financial condition and results.  Sophie further certified that they had

19   disclosed all instances of fraud involving management or other employees who had a

20   significant role in the Company's internal control financial reporting.

21               130.     The statement set forth above in ¶ 129 was materially false and misleading.  As

22   was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

23   had backdated options, causing them to have intrinsic value on the date of grant, the Company

24   underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

25   been properly accounted for, the Company would have recognized additional stock-based

26   compensation expenses in 2005 of $ 2,793,000 totaling $ 4,947,000.   The 2007 3rd Quarter

27   Form 10-Q further discloses that such amounts were required to be amortized over the related

28

1   service period, demonstrating that the quarterly report understated net losses for the quarterly

2   period.

3        131.    On August 9, 2005, the Company filed with the SEC its quarterly report on

4   Form 10-Q for the period ending June 30, 2005.  For the three month period ending June 30,

5   2005, the Company reported net loss of $ 73,948,000 ($0.64 per diluted share).  For the six

6   month period ending June 30, 2005, the Company reported net loss of $ 36,904,000 ($0.32

7   per diluted share).  By signing the Form 10-Q and certifications, pursuant to the Sarbanes-

8   Oxley Act, Sophie certified that the information contained in the quarterly report fairly

9   presented in all material respects UTStarcom's financial condition and results.  Sophie further

10  certified that they had disclosed all instances of fraud involving management or other

11  employees who had a significant role in the Company's internal control financial reporting.

12       132.    The statement set forth above in ¶ 131 was materially false and misleading.  As

13  was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

14  had backdated options, causing them to have intrinsic value on the date of grant, the Company

15  underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

16  been properly accounted for, the Company would have recognized additional stock-based

17  compensation expenses in 2005 of $ 2,793,000 totaling $ 4,947,000.   The 2007 3rd Quarter

18  Form 10-Q further discloses that such amounts were required to be amortized over the related

19  service period, demonstrating that the quarterly report understated net losses for the quarterly

20  period.

21       133.    On November 9, 2005, the Company filed with the SEC its quarterly report on

22  Form 10-Q for the period ending September 30, 2005.  For the three month period ending

23  September 30, 2005, the Company reported net loss of $ 402,661,000 ($3.40 per diluted

24  share).  For the nine month period ending September 30, 2005, the Company reported net loss

25  of $ 439,367,000 ($3.79 per diluted share).  By signing the Form 10-Q and certifications,

26  pursuant to the Sarbanes-Oxley Act, Sophie certified that the information contained in the

27  quarterly report fairly presented in all material respects UTStarcom's financial condition and

28  results.  Sophie further certified that they had disclosed all instances of fraud involving

1   management or other employees who had a significant role in the Company's internal control

2   financial reporting.

3          134.    The statement set forth above in ¶ 133 was materially false and misleading.  As

4   was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

5   had backdated options, causing them to have intrinsic value on the date of grant, the Company

6   underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

7   been properly accounted for, the Company would have recognized additional stock-based

8   compensation expenses in 2005 of $ 2,793,000 totaling $ 4,947,000.   The 2007 3rd Quarter

9   Form 10-Q further discloses that such amounts were required to be amortized over the related

10  service period, demonstrating that the quarterly report understated net losses for the quarterly

11  period.

12         135.    On June 1, 2006, the Company filed with the SEC its Form 10-K for the fiscal

13  year ending on December 31, 2005 (the "2005 Form 10-K").  In the Form 10-K, UTStarcom

14  stated a net loss of $ 487,359,000 ($4.16 per diluted share) for fiscal year 2005 and stock

15  based compensation expenses of  $2,154,000.  Defendants Lu, Wu, Barton, and Toy signed

16  the 2005 Form 10-K.  The certifications that Defendants Lu and Barton each signed pursuant

17  to § 906 of the Sarbanes-Oxley Act of 2002, which were included in the 2002 Form 10-K,

18  falsely stated that information contained in the 2002 Form 10-K fairly presents in all material

19  respects the financial condition and results of operations of UTStarcom.

20         136.    The 2005 Form 10-K also stated the following with regards to the Company's

21  1997 Stock Option Plan:  "[t]he exercise price of ISOs granted under the 1997 plan may not

22  be less than 100% of the fair market value of common stock on the grant date."  With regards

23  to the Company's 2001 Director Plan, the 2002 Form 10-K stated:  "[u]nder the terms of the

24  2001 Director Plan, the exercise price of each option granted is the market value of the

25  common stock on the date of grant."

26         137.    The Company's 2005 Form 10-K also contained the following Sarbanes-Oxley

27  certification signed by Defendants Lu and Barton:

28

In connection with the Report, we, Hong Liang Lu and Francis Barton, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that: (1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

138.    The statements set forth above in ¶ 135-137 were materially false and misleading.  As was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options been properly accounted for, the Company would have recognized additional stock-based compensation expenses in 2005 of $2,793,000 totaling $ 4,947,000.  The Sarbanes-Oxley certifications signed by Lu and Barton were materially false and misleading because UTStarcom underreported its expenses, net income/losses and accumulated deficit and therefore its financial statements did not fairly present its financial condition and results of operations.  Further these statements were false and misleading because they state that options were granted with an exercise price of at least 100% of the fair market value of the Company's stock on the date of grant, when in fact they were backdated.  The statements were additionally false and misleading because they state that the Company properly accounted for stock grants pursuant to APB 25.

### 4.       The 2006 Financial Statements

139.    On June 22, 2006, the Company filed with the SEC its quarterly reports on Form 10-Q for the period ending April 30, 2006.  For the three month period ending March 31, 2006, the Company reported net loss of $ 10,635,000 ($0.09 per diluted share).  By signing the Form 10-Q and certifications, pursuant to the Sarbanes-Oxley Act, Barton certified that the information contained in the quarterly report fairly presented in all material respects UTStarcom's financial condition and results.  Barton further certified that they had disclosed all instances of fraud involving management or other employees who had a significant role in the Company's internal control financial reporting.

1    140.   The statement set forth above in ¶ 113 was materially false and misleading.  As

2   was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

3   had backdated options, causing them to have intrinsic value on the date of grant, the Company

4   underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

5   been properly accounted for, the Company would have recognized a reduction in net income

6   in the first quarter of $671,000.

7    141.   On August 9, 2006, the Company filed with the SEC its quarterly reports on

8   Form 10-Q for the period ending June 30, 2006.  For the three month period ending June 30,

9   2006, the Company reported net loss of $ 21,443,000 ($0.18 per diluted share).  For the six

10   month period ending June 30, 2006, the Company reported net loss of $ 32,078,000 ($0.27

11   per diluted share).  By signing the Form 10-Q and certifications, pursuant to the Sarbanes-

12   Oxley Act, Barton certified that the information contained in the quarterly report fairly

13   presented in all material respects UTStarcom's financial condition and results.  Barton further

14   certified that they had disclosed all instance of fraud involving management or other

15   employees who had a significant role in the Company's internal control financial reporting.

16    142.   The statement set forth above in ¶ 141 was materially false and misleading.  As

17   was ultimately disclosed in UTStarcom's 2007 3rd Quarter Form 10-Q, because UTStarcom

18   had backdated options, causing them to have intrinsic value on the date of grant, the Company

19   underreported expenses.  The 2007 3rd Quarter Form 10-Q discloses that, had these options

20   been properly accounted for, the Company would have recognized a reduction in net income

21   in the second quarter of $510,000.

