# Exhibit F
# Part 1 of 4



# UTSTARCOM INC (UTSI)

1275 HARBOR BAY PARKWAY
STE 100
ALAMEDA, CA 94502
510. 864.8800
http://www.utstar.com/

# 10−Q

**QUARTERLY REPORT PURSUANT TO SECTIONS 13 OR 15(D)**
**Filed on 10/10/2007 − Period: 09/30/2006**
File Number 000−29661



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549
# FORM 10-Q

(Mark One)

☒     **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2006

OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to
COMMISSION FILE NUMBER 000-29661

# UTSTARCOM, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **52-1782500** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |
| **1275 HARBOR BAY PARKWAY** | |
| **ALAMEDA, CALIFORNIA** | **94502** |
| (Address of principal executive offices) | (zip code) |

Registrant's telephone number, including area code: **(510) 864-8800**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☐ No ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or non-accelerated filer (as defined in Rule 12b-2 of the Exchange Act).

Large accelerated filer ☒  Accelerated filer ☐  Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes ☐ No ☒

As of September 30, 2007 there were 121,294,645 shares of the registrant's common stock outstanding, par value $0.00125.

**TABLE OF CONTENTS**

EXPLANATORY NOTE
PART I–FINANCIAL INFORMATION                                                                                          3
ITEM 1–CONDENSED CONSOLIDATED FINANCIAL STATEMENTS                                                                   12
ITEM 2–MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS                         59
ITEM 3–QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS                                                   93
ITEM 4–CONTROLS AND PROCEDURES                                                                                       94
PART II–OTHER INFORMATION                                                                                           106
ITEM 1–LEGAL PROCEEDINGS                                                                                            106
ITEM 1A–RISK FACTORS                                                                                                109
ITEM 2–UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS                                                  128
ITEM 3–DEFAULTS UPON SENIOR SECURITIES                                                                              128
ITEM 4–SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS                                                          128
ITEM 5–OTHER INFORMATION                                                                                            129
ITEM 6–EXHIBITS                                                                                                     130
SIGNATURES                                                                                                          132

## EXPLANATORY NOTE

**The Company was unable to file timely its Form 10–Q for the quarterly period ended September 30, 2006 because we had commenced a voluntary review of historical stock option practices and the results of that review were not known at the date the Form 10–Q filing was due. We are filing the Form 10–Q for such period concurrently with filing of the Company's Form 10–K Annual Report for the year ended December 31, 2006. Information contained herein about the restatements of previously issued financial statements has been taken from the 2006 Annual Report. The 2006 Annual Report contains additional information about the restatements which is not included herein.**

Our consolidated financial statements and related financial information included in this Quarterly Report on Form 10–Q for accounting periods prior to the third quarter of 2006 have been restated, as described below.

*Summary*

In July 2007, the Company announced the Audit Committee was conducting an independent investigation of historical sales with certain customers in China and stated that it could not rule out the possibility that the outcome of the investigation could impact revenue recognized for certain of such contracts as recorded in previously issued financial statements. In September 2007, the Company announced the investigative phase of the Audit Committee's investigation had been completed. After consultation with and upon the recommendation of management, the Audit Committee determined revenue in the Company's Western Region of China was recognized earlier than it should have been and that the financial statements for the affected periods should be restated. The Company also announced that its previously issued financial statements for each of the fiscal years ended December 31 in the period 2000 through 2005, the financial statements for the interim periods contained in the Quarterly Reports on Form 10–Q filed with respect to each of these years, and the quarterly reports on Form 10–Q filed with respect to each of the quarterly periods ended March 31 and June 30, 2006 should not be relied upon. In this Quarterly Report we have corrected for the effects of net sales and related costs of net sales that were recorded earlier than they should have been. The net effect for the three and nine months ended September 30, 2005 was to reduce and defer previously recognized revenue and gross profit of $34.6 million and $15.1 million, respectively, and $63.7 million and $29.4 million, respectively.

We also conducted a voluntary review of historical stock option practices under the direction of the Nominating and Corporate Governance Committee of our Board of Directors ("Governance Committee"). This review considered all option grant awards made in the period from February 29, 2000, shortly before the initial public offering of our Common Stock, through August 2006 for compliance with the various stock–based compensation accounting standards applicable during this period as well as the rules of our stock option plans. We found that in a number of instances we did not use the proper date as the measurement date in determining whether stock options had been issued with exercise prices below the fair value of our common stock. Therefore, we have restated our previously issued financial statements for the years ended December 31, 1998 through 2005 to account for an additional $25.5 million of stock compensation expense that should have been recognized over the period together with an equal increase in additional paid–in capital to recognize the intrinsic value assigned to these issuances of equity securities. Related adjustments of payroll and income taxes resulted in an additional $0.5 million of expense being recognized for the 1998 through 2005 period and total stockholders' equity being reduced by a total of $2.1 million at December 31, 2005. During the first six months of 2006 an additional $1.2 million of stock compensation expense was recognized, which reduced our previously reported operating results for this period. During the three and nine months ended September 30, 2005 (in thousands), stock compensation expense totalling $76 and ($1,470), respectively, was recognized.

In restating our previously issued financial statements for the investigations described above, we also corrected other previously reported amounts. We corrected our reporting for $80.3 million of net sales to certain third party resellers and $41.2 million of associated cost of net sales in 2005 to classify these amounts as related party net sales and related party cost of net sales classifications, respectively, because in 2006 we determined that sales to these entities were, in substance, sales to one of our significant shareholders, SOFTBANK CORP. The accounts receivable from these sales was similarly reclassified into accounts receivable from related parties in our 2005 balance sheets. We also corrected our reporting of $6.3 million of time deposits at March 31 and June 30, 2006 because they did not mature within three months. Formerly the time deposits had been reported in error as cash equivalents, but now these amounts are included in short–term investments in these balance sheets and in the statements of cash flows for the March and June 2006 reporting periods. The corrections for the three and nine months ended September 30, 2005 interim periods have been recorded in the condensed consolidated financial statements included herein. See also Exhibit 99.1 of our Annual Report on Form 10–K for the year ended December 31, 2006 for the impact of the restatement on all quarterly periods for 2005 and 2006.

None of these restatements had any effect on any of our December 31 cash balances; however, cash equivalents were reduced in the March and June 2006 periods due to the reclassifications described above.

3

Additional information about these restatements and their effects on our financial statements is presented below as well as in the Notes to Consolidated Financial Statements.

*China Sales Investigation*

The Audit Committee of the Company's Board of Directors ("Audit Committee") engaged independent counsel to conduct an investigation of sales in China following a determination by the Internal Audit group that allegations of improper activities in a sales office in the Western Region were credible. The allegations were made by a Company employee using the Company's whistle blower program. The independent counsel engaged forensic accountants, and this group is collectively referred to as the Investigating Team in the rest of this discussion.

In conducting its procedures, the Investigating Team found instances where the customer contracts that evidenced the arrangement contained obligations for the Company to deliver software upgrades when and if made available for the equipment sold for no additional consideration and for an unspecified period that could extend over the term of the contract. This additional contract obligation is an element of "post contract support." In these cases, the Investigating Team found that the contract documentation for the same transaction submitted by the sales office to the Company's China headquarters for accounting purposes and utilized by the Company in determining the amount of revenue recognized did not include evidence of such post contract support obligations.

Accounting standards governing revenue recognition for system sales require all revenue to be deferred while there are undelivered elements under the arrangement unless the seller has established vendor specific objective evidence ("VSOE") of fair value for such contract elements. Because these arrangements included such undelivered elements, revenue should be deferred based on the VSOE of the fair value of the underlying elements. VSOE of fair value represents the price charged when the same element is sold separately. Since the Company does not sell this element separately, it has not established VSOE for such undelivered elements, and as such the revenue from such contracts is required to be deferred and recognized over the period the Company is obligated to provide the post contract support.

The China sales investigation covered each of the seven years in the period ended December 31, 2006 and included: investigating approximately 1,200 contracts in all of our five regions in China; reviews of the electronic files of 45 employees; and formal interviews of 96 employees in China. Additionally, the China sales investigation included reviewing contract files, performing various financial analyses including comparison of payments received per our accounting records to the contract terms, and computer forensic procedures where destruction of electronic documents was suspected. In the aggregate, the Investigating Team expended approximately 25,000 hours in conducting this investigation, which commenced in February 2007 and was completed in September 2007 when the independent counsel and forensic accountants presented their final report to the Audit Committee. In July 2007, we announced the Audit Committee was conducting an independent investigation of historical sales with certain customers in China and we stated that we could not rule out the possibility that the outcome of the investigation could impact revenue recognized for certain of such contracts as recorded in our previously issued financial statements.

Upon completion of the investigative phase of the independent investigation by the Audit Committee, our management:

- conducted follow–up procedures to attempt to locate any additional relevant information to ensure the Company considered all available information and documents;
- evaluated the accounting for identified system sales using the contract template and documentation found in the sales contract files from the Western Region offices. This included calculating the financial statement effects of correcting the accounting for all system sales where the contract template found at our sales offices contained post contract support obligations to recognize revenue and cost of net sales over estimated period of post contract support;
- concluded that as a result of the existence of this undelivered post contract support obligation our previously issued financial statements should be restated to defer system sales contract revenue and the related cost of net sales over the estimated period of post contract support when a contract contained unspecified software upgrade rights.

The Audit Committee concurred with management's decisions.

The effect of correcting improperly recognized revenue and cost of net sales is to (reduce) increase previously

4

reported net sales, gross profit and net income by the following amounts (in thousands of dollars):

| Year ended December 31, | Net sales | Gross profit | Net income |
|---|---|---|---|
| 2000 | $    (12,408) | $    (5,294) | $    (4,781) |
| 2001 | (17,154) | (6,330) | (5,779) |
| 2002 | (64,732) | (22,924) | (19,697) |
| 2003 | (21,060) | (8,014) | (6,382) |
| Totals through December 31, 2003 | (115,354) | (42,562) | (36,639) |
| 2004 | (104,965) | (27,241) | (18,594) |
| 2005 | (58,232) | (27,863) | (42,433) |
| 2000 − 2005 Total | (278,551) | (97,666) | (97,666) |
| **2006 quarter ended** | | | |
| March 31 | 5,410 | 1,360 | 1,360 |
| June 30 | 2,380 | (371) | (371) |
| Total China Sales Restatement | $    (270,761) | $    (96,677) | $    (96,677) |

The cumulative effect of all of the China sales restatement adjustments to our consolidated balance sheet as of December 31, 2003 resulted in a decrease in retained earnings of $36.6 million, an increase in deferred revenue of $115.4 million to account for previously recognized sales, an increase in deferred costs of $75.7 million to account for previously recognized cost of net sales, and an increase in deferred tax assets of $3.0 million. In our consolidated balance sheet at December 31, 2006, deferred revenue is $275.7 million, of which $35.6 million is classified as current and $240.1 million as non−current, and the deferred costs balance is $176.6 million. These amounts will be recognized in our consolidated statements of operations over the estimated remaining period of post contract support.

