Exhibit F

Part 2 of 4

## 4.    STOCK–BASED COMPENSATION

*Stock Option Plans*

*2006 Equity Incentive Plan:*

   The 2006 Equity Incentive Plan ("2006 Plan") was implemented on July 21, 2006 after being adopted by the Board of Directors on June 6, 2006 and approved by the Company's stockholders on July 21, 2006. The 2006 Plan replaces the 1997 Plan, the 2001 Plan, and the 2003 Plan (collectively, the "Prior Plans"), and no further awards will be granted pursuant to the Prior Plans. The 2006 Plan provides for the grant of the following types of incentive awards: (i) stock options, (ii) stock appreciation rights, (iii) restricted stock, (iv) restricted stock units, (v) performance shares and performance units, and (vi) and other stock or cash awards ("Award," collectively, "Awards"). Those who are eligible for Awards under the 2006 Plan include employees, directors and consultants who provide services to the Company and its affiliates.

   The maximum aggregate number of shares that may be awarded and sold under the 2006 Plan is 4,500,000 shares plus (i) any shares that have been reserved but remain unissued under the Prior Plans as of July 21, 2006, and (ii) any shares subject to stock options or similar awards granted under the Prior Plans that expire or become exercisable without having been exercised in full and shares issued pursuant to awards granted under the Prior Plans that are forfeited to or repurchased by the Company. As of September 30, 2006, the number of shares transferred from the Prior Plans to the 2006 plan totaled 5,638,708. As of September 30, 2006 options to purchase 41,750 shares of common stock were outstanding under the 2006 plan.

   The Board of Directors or the Compensation Committee of the Board ("Compensation Committee") administers the 2006 Plan ("Administrator"). Subject to the terms of the 2006 Plan, the Administrator has the sole discretion to select the employees, consultants, and directors who will receive Awards, determine the terms and conditions of Awards, and to interpret the provisions of the 2006 Plan and outstanding Awards. Options granted under the 2006 plan generally vest and become exercisable over four years.

   Awards granted under the 2006 Plan are generally not transferable, and all rights with respect to an Award granted to a participant generally may be exercised during a participant's lifetime only by the participant; provided, however, that with the Administrator's approval, a participant may (i) transfer an Award to a participant's spouse or former spouse pursuant to a court–approved domestic relations order which relates to the provision of child support, alimony payments or marital property rights, or (ii) transfer an Award by gift to or for the benefit of the participant's immediate family.

   The exercise price of all stock options and stock appreciation rights granted under the 2006 Plan must be at least equal to 100% of the fair market value of the Common Stock on the date of grant (or at least 110% of such fair market value for an incentive stock option ("ISO") granted to a stockholder with greater than 10% voting power of the Company's stock). The maximum term of a stock option granted to any participant must not exceed seven years from the date of grant (or five years for an ISO granted to a stockholder with greater than 10% of the voting power of the Common Stock). The Administrator will determine the terms and conditions of all other Awards granted under the Plan.

   In the event of a "change in control" of the Company, each outstanding Award will be assumed or an equivalent option or right substituted by the successor corporation or a parent or subsidiary of the successor corporation. In the event that the successor corporation, or the parent or subsidiary of the successor corporation, refuses to assume or substitute for the Award, the participant will fully vest in and have the right to exercise all of his or her outstanding options or stock appreciation rights, including shares as to which such Awards would not otherwise be vested or exercisable, all restrictions on restricted stock will lapse, and, with respect to restricted stock units, performance shares and performance units, all performance goals or other vesting criteria will be deemed achieved at target levels and all other terms and conditions met. In addition, if an option or stock appreciation right is not assumed or substituted for in the event of a change of control, the Administrator will notify the participant in writing or electronically that the option or stock appreciation right will be fully vested and exercisable for a period of time determined by the Administrator in its sole discretion, and the option or stock appreciation right will terminate upon the expiration of such period.

*Prior Plans –The 1997 Stock Plan, 2001 Director Option Plan, The 2003 Non–Statutory Stock Option Plan:*

*The 1997 Stock Plan*

   Prior to the implementation of the 2006 Plan on July 21, 2006, officers, employees and consultants of the Company and its affiliates were eligible to receive options to purchase shares of common stock and stock purchase rights under the 1997 Stock Plan ("1997 Plan"). On January 31, 1997, the Board of Directors adopted, and the Company's stockholders approved, the 1997 Plan. In December 1999, the Board of Directors amended the 1997 Plan, which the Company's stockholders approved in February 2000. The 1997 Plan was terminated in July 2006 effective upon stockholder approval of the 2006 Plan. As of September 30, 2006, there were options to purchase 19,446,566 shares of common stock outstanding under the 1997 Plan.

29

Options granted under the 1997 Plan prior to July 21, 2006 were either ISOs intended to qualify for favorable federal income tax treatment under the provisions of Section 422 of the Internal Revenue Code of 1986, as amended, or non-qualified stock options ("NSOs"), which did not so qualify.  The Compensation Committee oversaw the selection of eligible persons for option grants and determined the grant date, amounts, exercise prices, vesting periods and other relevant terms of the options, including whether the options would be ISOs or NSOs.  The exercise price of ISOs granted under the 1997 Plan could not be less than 100% of the fair market value of common stock on the grant date, (or at least 110% of such fair market value for an ISO granted to a stockholder with greater than 10% voting power of the Company's stock), while the exercise price of NSOs could be determined by the Compensation Committee in its discretion.  Options granted under the 1997 Plan were generally not transferable during the life of the optionee.

Under the 1997 Plan, options vest and become exercisable as determined by the Compensation Committee, generally over four years.  Options may generally be exercised at any time after they vest and before their expiration date as determined by the Compensation Committee.  However, no option may be exercised more than ten years after the grant date (or five years for ISOs granted to a stockholder with greater than 10% voting power of the Common Stock).  Options will generally terminate (i) 12 months after the death or permanent disability of an optionee and (ii) three months after termination of employment for any other reason.  The aggregate fair market value of the shares of common stock represented by ISOs that become exercisable in any calendar year by any one option holder may not exceed $100,000.  Options in excess of this limit are treated as NSOs.

Prior to the implementation of the 2006 Plan, the Company could also grant stock purchase rights to eligible participants under the 1997 Plan.  Under the 1997 Plan, any shares purchased pursuant to stock purchase rights were subject to a restricted stock purchase agreement.  Unless the Compensation Committee determined otherwise, this agreement granted the Company a right to repurchase the restricted stock upon the voluntary or involuntary termination of the employee for any reason, including death or disability prior to vesting.  The purchase price for repurchased shares was the original price paid and could be paid by cancellation of any indebtedness owed to the Company.  The Company's repurchase right lapsed at a rate determined by the Compensation Committee.

In the event the Company is merged with or into another corporation, or all or substantially all of the Company's assets are sold, each outstanding option and stock purchase rights will be assumed or an equivalent option or stock purchase right will be substituted by the successor corporation or its parent or subsidiary.  If the successor corporation refuses to assume or substitute for the option or right, the option or stock purchase right will automatically vest and become exercisable in full for a period of at least fifteen days, after which time the option or right will terminate.

*2001 Director Option Plan:*

Prior to the implementation of the 2006 Plan on July 21, 2006, those directors who were not employees of the Company ("Outside Directors") were eligible to receive options to purchase shares of common stock under the 2001 Director Option Plan ("2001 Plan").  The 2001 Plan was adopted by the Board of Directors on March 2, 2001 and was approved by the Company's stockholders in May 2001.  In July 2001, the Board of Directors amended the 2001 Plan.  The 2001 Plan was terminated in July 2006 effective upon stockholder approval of the 2006 Plan.  As of September 30, 2006, there were options to purchase 360,000 shares of common stock outstanding under the 2001 Plan.  The Compensation Committee has been the administrator of the 2001 Plan.

Under the terms of the 2001 Plan, each Outside Director was automatically granted an option to purchase eighty thousand shares of common stock ("First Option") on the date on which such person first became an Outside Director ("Anniversary Date").  A director who was an employee of the Company and ceased employment with the Company to become an Outside Director could receive an option to purchase twenty thousand shares of common stock ("Subsequent Option") at the Company's first annual meeting of stockholders following such conversion to an Outside Director and at each subsequent annual stockholder meeting thereafter, provided that he or she was serving as an Outside Director on each such date.  As such time as each Outside Director's First Option was fully vested, each Outside Director was automatically granted a Subsequent Option on the Anniversary Date of each year provided that he or she was then an Outside Director.

Under the terms of the 2001 Plan, the exercise price of each option granted equaled the market value of the common stock on the date of grant.  Such options have terms of ten years, but terminate earlier if the individual ceases to serve as a director.  The First Option grants vest as to 25% of shares subject to the First Option on each of the first four anniversaries of its date of grant, subject to the Outside Director continuing to serve as a director on such dates.  The Subsequent Option grants vest as to 100% of the shares subject to the Subsequent Option on the first anniversary of its date of grant.

30

*The 2003 Nonstatutory Stock Option Plan:*

Prior to the implementation of the 2006 Plan on July 21, 2006, directors, officers, employees and consultants of the Company and its affiliates were eligible to receive options to purchase shares of the Company's common stock under the 2003 Nonstatutory Stock Option Plan ("2003 Plan"). The 2003 Plan was adopted by the Board of Directors on April 15, 2003. Only nonstatutory stock options, which would not qualify for favorable federal income tax treatment under the provisions of Section 422 of the Internal Revenue Code of 1986, as amended, could be granted under the 2003 Plan. The 2003 Plan was terminated in July 2006 effective upon stockholder approval of the 2006 Plan. As of September 30, 2006, options to purchase 929,035 shares of common stock were outstanding under the 2003 Plan.

The 2003 Plan has been administered by the Compensation Committee. The Compensation Committee oversaw the selection of the eligible persons to whom options would be granted and determined the number of shares subject to the option, exercise prices, vesting periods and other terms applicable to each option.

Options granted under the 2003 Plan generally vest and become exercisable over four years, and may be exercised at any time after they vest but before their expiration date. Options will generally terminate (i) 12 months after the death or employment termination due to disability of an option holder and (ii) three months after termination of an option holder's service for any other reason other than for disability or due to the option holder's death. No option, however, may be exercised more than ten years after the grant date.

In the event of the Company's "change in control," the 2003 Plan provides for each outstanding option to be assumed or an equivalent option or right to be substituted by the successor corporation or its parent or subsidiary. If the successor corporation refuses to assume or substitute for the option, the option will automatically vest and become exercisable in full for a period determined by the compensation committee, after which time the option will terminate.

*Issanni Communications, Inc. Incentive Program:*

The Issanni plan was established for the issuance of up to a total of 39,876 shares of UTStarcom's common stock to specified former employees of Issanni Communications, Inc. ("Issanni") who became UTStarcom's employees in connection with UTStarcom's acquisition of Issanni. The Issanni plan is administered by the Board of Directors or the Compensation Committee. A participant in the Issanni plan is eligible to earn and vest in a designated number of shares that are subject to the award of shares made to a participant under the plan, based upon the attainment of one of six milestones related to the amount of revenue generated from Issanni products in 2002 and 2003 and subject to the participant's continued employment with Issanni, the Company or one of their subsidiaries through the day of the determination that the applicable milestone has been satisfied. In addition, each participant is entitled to receive the unearned shares, if any, on the fifth anniversary of the acquisition of Issanni if the employee continues to be employed with Issanni, the Company or any of their subsidiaries on such date regardless of whether any milestone is attained. The shares subject to an award will in any event become issuable, whether or not the milestones were achieved and whether or not the five–year vesting schedule has elapsed, upon (i) the sale or the discontinuation of the Company or UTStarcom International Products Inc., (ii) the sale of substantially all or any of the technology acquired by UTStarcom International Products Inc. in connection with the acquisition of Issanni, or (iii) the employment termination of certain Issanni principals.

If, prior to the date on which all of a participant's shares are earned, the participant's service with Issanni, the Company or one of their subsidiaries is terminated (i) voluntarily or for cause, the Company may exercise its repurchase option with respect to any of the participant's unearned shares, (ii) other than voluntarily or for cause, death or disability, the participant will be entitled to receive the shares that the participant would have otherwise earned with respect to milestones achieved within 24 months of the participant's termination, or (iii) as a result of death or disability, the participant (or his estate) will be entitled to receive the unearned portion of his shares with respect to all milestones.

*Advanced Communication Devices Corporation Incentive Program:*

In February, 2006 the Company sold substantially all of the assets and selected liabilities of its semiconductor design operations, including the assets related to its prior acquisition of ACD. As a result, all participants' service with the Company was voluntarily terminated and all shares subject to award that were not yet earned or distributed were cancelled.

31

*Stock Award and Stock Option Activity*
　　A summary of activity under all Plans follows:

| | Shares available for grant | Number of options outstanding | Weighted average exercise price |
|---|---|---|---|
| Options outstanding, December 31, 2005 | 6,345,767 | 19,908,010 | $ 18.34 |
| Options authorized in 2006 | 4,900,000 | | |
| Options granted | (5,410,057) | 5,410,057 | 6.12 |
| Options exercised | | (266,940) | 1.20 |
| Options forfeited or expired | 4,264,291 | (4,264,291) | 20.10 |
| Options outstanding, September 30, 2006 | 10,100,001 | 20,786,836 | $ 15.01 |

　　During the nine months ended September 30, 2006, the Company granted restricted stock awards to its employees under the 2006 Plan and the 1997 Plan. Such awards generally vest over a period of one to four years from the date of grant. The restricted stock awards have the voting rights of common stock and the shares underlying the restricted stock awards are considered issued and outstanding. The Company expenses the cost of the restricted stock awards, which is determined to be the fair market value of the shares at the date of grant, ratably over the period during which the restrictions lapse. The grant of restricted stock awards is deducted from the shares available for grant under the Company's stock option plan. Nonvested restricted stock activity as of September 30, 2006 and changes during the nine months ended September 30, 2006 is summarized below:

| | Shares | Weighted average grant date fair value |
|---|---|---|
| Restricted shares granted under 2006 and 1997 Plans | | |
| Nonvested at December 31, 2005 | 150,000 | $ 8.15 |
| Granted | 174,884 | 7.69 |
| Vested | (36,221) | 7.81 |
| Forfeited | — | — |
| Nonvested at September 30, 2006 | 288,663 | $ 7.93 |
| Restricted stock related to acquisition in 2002, included in issued and outstanding | 282,878 | $ 17.50 |
| Total nonvested at September 30, 2006 | 571,541 | $ 12.67 |

　　During the year ended December 31, 2005, the Company granted 150,000 shares of restricted stock with a weighted average grant date fair value of $8.15, all of which was nonvested as of December 31, 2005. Such shares of restricted stock are subject to the Company's right of repurchase, which lapse over a period of one to four years. Repurchased shares are recorded as treasury stock on an average cost basis. During the nine months ended September 30, 2006, 174,844 shares of restricted stock subject to such repurchase right of the Company were purchased by employees and directors. The total intrinsic value of restricted stock vested during the nine months ended September 30, 2006 was $0.3 million. The Company also granted rights to purchase 301,133 shares of restricted stock to executive officers of the Company which were allowed to lapse unexercised in March 2006. In their place, on February 1, 2007, the Compensation Committee of the Board of Directors of the Company determined that certain executive officers, based on their level of performance during the Company's 2006 fiscal year, are eligible to receive 203,000 shares of common stock in the aggregate. The Committee's determination is subject to compliance with applicable law, and the Committee will issue the Performance Stock after the Company is in compliance with all SEC reporting requirements   The Performance Stock is included in the Company's computation of stock–based compensation expense for the nine months ended September 30, 2006.

