# Exhibit F
# Part 4 of 4

*Material weakness 3 described in "Management's Report on Internal Control Over Financial Reporting" in Item 9A of the 2005 Form 10–K*
*Remediation Initiatives.* Lack of clarity in roles and responsibilities in certain areas affecting the Company's financial reporting structure contributed to a material weakness relating to the monitoring of its business unit accounting functions. To remediate material weakness 3 described in "Management's Report on Internal Control Over Financial Reporting" in Item 9A of the 2005 Form 10–K, the Company has implemented or plans to implement the measures described under "—Material weaknesses described in item 1 of "Management's Report on Internal Control Over Financial Reporting"—Remediation Initiatives—1. General plan for hiring and training of personnel" in Item 9A of the 2005 Form 10–K, as well as those described below. The Company will continue to evaluate and may in the future implement additional measures.

1.      The Company's chief financial officer, with assistance from senior financial staff and outside consultants, other than the Company's independent registered public accounting firm, has reviewed and will continue to review and adapt the overall design of the Company's financial reporting structure, including the roles and responsibilities of each functional group within the Company.

2.      During the first nine months of 2006, the Company implemented and plans to continue to augment month and quarter–end closing procedures to standardize its processes for financial review to ensure that U.S. reviewers monitor financial information from decentralized locations in a consistent manner.

3.      During the first nine months of 2006, the Company's corporate finance department expanded and plans to continue to enhance the required reporting package from various business units and subsidiaries in order to ensure it has accumulated the necessary accounting, finance and operational information to effectively analyze information required for financial statement preparation and footnote disclosures.

4.      In addition, in the first nine months of 2006 the Company's external reporting department expanded and plans to continue to improve the documentation and review of required information associated with the preparation of its quarterly and annual filings under the Exchange Act.

5.      In May 2006, the Company appointed a vice president of internal audit with relevant GAAP, audit and compliance experience, skills and knowledge. Throughout the year, the Company expanded the size of the internal audit group and the scope of the group's responsibilities to monitor decentralized operations through reviews and audits of such business units, subsidiaries and locations.

6.      In the fourth quarter of 2006, the Company's finance department commenced an initiative to "refresh" its finance and accounting policies and procedures. Through this initiative, which the Company expects will be ongoing throughout 2007 and beyond, the Company's financial policies and procedures will be reviewed for completeness, accuracy and adequacy, updated and brought current, and standardized globally as necessary and appropriate. A communication plan will also be developed to ensure "refreshed" policies and procedures are publicized and understood, and appropriate employees are trained in their application, as necessary. The Company expects this initiative will form the foundation for the process to maintain and keep current its finance and accounting policies and procedures on a go–forward basis. In addition, starting in the fourth quarter of 2006, the Company commenced internal audits of, and in 2007 plans to continue to expand and increase the scope of its efforts to monitor, controls at the Company's decentralized and remote operations globally, through reviews and audits of employee compliance with applicable policies and procedures at business units, subsidiaries and other locations.

*Interim Measures.* Management has not yet implemented and/or tested the effectiveness of all the measures described above. Nevertheless, management believes those measures identified above as having been implemented, together with the other measures undertaken by the Company described below, all of which were undertaken during the first three quarters of 2006 or subsequent to September 30, 2006 in connection with the September 30, 2006 quarter–end reporting process, address material weakness 3 described in "Management's Report on Internal Control Over Financial Reporting" in Item 9A of the 2005 Form 10–K. These other measures include the following:

1.      Senior financial staff in the Company's U.S. headquarters did a thorough review of trial balances issued from decentralized locations.

2.      The Company utilized outside consultants, other than the Company's independent registered public accounting firm, to assist the Company's management, working under its supervision and direction, with the September 30, 2006 quarter–end review of decentralized operations.

3.      All non–routine material transactions for decentralized locations were documented by staff in such decentralized locations and reviewed by senior financial staff in the Company's U.S. headquarters.

*Material weakness 4 described in "Management's Report on Internal Control Over Financial Reporting" in Item 9A of the 2005 Form 10−K*

*Remediation Initiatives.* The Company's failure to have sufficient personnel with knowledge, experience and training in the application of GAAP commensurate with the Company's financial reporting requirements as well as failure to prevent or detect instances of non−compliance with established policies and procedures or instances of non−compliance with laws and regulations contributed to a material weakness relating to the Company's control environment. To remediate material weakness 4 described in "Management's Report on Internal Control Over Financial Reporting" in Item 9A of the 2005 Form 10−K, the Company has implemented or plans to implement the measures described under "—Material weaknesses described in item 1 of "Management's Report on Internal Control Over Financial Reporting"—Remediation Initiatives—1. General plan for hiring and training of personnel" in Item 9A of the 2005 Form 10−K, as well as those described below. The Company will continue to evaluate and may in the future implement additional measures.

1.      During the first nine months of 2006, the Company implemented and plans to continue to augment month and quarter−end closing procedures to standardize its processes for financial review to ensure that U.S. reviewers monitor financial information from decentralized locations in a consistent manner.

2.      Further, during the first nine months of 2006, the Company's corporate finance department expanded and plans to continue to enhance the required reporting package from various business units and subsidiaries in order to ensure it has accumulated the necessary accounting, finance and operational information to effectively analyze information required for financial statement preparation and footnote disclosures

3.      In addition, during the first nine months of 2006 the Company's external reporting department expanded and plans to continue to improve the documentation and review of required information associated with the preparation of its quarterly and annual filings under the Exchange Act.

4.      During the second quarter of 2006, the Company launched a formal investigation at the direction of the audit committee of the Company's Board of Directors ("Audit Committee") to review alleged violations of the FCPA; refer to "*Governmental Investigations*" under Part II, Item 1, Legal Proceedings, for additional information. Throughout the course of this investigation, the Company has taken and plans to continue to take all appropriate actions including changes to its training, processes and procedures related to its code of business conduct and ethics, its payment controls particularly in outlying regions, and its due diligence evaluation of business partnerships. Upon conclusion of this investigation, the Company will review and, as necessary, further enhance its procedures to reduce the risk of ongoing control deficiencies in this area. In addition, in the third and fourth quarters of 2006, the Company provided training to personnel in offices in various regions including North America, Europe, and China and, in 2007, plans to continue to provide training and expand its coverage of personnel employed in other regions and countries. In addition, the Company's internal audit staff commenced audits and plans to continue to expand and increase the scope of the Company's efforts to monitor controls at company operations globally, through reviews and audits of employee compliance with applicable policies and procedures at business units, subsidiaries and other locations.

a)      In addition to the specific measures described above to address this material weakness in the control environment, the Company's planned remediation measures include the following:

i.      In November, 2006, the Company hired an assistant controller and a shared services manager at its U.S. headquarters whose responsibilities include overseeing the corporate accounting and SEC external financial reporting functions. In the first quarter of 2007, the Company hired a vice president of financial operations and a vice president of financial planning and analysis to provide additional finance personnel at its U.S. headquarters. These personnel have appropriate qualifications, considerable technical experience and training in areas including accounting and SEC reporting, and in the utilization of the Oracle financial system modules. The Company believes the addition of these personnel improves and strengthens the capabilities of this function.

ii.      In April 2007, the Company created the position of and hired a new chief ethics officer, to provide focused executive leadership in the area of corporate ethics and integrity.

iii.      The Company retained and intends to continue to retain the services of outside consultants with relevant accounting experience, skills and knowledge in the application of GAAP, working under the supervision and direction of the Company's management, to supplement the Company's existing corporate accounting and external financial reporting personnel.

iv.    The Company will continue to hire, and has allocated resources to hire, additional finance personnel as needs arise and to replace departures, in the areas of compliance, corporate accounting, external financial reporting, internal audit, revenue accounting and tax, with relevant accounting experience, skills and knowledge in the application of GAAP.

v.    In the first quarter of 2007, the company implemented a new "management by objectives" system which will be used globally to capture corporate and executive management goals and articulate them throughout the organization, and to cascade and align each employee's goals to support corporate objectives. The goal setting, monitoring and evaluation process will incorporate capturing employee's training and development requirements, including training to stay current with the application of GAAP and the company's code of business conduct and ethics.

vi.    In the first quarter of 2007, the Company's CFO, with assistance from senior financial staff and outside consultants, reviewed and in the remainder of 2007 will continue to review and adapt the overall design of the Company's financial reporting organization and structure, including the roles and responsibilities of each functional group within the Company.

5.    In May 2006, the Company appointed a vice president of internal audit with relevant GAAP, audit and compliance experience, skills and knowledge. Throughout the year, the Company expanded the size of the internal audit group and the scope of the group's responsibilities to monitor decentralized operations through reviews and audits of such business units, subsidiaries and locations.

6.    In the fourth quarter of 2006, the Company's finance department commenced an initiative to "refresh" its finance and accounting policies and procedures. Through this initiative, which the Company expects will be ongoing throughout 2007 and beyond, the Company's financial policies and procedures will be reviewed for completeness, accuracy and adequacy, updated and brought current, and standardized globally as necessary and appropriate. A communication plan will also be developed to ensure "refreshed" policies and procedures are publicized and understood, and appropriate employees are trained in their application, as necessary. The Company expects this initiative will form the foundation for the process to maintain and keep current its finance and accounting policies and procedures on a go–forward basis. In addition, starting in the fourth quarter of 2006, the Company commenced internal audits of, and in 2007 plans to continue to expand and increase the scope of its efforts to monitor, controls at the Company's decentralized and remote operations globally, through reviews and audits of employee compliance with applicable policies and procedures at business units, subsidiaries and other locations.

8.    In the first quarter of 2007, the company implemented a new "management by objectives" system which will be used globally to capture corporate and executive management goals and articulate them throughout the organization, and to cascade and align each employee's goals to support corporate objectives. The goal setting, monitoring and evaluation process will incorporate capturing employee's training and development requirements, including training to stay current with the application of GAAP and the company's code of business conduct and ethics.

9.    In April 2007, the Company created the position of and hired a new chief ethics officer, to provide focused executive leadership in the area of corporate ethics and integrity.

*Interim Measures.* Management has not yet implemented and/or tested the effectiveness of all the measures described above. Nevertheless, management believes those measures identified above as having been implemented, together with the other measures undertaken by the Company described below, all of which were undertaken during the first three quarters of 2006 or subsequent to September 30, 2006 in connection with the September 30, 2006 quarter–end reporting process, address material weakness 4 described in "Management's Report on Internal Control Over Financial Reporting." These other measures include the following:

1.    Senior financial staff in the Company's U.S. headquarters performed a thorough review of trial balances issued from decentralized locations.

2.    The Company utilized outside consultants, other than the Company's independent registered public accounting firm, to assist the Company's management, working under its supervision and direction, with the September 30, 2006 quarter–end review of decentralized operations.

3.    Non–routine material transactions for decentralized locations were documented by staff in such decentralized locations and reviewed by senior financial staff in the Company's U.S. headquarters.

103

*Material weakness 5 identified as of September 30, 2006, resulting from the Company's review of its historical stock option practices, as described above under "Governance Committee Review of Historical Stock Option Accounting"*

*Remediation Initiatives.* The Company's planned remediation measures are intended to address material weaknesses in internal control over its accounting for and disclosure of stock–based compensation expense that have the potential of misstating these balances in the financial statements in future financial periods. These measures include the following:

1.      In November 2006, the Company migrated to a new vendor's system for stock options and equity awards administration, selected in part for its improved processes, systems and controls.

2.      In April 2007, the Company's compensation committee of the board of directors approved an equity award grant policy and procedures ("Awards Policy"). Under this Awards Policy, the Company has adopted the following equity awards grant processes:

a)      Equity awards will be made only on grant dates pre–determined in accordance with the Awards Policy.

b)      The awards committee (a committee as defined in the Awards Policy consisting of human resources, legal and finance personnel, duly formed and authorized by the compensation committee, with specific, limited authority to approve certain grants of equity awards) will ensure completeness and accuracy of the final equity awards grant list.

c)      All equity awards will be approved monthly, at a meeting of the awards committee, the compensation committee or the board of directors, as applicable.

d)      Internal audit will conduct periodic review of the accounting records and equity awards grant process.

3.      Relevant personnel at the Company will be provided training in the equity awards granting and accounting process.

4.      In April 2007, the Company created the position of and hired a new chief ethics officer, to provide focused executive leadership in the area of corporate ethics and integrity.

5.      During 2007, the Company will update its record retention policy to specify retention of equity award records.

*Interim Measures.* Management has not yet implemented and/or tested the effectiveness of all the measures described above. Nevertheless, management believes those measures identified above as having been implemented, together with the other measures undertaken by the Company described below, all of which were undertaken during the first three quarters of 2006 or subsequent to September 30, 2006 in connection with the September 30, 2006 quarter–end reporting process, address material weakness 5, as described above under *"Governance Committee Review of Historical Stock Option Accounting."* These other measures include, as part of the voluntary review of historical stock option practices, the Governance Committee retaining independent outside counsel and forensic accountants to review substantially all equity grant awards made in the Review Period for compliance with the various stock–based compensation accounting standards applicable during the Review Period and, as necessary to establish alternative measurement dates for those grants where the original measurement date was found to be in error. In addition, the accounting and reporting process for the consolidated financial statements for the quarter ended September 30, 2006 was extended significantly, thereby allowing the Company time to conduct additional procedures and analyses, to assess the adequacy and accuracy of reserves and actual expense results, and to make additional adjustments and disclosures as necessary to ensure the accuracy of financial reporting.

*Material weakness 6 identified as of September 30, 2006, resulting from the Company's review of historical sales in China, as described above under "Audit Committee Investigation of Historical Sales in China"*

*Remediation Initiatives.* The Company's planned remediation measures are intended to address material weaknesses in internal control over its customer agreements and the related revenue recognition in China that have the potential of misstating its revenue, deferred revenue, cost of sales and deferred cost accounts, related income tax accounts, retained earnings and related financial disclosures in the financial statements in future financial periods. These measures include the following:

1.      In the period from January to May, 2007, the Company effected personnel changes in the sales force in China's western sales region, as well as certain associated sales offices. The Company believes that these changes will enable effective management of the China western sales region's sales operations and enhance compliance with the Company's policies and procedures, including the Company's Code of Business Conduct and Ethics.