22    143.   UTStarcom's 10-Ks, 10-Qs, and proxy statements during the Class Period

23   were false and misleading as a result of Defendants having either knowingly, or with

24   deliberate recklessness, manipulated the grant dates on stock options in order to enrich the

25   Individual Defendants by receiving favorable backdated exercise prices on the options.

26   Defendants thereby under-reported the Company's compensation expenses while inflating the

27   Company's net income during the Class Period.  Furthermore, the Company's financial

28   statements did not comply with Generally Accepted Accounting Principles on account of the

1  understatement of expenses and the overstatement of net income.  Each dollar diverted to the

2  Individual Defendants via the backdating of options has come at the expense of the Company.

3  **VIII.   ADDITIONAL FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

4          **A.      DEFENDANTS CERTIFIED FALSE AND MISLEADING FINANCIAL**

5                  **RESULTS**

6          144.    Defendants Lu, Barton and Sophie knowingly certified false and misleading

7  financial statements.  Defendants Lu, Barton and Sophie certified the following financial

8  statements during the Class Period:

| Type of Filing | Filing Period | Filing Date | Signed/Certified by CEO | Signed/Certified by CFO |
|---|---|---|---|---|
| 10-Q | Quarterly period ended 9/30/2002 | 11/8/2002 | Lu | Sophie |
| 10-K | Fiscal year ended 12/31/2002 | 2/21/2003 | Lu | Sophie |
| 10-Q | Quarterly period ended 3/31/2003 | 5/12/2003 | Lu | Sophie |
| 10-Q | Quarterly period ended 6/30/2003 | 8/4/2003 | Lu | Sophie |
| 10-Q/A | Quarterly period ended 3/31/2003 | 9/8/2003 | Lu | Sophie |
| 10-K/A | Fiscal year ended 12/31/2002 | 9/8/2003 | Lu | Sophie |
| 10-Q | Quarterly period ended 9/30/2003 | 11/12/2003 | Lu | Sophie |
| 10-K | Fiscal year ended 12/31/2003 | 3/9/2004 | Lu | Sophie |
| 10-Q | Quarterly period | 5/10/2004 | Lu | Sophie |

| | | | | |
|---|---|---|---|---|
| | ended 3/31/2004 | | | |
| 10-Q | Quarterly period ended 3/31/2004 | 5/14/2004 | Lu | Sophie |
| 10-Q | Quarterly period ended 6/30/2004 | 8/16/2004 | Lu | Sophie |
| 10-Q | Quarterly period ended 9/30/2004 | 11/9/2004 | Lu | Sophie |
| 10-K/A | Fiscal year ended 12/31/2003 | 4/13/2005 | Lu | Sophie |
| 10-K | Fiscal year ended 12/31/2004 | 4/15/2005 | Lu | Sophie |
| 10-Q | Quarterly period ended 3/31/2005 | 5/10/2005 | Lu | Sophie |
| 10-Q/A | Quarterly period ended 3/31/2004 | 6/3/2005 | Lu | Sophie |
| 10-Q/A | Quarterly period ended 6/20/2004 | 6/3/2005 | Lu | Sophie |
| 10-Q/A | Quarterly period ended 9/30/2004 | 6/3/2005 | Lu | Sophie |
| 10-Q | Quarterly period ended 6/30/2005 | 8/9/2005 | Lu | Sophie |
| 10-Q | Quarterly period ended 9/30/2005 | 11/9/2005 | Lu | Barton |
| 10-K | Fiscal year ended 12/31/2005 | 6/1/2006 | Lu | Barton |
| 10-Q | Quarterly period ended 3/31/2006 | 6/21/2006 | Lu | Barton |

| 10-Q/A | Quarterly period ended 3/31/2006 | 6/26/2006 | Lu | Barton |
| 10-K/A | Fiscal year ended 12/31/2005 | 6/26/2006 | Lu | Barton |
| 10-Q | Quarterly period ended 6/30/2006 | 8/9/2006 | Lu | Barton |

145.    These financial statements were not in accordance with GAAP and SEC rules. Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") and SEC Rules 13a-14(a) and 15d-14(a) of the Exchange Act required Defendant Lu as the CEO and Defendants Sophie and Barton as the CFO, to certify to the SEC and investors both the fairness of the financial information in each quarterly and annual report.  In their certifications, Defendants Lu, Sophie and Barton stated that the Company's financial reports did not contain any untrue statements of material fact or omit to state a material fact.  In addition, Defendants Lu, Sophie and Barton stated that UTStarcom had established and maintained disclosure controls and procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized, and reported within the specified time periods.

146.    Defendants Lu, Sophie and Barton knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules.  In accordance with § 906 of SOX and 18 U.S.C. § 1350, Defendants Lu, Sophie and Barton were required to certify each periodic report that included financial statements.  Their signed certifications falsely stated that: (i) the report fully complied with the requirements of §13(a) or §15(d) of the Exchange Act; and (ii) the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of UTStarcom.

147.    On the dates noted in the Schedule of Certified Financial Statements at ¶ 129 above, Defendants Lu, Sophie and Barton signed and filed with the SEC certifications under SEC Rules 13a-14(a)/15d-14(a) of the Exchange Act and § 906 of SOX attesting to the accuracy and truthfulness of the corresponding Forms 10-K and 10-Q for UTStarcom.  At the time, Defendants Lu, Sophie and Barton signed these certifications, they knew or recklessly disregarded that they were false for the reasons alleged herein.

**IX.    THE TRUTH BEGINS TO EMERGE**

**A.    VOLUNTARY REVIEW OF GRANT PRACTICES**

148.    On November 7, 2006, UTStarcom announced in a press release that it had commenced a voluntary review of its historical equity award grant practices.  The Company also announced that as a result of this review it would have to postpone its third quarter earnings release.  The press release stated that:

> **UTSTARCOM ANNOUNCES VOLUNTARY REVIEW OF EQUITY GRANTS**
>
> **Postpones Third Quarter Earnings Release Pending the Completion of the Review**
>
> ALAMEDA, Calif., November 7, 2006 — UTStarcom, Inc. (NASDAQ: UTSI), a global leader in IP-based, end-to-end networking solutions and services, today announced that it has commenced a voluntary review of its historical equity award grant practices under the direction of the Nominating and Corporate Governance committee (the "Committee") of the board of directors. The Committee is being assisted by independent legal counsel and independent accounting consultants.
>
> As part of this process, the Company has informed the staff of the Securities and Exchange Commission about the commencement of the review.  To date, no conclusions have been reached about whether the Company will need to record any non-cash adjustments to its financial statements related to prior equity grants.
>
> The Committee will make every effort to complete the review as soon as possible. The Company will not announce its third quarter results or file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 until after completing the review. The Company does not expect the review to be completed by the filing deadline for the Company's third quarter 10-Q, November 9, 2006, or the extended filing deadline of November 16, 2006. Once the review is completed the Company will share the findings with the investment community and set the date for the third quarter earnings report

149.    In reaction to this news, the Company's share price fell a statistically-significant 9%, from a closing price of $ 10.23 on November 7, 2007 to a closing price of $ 9.32 on November 9, 2006 after the market had absorbed the information.

150.    This revelation informed the market for the first time of a previously-concealed material negative risk factor that would affect the Company and its securities: the likelihood that the Company has been engaging in options backdating and would be forced to restate its financial results to reduce earnings over an extended period of time.  The Company's delay of its 3rd Quarter filings had significant gravity for investors as the Company would not be delaying its SEC filings unless a substantial likelihood of material misstatements in previous financial documents existed.   Both the media and the investing public recognized that during this time where a myriad of companies were forced to restate financials due to the results of options investigations, the substantial likelihood that delayed earnings reports would lead to a restatement existed.  This sentiment was evidenced by a Forbes.com article:

**Options Probe Derails UTStarcom Stock**

Shares of UTStarcom tumbled 6.6% Wednesday afternoon after the telecom-equipment maker said it was investigating grants of stock options grants.

The Alameda, Calif.-based company, which books about a third of its sales in China, said the "voluntary review" will delay the release of third-quarter results for an unspecified amount of time.

More than 150 U.S. companies are either embroiled in internal probes or are being investigated by the government for potential abuses relating to stock options. Most of these cases involve what is known as backdating, the practice of pricing options based on dates when the companies' shares were trading at low prices. The pricing dates often seem to have had no relation to the date of the options grants.

Before the UTStarcom announcement, the company's stock had been rising since it made an Oct. 11 announcement that it was exploring "strategic alternatives to enhance stockholder value."

Bear Stearns analyst Evan Erlanson said the options investigation will likely be a near-term burden on the stock.

"We now believe that potential emergence of legal and regulatory issues will likely outweigh any positive sentiment on the sector, while reducing the likelihood of an M&A transaction," Erlanson wrote in a client note Wednesday.

1    151.    As such, although it did not fully apprise the market of Defendants' backdating

2  scheme, the November 7, 2006 release was a partial disclosure of negative material facts

3  which had an immediate, statistically significant negative impact on the Company's share

4  price.