Due to this restatement, we decreased net sales, gross profit, and net income (in thousands) for the three and nine month periods ended September 30, 2005 as follows: $34,610 and $63,671; $15,062 and $29,429; and $29,186 and $43,999, respectively. In our consolidated balance sheet at September 30, 2006 the net reduction in previously recognized net sales is accounted for as deferred revenue, of which $34.5 million is classified as current and $240.3 million as non−current, and the related net reduction in cost of net sales of $177.0 million is accounted for as deferred costs. These amounts will be recognized in our consolidated statements of operations over the estimated remaining period of post contract support.

Upon completing its investigation, the Audit Committee concluded that the conditions and practices relating to systems contracts prevalent in the Western Region resulted primarily from the failure to prevent or detect instances of override related to controls in China over customer agreements, lack of proper management oversight, unclear record retention policies and procedures relating to systems contracts, and inadequate employee training. The Investigating Team and the Audit Committee also concluded that with respect to four regions other than the Western Region there was no evidence of fraud or misconduct or reason to suspect such occurred. The Investigating Team and the Audit Committee also concluded that there was no credible evidence of knowledge by senior management in China or the United States of the conditions and practices related to the Western Region of China that were discovered in the investigation. The Audit Committee concluded that local management in several of the sales offices in the Western Region of China did not submit appropriate information to the Company's senior management in China and the United States. Therefore, in prior years, neither the Company's management nor the Company's independent registered accounting firm were able to properly evaluate the effect of that information on revenue recognition. The Audit Committee also concluded that certain members of management in China bear varying degrees of responsibility for inadequate oversight of activities. As a result, certain employees in China have either been terminated or placed on suspension for failure to provide adequate oversight of activities.

We have restructured the management of the Western Region sales organization and are working to identify and implement changes to our policies and procedures and enhance employee training to improve internal control consciousness and lessen the possibility of accounting errors occurring in the future.

*Stock Option Accounting*

In November 2006, we announced we had commenced a voluntary review of historical stock option practices under the leadership of the Governance Committee following a preliminary review by management which identified potential deficiencies and discrepancies in the documentation of stock option grants. The review considered all option grant awards made in the period from February 29, 2000, shortly before the initial public offering of our Common Stock, through August 2006 ("Review Period") for compliance with the various stock-based compensation accounting standards applicable during the Review Period as well as the rules of our stock option plans. The Governance Committee engaged independent outside legal counsel to assist in the review who, in turn, engaged forensic accountants. (Separate law firms and separate forensic accounting firms were engaged by the Audit Committee and the Governance Committee for the China sales investigation and the stock option accounting review.) In the rest of this discussion, this group collectively is referred to as the Stock Option Review Team and their actions and activities are referred to as the Stock Option Review. The Stock Option Review Team members spent over 11,000 hours in this review, and the Governance Committee met with the Stock Option Review Team on more than a dozen occasions to receive, discuss, and consider the Stock Option Review Team's information and findings.

At the time the review commenced, the Governance Committee consisted of three members of the Board of Directors, all of whom are independent directors. The Committee decided to delegate supervision of the review to Mr. Jeff Clarke, its Chairman, who joined our Board in 2005 and had not served on the Compensation Committee of the Board of Directors ("Compensation Committee") during the period under review. The Governance Committee also consisted of two other independent directors, Mr. Larry D. Horner and Mr. Thomas Toy, who also serve on the Board's Compensation Committee. Mr. Allen Lenzmeier was appointed to the Governance Committee on April 27, 2007.

Review procedures included:

- interviews of individuals involved with granting, advising, administering, or accounting for stock options, including current and former: management, members of the Board of Directors, employees, and non-employee professionals;

- review of relevant stock administration, human resource, legal, and finance department files and records;

- review of stock option grant information in select employee personnel files;

- review by at least 30 attorneys and 15 forensic accountants of approximately 250,000 potentially relevant e-mails and documents in electronic format selected through electronic discovery techniques from over 1.8 million electronic documents processed;

- review of the electronic database of the Company's stock option activity maintained by a third party along with communications to and from this service provider;

- reconciliation of grant activity from approval documents executed by the Compensation Committee with the electronic database;

- reconciliation of stock option grant, exercise, and cancellation information from SEC filings with select employee personnel files and the electronic database;

- statistical and judgmental pattern analysis;

- follow-up on matters raising questions about the option granting process and its history, conduct of those involved with granting, advising, administering, or accounting for stock options, or the accounting treatment for stock options; and

- follow-up on items or issues requested or identified by management or the Company's independent registered public accounting firm.

The Stock Option Review Team, management, and the Governance Committee decided to group stock option grants into six award categories based on differences in what constituted substantive approval for each category under our stock option granting practices as well as giving consideration to the risk of intentional misstatement of the grant date. Guidance in a September 19, 2006 letter publicly issued by the SEC's Chief Accountant focuses on the concept that a measurement date under Accounting Principles Board Opinion No. 25 *Accounting for Stock Issued to Employees* ("APB 25"), the accounting standard governing our stock option accounting through 2005, does not occur until the number of shares an individual employee is entitled to receive and the exercise price is determined with finality (i.e., no longer subject to change). This is the

6

date on which substantive approval occurred, and depending on a company's facts and circumstances the guidance from the SEC discussed above recognizes a company may determine that the measurement date for some stock option grants may occur before all required granting actions have occurred — such as final approval by the Compensation Committee. This alternative is available only when a review of all facts and circumstances supports a conclusion that substantive approval occurs earlier than when all required granting actions have occurred and there is no evidence of fraudulent or manipulative conduct in the company's option granting practices.

In determining the measurement date to be used, the Stock Option Review Team, management, and the Governance Committee agreed to use the following definitions as constituting the proper measurement date, and generally these dates were used in testing the stated grant dates or establishing corrected measurement dates:

| | |
|---|---|
| **Discretionary Director and Officer Grants** | The date of a Compensation Committee meeting where the grant was approved or the date the final Compensation Committee signer approved the grant when approval occurred through unanimous written consent documents ("UWC"). |
| **Automatic Director Grants** | The date specified in the relevant stock option plan. |
| **Broadbase** | The date the grantee list, including the allocation of shares to individual grantees, was complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **Acquisition** | The first Compensation Committee meeting following the acquisition, provided grantees had received employment offer letters stating the number of stock options to be granted before such date, because this was the date at which the option exercise price was established. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **New Hire** | The first scheduled Compensation Committee meeting following the first day of employment, because this was the date at which the option exercise price was established. The number of options was based on either grant amounts specified in an employment offer letter or, in some cases, on a matrix that assigned grant amounts based on position and level within the Company. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **Other Merit** | The date the grantee list, including the allocation of shares to grantees, was substantially complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |

For 12 tested grant dates where a corrected measurement date was required, the Stock Option Review Team and management were unable to locate sufficient evidence to establish a corrected measurement date using our established criteria for the applicable option grant type. In these situations alternative available evidence was used to establish the corrected measurement date.

During the period covered by the Stock Option Review, we granted stock options on approximately 34 million shares of our Common Stock at 197 grant dates. The review specifically examined the appropriateness of the stated grant date for approximately 90% of the stock options granted, including all stock option grants made to directors and officers, all broadbase grants and all option grants made in connection with business acquisitions.

The findings of this review are summarized as follows:

| Grant Type | Number of grants | Grants tested | No change required | Measurement date changed additional compensation expense required | no additional compensation expense required(1) |
|---|---|---|---|---|---|
| Discretionary Director & Officer | 16 | 16 | 8 | 4 | 4 |
| Automatic Director | 5 | 5 | 5 | — | — |
| Broadbase | 8 | 8 | — | 6 | 2 |
| Acquisition | 10 | 10 | 10 | — | — |
| New Hire | 166 | 48 | 48 | — | — |
| Other Merit | 96 | 41 | 4 | 21 | 16 |
| Total | 301(2) | 128 | 75 | 31 | 22 |

(1) Under APB 25 there is no expense adjustment arising from using the corrected measurement date for these grants because the amount the employee would have to pay to exercise these stock option grants exceeded the quoted market price of our Common Stock at the corrected measurement date, and therefore, these stock option grants contained no intrinsic value at the corrected measurement date.

(2) The number of grants exceeds the number of grant dates because on certain grant dates more than one category of stock option grants were approved.

In late January 2007 the Governance Committee reported its interim findings concerning the use of incorrect measurement dates in our stock option accounting under APB 25 to our Board of Directors. On February 1, 2007, the Audit Committee of the Board of Directors then concluded, in consultation with and upon the recommendation of management, that we should correct for errors in previously reported stock-based compensation expense through restatement of our previously issued financial statements and that our previously issued financial statements for all periods should no longer be relied upon. We communicated this decision in a February 1, 2007 public announcement.

A non-cash compensation charge, to be recognized as an expense over a grantee's service period, arises under APB 25 if a stock option has intrinsic value at its measurement date. This intrinsic value is measured by the excess, if any, of the fair value at the date of grant of the underlying common stock over the stock option's exercise price. Our practice has been to grant stock options with exercise prices equal to the closing price of our Common Stock at each grant date, to use the grant date as the measurement date for stock-based compensation purposes, and as such previously we had determined the granted stock options had no intrinsic value at their grant dates and no compensation expense was recognized. However, APB 25 states the measurement date does not occur until all essential actions necessary to grant the option are completed, including the final determination of both the number of shares to be granted to each employee or director and the exercise price, and the option grant is approved by those with requisite authority. This is reinforced by the September 19, 2006 letter issued by the SEC's Chief Accountant which focuses on the need for the number of shares and exercise price of an award to an individual to be finalized to have a measurement date. This letter clarifies the SEC staff's view that if it is possible that those terms could change, a measurement date has not occurred, even if the award's terms are not actually changed.

Based on the available evidence, the review found that the number of shares an individual employee was entitled to receive and/or the exercise price was not determined with finality at the stated grant date on 53 tested grant dates, and we should have used a later date as the measurement date. The principal reasons for the stated grant date not qualifying as the measurement date under APB 25 include:

- certain listings of grantees, below officer level, were incomplete and added to by stock option administration personnel after the grant was approved by the Compensation Committee;
- for certain grants where Compensation Committee approval was not considered perfunctory, the date a UWC document was sent to Compensation Committee members for approval was used as the stated grant date for some discretionary officer and director grants rather than the date the UWC was signed by all Compensation Committee members and therefore became effective;
- the Stock Option Review Team was unable to locate contemporaneous documentation of some director and officer, broadbase, new hire, and other merit grants.