　　In connection with the October 2002 acquisition of Shanghai Yi Yun Telecom Technology Co. Ltd. ("Shanghai Yi Yun"), the Company issued 514,290 shares of restricted stock valued at that time at $9.0 million to the Shanghai Yi Yun employees that were hired by one of the Company's subsidiaries. Such shares of restricted stock cliff vests over five years through 2007, with accelerated vesting upon the achievement of specified milestones. The Company has treated these 514,290 shares of restricted stock as deferred compensation. During 2003, 226,302 of these shares vested upon achievement of specified milestones. As of September 30, 2006, 5,110 shares have been forfeited resulting in 282,878 remaining shares outstanding. No further vesting has occurred through September 30, 2006.

Information regarding the stock options outstanding at September 30, 2006, is summarized below:

| Range of exercise price | Outstanding at September 30, 2006 | Weighted average exercise price | Intrinsic value (in thousands) | Weighted average remaining contractual life (in years) | Exercisable at September 30, 2006 | Weighted average exercise price | Intrinsic value (in thousands) |
|---|---|---|---|---|---|---|---|
| $ 0.06 – $ 4.50 | 840,442 | $ 3.75 | $ 4,299 | 2.5 | 840,442 | $ 3.75 | $ 4,299 |
| 4.71 – 6.25 | 4,366,737 | 6.24 | 11,467 | 9.4 | 3,088 | 5.56 | 10 |
| 6.31 – 7.50 | 2,201,753 | 6.63 | 4,925 | 9.2 | 49,972 | 6.90 | 99 |
| 7.52 – 11.07 | 2,806,721 | 9.94 | 551 | 8.2 | 1,133,365 | 9.91 | 185 |
| 11.11 – 16.34 | 2,195,483 | 14.21 | — | 5.2 | 2,017,565 | 14.21 | — |
| 16.54 – 20.25 | 3,172,860 | 19.24 | — | 6.2 | 2,770,819 | 19.41 | — |
| 20.48 – 26.34 | 2,902,314 | 25.29 | — | 7.0 | 2,851,399 | 25.35 | — |
| 26.34 – 37.46 | 2,131,206 | 31.18 | — | 7.0 | 2,130,790 | 31.18 | — |
| 37.49 – 43.02 | 119,320 | 40.11 | — | 6.9 | 119,320 | 40.11 | — |
| 45.21 – 45.21 | 50,000 | 45.21 | — | 6.9 | 50,000 | 45.21 | — |
| $ 0.06 – $ 45.21 | 20,786,836 | $ 15.01 | $ 21,242 | 7.4 | 11,966,760 | $ 20.30 | $ 4,593 |

| Options exercisable and expected to vest September 30, 2006 | 19,229,712 | $ 15.02 | $ 18,315 |
|---|---|---|---|

The intrinsic value represents the total pre–tax intrinsic value and is calculated as the difference between the market value as reported by NASDAQ on September 30, 2006 and the exercise price of the in–the–money shares. The total intrinsic value of options exercised was $0.4 million and the amount of cash received for the exercise of options was $0.3 million during the nine months ended September 30, 2006. The weighted average remaining contractual life of options exercisable was 6.0 years, and the weighted average remaining contractual life of options expected to vest was 9.1 years as of September 30, 2006.

*2000 Employee Stock Purchase Plan:*

In February 2000, the Company's stockholders approved the 2000 Employee Stock Purchase Plan. The purchase plan is intended to qualify as an employee stock purchase plan under Section 423 of the Internal Revenue Code.

The Company had reserved 1,914,934 shares of common stock for sale under the stock purchase plan at September 30, 2006. The number of shares reserved for sale under the plan will be increased annually on the first day of each fiscal year beginning in 2001 by an amount equal to 2.0 million shares, or 2% of the outstanding shares of the Company's common stock on that date, or a lesser amount determined by the Board of Directors. The stock purchase plan is administered by the Board or a committee appointed by the Board.

The stock purchase plan is implemented by concurrent offering periods, the duration of which may not exceed 24 months. An offering period may contain up to four interim purchase periods. Shares purchased under the stock purchase plan will be held in separate accounts for each participant. The first offering period began in March 2000 and ended on the last trading day before April 30, 2002. There were no shares issued in May 2006 as the Company was not current with the filings of its annual report on Form 10–K for the year ended December 31, 2005 and quarterly report on Form 10–Q for the quarter ended March 31, 2006. The May 2006 offering period commenced on June 29, 2006, and terminates on May 14, 2008. Subsequent consecutive overlapping offering periods begin on May 15 and November 15 annually. These offering periods end twenty–four months thereafter.

Employees will be eligible to participate in the stock purchase plan if they are employed by the Company for more than 20 hours per week and more than five months in a calendar year. The stock purchase plan permits eligible employees to purchase the Company's common stock through payroll deductions, which may not exceed 15% of the employee's total compensation. Stock may be purchased under the plan at a price equal to 85% of the fair market value of the Company's stock on either the date of purchase or the first day of the offering period, whichever is lower. However, the Board of Directors may

33

in its discretion provide that the price at which shares of common stock are purchased under the plan shall be 85% of the fair market value of the Company's shares on the date of purchase. Participants may not purchase shares of common stock having a value greater than $25,000 during any calendar year.

Participants may increase or decrease their payroll deductions at any time during an offering period, subject to limits imposed by the Board of Directors. If a participant withdraws from the stock purchase plan, any contributions that have not been used to purchase shares shall be refunded. A participant who has withdrawn may not participate in the stock purchase plan again until the next offering period. In the event of retirement or cessation of employment for any reason, any contributions that have not yet been used to purchase shares will be refunded to the participant, or to the participant's designated beneficiary in the case of death, and a certificate will be issued for the full shares in the participant's account.

The Board of Directors may terminate or amend the stock purchase plan, subject to stockholder approval in some circumstances. Unless terminated earlier by the Board, the stock purchase plan will have a term of ten years.

*Stock−Based Compensation*

SFAS 123(R) requires the use of option−pricing models that were not developed for use in valuing employee stock options. The Company has used the Black−Scholes option pricing model ("Black−Scholes model") method of valuation for share−based awards granted prior to December 31, 2005, and has continued to use the Black−Scholes model for subsequent share−based payment awards. The Black−Scholes model was developed for use in estimating the fair value of short−lived exchange traded options that have no vesting restrictions and are fully transferable. In addition, option pricing models require the input of highly subjective assumptions, including the expected stock price volatility over the term of the awards, actual and projected employee stock option exercise behaviors, risk−free interest rate and expected dividends. The Company uses historical volatility as management believes it is more representative of future stock price trends than implied volatility due to the relatively small number of actively traded options on our common stock available to determine implied volatility. The Company estimates an expected term of options granted based upon the Company's historical exercise and cancellation data for vested options. In addition, separate groups of employees that have similar exercise behavior are considered separately. The expected term of employee stock purchase plan shares is the average of the remaining purchase periods under each offering period. The Company bases the risk free interest rate used in the option valuation model on U.S. Treasury zero−coupon issues with remaining terms similar to the expected term on the options. The Company does not anticipate paying any cash dividends in the foreseeable future and therefore uses an expected dividend yield of zero in the option valuation model. The Company is required to estimate forfeitures at the time of grant and revise those estimates in subsequent periods if actual forfeitures differ from those estimates. The Company uses historical data to estimate pre−vesting option forfeitures and record stock−based compensation expense only for those awards that are expected to vest. Prior to January 1, 2006, stock based awards were amortized on an accelerated basis by treating each vesting tranche as a separate stock option grant (graded vesting). Upon adoption of SFAS 123(R) on January 1, 2006, all stock based payment awards are amortized on a straight−line basis over the requisite service periods of the awards, which are generally the vesting periods.

The fair value of share based payment awards was estimated using the Black−Scholes option pricing model with the following assumptions:

|  | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
|  | 2006 | 2005 | 2006 | 2005 |
| Expected term in years | 4.0 | 4.0 | 4.0 | 3.2 |
| Weighted average risk−free interest rate | 4.9% | 4.0% | 4.7% | 3.8% |
| Expected dividend rate | 0.0% | 0.0% | 0.0% | 0.0% |
| Volatility | 56.0% | 71.0% | 56.9% | 65.7% |

34

| | Three months ended September 30, | | Nine months ended September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Expected term in years | 0.5–2.0 | 0.5–2.0 | 0.5–2.0 | 0.5–2.0 |
| Weighted average risk–free interest rate | 4.4% | 2.7% | 4.4% | 2.7% |
| Expected dividend rate | 0.0% | 0.0% | 0.0% | 0.0% |
| Volatility | 63.0% | 52.0% | 63.0% | 52.0% |

At September 30, 2006, there was $30.2 million of total unrecognized compensation cost, as measured, related to non–vested stock options and restricted stock, which is expected to be recognized over a weighted–average period of 2.7 years.  The weighted average fair value of options granted under the stock option plans during the nine months ended September 30, 2006 was $3.06 per share.

The total stock–based compensation cost recognized in income for the three and nine month periods ended September 30, 2006 was as follows:

| | Three months ended September 30, 2006 | Nine months ended September 30, 2006 |
|---|---|---|
| | (in thousands) | |
| Stock–based compensation expense by type of award: | | |
| Employee stock options | $        3,787 | $        11,180 |
| Employee stock purchase plan | 416 | 1,150 |
| Restricted stock | 1,401 | 3,206 |
| Forfeitures related to disposal of a component of a business | — | (2,393) |
| Tax effect | — | — |
| Total | $        5,604 | $        13,143 |

Stock–based compensation expense for the nine months ended September 30, 2006 was reduced by $2.4 million related to options forfeited in connection with the disposal of the Company's semiconductor design operations discussed in Note 11.  As a result of adopting SFAS 123(R) on January 1, 2006, the Company's income before income taxes and net income for the three and  nine months ended September 30, 2006 were approximately $3.3 million and $8.9 million lower than if it had continued to account for stock incentive compensation under the intrinsic value method. Had the Company continued to use the intrinsic value method, the effect on basic and diluted earnings per share would have been an increase of approximately $0.03 and $0.07 per share during the three and nine months ended September 30, 2006, respectively.

35

*Prior to the adoption of SFAS 123(R)*

The pro forma information required under SFAS 123 for the three and nine months ended September 30, 2005 was as follows:

| | Three months ended September 30, 2005 as restated | Nine months ended September 30, 2005 as restated |
|---|---|---|
| | (in thousands, except per share data) | |
| Basic and diluted Net loss: | | |
| As reported | $ (438,018) | $ (488,642) |
| Add: Stock–based employee compensation expense included in reported net loss, net of related tax effects | 4,172 | 3,857 |
| Deduct: Total compensation expense determined under fair value based method for all awards, net of related tax effects | (4,044) | (11,661) |
| Pro forma net loss | $ (437,890) | $ (496,446) |
| Basic and diluted loss per share: | | |
| As reported | $ (3.70) | $ (4.22) |
| Pro forma | $ (3.70) | $ (4.28) |

**5.      LOSS PER SHARE**

Basic EPS is computed by dividing net loss available to common stockholders by the weighted average number of shares of the Company's common stock outstanding during the period, which excludes unvested restricted shares. Diluted EPS presents the amount of net loss available to each share of common stock outstanding during the period plus each share of common stock that would have been outstanding assuming the Company had issued shares of common stock for all potentially dilutive common shares outstanding during the period. The Company's potentially dilutive common shares include employee stock options, unvested restricted shares, a written call option, warrants, convertible subordinated notes and vested acquisition–related stock options.

The following is a summary of the calculation of basic and diluted EPS:

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 (As restated) | 2006 | 2005 (As restated) |
| | | (in thousands except per share data) | | |
| **Numerator:** | | | | |
| Net loss for basic EPS computation | $ (43,048) | $ (438,018) | $ (75,316) | $ (488,642) |
| Effect of dilutive securities 7/8% convertible subordinated notes | — | — | — | — |
| Net loss adjusted for dilutive securities | $ (43,048) | $ (438,018) | $ (75,316) | $ (488,642) |
| **Denominator:** | | | | |
| Shares used to compute basic EPS | 120,676 | 118,262 | 120,628 | 115,902 |
| Dilutive common stock equivalent shares | — | — | — | — |
| Shares used to compute diluted EPS | 120,676 | 118,262 | 120,628 | 115,902 |
| Loss per share – basic and diluted | $ (0.36) | $ (3.70) | $ (0.62) | $ (4.22) |

For the three and nine months ended September 30, 2006 and 2005, there were no potentially dilutive common shares because of the net loss in each of these periods, and basic and dilutive EPS are the same. The following table summarizes the total potential shares of common stock that were excluded from the diluted per share calculation, because to include them would have been anti–dilutive for the period.

36

| | Three months ended September 30, | | Nine months ended September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
| | | As restated | | As restated |
| | | (in thousands except per share data) | | |
| Stock options | 20,787 | 19,401 | 20,787 | 19,231 |
| Conversion of convertible subordinated notes | 11,543 | 12,941 | 11,543 | 15,415 |
| Other | 827 | 474 | 744 | 430 |
| | 33,157 | 32,816 | 33,074 | 35,076 |

**6.    COMPREHENSIVE LOSS**

The reconciliation of net loss to comprehensive loss for the three and nine months ended September 30, 2006 and 2005 is as follows:

| | Three months ended September 30, | | Nine months ended September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
| | | As restated | | As restated |
| | | (in thousands) | | |
| Net loss | $ (43,048) | $ (438,018) | $ (75,316) | $ (488,642) |
| Unrealized gain (loss) on investments | 15,719 | (22) | 15,721 | (30) |
| Foreign currency translation | 5,553 | 10,718 | 8,817 | 10,163 |
| Total comprehensive loss | $ (21,776) | $ (427,322) | $ (50,778) | $ (478,509) |

**7.    CASH, CASH EQUIVALENTS AND SHORT–TERM INVESTMENTS**

Cash and cash equivalents consist of instruments with maturities of three months or less at the date of purchase. There were no available for sale securities included in cash and cash equivalents at September 30, 2006 or December 31, 2005. Short–term investments, consisting entirely of available–for–sale securities, were $12.3 million and $13.3 million at September 30, 2006 and December 31, 2005, respectively. These available–for–sale securities currently consist of bank time deposits, but can consist of government–backed notes, commercial paper, floating rate corporate bonds and fixed income corporate bonds. These investments are recorded at fair value. Any unrealized holding gains or losses are reported as a component of other comprehensive income. Realized gains and losses are reported in earnings.