104

2.      The Company plans to revise its policies and procedures related to entering into sales contracts, document retention, as well the Code of Business Conduct and Ethics to provide for details around the standards for entering into sales agreements and breaches to the Code of Business Conduct and Ethics.

3.      The Company plans to implement mandatory training to employees in China's sales organization around control consciousness and ongoing training to Sales, Contract Management and Finance in China around the Company's policies and procedures, including revenue recognition.

4.      The Company plans to review and make improvements to the sales databases to capture relevant contract information and current status information.

5.      The Company plans to establish a process around organizing visits by business operations and the regional sales managers to the various sales offices in China to enhance the awareness and compliance with the Company's polices and procedures.

*Interim Measures.* Management has not yet implemented and/or tested the effectiveness of all the measures described above. Nevertheless, management believes those measures identified above as having been implemented, together with the other measures undertaken by the Company described below, all of which were undertaken during the first three quarters of 2006 or subsequent to September 30, 2006 in connection with the September 30, 2006 quarter-end reporting process, address material weakness 6, as described above under *"Audit Committee Investigation of Historical Sales in China."* These other measures include, as part of the investigation of historical sales in China, the Audit Committee retaining independent outside counsel and forensic accountants to conduct an investigation of sales in China. The investigation was expanded to consider sales contracts entered into in the period 2000 to 2006 in China, beyond the western region in order to provide adequate coverage percentage of the value of sales contracts entered into during the period. The investigation encompassed different review procedures depending on the contract type, date and region in which the contracts were executed. In addition, the accounting and reporting process for the consolidated financial statements for the quarter ended September 30, 2006 was extended significantly, thereby allowing the Company time to conduct additional procedures and analyses, to assess the adequacy and accuracy of the related balances, and to make additional adjustments and disclosures as necessary to ensure the accuracy of financial reporting

***Material Weakness 7 identified as of September 30, 2006 related to the Company's accounting for warranty reserves and associated cost of sales at its U.S. Headquarters***

          *Remediation Initiatives.* The Company's planned remediation measures are intended to address material weaknesses in internal control over its accounting for warranty reserves and related cost of sales that have the potential of misstating these balances in the financial statements in future financial periods. These measures include the following:

1.      In November 2006, the Company hired an assistant controller and a shared services manager at its U.S. headquarters whose responsibilities include overseeing the international cost accounting function. These personnel have considerable experience and training in cost accounting and utilization of the relevant Oracle financial system modules. The Company believes the addition of these personnel improves and strengthens the capabilities for the manual analyses and management review required of this function.

2.      The company plans in 2007 to enhance its processes and procedures related to involving and obtaining detailed and timely input from business unit, operations and sales operations personnel to enhance the information available for finance to analyze these accounts. New reports have been developed and reports and procedures will continue to be enhanced as necessary to facilitate the accuracy of accounting for these processes. In addition, finance management has placed increased attention on reviewing in detail the accounting in this area.

*Interim Measures.* Management has not yet implemented and/or tested the effectiveness of all the measures described above. Nevertheless, management believes those measures identified above as having been implemented, together with the other measures undertaken by the Company described below, all of which were undertaken during the first three quarters of 2006 or subsequent to September 30, 2006 in connection with the September 30, 2006 quarter-end reporting process, address material weakness 7 related to the Company's accounting for its warranty reserves and associated cost of sales. These other measures include analysis of actual cost reports associated with specific warranty reserves, and discussions with business unit, operations and sales and services personnel to enhance the information available for finance to analyze, to determine the liability reserves for warranty and associated cost of sales.

*Management's Conclusions*

Management believes the remediation measures described under "Management's Further Remediation Initiatives and Interim Measures" above will strengthen the Company's internal control over financial reporting and remediate the material weaknesses 1 through 7 listed above. However, management has not yet implemented all of these measures and/or tested them. Management believes that the interim measures described under "Management's Further Remediation Initiatives and Interim Measures" above provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements included in this Form 10−Q and has discussed this with the Company's Audit Committee.

The Company is committed to continuing to improve its internal control processes and will continue to diligently and vigorously review its disclosure controls and procedures and its internal control over financial reporting in order to ensure compliance with the requirements of Section 404 of the Sarbanes−Oxley Act. However, any control system, regardless of how well designed, operated and evaluated, can provide only reasonable, not absolute, assurance that its objectives will be met. As management continues to evaluate and work to improve the Company's internal control over financial reporting, it may determine to take additional measures to address control deficiencies, and it may determine not to complete certain of the measures described under "Management's Further Remediation Initiatives and Interim Measures" above.

**Changes in Internal Control over Financial Reporting**

The discussion above under "Management's Further Remediation Initiatives and Interim Measures" describes the material planned and actual changes to the Company's internal control over financial reporting during the first three quarters of 2006 and subsequent to September 30, 2006 that materially affect, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**PART II—OTHER INFORMATION**

**ITEM 1—LEGAL PROCEEDINGS**

*Securities Class Action Litigation*

Beginning in October 2004, several shareholder class actions alleging federal securities violations were filed against us and various officers and directors of our company. The actions have been consolidated in United States District Court for the Northern District of California under the caption *In re UTStarcom, Inc. Securities Litigation*, Master File No. C−04−4908−JW(PVT). The lead plaintiffs in the case filed a First Amended Consolidated Complaint on July 26, 2005. The First Amended Complaint alleged violations of the Securities Exchange Act of 1934, and was brought on behalf of a putative class of shareholders who purchased our stock after April 16, 2003 and before September 20, 2004. On April 13, 2006, the lead plaintiffs filed a Second Amended Complaint adding new allegations and extending the end of the class period to October 6, 2005. In addition to the company defendants, the plaintiffs are also suing Softbank. Plaintiffs' complaint seeks recovery of damages in an unspecified amount.

On June 2, 2006, we and the individual defendants filed a motion to dismiss the Second Amended Complaint. On March 21, 2007, the Court granted defendants' motion and dismissed plaintiffs' Second Amended Complaint. The Court granted plaintiffs leave to file a Third Amended Complaint, which plaintiffs filed on May 25, 2007. On July 13, 2007, we and the individual defendants filed a motion to dismiss and a motion to strike the Third Amended Complaint.

On September 4, 2007, a second shareholder class action complaint captioned *Peter Rudolph v. UTStarcom, et al.*, Case No. C−07−4578 SI, was filed in the United States District Court for the Northern District of California against us and some of our current and former directors and officers. The complaint alleges violations of the Securities Exchange Act of 1934 through undisclosed improper accounting practices concerning our historical equity award grants. Plaintiff seeks unspecified damages on behalf of a purported class of purchasers of our common stock between July 24, 2002 and September 4, 2007.

106

Due to the preliminary status of these lawsuits and uncertainties related to litigation, we are unable to evaluate the likelihood of either a favorable or unfavorable outcome. Accordingly, we are unable at this time to estimate the effects of these complaints on our financial position, results of operations, or cash flows.

*Governmental Investigations*

In September 2005, we have received notice of a formal inquiry by the staff of the Securities & Exchange Commission ("SEC") into certain aspects of our financial disclosures during prior reporting periods and certain other issues. In addition, in December 2005, the U.S. Embassy in Mongolia informed us that it had forwarded to the Department of Justice ("DOJ") allegations that an agent of our Mongolia joint venture had offered payments to a Mongolian government official in possible violation of the Foreign Corrupt Practices Act (the "FCPA"). We, through our Audit Committee, authorized an independent investigation into possible violations of the FCPA, and we have been in contact with the DOJ and SEC regarding the investigation. The investigation has identified possible FCPA violations in Mongolia, Southeast Asia, India, and China, as well as possible violations of U.S. immigration laws. DOJ has requested that we voluntarily produce documents related to the investigation and the SEC has subpoenaed us for documents. We have executed tolling agreements extending the statute of limitations for the FCPA issues under investigation by the SEC and DOJ and the immigration issues under investigation by DOJ. At this time, we cannot predict when any inquiry will be completed or what the outcome of any inquiry will be.

*Shareholder Litigation*

On November 17, 2006, a shareholder derivative complaint captioned *Ernesto Espinoza v. Ying Wu et al.*, Case No. RG06298775, was filed against certain of our current and former officers and directors in the Superior Court of the County of Alameda, California. The complaint alleges that the individual defendants, among other things, breached their duties, were unjustly enriched, and violated the California Corporations Code in connection with the timing of stock option grants. The complaint names us as a nominal defendant and seeks unspecified monetary damages against the individual defendants and various forms of injunctive relief. On February 2, 2007, we and the individual defendants filed demurrers against the complaint. On April 11, 2007, the Court sustained the individual defendants' demurrer, overruled our demurrer, ordered the plaintiff to file an amended complaint, and ordered us to answer the original complaint. The plaintiff filed an amended complaint and we have filed an answer to the amended complaint. On August 21, 2007, the individual defendants filed demurrers against the amended complaint. The Court sustained the individual defendants' demurrers and ordered the plaintiff to file a second amended complaint.

Due to the preliminary status of this complaint and uncertainties related to litigation, we are unable to evaluate the likelihood of either a favorable or unfavorable outcome. Accordingly, we are unable at this time to estimate the effects of this complaint on our financial position, results of operations, or cash flows.

*IPO Allocation*

On October 31, 2001, a complaint was filed in United States District Court for the Southern District of New York against us, some of our directors and officers and various underwriters for our initial public offering. Substantially similar actions were filed concerning the initial public offerings for more than 300 different issuers, and the cases were coordinated as *In re Initial Public Offering Securities Litigation*, 21 MC 92 for pretrial purposes. In April 2002, a consolidated amended complaint was filed in the matter against us, captioned *In re UTStarcom, Initial Public Offering Securities Litigation*, Civil Action No. 01–CV–9604. Plaintiffs allege violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 through undisclosed improper underwriting practices concerning the allocation of IPO shares in exchange for excessive brokerage commissions, agreements to purchase shares at higher prices in the aftermarket and misleading analyst reports. Plaintiffs seek unspecified damages on behalf of a purported class of purchasers of our common stock between March 2, 2000 and December 6, 2000. Our directors and officers have been dismissed without prejudice pursuant to a stipulation. On February 19, 2003, the Court granted in part and denied in part a motion to dismiss brought by defendants including us. The order dismissed all claims against us except for a claim brought under Section 11 of the Securities Act of 1933, which alleges that the registration statement filed in accordance with the IPO was misleading. In June 2004, a stipulation of settlement and release of claims against the issuer defendants, including us, was submitted to the court for approval. The terms of the settlement, if approved, would have dismissed and released all claims against the participating defendants (including us). In August 2005, the Court preliminarily approved the settlement. In December 2006, the Court of Appeals for the Second Circuit reversed the Court's October 2004 order certifying a class in six test cases that were selected by the underwriter defendants and plaintiffs in the coordinated proceedings. Our case is not one of the test cases. Because class certification was a condition of the settlement, it was unlikely that the settlement would receive final Court approval. On June 25, 2007, the Court entered an order terminating the proposed settlement based on a stipulation among the parties to the settlement. Plaintiffs have filed amended master allegations and amended complaints in the six test cases. It is unclear whether there will be any revised or future settlement. If the litigation proceeds, we believe that we have meritorious defenses and intend to defend the action vigorously.

The total amount of the loss associated with the above litigation is not determinable at this time. Therefore, we are unable to currently estimate the loss, if any, associated with the litigation.

*Passave Litigation*

In November 2005, we filed suit in the Superior Court of California, County of Santa Clara, against Passave, Inc. ("Passave") for breaches of contract and warranties in connection with a semiconductor device sold by Passave, Ltd. (Passave's wholly−owned subsidiary) to us. Our Complaint alleges that the Passave device, known as the PAS5001M3 chip, has exhibited certain operational malfunctions within some of our Fiber−to−the−Home product line, and has thereby caused damage to us. The parties entered into a settlement agreement, dated August 7, 2007, and have since dismissed all claims with prejudice.

*UTStarcom, Inc. v. Starent Patent Infringement Litigations*

We brought suit against Starent Networks Corporation ("Starent") for patent infringement in the U.S. District Court for the Northern District of California. The Complaint was filed on March 22, 2004, and later amended. In this action, we asserted that Starent infringed our patent U. S. Reg. No. 6,628,671 through the manufacture, use, offer, for sale, and sale of Starent's ST−16 Intelligent Mobile Gateway. We sought damages and injunctive relief. Starent filed its answer to the Amended Complaint and counterclaims, denying our allegations and seeking a declaration that the patent−in−suit is not infringed, is invalid, and is unenforceable. A motion for a preliminary injunction against the making, using or selling of infringing products and methods was brought, but the Court denied it on June 17, 2005. After a claims construction hearing and order, on September 20, 2005, Starent filed a motion for summary judgment of non−infringement and we filed a motion for summary judgment that Starent is estopped from asserting invalidity and unenforceability. On December 6, 2005, the Court granted Starent's motion for summary judgment. On February 2, 2006, the Court entered judgment in favor of Starent and dismissed the case. On March 2, 2006 we filed an appeal to the Federal Circuit. On April 6, 2007, after reviewing the parties' briefs and hearing oral argument on April 2, 2007, the Federal Circuit, without a written opinion, affirmed the District Court's judgment and dismissal of the case. Although the Federal Circuit ruled against the Company, this decision will not have a material adverse effect on the business, financial condition, or results of its operations.

On February 16, 2005, we filed a second suit against Starent for patent infringement in the U.S. District Court for the Northern District of California. In the Complaint, we assert that Starent infringes UTStarcom patent U.S. Reg. No. 6,829,473 ("the '473 patent") through Starent's development and testing of a software upgrade for its customer's installed ST−16 Intelligent Mobile Gateways. We seek declaratory and injunctive relief. Starent subsequently filed its answer and counterclaims, denying our allegations and seeking a declaration that the patent−in−suit is not infringed, is invalid, and is unenforceable. On June 16, 2005, we filed a motion to strike Starent's affirmative defense and dismiss Starent's counterclaim alleging inequitable conduct. On July 19, 2005, the parties stipulated that Starent would file an amended answer and counterclaim by July 27, 2005 and that we would withdraw our motion to strike. On August 10, 2005, we responded to Starent's amended counterclaim filed on July 27, 2005. In early December 2006, we filed a reissue application for the '473 patent with the United States Patent and Trademark Office. Starent has also filed for reexamination of the '473 patent. The reexamination and reissue are currently copending. The litigation is still in a preliminary stage and its outcome cannot be predicted, although we believe the litigation has merit. Nonetheless, we believe that any adverse judgment on Starent's counterclaims will not have a material adverse effect on our business, financial condition, or results of operations.