5    152.    On February 1, 2007, the Company provided an update on the equity grant

6  review in a press release.  Although the review was ongoing at that point, the Company

7  indicated that incorrect measurement dates for certain stock option grants were used for

8  financial accounting and disclosure purposes.  The Company determined that its financial

9  statements for each of the three fiscal years in the period ended December 31, 2005 and

10  financial statements for fiscal years prior to fiscal 2003 should no longer be relied upon.

11    153.    On July 24, 2007, UTStarcom announced the preliminary results of its review

12  of historical equity award practices.  The press release stated, in relevant part:

> As previously communicated on February 1, 2007, the independent review by
> the Nominating and Corporate Governance Committee of the Company's
> Board of Directors (the "Governance Committee") found that in certain
> instances all actions that establish a measurement date under the requirements
> of Accounting Principles Board No. 25, Accounting for Stock Issued to
> Employees, had not occurred at the grant date, which had been used as the
> measurement date in accounting for Company stock option grants. A later date,
> when all such actions had taken place, should have been used as the
> measurement date for these stock options.  The Audit Committee of the
> Company's Board of Directors (the "Audit Committee") then determined, in
> consultation with and on the recommendation of the Company's management,
> the effect of using incorrect measurement dates would require the Company to
> record material additional stock-based compensation charges in its previously
> issued financial statements.
>
> The Company therefore announced its previously issued financial statements
> for the years 2000 through 2006, including interim periods within these fiscal
> years, should no longer be relied upon.
>
> The Company has now determined that ***the amount of the non-cash
> restatement will be approximately $28 million over the years 2000 through
> 2006***.  (emphasis added)

25    154.    Based in substantial part on these revelations, the market responded sharply to

26  this announcement and UTStarcom stock plummeted by 22% from a closing price of $ 4.73

27  on July 22, 2007 to a closing price of $ 3.70 on July 25, 2007, when the market had fully

28  absorbed the news.  The stock price continued to fall in the subsequent days.

1

**B.      THE RESTATEMENT**

2

155.    On October 10, 2007, UTStarcom filed its 2007 3rd Quarter Form 10-Q, signed

3

by Barton.  The Company, in relevant part, detailed:

4

> We also conducted a voluntary review of historical stock option practices under
> the direction of the Nominating and Corporate Governance Committee of our
> Board of Directors ("Governance Committee"). This review considered all
> option grant awards made in the period from February 29, 2000, shortly before
> the initial public offering of our Common Stock, through August 2006 for
> compliance with the various stock-based compensation accounting standards
> applicable during this period as well as the rules of our stock option plans. ***We
> found that in a number of instances we did not use the proper date as the
> measurement date in determining whether stock options had been issued
> with exercise prices below the fair value of our common stock.*** Therefore, we
> have restated our previously issued financial statements for the years ended
> December 31, 1998 through 2005 to account for an additional $25.5 million of
> stock compensation expense that should have been recognized over the period
> together with an equal increase in additional paid-in capital to recognize the
> intrinsic value assigned to these issuances of equity securities. Related
> adjustments of payroll and income taxes resulted in an additional $0.5 million
> of expense being recognized for the 1998 through 2005 period and total
> stockholders' equity being reduced by a total of $2.1 million at December 31,
> 2005. During the first six months of 2006 an additional $1.2 million of stock
> compensation expense was recognized, which reduced our previously reported
> operating results for this period. During the three and nine months ended
> September 30, 2005 (in thousands), stock compensation expense totaling $76
> and ($1,470), respectively, was recognized.

5

6

7

8

9

10

11

12

13

14

15

16

156.    With regard to the Governance Committees' review, the Company described

17

the process, stating, in relevant part:

18

> In November 2006, we announced we had commenced a voluntary review of
> historical stock option practices under the leadership of the Governance
> Committee following a preliminary review by management which identified
> potential deficiencies and discrepancies in the documentation of stock option
> grants. The review considered all option grant awards made in the period from
> February 29, 2000, shortly before the initial public offering of our Common
> Stock, through August 2006 ("Review Period") for compliance with the
> various stock-based compensation accounting standards applicable during the
> Review Period as well as the rules of our stock option plans. The Governance
> Committee engaged independent outside legal counsel to assist in the review
> who, in turn, engaged forensic accountants. (Separate law firms and separate
> forensic accounting firms were engaged by the Audit Committee and the
> Governance Committee for the China sales investigation and the stock option
> accounting review.) In the rest of this discussion, this group collectively is
> referred to as the Stock Option Review Team and their actions and activities
> are referred to as the Stock Option Review. The Stock Option Review Team
> members spent over 11,000 hours in this review, and the Governance
> Committee met with the Stock Option Review Team on more than a dozen
> occasions to receive, discuss, and consider the Stock Option Review Team's
> information and findings.

19

20

21

22

23

24

25

26

27

28

At the time the review commenced, the Governance Committee consisted of three members of the Board of Directors, all of whom are independent directors. The Committee decided to delegate supervision of the review to Mr. Jeff Clarke, its Chairman, who joined our Board in 2005 and had not served on the Compensation Committee of the Board of Directors ("Compensation Committee") during the period under review. The Governance Committee also consisted of two other independent directors, Mr. Larry D. Horner and Mr. Thomas Toy, who also serve on the Board's Compensation Committee. Mr. Allen Lenzmeier was appointed to the Governance Committee on April 27, 2007.

Review procedures included:

- interviews of individuals involved with granting, advising, administering, or accounting for stock options, including current and former: management, members of the Board of Directors, employees, and non-employee professionals;

- review of relevant stock administration, human resource, legal, and finance department files and records;

- review of stock option grant information in select employee personnel files;

- review by at least 30 attorneys and 15 forensic accountants of approximately 250,000 potentially relevant e-mails and documents in electronic format selected through electronic discovery techniques from over 1.8 million electronic documents processed;

- review of the electronic database of the Company's stock option activity maintained by a third party along with communications to and from this service provider;

- reconciliation of grant activity from approval documents executed by the Compensation Committee with the electronic database;

- reconciliation of stock option grant, exercise, and cancellation information from SEC filings with select employee personnel files and the electronic database;

- statistical and judgmental pattern analysis;

- follow-up on matters raising questions about the option granting process and its history, conduct of those involved with granting, advising, administering, or accounting for stock options, or the accounting treatment for stock options; and

- follow-up on items or issues requested or identified by management or the Company's independent registered public accounting firm.

The Stock Option Review Team, management, and the Governance Committee decided to group stock option grants into six award categories based on differences in what constituted substantive approval for each category under our stock option granting practices as well as giving consideration to the risk of intentional misstatement of the grant date. Guidance in a September 19, 2006

letter publicly issued by the SEC's Chief Accountant focuses on the concept that a measurement date under Accounting Principles Board Opinion No. 25 *Accounting for Stock Issued to Employees* ("APB 25"), the accounting standard governing our stock option accounting through 2005, does not occur until the number of shares an individual employee is entitled to receive and the exercise price is determined with finality (i.e., no longer subject to change). This is the date on which substantive approval occurred, and depending on a company's facts and circumstances the guidance from the SEC discussed above recognizes a company may determine that the measurement date for some stock option grants may occur before all required granting actions have occurred — such as final approval by the Compensation Committee. This alternative is available only when a review of all facts and circumstances supports a conclusion that substantive approval occurs earlier than when all required granting actions have occurred and there is no evidence of fraudulent or manipulative conduct in the company's option granting practices.

In determining the measurement date to be used, the Stock Option Review Team, management, and the Governance Committee agreed to use the following definitions as constituting the proper measurement date, and generally these dates were used in testing the stated grant dates or establishing corrected measurement dates:

| | |
|---|---|
| **Discretionary Director and Officer Grants** | The date of a Compensation Committee meeting where the grant was approved or the date the final Compensation Committee signer approved the grant when approval occurred through unanimous written consent documents ("UWC"). |
| **Automatic Director Grants** | The date specified in the relevant stock option plan. |
| **Broadbase** | The date the grantee list, including the allocation of shares to individual grantees, was complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **Acquisition** | The first Compensation Committee meeting following the acquisition, provided grantees had received employment offer letters stating the number of stock options to be granted before such date, because this was the date at which the option exercise price was established. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |

| | |
|---|---|
| **New Hire** | The first scheduled Compensation Committee meeting following the first day of employment, because this was the date at which the option exercise price was established. The number of options was based on either grant amounts specified in an employment offer letter or, in some cases, on a matrix that assigned grant amounts based on position and level within the Company. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **Other Merit** | The date the grantee list, including the allocation of shares to grantees, was substantially complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |

For 12 tested grant dates where a corrected measurement date was required, the Stock Option Review Team and management were unable to locate sufficient evidence to establish a corrected measurement date using our established criteria for the applicable option grant type. In these situations alternative available evidence was used to establish the corrected measurement date.