During the review the Company also discovered a stock option grant to a former officer that was modified in 1998 in connection with his termination of employment. This change was never included in the Company's stock option grant records and the additional compensation expense resulting from the change in the option's terms (approximately $1.2 million) was not recorded previously. This discovery is consistent with the Stock Option Review Team's finding that in certain instances there was a lack of formal documentation in the stock option granting process and/or expected documentation is missing from the stock option administration files. In addition, the Stock Option Review Team found that, in many instances, there was a lack of self-authenticating evidence to corroborate that cash exercises were contemporaneous. As a result, the findings on the issue of backdating of cash exercises were inconclusive.

8

We are restating our consolidated financial statements to recognize additional non-cash stock-based compensation expense arising from using corrected measurement dates for certain stock option grants made during the years 2000 through 2005 and to reflect the modification of the 1998 grant described above. Consistent with our historical accounting policy this additional stock-based compensation expense is being recognized on an accelerated basis by treating each vesting tranche as a separate stock option grant (graded vesting).

Our accounting for stock-based compensation changed to a fair value based method in 2006 when, as required by accounting standards, we ceased accounting for stock-based compensation under the intrinsic value method pursuant to APB 25 and began accounting for stock-based compensation under Statement of Financial Accounting Standards 123(R) *Share-Based Payments* ("SFAS 123(R)"). Under this method all stock option grants have a fair value determined using an option pricing model, and such fair value is used to recognize non-cash stock-based compensation expense. We restated our unaudited condensed consolidated financial statements for the first and second fiscal quarters of 2006, included in Exhibit 99.1 in our Annual Report on Form 10-K for the year ended December 31, 2006 (and as reflected in our results for the three and nine months ended September 30, 2006 included in this Form 10-Q), to recognize changes in non-cash stock-based compensation expense that arose from a re-determination of the fair value of stock options granted in 2005 and prior where the Governance Committee's review resulted in a corrected measurement date. By January 1, 2006, of the 17.9 million options granted in 2000 – 2005 where corrections were made to the measurement dates in the Stock Option Review, 4.4 million options with corrected measurement dates granted in 2000 and 2001 had fully vested. Therefore, the fair values of the outstanding and unvested portion of the remaining 13.5 million stock options granted in 2002–2005 with incorrect measurement dates were recalculated. We are also recording additional non-cash stock-based compensation expense in the first two quarters of 2006 arising from correcting the measurement date for stock option grants to three individuals in this period. We recognize stock compensation expense on a straight-line basis under SFAS 123(R).

Those stock option grants with corrected measurement dates have also been restated using the fair value based measurement principles of Statement of Financial Accounting Standards 123 *Accounting for Stock-Based Compensation* ("SFAS 123") to present, in Note 2, "Restatement of Financial Statements" of Notes to Consolidated Financial Statements contained in Item 8 of our Annual Report on Form 10-K for the year ended December 31, 2006, the pro forma effect on stock-based compensation expense, net income (loss), and earnings (loss) per share amounts in 2004 and 2005 of using the fair value based method to determine stock-based compensation expense rather than using APB 25's intrinsic value method. Such disclosure is required in financial statements for periods prior to the adoption of SFAS 123(R).

In addition to restating the consolidated financial statements in response to the Governance Committee's findings, we are recording additional non-cash adjustments to account for the modification in 1998 of a stock option grant to a former officer in connection with his termination of employment and to record in the first two quarters of 2006 corrections relating to accounting for performance related stock options and restricted stock grants, all of which were previously identified and considered immaterial.

Correcting the measurement date for previously granted stock options in some cases results in additional taxable income to employees on which additional payroll taxes are due from the employees as well as us. We have provided for all additional payroll taxes plus related penalties and interest arising from the restatement of stock-based compensation, including amounts otherwise payable by stock option recipients, and our restated financial statements include an accrual in all affected years of approximately $1.5 million for all estimated payroll tax related expenses.

9

The corrections for the stock option restatement are to increase (reduce) previously reported non-cash compensation expense, payroll taxes, income taxes and net income by the following amounts (in thousands of dollars):

| Year ended December 31, | Non-cash stock compensation | | Payroll taxes | | Income taxes | | Net income | |
|---|---|---|---|---|---|---|---|---|
| 1998 | $ | 1,244 | $ | — | $ | (448) | $ | (796) |
| 1999 | | — | | — | | — | | — |
| 2000 | | 556 | | — | | (104) | | (452) |
| 2001 | | 4,870 | | — | | (942) | | (3,928) |
| 2002 | | 8,110 | | — | | (1,550) | | (6,560) |
| 2003 | | 12,470 | | 900 | | (2,281) | | (11,089) |
| Totals through December 31, 2003 | | 27,250 | | 900 | | (5,325) | | (22,825) |
| 2004 | | (410) | | 541 | | 250 | | (381) |
| 2005 | | (1,290) | | 60 | | 4,083 | | (2,853) |
| 2000–2005 Total | | 25,550 | | 1,501 | | (992) | | (26,059) |
| 2006 quarter ended | | | | | | | | |
| March 31 | | 662 | | 9 | | — | | (671) |
| June 30 | | 504 | | 6 | | — | | (510) |
| | $ | 26,716 | $ | 1,516 | $ | (992) | $ | (27,240) |

The Governance Committee's review found 17.9 million stock options of the 28.8 million options granted on our Common Stock during 2000 through 2005 had incorrect measurement dates. Using the corrected measurement dates, 7.6 million stock options had exercise prices that exceeded the closing price of our Common Stock and therefore had no intrinsic value to be accounted for under APB 25, and 10.3 million stock options had intrinsic value because their exercise prices were below the closing price of our Common Stock. These 10.3 million stock options resulted in an increase in additional non-cash stock-based compensation expense of $24.3 million, and an additional $1.5 million of payroll tax related expenses during 2000–2005 partially offset by $0.5 million of income tax benefit as shown in the above table. Of the 10.3 million stock options resulting in additional non-cash stock-based compensation expense, 2.0 million options were granted to officers and directors and resulted in $6.1 million of additional non-cash stock-based compensation expense.

The total effect of the stock option restatement and the amounts for 2006, as shown in the above table, have been reflected in the September 30, 2006 financial statements. As a result of this restatement, net income decreased by $3.7 million and $2.6 million, respectively, for the three and nine months ended September 30, 2005.

Upon completing its review, the Governance Committee concluded it found no evidence of intent to manipulate the Company's operating results or financial statements. A key finding of the Governance Committee was that there were deficiencies with the process by which stock options were granted during the period from our initial public offering in 2000 through at least 2005, which resulted in accounting errors. The Governance Committee concluded that certain members of management bear varying degrees of responsibility for the deficiencies in the process by which stock options were granted. The Governance Committee's review also concluded that none of the current or former employees or directors of the Company engaged in intentional wrongdoing.

In determining the above restatement amounts, management used all reasonably available relevant information to form conclusions it believes are reasonable as to the most likely option granting actions that occurred, the dates when such actions occurred, and the determination of grant dates for financial accounting purposes based on when the requirements of the accounting standards were met. In light of significant judgment used in establishing revised measurement dates, alternative approaches to those used by the Stock Option Review Team and management could have resulted in different compensation charges than those recorded in the restatement. The Stock Option Review Team and management considered various alternatives throughout the course of the review and restatement, and management believes the adjustments to measurement dates used in our review of stock option grant accounting and restatement of our financial statements are reasonable and appropriate in our circumstances.

10

*Summary of Restatement Amounts*

The following table presents the decrease in net earnings from the restatement for each restated year:

| Year ended December 31, | Net income (loss), as previously reported | Restatement adjustments | | | Net income (loss), as restated |
|---|---|---|---|---|---|
| | | China Sales | Stock Options | Total | |
| | | | (in thousands) (Decrease) Increase | | |
| 1998 | $ | — | $ (796) | $ (796) | |
| 1999 | | — | | | |
| 2000 | | (4,781) | (452) | (5,233) | |
| 2001 | | (5,779) | (3,928) | (9,707) | |
| 2002 | $ 107,862 | (19,697) | (6,560) | (26,257) | $ 81,605 |
| 2003 | $ 209,856 | (6,382) | (11,089) | (17,471) | $ 192,385 |
| Totals through December 31, 2003 | | (36,639) | (22,825) | (59,464) | |
| 2004 | 69,824 | (18,594) | (381) | (18,975) | $ 50,849 |
| 2005 | $ (487,359) | (42,433) | (2,853) | (45,286) | $ (532,645) |
| 2000 – 2005 Total | | (97,666) | (26,059) | (123,725) | |
| 2006 quarter ended | | | | | |
| 2006 Q1 | | 1,360 | (671) | 689 | |
| 2006 Q2 | | (371) | (510) | (881) | |
| | | $ (96,677) | $ (27,240) | $ (123,917) | |

The effect these corrections on diluted earnings (loss) per share for 2002 to 2005 are as follows:

| Year ended December 31, | Diluted earnings (loss) per share, as previously reported | Restatement amounts | | | Diluted earnings (loss) per share, as restated |
|---|---|---|---|---|---|
| | | China sales | Stock options | Total restatement | |
| 2002 | 0.94 | (0.17) | (0.06) | (0.23) | 0.71 |
| 2003 | 1.70 | (0.05) | (0.09) | (0.14) | 1.56 |
| 2004 | 0.54 | (0.14) | (0.00) | (0.14) | 0.40 |
| 2005 | (4.16) | (0.36) | (0.03) | (0.39) | (4.55) |

The cumulative effect on stockholders' equity at December 31, 2003 from the above corrections is as follows (in thousands):

Increase (decrease) in paid–in capital and deferred stock compensation:

| | |
|---|---|
| Values assigned to stock options | $ 27,250 |
| Reduction of previously recorded income tax benefits from stock options | (1,278) |
| Net increase in paid–in capital and deferred stock compensation | 25,972 |

(Increase) decrease in retained earnings:

| | |
|---|---|
| Revenue and related cost of sales deferral for China system sales | (36,639) |
| Additional non–cash compensation expense from stock options | (27,250) |
| Payroll taxes for values assigned to stock options | (900) |
| Income tax benefit from additional compensation and payroll tax expense | 5,325 |
| Net increase in retained earnings | (59,464) |
| Net decrease in stockholders' equity at December 31, 2003 | $ (33,492) |

In restating the previously issued financial statements for the investigations discussed above, the Company also corrected other previously reported amounts. It corrected the reporting of $7.2 million and $62.7 million, respectively, of net sales to certain third party resellers and $7.7 million and $24.6 million, respectively, of associated cost of net sales for the three and nine months ended September 30, 2005 to classify these amounts as related party net sales and related party cost of net sales classifications, respectively, because in 2006 the Company determined that sales to these entities were, in substance, sales to a significant shareholder, SOFTBANK CORP. The classification of the accounts receivable from these sales was similarly changed to include them in accounts receivable from related parties in the September 30, 2005 consolidated balance sheet.