The Company accepts bank notes receivable with maturity dates of between three and six months from its customers in China in the normal course of business. The Company may discount these bank notes with banking institutions in China. A sale of these notes is reflected as a reduction of cash and cash equivalents or short–term investments and the proceeds of the settlement of these notes are included in cash flows from operating activities in the consolidated statement of cash flows. There were no bank notes sold during the three and nine months ended September 30, 2006.

Any notes that have been sold are not included in the Company's consolidated balance sheets as the criteria for sale treatment established by SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities" ("SFAS 140"), have been met. Under SFAS 140, upon a transfer, the transferor or entity must de–recognize financial assets when control has been surrendered and the transferee obtains control over the assets. In addition, the transferred assets have been isolated from the transferor, beyond the reach of its creditors, and the transferee has the right, without conditions or constraints, to pledge or exchange the assets it has received.

**8.    RESTRICTED CASH AND INVESTMENTS**

At September 30, 2006, the Company had short–term restricted cash and investments of $23.8 million and long–term restricted cash of $3.6 million included in other long–term assets. At December 31, 2005, the Company had short–term restricted cash and investments of $53.7 million and long–term restricted cash of $0.3 million included in other long–term assets. These amounts primarily collateralize the Company's issuance of standby and commercial letters of credit.

37

**9.          ACCOUNTS AND NOTES RECEIVABLE**

The Company accepts bank notes and commercial notes receivable from its customers in China in the normal course of business. The notes are typically non–interest bearing, with maturity dates between three and six months. Bank notes are included in short–term investments. Commercial notes receivable available for sale were $8.5 million and $2.1 million at September 30, 2006 and December 31, 2005, respectively. The Company may discount these notes with banking institutions in China. A sale of these notes is reflected as a reduction of notes receivable and the proceeds of the settlement of these notes are included in cash flows from operating activities in the consolidated statement of cash flows. Any notes that have been sold are not included in the Company's consolidated balance sheets as the criteria for sale treatment established by SFAS 140, has been met. There were no notes receivable sold during the three and nine months ended September 30, 2006 and 2005.

In August 2005, the Company entered into a Committed Receivables Purchase Agreement ("Agreement") with a commercial bank, whereby the Company may sell up to $100.0 million of its eligible accounts receivable, as defined in the Agreement. The Agreement contains provisions customary in transactions of this nature including certain commitment fees. During the three and nine months ended September 30, 2006, no receivables have been sold pursuant to provisions of the Agreement, and the Company recorded commitment fees of $0.4 million. In March 2007, the Agreement was amended and restated to reflect that the purchase of trade receivables shall be at the sole discretion of the commercial bank, with no associated commitment fees.

**10.          INVENTORIES**

As of September 30, 2006 and December 31, 2005, total inventories consisted of the following:

|  | September 30, 2006 | December 31, 2005 |
|---|---|---|
|  | (in thousands) | |
| Raw materials | $          84,566 | $          70,608 |
| Work–in–process | 36,704 | 27,582 |
| Finished goods | 342,120 | 327,765 |
| Total inventories | $          463,390 | $          425,955 |

**11.          SALE OF ASSETS**

*Marvell Technology Group Ltd.:*

In February 2006, the Company sold substantially all of the assets and selected liabilities of its semiconductor design business division to Marvell Technology Group Ltd. ("Marvell"). The Company received $35.4 million in cash, net of $0.6 million of transaction costs, and an additional $4.3 million in cash was paid by Marvell to the Company in August 2007. Included in the cash received was $16.0 million earned by the Company as a result of achieving certain defined milestones. The Company received payment of this $16.0 million in October 2006. The assets sold include the assets related to the prior acquisition of Advanced Communications Devices Corporation in 2001, and other system–on–chip semiconductors. In connection with the sale of assets, the Company has entered into a supply agreement with Marvell. Pursuant to the supply agreement, the Company has agreed to purchase chipsets supplied by Marvell for a period of five years. These chipsets will be included in certain handset products designed and manufactured by the Company.

The Company recognized a gain on this sale of assets of $12.3 million during the three months ended September 30, 2006. The gain was determined based upon total net proceeds less the net book value of assets sold of $2.9 million and the value of the supply agreement of $20.2 million. The value allocated to the supply agreement is included in other current and long–term liabilities and is being amortized in proportion to the quantities of chipsets purchased under the supply agreement over the next five years. As of September 30, 2006, approximately $1.1 million had been amortized against cost of sales.

**12.          GOODWILL AND INTANGIBLE ASSETS**

*Goodwill:*

Intangible assets classified as goodwill and those with indefinite lives are not amortized. The Company performs an annual impairment test of its goodwill during the fourth quarter of each year. The Company also tests for impairment between

38

annual tests if a "triggering" event occurs that may have the effect of reducing the fair value of a reporting unit below their respective carrying values. When conducting its goodwill impairment analysis, the Company calculates its impairment charges based on the two–step test prescribed in SFAS 142, "Goodwill and Other Intangible Assets" ("SFAS 142"). The Company uses the present value of future cash flows from the respective reporting units to determine the estimated fair value of the reporting unit and the implied fair value of goodwill.

The Company held a series of planning meetings in September 2005 to assess the current business forecasts for all of its reporting units. This assessment analyzed various factors including a reduction in the rate of growth of PAS subscribers in the third quarter, a delay of the expected granting of 3G licenses in China and Japan, challenges with product quality primarily in the Company's Broadband reporting unit, a narrowing of the Company's strategic focus related to the Company's product offerings and greater than expected revenue and margin decline due to continued pricing pressures for several of the Company's key markets. The Company concluded these factors combined represented a "triggering" event.

The Company determined that the significant adverse changes in the business outlook could indicate the carrying value of certain of its long–lived assets groups may not be recoverable and could indicate the fair value of the Company's reporting units may be below their fair value. As a result, the Company performed interim impairment tests on goodwill and certain other long–lived tangible and intangible assets.

The Company performed an impairment analysis pursuant to SFAS 142 as of September 30, 2005 for all of its reporting units. The Company compared the fair value of the reporting units to their carrying value. The Company determined the fair value of each reporting unit using both present value and comparable company techniques based, in part, upon an independent valuation. The fair values of the reporting units were reconciled to the Company's overall market capitalization at September 30, 2005.

Based on the impairment assessment noted above, a goodwill impairment charge of $192.9 million was recorded during the three months ended September 30, 2005 to write off the full value of goodwill for the Wireless, Broadband, Handsets and PCD business units. The second step of the goodwill impairment test for Broadband and Handsets segments was completed in the third quarter and for the Wireless and PCD units was performed in the fourth quarter of 2005, which reaffirmed the estimate from the third quarter that the goodwill was fully impaired. As such, there was no adjustment from the amount previously recorded. The changes to the carrying value of the Company's goodwill from January 1, 2005 through September 30, 2005 are reflected below:

| | January 1, 2005 | Additions | Exchange rate changes | Impairment | September 30, 2005 |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Handsets | $ 74,003 | $ 15,371 | $ (37) | $ (89,337) | $ — |
| Wireless | 55,641 | — | 29 | (55,670) | — |
| PCD | 24,710 | — | 2 | (24,712) | — |
| Broadband | 23,210 | — | — | (23,210) | — |
| Service | 3,063 | — | — | — | 3,063 |
| Total | $ 180,627 | $ 15,371 | $ (6) | $ (192,929) | $ 3,063 |

As of September 30, 2006 and December 31, 2005, goodwill was $3.1 million, the entire amount of which was allocated to the service operating segment.

*Long–lived Assets:*

The Company also tested its long–lived assets in all of the Company's assets groups for potential impairment during the third quarter of 2005 in accordance with SFAS 144. Based on this analysis, the Company determined that the undiscounted expected future cash flows for the Broadband and Handset asset groups were less than the carrying value of their net assets.

The Company determined the relative estimated fair value of tangible assets through a comparison of similar assets, and wherever practical, based on quoted market prices taking into consideration the asset type, age, condition, and physical location of the asset. As a result of this analysis, the Company recorded an impairment charge of $14.1 million during the three months ended September 30, 2005 for long–lived tangible assets related to the Broadband asset group and $9.4 million for long–lived tangible assets related to the Handset asset group.

39

In addition, the Company determined that the fair value of technology intangible assets within the Broadband and Handset asset groups as calculated using the discounted future cash flows was less than the carrying value of the net assets and, as such, the Company recorded a net asset write-off of $1.7 million during the three months ended September 30, 2005.

As of September 30, 2006 and December 31, 2005, intangible assets consisted of the following:

| | September 30, 2006 | December 31, 2005 |
|---|---|---|
| | (in thousands) | |
| Intangible assets: | | |
| Existing technology | $ 39,530 | $ 39,530 |
| Less accumulated amortization | (26,320) | (21,702) |
| | $ 13,210 | $ 17,828 |
| | | |
| Customer relationships | $ 57,220 | $ 57,220 |
| Less accumulated amortization | (16,973) | (12,037) |
| | $ 40,247 | $ 45,183 |
| | | |
| Supplier relationships | $ 5,300 | $ 5,300 |
| Less accumulated amortization | (5,079) | (3,092) |
| | $ 221 | $ 2,208 |
| | | |
| Trade names | $ 4,940 | $ 4,940 |
| Less accumulated amortization | (3,496) | (2,496) |
| | $ 1,444 | $ 2,444 |
| | | |
| Non-compete agreement | $ 10,800 | $ 10,800 |
| Less accumulated amortization | (5,175) | (3,150) |
| | $ 5,625 | $ 7,650 |
| | | |
| Total intangible assets | $ 60,747 | $ 75,313 |

Amortization expense was $4.8 million and $6.6 million for the three months ended September 30, 2006 and 2005, respectively, and was $14.6 million and $20.4 million for the nine months ended September 30, 2006 and 2005, respectively. The estimated aggregate amortization expense for intangibles for the fourth quarter of 2006 is $4.3 million and for each of the five years from the year ended December 31, 2007 through the year ended December 31, 2011 is $16.0 million, $12.7 million, $6.9 million, $5.1 million and $5.1 million, and is $10.6 million thereafter.

The weighted average amortization period for each class of unamortized identifiable intangible assets include the following:

| | Weighted Average Life |
|---|---|
| | (in years) |
| Technology | 2.3 |
| Customer relationships | 7.1 |
| Supplier relationships | 0.1 |
| Trade names | 1.1 |
| Non-compete | 2.1 |

40

13.        **LONG–TERM INVESTMENTS**
   The Company's investments are as follows:

| | September 30, 2006 | | December 31, 2005 |
|---|---|---|---|
| | (in thousands) | | |
| Gemdale | $ | 16,451 | $ | 1,321 |
| Cellon International | | 13,500 | | 8,000 |
| Restructuring Fund No. 1 | | — | | 1,538 |
| Global Asia Partners L.P. | | 1,700 | | 1,700 |
| Fiberxon Inc. | | 3,000 | | 3,000 |
| Immenstar | | 2,000 | | 2,000 |
| Matsushita Joint Venture | | — | | 465 |
| GCT SemiConductor | | 3,000 | | 3,000 |
| Xalted Networks | | 3,302 | | 3,000 |
| Infinera | | 1,902 | | 1,902 |
| Others | | 99 | | 97 |
| Total | $ | 44,954 | $ | 26,023 |

*Gemdale*

   In 1996, the Company invested $1.3 million in Gemdale Co., Ltd. ("Gemdale") in return for 11 million non–negotiable shares of Gemdale. Gemdale is a real estate company that invests and develops properties in China, primarily in Shanghai, Beijing, Shenzhen and Wuhan. During 2004, the Company received an additional 8.8 million non–negotiable shares in dividends. This investment was accounted for under the cost method through July 2006.

   In August 2006, pursuant to a Split Share Structure Reform Agreement in China, the Company transferred 6.0 million non–negotiable Gemdale shares to the holders of negotiable Gemdale shares in exchange for converting the remaining 13.8 million non–negotiable shares into negotiable shares, and a receivable for additional shares valued at $0.6 million at September 30, 2006. The negotiable Gemdale shares are traded on the Shanghai Stock Exchange. The 13.8 million negotiable shares are subject to a transfer restriction through August 2007. As of September 30, 2006 the Company had a 2% ownership interest in Gemdale. The investment is classified as equity securities available–for–sale and recorded at fair value. An unrealized gain on investment of $15.7 million is included in other comprehensive income as of September 30, 2006.

*Cellon International*

   In September 2001, the Company invested $2.0 million in Cellon International Holdings Corporation ("Cellon") and made additional investments of $3.0 million each in Cellon in April and December 2002. Cellon designs wireless terminals and related technology for handset manufacturers and private distributors. In November 2005, the Company and Cellon entered into an agreement under which the Company received consideration in the form of preferred stock and warrants of Cellon valued at $5.5 million in exchange for the transfer of fixed assets with a net book value of $3.0 million, a facilities lease and a workforce in place consisting of 156 employees. This transaction was completed on May 31, 2006 and a gain on sale of assets of $2.5 million was recorded in other income. As of September 30, 2006, with the additional shares obtained in the purchase transaction, the Company had an 11% ownership interest in Cellon. This investment is accounted for under the cost method, and its carrying value has been evaluated for possible impairment based on the achievement of business objectives and milestones, the financial condition and prospects of the Company and other relevant factors. For more information regarding this investment see Note 25.

   In November 2005, the Company entered into a Development Service Agreement with Cellon in which $5.0 million was prepaid in exchange for future product development. Approximately $0.7 million and $2.0 million of the prepaid amount has been used in the three and nine months ended September 30, 2006 as payments for design services. The Company may also use the $5.0 million prepayment in satisfaction of royalties Cellon may earn from sales by the Company of products Cellon designs under the Development Services Agreement. This agreement also obligates Cellon to pay the Company a royalty if certain technology shared by the Company to Cellon is used in products developed and sold to customers other than the Company through November 2007.

41

*Matsushita Joint Venture*

In December 2005 the parties agreed to dissolve the partnership. A final distribution was made in April 2006 that did not materially exceed the carrying value of the investment.

*Restructuring Fund No. 1*

During the first quarter of fiscal 2002, the Company invested $2.0 million in Restructuring Fund No. 1, a venture capital investment limited partnership established by SOFTBANK INVESTMENT CORP., an affiliate of SOFTBANK CORP. SOFTBANK America Inc., an entity affiliated with SOFTBANK CORP., is a significant stockholder of the Company. The fund focuses on leveraged buyout investments in companies in Asia undergoing restructuring or bankruptcy procedures. The fund has a separate management team, and none of the Company's employees are employed by the fund. The Company accounted for this investment under the equity method of accounting. The Company received a cash distribution of approximately $0.7 million in March 2006 and an additional cash distribution of $1.5 million in May 2006 and reduced the carrying value of the investment accordingly. Income of $0.7 million in excess of our carrying value was recognized in other income in the quarter ended June 30, 2006. The partnership was dissolved in July 2006. The Company received a final cash distribution of approximately $0.7 million which was recorded as a gain on investment in September 2006. There were no cash distributions during the three or nine months ended September 30, 2005.