On May 8, 2007, we filed an third suit against Starent and sixteen individual defendants (who were all former employees of 3Com's CommWorks division which we acquired certain assets of in May of 2003) in the Northern District of Illinois. The causes of action include claims for patent infringement, misappropriation of trade secrets, intentional interference with business relations and prospective economic advantage and declarations of ownership of certain patent rights. In its Complaint, we assert that Starent infringes UTStarcom patents U. S. Reg. Nos. 7,173,905; 6,978,128; 6,963,582; 6,975,900; and 6,684,256 through the manufacture, use, offer, for sale, and sale of Starent's ST16 Intelligent Mobile Gateway and ST40 multimedia code platform, that the individual Defendants and Starent have misappropriated valuable Company trade secrets by improperly taking and using our confidential and proprietary information for the benefit of Starent, that the individual defendants and Starent have interfered with our business relations and prospective economic advantage by using the misappropriated information to obtain and enhance sales of Starent's products, and that several of Starent's patent applications and one issued patent are based on information obtained by the former employees while at the Company (CommWorks) and on that basis belong to UTStarcom. We seek compensatory damages, punitive damages and injunctive relief. After the court denied the defendants motion to dismiss the misappropriation of trade secrets claims, on August 30, 2007, Starent answered our complaint, denying our allegations and asserting a number of affirmative defenses and counterclaims, including non−infringement of the subject patents and alleged tortious interference with prospective economic advantage. We have filed a motion to dismiss most of the counterclaims and the court has ordered appointment of a special

108

master to handle discovery, which is just beginning. We believe that any adverse judgment on Starent's counterclaims will not have a material adverse effect on our business, financial condition or results of operations.

*Telemetrix, Inc. Arbitration*

On October 19, 2006, Telemetrix, Inc. ("Telemetrix") filed a formal Request for Arbitration against us to the World Intellectual Property Organization ("WIPO") in Geneva, Switzerland. The Request for Arbitration sought unspecified damages arising from a contract between Telemetrix and Telos Technology, Inc., dated October 22, 2003. We assumed Telos' rights and obligations under this contract pursuant to our purchase of Telos' assets on May 19, 2004. Telemetrix alleged nine causes of action, including breach of contract, fraud, negligent misrepresentation, interference with contractual relations, and interference with prospective economic advantage. In December 2006, we filed a formal response to the Request for Arbitration, denying all material factual allegations asserted by Telemetrix. An arbitrator was selected by the parties, and, on August 2, 2007, the arbitrator granted a pleading motion in favor of us due to Telemetrix's failure to allege sufficient facts in support of a majority of its causes of action. On August 17, 2007, Telemetrix filed an Amended Statement of Claim, alleging six causes of action, including breach of contract, fraud, interference with contractual relations and interference with prospective economic advantage. The previous hearing date of December 11–13 has been vacated. No hearing date has been rescheduled. Discovery has begun.

*Telos Technology, Inc. Litigation*

On November 22, 2005, plaintiffs Telos Technology, Inc., Telos Technology (Canada), Inc., Telos Technology (Bermuda) Ltd., and Telos Engineering Limited (collectively, the "Telos Plaintiffs") filed a Complaint against the Company in the Superior Court of California, County of Santa Clara. The Complaint alleges five causes of action, including breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, intentional misrepresentation and negligent misrepresentation, all of which arise from the Asset Purchase Agreement between the parties dated April 21, 2004. The Telos Plaintiffs assert that the Company breached the express and implied terms of the Asset Purchase Agreement and made representations to the Telos Plaintiffs during negotiations that it never intended to fulfill. The Telos Plaintiffs sought at least $19 million in damages, unspecified punitive damages and attorneys' fees. The parties executed a settlement agreement in the amount of $4.5 million on August 20, 2007 and the case was dismissed on September 26, 2007 with prejudice.

*Other Litigation*

We are a party to other litigation matters and claims that are normal in the course of operations, and while the results of such litigation matters and claims cannot be predicted with certainty, we believe that the final outcome of such matters will not have a material adverse impact on our financial position or results of operations.

**ITEM 1A—RISK FACTORS**

### FACTORS AFFECTING FUTURE OPERATING RESULTS

**FACTORS AFFECTING FUTURE OPERATING RESULTS**

**RISKS RELATED TO OUR COMPANY**

*The restatement of our consolidated financial statements following the Nominating and Corporate Governance Committee's and management's review of our past stock option granting practices and the Audit Committee's and management's review of certain sales in China has resulted in expanded litigation and regulatory proceedings and may result in future litigation which could harm our financial results*

Our review of our historic option granting practices and certain sales in China has required us to incur substantial expenses for legal, accounting, tax and other professional services, has diverted our management's attention from our business, and could in the future harm our business, financial condition, results of operations and cash flows.

The Audit Committee of our Board of Directors ("Audit Committee") engaged independent counsel to conduct an investigation of sales in China. The independent counsel engaged forensic accountants. The China sales investigation, which commenced in February 2007 and was completed in September 2007, covered each of the seven years in the period ended December 31, 2006. As a result of the review, management concluded and recommended to the Audit Committee that our previously issued financial statements should be restated to defer the system sales contract revenue and the related cost of net sales for certain sales arrangements in one region of China found to contain post–contract support obligations and recognize such amounts in our consolidated statements of operations over the estimated period of post–contract support. The Audit Committee concurred with management's recommendation.

109

In November 2006 we announced that the Nominating and Corporate Governance Committee of our Board of Directors ("Governance Committee"), comprised of independent directors, was conducting a voluntary review, with the assistance of independent legal counsel and forensic accounting experts (the "Option Grant Review Team"), of our historic option granting practices, the timing of option grants and related accounting matters. The review considered all option grant awards made in the period from February 29, 2000, shortly before the initial public offering of our Common Stock, through August 2006 for compliance with the various stock−based compensation accounting standards applicable as well as the rules of our stock option plans. Upon completion of the review, management concluded the adjustments to correct errors in stock option accounting in our previously issued financial statements for the years ended December 31, 1998 and 2000 through 2005, and the quarterly periods of 2005, as well as in the quarterly periods ended March 31 and June 30, 2006 that are reflected in our consolidated financial statements included in Exhibit 99.1 in our Annual Report on Form 10−K for the year ended December 31, 2006 should be made.

In determining the restatement adjustments in connection with the review of our historical option granting practices, management used all reasonably available relevant information to form conclusions it believes are reasonable as to the most likely option granting actions that occurred, the dates when such actions occurred, and the determination of grant dates for financial accounting purposes based on when the requirements of the accounting standards were met. The Option Grant Review Team and management considered various alternatives throughout the course of the review and restatement; management believes the adjustments to measurement dates used in our restatement of our financial statements are reasonable and appropriate in our circumstances.

Our restatement of previously issued financial statements to correct revenue recognition for certain sales in China and for the effects of past stock options granting practices has exposed us to greater risks associated with litigation and regulatory proceedings. We have voluntarily provided information about the conduct of our independent investigation and review, the findings of the reviews, and our conclusions to the staff of the Securities and Exchange Commission ("SEC"), and are cooperating, and will continue to cooperate fully with the SEC. In addition, as described in Part II, Item 1, "Legal Proceedings," of this Form 10−Q, several derivative complaints have been filed against certain of our current and former officers and directors pertaining to allegations relating to stock option grants. However, our judgments may be challenged in legal proceedings or regulatory reviews, and we could be subject to adverse findings that could require us to again restate our financial statements, to pay damages or penalties, or have other remedies imposed upon us that could harm our business, financial condition, results of operations and cash flows. We may also be exposed to legal proceedings in connection with the results of our investigation of certain sales in China. We cannot guarantee that new lawsuits related to the matters resulting in the restatements will not be filed, and we cannot predict the outcome of any current or potential future litigation or regulatory proceeding against the Company or our current and former directors or officers.

*The matters relating to the Audit Committee's investigation of revenue recognition in China, the Governance Committee's review of our past stock option granting practice, and the restatement of our consolidated financial statements may otherwise adversely impact our business.*

As a result of our delayed filing of our Quarterly Reports on Form 10-Q for the quarters ended September 30, 2006, March 31, 2007 and June 30, 2007, as well as our Form 10−K for the fiscal year ended December 31, 2006, we will be ineligible to register our securities on Form S−3 for sale by us or resale by others until we have been current in our SEC filings for 12 calendar months. We may use Form S−1 to raise capital, but doing so could increase transaction costs and the time required to complete such transactions.

Employees who were awarded options at a discount from fair market value and were totally or partially unvested as of December 31, 2004, may be subject to a penalty tax under Internal Revenue Code Section 409A ("Section 409A") and corresponding states taxes upon exercise of these stock options. We are considering certain actions, which we believe would be in the best interests of our stockholders and employees that might substantially reduce or eliminate the federal and state penalty taxes. However, there is no guarantee that we will be successful in developing effective measures to address employees' adverse tax consequences, and any such measures may cause us to incur additional cash or noncash compensation expense. Furthermore, such measures, or the failure of such measures, may require the Company to incur substantial expenses for legal, accounting, tax and other professional services and may divert management's attention from our business, which could in the future harm our business, financial condition, results of operations and cash flows.

*Our future product sales are unpredictable and, as a result, our operating results are likely to fluctuate from quarter to quarter.*

Our quarterly and annual operating results have fluctuated in the past and are likely to fluctuate in the future due to a variety of factors, some of which are outside of our control. Factors that may affect our future operating results include:

- the timing and size of the orders for our products;
- consumer acceptance of new products we may introduce to market;
- changes in the growth rate of customer purchases of communications services;
- the lengthy and unpredictable sales cycles associated with sales of our products;
- revenue recognition, which is based primarily on customer acceptance of delivered products, is unpredictable;
- cancellation, deferment or delay in implementation of large contracts;
- quality issues resulting from the design or manufacture of the products, or from the software used in the product;
- cash collection cycles in China and other emerging markets;
- reliance on product, software and component suppliers who may constitute a sole source of supply or may have going concern issues;
- the decline in business activity we typically experience during the Chinese Lunar New Year, which leads to decreased sales and collections during our first fiscal quarter;
- issues that might arise from the integration of acquired entities or the inability to achieve expected results from such acquisitions; and
- shifts in our product mix or market focus.

As a result of these and other factors, period–to–period comparisons of our operating results are not necessarily meaningful or indicative of future performance. In addition, the factors noted above may make it difficult for us to forecast and provide in a timely manner public guidance (including updates to prior guidance) related to our projected financial performance. Furthermore, it is possible that in some future quarters our operating results will fall below the expectations of securities analysts or investors. If this occurs, the trading price of our common stock could decline.

*Competition in our markets may lead to reduced prices, revenues and market share.*

We have experienced intense competition in the past years, and we believe that we will continue to face intense competition from both domestic and international companies in our target markets, many of which may operate under lower cost structures or may be given preferential treatment by applicable governmental regulators and policies and have much larger sales forces than we do. Additionally, other companies not presently offering competing products may also enter our target markets. Many of our competitors have significantly greater financial, technical, product development, sales, marketing and other resources than we do. As a result, our competitors may be able to respond more quickly to new or emerging technologies and changes in service provider requirements. Our competitors may also be able to devote greater resources than we can to the development, promotion and sale of new products. These competitors may be able to offer significant financing arrangements to service providers, which may give them a competitive advantage in selling systems to service providers with limited financial resources. In many of the developing markets in which we operate or intend to operate, relationships with local governmental telecommunications agencies are important to establish and maintain. In many such markets, our competitors may have or be able to establish better relationships with local governmental telecommunications agencies than we have, which could result in their ability to influence governmental policy formation and interpretation to their advantage. Additionally, our competitors might have better relationships with their third party suppliers and obtain component parts at a reduced rate, allowing them to offer their end products at reduced prices. Moreover, the telecommunications and data transmission industries have experienced significant consolidation, and we expect this trend to continue. If we have fewer significant customers, we may be more reliant on such large customers and our bargaining position and profit margins may suffer. Increased competition is likely to result in price reductions, reduced gross profit as a percentage of net sales and loss of market share, any one of which could materially harm our business, cash flows and financial condition, including potential impairment in value of our tangible and intangible assets and goodwill if extended losses were incurred.

*We have incurred net losses in the past and will need to renew our lines of credit in China, refinance our convertible subordinated notes, and transfer cash from our subsidiaries in China to have sufficient cash resources and liquidity. Our ability to accomplish these actions is not assured, and our ability to raise funds for other purposes is uncertain.*

At September 30, 2006, we had cash and short–term investments of $616.7 million to meet our liquidity requirements of which $455.4 million was held by our subsidiaries in China. China imposes currency exchange controls on transfers of funds outside of China; such controls limit transfers of approximately $200 million of our net assets outside of China without first obtaining the consent of the Chinese government. While we believed the China subsidiaries could freely transfer at least $200 million as of September 30, 2006, the amount of cash available for transfer from the China subsidiaries is limited both by the liquidity needs of the subsidiaries in China and by the Chinese government requirements that the China subsidiaries retain adequate capital levels in China to protect creditors and to have funds available for mandated employee benefits. Additionally, available credit facilities in China at September 30, 2006 totaled $789.5 million, of which $498.5 million was available for working capital purposes and $291.0 million was available for use in support of letters of credit and corporate guarantees. These credit facilities expire principally in November and December 2007, and we had borrowed $105.0 million at September 30, 2006 under the working capital portion of the available credit lines and such borrowings increased to $140.1 million at September 30, 2007. We also have outstanding long–term debt outside of China in the form of our convertible subordinated notes with a principal balance of $274.6 million that mature in March 2008 (the "Notes").