During the period covered by the Stock Option Review, we granted stock options on approximately 34 million shares of our Common Stock at 197 grant dates. The review specifically examined the appropriateness of the stated grant date for approximately 90% of the stock options granted, including all stock option grants made to directors and officers, all broadbase grants and all option grants made in connection with business acquisitions.

157.    The results of the Governance's Committees' review are summarized, in relevant part, by the following:

> **The Governance Committee's review found 17.9 million stock options of the 28.8 million options granted on our Common Stock during 2000 through 2005 had incorrect measurement dates.** Using the corrected measurement dates, 7.6 million stock options had exercise prices that exceeded the closing price of our Common Stock and therefore had no intrinsic value to be accounted for under APB 25, **and 10.3 million stock options had intrinsic value because their exercise prices were below the closing price of our Common Stock. These 10.3 million stock options resulted in an increase in additional non-cash stock-based compensation expense of $24.3 million, and an additional $1.5 million of payroll tax related expenses during 2000-2005** partially offset by $0.5 million of income tax benefit as shown in the above table. **Of the 10.3 million stock options resulting in additional non-cash stock-based compensation expense, 2.0 million options were granted to officers and directors and resulted in $6.1 million of additional non-cash stock-based compensation expense.**

158.    The Governance Committee also concluded that: "[a] key finding of the Governance Committee was that there were deficiencies with the process by which stock

1  options were granted during the period from our initial public offering in 2000 through at least

2  2005, which resulted in accounting errors. The Governance Committee concluded that certain

3  members of management bear varying degrees of responsibility for the deficiencies in the

4  process by which options were granted."

5       **C.     THE RESTATEMENT'S IMPACT ON FINANCIAL RESULTS**

6       159.    The Restatement had a significant and material effect on UTStarcom's

7  financials.  With regard to the impact that such discoveries by the Governance Committee

8  would have on the Company's financial condition, the Company stated:

9       The corrections for the stock option restatement were to increase (reduce)
   previously reported non-cash compensation expense, payroll taxes, income

10      taxes and net income by the following amounts (in thousands of dollars):

| Year ended December 31, | Non-cash stock compensation | Payroll taxes | Income taxes | Net income |
|---|---|---|---|---|
| 1998 | $ 1,244 | $ — | $ (448) | $ (796) |
| 1999 | — | — | — | — |
| 2000 | 556 | — | (104) | (452) |
| 2001 | 4,870 | — | (942) | (3,928) |
| 2002 | 8,110 | — | (1,550) | (6,560) |
| 2003 | 12,470 | 900 | (2,281) | (11,089) |
| Totals through December 31, 2003 | 27,250 | 900 | (5,325) | (22,825) |
| 2004 | (410) | 541 | 250 | (381) |
| 2005 | (1,290) | 60 | 4,083 | (2,853) |
| 2000-2005 Total | 25,550 | 1,501 | (992) | (26,059) |
| 2006 quarter ended | | | | |
| March 31 | 662 | 9 | — | (671) |
| June 30 | 504 | 6 | — | (510) |
| | $ 26,716 | $ 1,516 | $ (992) | $ (27,240) |

***Summary of Restatement Amounts***

The following table presents the decrease in net earnings from the restatement

for each restated year:

---

| Year ended December 31 | Net income (loss), as previously reported | Restatement adjustments | | | Net income (loss), as restated |
|---|---|---|---|---|---|
| | | China Sales | Stock Options | Total | |
| | | (in thousands) (Decrease) Increase | | | |
| 1998 | | $ — | $ (796) | $ (796) | |
| 1999 | | — | — | — | |
| 2000 | | (4,781) | (452) | (5,233) | |
| 2001 | | (5,779) | (3,928) | (9,707) | |
| 2002 | $ 107,862 | (19,697) | (6,560) | (26,257) | $ 81,605 |
| 2003 | $ 209,856 | (6,382) | (11,089) | (17,471) | $ 192,385 |
| Totals through December 31, 2003 | | (36,639) | (22,825) | (59,464) | |
| 2004 | $ 69,824 | (18,594) | (381) | (18,975) | $ 50,849 |
| 2005 | $ (487,359) | (42,433) | (2,853) | (45,286) | $ (532,645) |
| 2000 - 2005 Total | | (97,666) | (26,059) | (123,725) | |
| 2006 quarter ended | | | | | |
| March 31 | $ (10,635) | 1,360 | (671) | 689 | $ (9,946) |
| June 30 | $ (21,443) | (371) | (510) | (881) | $ (22,324) |
| | | $ (96,677) | $ (27,240) | $ (123,917 | |

The cumulative effect on stockholders' equity at December 31, 2003 from the above corrections was as follows (in thousands):

Increase (decrease) in paid-in capital and deferred stock compensation:

| | |
|---|---|
| Values assigned to stock options | $ 27,250 |
| Reduction of previously recorded income tax benefits from stock options | (1,278) |
| Net increase in paid-in capital and deferred stock compensation | 25,972 |

(Increase) decrease in accumulated deficit:

| | |
|---|---|
| Revenue and related cost of sales deferral for China system sales | (36,639) |

| | |
|---|---|
| Additional non-cash compensation expense from stock options | (27,250) |
| Payroll taxes for values assigned to stock options | (900) |
| Income tax benefit from additional compensation and payroll tax expense | 5,325 |
| Net increase in accumulated deficit | (59,464) |
| Net decrease in stockholders' equity at December 31, 2003 | $  (33,492) |

**D.      THE SEC REACHES SETTLEMENT WITH DEFENDANTS LU AND SOPHIE**

160.     On May 1, 2008, the SEC filed a complaint in the United States District Court for the Northern District of California, *Securities and Exchange Commission v. Hong Liang Lu and Michael Sophie*, Case No. 08-cv-2262PJH alleging that UTStarcom failed to properly account for certain stock option grants because the company used incorrect grant dates for determining compensation expenses.  The complaint states that "[c]ertain grants to UTSI officers were backdated or accounted for with incorrect grant dates prior to the proper authorization of the grant by the company's Compensation Committee.  This resulted in an exercise price below market price on the date of the grant, yet no expense was recorded by the company."  ¶ 29.

161.     The complaint further alleges that "UTSI failed to establish and implement adequate internal controls for the granting of employee stock options.  Among other things, UTSI failed to maintain necessary documentation showing when the grants were actually authorized by the Compensation Committee."  ¶ 30.

162.     The SEC requested a Final Judgment from the Court ordering the Defendants to pay civil monetary penalties and granting other relief that the Court deemed appropriate.

163.     Without denying the Commission's allegations against him, on May 1, 2008 Defendant Lu filed a Consent to Entry of Final Judgment with the Court.  Lu consented to paying a civil penalty in the amount of $100,000 to the SEC.

164.     Without denying the Commission's allegations against him, on May 1, 2008 Defendant Sophie filed a Consent to Entry of Final Judgment with the Court.  Sophie consented to paying a civil penalty in the amount of $75,000 to the SEC

165.     In a related administrative order issued on May 1, 2008 the Commission found that, by its conduct, UTStarcom violated Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder. The Order further found that Lu and Sophie caused the company's violations and violated Exchange Act Rule 13a-14. Without admitting or denying the Commission's findings, UTStarcom agreed to cease and desist from violating the corporate reporting, books and records and internal controls provisions of the federal securities laws, and Lu and Sophie agreed to cease and desist from causing such violations and violating the certification provisions of the federal securities laws.

166.     On May 13, 2008, the Court the signed the Order of Final Judgment enforcing the Consent to Final Judgment by Defendants Lu and Sophie.

## X.      ADDITIONAL ALLEGATIONS OF SCIENTER

167.     UTStarcom and each of the Individual Defendants knew or recklessly disregarded that (a) the Company issued option grants which were backdated and otherwise violated the Company's stock option plans, and (b) these stock options were improperly accounted for in the Company's financial statements.