11

**PART I—FINANCIAL INFORMATION**
**ITEM 1—CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**UTSTARCOM, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS (UNAUDITED)**
(In thousands, except share data)

| | September 30, 2006 | December 31, 2005 (As Restated) |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 604,410 | $ 645,571 |
| Short-term investments | 12,330 | 13,266 |
| Accounts receivable, net of allowances for doubtful accounts of $61,184 and $67,789 at September 30, 2006 and December 31, 2005, respectively | 391,259 | 439,597 |
| Accounts receivable, related parties, net of allowances for doubtful accounts of $0 and $5 at September 30, 2006 and December 31, 2005, respectively | 37,827 | 83,367 |
| Notes receivable | 8,532 | 2,065 |
| Inventories | 463,390 | 425,955 |
| Deferred costs | 209,230 | 239,876 |
| Prepaids and other current assets | 126,179 | 99,062 |
| Short-term restricted cash and investments | 23,835 | 53,680 |
| Total current assets | 1,876,992 | 2,002,439 |
| Property, plant and equipment, net | 212,093 | 233,403 |
| Long-term investments | 44,954 | 26,023 |
| Goodwill | 3,063 | 3,063 |
| Intangible assets, net | 60,747 | 75,313 |
| Long-term deferred costs | 177,007 | 185,279 |
| Other long-term assets | 27,817 | 25,811 |
| Total assets | $ 2,402,673 | $ 2,551,331 |
| **LIABILITIES, MINORITY INTEREST AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 308,189 | $ 320,677 |
| Short-term debt | 105,010 | 198,826 |
| Income taxes payable | 31,147 | 34,229 |
| Customer advances | 286,630 | 221,301 |
| Deferred revenue | 95,786 | 101,912 |
| Other current liabilities | 234,621 | 291,368 |
| Total current liabilities | 1,061,383 | 1,168,313 |
| Long-term deferred revenue | 255,714 | 273,131 |
| Long-term debt | 274,900 | 274,900 |
| Other long-term liabilities | 13,843 | — |
| Total liabilities | 1,605,840 | 1,716,344 |
| Commitments and contingencies (Note 16) | | |
| Minority interest in consolidated subsidiaries | 7,500 | 8,338 |
| Stockholders' equity: | | |
| Common stock: $0.00125 par value; authorized: 750,000,000 shares; issued and outstanding: 121,284,976 and 121,018,036 at September 30, 2006 and December 31, 2005, respectively | 152 | 152 |
| Additional paid-in capital | 1,202,072 | 1,192,201 |
| Deferred stock-based compensation | — | (3,591) |
| Accumulated deficit | (452,214) | (376,899) |
| Accumulated other comprehensive income | 39,323 | 14,786 |
| Total stockholders' equity | 789,333 | 826,649 |
| Total liabilities, minority interest and stockholders' equity | $ 2,402,673 | $ 2,551,331 |

See accompanying notes to the condensed consolidated financial statements.

12

**UTSTARCOM, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except per share data)**

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | **2006** | **2005** | **2006** | **2005** |
| | | As restated | | As restated |
| Net sales | | | | |
| Unrelated party | $ 569,826 | $ 584,072 | $ 1,640,761 | $ 1,794,895 |
| Related party | 31,073 | 13,363 | 113,645 | 395,123 |
| | 600,899 | 597,435 | 1,754,406 | 2,190,018 |
| Cost of net sales | | | | |
| Unrelated party | 503,618 | 548,686 | 1,379,316 | 1,645,793 |
| Related party | 22,480 | 10,862 | 67,548 | 171,044 |
| Gross profit | 74,801 | 37,887 | 307,542 | 373,181 |
| Operating expenses: | | | | |
| Selling, general and administrative | 80,076 | 86,414 | 246,908 | 297,390 |
| Research and development | 46,305 | 60,817 | 139,310 | 192,297 |
| Amortization of intangible assets | 4,821 | 6,643 | 14,567 | 20,391 |
| Gain on sale of semiconductor design assets | (12,291) | — | (12,291) | — |
| Impairment of long−lived assets | — | 218,094 | — | 218,094 |
| Restructuring | — | 3,378 | — | 18,505 |
| In−process research and development | — | — | — | 660 |
| Total operating expenses | 118,911 | 375,346 | 388,494 | 747,337 |
| Operating loss | (44,110) | (337,459) | (80,952) | (374,156) |
| Interest income | 3,214 | 1,673 | 10,693 | 4,474 |
| Interest expense | (2,620) | (3,876) | (9,287) | (12,864) |
| Gain on extinguishment of subordinated notes | — | 20,297 | — | 31,392 |
| Other income (expense), net | 1,835 | 7,352 | 12,289 | (1,723) |
| Loss before income taxes, minority interest and equity in loss of affiliated companies | (41,681) | (312,013) | (67,257) | (352,877) |
| Income tax expense | (1,459) | (125,222) | (8,966) | (134,041) |
| Minority interest in losses of consolidated subsidiaries | 92 | 3 | 907 | 94 |
| Equity in loss of affiliated companies | — | (786) | — | (1,818) |
| Net loss | $ (43,048) | $ (438,018) | $ (75,316) | $ (488,642) |
| Loss per share − Basic and diluted | $ (0.36) | $ (3.70) | $ (0.62) | $ (4.22) |
| Weighted average shares used in per−share calculation: | | | | |
| − Basic and diluted | 120,676 | 118,262 | 120,628 | 115,902 |

See accompanying notes to the condensed consolidated financial statements.

13

**UTSTARCOM, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED)**
(In thousands)

| | Nine months ended September 30, | |
|---|---:|---:|
| | 2006 | 2005 |
| | | (As restated) |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (75,316) | $ (488,642) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 51,547 | 78,489 |
| Gain on sale of semiconductor design assets | (12,291) | — |
| Net loss on sale of assets | 2,183 | 3,870 |
| Loss on asset impairment | — | 218,094 |
| Non-cash restructuring charges | — | 12,389 |
| Stock-based compensation expense | 13,143 | 191 |
| (Recovery of) provision for doubtful accounts | (6,948) | 38,115 |
| (Recovery of) provision for deferred costs reserves | (5,103) | 14,564 |
| Deferred income taxes | (671) | 192,383 |
| Gain on extinguishment of debt | — | (31,392) |
| Other | (102) | 3,164 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 105,466 | 202,650 |
| Inventories | (35,659) | 116,028 |
| Deferred costs | 51,324 | (55,974) |
| Other assets | (15,585) | 84,956 |
| Accounts payable | (16,027) | (120,472) |
| Income taxes payable | (3,408) | (118,615) |
| Customer advances | 61,761 | (164,814) |
| Deferred revenue | (24,740) | 93,138 |
| Other current liabilities | (71,452) | 5,504 |
| Net cash provided by operating activities | 18,122 | 83,626 |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Additions to property, plant and equipment | (17,176) | (60,904) |
| Investment in affiliates, net of cash acquired | (302) | (3,550) |
| Purchase of business, net of cash acquired | — | (24,326) |
| Proceeds from sale of semiconductor design assets | 19,965 | — |
| Proceeds from disposal of property | 136 | 695 |
| Change in restricted cash and long-term investments | 26,536 | 176 |
| Purchase of short-term investments | (40,182) | (149,469) |
| Proceeds from sale of short-term investments | 42,121 | 270,672 |
| Other | 1,538 | (750) |
| Net cash provided by investing activities | 32,636 | 32,544 |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Issuance of stock, net of expenses | 319 | 4,327 |
| Proceeds from borrowing | 63,259 | 346,284 |
| Payments on borrowings | (159,251) | (478,081) |
| Cash paid to extinguish debt | — | (57,136) |
| Other | (683) | 1,801 |
| Net cash used in financing activities | (96,356) | (182,805) |
| Effect of exchange rate changes on cash and cash equivalents | 4,437 | 229 |
| Net decrease in cash and cash equivalents | (41,161) | (66,406) |
| Cash and cash equivalents at beginning of period | 645,571 | 562,532 |
| Cash and cash equivalents at end of period | $ 604,410 | $ 496,126 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid: | | |
| Interest | $ 8,542 | $ 11,294 |
| Income taxes | $ 7,839 | $ 10,872 |
| Non-cash operating activity | | |
| Accounts receivable transferred to notes receivable | $ 19,023 | $ 40,210 |
| Property, plant and equipment exchanged for long-term investment | $ 5,550 | $ — |

See accompanying notes to the condensed consolidated financial statements.

14

**UTSTARCOM, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**

**1.    BASIS OF PRESENTATION AND LIQUIDITY**

The accompanying unaudited condensed consolidated financial statements include the accounts of UTStarcom, Inc. ("Company") and its wholly and majority owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in the preparation of the condensed consolidated financial statements. The minority interests in consolidated subsidiaries and equity in affiliated companies are shown separately in the condensed consolidated financial statements.

The accompanying unaudited condensed consolidated financial statements as of September 30, 2006 and for the three and nine months ended September 30, 2006 and 2005 have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. The December 31, 2005 balance sheet was derived from restated audited financial statements, but does not include all disclosures required by generally accepted accounting principles. These condensed consolidated financial statements should be read in conjunction with the Company's audited financial statements, including the notes thereto, and other information set forth in the Company's Annual Report on Form 10-K for the year ended December 31, 2006, which is being filed concurrently with this Quarterly Report.

In the opinion of management, the accompanying unaudited condensed consolidated financial statements reflect all adjustments considered necessary for a fair statement of the Company's financial condition, the results of its operations and its cash flows for the periods indicated. The results of operations for the three and nine months ended September 30, 2006 are not necessarily indicative of the operating results for the full year.

The Company reported net losses in each quarter in the period beginning April 1, 2005 and continuing through September 30, 2006, which has resulted in an accumulated deficit of $452.2 million and total stockholders' equity being reduced to $789.3 million at September 30, 2006. Additionally, at September 30, 2006, the Company had short-term debt in China under its lines of credit of $105.0 million maturing in 2007 and long-term debt outside of China in the form of its 7/8% convertible subordinated notes with a principal balance of $274.6 million that matures in March 2008. Subsequent to December 31, 2006, the Company and the holders of the convertible subordinated notes entered into two agreements to prevent covenant defaults occurring from the Company's inability to timely file required periodic reports containing financial statements with the SEC; the first agreement increased the interest rate on the convertible subordinated notes from 7/8% to 7.625% effective as of January 9, 2007 and the second agreement increased the interest rate to 10.875% effective as of July 26, 2007. For additional information concerning the Company's Supplemental Indentures see Note 25.