*Xalted Networks*

In May 2005 and August 2005, the Company invested $2.0 million and $1.0 million, respectively, in Xalted Networks ("Xalted"). In March 2006 the Company invested an additional $0.3 million in Xalted. Xalted is a development stage company providing telecommunication operator customers with a comprehensive set of network systems, software solutions and service offerings. The Company has a 10% ownership interest in Xalted and accounts for the investment under the cost method.

14.     **DEBT**

The following represents the outstanding borrowings at September 30, 2006 and December 31, 2005:

| | September 30, 2006 | December 31, 2005 |
|---|---|---|
| | (in thousands) | |
| Bank loans | $ 105,010 | $ 198,826 |
| Other | 300 | 300 |
| Convertible subordinated notes, due March 1, 2008 | 274,600 | 274,600 |
| Total debt | $ 379,910 | $ 473,726 |
| Long-term debt | 274,900 | 274,900 |
| Short-term debt | $ 105,010 | $ 198,826 |

At September 30, 2006, the Company had loans with various banks totaling $105.0 million with interest rates of 5.02% per annum. These bank loans mature during 2006 and 2007, and are included in short-term debt. There are no significant covenants associated with these loans.

The Company also had available credit facilities in China at September 30, 2006 totaling $789.5 million, of which $498.5 million of this amount was available for working capital purposes, and the Company had drawn $105.0 million in outstanding borrowings, and $291.0 million was available for use in support of letters of credit and corporate guarantees. These facilities expire primarily in 2007.

On March 12, 2003, the Company completed an offering of $402.5 million of 7/8% convertible subordinated notes due March 1, 2008 to qualified buyers pursuant to Rule 144A under the Securities Act of 1933. The notes are convertible into the Company's common stock at a conversion price of $23.79 per share and are subordinated to all present and future senior debt of the Company. Holders of the notes may convert their notes only if: (i) the price of the Company's common stock issuable upon conversion of a note reaches a specified threshold, (ii) specified corporate transactions occur, or (iii) the trading price for the notes falls below certain thresholds. At the initial conversion price, each $1,000 principal amount of notes will be convertible into approximately 42.0345 shares of common stock. Expenses associated with the convertible subordinated notes issuance were $11.7 million and have been recorded in other long-term assets and are being amortized over the life of the notes.

42

The Company has entered into a convertible bond hedge and call option transaction.  The convertible bond hedge allows the Company to purchase 11.5 million shares of its common stock at $23.79 per share from the other party to the agreement.  The written call option allows the holder to purchase 11.5 million shares of the Company's common stock from the Company at $32.025 per share.  Both the bond hedge and call option transactions may be settled at the Company's option either in cash or net shares and expire on March 1, 2008.

The Company recorded these instruments at cost, and their carrying value at September 30, 2006 equaled their original cost as adjusted for amendments related to the early extinguishment of debt.  The convertible bond hedge and call option transactions are expected to reduce the potential dilution from conversion of the notes.  The options have been included in stockholders' equity in accordance with the guidance in EITF No. 00−19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock."

On November 15, 2006, the Company received a notice asserting that its failure to timely file its Quarterly Report on Form 10−Q for the period ended September 30, 2006 had caused a default under the provisions of the indenture governing the convertible subordinated notes which, if not cured within 60 days, would cause an event of default.  For information regarding the subsequent solicitations of consents from the holders of the notes see Note 25 entitled "Subsequent Events" below.

**15.          WARRANTY OBLIGATIONS AND OTHER GUARANTEES**

The Company provides a warranty on its equipment and handset sales for a period generally ranging from one to three years from the time of final acceptance.  Very rarely, the Company has entered into arrangements to provide limited warranty services for periods longer than three years.  The longest of such warranty periods is ten years.  The Company provides for the expected cost of product warranties at the time that revenue is recognized based on an assessment of past warranty experience.

Warranty obligations, included in other current liabilities are as follows:

| | Three months ended September 30, | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2006 | 2005 | 2006 | 2005 |
| | | As restated | | As restated |
| | | (in thousands) | | |
| Beginning of period | $ 64,108 | $ 58,586 | $ 76,719 | $ 46,596 |
| Accruals for warranties issued during the period | 17,095 | 15,260 | 28,865 | 47,828 |
| Settlements made during the period | (16,265) | (18,196) | (40,646) | (38,774) |
| Balance at end of period | $ 64,938 | $ 55,650 | $ 64,938 | $ 55,650 |

During 2005, the Company recorded a special warranty charge for equipment sold to Softbank during 2003 and 2004.  Since the agreement to repair these parts exceeds the Company's normal warranty terms the Company  recorded an additional special warranty charge of $11.7 million for certain asynchronous digital subscriber line ("ADSL") products, $4.0 million primarily for NetRing equipment and $14.9 million for GEPON equipment.  During the three months ended September 30, 2006, the Company recorded an additional warranty charge of $4.7 million, consisting of $2.9 million for the NetRing equipment and $1.8 million for the GEPON equipment sold to Softbank, based on the results of the Company's analysis of warranty costs incurred, and revised estimates of the remaining liability.

Certain of the Company's sales contracts include provisions under which customers would be indemnified by the Company in the event of, among other things, a third−party claim against the customer for intellectual property rights infringement related to the Company's products.  There are no limitations on the maximum potential future payments under these guarantees.  The Company has not accrued any amount in relation to these provisions as no such claims have been made and the Company believes it has valid, enforceable rights to the intellectual property embedded in its products.

**16.**        **COMMITMENTS AND CONTINGENCIES**
*Leases:*

The Company leases certain facilities under non-cancelable operating leases that expire at various dates through 2013. The minimum future lease payments under the leases at September 30, 2006 were as follows:

|  | September 30, 2006 |
|---|---|
|  | (in thousands) |
| 1 year | $ 16,467 |
| 2 year | 11,319 |
| 3 year | 8,630 |
| 4 year | 3,609 |
| 5 year and after | 1,966 |
| Total minimum lease payments | $ 41,991 |

Rent expense for the three and nine months ended September 30, 2006 were $4.8 million and $15.0 million, respectively. Rent expense for the three and nine months ended September 30, 2005 were $5.2 million and $16.2 million, respectively.

*Contractual obligations and commercial commitments:*

As of September 30, 2006 the Company's obligations under contractual obligations and commercial commitments are as follows:

|  | | September 30, 2006 Payments Due by Period | |
|---|---|---|---|
|  | Total | Less than 1 year | 1–3 years |
|  | | (in thousands) | |
| Bank loans | $ 105,010 | $ 105,010 | $ — |
| Convertible subordinated notes | $ 274,600 | $ — | $ 274,600 |
| Interest payable on debt | $ 37,850 | $ 23,940 | $ 13,910 |
| Letters of credit | $ 53,281 | $ 49,640 | $ 3,641 |
| Purchase commitments | $ 730,216 | $ 663,560 | $ 66,656 |

*Letters of credit:*

The Company issues standby letters of credit primarily to support international sales activities outside of China. When the Company submits a bid for a sale, often the potential customer will require that the Company issue a bid bond or a standby letter of credit to demonstrate its commitment through the bid process. In addition, the Company may be required to issue standby letters of credit as guarantees for advance customer payments upon contract signing or performance guarantees. The standby letters of credit usually expire without being drawn by the beneficiary thereof. Finally, the Company may issue commercial letters of credit in support of purchase commitments.

*Purchase commitments:*

The Company is obligated to purchase raw materials and work–in–process inventory under various orders from various suppliers, all of which should be fulfilled without adverse consequences material to its operations or financial condition. As of September 30, 2006, total purchase commitments, including cancelable and non–cancelable purchase orders, approximated $730 million. Additionally, in connection with the sale of assets to Marvell, the Company has agreed to purchase from Marvell certain chipsets that will be included in the Company's PAS handsets through 2011. These chipsets will be included in certain handset products designed and manufactured by the Company.

*Investment commitments:*

As of September 30, 2006, the Company had invested a total of $2.6 million in Global Asia Partners L.P. The fund was formed to make private equity investments in private or pre–IPO technology and telecommunications companies in Asia. The Company had a commitment to invest up to a maximum of $5.0 million. As the result of a reorganization of capital contributions by the partners, reached in April 2005, the Company's capital contribution of $0.5 million in April 2005 was the final capital contribution to be made. In addition, the agreement allows the partnership to re–invest up to $2.5 million that otherwise would have been available to us as future distributions. There were no cash distributions during the three and nine months ended September 30, 2006 or 2005.

44

*Intellectual property:*

Certain sales contracts include provisions under which customers would be indemnified by the Company in the event of, among other things, a third party claim against the customer for intellectual property rights infringement related to the Company's products. There are no limitations on the maximum potential future payments under these guarantees. The Company has not accrued any amounts in relation to these provisions as no such claims have been made and the Company believes it has valid enforceable rights to the intellectual property embedded in its products.

*Litigation*

*Securities Class Action Litigation*

Beginning in October 2004, several shareholder class actions alleging federal securities violations were filed against the Company and various officers and directors of the Company. The actions have been consolidated in United States District Court for the Northern District of California under the caption *In re UTStarcom, Inc. Securities Litigation*, Master File No. C–04–4908–JW(PVT). The lead plaintiffs in the case filed a First Amended Consolidated Complaint on July 26, 2005. The First Amended Complaint alleged violations of the Securities Exchange Act of 1934, and was brought on behalf of a putative class of shareholders who purchased our stock after April 16, 2003 and before September 20, 2004. On April 13, 2006, the lead plaintiffs filed a Second Amended Complaint adding new allegations and extending the end of the class period to October 6, 2005. In addition to the Company defendants, the plaintiffs are also suing Softbank. Plaintiffs' complaint seeks recovery of damages in an unspecified amount.

On June 2, 2006, the Company and the individual defendants filed a motion to dismiss the Second Amended Complaint. On March 21, 2007, the Court granted defendants' motion and dismissed plaintiffs' Second Amended Complaint. The Court granted plaintiffs leave to file a Third Amended Complaint, which plaintiffs filed on May 25, 2007. On July 13, 2007, the Company and the individual defendants filed a motion to dismiss and a motion to strike the Third Amended Complaint.

On September 4, 2007, a second shareholder class action complaint captioned *Peter Rudolph v. UTStarcom, et al.*, Case No. C–07–4578 SI, was filed in the United States District Court for the Northern District of California against the Company and some of the Company's current and former directors and officers. The complaint alleges violations of the Securities Exchange Act of 1934 through undisclosed improper accounting practices concerning the Company's historical equity award grants. Plaintiff seeks unspecified damages on behalf of a purported class of purchasers of the Company's common stock between July 24, 2002 and September 4, 2007.

Due to the preliminary status of these lawsuits and uncertainties related to litigation, the Company is unable to evaluate the likelihood of either a favorable or unfavorable outcome. Accordingly, the Company is unable at this time to estimate the effects of these complaints on the Company's financial position, results of operations, or cash flows.

*Governmental Investigations*

The Company has received notice of a formal inquiry by the staff of the Securities & Exchange Commission ("SEC") into certain aspects of the Company's financial disclosures during prior reporting periods and certain other issues. In addition, in December 2005, the U.S. Embassy in Mongolia informed the Company that it had forwarded to the Department of Justice ("DOJ") allegations that an agent of the Company's Mongolia joint venture had offered payments to a Mongolian government official in possible violation of the Foreign Corrupt Practices Act (the "FCPA"). The Company through our Audit Committee, authorized an independent investigation into possible violations of the FCPA, and the Company has been in contact with the DOJ and SEC regarding the investigation. The investigation has identified possible FCPA violations in Mongolia, Southeast Asia, India, and China, as well as possible violations of U.S. immigration laws. The DOJ has requested that the Company voluntarily produce documents related to the investigation and the SEC has subpoenaed the Company for documents. The Company has executed tolling agreements extending the statute of limitations for the FCPA issues under investigation by the SEC and DOJ and the immigration issues under investigation by the DOJ. At this time, the Company cannot predict when any inquiry will be completed or what the outcome of any inquiry will be.

*Shareholder Litigation*

On November 17, 2006, a shareholder derivative complaint captioned *Ernesto Espinoza v. Ying Wu et al.*, Case No. RG06298775, was filed against certain of the Company's current and former officers and directors in the Superior Court of the County of Alameda, California. The complaint alleges that the individual defendants, among other things, breached their duties, were unjustly enriched, and violated the California Corporations Code in connection with the timing of stock option grants. The complaint names the Company as a nominal defendant and seeks unspecified monetary damages against the individual defendants and various forms of injunctive relief. On February 2, 2007, the Company and the individual defendants filed

45

demurrers against the complaint.  On April 11, 2007, the Court sustained the individual defendants' demurrer, overruled the Company's demurrer, ordered the plaintiff to file an amended complaint, and ordered the Company to answer the original complaint.  The plaintiff filed an amended complaint and the Company has filed an answer to the amended complaint.  On August 21, 2007, the individual defendants filed demurrers against the amended complaint.  The Court sustained the individual defendants' demurrers and ordered the plaintiff to file a second amended complaint.

Due to the preliminary status of this complaint and uncertainties related to litigation, the Company is unable to evaluate the likelihood of either a favorable or unfavorable outcome.  Accordingly, the Company is unable at this time to estimate the effects of this complaint on the Company's financial position, results of operations, or cash flows.

*IPO Allocation*

On October 31, 2001, a complaint was filed in United States District Court for the Southern District of New York against the Company, some of the Company's directors and officers and various underwriters for the Company's initial public offering.  Substantially similar actions were filed concerning the initial public offerings for more than 300 different issuers, and the cases were coordinated as *In re Initial Public Offering Securities Litigation*, 21 MC 92 for pretrial purposes.  In April 2002, a consolidated amended complaint was filed in the matter against the Company, captioned *In re UTStarcom, Initial Public Offering Securities Litigation*, Civil Action No. 01−CV−9604.  Plaintiffs allege violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 through undisclosed improper underwriting practices concerning the allocation of IPO shares in exchange for excessive brokerage commissions, agreements to purchase shares at higher prices in the aftermarket and misleading analyst reports.  Plaintiffs seek unspecified damages on behalf of a purported class of purchasers of the Company's common stock between March 2, 2000 and December 6, 2000.  The Company's directors and officers have been dismissed without prejudice pursuant to a stipulation.  On February 19, 2003, the Court granted in part and denied in part a motion to dismiss brought by defendants including the Company.  The order dismissed all claims against the Company except for a claim brought under Section 11 of the Securities Act of 1933, which alleges that the registration statement filed in accordance with the IPO was misleading.  In June 2004, a stipulation of settlement and release of claims against the issuer defendants, including the Company, was submitted to the court for approval.  The terms of the settlement, if approved, would have dismissed and released all claims against the participating defendants (including the Company).  In August 2005, the Court preliminarily approved the settlement.  In December 2006, the Court of Appeals for the Second Circuit reversed the Court's October 2004 order certifying a class in six test cases that were selected by the underwriter defendants and plaintiffs in the coordinated proceedings.  The Company's case is not one of the test cases.  Because class certification was a condition of the settlement, it was unlikely that the settlement would receive final Court approval.  On June 25, 2007, the Court entered an order terminating the proposed settlement based on a stipulation among the parties to the settlement.  Plaintiffs have filed amended master allegations and amended complaints in the six test cases.  It is unclear whether there will be any revised or future settlement.  If the litigation proceeds, the Company believes that the Company has meritorious defenses and intend to defend the action vigorously.  The total amount of the loss associated with the above litigation is not determinable at this time.  Therefore, the Company is unable to currently estimate the loss, if any, associated with the litigation.