During the nine months ended September 30, 2007 our China subsidiaries have made transfers of funds out of China to the Company totaling $150 million. Although we believe the Company now has sufficient amount of cash resources to finance the Company's anticipated working capital and capital expenditure requirements for the next 12 months, we do not have enough cash outside of China to repay the convertible notes maturing in March 2008, and we expect our recent financial performance and financial position will cause the lenders to reduce the total available credit facilities when we negotiate renewals of the lines of credit in China in late 2007. Management's liquidity plans include a partial or complete refinancing of the convertible notes, renewal of the lines of credit in China, transfers of additional cash from its subsidiaries in China to the extent necessary, and, if needed, liquidation of certain investments and/or seeking new financing arrangements. In addition, it may be necessary for us to make significant changes to our business plan to maintain adequate liquidity for at least the next 12 months in the event of various matters, such as:

- changes in financial market conditions or our business condition that could limit our access to existing credit facilities or make planned re–financings more costly or even unfeasible;
- changes in China's currency exchange control regulations that could limit our ability to access cash in China to meet liquidity requirements outside of China; and
- inability to achieve planned operating results that could increase liquidity requirements beyond those considered in our financial plans.

We may desire to raise additional funds for purposes not presently included in our financial plans such as to develop new or enhanced products, respond to competitive pressures, take advantage of acquisition opportunities or raise capital for strategic purposes. There is no assurance that additional financing for these or other purposes would be available on acceptable terms or at all. If we raise additional funds through the issuance of equity securities, our stockholders will experience dilution of their ownership interest, and the newly issued securities may have rights superior to those of common stock. If we raise additional funds by issuing debt, our ability to meet our debt service obligations will be dependent upon our future performance, which will be subject to financial, business and other factors affecting our operations, many of which are beyond our control, we may be subject to limitations on our operations, and our leverage may increase. The degree to which we are leveraged could materially and adversely affect our ability to obtain financing for working capital, acquisitions or other purposes and could make us more vulnerable to industry downturns and competitive pressures.

*Our ability to meet our obligations under the terms of our outstanding convertible notes and to continue operations may be compromised if we are unable to transfer funds from our China operations as needed.*

During the nine months ended September 30, 2007 our China subsidiaries have made transfers of funds out of China to the Company totaling $150 million. Although we believe the Company now has sufficient amount of cash resources to finance the Company's anticipated working capital and capital expenditure requirements for the next 12 months we do not have enough cash outside of China to also repay the convertible notes, aggregating $274.6 million and maturing on March 1, 2008

Because we are limited by the Chinese government's imposition of currency controls on transfer of funds outside of China, it may be time-consuming, difficult and /or expensive for us to transfer funds from China to repay the Notes. As a result, if an Event of Default on the Notes were to occur, we may not have sufficient cash resources to repay the Note and to continue operations without seeking new financing arrangements. We cannot be certain that additional financing for these purposes would be available on acceptable terms or at all, and if such financing is not available, our business could be seriously harmed. See the risk factor entitled *"We face a variety of risks related to our convertible subordinated notes"* for a further description of our obligations under the Notes, our recent consent solicitation of the noteholders and our compliance with certain covenants under the Indenture.

*Sales in China have historically accounted for a material portion of our total sales, and our business, financial condition and results of operations are to a significant degree subject to economic, political and social events, and the performance of our senior management team in China.*

Approximately $785.5 million, or 32%, $870.6 million, or 30%, and $2,028.2 million, or 79%, of our net sales for fiscal years 2006, 2005 and 2004, respectively, occurred in China. While we have expanded into other markets, we have made substantial investments in China and, therefore, our business, financial condition and results of operations are to a significant degree subject to economic, political, legal and social developments and other events in China. In addition, we have had significant changes within our senior management team in China recently, and our current senior management team as a whole does not have the same degree of experience in China as our senior management team had in the past. (See the risk factor entitled *"Our success is dependent on continuing to hire and retain qualified personnel, including for senior management positions, and if we are not successful in attracting and retaining these personnel and in managing key employee turnover, our business will suffer"*). If our current senior management in China cannot maintain and /or establish key relationships with customers, governmental entities and others in China, our business in China may decline significantly. If our business in China declines, our financial condition and results of operations may be significantly harmed.

*The average selling prices of our products may decrease, which may reduce our revenues and our gross profit. As a result, we must introduce new products and reduce our costs in order to maintain profitability.*

The average selling prices for communications access and switching systems and handsets have historically declined as a result of a number of factors, including:

- increased competition;
- aggressive price reductions by competitors;
- rapid technological change; and
- constant change in customer buying behavior and market trends.

The average selling prices of our products may continue to decrease in the future in response to product introductions by us or our competitors or other factors, including price pressures from customers. Certain of our products, including wireless handsets, have historically had low gross profit margins, and any further deterioration of our profit margins on such products could result in losses with respect to such products. Therefore, we must continue to develop, source and introduce new products and enhancements to existing products that incorporate features that can be sold at higher average selling prices. Failure to do so or the failure of consumers or our direct customers to accept such new products could cause our revenues and gross profit to decline.

Our cost reduction efforts initiated in 2005 and our subsequent efforts in the second half of 2007 and early 2008 may not allow us to keep pace with competitive pricing pressures or lead to improved gross profit, as a percentage of net sales. In order to be competitive, we must continually reduce the cost of manufacturing our products through design and engineering changes. We may not be successful in these efforts or in delivering our products to market in a timely manner. In addition, any redesign may not result in sufficient cost reductions to allow us to reduce the prices of our products to remain competitive or to improve or maintain our gross profit, as a percentage of net sales, which would cause our financial results to suffer.

113

*Our market is subject to rapid technological change, and to compete effectively, we must continually introduce new products and product enhancements that achieve market acceptance.*

The market for communications equipment is characterized by rapid technological developments, frequent new product introductions, changes in consumer preferences and evolving industry and regulatory standards. Our success will depend in large part on our ability to enhance our technologies and develop and introduce new products and product enhancements that anticipate changing service provider requirements, technological developments and evolving consumer preferences. We may need to make substantial capital expenditures and incur significant research and development costs to develop and introduce new products and enhancements. If we fail to develop and introduce new products or enhancements to existing products that effectively respond to technological change on a timely basis, our business, financial condition and results of operations could be materially adversely affected. Certain of our products, including wireless handsets, have a short product life. Moreover, from time to time, our competitors or we may announce new products or product enhancements, technologies or services that have the potential to replace or shorten the life cycles of our products and that may cause customers to defer purchasing our existing products, resulting in charges for inventory obsolescence reserves. Future technological advances in the communications industry may diminish or inhibit market acceptance of our existing or future products or render our products obsolete. Even if we are able to develop and introduce new products, they may not gain market acceptance. Market acceptance of our products will depend on various factors, including:

- our ability to obtain necessary approvals from regulatory organizations within the countries in which we operate and for any new technologies that we introduce;
- the length of time it takes service providers to evaluate our products, causing the timing of purchases to be unpredictable;
- the compatibility of our products with legacy technologies and standards existing in previously deployed network equipment;
- our ability to attract customers who may have pre-existing relationships with our competitors;
- product pricing relative to performance;
- the level of customer service available to support new products; and
- the timing of new product introductions meeting demand patterns.

If our products fail to obtain market acceptance in a timely manner, our business and results of operations could suffer.

*We depend on some sole source and key suppliers for handsets, base stations, components and materials used in our products. If we cannot secure adequate supplies of high quality products at competitive prices or in a timely manner from these suppliers or sources, or if the suppliers successfully market their products directly to our customers, our competitive position, reputation and business could be harmed.*

We have contracts with a limited group of suppliers to purchase some components and materials used in our products. If any supplier is unwilling or unable to provide us with high-quality components and materials in the quantities required and at the costs specified by us, we may not be able to find alternative sources on favorable terms, in a timely manner, or at all. Further, a supplier could market its products directly to our customers. The possibility of a supplier marketing its own products would create direct competition and may affect our ability to obtain adequate supplies. Our inability to obtain or to develop alternative sources if and as required could result in delays or reductions in manufacturing or product shipments. From time to time, there could be shortages of certain products or components. Moreover, our suppliers may supply us with inferior quality products. If an inferior product supplied by a third party is embedded in our end product and causes a problem, it might be difficult to identify the source of the problem as being due to the component parts. If any of these events occur, our competitive position, reputation and business could suffer.

Our ability to source a sufficient quantity of high-quality, cost-effective components used in our products may also be limited by import restrictions and duties in the foreign countries in which we manufacture our products. We require a significant number of imported components to manufacture our products, and imported electronic components and other imported goods used in the operation of our business may be limited by a variety of permit requirements, approval procedures, patent infringement claims, import duties and licensing requirements. As an example, a recent court case between a third party and one of our suppliers involved a patent dispute potentially restricting the importation of handsets into the U.S. While this case has been resolved in the supplier's favor at the trial court level, our supply of products could be affected by similar cases in the future. Moreover, import duties on such components increase the cost of our products and may make them less competitive.

114

*Product defects or performance quality issues could cause us to lose customers and revenue or to incur unexpected expenses.*

Many of our products are highly complex and may have quality deficiencies resulting from the design or manufacture of such product, or from the software or components used in the product. For example, during 2005 we recorded warranty charges of $70.6 million, including special warranty charges of $11.7 million for certain asynchronous digital subscriber line ("ADSL") products, $4.0 million for NetRing™ equipment and $14.9 million for GEPON equipment sold to SBBC, an affiliate of SOFTBANK CORP and SOFTBANK America Inc., during 2003 and 2004. Often these issues are identified prior to the shipment of the products and may cause delays in market acceptance of our products, delays in shipping products to customers, or the cancellation of orders. In other cases, we may identify the quality issues after the shipment of products. In such cases, we may incur unexpected expenses and diversion of resources to replace defective products or correct problems. Such pre–shipment and post–shipment quality issues could result in delays in the recognition of revenue, loss of revenue or future orders, and damage to our reputation and customer relationships. In addition, we may be required to pay damages for failed performance under certain customer contracts, and may receive claims from customers related to the performance of our products. Such pre–shipment and post–shipment quality issues could result in delays in the recognition of revenue, loss of revenue or future orders, and damage to our reputation and customer relationships. In addition, we may be required to pay damages for failed performance under certain customer contracts and may receive claims from customers related to the performance of our products.

*Our global diversification strategy and growth has strained our resources, adversely affected our reported gross margins, and if we are unable to manage this growth, our future operating results will be further negatively affected.*

Over the last four years we have experienced a rapid expansion of our international operations and anticipate that we must continue to transform our operations to address market demands and potential market opportunities globally.

Competition in international markets for new service provider customers and for new infrastructure deployments is particularly intense and increasingly focused on price. To meet competitive offerings we may accept contracts with low profitability or even enter into contracts with anticipated losses if we believe it is necessary to establish a relationship with a customer or a presence in a market that we consider important to our international expansion strategy. We believe these decisions will facilitate the development of our international business, but we can provide no assurance that they will. Accepting a contract with an anticipated loss requires us to a recognize a provision for the entire loss in the period in which it becomes evident rather than in later periods in which contract performance occurs. Accepting contracts with low gross margins adversely affects our reported results when the revenues from such contracts are recognized; in some cases revenue recognition must be deferred until all revenue recognition criteria have been met, and this would result in recognizing the adverse effects of low gross margin contracts in periods subsequent to when contract performance occurred.

Our transformation to a global focus will place a significant strain on our management, operational, financial and other resources. To manage this transformation effectively, we will need to take various actions, including:

- enhancing management information systems, including forecasting procedures;
- further developing our operating, administrative, financial and accounting systems and controls;
- managing our working capital and sources of financing;
- maintaining close coordination among our engineering, accounting, finance, marketing, sales and operations organizations;
- retaining, training and managing our employee base;
- enhancing human resource operations and improving employee hiring and training programs;
- reorganizing our business structure to more effectively allocate and utilize our internal resources;
- improving and sustaining our supply chain capability; and
- managing both our direct and indirect sales channels in a cost–efficient and competitive manner.

115

If we fail to implement or improve systems or controls or to manage any future growth and transformation effectively, our business could suffer.

*Any failure by us to execute planned cost reductions successfully could result in total costs and expenses that are greater than expected.*

From time to time we have undertaken restructuring plans to bring operational expenses to appropriate levels for each of our businesses, while simultaneously implementing extensive new company–wide expense–control programs. For example, in 2005, we announced workforce restructurings. These programs resulted in the termination of approximately 1,595 employees worldwide through December 31, 2005. We anticipate making further workforce reductions and taking additional rebalancing actions in the future. In October 2007, our Board of Directors approved a restructuring plan which includes a worldwide reduction in force of approximately 11% of the Company's headcount, or approximately 700 employees. We expect cost savings from planned restructuring activities to be used to offset market forces or to be reinvested in our businesses to strengthen our competitiveness, but we cannot be certain that we will be successful in these efforts. Significant risks associated with these actions and other workforce management issues that may impair our ability to achieve anticipated cost reductions or may otherwise harm our business include delays in implementation of anticipated workforce reductions in highly regulated locations outside of the United States, particularly in Europe and Asia, redundancies among restructuring programs, decreases in employee morale and the failure to meet operational targets due to the loss of employees, particularly sales employees.

*Our success is dependent on continuing to hire and retain qualified personnel, including for senior management positions, and if we are not successful in attracting and retaining these personnel and in managing key employee turnover, our business will suffer.*

The success of our business depends in significant part upon the continued contributions of key technical and senior management personnel, many of whom would be difficult to replace. In particular, our success depends in large part on the knowledge, expertise and services of Hong Liang Lu, our Chief Executive Officer, Peter Blackmore, our President and Chief Operating Officer, Francis P. Barton, Executive Vice President and Chief Financial Officer and Philip Christopher, President and Chief Executive Officer of our Personal Communications Division. The loss of any key employee, the failure of any key employee to perform satisfactorily in his or her current position or our failure to attract and retain other key technical and senior management employees could have a significant negative impact on our operations. We have had significant changes within our senior management team recently, and our current senior management team as a whole does not have the same degree of experience in China as our senior management had in the past. If our current senior management cannot maintain and/or establish key relationships with customers, governmental entities and others in China, our business in China may decline significantly and our financial condition and results of operations may be significantly harmed.