168.     As alleged herein, the Individual Defendants acted with scienter in that they (a) had access to all internal data concerning the Company's stock option plans; (b) directed and/or participated in establishing the terms of the option grants, including the choice of grant dates and exercise price; (c) knew or with deliberate recklessness disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false, incomplete or misleading; (d) knew or with deliberate recklessness disregarded that such statements of documents would be issued or disseminated to the investing public; and (e) knowingly or with deliberate recklessness participated or acquiesced in the issuance of dissemination of such statements or documents as primary violations of the federal securities laws.

169.    Additional facts provide actual and strong circumstantial evidence of the Individual Defendants scienter including: (a) the Company's admissions in its Restatement; (b) Defendants' violations of the Company's stock option plans; (c) the duration, magnitude and pervasiveness of the wrongdoing; (d) the fact that purported compliance with APB 25 was essential to maintaining UTStarcom's profitable performance; (e) the false certifications under SOX; (f) the Individual Defendants' profits from the back dated option grants and insider trading; and (g) the confidential witnesses accounts of the options backdating practices.

A.    **THE COMPANY'S ADMISSIONS IN ITS RESTATEMENT CONTRIBUTE TO A STRONG INFERENCE OF DEFENDANTS' SCIENTER**

170.    The UTStarcom Defendants have made numerous admissions that raise a strong inference of scienter against UTStarcom and the Individual Defendants.

    (a)    In its 2007 3rd Quarter 10-Q, the Company admitted that options were backdated, stating that "the review found that the number of shares and individual employee was entitled to receive and/or the exercise price for stock option grants was not determined with finality at the stated grant date at 53 tested grant dates, and the Company should have used a later date as the measurement date."

    (b)    In its 2007 3rd Quarter 10-Q, the Company *conceded that it had improperly accounted for 17.9 million stock options, or 62%,* of the 28.8 million options granted on its common stock during 2000 through 2005.

    (c)    In its 2007 3rd Quarter 10-Q, the Company conceded that *10.3 million stock options had intrinsic value because their exercise prices were below the closing price of its common stock.* These 10.3 million stock options resulted in an increase in additional non-cash stock-based compensation expense of $24.3 million.

    (d)    In its 2007 3rd Quarter 10-Q, the Company admitted that "[a] key finding of the Governance Committee was that there were deficiencies with the

1  process by which stock options were granted during the period from our initial public

2  offering in 2000 through at least 2005.

3        (e)    In its 2007 3rd Quarter 10-Q, the Company admitted that the Stock

4  Option Review Team was *unable to locate contemporaneous documentation of some*

5  *director and office, broadbase, new hire, and other merit grants.*

6        (f)    In its 2007 3rd Quarter 10-Q, the Company noted that almost $13

7  million in additional stock-based compensation expenses were related to fiscal years

8  2003 through 2005.  This is a tacit admission that some backdating occurred after

9  2002, which is after SOX changed the requirements for reporting option grants.  After

10  August 29, 2002, option grants had to be reported to the SEC within two days of the

11  grant – although it appears that UTStarcom often failed to comply with this

12  requirement.  The fact that the options misconduct occurred both before and after this

13  SOX provision was enacted suggests a knowing violation of securities laws or at least

14  severe recklessness.

15  **B.**     **DEFENDANTS' VIOLATIONS OF THE COMPANY'S STOCK**

16          **OPTION PLANS CONTRIBUTE TO A STRONG INFERENCE OF**

17          **SCIENTER**

18      171.    A strong inference of scienter is supported by UTStarcom's admissions that the

19  option grants deviated from the terms of the Company's stock option plans and the

20  representations in the Company's proxy statements (and other SEC filings) that "the exercise

21  price of options is the market price on the date of grant, ensuring that the option will acquire

22  value only to the extent that the price of the Company's Common Stock increases relative to

23  the market price at the date of grant."  The Company has admitted that, over a five year

24  period, millions of officer and director option grants were priced on dates that preceded their

25  approval dates in order to coincide with the backdated grant dates chosen by the

26  Compensation Committee or the Board of Directors.  Grant dates were also selected for

27  newly-hired officers prior to the commencement of their employment.  In other instances,

28

1   grant dates were selected without formal approval by the Board or the Compensation

2   Committee.

3        172.    A strong inference of scienter is also supported by the fact that the primary

4   accounting rule at issue – APB 25 – was simple and straightforward in its application by

5   UTStarcom: options were supposedly priced on the date final approval was received from the

6   Board or the Compensation Committee.  However, this practice was ignored to such an extent

7   that the Company could not reliably document that the reported grant dates for 17.9 million

8   option shares from 2000 through 2005 were, in fact, the dates of approval.  As a result of this

9   improper accounting, UTStarcom was required to record $24.3 million in compensation

10  charges.

11  **C.     THE DURATION, MAGNITUDE AND PERVASIVENESS OF THE**

12         **WRONGDOING CONTRIBUTE TO A STRONG INFERENCE OF**

13         **SCIENTER**

14       173.    The duration, magnitude and pervasiveness of the scheme support a strong

15  inference of fraudulent conduct by UTStarcom and the Individual Defendants.  UTStarcom

16  admits that option grants deviated from the Company's reported practices for more than five

17  years, from 2000 through 2005, and covered option grants for over 17.9 million shares.

18       174.    The Company also admits in its 2007 3rd Quarter 10-Q that UTStarcom's

19  financial statements issued during the Company's life as a public company (from 2000 until

20  2005) can no longer be relied upon, and has restated six years of financial statements.

21  UTStarcom has also taken a substantial $24.3 million charge for compensation expenses

22  associated with backdated stock options that has reduced earnings for six years of financial

23  results.

24       175.    Every single option granted to the Executive Officers, namely Lu, Wu and

25  Sophie, pursuant to the Company's discretionary 1997 Stock Option Plan between 2000 and

26  2002 was dated on both a monthly low and a year-to-date low.  Further, all of these option

27  grants were dated immediately preceding an increase in share price.  The pervasiveness and

28  consistency of these unusually favorable grant dates occurring for every grant to the

1  Executive Officers pursuant to the discretionary 1997 Stock Option Plan between 2000 and

2  2002 contributes to a strong inference of scienter.

3      **D.      THE FACT THAT PURPORTED COMPLIANCE WITH APB 25**

4              **WAS ESSENTIAL TO MAINTAINING UTSTARCOM'S PROFITABLE**

5              **PERFORMANCE SUPPORTS A STRONG INFERENCE OF**

6              **SCIENTER**

7      176.    Given the enormous amount of stock options issued as compensation to

8  UTStarcom's workforce, the Individual Defendants were keenly award of the potentially

9  devastating impact on UTStarcom's financial condition that would result if the Company

10 failed to comply with APB 25 and was required to record compensation expenses for gains

11 incurred in connection with its option grants.  For example, had UTStarcom properly recorded

12 its net income for the fiscal years 2002 and 2003, it would have reported $101,302,000 and

13 $204,443,000 respectively.  This would have decreased UTStarcom's reported net income by

14 $6,560,000 in 2002 and $11,089,000 in 2003, causing the Company to fall short of market

15 earnings expectations and suffer a declining share price.

16     177.    Accordingly, it was of enormous significance to UTStarcom's earnings and

17 business model that the Company qualify for favorable tax treatment under APB 25.  By

18 disguising backdated options by manipulating their grant dates, the Individual Defendants

19 were able to receive additional immediate value for their options while the Company

20 continued to claim (albeit improperly) favorable accounting treatment, thereby inflating

21 earnings.

22     **E.      THE FALSE CERTIFICATIONS UNDER SOX CONTRIBUTE TO A**

23              **STRONG INFERENCE OF SCIENTER**

24     178.    The certifications pursuant to SOX signed by defendants Lu, Sophie and

25 Barton included in the Forms 10-K and 10-Q from 3Q 2002 through 2Q 2006 were materially

26 false and misleading in certifying the accuracy of UTStarcom's financial statements and the

27 effectiveness of its internal controls regarding financial reporting for stock option grants.

28

179.   Moreover, Lu, Sophie and Barton misrepresented that they designed or caused to be designed sufficient disclosure controls to ensure that they were provided with material information relating to UTStarcom and that the financial reporting was reliable.  Given the vital importance of compliance with APB 25 to UTStarcom's profitability, it was incumbent upon these defendants to design controls to assure and document that stock options were priced on the dates they were approved.  However, as UTStarcom admits in its 2007 3rd Quarter 10-Q, "there were deficiencies with the process by which stock options were granted during the period from our initial public offering in 2000 through at least 2005."  The result of these "deficiencies" was options backdating and other accounting irregularities, which remained undetected for years.