The Company's cash and short-term investments aggregated $616.7 million (of which $455.4 million are held in China) at September 30, 2006.

Credit facilities in China at September 30, 2006 totaled $789.5 million, with $498.5 million of this amount available for working capital purposes, of which the Company had drawn $105.0 million in outstanding borrowings, and $291.0 million was available for use in support of letters of credit and corporate guarantees. These facilities expire primarily in November and December of 2007, and the Company believes that based upon its recent financial performance and financial position its lenders may reduce the total available credit when it negotiates renewals of these lines. Furthermore, each borrowing under the credit facilities is subject to the bank's current favorable opinion of the credit worthiness of the Company's China subsidiaries, as well as the bank having funds available for lending and other Chinese banking regulations. However, the Company believes the amounts of credit its lenders may make available and the borrowings made under the renewed lines of credit will be sufficient to meet planned uses of these credit facilities.

To meet liquidity needs outside of China, the Company's subsidiaries in China have the ability to transfer cash to the Company under China's current exchange control regulations. The amount of cash available for transfer from the Company's China subsidiaries is limited both by the Company's liquidity needs in China and by Chinese government requirements that the China subsidiaries retain adequate capital levels in China to protect creditors and to have funds available for mandated employee benefits. The Company believed the China subsidiaries could freely transfer at least $200 million to the Company as of December 31, 2006, and during the nine months ended September 30, 2007 its China subsidiaries have made such transfers totaling $150 million.

Although management believes the Company has a sufficient amount of cash resources to finance the Company's anticipated working capital and capital expenditure requirements for the next 12 months, the Company does not have enough cash outside of China to repay the convertible notes due on March 1, 2008. Management's liquidity plans include a partial or complete refinancing of the convertible notes, renewal of the lines of credit in China, transfers of more cash from its subsidiaries in China to the extent necessary, and, if needed, liquidation of certain investments and/or seeking new financing arrangements. The Company's ability to maintain sufficient liquidity is also dependent on achieving projected sales and operating margin forecasts.

If additional sources of liquidity were needed, the Company would consider new debt or equity offerings or obtaining cash from asset sales, but there is no assurance that such transactions could be consummated on acceptable terms or at all. Failure to raise sufficient capital when needed could have a material adverse effect on the business, results of operations and financial position of the Company.

**2.     RESTATEMENT OF FINANCIAL STATEMENTS**

The consolidated financial statements for the three and nine months ended September 30, 2005 included herein have been restated. The reasons for the restatement are discussed below.

*China Sales Investigation*

The Audit Committee of the Company's Board of Directors ("Audit Committee") engaged independent counsel to conduct an investigation of sales in China following a determination by the Internal Audit group that allegations of improper activities in a sales office in the Western Region were credible. The allegations were made by a Company employee using the Company's whistle blower program. The independent counsel engaged forensic accountants, and this group is collectively referred to as the Investigating Team in the rest of this discussion.

In conducting its procedures, the Investigating Team found instances where the customer contracts that evidenced the arrangement contained obligations for the Company to deliver software upgrades when and if made available for the equipment sold for no additional consideration and for an unspecified period that could extend over the term of the contract. This additional contract obligation is an element of "post contract support." In these cases, the Investigating Team found that the contract documentation for the same transaction submitted by the sales office to the Company's China headquarters for accounting purposes and utilized by the Company in determining the amount of revenue recognized did not include evidence of such post contract support obligations.

Accounting standards governing revenue recognition for system sales require all revenue to be deferred while there are undelivered elements under the arrangement unless the seller has established vendor specific objective evidence ("VSOE") of fair value for such contract elements. Because these arrangements included such undelivered elements, revenue should be deferred based on the VSOE of the fair value of the underlying elements. VSOE of fair value represents the price charged when the same element is sold separately. Since the Company does not sell this element separately, it has not established VSOE for such undelivered elements, and as such the revenue from such contracts is required to be deferred and recognized over the period the Company is obligated to provide the post contract support.

Upon completion of the investigative phase of the independent investigation by the Audit Committee, management:

- conducted follow-up procedures to attempt to locate any additional relevant information to ensure the Company considered all available information and documents;
- evaluated the accounting for identified system sales using the contract template and documentation found in the sales contract files from the Western Region offices. This included calculating the financial statement effects of correcting the accounting for all system sales where the contract template found at the sales offices contained post contract support obligations to recognize revenue and cost of net sales over estimated period of post contract support;
- concluded that as a result of this undelivered post contract support obligation the Company's previously issued financial statements should be restated to defer system sales contract revenue and the related cost of net sales over the estimated period of post contract support when a contract contained unspecified software upgrade rights.

The Audit Committee concurred with management's decisions.

16

The effect of correcting improperly recognized revenue and cost of net sales is to (reduce) increase previously reported net sales, gross profit and net income by the following amounts (in thousands of dollars):

| Year ended December 31, | | Net sales | | Gross profit | | Net income |
|---|---|---|---|---|---|---|
| 2000 | $ | (12,408) | $ | (5,294) | $ | (4,781) |
| 2001 | | (17,154) | | (6,330) | | (5,779) |
| 2002 | | (64,732) | | (22,924) | | (19,697) |
| 2003 | | (21,060) | | (8,014) | | (6,382) |
| Totals through December 31, 2003 | | (115,354) | | (42,562) | | (36,639) |
| 2004 | | (104,965) | | (27,241) | | (18,594) |
| 2005 | | (58,232) | | (27,863) | | (42,433) |
| 2000 – 2005 Total | $ | (278,551) | $ | (97,666) | $ | (97,666) |

In the consolidated balance sheets at September 30, 2006 and December 31, 2005, the net reduction in previously recognized net sales is accounted for as deferred revenue, of which $34.5 million and $32.9 million, respectively, is classified as current, $240.3 million and $252.1 million, respectively as non–current, and the related net reduction in cost of net sales of $177.0 million and $185.3 million, respectively, is accounted for as deferred costs. These amounts will be recognized in the Company's consolidated statements of operations over the estimated remaining period of post contract support.

Due to this restatement, the Company decreased net sales, gross profit, and net income (in thousands) for the three and nine month periods ended September 30, 2005 as follows: $34,610 and $63,671; $15,062 and $29,429; and $29,186 and $43,999, respectively.

*Audit Committee Findings*

Upon completing its investigation, the Audit Committee concluded that the conditions and practices relating to systems contracts prevalent in the Western Region resulted primarily from the failure to prevent or detect instances of override related to controls in China over customer agreements, lack of proper management oversight, unclear record retention policies and procedures relating to systems contracts, and inadequate employee training. The Investigating Team and the Audit Committee also concluded that with respect to four regions other than the Western Region there was no evidence of fraud or misconduct or reason to suspect such occurred. The Investigating Team and the Audit Committee also concluded that there was no credible evidence of knowledge by senior management in China or the United States of the conditions and practices related to the Western Region of China that were discovered in the investigation. The Audit Committee concluded that local management in several of the sales offices in the Western Region of China did not submit appropriate information to the Company's senior management in China and the United States. Therefore, in prior years, neither the Company's management nor the Company's independent registered accounting firm were able to properly evaluate the effect of that information on revenue recognition. The Audit Committee also concluded that certain members of management in China bear varying degrees of responsibility for inadequate oversight of activities. As a result, certain employees in China have either been terminated or placed on suspension for failure to provide adequate oversight of activities.

*Governance Committee Review of Historical Stock Option Accounting*

In November 2006 the Company announced it had commenced a voluntary review of historical stock option practices under the leadership of the Nominating and Corporate Governance Committee of the Company's Board of Directors ("Governance Committee") following a preliminary review by management which identified potential deficiencies and discrepancies in the documentation of stock option grants. The review considered all option grant awards made in the period from February 29, 2000, shortly before the initial public offering of the Company's Common Stock, through August 2006 ("Review Period") for compliance with the various stock–based compensation accounting standards applicable during the Review Period, the rules of the Company's stock option plans, and the guidance on stock option accounting issued by the SEC in the September 19, 2006 letter which was to be considered applicable to periods prior as well as subsequent to its issuance. At the time the review commenced, the Governance Committee consisted of three members of the Board of Directors, all of whom are independent directors. Mr. Allen Lenzmeier was appointed to the Governance Committee on April 27, 2007. The Governance Committee engaged independent outside legal counsel to assist in the review who, in turn, engaged forensic accounting experts (collectively referred to herein as the "Review Team").

17

The Review Team, management, and the Governance Committee decided to group stock option grants into six award categories based on differences in what constituted substantive approval for each category under the Company's stock option granting practices as well as giving consideration to the risk of intentional misstatement of the grant date. Guidance in the September 19, 2006 letter on determining the date when substantive approval of a stock option grant occurs recognizes that depending on a company's facts and circumstances a company may determine that the measurement date for some stock option grants may occur before all required granting actions have occurred – such as final approval by the Compensation Committee. This alternative is available only when a review of all facts and circumstances supports a conclusion that substantive approval occurs earlier than when all required granting actions have occurred and there is no evidence of fraudulent or manipulative conduct in the company's option granting practices.

In determining the measurement date to be used, the Review Team, management, and the Governance Committee agreed to use the following definitions as constituting the proper measurement date, and generally these dates were used in testing the stated grant dates or establishing corrected measurement dates:

| | |
|---|---|
| **Discretionary Director and Officer Grants** | The date of a Compensation Committee meeting where the grant was approved or the date the final Compensation Committee signer approved the grant when approval occurred through unanimous written consent documents ("UWC"). |
| **Automatic Director Grants** | The date specified in the relevant stock option plan. |
| **Broadbase** | The date the grantee list, including the allocation of shares to individual grantees, was complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **Acquisition** | The first Compensation Committee meeting following the acquisition, provided grantees had received employment offer letters stating the number of stock options to be granted before such date because this was the date at which the option exercise price was established. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **New Hire** | The first scheduled Compensation Committee meeting following the first day of employment because this was the date at which the option exercise price was established. The number of options was based on either grant amounts specified in an employment offer letter or, in some cases, on a matrix that assigned grant amounts based on position and level within the Company. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |
| **Other Merit** | The date the grantee list, including the allocation of shares to grantees, was substantially complete. Compensation Committee approval was considered perfunctory due to delegation of authority to management. |

During the Review Period, the Company granted stock options on approximately 34 million shares of the Company's common stock at 197 grant dates. The review specifically examined the appropriateness of the stated grant date for approximately 90% of the stock options granted, including all stock option grants made to directors and officers, all broadbase options and all option grants made in connection with business acquisitions. The review included an extensive examination of the Company's historical stock option practices – including information from stock option administration, human resource, legal, and accounting department files and records as well as from e-mail communications, an electronic database of the Company's stock option activity maintained by a third party, and information stored in Company hard drives and back-up tapes. The Review Team also conducted interviews of individuals involved with the granting, advising, administering, or accounting for stock options, including current and former: management, members of the Board of Directors, employees, and non-employee professionals.