*Passave Litigation*

In November 2005, the Company filed suit in the Superior Court of California, County of Santa Clara, against Passave, Inc. ("Passave") for breaches of contract and warranties in connection with a semiconductor device sold by Passave, Ltd. (Passave's wholly--owned subsidiary) to the Company.  The Company's complaint alleges that the Passave device, known as the PAS5001M3 chip, has exhibited certain operational malfunctions within some of our Fiber−to−the−Home product line, and has thereby caused damage to the Company.  The parties entered into a settlement agreement, dated August 7, 2007, and have since dismissed all claims with prejudice.

*UTStarcom, Inc. v. Starent Patent Infringement Litigations*

The Company brought suit against Starent Networks Corporation ("Starent") for patent infringement in the U.S. District Court for the Northern District of California.  The Complaint was filed on March 22, 2004, and later amended.  In this action, the Company asserted that Starent infringed the Company's patent U. S. Reg. No. 6,628,671 through the manufacture, use, offer, for sale, and sale of Starent's ST−16 Intelligent Mobile Gateway.  The Company sought damages and injunctive relief.  Starent filed its answer to the Amended Complaint and counterclaims, denying our allegations and seeking a declaration that the patent−in−suit is not infringed, is invalid, and is unenforceable.  A motion for a preliminary injunction against the making, using or selling of infringing products and methods was brought, but the Court denied it on June 17, 2005.  After a claims construction hearing and order, on September 20, 2005, Starent filed a motion for summary judgment of non−infringement and the Company filed a motion for summary judgment that Starent is estopped from asserting invalidity

46

and unenforceability.  On December 6, 2005, the Court granted Starent's motion for summary judgment.  On February 2, 2006, the Court entered judgment in favor of Starent and dismissed the case.  On March 2, 2006 the Company filed an appeal to the Federal Circuit.  On April 6, 2007, after reviewing the parties' briefs and hearing oral argument on April 2, 2007, the Federal Circuit, without a written opinion, affirmed the District Court's judgment and dismissal of the case.  Although the Federal Circuit ruled against the Company, this decision will not have a material adverse effect on the business, financial condition, or results of its operations.

On February 16, 2005, the Company filed a second suit against Starent for patent infringement in the U.S. District Court for the Northern District of California.  In the Complaint, the Company asserts that Starent infringes UTStarcom patent U.S. Reg. No. 6,829,473 ("the '473 patent") through Starent's development and testing of a software upgrade for its customer's installed ST–16 Intelligent Mobile Gateways.  The Company seeks declaratory and injunctive relief.  Starent subsequently filed its answer and counterclaims, denying the Company's allegations and seeking a declaration that the patent–in–suit is not infringed, is invalid, and is unenforceable.  On June 16, 2005, the Company filed a motion to strike Starent's affirmative defense and dismiss Starent's counterclaim alleging inequitable conduct.  On July 19, 2005, the parties stipulated that Starent would file an amended answer and counterclaim by July 27, 2005 and that the Company  would withdraw the Company's motion to strike.  On August 10, 2005, the Company responded to Starent's amended counterclaim filed on July 27, 2005.  In early December 2006, the Company filed a reissue application for the '473 patent with the United States Patent and Trademark Office.  Starent has also filed for reexamination of the '473 patent.  The reexamination and reissue are currently copending.  The litigation is still in a preliminary stage and its outcome cannot be predicted, although the Company believes the litigation has merit.  Nonetheless, the Company believes that any adverse judgment on Starent's counterclaims will not have a material adverse effect on the Company's business, financial condition, or results of operations.

On May 8, 2007, the Company filed a third suit against Starent and sixteen individual defendants (who were all former employees of 3Com's CommWorks division which the Company acquired certain assets of in May of 2003) in the Northern District of Illinois.  The causes of action include claims for patent infringement, misappropriation of trade secrets, intentional interference with business relations and prospective economic advantage and declarations of ownership of certain patent rights.  In its Complaint, the Company asserts that Starent infringes UTStarcom patents U. S. Reg. Nos. 7,173,905; 6,978,128; 6,963,582; 6,975,900; and 6,684,256 through the manufacture, use, offer, for sale, and sale of Starent's ST16 Intelligent Mobile Gateway and ST40 multimedia code platform, that the individual Defendants and Starent have misappropriated valuable Company trade secrets by improperly taking and using  the Company's confidential and proprietary information for the benefit of Starent, that the individual defendants and Starent have interfered with the Company's business relations and prospective economic advantage by using the misappropriated information to obtain and enhance sales of Starent's products, and that several of Starent's patent applications and one issued patent are based on information obtained by the former employees while at the Company (CommWorks) and on that basis belong to UTStarcom.  The Company seeks compensatory damages, punitive damages and injunctive relief.  After the court denied the defendants motion to dismiss the misappropriation of trade secrets claims, on August 30, 2007, Starent answered the Company's complaint, denying the Company's allegations and asserting a number of affirmative defenses and counterclaims, including non–infringement of the subject patents and alleged tortious interference with prospective economic advantage.  The Company has filed a motion to dismiss most of the counterclaims and the court has ordered appointment of a special master to handle discovery, which is just beginning.  The Company believes that any adverse judgment on Starent's counterclaims will not have a material adverse effect on the Company's business, financial condition or results of operations.

*Telemetrix, Inc. Arbitration*

On October 19, 2006, Telemetrix, Inc. ("Telemetrix") filed a formal Request for Arbitration against the Company to the World Intellectual Property Organization ("WIPO") in Geneva, Switzerland.  The Request for Arbitration sought unspecified damages arising from a contract between Telemetrix and Telos Technology, Inc., dated October 22, 2003.  The Company assumed Telos' rights and obligations under this contract pursuant to the Company's purchase of Telos' assets on May 19, 2004.  Telemetrix alleged nine causes of action, including breach of contract, fraud, negligent misrepresentation, interference with contractual relations, and interference with prospective economic advantage.  In December 2006, the Company filed a formal response to the Request for Arbitration, denying all material factual allegations asserted by Telemetrix.  An arbitrator was selected by the parties, and, on August 2, 2007, the arbitrator granted a pleading motion in favor of the Company due to Telemetrix's failure to allege sufficient facts in support of a majority of its causes of action.  On August 17, 2007, Telemetrix filed an Amended Statement of Claim, alleging six causes of action, including breach of contract, fraud, interference with contractual relations and interference with prospective economic advantage.  The previous hearing date of December 11–13 has been vacated.  No hearing date has been rescheduled.  Discovery has begun.

*Telos Technology, Inc. Litigation*

On November 22, 2005, plaintiffs Telos Technology, Inc., Telos Technology (Canada), Inc., Telos Technology (Bermuda) Ltd., and Telos Engineering Limited (collectively, the "Telos Plaintiffs") filed a Complaint against the Company in the Superior Court of California, County of Santa Clara. The Complaint alleges five causes of action, including breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, intentional misrepresentation and negligent misrepresentation, all of which arise from the Asset Purchase Agreement between the parties dated April 21, 2004. The Telos Plaintiffs assert that the Company breached the express and implied terms of the Asset Purchase Agreement and made representations to the Telos Plaintiffs during negotiations that it never intended to fulfill. The Telos Plaintiffs sought at least $19 million in damages, unspecified punitive damages and attorneys' fees. The parties executed a settlement agreement in the amount of $4.5 million on August 20, 2007 and the case was dismissed on September 26, 2007 with prejudice.

*Other Litigation*

The Company is a party to other litigation matters and claims that are normal in the course of operations, and while the results of such litigation matters and claims cannot be predicted with certainty, the Company believes that the final outcome of such matters will not have a material adverse impact on the Company's financial position, results of operations or cash flows.

**17.        SEGMENT REPORTING**

The Company has organized its business in a manner consistent with the chief operating decision makers' view and management of the business. The Company offers products and services through four operating units, (i) Network Solutions, (ii) Personal Communications Division ("PCD") (iii) Handsets and (iv) Service. The Network Solutions operating unit provides its products and services through two reporting segments; Broadband Infrastructure and Wireless Infrastructure. Each reporting segment and operating unit is responsible for managing its own performance.

The Company currently evaluates operating performance of and allocates resources to the reporting segments based on segment gross profit. Cost of sales and direct expenses in relation to productions are assigned to the reporting segments. The accounting policies used in measuring segment assets and operating performance are the same as those used by corporate and are consistently applied across all segments.

Summarized below are the Company's segment sales revenue and gross profit for the three and nine months ended September 30, 2006 and 2005, respectively.

| | Three months ended September 30, | | | | Nine months ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2006 | % Net sales | 2005 As restated | % Net sales | 2006 | % Net sales | 2005 As restated | % Net sales |
| | | | | (in thousands) | | | | |
| **Net Sales by Segment** | | | | | | | | |
| Broadband Infrastructure | $ 50,754 | 8% | $ 31,018 | 5% | $ 152,774 | 9% | $ 414,148 | 19% |
| Wireless Infrastructure | 110,299 | 18% | 77,586 | 13% | 331,997 | 19% | 310,708 | 14% |
| Network Solutions | 161,053 | 26% | 108,604 | 18% | 484,771 | 28% | 724,856 | 33% |
| PCD | 328,701 | 55% | 363,637 | 61% | 917,943 | 52% | 1,021,452 | 47% |
| Handsets | 93,163 | 16% | 106,294 | 18% | 299,266 | 17% | 378,256 | 17% |
| Service | 17,982 | 3% | 18,900 | 3% | 52,426 | 3% | 65,454 | 3% |
| | $ 600,899 | 100% | $ 597,435 | 100% | $ 1,754,406 | 100% | $ 2,190,018 | 100% |

48

| | Three months ended September 30, | | | | Nine months ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2006 | Gross Profit % | 2005 | Gross Profit % | 2006 | Gross Profit % | 2005 | Gross Profit % |
| | | | (As restated) | | | | (As restated) | |
| | | | (in thousands) | | | | | |
| **Gross profit by Segment** | | | | | | | | |
| Broadband Infrastructure | $ (837) | (2)% | $ (13,875) | (45)% | $ 27,138 | 18% | $ 166,958 | 40% |
| Wireless Infrastructure | 54,217 | 49% | 16,332 | 21% | 158,835 | 48% | 77,661 | 25% |
| Network Solutions | 53,380 | 33% | 2,457 | 2% | 185,973 | 38% | 244,619 | 34% |
| PCD | (7,057) | (2)% | 13,199 | 4% | 19,653 | 2% | 42,881 | 4% |
| Handsets | 24,012 | 26% | 13,633 | 13% | 88,521 | 30% | 48,972 | 13% |
| Service | 4,466 | 25% | 8,598 | 45% | 13,395 | 26% | 36,709 | 56% |
| | $ 74,801 | 12% | $ 37,887 | 6% | $ 307,542 | 18% | $ 373,181 | 17% |

Assets by segment are as follows:

| Long−lived assets | September 30, 2006 | December 31, 2005 |
|---|---|---|
| | (in thousands) | |
| Broadband | $ 43,211 | $ 47,480 |
| Wireless | 79,791 | 87,673 |
| Network Solutions | 123,002 | 135,153 |
| PCD | 1,050 | 1,512 |
| Handsets | 43,651 | 47,963 |
| Service | 44,390 | 48,775 |
| | $ 212,093 | $ 233,403 |

| Total assets | September 30, 2006 | December 31, 2005 |
|---|---|---|
| | | (As restated) |
| | (in thousands) | |
| Broadband | $ 399,046 | $ 473,181 |
| Wireless | 927,938 | 1,015,699 |
| Network Solutions | 1,326,984 | 1,488,880 |
| PCD | 424,378 | 420,191 |
| Handsets | 564,142 | 546,910 |
| Service | 87,169 | 95,350 |
| | $ 2,402,673 | $ 2,551,331 |

Sales are attributed to a geographical area based upon the location of the customer. Sales data by geographical areas are as follows:

| | Three months ended September 30, | | | | Nine months ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2006 | % Net sales | 2005 | % Net sales | 2006 | % Net sales | 2005 | % Net sales |
| | | | As restated | | | | As restated | |
| | | | (in thousands) | | | | | |
| **Sales by region** | | | | | | | | |
| United States | $ 328,433 | 54% | $ 359,164 | 60% | $ 924,548 | 53% | $ 987,223 | 45% |
| China | 190,379 | 32% | 175,410 | 29% | 595,505 | 34% | 660,821 | 30% |
| Japan | 30,745 | 5% | 13,635 | 2% | 116,477 | 6% | 398,694 | 18% |
| Other | 51,342 | 9% | 49,226 | 9% | 117,876 | 7% | 143,280 | 7% |
| Total net sales | $ 600,899 | 100% | $ 597,435 | 100% | $ 1,754,406 | 100% | $ 2,190,018 | 100% |

Long–lived assets by geographical areas are as follows:

| | September 30, 2006 | December 31, 2005 |
|---|---|---|
| | (in thousands) | |
| U.S. | $ 14,939 | $ 16,676 |
| China | 190,102 | 204,630 |
| Other | 7,052 | 12,097 |
| Total long–lived assets | $ 212,093 | $ 233,403 |

**18.          TRANSACTIONS WITH RELATED PARTIES AND CERTAIN INVESTEES**

*Softbank and affiliates*

The Company recognized revenue of $29.7 million and $112.0 million for the three and nine months ended September 30, 2006, respectively, and revenue of $13.0 million and $394.6 million during the three and nine months ended September 30, 2005, as restated, respectively, with respect to sales of telecommunications equipment to affiliates of SOFTBANK CORP. ("Softbank"), a significant stockholder of the Company.  In the third quarter of 2006, the Company determined that certain sales to third party resellers are, in substance, sales to Softbank and therefore, the Company has included these amounts in related party sales.   Softbank offers asynchronous digital subscriber line ("ADSL") coverage throughout Japan, which is marketed under the name "YAHOO! BB."  The Company supports Softbank's fiber–to–the–home service through sales of our carrier class Gigabit Ethernet Passive Optical Network ("GEPON") product as well as its multi–service optical transport product ("NetRing™").  In addition, the Company supports Softbank's new internet protocol television ("IPTV"), through sales of our RollingStream™ product.  Included in revenue for the nine months ended September 30, 2006 is a fee of $31.2 million charged for the cancellation of orders for broadband products and $10.0 million charged for the cancellation of orders for wireless infrastructure products.