Notwithstanding our workforce restructurings, to effectively manage our operations, we will need to recruit, train, assimilate, motivate and retain qualified employees both locally and internationally. Competition for qualified employees is intense, and the process of recruiting personnel in all fields, including technology, research and development, sales and marketing, administration and management with the combination of skills and attributes required to execute our business strategy can be difficult, time–consuming and expensive. As we grow globally, we must implement hiring and training processes that are capable of quickly deploying qualified local residents to knowledgeably support our products and services. Alternatively, if there is an insufficient number of qualified local residents available, we might incur substantial costs importing expatriates to service new global markets. For example, we have historically experienced difficulty finding qualified accounting personnel knowledgeable in both U.S. and Chinese accounting standards who are Chinese residents. If we fail to attract, hire, assimilate or retain qualified personnel, our business would be harmed. Competitors and others have in the past, and may in the future, attempt to recruit our employees. In addition, companies in the telecommunications industry whose employees accept positions with competitors frequently claim that the competitors have engaged in unfair hiring practices. We may be the subject of these types of claims in the future as we seek to hire qualified personnel. Some of these claims may result in material litigation and disruption to our operations. We could incur substantial costs in defending ourselves against these claims, regardless of their merit.

*Any acquisitions and divestitures that we undertake could be difficult to integrate, disrupt our business, dilute our stockholders and harm our operating results.*

We have acquired and divested certain businesses, products and technologies. Anticipated benefits of these acquisitions and divestitures may not be realized. We have in the past and will continue to evaluate acquisition prospects that would complement our existing product offerings, augment our market coverage, enhance our technological capabilities, or that may otherwise offer growth opportunities. Acquisitions may result in dilutive issuances of equity securities, use of our cash resources, the incurrence of debt and the amortization of expenses related to intangible assets. In addition, acquisitions involve

116

numerous risks, including difficulties in the assimilation of operations, technologies, products and personnel of the acquired company, diversion of management's attention from other business concerns, risks of entering markets in which we have no direct or limited prior experience, the potential loss of key employees of the acquired company, unanticipated costs and, in the case of the acquisition of financially troubled businesses, challenges as to the validity of such acquisitions from third party creditors of such businesses. For example, in the fourth quarter 2004, we encountered difficulties in integrating Hyundai Syscomm, Inc. ("HSI") legacy operations into our operations and determined to abandon a substantial amount of HSI's legacy operations. As a result, in the fourth quarter 2004, we wrote off the entire goodwill and intangibles associated with HSI.

*We may be unable to adequately protect the loss or misappropriation of our intellectual property, which could substantially harm our business.*

We rely on a combination of patents, copyrights, trademarks, trade secret laws and contractual obligations to protect our technology. We have applied for patents in the United States and internationally. Additional patents may not be issued from our pending patent applications, and our issued patents may not be upheld. In addition, we have, from time to time, chosen to abandon previously filed patent and trademark applications. Moreover, we may face difficulties in registering our existing trademarks in new jurisdictions in which we operate, and we may be forced to abandon or change product or service trademarks because of the unavailability of our existing trademarks or because of oppositions filed or legal challenges to our trademark filings. We cannot guarantee that the intellectual property protection measures that we have taken will be sufficient to prevent misappropriation of our technology or trademarks or that our competitors will not independently develop technologies that are substantially equivalent or superior to ours. In addition, the legal systems of many foreign countries do not protect or honor intellectual property rights to the same extent as the legal system of the United States. For example, in China, the legal system in general, and the intellectual property regime in particular, are still in the development stage. It may be very difficult, time–consuming and costly for us to attempt to enforce our intellectual property rights in these jurisdictions.

*We may be subject to claims that we infringe the intellectual property rights of others, which could substantially harm our business.*

The industry in which we compete is moving towards aggressive assertion, licensing, and litigation of patents and other intellectual property rights. From time to time, we have become aware of the possibility or have been notified that we may be infringing certain patents or other intellectual property rights of others. Regardless of their merit, responding to such claims could be time consuming, divert management's attention and resources and cause us to incur significant expenses. In addition, although some of our supplier contracts provide for indemnification from the supplier with respect to losses or expenses incurred in connection with any infringement claim, certain contracts with our key suppliers do not provide for such protection. Moreover, certain of our sales contracts provide that we must indemnify our customers against claims by third parties for intellectual property rights infringement related to our products. There are no limitations on the maximum potential future payments under these guarantees. Therefore, we may incur substantial costs related to any infringement claim, which may substantially harm our results of operations and financial condition.

We have been and may in the future become subject to litigation to defend against claimed infringements of the rights of others or to determine the scope and validity of the proprietary rights of others. Future litigation may also be necessary to enforce and protect our patents, trade secrets and other intellectual property rights. Any intellectual property litigation or threatened intellectual property litigation could be costly, and adverse determinations or settlements could result in the loss of our proprietary rights, subject us to significant liabilities, require us to seek licenses from or pay royalties to third parties which may not be available on commercially reasonable terms, if at all, and/or prevent us from manufacturing or selling our products, which could cause disruptions to our operations.

In the event that there is a successful claim of infringement against us and we fail to develop non–infringing technology or license the proprietary rights on commercially reasonable terms and conditions, our business, results of operations and financial condition could be materially and adversely impacted.

*Our multinational operations subject us to various economic, political, regulatory and legal risks.*

We market and sell our products globally, with a significant portion of our sales made in China. The expansion of our existing multinational operations and entry into new markets will require significant management attention and financial resources. Multinational operations are subject to a variety of risks, such as:

- the burden of complying with a variety of foreign laws and regulations;

117

- the burden of complying with United States laws and regulations for foreign operations, including the Foreign Corrupt Practices Act;
- difficulty complying with continually evolving and changing global product and communications standards and regulations for both our end products and their component technology;
- market acceptance of our new products, including longer product acceptance periods in new markets into which we enter;
- reliance on local original equipment manufacturers ("OEMs"), third party distributors and agents to effectively market and sell our products;
- unusual contract terms required by customers in developing markets;
- changes in local governmental control or influence over our customers;
- changes to import and export regulations, including quotas, tariffs, licensing restrictions and other trade barriers;
- the burden of compliance with complex and varying taxation requirements of multiple jurisdictions;
- evolving and unpredictable nature of the economic, regulatory, competitive and political environments;
- reduced protection for intellectual property rights in some countries;
- unproven business operation models developed or operated in specific countries or regions;
- longer accounts receivable collection periods; and
- difficulties and costs of staffing, monitoring and managing multinational operations, including but not limited to internal controls and compliance.

*We do business in markets that are not fully developed, which subjects us to various economic, political, regulatory and legal risks unique to developing economies.*

Less developed markets present additional risks, such as the following:

- customers that may be unable to pay for our products in a timely manner or at all;
- new and unproven markets for our products and the telecommunications services that our products enable;
- lack of a large, highly trained workforce;
- difficulty in controlling local operations from our headquarters;
- variable ethical standards and an increased potential for fraud;
- unstable political and economic environments; and
- lack of a secure environment for our personnel, facilities and equipment.

In particular, these factors create the potential for physical loss of inventory and misappropriation of operating assets. We have in the past experienced cases of vandalism and armed theft of our equipment that had been or was being installed in the field. If disruptions for any of these reasons become too severe in any particular market, it may become necessary for us to terminate contracts and withdraw from that market and suffer the associated costs and lost revenue.

118

*Our wireless handset products are subject to a wide range of environmental, health and safety laws, and may expose us to potential health and environmental liability claims.*

Our handset products are subject to a wide range of environmental, health and safety laws, including laws relating to the use, disposal and clean up of, and human exposure to hazardous substances. In the United States, these laws often require parties to fund remedial action regardless of fault. Factors such as the discovery of additional contaminants, the extent of remediation and compliance expenses, and the imposition of additional clean up obligations could cause us to incur substantial costs relating to remediation activities. Compliance with existing or future environmental, health and safety laws could also cause us to incur substantial costs relating to such compliance, including the expense of modifying product designs and manufacturing processes. In addition, restrictions on the use of certain materials in our facilities or products in the future could have a negative impact on our operations.

Additionally, there have been claims made alleging a link between the use of wireless handsets and the development or aggravation of certain cancers, including brain cancer. The scientific community is divided on whether there is a risk from wireless handset use, and if so, the magnitude of the risk. Even if there is no link established between wireless handset use and cancer, the negative publicity and possible litigation could have a material adverse effect on our business. In the past, several plaintiffs' groups have brought class actions against wireless handset manufacturers and distributors, alleging that wireless handsets have caused cancer. To date, we have not been named in any of these actions and none of these actions has been successful. In the future we could incur substantial costs in defending ourselves against similar claims, regardless of their merit. Also, claims may be successful in the future and may have a material adverse effect on our business.

Furthermore, there have been claims made alleging a link between the use of Bluetooth enabled mobile phone handsets and noise-induced hearing loss. To date, we have not been named in any of these actions. In the future we could incur substantial costs in defending ourselves against similar claims, regardless of their merit. Also, claims may be successful in the future and may have a material adverse effect on our business.

*We are subject to a wide range of environmental, health and safety laws and efforts to comply with such laws may be costly and may adversely impact our financial performance.*

Our operations and the products we manufacture and/or sell are subject to a wide range of global environmental, health and safety laws. Compliance with existing or future environmental, health and safety laws could subject us to future costs, liabilities, impact our production capabilities, constrict our ability to sell, expand or acquire facilities and generally impact our financial performance. Some of these laws relate to the use, disposal, clean up of, and exposure to hazardous substances. In the United States, laws often require parties to fund remedial studies or action regardless of fault. Over the last several years, the European Union (the "EU") countries have enacted environmental laws regulating electronic products. For example, beginning July 1, 2006, our products have been subject to laws that mandate the recycling of waste in electronic products sold in the EU and that limit or prohibit the use of certain substances in electronic products. Other countries outside of Europe are expected to adopt similar laws. We may incur additional expenses to comply with these laws.

*Currency rate fluctuations and exchange controls may adversely affect our cash flow and operating results.*

Because a significant percentage of our sales are made in foreign countries and denominated in local currency, we are exposed to market risk for changes in foreign exchange rates on our foreign currency denominated accounts and notes receivable balances. Historically, the majority of our sales have been made in China and denominated in Renminbi. Prior to July 2005, the impact of currency fluctuations of Renminbi were insignificant as it was fixed to the U.S. dollar. However, in July 2005, China uncoupled the Renminbi from the U.S. dollar and let it float in a narrow band against a basket of foreign currencies. The move revalued the Renminbi by 2.1% against the U.S. dollar; however, it is uncertain what further adjustments may be made in the future. The Renminbi-U.S. dollar exchange rate could float, and the Renminbi could appreciate relative to the U.S. dollar. For example, the Renminbi-U.S. dollar exchange rate was 8.28 to the U.S. dollar prior to the float of the Renminbi in July 2005 and 7.80 Renminbi to the U.S. dollar at December 31, 2006. Any significant revaluation of the Renminbi may materially and adversely affect our cash flows, revenues, operating results and financial position.

Outside of China, our primary foreign currency exposures have related to non-dollar denominated sales and purchases in Japan, Europe and Canada. Additionally, we have exposures to emerging market currencies, which can have extreme currency volatility. We have experienced material adverse impacts on our results of operations from fluctuations in currency exchange rates and may continue to do so in the future.

We may, from time to time, enter into foreign exchange forward contracts to minimize the short-term impact of foreign currency fluctuations on certain foreign currency receivables and payables. Our attempts to hedge against these risks may not be successful, resulting in an adverse impact on our results of operations. Moreover, some of the foreign countries in which we do business might impose currency restrictions that may limit the ability of our subsidiaries and joint ventures in such countries to obtain and remit foreign currency necessary for the purchase of imported components and may limit our ability to obtain and

119

remit foreign currency in exchange for foreign earnings. For example, China employs currency controls restricting Renminbi conversion, limiting our ability to engage in currency hedging activities in China. Various foreign exchange controls may also make it difficult for us to repatriate earnings, which could have a material adverse effect on our ability to conduct business globally.

*Business interruptions could adversely affect our business.*

Our operations are vulnerable to interruption by fire, earthquake, power loss, telecommunications failure, external interference with our information technology systems, incidents of terrorism and other events beyond our control. For example, our Hangzhou manufacturing facility's ability to produce sufficient products is dependent upon a continuous power supply. However, the Hangzhou facility has in the past been subject to power shortages, which has affected our ability to produce and ship sufficient products. Also, our operations in Alameda, California are located in an area prone to earthquakes. We do not have a detailed disaster recovery plan, and the occurrence of any events like these that disrupt our business could harm our business and operating results.

*We may suffer losses with respect to equipment held at customer sites, which could harm our business.*

We face the risk of loss relating to our equipment held at customer sites. In some cases, our equipment held at customer sites is under contract, pending final acceptance by the customer. We generally do not hold title or risk of loss on such equipment, as title and risk of loss are typically transferred to the customer upon delivery of our equipment. However, we do not recognize revenue and accounts receivable with respect to the sale of such equipment until we obtain acceptance from the customer. If we do not obtain final acceptance, we may not be able to collect the contract price and recover this equipment or its associated costs. In other cases, particularly in China, where governmental approval is required to finalize certain contracts, inventory not under contract may be held at customer sites. We hold title and risk of loss on this inventory until the contracts are finalized and, as such, are subject to any losses incurred resulting from any damage to or loss of this inventory.

If our contract negotiations fail or if the government of China otherwise delays approving contracts, we may not recover or receive payment for this inventory. Moreover, our insurance may not cover all losses incurred if our inventory at customer sites not under contract is damaged prior to contract finalization. If we incur a loss relating to inventory for any of the above reasons, our financial condition, cash flows, and operating results could be harmed.

*Restrictions on the use of handsets while driving could affect our future growth.*

Several foreign governments and U.S. state and local governments have adopted or are considering adopting legislation that would restrict or prohibit the use of wireless handsets while driving. Widespread legislation that restricts or prohibits the use of wireless handsets while driving could negatively affect our future growth.

*We have been named as a defendant in securities litigation and other lawsuits, as well as lawsuits in the ordinary course of business.*

Currently, we are a defendant in securities litigation class action lawsuits, as well as other lawsuits. Additionally, from time to time we are plaintiffs or defendants in other lawsuits including lawsuits in the ordinary course of our business. The pursuit or defense of these lawsuits may divert our management's attention, and we may incur significant expenses in pursuing or defending these lawsuits. In addition, we may be required to pay judgments or settlements that could have a material adverse effect on our results of operations, financial condition and liquidity.