180.   In this regard, Defendants Lu, Wu and Sophie falsely certified that they carried out an evaluation within 90 days prior to filing the Reports and concluded that the disclosure controls were effective.  If they really did conduct such an evaluation, they could hardly have failed to detect that, as UTStarcom now admits in its 2007 3rd Quarter 10-Q, that there was no systematic documents for over 17.9 million stock option grants.  As a result, it was impossible to reliably determine that the reported grants were actually priced on their approval dates in accordance with APB 25 rather than backdated.  Had these defendants conducted an appropriate evaluation, they would have determined when the grants were made in fact, and disclosed these critical facts – which, when ultimately detected, led to the financial restatements at issue – to the Company's auditors and Audit Committee.

181.   Lu, Sophie and Barton's false certifications on matters of such enormous magnitude give rise to a strong inference that they either knew or were reckless in not knowing that employee and executive stock options – their own options, in fact – were being granted in a manner inconsistent with the internal policies and procedures established by the Board of Directors (of which they were members) for granting stock options, and that the Company's disclosure controls and procedures were insufficient to detect and prevent this continuing misconduct.

F.   **INDIVIDUAL DEFENDANTS' PROFITS FROM THE BACKDATED OPTION GRANTS AND INSIDER TRADING CONTRIBUTE TO A STRONG INFERENCE OF SCIENTER**

182.   The Individual Defendants were motivated to commit the fraudulent scheme in order to reap significant personal profits.  The Individual Defendants provided themselves with a direct form of compensation, which amounted to undisclosed and unaccounted for compensation in a number of ways.

183.   Moreover, at least two of the Individual Defendants, Sophie and Toy, profited enormously from the exercise of their backdated stock options an the simultaneous sale of their stock during the Class Period , as follows:

**Toy's Profits from Backdated Stock Options**

| Date of Exercise and Stock Sale | Shares | Exercise Price | Sale Price | Profit |
|---|---|---|---|---|
| 7/22/2003 | 2500 | $ 15.00 | $ 42.00 | $ 67,500 |
| 7/22/2003 | 7500 | $ 12.50 | $ 42.00 | $221,250 |
| **TOTAL** | **10,000** | | | **$288,750** |

**Sophie's Profits from Backdated Stock Options**

| Date of Exercise and Stock Sale | Shares | Exercise Price | Sale Price | Profit |
|---|---|---|---|---|
| 10/29/2003 | 1667 | $ 15.00 | $ 32.25 | $ 28,755.75 |
| 10/29/2003 | 1597 | $ 12.50 | $ 32.25 | $ 31,540.75 |
| 10/29/2003 | 4587 | $ 20.25 | $ 32.25 | $ 55,044.00 |
| 10/29/2003 | 1921 | $ 15.72 | $ 32.25 | $ 31,754.13 |
| 11/03/2003 | 1667 | $ 15.00 | $ 31.64 | $ 27,738.88 |
| 11/03/2003 | 1597 | $ 12.50 | $ 31.64 | $ 30,566.58 |
| 11/03/2003 | 4587 | $ 20.25 | $ 31.64 | $ 52,245.93 |
| 11/03/2003 | 1921 | $ 15.72 | $ 31.64 | $ 30,582.32 |
| 12/01/2003 | 1667 | $ 15.00 | $ 37.83 | $ 38,057.61 |
| 12/01/2003 | 1597 | $ 12.50 | $ 37.83 | $ 40,452.01 |
| 12/01/2003 | 4587 | $ 20.25 | $ 37.83 | $ 80,639.46 |
| 12/01/2003 | 1921 | $ 15.72 | $ 37.83 | $ 42,473.31 |
| 01/02/2004 | 1667 | $ 15.00 | $ 38.75 | $ 39,591.25 |
| 01/02/2004 | 1597 | $ 12.50 | $ 38.75 | $ 41,921.25 |
| 01/02/2004 | 4587 | $ 20.25 | $ 38.75 | $ 84,859.50 |
| 01/02/2004 | 1921 | $ 15.72 | $ 38.75 | $ 44,240.63 |
| **TOTAL** | **39,088** | | | **$700,463.36** |

184.    Both Sophie and Toy sold stock while in possession of material, non-public adverse information concerning UTStarcom, namely, the Company's improper accounting for stock option grants that inflated UTStarcom's earnings.  Accordingly, Sophie and Toy's insider trading supports a strong inference of scienter.

185.    Individual Defendants Lu, Sophie, Toy and Wu also sold substantial amounts of their shareholdings before and during the Class Period, while the backdating of options was concealed and UTStarcom's earnings were inflated.

### Hong Liang Lu – Stock Sales

| Date | No. of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 07/22/2003 | 10,000 | $ 42.00 | $   420,000.00 |
| 08/01/2003 | 10,000 | $ 42.03 | $   420,300.00 |
| 08/21/2003 | 100,000 | $ 45.24 | $ 4,524,000.00 |
| 09/02/2003 | 10,000 | $ 44.00 | $   440,000.00 |
| 10/28/2003 | 10,000 | $ 32.62 | $   326,200.00 |
| 11/03/2003 | 10,000 | $ 31.64 | $   316,400.00 |
| 12/01/2003 | 10,000 | $ 37.83 | $   378,300.00 |
| 01/02/2004 | 10,000 | $ 38.75 | $   387,500.00 |
| **TOTAL** | **170,000** | | **$ 7,212,700.00** |

### Michael Sophie – Stock Sales

| Date | No. of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 07/01/2003 | 12,000 | $ 34.28 | $ 411,360.00 |
| 08/01/2003 | 12,000 | $ 42.06 | $ 504,720.00 |
| 09/02/2003 | 12,000 | $ 43.77 | $ 525,240.00 |
| 10/29/2003 | 21,839 | $ 32.25 | $ 704,307.75 |
| 11/03/2003 | 21,839 | $ 31.64 | $ 690,985.96 |
| 12/01/2003 | 21,805 | $ 37.83 | $ 824,883.15 |
| 01/02/2004 | 9,839 | $ 38.75 | $ 381,261.25 |
| **TOTAL** | **111,356** | | **$ 4,142,157.90** |

### Thomas Toy – Stock Sales

| Date | No. of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 07/22/2003 | 10,000 | $ 42.00 | $ 420,000.00 |
| 08/01/2003 | 10,000 | $ 42.06 | $ 420,600.00 |
| 09/20/2003 | 10,000 | $ 43.61 | $ 436,100.00 |
| 11/05/2003 | 20,000 | $ 34.26 | $ 685,200.00 |
| 12/01/2003 | 10,000 | $ 37.83 | $ 378,300.00 |
| 01/02/2004 | 10,000 | $ 38.75 | $ 387,500.00 |
| **TOTAL** | **70,000** | | **$ 2,727,700.00** |

**Ying Wu – Stock Sales**

| Date | No. of Shares Sold | Price Per Share | Proceeds |
|------|--------------------|-----------------|----------|
| 07/22/2003 | 85,000 | $ 42.00 | $ 3,570,000.00 |
| 08/01/2003 | 85,000 | $ 42.06 | $ 3,575,100.00 |
| 09/02/2003 | 50,000 | $ 43.18 | $ 2,159,000.00 |
| 09/02/2003 | 35,000 | $ 43.18 | $ 1,511,300.00 |
| 10/28/2003 | 85,000 | $ 32.62 | $ 2,772,700.00 |
| 11/03/2003 | 85,000 | $ 31.64 | $ 2,689,400.00 |
| 12/01/2003 | 85,000 | $ 37.83 | $ 3,215,550.00 |
| 01/05/2004 | 85,000 | $ 39.86 | $ 3,388,100.00 |
| **TOTAL** | **595,000** | | **$ 22,881,150.00** |

186.    Each of these Defendants sold his stock while in possession of material adverse non-public information concerning UTStarcom, namely, the Company's improper accounting for stock option grants that inflated UTStarcom's earnings.  Accordingly, the Individual Defendants' massive insider trading supports a strong inference of scienter.