The findings of this review are summarized as follows:

| Grant Type | Number of grants | Grants tested | No change required | Measurement date changed additional compensation expense required | Measurement date changed no additional compensation expense required(1) |
|---|---|---|---|---|---|
| Discretionary Director & Officer | 16 | 16 | 8 | 4 | 4 |
| Automatic Director | 5 | 5 | 5 | — | — |
| Broadbase | 8 | 8 | — | 6 | 2 |
| Acquisition | 10 | 10 | 10 | — | — |
| New Hire | 166 | 48 | 48 | — | — |
| Other Merit | 96 | 41 | 4 | 21 | 16 |
| Total | 301(2) | 128 | 75 | 31 | 22 |

(1) Under APB 25 there is no expense adjustment arising from using the corrected measurement date for these grants because the amount the employee would have to pay to exercise these stock option grants exceeded the quoted market price of the Company's Common Stock at the corrected measurement date, and therefore, these stock option grants contained no intrinsic value at the corrected measurement date.

(2) The number of grants exceeds the number of grant dates because on certain grant dates more than one category of stock option grants were approved.

A non-cash compensation charge, to be recognized as an expense over a grantee's service period, arises under Accounting Principles Board Opinion No. 25 *Accounting for Stock Issued to Employees* ("APB 25"), the accounting standard governing the Company's stock option accounting through 2005, if a stock option has intrinsic value at its measurement date. This intrinsic value is measured by the excess, if any, of the fair value at the date of grant of the underlying common stock over the stock option's exercise price. The Company's practice has been to grant stock options with exercise prices equal to the closing price of the underlying Company common stock at each grant date, to use the grant date as the measurement date for stock-based compensation purposes, and as such previously the Company had determined the granted stock options had no intrinsic value at their grant dates and no compensation expense was recognized. However, APB 25 states the measurement date does not occur until all essential actions necessary to grant the option are completed, including the final determination of both the number of shares to be granted to each employee or director and the exercise price, and the option grant is approved by those with requisite authority. A September 19, 2006 letter publicly issued by the SEC's Chief Accountant focused companies registered with the SEC on the need for the number of shares and exercise price of an award to an individual to be finalized to have a measurement date. This letter clarifies the SEC staff's view that if it is possible that those terms could change, a measurement date has not occurred, even if the award's terms are not actually changed.

Based on available evidence, the review found that the number of shares an individual employee was entitled to receive and/or the exercise price for stock option grants was not determined with finality at the stated grant date at 53 tested grant dates, and the Company should have used a later date as the measurement date. The principal reasons for the stated grant date not qualifying as the measurement date under APB 25 include:

• certain listings of grantees, below officer level, were incomplete and added to or modified by stock option administration personnel after the grant was approved by the Compensation Committee;

• for certain grants where Compensation Committee approval was not considered perfunctory, the date a UWC document was sent to Compensation Committee members for approval was used as the stated grant date for some discretionary officer and director grants rather than the date the UWC was signed by all Compensation Committee members and therefore became effective;

• the Stock Option Review Team was unable to locate contemporaneous documentation of some director and officer, broadbase, new hire, and other merit grants.

A total of 17.9 million stock options were granted at the 53 tested grant dates during 2000 through 2005 where the Governance Committee's review found the Company used incorrect measurement dates. Using the corrected measurement dates, 10.3 million stock options had intrinsic value because their exercise prices were below the closing price of the Company's Common Stock at the corrected measurement date, and 7.6 million stock options had exercise prices that exceeded the closing price of the Company's Common Stock and therefore had no intrinsic value to be accounted for under APB 25. These 10.3 million stock options resulted in an increase in non-cash stock-based compensation expense of $24.3 million during 2000 to 2005. Of the 10.3 million stock options resulting in additional non-cash stock-based compensations expense, 2.0 million options were granted to officers and directors and resulted in $6.1 million of additional non-cash stock-based compensation expense.

In some cases, in correcting the measurement date for previously granted stock options additional taxable income to employees arises on which additional payroll taxes are due from the employee as well as the Company. The Company has

assumed responsibility for all additional payroll taxes plus related penalties and interest arising from the restatement of stock-based compensation, including amounts otherwise payable by stock option recipients, and the Company's restated financial statements include a $1.5 million accrual for this estimated expense.

Because the holders of stock options where corrections were made to the measurement dates were not aware that improper measurement dates were used, the Company has taken certain actions and is contemplating taking additional actions to deal with the adverse personal income tax consequences that may be incurred by the holders of stock options with corrected measurement dates. Adverse personal income tax consequences arise from the exercise of stock options vesting after December 31, 2004 where the corrected measurement dates cause them to have an exercise price below the fair market value of Company's common stock at the measurement date ("409A Affected Options"). Such an exercise would subject the option holder to a penalty tax under IRC Section 409A (and, as applicable, similar penalty taxes under California and other state tax laws). The Company has evaluated its stock option exercises through December 31, 2006 and determined there were no exercises of 409A Affected Options; accordingly, no penalty tax has been incurred by employees exercising stock options through that date.

The Company is considering how to deal with exercises of 409A Affected Options that occur in 2007 and beyond.  One alternative would be to offer to amend all 409A Affected Options to change the exercise price to the fair market price of the Company's common stock on the corrected measurement date. These amended options would not be subject to taxation under IRC Section 409A.  Under IRS regulations, option amendments had to be completed by December 31, 2006 for anyone who was an executive officer or member of the Board of Directors when he or she received 409A Affected Options. Therefore, prior to December 31, 2006 eight of the Company's current and former executive officers and directors executed an irrevocable Protective Amendment Election Form whereby any of their stock options will be automatically amended to restate the exercise price to the fair market value of the Company's common stock at the corrected measurement date if in the future such stock options would otherwise be determined to be 409A Affected Options.  A similar offer to amend all 409A Affected Options held by non-officer employees is currently under consideration, but no decision has been reached and such an offer cannot be made until the Company is current with its SEC reporting obligations.

During the review the Company also discovered a stock option grant to a former officer that was modified in 1998 in connection with his termination of employment that should have resulted in additional compensation expense. This change was never included in the Company's stock option grant records and the additional compensation expense resulting from the change in the option's terms  (approximately $1.2 million)  was not recorded previously. This discovery is consistent with the Review Team's finding that in certain instances there was a lack of formal documentation in the stock option granting process and/or expected documentation is missing from the stock option administration files. In addition, the Review Team found that, in many instances, there was a lack of self-authenticating evidence to corroborate that cash exercises were contemporaneous. As a result, the findings on the issue of backdating of cash exercises were inconclusive.

The Company's accounting for stock-based compensation changed to a fair value method in 2006 when, as required by accounting standards, it ceased accounting for stock-based compensation under the intrinsic value method pursuant to APB 25 and began accounting for stock-based compensation pursuant to Statement of Financial Accounting Standards 123(R) Share-Based Payments ("SFAS 123(R)"). Under this method all stock option grants have a fair value determined using an option pricing model, and such fair value is used to recognize non-cash stock-based compensation expense. The Company recognizes stock compensation expense on a straight-line basis under SFAS 123(R).

The table below shows the effects of correcting the consolidated financial statements for the Governance Committee's findings and the modification in 1998 of a stock option grant to a former officer in connection with his termination of employment. Consistent with its historical accounting policy, this additional stock–based compensation expense is being recognized on an accelerated basis by treating each vesting tranche as a separate stock option grant (graded vesting). Additionally, the table gives effect to corrections of the accounting for performance related stock options and restricted stock grants in the first two quarters of 2006, all of which were previously identified and considered immaterial. The effects of correcting the errors in the Company's previous stock option accounting are to increase (reduce) previously reported non–cash compensation expense, payroll taxes, income taxes and net income by the following amounts (in thousands of dollars):

| Year ended December 31, | Non-cash stock compensation | Payroll taxes | Income taxes | Net income |
|---|---|---|---|---|
| 1998 | $      1,244 | $       — | $       (448) | $      (796) |
| 1999 | — | — | — | — |
| 2000 | 556 | — | (104) | (452) |
| 2001 | 4,870 | — | (942) | (3,928) |
| 2002 | 8,110 | — | (1,550) | (6,560) |
| 2003 | 12,470 | 900 | (2,281) | (11,089) |
| Totals through December 31, 2003 | 27,250 | 900 | (5,325) | (22,825) |
| 2004 | (410) | 541 | 250 | (381) |
| 2005 | (1,290) | 60 | 4,083 | (2,853) |
| 2000–2005 Total | 25,550 | 1,501 | (992) | (26,059) |

The following table shows the Company's stock–based compensation expense as previously reported and the impact of the restatement (excluding payroll taxes) on stock–based compensation for periods prior to fiscal 2006, net of income tax:

| Year ended December 31, | Stock–Based Compensation Expense (Net of Tax) (in thousands) | | |
|---|---|---|---|
| | As Reported | Adjustments | As Restated |
| 1998 (net of income tax benefit/(expense) of $118, $448 and $566, respectively) | $      294 | $      796 | $      1,090 |
| 1999 (net of income tax benefit/(expense) of $1,596, $0 and $1,596, respectively) | 3,957 | — | 3,957 |
| 2000 (net of income tax benefit/(expense) of $3,323, $104 and $3,427, respectively) | 8,238 | 452 | 8,690 |
| 2001 (net of income tax benefit/(expense) of $1,495, $942 and $2,437, respectively) | 3,706 | 3,928 | 7,634 |
| 2002 (net of income tax benefit/(expense) of $891, $1,550 and $2,441, respectively) | 2,209 | 6,560 | 8,769 |
| 2003 (net of income tax benefit/(expense) of $1,212, $2,281 and $3,493, respectively) | 3,071 | 10,189 | 13,260 |
| 2004 (net of income tax benefit/(expense) of $149, ($250) and ($101), respectively) | 370 | (160) | 210 |
| 2005 (net of income tax benefit/(expense) of $105, ($4,083) and ($3,978), respectively) | 2,154 | 2,793 | 4,947 |

*Governance Committee Findings*

Upon completing its review, the Governance Committee concluded it found no evidence of intent to manipulate the Company's operating results or financial statements. A key finding of the Governance Committee was that there were deficiencies with the process by which stock options were granted during the period from the Company's initial public offering in 2000 through at least 2005, which resulted in accounting errors. The Governance Committee concluded that certain members of management bear varying degrees of responsibility for the deficiencies in the process by which options were granted. The Governance Committee's review also concluded that none of the current or former employees or directors of the Company engaged in intentional wrongdoing.