Included in accounts receivable at September 30, 2006 and December 31, 2005 were $35.2 million and $83.4 million, respectively, related to these agreements.  Sales to Softbank include a three year service period and a penalty clause if product failure rates exceed a certain level over a seven year period.  There were $13.3 million and $19.6 million included in long term deferred revenue with respect to these agreements at September 30, 2006 and December 31, 2005, respectively.  Additionally, there were $11.2 million and $8.0 million included in current deferred revenue at September 30, 2006 and December 31, 2005, respectively.  As of September 30, 2006 there were no customer advances, and as of December 31, 2005 there were $5.4 million included in customer advances related to Softbank agreements.  The Company has an outstanding purchase commitment with Softbank to purchase component parts.  Purchases from Softbank totaled $1.0 million and $1.4 million during the three and nine months ended September 30, 2006, respectively.  There were no purchases from Softbank during the three and nine months ended September 30, 2005, respectively.  The Company has an outstanding accounts payable balance of $2.7 million with Softbank as of September 30, 2006.

During August 2004, the Company entered into several agreements with Japan Telecom Co., Ltd ("JT"), a wholly owned subsidiary of Softbank.  These agreements relate to the sale of *i*AN–8000 equipment with specified value and delivery dates, as well as an oral agreement which subsequently converted into specific service contracts to manage a sales promotional program for JT.  The Company has determined that the service activities revenue should be recorded net of expected promotional spending.

Because the Company had not provided these activities in the past and could not estimate the fair value of these services, the Company determined under the guidance of SAB 104 that all revenue related to these agreements could not be recognized until all goods and services were delivered.  The Company had delivered and received final acceptance for all equipment contemplated under these agreements in the quarter ended March 31, 2005.

The promotional services discussed above involved contracting with third party promotional vendors, who in turn, facilitated the marketing and subscriber recruitment for the JT fiber–to–the–home program.  During the fourth quarter of 2004, the Company determined that it would end its involvement with the JT promotional program after completion of the contract discussed above.  Accordingly, late in the fourth quarter of 2004 and during the first quarter of 2005, the Company either cancelled or assigned to another party all third party contracts with promotional vendors related to the JT contract.  Such termination or assignment of all third party promotional agreements, as well as effective satisfaction of the Company's obligations with JT under such agreements, satisfied the revenue recognition criteria for these agreements and as such, the net value of the promotional services and the value of equipment delivered, which totaled $205.4 million, was reported in the quarter ended March 31, 2005.

50

The Company also entered into an agreement with JT during the third quarter of 2004 to supply chassis equipment. The equipment shipped under this agreement is considered linked to the *i*AN−8000 sale noted above and as such, was also deferred until the completion of the above−mentioned promotional activities. The revenue recognition criteria related to the sale of the *i*AN−8000 equipment was satisfied in the first quarter of 2005 and as such, the revenue related to the chassis sale of $66.5 million was reported in the quarter ended March 31, 2005.

During the three and nine months ended September 30, 2006, sales to Softbank included $2.0 million and $5.2 million, respectively, with regards to telecommunications equipment and services sold to JT. During the three and nine months ended September 30, 2005, sales to Softbank included $2.5 million and $278.6 million, respectively, with regards to telecommunications equipment and services sold to JT.

In June 2006, the Company purchased advertising space and season tickets totaling $0.2 million from a sports franchise owned by Softbank.

On July 17, 2003, the Company entered into a Mezzanine Loan Agreement with BB Modem Rental PLC ("BB Modem"), an affiliate of Softbank. Under the terms of the agreement, the Company loaned BB Modem $10.1 million at an effective interest rate of 12.01% per annum, for the purpose of investing in a portfolio of ADSL modems and associated modem rental agreements, from Softbank. Softbank will continue to service such modems and modem rental agreements. The Company's loan is subordinated to certain senior lenders of BB Modem, and repayments are payable to the Company over a 42−month period through January 31, 2007, with a substantial portion of the principal amount of the loan repaid during the last 16 months of this period. During the three and nine months ended September 30, 2006, the Company recorded $0.1 million and $0.5 million, respectively, in interest income in respect to this loan. The loan receivable at September 30, 2006 and December 31, 2005 was approximately $2.4 million and $9.0 million, respectively and is included in other current assets. The note receivable was paid in full in January 2007.

As of September 30, 2006, Softbank beneficially owned approximately 12.1% of the Company's outstanding stock.

*Acoustek Int'l, Inc.*

In 2005 and 2006, the Company received consulting services from Acoustek Int'l Corp. ("Acoustek"), which employed Minnie Huang, spouse of William Huang, the Company's former Senior Vice President and Chief Technology Officer. Mr. Haung's employment with the Company terminated on December 31, 2006. The Company paid to Acoustek $0.1 million during each of the nine months ended September 30, 2006 and 2005 for consulting services, and a negligible amount during the three months ended September 30, 2006 or 2005.

*Audiovox*

One of the Company's officers also serves as a director for Audiovox Corporation ("Audiovox"). During the three and nine months ended September 30, 2006, the Company paid approximately $0.4 million and $1.1 million, respectively, of IT services from Audiovox.

*Cellon*

In September 2001, the Company invested $2.0 million in Cellon International Holdings Corporation ("Cellon") and made additional investments of $3.0 million each in Cellon in April and December 2002. Cellon designs wireless terminals and related technology for handset manufacturers and private distributors. In November 2005, the Company and Cellon entered into an agreement under which the Company received consideration in the form of preferred stock and warrants of Cellon valued at $5.5 million in exchange for the transfer of fixed assets with a net book value of $3.0 million, a facilities lease and a workforce in place consisting of 156 employees. This transaction was completed on May 31, 2006 and a gain on sale of assets of $2.5 million was recorded in other income. As of September 30, 2006, with the additional shares obtained in the purchase transaction, the Company had an 11% ownership interest in Cellon. This investment is accounted for under the cost method, and its carrying value has been evaluated for possible impairment based on the achievement of business objectives and milestones, the financial condition and prospects of the Company and other relevant factors. For information regarding the Company's investment in Cellon see Note 25.

In November 2005, the Company entered into a Development Service Agreement with Cellon in which $5.0 million was prepaid in exchange for future product development. Approximately $0.7 million and $2.0 million of the prepaid amount has been used in the three and nine months ended September 30, 2006 as payments for design services. The Company may also

51

use the $5.0 million prepayment in satisfaction of royalties Cellon may earn from sales by the Company of products Cellon designs under the Development Services Agreement. This agreement also obligates Cellon to pay the Company a royalty if certain technology shared by the Company to Cellon is used in products developed and sold to customers other than the Company through November 2007.

As of September 30, 2006, the Company had an accounts payable balance of $0.6 million, and an account receivable balance of $0.1 million with Cellon.

*Fiberxon, Ltd.*

The Company has an outstanding purchase commitment with Fiberxon, in which the Company has a 7% ownership interest, to purchase component parts for optical networking products. Purchases from Fiberxon totaled $1.7 million and $2.1 million during the three and nine months ended September 30, 2006, respectively. Purchases from Fiberxon totaled $0.5 million and $8.6 million during the three and nine months ended September 30, 2005, respectively and the Company had $1.1 million and $0.3 million in accounts payable to Fiberxon at September 30, 2006 and December 31, 2005, respectively. As of September 30, 2006 the Company has $0.6 million of open purchase commitments to Fiberxon.

*GCT Semiconductor, Inc.*

The Company has an outstanding purchase commitment with GCT Semiconductor, Inc. ("GCT"), in which the Company has a 2% ownership interest, to purchase component parts. Purchases from GCT for the three and nine months ended September 30, 2006 were $0.5 million and $4.9 million, respectively. As of September 30, 2006, the Company had a $0.5 million accounts payable balance with GCT. The Company had purchases of $0.3 million for the nine months ended September 30, 2005.

*Global Asia Partners L.P.*

Global Asia Partners L.P. is a venture capital fund formed to make private equity investments in private or pre–IPO technology and telecommunications companies in Asia. The general partner of this fund is also a sales agent of the Company. Between June 2002 and April 2005, the Company invested a total of $2.6 million in the fund. As of September 30, 2006 and December 31, 2005, the Company had 49% of the fund's outstanding partnership units. The Company had a commitment to invest up to a maximum of $5.0 million. As the result of a reorganization of capital contributions by the partners, reached in April 2005, our capital contribution of $0.5 million in April 2005 was the final capital contribution to be made. In addition, the agreement allows the partnership to re–invest up to $2.5 million that otherwise would have been available to us as future distributions. There were no cash distributions during the three or nine months ended September 30, 2006 or 2005.

*Immenstar*

The Company has an outstanding purchase commitment with Immenstar, in which the Company owns Series A preferred stock, to purchase component parts. The Company's purchases from Immenstar totaled $1.3 million and $1.8 million during the three and nine months ended September 30, 2006, respectively. As of September 30, 2006, the Company had $0.3 million accounts payable balance and $4.5 million of open purchase commitment to Immenstar.

*Matsushita Joint Venture*

In July 2002, the Company entered into a joint venture agreement with Matsushita Communication Industrial Co., Ltd. to jointly design and develop, manufacture and sell telecommunication products. The Company had a 49% ownership interest in the joint venture company. As of December 31, 2005, the Company had a receivable of $0.1 million. In December 2005, the partners agreed to dissolve the joint venture, which was completed by June 30, 2006.

*MDC Holding, Ltd.*

The Company had an outstanding accounts receivable balance with MDC Holding, Inc. ("MDC") related to a PAS system purchase of $1.3 million at September 30, 2006. There was no accounts receivable balance at December 31, 2005. Certain employees of the Company were shareholders of MDC as of September 30, 2006. MDC is in the business of providing value–added services, such as short message, voicemail or ring–tone services for PAS telecom networks.

*ORG, Inc.*

As of September 30, 2006, the Company had a 49% ownership in Global Asia Partners L.P. which in turn was a significant shareholder in ORG, Inc. During the three and nine months ended September 30, 2006, the Company had sales of $1.4 million and $1.6 million to ORG, Inc. During the three and nine months ended September 30, 2005 the Company had $0.3 million and $0.5 million in sales to ORG, Inc. The Company had a $1.3 million and $0.2 million receivable as of September 30, 2006 and December 31, 2005, respectively.

*Starcom Products, Inc.*

The Company obtains engineering consulting and employee placement services from Starcom Products, Inc. ("Starcom"), which is 31% owned by an individual related to one of the Company's former officers who was also a member of the Company's Board of Directors. In the three and nine months ended September 30, 2005, the Company obtained services from this entity in the amount of $0.1 million and $0.6 million, respectively. There were no such services performed during the three and nine months ended September 30, 2006.

*Xalted Networks, Inc.*

The Company received purchase orders from Xalted Networks, in which the Company owns preferred stock, totaling approximately $1.3 million in 2005 for telecommunications equipment that is for product not typically sold by the Company to other customers. The Company is charging a ten percent procurement fee to Xalted for obtaining and reselling these products. The equipment was delivered but revenue has not been recognized as the revenue recognition process had not been completed.

**19.    RESTRUCTURING COSTS**

In 2005 the Company incurred $35.3 million in expenses in relation to the restructuring plan actions, primarily consisting of (i) $15.2 million related to severance payments (ii) $14.5 million in asset impairments primarily related to the write–off of equipment and licenses associated with discontinued products, which are included in operating expenses and (iii) $5.6 million in inventory write–off associated with discontinued products. Included in severance is a $1.8 million non–cash reversal of a housing allowance accrual in China. As of September 30, 2006 and December 31, 2005, a total of 1,595 employees were terminated or placed in the workforce reduction programs pursuant to the plan.

A summary of the restructuring accrual related to the 2005 charge during the nine months ended September 30, 2006, is as follows:

| | December 31, 2005 Balance | Cash payment | Non–cash settlement | September 30, 2006 Balance |
|---|---|---|---|---|
| | | (in thousands) | | |
| **Broadband** | | | | |
| Severance payments | $         50 | $        (50) | $        — | $        — |
| **Handsets** | | | | |
| Severance payments | 29 | (29) | | — |
| Exit cost | 350 | | (350) | — |
| **Corporate** | | | | |
| Severance payments | 207 | (207) | | — |
| Exit cost | 579 | | (274) | 305 |
| **Summary Totals** | | | | |
| Severance payments | 286 | (286) | | — |
| Exit cost | 929 | — | (624) | 305 |
| **Total** | $     1,215 | $      (286) | $     (624) | $        305 |

20.     **OTHER INCOME AND EXPENSES:**

The other income (expense) balances in the three and nine months ended September 30, 2006 and 2005 are comprised of the following items:

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| | (in millions) | | | |
| Foreign exchange gains (losses) | $ 0.4 | $ 7.3 | $ 6.1 | $ (7.3) |
| Dividend income | 1.0 | — | 1.7 | — |
| Chinese government financial subsidy | 0.5 | — | 1.3 | 0.5 |
| Japan consumption tax refund | — | — | — | 6.0 |
| Gain on sale of assets | — | — | 2.5 | — |
| Other | (0.1) | 0.1 | 0.7 | (0.9) |
| Total | $ 1.8 | $ 7.4 | $ 12.3 | $ (1.7) |

21.     **CREDIT RISK AND CONCENTRATION**

During the three months ended September 30, 2006 two customers accounted for approximately 17% and 12% of net sales. In the nine months ended September 30, 2006 two customers accounted for approximately 13% and 10% of net sales. During the three months ended September 30, 2005 two customers accounted for 17% and 10% of net sales. For the nine months ended September 30, 2005 two customers accounted for approximately 18% and 11% of net sales. As of September 30, 2006 no customer accounted for more than 10% of accounts receivable, while one customer accounted for 13% of accounts receivable as of December 31, 2005.

Approximately 23% and 20% of the Company's net sales during the three months ended September 30, 2006 and 2005, respectively, and approximately 32% and 22% of the Company's net sales during the nine months ended September 30, 2006 and 2005, respectively, were to entities affiliated with the government of China. Accounts receivable balances from these China government affiliated entities or state owned enterprises were $263.8 million and $268.8 million, respectively, as of September 30, 2006 and December 31, 2005. The Company extends credit to its customers in China generally without requiring collateral. In global sales outside of China, the Company often requires letters of credit from its customers. The Company monitors its exposure for credit losses and maintains allowances for doubtful accounts.