*We face risks related to pending governmental inquiries.*

In September 2005, we received notice of a formal inquiry by the staff of the Securities & Exchange Commission ("SEC") into certain aspects of our financial disclosures during prior reporting periods and certain other issues. In addition, in December 2005, the U.S. Embassy in Mongolia informed us that it had forwarded to the Department of Justice ("DOJ") allegations that an agent of our Mongolia joint venture had offered payments to a Mongolian government official in possible violation of the Foreign Corrupt Practices Act (the "FCPA"). We, through our Audit Committee, authorized an independent investigation into possible violations of the FCPA, and we have been in contact with the DOJ and SEC regarding the investigation. The investigation has identified possible FCPA violations in Mongolia, Southeast Asia, India and China, as well as possible violations of U.S. immigration laws. The DOJ has requested that the Company voluntarily produce documents related to the investigation and the SEC has subpoenaed the Company for documents. The Company has executed tolling agreements extending the statute of limitations for the FCPA issues under investigation by the SEC and the DOJ and the immigration issues under investigation by the DOJ. At this time, we cannot predict when any inquiry will be completed or what

the outcome of any inquiry will be. These inquiries could harm relationships with existing customers and our ability to obtain new customers and partners. If the SEC or the DOJ makes a determination that we have violated federal laws, we may face sanctions including, but not limited to, fines, disgorgement and an injunction. Additionally, such a determination by the SEC or the DOJ could adversely affect our business, results of operations, financial position and cash flow, and ultimately our stock price.

We have also been in communication with the SEC regarding our voluntary review of our historical option grant awards grant practices and our review of certain historical sales contracts in China. Although we have now completed both of those voluntary reviews, it is possible that the SEC may question the findings of our reviews or initiate its own review into related matters.

It is possible that the findings and outcome of any of these inquiries may affect other lawsuits that are pending. These inquiries could divert management attention and resources, which could harm our business.

*Failure to achieve and maintain effective internal controls in accordance with Section 404 of the Sarbanes–Oxley Act of 2002 could have a material adverse effect on our business and stock price.*

Section 404 of the Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley Act") requires that we establish and maintain an adequate internal control structure and procedures for financial reporting and include a report of management on our internal control over financial reporting. Our annual report on Form 10–K must contain an assessment by management of the effectiveness of our internal control over financial reporting and must include disclosure of any material weaknesses in internal control over financial reporting that we have identified. In addition, our independent registered public accounting firm must attest to and report on management's assessment of the effectiveness of our internal control over financial reporting.

We have identified material weaknesses in our internal control over financial reporting. See "Part I Item 4 — Controls and Procedures—Management's Report on Internal Control Over Financial Reporting." As of the date of this quarterly report on Form 10–Q, we are still in the process of implementing remedial measures related to the material weaknesses identified in 2004 through 2006. If our efforts to remediate the weaknesses we identified are not successful, our business and operating results could be harmed and the reliability of our financial statements could be impaired, which could adversely affect our stock price. The requirements of Section 404 of the Sarbanes–Oxley Act are ongoing and also apply to future years. We expect that our internal control over financial reporting will continue to evolve as we continue in our efforts to transform our business. Although we are committed to continue to improve our internal control processes and we will continue to diligently and vigorously review our internal control over financial reporting in order to ensure compliance with the Section 404 requirements, any control system, regardless of how well designed, operated and evaluated, can provide only reasonable, not absolute, assurance that its objectives will be met. In addition, successful remediation of the noted control deficiencies is dependent on the Company's ability to hire and retain qualified personnel. Therefore, we cannot be certain that in the future additional material weaknesses or significant deficiencies will not exist or otherwise be discovered.

## RISKS RELATED TO CONDUCTING BUSINESS IN CHINA

*China's governmental and regulatory reforms may impact our ability to do business in China.*

Since 1978, the Chinese government has been in a state of evolution and reform. The reforms have resulted in and are expected to continue to result in significant economic and social development in China. Many of the reforms are unprecedented or experimental and may be subject to change or readjustment due to a variety of political, economic and social factors. Multiple government bodies are involved in regulating and administering affairs in the telecommunications and information technology industries, among which the Ministry of Information Industry ("MII"), the National Development and Reform Commission ("NDRC"), the State–owned Assets Supervision and Administration Commission ("SASAC") and the State Administration of Radio, Film and Television ("SARFT") play the leading roles. These government agencies have broad discretion and authority over all aspects of the telecommunications and information technology industry in China, including but not limited to, setting the telecommunications tariff structure, granting carrier licenses and frequencies, approving equipment and products, granting product licenses, approving of the form and content of transmitted data, specifying technological standards as well as appointing carrier executives, all of which may impact our ability to do business in China.

Any of the following changes in China's political and economic conditions and governmental policies could have a substantial impact on our business:

- the promulgation of new laws and regulations and the interpretation of those laws and regulations;

121

- inconsistent enforcement and application of the telecommunications industry's rules and regulations by the Chinese government between foreign and domestic companies;
- the restructuring of telecommunications carriers in China, including policy making governing 3G network infrastructure and licensing;
- restrictions on IPTV license grants, which could limit the potential market for our products;
- the introduction of measures to control inflation or stimulate growth;
- the introduction of new guidelines for tariffs and service rates, which affect our ability to competitively price our products and services;
- changes in the rate or method of taxation;
- the imposition of laws, rules or regulations affecting the direct or indirect nationalization of assets controlled by non–governmental persons or entities;
- the imposition of additional restrictions on currency conversion and remittances abroad; or
- any actions that limit our ability to develop, manufacture, import or sell our products in China, or to finance and operate our business in China.

In addition to modifying the existing telecommunications regulatory framework, the Chinese government is currently preparing a draft of a standard, national telecommunications law ("Telecommunications Law") to provide a uniform regulatory framework for the telecommunications industry. Currently a draft of the law has been finished and delivered to the National People's Congress for discussion. We do not yet know the final nature or scope of the regulations that would be created if the Telecommunications Law is passed. Accordingly, we cannot predict whether it will have a positive or negative effect on us or on some or all aspects of our business.

Under China's current regulatory structure, the communications products that we offer in China must meet government and industry standards. In addition, a network access license for the equipment must be obtained. Without a license, telecommunications equipment is not allowed to be connected to public telecommunications networks or sold in China. Moreover, we must ensure that the quality of the telecommunications equipment for which we have obtained a network access license is stable and reliable, and will not negatively affect the quality or performance of other installed licensed products.

*China's changing economic environment may impact our ability to do business in China.*

Since 1978, the Chinese government has been reforming the economic system in China to increase the emphasis placed on decentralization and the utilization of market forces in the development of China's economy. These reforms have resulted in significant economic growth. However, any economic reform policies or measures in China may from time to time be modified or revised by the Chinese government. While we may be able to benefit from the effects of some of these policies, these policies and other measures taken by the Chinese government to regulate the economy could also have a significant negative impact on economic conditions in China, which would result in a negative impact on our business.

*China's entry into the World Trade Organization and relaxation of trade restrictions have led to increased foreign investment in China's telecommunications industry and may lead to increased competition in our markets which may have an adverse impact on our business.*

China's economic environment has been changing as a result of China's entry, in December of 2001, into the World Trade Organization ("WTO"). Foreign investment in the telecommunications sector is regulated by the "Provisions on Administration of Foreign Invested Telecommunications Enterprises" promulgated by the State Council in December 2001 and effective as of January 1, 2002. The provisions brought foreign equity limits into conformity with China's WTO commitments, allowing foreign investors to own equity generally up to 49% for basic telecom services enterprises and up to 50% for value–added telecom services enterprises. Furthermore, China is gradually introducing a market oriented pricing mechanism for telecommunication services. On July 13, 2005, China's Ministry of Information Industry ("MII") and National Development and Reform Commission ("NDRC") approved the launch of plan–based pricing for fixed–line telephone service by China's two

122

fixed–line operators, China Telecom and China Netcom.  In August 2005, MII and NDRC endorsed a "Circular on the Changes in Administration of Telecom Service Pricing," which became effective on October 1, 2005 and further relaxed the pricing administration on certain telecom services.  As China gradually relaxes such legal provisions, international telecommunication service vendors may seize this opportunity to adjust their China strategy, increasing their investment in China and converting some of their joint–ventures into fully–owned enterprises.

As the existing international vendors increase their investment in China, and more vendors enter the China market, the competition in the telecommunication equipment market may increase, and as a result, our business may suffer. If China's entry into the WTO results in increased competition or has a negative impact on China's economy, our business could suffer. In addition, although China is increasingly according foreign companies and foreign investment enterprises established in China the same rights and privileges as Chinese domestic companies as a result of its admission into the WTO, special laws, administrative rules and regulations governing foreign companies and foreign investment enterprises in China may still place foreign companies at a disadvantage in relation to Chinese domestic companies and may adversely affect our competitive position.

*Uncertainties with respect to the Chinese legal system may adversely affect us.*

We conduct our business in China primarily through our wholly owned subsidiaries incorporated in China. Our subsidiaries are generally subject to laws and regulations applicable to foreign investment in China. Accordingly, our business might be affected by China's developing legal system. Since 1978, many new laws and regulations covering general economic matters have been promulgated in China, and government policies and internal rules promulgated by governmental agencies may not be published in time, or at all. As a result, we may operate our business in violation of new rules and policies without having any knowledge of their existence. In addition, there are uncertainties regarding the interpretation and enforcement of laws, rules and policies in China. Governmental authorities have broad discretion in the interpretation and enforcement of the laws, regulations and rules. The Chinese legal system is based on written statutes, and prior court decisions have limited precedential value. Because many laws and regulations are relatively new and the Chinese legal system is still evolving, the interpretations of many laws, regulations and rules are not always uniform. Moreover, the relative inexperience of China's judiciary in many cases creates additional uncertainty as to the outcome of any litigation, and the interpretation of statutes and regulations may be subject to government policies reflecting domestic political changes. Finally, enforcement of existing laws or contracts based on existing law may be uncertain and sporadic, and it may be difficult to obtain swift and equitable enforcement, or to obtain enforcement of a judgment by a court of another jurisdiction. Any litigation in China may be protracted and result in substantial costs and diversion of resources and management's attention.

*If tax benefits available to our subsidiaries located in China are reduced or repealed, our business could suffer.*

On March 16, 2007, China's top legislature, the National People's Congress, passed the China Corporate Income Tax Law ("CIT Law").  CIT Law will be effective on January 1, 2008.  Under the CIT Law, China's dual tax system for domestic enterprises and foreign investment enterprises ("FIEs") would be effectively replaced by a unified system.  The new law establishes a tax rate of 25% for most enterprises and a reduced rate of 15% for certain qualified high technology enterprises.

Prior to this change in tax law, certain subsidiaries and joint ventures located in China enjoyed tax benefits in China which are generally available to FIEs.  The tax holidays/incentives for FIEs were applicable or potentially applicable to UTStarcom ChongQing Telecom Co. Ltd. ("CUTS"), UTStarcom Telecom Co., Ltd. ("HUTS"), Hangzhou UTStarcom Telecom Co., Ltd. ("HSTC") and UTStarcom China Co., Ltd. ("UTSC"), our active subsidiaries in China, because these entities may qualify as accredited technologically advanced enterprises.

CIT Law targets certain industries for the reduced 15% tax rate for certain qualified high technology enterprises.   For FIEs established before the promulgation of the new law who currently enjoy lower tax rates, any increase in their tax rates would be gradually phased in over five years. Significant regulations regarding the interpretation and implementation of the new tax law are still pending.  There is potential risk that our subsidiaries may not qualify for the reduced 15% tax rate.  Therefore, the new law may have an adverse impact on our future tax expense in China.

Moreover, the Chinese central government may review and audit tax benefits granted by local or provincial authorities and could determine to disallow such benefits. Certain of our subsidiaries and joint ventures located in China enjoy tax benefits in China that are generally available to foreign investment enterprises. If these tax benefits are reduced, disallowed or repealed due to changes in tax laws or determination by the Chinese government, our business could suffer.

123

*Our ability to continue successful deployment of PAS system and sales of PAS handsets are limited by certain factors, including the following:*
*Maturing PAS market and increased competition in handsets and tariffs.*

     The market for PAS exceeded 96 million users as of the end of fiscal year 2006 and is available in most of the provinces throughout China. We believe the PAS market has matured. For example, during fiscal year 2005, net sales of the PAS/iPAS system and the wireless infrastructure market declined significantly as compared to fiscal year 2004. This decline continued through fiscal year 2006, and the first quarter of 2007. If additional handset competitors enter the market, or if competitors decide to further reduce pricing, our sales of PAS handsets may be adversely impacted.

     Furthermore, competition from mobile operators, such as China Mobile and China Unicom, has increased in cities where PAS is deployed. Mobile operators offering special promotional pricing or incentives to customers, such as free incoming calls or free mobile−to−mobile calls, have harmed the ability of our customers, China Telecom and China Netcom, to compete effectively. The continued use of such incentive programs by mobile operators may adversely impact China Telecom and China Netcom's ability to increase PAS subscriptions. Due to our relationships with China Telecom and China Netcom, reduced subscription growth at these carriers may have a material adverse effect on our pricing and harm our business or results of operations.

*Our PAS system and handsets sales may experience a sharp decline if China Telecom or China Netcom obtain licenses allowing them to deliver mobile services.*

     China's media sources have widely reported that the MII may grant 3G mobile licenses to China Telecom or China Netcom, or to both in 2007. If China Telecom or China Netcom obtains 3G mobile licenses, they may re−allocate capital expenditures to construct 3G networks, and as a consequence, may significantly reduce capital expenditures relating to PAS networks that utilize our existing products. In addition, it is possible that current PAS frequency bands utilized by PAS networks may be reallocated for use by 3G networks, resulting in the restriction of or shutting down of PAS networks. If this were to occur, we could lose current and potential future customers of our products, and our financial condition and results of operations could be significantly harmed.

*We only have trial licenses for the PAS system and handsets in China.*

     We only have trial licenses for our PAS systems and handsets. We have applied for, but have not yet received, a final official network access license for our PAS systems and handsets. Based upon communication with the MII, we understand that our PAS systems and handsets are considered to still be in the trial period and sales of our PAS systems and handsets may continue to be made by us during this trial period, but that licenses will ultimately be required. If we fail to obtain the required licenses, we could be prohibited from making further sales of the unlicensed products, including our PAS systems and handsets, in China, which would substantially harm our business, financial condition and results of operations. The regulations implementing these requirements are not very detailed, have not been applied by a court and may be interpreted and enforced by regulatory authorities in a number of different ways. Our external legal counsel in China has advised us that China's governmental authorities may interpret or apply the regulations with respect to which licenses are required and the ability to sell a product while a product is in the trial period in a manner that is inconsistent with the information received by our legal counsel in China, and either of these conditions could have a material adverse effect on our business, financial condition and results of operations.