G.    **CONFIDENTIAL WITNESS ACCOUNTS CONTRIBUTE TO A STRONG INFERENCE OF SCIENTER**

187.    According to Confidential Witness #1 ("CW #1"), a former Human Resources Coordinator at the Company's Alameda corporate headquarters from January 31, 2005 through March 1, 2007, UTStarcom actively backdated its stock option grants to senior executives in order to assure that these executives received the highest possible margins related to their sale of options.  During her first year of employment at UTStarcom, CW #1 reported to the Director of HR, Jane Funk, who left the Company in early 2005.  After Funk left, CW #1 reported to the Director of HR Ed Hudson until approximately September 2005 at which time CW #1 reported to Senior HR Representative Waing Cheung, who reportedly directly to Hudson.

188.    As HR Coordinator, CW #1 was responsible for processing the paperwork associated with senior executive stock sales.  CW #1 also worked closely with the Company's stock administrator, Daryl Wilke, during her time there.  CW #1 also processed all of the paperwork associated with new employee's initial stock offerings, or "ISOs." After that, all

1   trades/purchases/grants and sales of Company stock were handled by Stock Administrator

2   Daryl Wilke.

3   189.   Through her position, CW #1 was quite familiar with the paper trail for

4   backdated options.  The witness indicated that all of the paperwork associated with the back

5   dating of options first went through the approval of the Company's General Counsel Russell

6   Boltwood and Stock Administrator Daryl Wilke.  The witness was aware that Wilke reported

7   directly to Senior Finance Administrator Gayle Adams, (who was responsible for the

8   Company's accounts receivable, accounts payable and payroll) Lu and Sophie.  CW #1 added

9   that Hudson, her immediate supervisor, reported directly to Boltwood.

10   190.   CW #1 stated that she personally witnessed the fabrication and alteration of

11   false documents in furtherance of Defendants' options backdating.  For example, she

12   personally witnessed the Company's CFO Barton backdating his stock options.  CW #1

13   indicated that the "green light" to backdate Barton's options came directly from President and

14   CEO Lu.  CW #1 handled the paperwork associated with Barton's options being backdated to

15   approximately June 2005, although he did not begin working for the Company until

16   approximately August 2005.  CW #1 said that she witnessed the dates on his W-4 being

17   altered as well as the dates being altered on his "New-hire Notification Form." CW # 1 stated

18   that she was in charge of maintaining all of the New-Hire Identification Forms, and this being

19   the case, the discrepancy between Barton's June 2005 stock exercising date and his August

20   2005 start date "stuck out."

21   191.   CW #1 indicated that Barton's June 2005 stock option grant was between $1

22   and $2 million.  CW #1 added that any paperwork associated with the executive bonuses

23   "came to her" before being filed in the appropriate employee records reports.  CW #1 stated

24   that in approximately August 2005, she was given paperwork to process in association with

25   CFO Barton's stock options, and she immediately noticed that the paperwork was back dated

26   to approximately June 2005, two months before his August 2005 start date.  Alarmed, the

27   witness took the matter to Melody Fan, a Senior HR manager, and explained her concerns

28   about the backdated paperwork.  Fan instructed CW #1 to process the paperwork utilizing the

1   earlier June 2005 date, "since that is what they [Barton and Lu] wanted us to do."  As

2   instructed, CW #1 processed the paperwork under the June 2005 start date.  She added that

3   she had to change the dates on several of the Company's internal forms, including Barton's

4   new hire paperwork, in order to (inaccurately) reflect that Barton started at UTStarcom in

5   June 2005, keeping with the instructions handed down to her by Fan.

6        192.    CW #1 said that until approximately six months prior to her departure from the

7   Company, the stock's exercising  reports as well as the executive bonus information was

8   maintained within an ADP HRIS system, however, as of approximately September 2005, the

9   information was transferred into an Oracle based system.  Prior to that, the newly awarded

10   option information was maintained within a "Stock ISO Grant Screen," which, CW #1 said,

11   stood for initial stock option grant screen.  The Stock ISO Grant screen recorded the amount

12   of the stock granted and the price at which it was granted.  CW #1 reiterated that the "paper

13   back up" was maintained within the personnel files, which CW #1 personally oversaw.  CW

14   #1 was responsible for "pulling" all personnel files that the Company's independent auditors

15   requested to review.  Based on this experience, CW #1 said that she is certain that the

16   Company's executives had engaged in a pervasive options backdating scheme for years.

17        193.    CW #1 also stated that she personally witnessed former CFO Sophie engage in

18   the practice of backdating executive stock options – particularly his own.

19        194.    CW #1 recalled that in late 2006, Price Waterhouse Cooper ("PWC") insisted

20   that UTStarcom hire another independent auditing firm.  CW #1 said it was known within the

21   HR Department that the independent firm found problems relating to UTStarcom's executives

22   backdating of their options, and as a result, the independent auditing firm increased the scope

23   of its audit to go back as far as 2000.  She said that because of the issues that the independent

24   auditing company found relating to UTStarcom's practice of backdating its options for senior

25   executives, the Company's late 2006 earnings announcement was delayed, thereby providing

26   the independent auditing firm with enough time to conclude its audit on the Company's

27   records.

28

195.    According to Confidential Witness #2 ("CW #2"), during the time of her employment, there was internal chatter about the Company's executives backdating their stock options.  CW #2 was employed with UTStarcom at its Alameda headquarters from approximately October 2006 until September 2007 as an Administrative Support Representative.  CW #2 reported directly to Assistant Controller Chaz Dumas.

196.    CW #2 recalled that her supervisor, Dumas, was required to attend an all-hands meeting in January 2007 at the first floor conference room located within the Company's corporate headquarters.  Dumas informed her that during this meeting, the executive's practice of backdating stock options was discussed.  Dumas told CW #2 that during the meeting it was stated that the Company's employees did not need to worry about the backdating because the Company was working to correct the problem.  The witness recalled that the Accounting Treasurer Candice Hsu, International Accounting Manager Kheron Jones and Accounting Representative Terri Yurkovich all attended the meeting with Dumas.

197.    The accounts regarding the stock option backdating practices at UTStarcom given by CW #1 and CW #2 contribute to a strong inference of scienter, if not provide a first hand account of backdating occurring at the Company.

## XI.    LOSS CAUSATION

198.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated UTStarcom's securities prices and operated as a fraud or deceit on Class Period purchasers of UTStarcom securities by misrepresenting the Company's business condition.  Defendants achieved this façade of success, growth and strong future business prospects by misrepresenting the Company's financial results and compensation practices.  Later, however, when Defendants' prior misrepresentations and fraudulent conduct began to be disclosed and became apparent to the market, UTStarcom stock fell precipitously as the prior artificial inflation was removed from UTStarcom's securities prices.  As a result of their purchases of UTStarcom securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

199.    During the Class Period, the Defendants presented a misleading picture of UTStarcom's business and prospects.  Instead of truthfully disclosing that UTStarcom's business was not as healthy as represented, Defendants caused UTStarcom to misrepresent the Company's earnings and compensation and tax expenses, among other important metrics. During the Class Period, Defendants also repeatedly, but falsely, emphasized that UTStarcom's compensation practices aligned the interests of management with shareholders, and that UTStarcom's compensation and accounting practices were overseen by independent, competent directors.

200.    These false and misleading representations concerning UTStarcom's financial results and management compensation – plus Defendants' non-disclosure of material facts concerning the Company's compensation practices, which facts demonstrate that Defendants were not acting in the best interests of shareholders, but, rather were acting dishonestly and in violation of Company, NASDAQ and SEC policies and regulations – caused and maintained the artificial inflation in UTStarcom's securities prices throughout the Class Period and until the truth was ultimately revealed to the market.

201.    Defendants' false and misleading statements had the intended effect and caused UTStarcom's common stock to trade at artificially inflated levels throughout the Class Period, reaching a high of $45.36 on August 21, 2003.

202.    Starting on November 7, 2006 through the end of the Class Period on July 24, 2007, investors began to learn the truth through a number of disclosures.  These revelations did not happen all at once, but rather were the result of at least two specific pronouncements from the Company.  As investors and the market became aware of the true facts, which had been obfuscated for over seven years by Defendants, the prior artificial inflation came out of UTStarcom's securities prices, damaging investors.