21

***Restatement and Impact on Financial Statements***

    The following table presents the decrease in net income, by year, as a result of restating for the results of the China sales investigation and the historical stock option accounting review:

| Year ended December 31, | Net income (loss), as previously reported | Restatement adjustments | | | Net income (loss), as restated |
|---|---|---|---|---|---|
| | | China Sales | Stock Options (in thousands) (Decrease) Increase | Total | |
| 1998 | $ — | $ — | (796) | $ (796) | $ |
| 1999 | | — | — | — | |
| 2000 | | (4,781) | (452) | (5,233) | |
| 2001 | | (5,779) | (3,928) | (9,707) | |
| 2002 | | (19,697) | (6,560) | (26,257) | |
| 2003 | | (6,382) | (11,089) | (17,471) | |
| Totals through December 31, 2003 | | (36,639) | (22,825) | (59,464) | |
| 2004 | $ 69,824 | (18,594) | (381) | (18,975) | $ 50,849 |
| 2005 | $ (487,359) | (42,433) | (2,853) | (45,286) | $ (532,645) |
| 2000 – 2005 Total | | (97,666) | (26,059) | (123,725) | |
| Three months ended September 30, 2005 | $ (405,126) | (29,185) | (3,707) | (32,892) | $ (438,018) |
| Nine months ended September 30, 2005 | $ (442,029) | (43,997) | (2,616) | (46,613) | $ (488,642) |

    The cumulative effect of the restatements at December 31, 2003 was an increase to additional paid–in capital and deferred stock–based compensation of $26.0 million from $646.7 million to $672.7 million, and a decrease in retained earnings of $59.5 million from $237.4 million to $177.9 million, and a decrease in total stockholders' equity of $33.5 million from $887.7 million to $854.2 million.

***Other Changes***

    In restating the previously issued financial statements for the investigations discussed above, the Company also corrected other previously reported amounts. It corrected the reporting of $7.2 million and $62.7 million, respectively, of net sales to certain third party resellers and $7.7 million and $24.6 million, respectively, of associated cost of net sales for the three and nine months ended September 30, 2005 to classify these amounts as related party net sales and related party cost of net sales classifications, respectively, because in 2006 the Company determined that sales to these entities were, in substance, sales to a significant shareholder, SOFTBANK CORP. The classification of the accounts receivable from these sales was similarly changed to include them in accounts receivable from related parties in the September 30, 2005 consolidated balance sheet.

22

*Restated Financial Information*
    The following tables summarize the impact of the restatement adjustments on the condensed consolidated statement of operations for the three and nine months ended September 30, 2005 and the condensed consolidated statement of cash flows for the nine months ended September 30, 2005:
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three months ended September 30, 2005 | | |
|---|---|---|---|
| | As previously reported | Adjustments | As restated |
| | (In thousands, except per share amounts) | | |
| Net sales | | | |
| Unrelated party | $ 625,902 | $ (41,830) | $ 584,072 |
| Related party | 6,144 | 7,219 | 13,363 |
| | 632,046 | (34,611) | 597,435 |
| Cost of net sales | | | |
| Unrelated party | 575,907 | (27,221) | 548,686 |
| Related party | 3,185 | 7,677 | 10,862 |
| Gross profit | 52,954 | (15,067) | 37,887 |
| Operating expenses: | | | |
| Selling, general and administrative | 86,362 | 52 | 86,414 |
| Research and development | 60,797 | 20 | 60,817 |
| Amortization of intangible assets | 6,643 | — | 6,643 |
| Impairment of long–lived assets | 218,094 | — | 218,094 |
| Restructuring costs | 3,378 | — | 3,378 |
| Total operating expenses | 375,274 | 72 | 375,346 |
| Operating loss | (322,320) | (15,139) | (337,459) |
| Interest income | 1,673 | — | 1,673 |
| Interest expense | (3,876) | — | (3,876) |
| Gain on extinguishment of subordinated notes | 20,297 | — | 20,297 |
| Other income, net | 7,352 | — | 7,352 |
| Loss before income taxes, minority interest and equity in loss of affiliated companies | (296,874) | (15,139) | (312,013) |
| Income tax expense | (107,469) | (17,753) | (125,222) |
| Minority interest in losses of consolidated subsidiaries | 3 | | 3 |
| Equity in loss of affiliated companies | (786) | | (786) |
| Net loss | $ (405,126) | $ (32,892) | $ (438,018) |
| Loss per share − Basic and diluted | $ (3.43) | $ (0.27) | $ (3.70) |
| Weighted average shares used in per−share calculation: | | | |
| − Basic and diluted | 118,262 | 118,262 | 118,262 |

23

| | Nine months ended September 30, 2005 | | |
| --- | --- | --- | --- |
| | As previously reported | Adjustments | As restated |
| | (In thousands, except per share amounts) | | |
| Net sales | | | |
| Unrelated party | $ 1,921,264 | $ (126,369) | $ 1,794,895 |
| Related party | 332,425 | 62,698 | 395,123 |
| | 2,253,689 | (63,671) | 2,190,018 |
| Cost of net sales | | | |
| Unrelated party | 1,704,751 | $ (58,958) | 1,645,793 |
| Related party | 146,422 | 24,622 | 171,044 |
| Gross profit | 402,516 | (29,335) | 373,181 |
| Operating expenses: | | | |
| Selling, general and administrative | 298,384 | (994) | 297,390 |
| Research and development | 192,678 | (381) | 192,297 |
| Amortization of intangible assets | 20,391 | — | 20,391 |
| Impairment of long−lived assets | 218,094 | — | 218,094 |
| Restructuring | 18,505 | — | 18,505 |
| In−process research and development | 660 | — | 660 |
| Total operating expenses | 748,712 | (1,375) | 747,337 |
| Operating loss | (346,196) | (27,960) | (374,156) |
| Interest income | 4,474 | — | 4,474 |
| Interest expense | (12,864) | — | (12,864) |
| Gain on extinguishment of subordinated notes | 31,392 | — | 31,392 |
| Other expense, net | (1,723) | — | (1,723) |
| Loss before income taxes, minority interest and equity in loss of affiliated companies | (324,917) | (27,960) | (352,877) |
| Income tax expense | (115,388) | (18,653) | (134,041) |
| Minority interest in losses of consolidated subsidiaries | 94 | — | 94 |
| Equity in loss of affiliated companies | (1,818) | — | (1,818) |
| Net loss | $ (442,029) | (46,613) | $ (488,642) |
| Loss per share − Basic and diluted | $ (3.81) | $ (0.41) | $ (4.22) |
| Weighted average shares used in per−share calculation: | | | |
| − Basic and diluted | 115,902 | 115,902 | 115,902 |

24

**CONDENSED CONSOLIDATED STATEMENT OF CASH FLOWS (UNAUDITED)**

| | Nine months ended September 30, 2005 | | |
| --- | --- | --- | --- |
| | As previously reported | Adjustments (In thousands) | As restated |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net loss | $ (442,029) | $ (46,613) | $ (488,642) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 78,489 | | 78,489 |
| Net loss on disposal of property | 3,870 | | 3,870 |
| Loss on asset impairment | 218,094 | | 218,094 |
| Non–cash restructuring charges | 12,389 | | 12,389 |
| Stock–based compensation expense | 1,712 | (1,521) | 191 |
| Provision for doubtful accounts | 38,115 | | 38,115 |
| Provision for deferred costs | 14,564 | | 14,564 |
| Deferred income taxes | 173,730 | 18,653 | 192,383 |
| Gain on extinguishment of debt | (31,392) | | (31,392) |
| Other | 3,164 | | 3,164 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | 202,650 | | 202,650 |
| Inventories | 116,028 | | 116,028 |
| Deferred costs | (21,389) | (34,585) | (55,974) |
| Other current and non-current assets | 84,956 | | 84,956 |
| Accounts payable | (120,472) | | (120,472) |
| Income taxes payable | (118,615) | | (118,615) |
| Customer advances | (164,814) | | (164,814) |
| Deferred revenue | 29,125 | 64,013 | 93,138 |
| Other current liabilities | 5,451 | 53 | 5,504 |
| Net cash provided by operating activities | 83,626 | — | 83,626 |
| | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Additions to property, plant and equipment | (60,904) | | (60,904) |
| Investment in affiliates, net of cash acquired | (3,550) | | (3,550) |
| Purchase of business, net of cash acquired | (24,326) | | (24,326) |
| Proceeds from disposal of property | 695 | | 695 |
| Change in restricted cash and long–term investments | 176 | | 176 |
| Purchase of short–term investments | (149,469) | | (149,469) |
| Proceeds from sale of short–term investments | 270,672 | | 270,672 |
| Other | (750) | | (750) |
| Net cash provided by investing activities | 32,544 | — | 32,544 |
| | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Issuance of stock, net of expenses | 4,327 | | 4,327 |
| Proceeds from borrowing | 346,284 | | 346,284 |
| Payments on borrowings | (478,081) | | (478,081) |
| Cash paid to extinguish debt | (57,136) | | (57,136) |
| Other | 1,801 | | 1,801 |
| Net cash used in financing activities | (182,805) | — | (182,805) |
| Effect of exchange rate changes on cash and cash equivalents | 229 | | 229 |
| Net decrease in cash and cash equivalents | (66,406) | — | (66,406) |
| Cash and cash equivalents at beginning of period | 562,532 | | 562,532 |
| Cash and cash equivalents at end of period | $ 496,126 | $ — | $ 496,126 |
| | | | |
| Supplemental disclosure of cash flow information: | | | |
| Cash paid: | | | |
| Interest | $ 11,294 | $ — | $ 11,294 |
| Income taxes | $ 10,872 | $ — | $ 10,872 |
| Non–cash operating activity | | | |
| Accounts receivable transferred to notes receivable | $ 40,210 | $ — | $ 40,210 |

**3.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Use of Estimates:*

The preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Estimates are used for revenue recognition, allowance for doubtful accounts and sales returns, tax valuation allowances, reserves for inventory, deferred costs, accrued product warranty costs, provisions for contract losses, goodwill and other long-lived asset impairments, stock-based compensation, loss contingencies and restructuring expenses among others. Actual results could differ from those estimates.