Approximately 32% and 29% of the Company's sales for the three months ended September 30, 2006 and 2005, respectively, and approximately 34% and 30% of the Company's sales for the nine months ended September 30, 2006 and 2005, respectively, were made in China. Accordingly, the political, economic and legal environment, as well as the general state of China's economy, may influence the Company's business, financial condition and results of operations. The Company's operations in China are subject to special considerations and significant risks not typically associated with companies in the United States. These include risks associated with, among others, the political, economic and legal environments and foreign currency exchange. The Company's results may be adversely affected by, among other things, changes in the political, economic and social conditions in China, and by changes in governmental policies with respect to laws and regulations, changes in China's telecommunications industry and regulatory rules and policies, anti–inflationary measures, currency conversion and remittance abroad, and rates and methods of taxation.

Approximately 5% and 2% of the Company's sales for the three months ended September 30, 2006 and 2005, respectively, and approximately 6% and 18% of the Company's sales for the nine months ended September 30, 2006 and 2005, respectively, were made in Japan. Accordingly, the political, economic and legal environment and the general state of Japan's economy may influence the Company's business, financial condition and results of operations.

22.     **INCOME TAX ASSETS AND LIABILITIES**

In establishing its deferred income tax assets and liabilities, the Company makes judgments and interpretations based on the enacted tax laws and published tax guidance applicable to its operations as well as the amount and jurisdiction of future taxable income. The Company records deferred tax assets and liabilities and evaluates the need for valuation allowances to reduce the deferred tax assets to realizable amounts. The Company will maintain a full valuation allowance on its net deferred tax assets in China, the United States, and other countries until an appropriate level of profitability that generates taxable income is sustained or until it is able to develop tax strategies that would enable the Company to conclude that it is more likely than not that a portion of our deferred tax assets will be realizable. Any reversal of valuation allowances will favorably impact our results of operations in the period of the reversal.

54

The Company is subject to income taxes in both the United States and numerous foreign jurisdictions. Significant judgment is required in evaluating the Company's tax positions and determining the Company's provision for income taxes. During the ordinary course of business, there are many transactions and calculations for which the ultimate tax determination is uncertain. The Company establishes reserves for tax–related uncertainties based on estimates of whether, and the extent to which, additional taxes and interest will be due. These reserves are established when, despite the Company's belief that its tax return positions are fully supportable, the Company believes that certain positions are likely to be challenged and may not be sustained on review by tax authorities. The Company adjusts these reserves in light of changing facts and circumstances, such as the closing of a tax audit. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate, as well as the related net interest. In the fourth quarter of 2006, the Company recorded a $29.0 million income tax benefit related to the settlement of a tax audit in China on October 18, 2006 for the 2003 through 2005 tax years for UTStarcom Telecom Co., Ltd. ("HUTS") and Hangzhou UTStarcom Telecom Co., Ltd ("HSTC"), two of the Company's subsidiaries in China and the acceptance of its tax holiday for HSTC.

Income tax expense was $1.5 million and $125.2 million for the three months ended September 30, 2006 and 2005, respectively. Income tax expense was $9.0 million and $134.0 million for the nine months ended September 30, 2006 and 2005, respectively. There are two primary reasons why the Company has tax expense while the Company has pretax losses. First, the Company has not provided any tax benefit on the forecasted current year losses incurred and tax credits generated in the United States and other countries, because management believes that it is more likely than not that the tax benefit associated with these losses will not be realized. Second, the Company continues to accrue tax expense in jurisdictions where the Company has been historically profitable. Estimates of the annual effective tax rate at the end of the interim periods are based on evaluations of possible future events and transactions and may be subject to subsequent refinement or revision.

The Company's income tax returns for 2003 though 2005 are currently under audit by the Internal Revenue Service. The Company is also under audit by the taxing authorities in China on a recurring basis.

23.    **VARIABLE INTEREST ENTITIES**

The FASB issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities", and ("FIN 46"). FIN 46 requires that if an entity is the primary beneficiary of a variable interest entity ("VIE"), the assets, liabilities, and results of operations of the VIE should be included in the consolidated financial statements of the entity.

During the fourth quarter of 2005, the Company provided an interest free, $12.4 million loan to a party in China as seed capital for a venture organized to participate in providing technical service, networking technology, and equipment to the emerging market for IPTV products in China. The loan is partially secured by an indirect ownership interest in the venture, is payable in 10 years and may be called early without penalty. As a result of the foregoing, and the fact that the venture's continuing viability is heavily dependent on the further provision of network and terminal equipment by the Company, the Company has determined that the venture is a VIE and that the Company is the primary beneficiary of the venture. Therefore, this venture is consolidated into the Company's results as of September 30, 2006. This VIE had insignificant revenue during the three and nine months ended September 30, 2006, and had net losses of $0.3 million and $1.7 million during the three and nine months ended September 30, 2006. The consolidation of this VIE represented $17.6 million and $18.9 million of both the total assets and total liabilities and equity of the Company as of September 30, 2006 and December 31, 2005. The liabilities of the VIE consolidated by the Company do not represent additional claims on the Company's general assets; rather they represent claims against the specific assets of the VIE. Likewise, the assets of the VIE consolidated by the Company do not represent additional assets available to satisfy claims against the Company's general assets. The creditors' of the VIE do not have recourse to the Company thereby limiting the liability risks associated with the Company's variable interests in the VIE.

In the first quarter of 2005, the Company invested in an additional entity, which is considered a VIE where the Company was the primary beneficiary and did not hold a majority voting interest. The VIE was established to install, develop and operate a PAS network in Mongolia. The creditors of this VIE have no recourse to the Company. In December 2005, the U.S. Embassy in Mongolia informed the Company that it had forwarded to the Department of Justice allegations that an agent of the joint venture had offered payments to a Mongolian government official, in possible violation of the Foreign Corrupt Practices Act. The Audit Committee authorized an independent investigation into the matter. As a result of the investigation, the Company wrote off $1.2 million of intangibles and established a $2.6 million VAT liability at December 31, 2005. The investigation is still ongoing. The consolidation of this entity resulted in a $6.0 million increase in both total assets and total liabilities and equity as of December 31, 2005. In the first quarter of 2006, the Company decided to terminate the joint venture arrangement and wrote off the remaining net assets, of approximately $4.7 million.

55

**24.     RECENT ACCOUNTING PRONOUNCEMENTS**

In June 2006, the FASB issued FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109" ("FIN 48"). The interpretation contains a two–step approach to recognizing and measuring uncertain tax positions accounted for in accordance with SFAS No. 109, "Accounting for Income Taxes." The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement. The Company adopted the provisions of FIN 48 as of January 1, 2007, which resulted in a $1.4 million increase to the liability for uncertain tax positions offset by a reduction to the opening balance of retained earnings.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements," ("SFAS 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. The provisions of this standard apply to current accounting pronouncements that require or permit fair value measurements. SFAS 157 becomes effective for the Company on January 1, 2008. Upon adoption, the provisions of SFAS 157 are to be applied prospectively with limited exceptions. The Company is currently evaluating the effects of SFAS 157 on its consolidated financial statements.

In September 2006, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 108, "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements" ("SAB 108"). SAB 108 requires analysis of misstatements using both an income statement (rollover) approach and a balance sheet (iron curtain) approach in assessing materiality and provides for a one–time cumulative effect transition adjustment. SAB 108 is effective for annual financial statements for the first fiscal year ending after November 15, 2006. The Company adopted SAB 108 during the fourth quarter of 2006. The adoption of SAB 108 had no impact on the Company's consolidated financial statements.

In February 2007, The FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("SFAS 159"). This statement permits, but does not require, companies to report at fair value the majority of recognized financial assets, financial liabilities and firm commitments. Under this standard, unrealized gains and losses on items for which the fair value option is elected are reported in earnings at each subsequent reporting date. SFAS 159 becomes effective for the Company on January 1, 2008. The Company is currently evaluating the effects of SFAS 159 on its consolidated financial statements.

**25     SUBSEQUENT EVENTS**

**First and Second Supplemental Indentures and Notice of Default**

After receiving the notice of default from the Trustee referred to in Note 14 above, the Company solicited and obtained the requisite consents from holders of the convertible subordinated notes due in March 2008 to a waiver effective January 9, 2007 of any default which may have occurred prior to such date due to the delay in filing and non–compliance with certain covenants, and the Company and the trustee entered into a First Supplemental Indenture, dated January 9, 2007, providing that any failure by the Company to comply with certain covenants of the original indenture would not result in a default or an event of default through May 31, 2007. The First Supplemental Indenture provided for additional interest at a rate of 6.75% per annum in special interest on the notes from and after January 9, 2007 to the March 1, 2008 maturity date of the notes, unless the notes are earlier repurchased or converted. Payments of the special interest were to be made in addition to and at the same time and in the same manner as regularly scheduled payments of interest to holders entitled to such regularly scheduled payments of interest. As a result of the First Supplemental Indenture, the convertible subordinated notes accrued interest at a rate of 7.625% per annum as of January 9, 2007.

On May 31, 2007, the Company received a notice of default from the trustee for the notes asserting that a default had occurred due under the indenture, as amended by the First Supplemental Indenture ("the Indenture") with respect to the Company's convertible subordinated notes due in March 2008. The specific purported defaults referred to in the notice of default were (1) the Company's failure to file its Quarterly Report on Form 10–Q for the fiscal quarter ended September 30, 2006, its annual report on Form 10–K for the year ended December 31, 2006 and its Quarterly Report on Form 10–Q for the fiscal quarter ended March 31, 2007 and (2) the Company's failure to deliver to the Trustee the officer's certificate of compliance of the Company required by the Indenture.

Subsequently, the Company solicited and obtained the requisite consents from the holders of the notes to a waiver, effective July 26, 2007, of any default which may have occurred prior to such date due to the delay in filing and non–compliance with certain covenants, and the Company entered into a Second Supplemental Indenture with the trustee, dated July 26, 2007, after receiving consent from holders of more than 50% of the outstanding aggregate principal amount of the convertible

subordinated notes in connection with the Company's consent solicitation announced July 19, 2007. The Second Supplemental Indenture provides that the convertible subordinated notes accrue additional interest at a rate of (a) 6.75% per annum in special interest from and after January 9, 2007 to and including July 25, 2007, and (b) 10% per annum in special interest from and after July 26, 2007 to the date the notes are paid, prepaid, redeemed converted or otherwise cease to be outstanding.   The special interest rate provided by the Second Supplemental Indenture represents an increase of 3.25% per annum over the special interest rate of 6.75% provided by the First Supplemental Indenture. As a result of the Second Supplemental Indenture, the convertible subordinated notes now bear a stated interest rate of 10.875%. Payments of special interest will be made in addition to, and at the same time and in the same manner as, regularly scheduled payments of interest to holders entitled to such regularly scheduled payments of interest.

The Second Supplemental Indenture also provides that (i) during the period from and including July 26, 2007 to and including October 15, 2007 ("Covenant Reversion Date"), any failure by the Company to comply with the covenants contained in the original agreement related to the filing of reports required to be filed with the SEC, and the furnishing of copies of the SEC reports and certain compliance certificates to the Trustee, will not constitute a default, and that (ii) if, but for the Second Supplemental Indenture, a default would be deemed to have occurred as a result of a failure to comply with such covenants and such default remains uncured and is continuing as of the Covenant Reversion Date, such default will be deemed to have occurred on the Covenant Reversion Date.

**ImmenStar**

In February 2007, ImmenStar was acquired by Cortina Systems, Inc. In exchange for the Company's investment in ImmenStar, the Company received 4 million shares of Series D Preferred Stock of Cortina Systems, Inc., $1.8 million cash in March 2007 and is entitled to receive an additional $0.2 million currently held in escrow. As a result of the acquisition, the Company recorded a gain on investment of $2.8 million, in other income, net, and owns 1.3% interest of Cortina Systems, Inc. on a fully diluted basis.

**Committed Receivables Agreement**

On March 30, 2007, the Company amended and restated its committed receivables purchase facility with Citibank, N.A., which provides for the sale of up to $100.0 million of trade accounts receivable of our PCD segment, to reflect that the purchase of trade receivables shall be at the sole discretion of Citibank, N.A.

**Impairment of Investment in Cellon and Liquidation of Assets**

In the fourth quarter of 2006, the Company reviewed its long-term investment in Cellon. The review included, but was not limited to, a review of Cellon's cash position, recent financing activities, financing needs, earnings/revenue outlook, operational performance, management/ownership changes, and competition. Based on the deterioration of Cellon's financial condition that resulted from significant adverse changes in Cellon's business in the fourth quarter of 2006, the Company determined that the carrying value of the investment was at an amount above the fair value of the investment, and the decline was other-than temporary. As of December 31, 2006, the Company recorded a $13.5 million other-than-temporary impairment charge for this investment in other income, net and recorded an operating expense of $3.0 million to write-off a prepayment to Cellon. On June 18, 2007, a meeting of Cellon's shareholders was held where a resolution was passed to place Cellon in voluntary liquidation.

**Infinera Initial Public Offering**

On June 7, 2007, Infinera Corporation ("Infinera") closed on its initial public offering of 14,000,000 shares of common stock at a price of $13.00 per share. Infinera also announced that the underwriters of the offering exercised in full their option to purchase an additional 2,100,000 shares of Infinera common stock, bringing the total initial public offering size to $209.3 million. After the initial public offering, the Company is entitled to convert its 669,643 shares of Series D and 2,500,000 shares of Series E Preferred Stock into 792,410 shares of Infinera's common stock; subject to Rule 144 trading restrictions and 180 days lock up period starting June 2007 through December 2007.

As a result of the initial public offering, the value of the Infinera shares owned by the Company was readily determinable and the investment was classified as an equity security available-for-sale in accordance with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities." The closing price per share of Infinera common stock on June 29, 2007 was $24.92 and the value of the Company's investment was $19.7 million. In the second quarter of 2007, the Company recorded an unrealized gain of $17.8 million, in other comprehensive income, representing the difference between the fair value of the investment on June 29, 2007 and the initial investment amount of $1.9 million.

57

**Fiberxon merger with MRV Communications**

On July 1, 2007, Fiberxon, an investment in which the Company has a 7% ownership interest, completed a merger with MRV Communications ("MRV"). In exchange for the Company's investment in Fiberxon, the Company will receive approximately $1.5 million in cash, 1.5 million shares of MRV common stock and deferred consideration of approximately $2.7 million. The deferred consideration becomes payable upon the completion of certain milestones and may be reduced by legitimate claims of MRV for certain matters related to the merger.