*Increasing centralization of purchasing decision−making by carriers may lead to customer concentration and affect the results of our business.*

     Most Chinese carriers have three levels of operations: the central headquarters level, the provincial level and the local city/county level. Both central and provincial levels are independent legal persons and have their own corporate mandate. The purchasing decision−making process may take various forms for different projects and may also differ significantly from carrier to carrier. In the case of PAS systems, we negotiate and enter into all China Netcom contracts with the provincial operators. However, the central headquarters of China Telecom has chosen to exert its influence in the purchasing decision−making process by negotiating contractual terms, such as purchase price, payment terms, and acceptance clauses at the central level. The provincial operator then further negotiates the contract based on the guidelines provided by the headquarters. We enter into final contracts with the provincial operator. However, if this trend of centralized decision−making expands to unified purchasing, resulting in the negotiation and execution of contracts at the central headquarter level, there may be a concentration of customers which could have a significant impact on our business. If China Netcom follows China Telecom and exerts the headquarters' influence in price negotiation, it may give downward pressure to the margin of our PAS system products to China Netcom.

124

*Television over the internet is a new business in China and laws regulating the business have not been fully developed and may be unpredictable. Unfavorable regulation of the industry may adversely affect our IPTV operations in China and negatively impact our business.*

Broadcasting television over the internet has only recently begun in China. The State Administration of Radio, Film and Television (SARFT), the central government's regulatory body, issued a measure in July 2004 to regulate the broadcasting of audio–visual programs through the information network, which includes our Internet Protocol television (IPTV) business. SARFT categorized the information network into the mobile telecommunication network, fixed communications network, microwave communication network, cable television network, satellite or other metropolitan area network, wide area network, local area network and other information networks categories. The receiving terminal equipment includes computers, television sets, mobile phones and other electronic products. While regulating the IPTV business, SARFT is encouraging development in China of the digital television business, a business that may be competitive with IPTV in the target market. The digital television and IPTV target complementary markets and it is not clear the extent of support SARFT will provide for IPTV in setting regulations. For example, the Guangzhou Administration of Radio, Film, and Television, the municipal regulatory body in the city of Guangzhou, issued a notice to stop all IPTV business in Guangzhou on December 25, 2005. The Zhejiang Administration of Radio, Film, and Television, the local regulatory body in the province of Zhejiang, issued a similar notice on January 10, 2006. In both instances, SARFT had not formally endorsed the launch of commercial IPTV services in those localities. Because the IPTV industry relates to both television and telecom sectors, it may be subject to regulation by different governmental authorities, including the Ministry of Information Industry (MII). At the end of 2005, an official of MII declared that MII and SARFT would jointly administer the IPTV industry in the coming years. However, due to a lack of uniform regulation on the development of the IPTV industry, we cannot predict that our IPTV business will operate smoothly in China. Our business may suffer if the law or policy in China does not encourage the IPTV industry.

*We currently do not have a license to engage in the IPTV operator service business in China and development of our IPTV business depends upon the cooperation of IPTV license holder(s) and network operators. If we are unable to work cooperatively with license holder(s) and network operators, our business may suffer.*

Under the measures issued by SARFT in July 2004, entities intending to engage in the IPTV operator service business should obtain a license from SARFT and foreign investment enterprises are prohibited from engaging in the IPTV operator service business. In practice, SARFT only grants such licenses to state–owned companies. Since we are the technical service and equipment provider in this field, our business development will depend on the cooperation of license holders and network operators. Our business may suffer if we fail to cooperate with license holders or network operators, or if the license holder(s) we're cooperating with lose their licenses.

## RISKS RELATED TO OUR STOCK PERFORMANCE AND CONVERTIBLE DEBT SECURITIES

*Our stock price is highly volatile.*

The trading price of our common stock has fluctuated significantly since our initial public offering in March of 2000. Our stock price could be subject to wide fluctuations in the future in response to many events or factors, including those discussed in the preceding risk factors relating to our operations, as well as:

- actual or anticipated fluctuations in operating results, actual or anticipated gross profit as a percentage of net sales, levels of inventory, our actual or anticipated rate of growth and our actual or anticipated earnings per share;
- changes in expectations as to future financial performance or changes in financial estimates or buy/sell recommendations of securities analysts;
- changes in governmental regulations or policies in China;
- our, or a competitor's, announcement of new products, services or technological innovations;
- the operating and stock price performance of other comparable companies; and
- news and commentary emanating from the media, securities analysts or government bodies in China relating to us and to the industry in general.

125

General market conditions and domestic or international macroeconomic factors unrelated to our performance may also affect our stock price. For these reasons, investors should not rely on recent trends to predict future stock prices or financial results. In addition, following periods of volatility in a company's securities, securities class action litigation against a company is sometimes instituted. We have experienced substantial costs and the diversion of management's time and resources on this type of litigation and may do so in the future.

In addition, public announcements by China Telecom, China Netcom, China Mobile, and China Unicom each of which exert significant influence over many of our major customers in China, may contribute to volatility in the price of our stock. The price of our stock may react to such announcements.

*SOFTBANK CORP. with its related entities, including SOFTBANK America Inc., has significant influence over our management and affairs, which it could exercise against the best interests of our stockholders.*

SOFTBANK CORP. and its related entities, including SOFTBANK America Inc. (collectively, "SOFTBANK"), beneficially owned approximately 12% of our outstanding stock as of December 31, 2006. As a result, SOFTBANK has the ability to influence all matters submitted to our stockholders for approval, as well as our management and affairs. Matters that could require stockholder approval include:

- election and removal of directors;
- our merger or consolidation with or into another entity; and
- sale of all or substantially all of our assets.

This concentration of ownership may delay or prevent a change of control or discourage a potential acquirer from making a tender offer or otherwise attempting to obtain control of us, which could decrease the market price of our common stock.

*Delaware law and our charter documents contain provisions that could discourage or prevent a potential takeover, even if the transaction would benefit our stockholders.*

Other companies may seek to acquire or merge with us. Our acquisition or merger could result in benefits to our stockholders, including an increase in the value of our common stock. Some provisions of our Certificate of Incorporation and Bylaws, as well as provisions of Delaware law, may discourage, delay or prevent a merger or acquisition that a stockholder may consider favorable. These provisions include:

- authorizing the board of directors to issue additional preferred stock;
- prohibiting cumulative voting in the election of directors;
- limiting the persons who may call special meetings of stockholders;
- prohibiting stockholder action by written consent;
- creating a classified board of directors pursuant to which our directors are elected for staggered three year terms; and
- establishing advance notice requirements for nominations for election to the board of directors and for proposing matters that can be acted on by stockholders at stockholder meetings.

*We face a variety of risks related to our convertible subordinated notes.*

We face a variety of risks with respect to our convertible subordinated notes due in 2008 ("Notes"), including the following:

- we have significantly increased our leverage as a result of the sale of the Notes which could have an adverse impact on our ability to obtain additional financing for working capital;

126

- we may be limited in our ability to purchase the Notes in the event of a change in control, either for cash or stock, which could result in our defaulting on the Notes at the time of the change in control, and purchases for stock would be subject to market risk; and
- hedging transactions related to the Notes and our common stock and other transactions, as well as changes in interest rates and our creditworthiness, may affect the value of our common stock.

In addition, we are subject to various covenants pursuant to the terms of the indenture governing the Notes (the "Indenture"). Should we fail to comply with certain covenants in the Indenture, including covenants requiring us to file certain reports required to be filed pursuant to the Exchange Act (the "SEC Reports") with the Securities and Exchange Commission (the "SEC") and to provide the trustee for the notes (the "Trustee") with copies of such reports and certain certificates regarding our compliance with our obligations under the Indenture, the Trustee or the holders of 25% of the aggregate principal amount of the Notes outstanding (the "25% Holders") could accelerate the maturity of the Notes and the Notes could become immediately due and payable. In the past, there have been delays in filing such reports: For example, as of November 9, 2006 and continuing through the date hereof there has been a delay in the filing of our Quarterly Report on Form 10–Q for the quarter ended September 30, 2006 (the "2006 Q3 Form 10–Q"), our Annual Report on Form 10–K for the fiscal year ended December 31, 2006 (the "2006 Form 10–K"), our Quarterly Report on Form 10–Q for the quarter ended March 31, 2007 (the "2007 Q1 Form 10–Q"), and our Quarterly Report on Form 10–Q for the quarter ended June 30, 2007 (the "2007 Q2 Form 10–Q," and together with the 2006 Q3 Form 10–Q, the 2006 Form 10–K, and the 2007 Q1 Form 10–Q, the "Delayed Reports"). We received a notice from the Trustee on May 31, 2007, asserting that our failure to file the 2006 Q3 Form 10–Q, the 2006 Form 10–K and the 2007 Q–1 Form 10–Q had resulted in a default under the Indenture, and that if we failed to file such reports within 60 days, an event of default would arise under the Indenture.

In July 2007, we sought and obtained the requisite consents from holders of the Notes to certain amendments to the Indenture, which provide that (i) any failure by us to file SEC Reports with the SEC and provide copies of such reports and certain certificates to the Trustee prior to 5:30 p.m. New York City time on October 15, 2007 (the "Expiration Date") will not cause a default under the Indenture, (ii) any such failure continuing after the Expiration Date would cause a default under the Indenture, which would be deemed to have occurred as of the Expiration Date, and (iii) we will pay additional interest on the Notes of (a) 6.75% annually from January 9, 2007 to and including July 25, 2007, and (b) 10.0% annually from and including July 26, 2007 to the date the Notes are paid, prepaid, converted, redeemed or otherwise cease to be outstanding (in each case, in addition to interest of 7/8% annually, as provided by the Indenture, without regard to any amendments). Thus, if we fail to file the SEC Reports and deliver copies of such reports and certain certificates to the Trustee on or prior to October 15, 2007, the Trustee or the 25% Holders may give notice to us asserting that such failure caused a default under the Indenture, which, if not cured within 60 days after the date the notice is effective, would cause an event of default under the Indenture. If an event of default were to occur, the Trustee or the 25% Holders would have the right to accelerate the maturity of the Notes and declare all unpaid principal and accrued interest on the Notes then outstanding to be immediately due and payable, as described above. No assurance can be given that we would be able to obtain the requisite consents of the Holders to a further amendment to the Indenture, providing for a waiver of compliance with covenants in the Indenture relating to the filing of SEC Reports, on acceptable terms or at all. If an event of default under the Indenture were to occur, and the maturity of the Notes were accelerated, and all unpaid principal and accrued interest is declared immediately due and payable, our business would be seriously harmed. If we have not filed the SEC Reports, our ability to raise additional capital may be limited, and specifically, we would not be able to refinance indebtedness under the Notes from the proceeds of an issuance of new convertible notes. In addition, if we are able to raise capital to refinance indebtedness under the Notes by issuing new convertible notes, the terms of such notes may be significantly less favorable than the terms of the Notes, and may cause greater dilution to holders of our common stock.

*Our failure to timely file periodic reports with the Securities and Exchange Commission could result in the delisting of our common stock from the NASDAQ Stock Market.*

As a result of our failure to timely file our Quarterly Report on Form 10–Q for the period ended September 30, 2006 ("Q3 2006 Form 10–Q"), our Annual Report on Form 10–K for the year ended December 31, 2006, our Quarterly Report on Form 10–Q for the period ended March 31, 2007 ("Q1 2007 Form 10–Q") and our Quarterly Report on Form 10–Q for the period ended June 30, 2007 ("Q2 2007 Form 10–Q"), we have not been in full compliance with NASDAQ Marketplace Rule 4310(c)(14), which requires us to make, on a timely basis, all filings with the Securities and Exchange Commission required by the Securities Exchange Act of 1934. Although we have now filed this Q3 2006 10–Q and our Form 10–K, we have not yet filed our Q1 2007 Form 10–Q and Q2 2007 Form 10–Q and thus continue not to be in full compliance with this rule. We are required to comply with NASDAQ Marketplace Rule 4310(c)(14) as a condition for our common stock to continue to be listed on the NASDAQ Stock Market.

127

In connection with our failure to timely file our periodic reports, we received four NASDAQ Staff Determination letters, dated November 15, 2006, March 7, 2007, May 16, 2007 and August 13, 2007, respectively, stating that, as a result of each of these non–timely filings, we were not in compliance with the requirements of Marketplace Rule 4310(c)(14) and, therefore, that our stock was subject to delisting from the NASDAQ Stock Market. We appealed the November 15, 2006 determination to the Nasdaq Listing Qualifications Panels (the "Panel") and were granted a conditional extension to our request for continued listing until April 16, 2007. On April 17, 2007 the Panel extended the deadline for filing our Q3 2006 Form 10–Q to May 14, 2007. The Panel also extended the deadline for filing our 2006 Form 10–K until July 16, 2007. On May 2, 2007, we asked the NASDAQ Listing and Hearing Review Council ("Listing Council") to review the April 17, 2007 decision of the Panel. On May 14, 2007, the Listing Council called the Panel's decision for review and requested that we provide an update on our efforts to file our delinquent filings. We have continued and continue to comply with that request. In addition, the Listing Council stayed the Panel's decision that required us to file our Q3 2006 Form 10–Q by May 14, 2007, and to file our 2006 Form 10–K by July 16, 2007. On August 23, 2007, the Listing Council granted the Company an extension until October 22, 2007 to file our delinquent periodic reports and restatements.

If we are unable to maintain compliance with the conditions for continued listing required by NASDAQ, then our shares of common stock may be subject to delisting from the NASDAQ Stock Market. If our shares of common stock are delisted from the NASDAQ Stock Market, they may not be eligible to trade on any national securities exchange or the over–the counter market. If our common stock is no longer traded through a market system, the liquidity of our common stock may be greatly reduced, which could negatively affect its price. In addition, we may be unable to obtain future equity financing, or use our common stock as consideration for mergers or other business combinations. A delisting from the NASDAQ Stock Market may also have other negative implications, including the potential loss of confidence by suppliers, customers and employees, the loss of institutional investor interest, and fewer business development opportunities.