203.    On November 7, 2006, UTStarcom announced in a press release that it had commenced a voluntary review of its historical equity award grant practices.  The Nominating and Corporate Governance committee of the board directed the review.  They were assisted by independent legal counsel and independent accounting counsel.  As a result of this review,

1   the Company would have to postpone its third quarter earnings release.  In reaction to this

2   news, the Company's share price fell a statistically significant 9% from a closing price of $

3   10.23 on November 7, 2007 to a closing price of $ 9.32 on November 9, 2006 after the market

4   had absorbed the information.  This release was a partial disclosure of negative material facts

5   which had an immediate, statistically significant impact on the Company's share price.

6        204.    On July 24, 2007, UTStarcom announced the preliminary results of its review

7   of historical equity award practices, requiring the Company to restate approximately $ 28

8   million of non-cash compensation expenses over the years 2000 through 2006.  Based in

9   substantial part on these revelations, the market responded sharply to this announcement and

10   UTStarcom stock plummeted by 22% from a closing price of $ 4.73 on July 22, 2007 to a

11   closing price of $ 3.70 on July 25, 2007, when the market had fully absorbed the news.  The

12   stock price continued to fall in the subsequent days

13        205.    As a direct result of these share price declines in response to the revelation of

14   the previously misrepresented and concealed material facts concerning Defendants' options

15   backdating, Lead Plaintiff and the Class have been damaged.

16   **XII.    INAPPLICABILITY OF STATURY SAFE HARBOR**

17        206.    The statutory safe harbor for certain forward-looking statements does not apply

18   to the misrepresentations and omissions alleged in this complaint.  Many of the statements

19   were not specifically identified as "forward-looking statements" when made.  To the extent

20   that there were any properly identified forward-looking statements, there were no meaningful

21   cautionary statements identifying the important, then-present factors that could and did cause

22   actual results to differ materially form those in the purportedly forward-looking statements.

23   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking

24   statements pleaded herein, Defendants are nonetheless liable because at the time each of the

25   misrepresentations was made, the particular speakers knew that the statement was false or

26   misleading at that time.

27        207.    Any warnings or other cautionary language contained in the press releases and

28   other public statements described herein were generic, "boilerplate" statements of risk that

1   would affect any similar company, and misleadingly contained no factual disclosure of any of

2   the problems with the Company which placed the ability of the Company to accurately depict

3   its own financial situations into serious question.  As such, any forward-looking statements

4   complained of herein were not accompanied by meaningful cautionary language.

5        208.    Any relevant purported risk disclosures were, in fact, false and misleading in

6   and of themselves, by virtue of the fact that the events which the risk disclosures purported to

7   warn against as contingencies had frequently already become a reality or a certainty.

8   **XIII.   PRESUMPTION OF RELIANCE**

9        209.    At all relevant times, the market for UTStarcom securities was an efficient

10  market for the following reasons, among others:

11            a.  At all relevant times during the Class Period, UTStarcom's common stock

12               was listed and actively traded either over the counter or on the NASDAQ

13               GS, a highly efficient National Market.

14            b.  As a registered and regulated issuer of securities, UTStarcom filed periodic

15               reports with the SEC, in addition to the frequent voluntary dissemination of

16               information described in this Complaint.

17            c.  The Company's stock was followed by numerous financial analysts.  Thus,

18               the Company's stock reflected the effect of information disseminated in the

19               market.

20       210.    As a result of the above, the market for UTStarcom securities promptly

21  digested current information with respect to the Company from all publicly available sources

22  and reflected such information in the securities' prices.  Under these circumstances, all

23  purchasers of UTStarcom securities during the Class Period suffered similar injury through

24  their purchase of securities at prices which were artificially inflated by Defendants'

25  misrepresentations and omissions.  Thus, a presumption of reliance applies.

26

27

28

## XIV. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### <u>COUNT ONE</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### Promulgated Thereunder Against All Defendants)

211.   Lead Plaintiff incorporates by reference and realleges all preceding paragraphs though fully set forth herein.

212.   During the Class Period, Defendants engaged in a plan, scheme, and course of business which operated as a fraud upon Plaintiff and Class Members, and made various untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and other Class Members as set forth above.  The purpose and effect of this scheme was to induce Plaintiffs and members of the Class to purchase the Company's securities during the Class Period at artificially inflated prices.

213.   By reason of the foregoing, Defendants knowingly or recklessly violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they themselves or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of the Company's common stock during the Class Period.

214.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the representations described above, Plaintiff and other members of the Class relied, to their detriment, directly on the misstatements or the integrity of the market both as to price and as to whether to purchase these securities.  Plaintiff and other members of the Class would not have purchased UTStarcom stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and

1   misleading statements and omissions.  At the time of the purchase of UTStarcom securities by

2   Plaintiff and the other members of the Class, the fair market value of said securities was

3   substantially less than the prices paid.  Plaintiff and the other members of the Class have

4   suffered substantial damages as a result.

## COUNT TWO

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

215.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

216.    The Individual Defendants are liable for the material misrepresentations and omissions complained of herein under § 20(a) of the Exchange Act in that they functioned as control persons of UTStarcom by virtue of their executive and directorial positions with UTStarcom, their knowledge and involvement in the business of the Company, their daily access to confidential information regarding the operations and finances of the Company, and their power and ability to make public statements on behalf of UTStarcom to shareholders, potential investors, and the media.  As such, they had the power and ability to control the Company's actions.

## COUNT THREE

### (Violations of Section 14(a) of the Exchange Act and Rule 14a-9

### Promulgated Thereunder Against All Defendants)

217.    Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

218.    UTStarcom's proxy statements were required to disclose the Company's executive officers' and directors' direct and indirect compensation, including a description of stock options granted to these individuals by the Company.

219.    The proxy statements during the Class Period misrepresented that the stock options' exercise prices would be the Company's market price on the date of grant, when in fact the options were backdated to a time when the Company's market price was lower than

1    that on the actual grant date.  Thus, by backdating options, the Company received less for the

2    stock when exercised.  The Company should have disclosed the difference between the

3    Company's stock price on the actual date of the option grant, and the lower, backdated price

4    should have been disclosed as additional compensation to the Individual Defendants.

5    Therefore, the amounts of compensation to the Individual Defendants were materially

6    understated.

7          220.    Defendants solicited proxies from shareholders for the election of directors

8    each year during the Class Period.  Since the proxy statements failed to set forth the material

9    information that the option grants were being and had been backdated, the proxy statements

10   misrepresented material information about the exercise price of the stock options granted to

11   the Company's executive officer and directors and their executive compensation.

12         221.    Defendants negligently omitted the material facts about option grant

13   backdating and negligently misrepresented the terms of the Individual Defendants'

14   compensation and management integrity.  These facts would have been material to a

15   reasonable investor or shareholder in considering how to vote.

16         222.    In reliance on the false and misleading proxy statements, Plaintiff and other

17   members of the Class voted for the Individual Defendants as directors, which allowed the

18   Individual Defendants to cash in their backdated options, to the detriment of the Company and

19   its shareholders.

20         223.    At the time of the materially false and misleading proxy statements regarding

21   stock options and executive compensation, Plaintiff and other members of the Class were

22   ignorant of the true facts.  Had Plaintiff and the other members of the Class known the facts

23   that were not disclosed by Defendants, Plaintiff and other members of the Class would not

24   have voted for the Individual Defendants as directors.

25         224.    By virtue of the foregoing, Defendants have violated Section 14(a) of the

26   Exchange Act and Rule 14a-9 promulgated thereunder.

27

28

225.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered injury in correlation with their proxy voting during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and on behalf of the Class, prays for judgment as follows:

A.     Declaring this action to be a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Plaintiff and members of the Class recissory or compensatory damages in an amount which may be proven at trial, together with interest thereon;

C.     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees and expert witness fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable relief and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure Plaintiff and the members of the Class have an effective remedy.

## JURY DEMAND

Plaintiff hereby demands a jury trial.


Dated:  May 16, 2008                          Respectfully submitted,


By:_____/s/_____
Mark Punzalan
FINKELSTEIN THOMPSON LLP
100 Bush Street
Suite 1450
San Francisco, California 94104

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: 415.398.8700
Facsimile: 415.398.8704

- and -

Donald J. Enright, Esq.
Elizabeth K. Tripodi
FINKELSTEIN THOMPSON LLP
1050 30th Street, NW
Washington, D.C. 20007
Telephone: 202.337.8000
Facsimile: 202.337.8090

*Counsel for Plaintiffs*