*Revenue Recognition:*

Revenues from sales of telecommunications equipment and handsets are recognized when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collectibility is probable. If the payment due from the customer is not fixed or determinable due to extended payment terms, revenue is recognized as payments become due and payable by the customer, assuming all other criteria for revenue recognition are met. Any payments received prior to revenue recognition are recorded as customer advances. Normal payment terms differ for various reasons amongst different customer regions, depending upon common business practices for customers within a region. Billing to customers for shipping and handling are recorded as revenues and the associated costs are recorded as costs of revenues. Any expected losses on contracts are recognized when identified on an individual basis in accordance with the prevailing accounting guidance for the respective contract.

Sales may be generated from complex contractual arrangements that require significant revenue recognition judgments, particularly in the area of contracts with multiple deliverable elements (multiple element arrangements). Where multiple elements exist in an arrangement, the contract price is allocated to the different elements based upon and in proportion to verifiable objective evidence of the fair value of the various elements, as governed under Emerging Issues Task Force Issue ("EITF") No. 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," and SEC Staff Accounting Bulletin No. 104, "Revenue Recognition." Multiple element arrangements primarily involve the sale of equipment, installation, training and post-contract support. Revenue is recognized as each element is earned, namely upon installation and acceptance of equipment or delivery of handsets, provided that the fair value of the undelivered element(s) has been determined, the delivered element(s) has stand-alone value, there is no right of return on delivered element(s), and the Company is in control of the undelivered element(s). For arrangements that include service elements, including promotional support and installation, for which verifiable objective evidence of the fair value does not exist, revenue is deferred until such services are deemed complete, or until the time the Company can establish verifiable objective evidence of the fair value.

Final acceptance is required for revenue recognition when installation services are not considered perfunctory. Final acceptance indicates that the customer has fully accepted delivery of equipment and the Company is entitled to full payment. The Company does not recognize revenue before final acceptance is granted by the customer if acceptance is considered substantive to the transaction.

Where multiple elements exist in an arrangement that includes software, and the software is considered more than incidental to the equipment or services in the arrangement, software and software related elements are recognized under the provisions of Statement of Position 97-2, "Software Revenue Recognition," as amended, and EITF No. 03-05, "Applicability of SOP 97-2 to Non-software Deliverables Containing More Than Incidental Software." The Company allocates revenues to each element of software arrangements based on vendor specific objective evidence ("VSOE") of fair value. VSOE of fair value of each element is based on the price charged when the same element is sold separately. The Company uses the residual method to recognize revenue when an arrangement includes one or more elements to be delivered at a future date and VSOE of the fair value of all the undelivered elements exists. Under the residual method, the fair value of the undelivered elements is deferred and the remaining portion of the contract price is recognized as revenue when all other revenue recognition criteria are met. If VSOE of fair value of one or more undelivered elements does not exist, all revenue for delivered and undelivered elements is deferred until delivery of all elements occurs or when VSOE of fair value of the undelivered elements can be established. In some cases the Company has agreed to give software upgrade rights on a "when and if made available" basis for equipment sold for no additional consideration and for an unspecified period which could extend over the term of the contract. This additional contract obligation is an element of "post contract support." The Company has not established VSOE for such contract element. Accordingly, the revenues from such contracts are recognized ratably over the period during which the post contract support is expected to be provided. The expected period of support is generally the term of the contract. In some cases where there is no

26

stated contractual term, revenue is recognized ratably over the estimated period of support. The Company reviews assumptions regarding the estimated post contract support periods on a regular basis. If the Company determines that it is necessary to revise the Company's estimates of the support periods, the amount of revenue recognized over the life of the contract would not be affected. However, to the extent the new assumptions regarding the post contract support periods were different than original assumptions, the contract revenues would be recognized over the remaining expected period of support.

    Contract accounting is utilized for contracts that include a requirement for significant software modification or customization; when utilized the Company generally accounts for such contracts using the completed contract method of accounting, whereby no revenue is recognized prior to the completion of the project, because for contracts involving unique requirements the Company is unable to make reasonably dependable estimates of its progress towards meeting contractual requirements. In the event estimated total project costs exceed estimated total project revenues, the entire estimated loss is charged to operations in the period in which the loss becomes probable and can be reasonably estimated. The complexity of the estimation process and judgments about internal and external factors including labor utilization, changes to specifications and testing requirements, time required for performance and resulting incurrence of contract penalties, and the performance of subcontractors affect the estimation process.

    The Company recognizes revenue for system integration, installation and training upon completion of performance and if all other revenue recognition criteria are met. Other service revenue, principally related to maintenance and support contracts, is recognized ratably over the maintenance term. Revenues from services were less than 10% of revenues for all periods presented.

    The Company also sells products through resellers. Revenue is generally recognized when the standard price protection period, which ranges from 30 to 90 days, has lapsed. If collectibility cannot be reasonably assured in a reseller arrangement, revenue is recognized upon sell through to the end customer and receipt of cash. There may be additional obligations in reseller arrangements such as inventory rotation, or stock exchange rights on the product. As such, revenue is recognized in accordance with Statement of Financial Accounting Standards ("SFAS") No. 48, "Revenue Recognition When Right of Return Exists." In most cases, the Company has developed reasonable estimates for stock exchanges based on historical experience with similar types of sales of similar products.

    The Company has sales agreements with certain wireless customers that provide for a rebate of the selling price to such customers if the particular product is subsequently sold at a lower price to such customers or to a different customer. The rebate period extends for a relatively short period of time. Historically, the amounts of such rebates paid to customers have not been material. The Company estimates the amount of the rebate based upon the terms of each individual arrangement, historical experience and future expectations of price reductions and then records its estimate of the rebate amount at the time of the sale. The Company also enters into sales incentive programs, such as co-marketing arrangements, with certain wireless and handset customers. The Company records the incurred incentive as a reduction of revenue when the sales revenue is recognized.

    The assessment of collectibility is also a factor in determining whether revenue should be recognized. The Company assesses collectibility based on a number of factors, including payment history and the credit worthiness of the customer. The Company does not request collateral from its customers. In international sales, the Company may require letters of credit from its customers that can be drawn on demand if the customer defaults on its payment. If the Company determines that collection of a payment is not reasonably assured, the Company defers revenue recognition until collection becomes reasonably assured, which is generally upon receipt of cash.

    Occasionally, the Company enters into revenue sharing arrangements. Under these arrangements, the Company collects payment only after its customer, the telecommunications service provider, collects service revenues. When the Company enters a revenue sharing arrangement, the Company does not recognize revenue until collection is reasonably assured.

    Because of the nature of doing business in China and other emerging markets, the Company's billings and/or customer payments may not correlate with the contractual payment terms and the Company generally does not enforce contractual payment terms prior to final acceptance. Accordingly, accounts receivable are not recorded until the Company recognizes the related customer revenue. Advances from customers are recognized when the Company has collected cash from the customer, prior to recognizing revenue. The Company had current deferred revenue of $95.8 million and $101.9 million, and long-term deferred revenue of $255.7 million and $273.1 million at September 30, 2006 and December 31, 2005, respectively.

*Inventories:*

Inventories consist of product held at the Company's manufacturing facility and warehouses, as well as finished goods at customer sites for which the customer has taken possession, but based on specific contractual terms, title has not yet passed to the customer. The Company may ship inventory to existing customers that require additional equipment to expand their existing networks prior to the signing of an expansion contract. Inventories are stated at the lower of cost or market value, net of write-downs for excess, slow moving and obsolete inventory. With the exception of the handset inventory for our Personal Communications Division ("PCD"), which is based on weighted average cost, inventory cost is computed using standard cost, which approximates actual cost on a first-in, first-out basis. Inventory is written down for estimated obsolescence or unmarketable inventory equal to the difference between inventory cost and the estimated market value.

*Deferred costs:*

Deferred costs consist of product shipped to the customer for which the rights and obligations of ownership have passed to the customer but revenue has not yet been recognized. Deferred costs also include the costs associated with third party integrators and freight. All deferred costs are stated at cost. Management periodically assesses the recoverability of deferred costs and provides reserves against deferred cost balances when recovery of deferred costs is not probable. Recoverability is evaluated based on various factors including the length of time the product has been held at the customer site, the viability of payment, including assessment of product demand if a revenue sharing arrangement exists and/or the evaluation if a related transaction will result in a gross margin loss. In a loss situation for a transaction, the deferred cost balance is adjusted for an impairment equal to the value of the excess of cost over the amount of revenue that will be eventually recognized for the transaction. Revenue and cost of sales are recorded when final acceptance is received from the customer. With greater concentration of product at customer sites with specific or individual customer, the financial conditions of any specific or individual customer may result in increased concentration risk exposure for the Company's inventory.

For any post contract support services where the revenue is deferred, the entire related deferred direct costs are classified as a noncurrent asset, consistent with the definition of a current asset per Accounting Research Bulletin No. 43, "Working Capital: Current Assets and Current Liabilities."

*Stock-Based Compensation*

Prior to January 1, 2006, the Company accounted for share-based payment awards under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and provided the required pro forma disclosures under SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"). In accordance with APB 25, non-cash compensation expense was recognized for any options for which the exercise price was below the market price on the actual grant date, based on the difference between the exercise price and the market price. The expense was recognized ratably over the associated service period, which was generally the option vesting term.

On January 1, 2006, the Company adopted SFAS No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123(R)"), using the modified prospective transition method. Stock-based compensation expense recognized during the period is based on the value of the portion of share-based payment awards that is ultimately expected to vest. Stock-based compensation expense recognized in the consolidated statement of operations for the year ended December 31, 2006 included compensation expense for share-based payment awards granted prior to, but not yet vested as of December 31, 2005 based on the grant date fair value estimated in accordance with the pro forma provisions of SFAS 123 and compensation expense for the share-based payment awards granted subsequent to December 31, 2005 based on the grant date fair value estimated in accordance with the provisions of SFAS 123(R). On November 10, 2005, the Financial Accounting Standards Board ("FASB") issued FASB Staff Position No. FAS 123(R)-3, "Transition Election Related to Accounting for Tax Effects of Share-Based Payment Awards." The Company adopted the alternative transition method provided in the FASB Staff Position for calculating the tax effects of stock-based compensation pursuant to SFAS 123(R). The alternative transition method includes simplified methods for establishing the beginning balance of the additional paid-in-capital pool ("APIC pool") related to the tax effects of employee stock-based compensation, and to determine the subsequent impact on the APIC pool and consolidated statements of cash flows of the tax effects of employee stock-based compensation awards that are outstanding upon adoption of SFAS 123(R). The Company accounts for utilization of windfall tax benefits based on tax law ordering and considered only the direct effects of stock-based compensation for purposes of measuring the windfall at settlement of an award.

28