58

**ITEM 2—MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**
**FORWARD–LOOKING STATEMENTS**

This Quarterly Report on Form 10–Q contains forward–looking statements within the meaning of the federal securities laws. These statements are based on information that is currently available to management. We intend such forward–looking statements to be covered by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, and we are including this statement for purposes of complying with those provisions. The forward–looking statements include, without limitation, those concerning the following: our expectations regarding our compliance with SEC reporting requirements and NASDAQ listing requirements; our expectations as to the nature of possible market trends; our expectations regarding continued growth in our business and operations; our expectations regarding fluctuations in gross profit; our plans regarding payment of cash dividends; our plans regarding legal proceedings; our expectations regarding the effect of legal proceedings and government inquiries; our expectations regarding the functionality, performance and features of our products; our expectation regarding Softbank's continued service of certain modems and modem rental agreements; our plans and expectations regarding relationships with vendors and suppliers; our plan to fulfill the purchase commitment under various orders from our suppliers; our expectations regarding the exchange rate risks with respect to accountable receivables and payables in Renminbi, Japanese Yen and Euros; our plans regarding the use of financial instruments to hedge against certain foreign currency exchange rate risks; our plans regarding the discounting of certain bank notes and commercial notes; our expectations regarding our ability to raise funds, including the impact of late filing of our reports with the SEC on our ability to raise funds; our expectations regarding the availability of funding under the account receivable financing program with Citibank, N.A.; and our plan to continue service the account receivable; our expectations regarding our investment in Global Asia Partners L.P.; our expectations regarding our right to intellectual property embedded in our products; our expectations regarding our ability to protect our intellectual property; our expectations regarding the effect of market risks on our operating results; our plans to implement measures to remediate material weaknesses; our expectations regarding the effectiveness of remediation measures; our plans to continue to review internal controls; our expectations regarding competition and the competitive advantages of our competitors; our expectations regarding consolidation of the telecommunications industry; our expectations regarding the development and introduction of new and more advanced products; our expectations regarding deployment of our products; our plans and expectations regarding our workforce restructurings; our expectation regarding the adoption of environmental, health and safety laws by countries world–wide; our expectations regarding the effect of the Sarbanes–Oxley Act on our corporate governance and disclosure practices; our expectation regarding the expenses associated with compliance with the Sarbanes–Oxley Act; our expectations regarding the impact of the restatement of our consolidated financial statements; our expectations regarding the maturation of the PAS market and corresponding decrease in PAS subscriber growth; our expectations regarding the long–term demand for our PAS products; our expectations regarding our ability to offset the decline in PAS sales through pursuing other products; our expectations regarding PAS system spending; our plan to pursue opportunities for our wireless infrastructure products in multiple markets; our expectations regarding our investment in and development of the IPTV market; our expectations regarding product margins; our expectations regarding our annual effective tax rate; our expectations regarding the likelihood to realize the tax benefits in the U.S. and other countries; our expectations regarding the effect of the China Corporate Income Tax Law on our future tax expenses; our expectations regarding valuation allowance on our net deferred tax assets and its impact; our expectations regarding our level of capital expenditures in China; our plans to maintain adequate liquidity levels through at least the next 12 months; our expectations regarding the availability and sufficiency of credit lines from lenders; our plans to issue new debt instruments, sell investments and assets; our expectations regarding refinancing of the convertible notes and access to cash in our China subsidiaries to meet our liquidity requirements outside of China; our expectations regarding interest rates; our expectations regarding sufficiency of cash resources; our expectations regarding our ability to receive licenses for our products; our expectation that our business, financial condition and results of operations will continue to be significantly influenced by the political, economic, legal and social environment in China and other international markets, including Japan, India and Europe; our expectations regarding the nature of political, economic and legal reform in China; our expectations regarding the continued importance of the Chinese market for our technologies and development and the importance of sales in China to our operating results; our expectations regarding future sales generated from China as a percentage of total sales; our expectations regarding the impact of our receiving the license to sell GSM and CDMA handsets in China on our ability to meet future market demands; our expectations regarding subscriber growth in China; our

expectations regarding global expansion of sales outside of China; our expectation that research and development expenses will be stable; our expectations regarding future amortization expenses; our expectations regarding the impact of product defects or performance quality issues; our expectations regarding the impact of international expansion on our management, operational, financial and other resources; our expectations regarding the impact of legislation that restricts or prohibits the use of wireless handsets while driving on our future sales; our plans regarding improvement of our internal supply chain and inventory management processes; our expectations regarding the reliability of stock−based compensation valuation models and the impact of SFAS 123R; and our expectations regarding our ability to implement and enhance our administrative infrastructure. Additional forward−looking statements may be identified by the words "anticipate," "expect," "believe," "intend," "will," "may," and similar expressions, as they relate to us or our management, or by the words "designed," "intended" and similar expressions, as they relate to our products and services. Investors are cautioned that these forward−looking statements are inherently uncertain. These statements are subject to risks and uncertainties that may cause actual results and events to differ materially. For a detailed discussion of these risks and uncertainties, see Part II, Item 1A "Risk Factors" of this Form 10−Q. We do not guarantee future results and undertake no obligation to update the forward−looking statements to reflect events or circumstances occurring after the date of this Form 10−Q.

## RESTATEMENT OF CONSOLIDATED FINANCIAL STATEMENTS

Our consolidated financial statements and related financial information included in this Quarterly Report on Form 10−Q for accounting periods prior to the third quarter of 2006 have been restated, as described below.

### Summary

In July 2007, the Company announced the Audit Committee was conducting an independent investigation of historical sales with certain customers in China and stated that it could not rule out the possibility that the outcome of the investigation could impact revenue recognized for certain of such contracts as recorded in previously issued financial statements. In September 2007, the Company announced the investigative phase of the Audit Committee's investigation had been completed. After consultation with and upon the recommendation of management, the Audit Committee determined revenue in the Company's Western Region of China was recognized earlier than it should have been and that the financial statements for the affected periods should be restated. The Company also announced that its previously issued financial statements for each of the fiscal years ended December 31 in the period 2000 through 2005, the financial statements for the interim periods contained in the Quarterly Reports on Form 10−Q filed with respect to each of these years, and the quarterly reports on Form 10−Q filed with respect to each of the quarterly periods ended March 31 and June 30, 2006 should not be relied upon. In this Quarterly Report we have corrected for the effects of net sales and related costs of net sales that were recorded earlier than they should have been. The net effect for the three and nine months ended September 30, 2005 was to reduce and defer previously recognized revenue and gross profit of $34.6 million and $15.1 million, respectively, and $63.7 million and $29.4 million, respectively.

We also conducted a voluntary review of historical stock option practices under the direction of the Nominating and Corporate Governance Committee of our Board of Directors ("Governance Committee"). This review considered all option grant awards made in the period from February 29, 2000, shortly before the initial public offering of our Common Stock, through August 2006 for compliance with the various stock−based compensation accounting standards applicable during this period as well as the rules of our stock option plans. We found that in a number of instances we did not use the proper date as the measurement date in determining whether stock options had been issued with exercise prices below the fair value of our common stock. Therefore, we have restated our previously issued financial statements for the years ended December 31, 1998 through 2005 to account for an additional $25.5 million of stock compensation expense that should have been recognized over the period together with an equal increase in additional paid−in capital to recognize the intrinsic value assigned to these issuances of equity securities. Related adjustments of payroll and income taxes resulted in an additional $0.5 million of expense being recognized for the 1998 through 2005 period and total stockholders' equity being reduced by a total of $2.1 million at December 31, 2005. During the first six months of 2006 an additional $1.2 million of stock compensation expense was recognized, which reduced our previously reported operating results for this period. During the three and nine months ended September 30, 2005 (in thousands), stock compensation expense totalling $76 and ($1,470), respectively, was recognized.

In restating our previously issued financial statements for the investigations described above, we also corrected other previously reported amounts. We corrected our reporting for $80.3 million of net sales to certain third party resellers and $41.2 million of associated cost of net sales in 2005 to classify these amounts as related party net sales and related party cost of net sales classifications, respectively, because in 2006 we determined that sales to these entities were, in substance, sales to one of our significant shareholders, SOFTBANK CORP. The accounts receivable from these sales was similarly reclassified into accounts receivable from related parties in our 2005 balance sheet. We also corrected our reporting of $6.3 million of time deposits at March 31 and June 30, 2006 because they did not mature within three months. Formerly the time deposits had been reported in error as cash equivalents, but now these amounts are included in short−term investments in these balance sheets and in the statements of cash flows for the March and June 2006 reporting periods. The corrections for the three and nine months ended September 30, 2005 interim periods have been recorded in the condensed consolidated financial statements included herein. See also Exhibit 99.1 of our Annual Report on Form 10−K for the year ended December 31, 2006 for the impact of the restatement on all quarterly periods for 2005 and 2006.

None of these restatements had any effect on any of our December 31 cash balances; however, cash equivalents were reduced in the March and June 2006 periods due to the reclassifications described above.

Additional information about these restatements and their effects on our financial statements is presented below as well as in the Notes to Condensed Consolidated Financial Statements.

*China Sales Investigation*

The Audit Committee of the Company's Board of Directors ("Audit Committee") engaged independent counsel to conduct an investigation of sales in China following a determination by the Internal Audit group that allegations of improper activities in a sales office in the Western Region were credible. The allegations were made by a Company employee using the Company's whistle blower program. The independent counsel engaged forensic accountants, and this group is collectively referred to as the Investigating Team in the rest of this discussion.

In conducting its procedures, the Investigating Team found instances where the customer contracts that evidenced the arrangement contained obligations for the Company to deliver software upgrades when and if made available for the equipment sold for no additional consideration and for an unspecified period that could extend over the term of the contract. This additional contract obligation is an element of "post contract support." In these cases, the Investigating Team found that the contract documentation for the same transaction submitted by the sales office to the Company's China headquarters for accounting purposes and utilized by the Company in determining the amount of revenue recognized did not include evidence of such post contract support obligations.

Accounting standards governing revenue recognition for system sales require all revenue to be deferred while there are undelivered elements under the arrangement unless the seller has established vendor specific objective evidence ("VSOE") of fair value for such contract elements. Because these arrangements included such undelivered elements, revenue should be deferred based on the VSOE of the fair value of the underlying elements. VSOE of fair value represents the price charged when the same element is sold separately. Since the Company does not sell this element separately, it has not established VSOE for such undelivered elements, and as such the revenue from such contracts is required to be deferred and recognized over the period the Company is obligated to provide the post contract support.

The China sales investigation covered each of the seven years in the period ended December 31, 2006 and included:  investigating approximately 1,200 contracts in all of our five regions in China; reviews of the electronic files of 45 employees; and formal interviews of 96 employees in China. Additionally, the China sales investigation included reviewing contract files, performing various financial analyses including comparison of payments received per our accounting records to the contract terms, and computer forensic procedures where destruction of electronic documents was suspected. In the aggregate, the Investigating Team expended approximately 25,000 hours in conducting this investigation, which commenced in February 2007 and was completed in September 2007 when the independent counsel and forensic accountants presented their final report to the Audit Committee. In July 2007, we announced the Audit Committee was conducting an independent investigation of historical sales with certain customers in China and we stated that we could not rule out the possibility that the outcome of the investigation could impact revenue recognized for certain of such contracts as recorded in our previously issued financial statements.

Upon completion of the investigative phase of the independent investigation by the Audit Committee, our management:

- conducted follow-up procedures to attempt to locate any additional relevant information to ensure the Company considered all available information and documents;

- evaluated the accounting for identified system sales using the contract template and documentation found in the sales contract files from the Western Region offices. This included calculating the financial statement effects of correcting the accounting for all system sales where the contract template found at our sales offices contained post contract support obligations to recognize revenue and cost of net sales over estimated period of post contract support;

- concluded that as a result of the existence of this undelivered post contract support obligation our previously issued financial statements should be restated to defer system sales contract revenue and the related cost of net sales over the estimated period of post contract support when a contract contained unspecified software upgrade rights.

61

The Audit Committee concurred with management's decisions.

The effect of correcting improperly recognized revenue and cost of net sales is to (reduce) increase previously reported net sales, gross profit and net income by the following amounts (in thousands of dollars):

| Year ended December 31, | | Net sales | Gross profit | Net income |
|---|---|---|---|---|
| | 2000 | $ (12,408) | $ (5,294) | $ (4,781) |
| | 2001 | (17,154) | (6,330) | (5,779) |
| | 2002 | (64,732) | (22,924) | (19,697) |
| | 2003 | (21,060) | (8,014) | (6,382) |
| Totals through December 31, 2003 | | (115,354) | (42,562) | (36,639) |
| | 2004 | (104,965) | (27,241) | (18,594) |
| | 2005 | (58,232) | (27,863) | (42,433) |
| 2000 − 2005 Total | | (278,551) | (97,666) | (97,666) |
| 2006 quarter ended | | | | |
| | March 31 | 5,410 | 1,360 | 1,360 |
| | June 30 | 2,380 | (371) | (371) |
| Total China Sales Restatement | | $ (270,761) | $ (96,677) | $ (96,677) |

The cumulative effect of all of the China sales restatement adjustments to our consolidated balance sheet as of December 31, 2003 resulted in a decrease in retained earnings of $36.6 million, an increase in deferred revenue of $115.4 million to account for previously recognized sales, an increase in deferred costs of $75.7 million to account for previously recognized cost of net sales, and an increase in deferred tax assets of $3.0 million. In our consolidated balance sheet at December 31, 2006, deferred revenue is $275.7 million, of which $35.6 million is classified as current and $240.1 million as non−current, and the deferred costs balance is $176.6 million. These amounts will be recognized in our consolidated statements of operations over the estimated remaining period of post contract support.

Due to this restatement, we decreased net sales, gross profit, and net income (in thousands) for the three and nine month periods ended September 30, 2005 as follows: $34,610 and $63,671; $15,062 and $29,429; and $29,186 and $43,999, respectively. In our consolidated balance sheet at September 30, 2006 the net reduction in previously recognized net sales is accounted for as deferred revenue, of which $34.5 million is classified as current and $240.3 million as non−current, and the related net reduction in cost of net sales of $177.0 million is accounted for as deferred costs. These amounts will be recognized in our consolidated statements of operations over the estimated remaining period of post contract support.

Upon completing its investigation, the Audit Committee concluded that the conditions and practices relating to systems contracts prevalent in the Western Region resulted primarily from the failure to prevent or detect instances of override related to controls in China over customer agreements, lack of proper management oversight, unclear record retention policies and procedures relating to systems contracts, and inadequate employee training. The Investigating Team and the Audit Committee also concluded that with respect to four regions other than the Western Region there was no evidence of fraud or misconduct or reason to suspect such occurred. The Investigating Team and the Audit Committee also concluded that there was no credible evidence of knowledge by senior management in China or the United States of the conditions and practices related to the Western Region of China that were discovered in the investigation. The Audit Committee concluded that local management in several of the sales offices in the Western Region of China did not submit appropriate information to the Company's senior management in China and the United States. Therefore, in prior years, neither the Company's management nor the Company's independent registered accounting firm were able to properly evaluate the effect of that information on revenue recognition. The Audit Committee also concluded that certain members of management in China bear varying degrees of responsibility for inadequate oversight of activities. As a result, certain employees in China have either been terminated or placed on suspension for failure to provide adequate oversight of activities.

We have restructured the management of the Western Region sales organization and are working to identify and implement changes to our policies and procedures and enhance employee training to improve internal control consciousness and lessen the possibility of accounting errors occurring in the future.

62