## ITEM 2—UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

None

## ITEM 3—DEFAULTS UPON SENIOR SECURITIES

None

## ITEM 4—SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

On July 21, 2006, the Company held its annual meeting of stockholders. As of May 25, 2006, the record date for the annual meeting, there were 121,089,996 shares of common stock of the Company issued and outstanding and entitled to vote at the annual meeting. The following proposals were submitted to a vote of the stockholders:

To elect the following two Class III directors to serve for a term expiring on the date on which the annual meeting of stockholders is held in the year 2009.

| Election of Directors | Votes for | Votes Withheld |
|---|---|---|
| Jeff Clarke | 103,480,609 | 1,809,464 |
| Hong Liang Lu | 101,449,620 | 3,840,453 |

There were no broker non–votes on this matter. As a result, Messrs. Clarke and Lu were elected as Directors of the Company. Other directors whose terms of office continued after the meeting were as follows:

| Class I (Term Expiring 2007) | Class II (Term Expiring 2008) |
|---|---|
| Thomas Toy | Larry D. Horner |
| Ying Wu | Allen Lenzmeier |

(ii)    To adopt and approve the 2006 Equity Incentive Plan, which would govern the grant of incentive awards to the Company's service providers, including (a) stock options, (b) stock appreciation rights, (c) restricted stock, (d) restricted stock units, (e) performance shares and performance units, and (f) other stock or cash awards.

| For | Against | Abstain |
|---|---|---|
| 46,952,724 | 7,245,445 | 667,710 |

128

There were 50,424,194 broker non–votes on this matter. As described in the Company's definitive proxy statement as filed with the SEC on June 21, 2006, broker non–votes are counted for purposes of establishing quorum but do not effect the outcome of the proposal being voted on because they are not considered votes cast. As a result, the 2006 Equity Incentive Plan was approved and adopted.

    (iii)     To ratify and approve the appointment of PricewaterhouseCoopers LLP as the Independent Registered Public Accounting Firm of the Company for the fiscal year ending December 31, 2006.

| For | Against | Abstain |
| --- | --- | --- |
| 102,151,544 | 2,620,700 | 517,829 |

There were no broker non–votes on this matter. As a result, the appointment of PricewaterhouseCoopers LLP as the Independent Registered Public Accounting Firm of the Company was ratified.

**ITEM 5—OTHER INFORMATION**

Amended and Restated Change of Control Severance Agreement with Francis Barton

    We entered into an Amended and Restated Change of Control Severance/Involuntary Termination Agreement dated August 23, 2006 with Mr. Barton ("Barton Severance Agreement"). The Barton Severance Agreement provides that if Mr. Barton's employment with us terminates as a result of an involuntary termination at any time within 18 months after a change of control, or any other regular involuntary termination during the period of employment, (i) Mr. Barton will be entitled to 24 months of base salary as in effect as of the date of such termination, payable in a lump sum within 30 days of termination, and 100% of the bonus for the year in which termination occurs, (ii) all equity awards, including without limitation option grants, restricted stock and stock purchase rights, granted to Mr. Barton prior to the change of control will become fully vested and/or exercisable to the extent such equity awards are outstanding and/or unexercisable at the time of such termination, (iii) Mr. Barton would be permitted to exercise such vested equity awards for the shorter period of (a) 12 months from the date of termination and (b) the remaining term of the respective equity awards, and (iv) we will continue to provide Mr. Barton the same level of health coverage as in effect on the day immediately preceding the termination date until the earlier of the date he is no longer eligible to receive continuation coverage pursuant to the COBRA, or 12 months from the termination date.

    The Barton Severance Agreement also provides that if Mr. Barton's employment with us terminates as a result of a regular involuntary termination during the period of employment apart from a change of control, (i) Mr. Barton will be entitled to 24 months of base salary as in effect as of the date of such termination, payable in a lump sum within 30 days of termination, and 100% of the bonus for the year in which termination occurs, (ii) all equity awards, including without limitation option grants, restricted stock and stock purchase rights, granted to Mr. Barton would be fully vested and/or exercisable to the extent such equity awards are outstanding and/or unexercisable at the time of such termination, (iii) Mr. Barton would be permitted to exercise such vested equity awards for the shorter period of (a) 12 months from the date of termination and (b) the remaining term of the respective equity awards, and (iv) we will continue to provide Mr. Barton the same level of health coverage as in effect on the day immediately preceding the termination date until the earlier of the date he is no longer eligible to receive continuation coverage pursuant to the COBRA or 12 months from the termination date. The Barton Severance Agreement is filed as Exhibit 10.15 to this Form 10–Q for the quarter ended September 30, 2006.

    If Mr. Barton's employment with us terminates other than as a result of a change of control or other involuntary termination, Mr. Barton shall not be entitled to receive severance or other benefits under the Barton Severance Agreement.

Amended and Restated Change of Control/Involuntary Severance Agreement with Ying Wu

    On November 14, 2006, we entered into an Amended and Restated Change of Control/Involuntary Termination Severance Agreement with Mr. Ying Wu, our then Executive Vice President, Vice Chairman of the Board and Chairman and Chief Executive Officer of our subsidiary, UTStarcom China Co., Ltd. ("Wu Severance Agreement"). The Wu Severance Agreement provided that if Mr. Wu's employment with us terminated as a result of an involuntary termination at any time within 18 months after a change of control, (i) Mr. Wu would be entitled to 24 months of base salary as in effect as of the

date of such termination payable in a lump sum within 30 days of termination, and 100% of the bonus for the year in which termination occurred, (ii) all equity awards, including without limitation option grants, restricted stock and stock purchase rights, granted to Mr. Wu prior to the change of control would become fully vested and/or exercisable, to the extent such equity awards were outstanding and/or unexercisable at the time of such termination, (iii) Mr. Wu would be permitted to exercise such vested equity awards for the shorter period of (a) 12 months from the date of termination and (b) the remaining term of the respective equity awards, and (iv) we would continue to provide Mr. Wu the same level of health coverage as in effect on the day immediately preceding the termination date until the earlier of the date he is no longer eligible to receive continuation coverage pursuant to COBRA, or 12 months from the termination date.

The Wu Severance Agreement also provided that if Mr. Wu's employment with us terminated as a result of a regular involuntary termination during the period of employment apart from a change of control, (i) Mr. Wu would be entitled to 12 months of base salary as in effect as of the date of such termination, payable in a lump sum within 30 days of termination, and 100% of the bonus for the year in which termination occurred, (ii) all equity awards, including without limitation option grants, restricted stock and stock purchase rights, granted to Mr. Wu would become fully vested and/or exercisable to the extent such equity awards were outstanding and/or unexercisable at the time of such termination, (iii) Mr. Wu would be permitted to exercise such vested equity awards for the shorter period of (a) 12 months from the date of termination and (b) the remaining term of the respective equity awards, and (iv) we would continue to provide Mr. Wu the same level of health coverage as in effect on the day immediately preceding the termination date until the earlier of the date he is no longer eligible to receive continuation coverage pursuant to COBRA or 12 months from the termination date. If Mr. Wu's employment with us terminated other than as a result of a change of control or other involuntary termination, Mr. Wu would not be entitled to receive severance or other benefits under the Wu Severance Agreement. The Wu Severance Agreement is filed as Exhibit 10.28 to our Annual Report on Form 10–K for the fiscal year ended December 31, 2006.

Mr. Wu's employment with the Company and its subsidiaries terminated on June 1, 2007. Mr. Wu is eligible to receive severance benefits for involuntary termination without a change in control in accordance with the terms of the Wu Severance Agreement as described above, such payments to total $998,768.83 (comprised of $550,000 in base salary, $440,000 in bonus, subject to applicable withholding, and $8,768.83 for health care premiums).

Amended and Restated Change of Control/Involuntary Severance Agreement with William Huang

We entered into an Amended and Restated Change of Control/Involuntary Termination Severance Agreement dated August 21, 2006 with Mr. Huang ("Huang Severance Agreement"). The Huang Severance Agreement had the same terms and conditions as the Wu Severance Agreement described above. The Huang Severance Agreement is filed as Exhibit 10.14 to this Form 10–Q for the quarter ended September 30, 2006. Mr. Huang voluntarily resigned as our Senior Vice President and Chief Technology Officer effective on December 31, 2006. In connection with his departure, Mr. Huang did not receive any severance payments or benefits under the Huang Severance Agreement. However, Mr. Huang received payments for his accrued but unpaid time off and floating holiday benefits in an amount of $67,305.

## ITEM 6—EXHIBITS

| Exhibit Number | EXHIBIT DESCRIPTION |
| --- | --- |
| 3.1 | Thirteenth Amended and Restated Certificate of Incorporation of UTStarcom, Inc., as amended. (incorporated by reference to Exhibit 3.1 of Current Report on Form 8–K filed with the SEC on December 12, 2003) |
| 3.2 | First Amended and Restated Bylaws of UTStarcom, Inc., as amended (incorporated by reference to Exhibit 3.1 of Current Report on Form 8–K filed with the SEC on November 11, 2006) |
| 4.1 | See exhibits 3.1 and 3.2 for provisions of the Certificate of Incorporation and Bylaws defining the rights of holders of Common Stock. |
| 4.2 | Specimen Common Stock Certificate. (incorporated by reference to Exhibit 4.1 of Form S–1/A filed with the SEC on February 7, 2000) |
| 4.3 | Third Amended and Restated Registration Rights Agreement dated December 14, 1999. (incorporated by reference to Exhibit 4.2 of Form S–1 filed with the SEC on December 20, 1999) |
| 4.4 | Convertible Subordinated Notes Indenture dated as of March 12, 2003 between UTStarcom, Inc. and U.S. Bank National Association, including the form of the 7⁄8% Convertible Subordinated Notes due 2008. (incorporated by reference to Exhibit 4.4 of Quarterly Report on Form 10–Q filed with the SEC on May 12, 2003) |

130

| | |
|---|---|
| 4.5 | First Supplemental Indenture, dated January 9, 2007, by and between the Company and U.S. Bank National Association. (incorporated by reference to Exhibit 99.2 of Current Report on Form 8–K filed with the SEC on January 10, 2007) |
| 4.6 | Underwriting Agreement, dated January 8, 2004 between the Company and Bank of America Securities LLC, as amended on January 14, 2004. (incorporated by reference to Exhibit 4.7 of Form 10–K filed with the SEC on April 15, 2005) |
| 4.7 | Consent Solicitation Statement dated December 22, 2006 related to the Company's 7/8% Convertible Subordinated Notes due 2008 (incorporated by reference to Exhibit 99.2 of Current Report on Form 8–K filed with the SEC on December 22, 2006) |
| 4.8 | Amended Letter of Consent related to the Company's 7/8% Convertible Subordinated Notes due 2008 (incorporated by reference to Exhibit 99.3 of Current Report on Form 8–K filed with the SEC on January 8, 2007) |
| 4.9 | Supplemental Consent Solicitation Statement dated January 8, 2007 related to the Company's 7/8% Convertible Subordinated Notes due 2008 (incorporated by reference to Exhibit 99.2 of Current Report on Form 8–K filed with the SEC on January 8, 2007) |
| 4.10 | Second Consent Solicitation Statement dated July 19, 2007 relating to the Company's Convertible Subordinated Notes due 2008 (incorporated by reference to Exhibit 99.2 to the Form 8–K filed with the SEC on July 19, 2007) |
| 4.11 | Letter of Consent relating to the Company's Convertible Subordinated Notes due 2008 (incorporated by reference to Exhibit 99.3 to the Form 8–K filed with the SEC on July 19, 2007) |
| 4.12 | Second Supplemental Indenture, dated July 26, 2007, by and between the Company and U.S. Bank National Association (incorporated by reference to Exhibit 99.1 to the Form 8–K filed with the SEC on July 30, 2007) |
| 10.1*(1) | UTStarcom, Inc. 2006 Equity Incentive Plan (2006 EIP) |
| 10.2*(1) | Form of Stock Option Award Agreement to be used with 2006 EIP |
| 10.3*(1) | Form of Stock Option Award Agreement for Directors and Officers to be used with 2006 EIP |
| 10.4*(1) | Form of Restricted Stock Agreement to be used with 2006 EIP |
| 10.5*(1) | Form of Restricted Stock Unit Agreement to be used with 2006 EIP |
| 10.6* | Offer Letter to Viraj Patel dated November 2, 2005. |
| 10.7* | Offer Letter to Mark Green dated December 19, 2005. |
| 10.8* | Offer Letter to David King dated April 3, 2006. |
| 10.9* | Employment Agreement by and between Philip Christopher and UTStarcom, Inc. dated June 11, 2004. |
| 10.10* | Severance Agreement and Release by and between Michael J. Sophie and UTStarcom, Inc. dated April 13, 2006. |
| 10.11++ | Strategic Alliance Agreement by and between Pantech & Curitel Communications and UTStarcom, Inc., dated September 25, 2006. |
| 10.12* | UTStarcom, Inc. Vice President Change in Control and Involuntary Termination Severance Pay Plan |
| 10.13* | UTStarcom, Inc. Executive Involuntary Termination Severance Pay Plan |
| 10.14* | Amended and Restated Change of Control/Involuntary Termination Severance Agreement by and between William X. Huang and UTStarcom, Inc. dated August 21, 2006. |
| 10.15* | Amended and Restated Change of Control/Involuntary Termination Severance Agreement by and between Francis P. Barton and UTStarcom, Inc. dated August 23, 2006. |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a–14(a) or Rule 15d–14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a–14(a) or Rule 15d–14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | Certifications of the Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes–Oxley Act of 2002. |

| | |
|---|---|
| * | Management contract, plan or arrangement |
| ++ | Portions of the exhibit have been omitted pursuant to a request for confidential treatment filed with the Securities and Exchange Commission for confidential treatment. |
| (1) | Incorporated by reference to the registrant's Current Report on Form 8–K, which was filed with the Securities and Exchange Commission on July 27, 2006. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

UTSTARCOM, INC.

Date: October 10, 2007

By:    /s/ Francis P. Barton
_____
Francis P. Barton
*Executive Vice President and Chief Financial Officer*
*(Principal Financial Officer)*

132