# Exhibit K
# Part 1 of 2



# FORM DEF 14A

## UTSTARCOM INC – UTSI

**Filed: April 18, 2005 (period: May 13, 2005)**

Official notification to shareholders of matters to be brought to a vote (Proxy)

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934

Filed by the Registrant  ☒
Filed by a Party other than the Registrant  ☐
Check the appropriate box:
☐   Preliminary Proxy Statement
☐   Confidential, for Use of the Commission Only (as permitted by Rule 14a−6(e)(2))
☒   Definitive Proxy Statement
☐   Definitive Additional Materials
☐   Soliciting Material Pursuant to §240.14a−12

---

**UTSTARCOM, INC.**

(Name of Registrant as Specified In Its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

---

Payment of Filing Fee (Check the appropriate box):
☒   No fee required.
☐   Fee computed on table below per Exchange Act Rules 14a−6(i)(1) and 0−11.
   (1)   Title of each class of securities to which transaction applies:

   (2)   Aggregate number of securities to which transaction applies:

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0−11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)   Proposed maximum aggregate value of transaction:

   (5)   Total fee paid:

☐   Fee paid previously with preliminary materials.
☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0−11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
   (1)   Amount Previously Paid:

   (2)   Form, Schedule or Registration Statement No.:

   (3)   Filing Party:

   (4)   Date Filed:

**Persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**



April 18, 2005

Dear Stockholder:

You are cordially invited to attend the 2005 annual meeting of stockholders of UTStarcom, Inc. (the "**Company**") to be held at the Hilton Oakland Airport, 1 Hegenberger Road, Oakland, Califomia 94621, on Friday, May 13, 2005 at 10:00 a.m., Pacific Daylight Time. Enclosed are a notice of annual meeting of stockholders, a proxy statement describing the business to be transacted at the meeting, and a proxy card for use in voting at the meeting.

At the annual meeting, you will be asked to vote on the important matters described in detail in the notice of annual meeting of stockholders and proxy statement accompanying this letter. There also will be an opportunity for you to ask questions and receive information about the business of the Company.

Included with the proxy statement is a copy of the Company's annual report to stockholders. We encourage you to read the annual report. It includes information on the Company's operations as well as the Company's audited financial statements.

Please take this opportunity to participate in the affairs of the Company by voting on the business to come before this meeting. **WHETHER OR NOT YOU EXPECT TO ATTEND THE MEETING, PLEASE COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE ACCOMPANYING PROXY CARD IN THE ENCLOSED POSTAGE−PAID ENVELOPE SO THAT YOUR SHARES MAY BE REPRESENTED AT THE MEETING.** Returning the proxy card does not deprive you of your right to attend the meeting and to vote your shares in person.

We look forward to seeing you at the meeting.

Sincerely,

Hong Liang Lu
*President, Chief Executive Officer and*
*Chairman of the Board of Directors*

**YOUR VOTE IS IMPORTANT. PLEASE COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE ENCLOSED PROXY CARD IN THE ENCLOSED POSTAGE−PAID ENVELOPE WHETHER OR NOT YOU PLAN TO ATTEND THE MEETING. IF YOU ATTEND THE MEETING AND DESIRE TO WITHDRAW YOUR PROXY, YOU MAY VOTE IN PERSON AND YOUR PROXY WILL BE WITHDRAWN.**

# UTSTARCOM, INC.

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To Be Held May 13, 2005

To the Stockholders:

NOTICE IS HEREBY GIVEN that the annual meeting of stockholders (the **"Annual Meeting"**) of UTStarcom, Inc. (the **"Company"**), a Delaware corporation, will be held on Friday, May 13, 2005 at 10:00 a.m., Pacific Daylight Time, at the Hilton Oakland Airport, 1 Hegenberger Road, Oakland, California 94621, for the following purposes:

1. To elect two Class II directors to serve for a term expiring on the date on which the annual meeting of stockholders is held in the year 2008.

2. To approve the 2005 Equity Incentive Plan, including approval of its material terms and performance goals for the purposes of Section 162(m) of the Internal Revenue Code of 1986, as amended.

3. To ratify and approve the appointment of PricewaterhouseCoopers LLP as the Independent Registered Accounting Firm of the Company for the fiscal year ending December 31, 2005.

4. To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

The foregoing items of business are more fully described in the proxy statement accompanying this notice.

Only stockholders of record at the close of business on March 14, 2005 are entitled to notice of and to vote at the Annual Meeting.

All stockholders are cordially invited to attend the Annual Meeting in person. However, to assure your representation at the Annual Meeting, you are urged to complete, sign and return the enclosed proxy card as promptly as possible in the postage–paid envelope enclosed for that purpose. Any stockholder attending the Annual Meeting may vote in person even if he or she returned a proxy.

By Order of the Board of Directors

Michael J. Sophie
*Senior Vice President of Finance and
Chief Financial Officer*

Alameda, California
April 18, 2005

### YOUR VOTE IS IMPORTANT

To assure your representation at the Annual Meeting, you are requested to complete, sign and date the enclosed proxy as promptly as possible and return it in the enclosed postage–paid envelope, which requires no postage if mailed in the United States.

# UTSTARCOM, INC.

## PROXY STATEMENT

### INFORMATION CONCERNING SOLICITATION AND VOTING

#### General

The enclosed proxy is solicited on behalf of the Board of Directors (the "**Board**") of UTStarcom, Inc. (the "**Company**") for use at the annual meeting of stockholders to be held on Friday, May 13, 2005 at 10:00 a.m., Pacific Daylight Time (the "**Annual Meeting**"), or at any adjournment or postponement thereof, for the purposes set forth in this proxy statement prepared in connection with the Annual Meeting (the "**Proxy Statement**") and in the accompanying Notice of Annual Meeting of Stockholders. The Annual Meeting will be held at the Hilton Oakland Airport, 1 Hegenberger Road, Oakland, California 94621. The Company's telephone number at that location is (510) 635−5000.

The Company's principal executive offices are located at 1275 Harbor Bay Parkway, Alameda, California 94502.

These proxy solicitation materials and the Company's annual report to stockholders for the year ended December 31, 2004 were mailed on or about April 18, 2005 to all stockholders entitled to vote at the Annual Meeting.

#### Record Date and Voting Securities

Only stockholders of record at the close of business on March 14, 2005 (the "**Record Date**") are entitled to notice of, and to vote at, the Annual Meeting. As of the Record Date, 114,809,960 shares of the Company's common stock, par value $0.00125 per share (the "**Common Stock**"), were issued and outstanding. No shares of the Company's preferred stock, par value $0.00125 per share, were issued and outstanding.

#### Revocability of Proxies

Any proxy given pursuant to this solicitation of proxies may be revoked by the person giving it at any time before its use by delivering to the Assistant Secretary of the Company at the Company's principal executive offices a written notice of revocation or a duly executed proxy bearing a later date or by attending the Annual Meeting and voting in person. The mere presence at the Annual Meeting of a stockholder who has appointed a proxy will not revoke the prior appointment. If not revoked, the proxy will be voted at the Annual Meeting in accordance with the instructions indicated on the proxy card, or if no instructions are indicated, will be voted FOR the slate of members of the Board described herein, FOR Proposal Two, FOR Proposal Three and as to any other matter that may properly be brought before the Annual Meeting in accordance with the judgment of the proxy holders.

#### Voting and Solicitation

Each stockholder is entitled to one vote for each share of Common Stock held on all matters presented at the Annual Meeting. Stockholders do not have the right to cumulate their votes in the election of members to the Board.

This solicitation of proxies is made by the Company, and all costs associated with soliciting proxies will be borne by the Company. In addition, the Company will reimburse brokerage firms and other persons representing beneficial owners of shares for their expenses in forwarding solicitation materials to such beneficial owners. Proxies may be solicited by certain of the Company's directors, officers and regular

employees personally or by telephone, facsimile or electronic mail. No additional compensation will be paid to these persons for such services.

## Quorum; Abstentions; Broker Non-Votes

The required quorum for the transaction of business at the Annual Meeting is a majority of the shares of Common Stock issued and outstanding on the Record Date. All shares represented at the Annual Meeting, whether in person or by a general or limited proxy, will be counted for the purpose of establishing a quorum. All votes will be tabulated by the inspector of elections appointed for the Annual Meeting, who will separately tabulate affirmative and negative votes, abstentions and broker non-votes.

Abstentions and broker non-votes will be counted towards the tabulation of the total number of shares present and entitled to vote (the "**Votes Cast**") on proposals presented to the stockholders and will have the same effect as negative votes.

## Deadlines for Submission of Stockholder Proposals for 2006 Annual Meeting

Stockholders of the Company are entitled to present proposals for consideration at forthcoming stockholder meetings provided that such proposals comply with the proxy rules promulgated by the Securities and Exchange Commission (the "**SEC**") and the bylaws of the Company (the "**Bylaws**"). Under Rule 14a-8 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), stockholders wishing to present a proposal at the Company's 2006 annual meeting of stockholders must submit the proposal to the Company by December 19, 2005 if they wish for it to be eligible for inclusion in the proxy statement and form of proxy relating to that meeting. In addition, under the Bylaws, a stockholder wishing to make a proposal at the 2006 annual stockholder meeting must ensure that such proposal is delivered to or is mailed and received at the Company's principal executive offices prior to March 4, 2006.

## Householding

As permitted by applicable law, only one copy of this Proxy Statement is being delivered to stockholders residing at the same address if they have previously consented to receiving only one copy of the Proxy Statement on a voter instruction card submitted for a prior year's annual meeting of stockholders. Stockholders who share an address and currently receive multiple copies of the Company's proxy statements and annual reports may request that in the future a single copy of the proxy statement and a single copy of the Company's annual report be delivered by filling out the applicable section of the voter instruction card for the Annual Meeting.

2

## PROPOSAL ONE
## ELECTION OF DIRECTORS

**Nominees**

The authorized number of directors of the Company (each a "**Director**") is currently established at seven. Following the Annual Meeting, this number will be reduced to six. The Company's certificate of incorporation provides that Directors shall be divided into three classes, with the classes serving for staggered, three–year terms (or less if they are filling a vacancy). Currently there are two Directors in each of Class II and Class III, and three Directors in Class I. Each of the two Class III Directors will hold office until the 2006 annual meeting or until the Class III Director's successor has been duly elected and qualified, and two of the Class I Directors, Thomas Toy and Ying Wu, will hold office until the 2007 annual meeting or until the Class I Director's successor has been duly elected and qualified. One Class II Director, Betsy Atkins, is not standing for reelection. The Company's nominees for election as the Class II Directors at this Annual Meeting are the third Class I Director, Allen Lenzmeier, and the remaining Class II Director, Larry Horner.

Unless otherwise instructed, the proxy holders will vote the proxies received by them for the Company's two nominees for Class II Directors, Allen Lenzmeier and Larry Horner, each to hold office until the 2008 annual meeting or until the Class II Director's successor has been duly elected and qualified.

The Company expects that each nominee for election as a Director at the Annual Meeting will be able to serve if elected. In the event that any nominee of the Company becomes unable or declines to serve as a Director at the time of the Annual Meeting, the proxy holders will vote the proxies for any substitute nominee who is designated by the current Board to fill the vacancy.

**Required Vote**

The two nominees receiving the highest number of votes of the shares entitled to be voted for such nominees shall be elected as Directors. Votes withheld from any Director will be counted for purposes of determining the presence or absence of a quorum for the transaction of business at the Annual Meeting, but have no other legal effect upon election of Directors under the Delaware General Corporation Law.

**THE COMPANY'S BOARD OF DIRECTORS RECOMMENDS VOTING "FOR" THE NOMINEES SET FORTH HEREIN.**

3

# BOARD OF DIRECTORS

The names of the two Class II nominees for Director and the current Class I and Class III Directors with unexpired terms, their ages as of the date of this Proxy Statement and certain other information are set forth below:

| Name of Director | Age | Principal Occupation | Director Since | Term Expires |
|---|---|---|---|---|
| *Nominees for Class II Directors:* | | | | |
| Larry Horner | 71 | Member of the board of directors of ConocoPhillips, Clinical Data, Inc., Novitron International, Inc., Technical Olympic USA, Inc. and New River Pharmaceuticals, Inc. | 2000 | 2008 |
| Allen Lenzmeier(1) | 61 | Vice Chairman and member of the board of directors of Best Buy Co. Inc. | 2005 | 2008 |
| *Continuing Class III Directors:* | | | | |
| Jeff Clarke(2) | 43 | Chief Operating Officer of Computer Associates International, Inc. | 2005 | 2006 |
| Hong Liang Lu | 50 | President, Chief Executive Officer and Chairman of the Board | 1991 | 2006 |
| *Continuing Class I Directors:* | | | | |
| Thomas Toy | 50 | Managing Director of PacRim Venture Partners and member of the board of directors of White Electronic Designs Corporation | 1995 | 2007 |
| Ying Wu | 45 | Executive Vice President and Vice Chairman of the Board, and Chairman and Chief Executive Officer for China | 1995 | 2007 |

(1)  Mr. Lenzmeier was originally appointed a Class I Director by unanimous written consent of the Board, effective March 15, 2005. Mr. Lenzmeier is now the Company's nominee as a Class II Director, to take the place of Ms. Atkins, who is not seeking reelection.

(2)  Mr. Clarke was appointed by unanimous written consent of the Board on January 17, 2005, replacing Masayoshi Son, who resigned from the Board effective as of September 15, 2004.

Except as set forth below, each nominee or incumbent Director has been engaged in his or her principal occupation described above during the past five years. There is no family relationship between any Director or executive officer of the Company.

*Hong Liang Lu* has served as our President, Chief Executive Officer and as a Director since June 1991, and as Chairman of the Board since March 2003. In June 1991, Mr. Lu co-founded the Company under its prior name, Unitech Telecom, Inc., which subsequently acquired StarCom Network Systems, Inc. in September 1995. From 1986 through December 1990, Mr. Lu served as President and Chief Executive Officer of Kyocera Unison, a majority-owned subsidiary of Kyocera International, Inc. He served as President and Chief Executive Officer of Unison World, Inc., a software development company from 1983 until its merger with Kyocera in 1986. From 1979 to 1983, he served as Vice President and Chief Operating

4

Officer of Unison World, Inc. Mr. Lu also serves as a director of Shanda Interactive Entertainment Ltd. Mr. Lu holds a B.S. in Civil Engineering from the University of California at Berkeley.

*Jeff Clarke* has served as a Director since January 17, 2005. Starting in April 2004, Mr. Clarke has served as the Chief Operating Officer of Computer Associates International, Inc., a global provider of management software. From 2002 to 2004, Mr. Clarke was Executive Vice President, Global Operations of Hewlett–Packard Company, and prior to that he was the Chief Financial Officer of Compaq Computer Corporation. Mr. Clarke holds a B.A. in Economics from the State University of New York at Geneseo and an M.B.A. from Northeastern University.

*Larry Horner* has served as a Director since January 2000. Mr. Horner has been a director of ConocoPhillips since 1991, and he also serves on the board of directors of Atlantis Plastics, Inc., Clinical Data Inc., Technical Olympic USA, Inc. and New River Pharmaceuticals, Inc. From 1994 until 2001, Mr. Horner served as Chairman of Pacific USA Holdings Corp., and as Chairman and Chief Executive Officer of Asia Pacific Wire & Cable Corporation Limited. Mr. Horner formerly served as Chairman and Chief Executive Officer of KPMG Peat Marwick from 1984 to 1990. Mr. Horner, a Certified Public Accountant, holds a B.S. from the University of Kansas and is a graduate of the Stanford Executive Program.

*Allen Lenzmeier* has served as a Director since March 15, 2005. Mr. Lenzmeier has served as the Vice Chairman of Best Buy Co. Inc. since December 2004. From 2002 to 2004, Mr. Lenzmeier served as the President and Chief Operating Officer of Best Buy Co. Inc. Mr. Lenzmeier served as the President of Best Buy Retail from 2001 to 2002. From 1991 to 2001 he served as the Executive Vice President and Chief Financial Officer of Best Buy Co. Inc. and began his employment with the company in 1984. Mr. Lenzmeier holds a B.S. from Minnesota State University Mankato.

*Thomas Toy* has served as a Director since February 1995. Since March 1999, Mr. Toy has served as Managing Director of PacRim Venture Partners, a professional venture capital firm specializing in investments in the information technology sector. From 1987 until 1992, Mr. Toy was employed as a Vice President at Technology Funding, and was a partner there from 1992 until 1999. While at Technology Funding, Mr. Toy was Managing Director of Corporate Finance and headed the firm's investment committee. Mr. Toy also serves as a director of White Electronic Designs Corporation and several private companies. Mr. Toy holds B.A. and M.M. degrees from Northwestern University.

*Ying Wu* has served as our Executive Vice President and Vice Chairman of the Board since October 1995. Mr. Wu has also served as Chairman and Chief Executive Officer, and, until February 2004, as President, of one of our subsidiaries, UTStarcom China Co., Ltd., beginning his duties there in October 1995. Mr. Wu was a co–founder, and from February 1991 to September 1995 served as Senior Vice President, of StarCom Network Systems, Inc., a company that marketed and distributed third party telecommunications equipment. From 1988 to 1991, Mr. Wu served as a member of the technical staff of Bellcore Laboratories. From 1987 to 1988, Mr. Wu served as a consultant at AT&T Bell Labs. Mr. Wu also serves as a director of AsiaInfo Holdings, Inc. He holds a B.S. in Electrical Engineering from Beijing Industrial University and an M.S. in Electrical Engineering from the New Jersey Institute of Technology.

**The Company's Director Nomination Process**

The Board's process for identifying and evaluating nominees for Director consists mainly of evaluating candidates who are recommended by the Nominating and Corporate Governance Committee. The Nominating and Corporate Governance Committee identifies and recommends nominees for election or reelection to the Board, or for appointment to fill any vacancy that is anticipated or has arisen on the Board, in accordance with the criteria, policies and principles set forth in the Company's Corporate Governance Guidelines and the Nominating and Corporate Governance Committee Charter, or otherwise approved by the Board.

The Board may also, on a periodic basis, solicit ideas for possible candidates from a number of sources, including current members of the Board, senior Company executives, individuals personally known to members of the Board, and employment of one or more professional search firms. The Company engaged Christian & Associates, LLC, a professional search firm, with respect to the identification of candidates that included Mr. Clarke and Mr. Lenzmeier.

Stockholder nominations of Director candidates will be given the same consideration and evaluated with the same criteria as candidates that are recommended internally. The form and delivery requirements of such stockholder nominations must comply with the relevant provisions of the Bylaws, copies of which may be obtained by sending an email to the Company's investor relations department at *investorrelations@utstar.com.*

### Board Attendance, Director Independence and Financial Sophistication

Of our incumbent directors standing for reelection and those with continuing terms, Messrs. Horner, Toy, Clarke and Lenzmeier have been determined to be independent as set forth in Rule 4200(a)(15) of the Nasdaq Marketplace Rules, the listing standards of The Nasdaq Stock Market, as currently in effect. In addition, the Board has also determined that each of Messrs. Horner, Toy, Clarke and Lenzmeier possess the attributes to be considered financially sophisticated for purposes of applicable Nasdaq Marketplace Rules and has the background to be considered an "audit committee financial expert" as defined by the rules and regulations of the SEC and required by the Nasdaq Marketplace Rules.

The Board held a total of 14 meetings during the fiscal year ended December 31, 2004. During fiscal year 2004, each of the Directors attended 75% or more of the meetings of the Board and the committees of the Board on which the Director served subsequent to becoming a Director or a member of such committee, except for Mr. Son, who resigned from the Board effective September 15, 2004. It is the Board's policy that Directors are encouraged to attend the Annual Meeting. Two Directors attended the 2004 annual meeting of stockholders.

The three principal standing committees of the Board are the Audit Committee, the Compensation Committee and the Nominating and Corporate Governance Committee, each of which consists solely of independent Directors. The Board has also authorized a Disinterested Director Committee, which consists of two employee Directors. In addition to these committees, the Board has appointed Mr. Horner as Lead Director. The Lead Director's responsibilities include, among other things, facilitating communications among Directors, working with the Chief Executive Officer to ensure appropriate information flows to the Board, chairing an executive session of the independent Directors at regularly scheduled meetings as required by Nasdaq Marketplace Rule 4350(c)(2), overseeing processes established for stockholder communication with members of the Board, and acting as a liaison between disinterested Directors and interested parties in the case of related–party transactions or other such matters. The Lead Director is not an employee of the Company or a holder of 5% or more of our issued and outstanding Common Stock.

#### *Stockholder Communications with the Board*

The Board has established a process for stockholders to communicate with members of the Board, which includes the creation of the Lead Director position. All concerns, questions or complaints regarding our compliance with any policy or law, or any other Board related communication, should be directed to the Board via the link entitled "Email Board of Directors" at *http://investorrelations.utstar.com.* All such communications will be received and reviewed by one or more independent Directors or officers acting under their direction, who will prepare a report for the Board or particular Board committees, as appropriate. In the case of accounting, audit or internal control matters, the Audit Committee will have the opportunity to discuss stockholder inquiries and oversee any action as appropriate.

**Board Committees and Related Functions**

*Audit Committee*

The Audit Committee of the Board, currently consisting of Mr. Horner, who chairs the committee, Ms. Atkins and Messrs. Clarke, Toy and Lenzmeier, held 23 meetings during the last fiscal year. The Audit Committee, among other duties and responsibilities: (i) reviews and approves the annual appointment of our independent registered public accounting firm; (ii) discusses and reviews in advance the scope and fees of the annual audit; (iii) reviews the results of the audit with the independent registered public accounting firm and discusses the foregoing with our management; (iv) reviews and approves non–audit services of the independent registered public accounting firm; (v) reviews compliance with our existing major accounting and financial reporting policies; (vi) reviews and approves in advance all related–party transactions that would require disclosure pursuant to the rules of the SEC and the policies and procedures related to such transactions; and (vii) provides oversight and monitoring of our management and their activities with respect to our financial reporting process. In connection with the execution of the responsibilities of the Audit Committee, including the review of our quarterly earnings reports prior to public release, Audit Committee members communicated throughout 2004 with our management and the independent registered public accounting firm.

Each member of the Audit Committee meets the applicable independence and financial literacy requirements of the Nasdaq Marketplace Rules and the SEC. Further, Messrs. Horner, Clarke, Toy and Lenzmeier have been determined by the Board to meet the "financial expert" requirements of the same SEC and Nasdaq Marketplace Rules. On March 29, 2004, the Board approved a revised charter of the Audit Committee, a copy of which was filed as an attachment to the Company's proxy statement for the 2004 annual meeting of stockholders.

*Nominating and Corporate Governance Committee*

The Nominating and Corporate Governance Committee, currently consisting of Mr. Clarke, who succeeded Ms. Atkins as chair of the committee in April 2005, Ms. Atkins and Messrs. Horner and Toy, held one formal meeting and several informal meetings during the last fiscal year. Each member of the Nominating and Corporate Governance Committee meets the applicable independence requirements of the Nasdaq Marketplace Rules.

The Nominating and Corporate Governance Committee's responsibilities include the selection of Director nominees for the Board and the development and annual review of our governance principles. The Nominating and Corporate Governance Committee also: (i) assists the Board by actively identifying individuals qualified to become Board members; (ii) recommends Director nominees to the Board for election at the next annual meeting of stockholders; (iii) monitors significant developments in the law and practice of corporate governance and of the duties and responsibilities of directors of public companies; (iv) leads the Board in its annual performance self–evaluation, including establishing criteria to be used in connection with such evaluation; (v) oversees compliance with the Company's Code of Business Conduct and Ethics; and (vi) develops and recommends to the Board and administers the corporate governance guidelines of the Company.

On March 29, 2004, the Board adopted a formal charter of the Nominating and Corporate Governance Committee, addressing the nominations process and such related matters as may be required under federal securities laws and Nasdaq Marketplace Rule 4350(c)(4)(B). A copy of this charter was filed as an attachment to the Company's proxy statement for the 2004 annual meeting of stockholders.

*Compensation Committee*

The Compensation Committee of the Board, currently consisting of Mr. Toy, who chairs the committee, Ms. Atkins and Messrs. Lenzmeier and Horner, held two meetings during the last fiscal year. The authority and duties of the Compensation Committee include, among others: (i) approving and overseeing the total compensation package for the Company's executives; (ii) reviewing and approving corporate goals and objectives relevant to the compensation of our Chief Executive Officer; (iii) reviewing and making recommendations to the Board regarding all new employment agreements or arrangements; (iv) reviewing and making recommendations to the Board regarding long–term incentive compensation or equity plans, programs or similar arrangements of the Company; and (v) preparing an annual report on executive compensation as required by the SEC to be included in our annual proxy statement filed with the SEC. Each member of the Compensation Committee meets the applicable independence requirements of the Nasdaq Marketplace Rules.

The charter for the Compensation Committee provides that the purpose of such committee is to discharge the responsibilities of the Board relating to all compensation, including equity compensation of the Company's executives. The charter also generally provides the membership requirements, authority and duties of the Compensation Committee. The Compensation Committee shall consist of no fewer than three members, all of whom (i) meet the independence requirements of the Nasdaq Marketplace Rules, (ii) are "non–employee directors" under the definition of Rule 16b–3 promulgated under Section 16 of the Exchange Act; and (iii) are "outside directors" for purposes of the regulations promulgated under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"). The chair of the Compensation Committee is appointed by the Board. The Compensation Committee must conduct a self–evaluation annually and report such findings to the Board. In addition, the Compensation Committee must periodically assess the adequacy of its charter and recommend changes to the Board.

*Disinterested Director Committee*

On March 29, 2004, the Board authorized a Disinterested Director Committee, granting it authority over compensation matters for Directors who are not employees of the Company or beneficial owners of greater than 5% of our outstanding stock ("**Non–Employee Directors**"). The Disinterested Director Committee originally consisted of any two of Messrs. Lu, Wu and Son (who resigned from the Board effective September 15, 2004), and on March 30, 2005 was reauthorized with Messrs. Lu and Wu as its only members.

## Director Compensation

Directors who are employees of the Company receive no additional compensation for serving on the Board. In 2004, Non–Employee Directors received a quarterly participation fee of $8,750 for services rendered as to both full meetings of the Board and committee meetings.

Starting in 2005, Non–Employee Directors receive a quarterly participation fee of $10,000 for services rendered as to full meetings of the Board. In addition, Non–Employee Directors receive annual retainer fees for committee membership and other duties as follows:

- Lead Director: $20,000;

- Audit Committee: $10,000 for chair, $3,500 for members;

- Compensation Committee: $5,000 for chair, $3,000 for members; and

- Corporate Governance and Nominating Committee: $5,000 for chair, $2,000 for members.

8

In January 2005, in recognition of services rendered in 2004, we also paid Mr. Horner, our Lead Director, a one-time compensation award of $25,000, and Mr. Toy and Ms. Atkins, both Non-Employee Directors, a one-time compensation award of $20,000.

We reimburse all Directors for travel and other related expenses incurred in connection with the business of the Company, including attending stockholder meetings, meetings of the Board or any Board committee.

Non-Employee Directors are also eligible to participate in our 2001 Director Stock Option Plan. Under the plan, each Non-Employee Director is automatically awarded options to purchase 80,000 shares of Common Stock (the "**First Option**") on the date on which such person first becomes a Non-Employee Director (or the date on which the plan was initially adopted). The First Option vests in equal installments of 25% per year on each of the first four anniversaries of the date of grant. After the First Option has fully vested, each Non-Employee Director will receive an automatic annual grant of an option to purchase 20,000 shares of Common Stock (an "**Annual Option**"). The Annual Option vests in full on the first anniversary of the date of grant. If, following a change in control of the Company, a Non-Employee Director's status as a Director of the Company or the successor corporation is terminated (other than as a result of voluntary resignation), the options become fully exercisable and remain exercisable for the remainder of the relevant term. The exercise price of all options granted under the plan is 100% of the fair market value of our Common Stock on the date of grant. The options expire ten years after the date of grant, subject to earlier termination if the individual ceases to serve as a Director.

On May 11, 2001, we granted a First Option to each of Messrs. Horner and Toy, on March 20, 2002, we granted a First Option to Ms. Atkins, on January 17, 2005, we granted a First Option to Mr. Clarke and on March 15, 2005 we granted a First Option to Mr. Lenzmeier. The options have exercise prices of $22.71, $23.02, $16.96 and $13.14, respectively, and will be fully vested on May 11, 2005, March 20, 2006, January 17, 2009 and March 15, 2009, respectively. To date, no Non-Employee Director has been awarded an Annual Option.

It is also our policy to grant each Non-Employee Director an annual option grant for 25,000 shares pursuant to our 1997 Stock Plan. These annual option grants vest over one year in equal monthly installments. Pursuant to this policy, on August 27, 2004, the Company granted an option to purchase 25,000 shares of Common Stock to each of Ms. Atkins and Messrs. Horner and Toy with an exercise price of $16.34 per share. If, following a change in control of the Company, a Non-Employee Director's status with the Company or the successor corporation is terminated (other than as a result of voluntary resignation), the options will become fully exercisable and remain exercisable for the remainder of the applicable term. On April 12, 2005, the Disinterested Director Committee extended the post termination period of exercisability from three months to twelve months for the options granted on August 27, 2004. We have proposed to formalize these policies in connection with the adoption of the 2005 Equity Incentive Plan as further described in Proposal 2 below. Assuming stockholder approval, grants currently made by the Disinterested Director Committee will be made automatically under the 2005 Equity Incentive Plan.

9

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information with respect to beneficial ownership of our Common Stock as of March 31, 2005 (except as otherwise indicated), by: (i) each person who is known by us to own beneficially more than 5% of our Common Stock; (ii) each of our President and Chief Executive Officer and the four other highest paid executive officers serving as executive officers at the end of the 2004 fiscal year, (iii) each of the Company's Directors; and (iv) all Directors and executive officers as a group. Except as indicated in the footnotes to this table, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them, subject to community property laws where applicable.

Calculations are based on a total number of outstanding shares of 114,841,976 shares as of March 31, 2005.

| Name and Address of Beneficial Owner | Shares Beneficially Owned(1) | Approximate Percent Owned(1) |
|---|---|---|
| Entities affiliated with SOFTBANK CORP.(2) | 14,651,630 | 12.76% |
| FMR Corp.(3) | 8,223,850 | 7.16% |
| Ying Wu(4) | 4,801,643 | 4.16% |
| Hong Liang Lu(5) | 4,013,589 | 3.46% |
| William Huang(6) | 1,091,641 | * |
| Shao–Ning J. Chou(7) | 598,236 | * |
| Michael Sophie(8) | 351,004 | * |
| Larry Horner(9) | 189,024 | * |
| Thomas Toy(10) | 147,049 | * |
| Betsy Atkins(11) | 95,753 | * |
| Jeff Clarke | 0 | * |
| Allen Lenzmeier | 0 | * |
| All current directors and officers as a group (10 persons)(12) | 11,287,939 | 9.54% |

\* Less than 1%

(1) Includes any shares issuable pursuant to options held by the person or group in question that may be exercised within 60 days of March 31, 2005.

(2) Includes 14,651,630 shares registered in the name of SOFTBANK America Inc., a Delaware corporation. SOFTBANK America Inc. is a wholly owned subsidiary of SOFTBANK Holdings Inc., a Delaware corporation. SOFTBANK Holdings Inc. is a wholly owned subsidiary of SOFTBANK CORP., a Japanese corporation. The business address for these entities is c/o SOFTBANK CORP., 24 1 Nihonbashi Hakozakicho, Chuoku, Tokyo 103 8501 Japan.

(3) Includes 7,773,850 shares beneficially owned by Fidelity Management & Research Company and 450,000 shares beneficially owned by Fidelity International Limited. FMR Corp. has sole dispositive power over 8,223,850 shares. FMR Corp. has sole power to vote or to direct the voting of 450,000 shares. The business address for FMR Corp. is 82 Devonshire Street, Boston, MA 02109.

(4) Includes (i) 1,505,500 shares registered in the name of Wu Partners, a California Limited Partnership, of which Mr. Wu is general partner, (ii) 1,080,000 shares registered in the name of Stonybrook Investors L.P., (iii) 4,868 shares registered in the name of Wu Living Trust, (iv) 4,873 shares registered in the name of Ashley Wu Trust—1998 and (v) 4,873 shares registered in the name of Richard Wu Trust—1998. Ashley Wu and Richard Wu are Mr. Wu's children. Mr. Wu may be

10

deemed the beneficial owner of the shares. Also includes 684,842 shares issuable upon exercise of options that are exercisable within 60 days of March 31, 2005.

(5)  Includes (i) 229,000 shares owned by The Lu Family Limited Partnership, of which Mr. Lu is a general partner, (ii) 130,000 shares registered in the name of Lu Charitable Remainder Trust, of which Mr. Lu is the trustee, (iii) 5,332 shares registered in the name of Benjamin Lu, and (iv) 5,332 shares registered in the name of Melissa Lu. Benjamin Lu and Melissa Lu are Mr. Lu's children. Mr. Lu may be deemed the beneficial owner of the shares. Also includes 1,242,500 shares issuable upon exercise of options that are exercisable within 60 days of March 31, 2005.

(6)  Includes (i) 106,000 shares owned by the 2000 Huang Family Limited Partnership, of which Mr. Huang is a general partner, (ii) 6,600 shares registered in the name of Alexander Huang, and (iii) 6,600 shares registered in the name of Helen Huang. Alexander Huang and Helen Huang are Mr. Huang's children. Mr. Huang may be deemed the beneficial owner of the shares. Also includes 311,461 shares issuable upon exercise of options that are exercisable within 60 days of March 31, 2005.

(7)  Includes 547,815 shares issuable upon exercise of options that are exercisable within 60 days of March 31, 2005.

(8)  Includes 320,538 shares issuable upon exercise of options that are exercisable within 60 days of March 31, 2005.

(9)  Includes 157,249 shares issuable upon exercise of options that are exercisable within 60 days of March 31, 2005.

(10)  Includes 147,049 shares issuable upon exercise of options that are exercisable within 60 days of March 31, 2005.

(11)  Includes 95,753 shares issuable upon exercise of options that are exercisable within 60 days of March 31, 2005.

(12)  Includes a total of 3,507,207 shares issuable upon exercise of options that are exercisable within 60 days of March 31, 2005.

11

**MANAGEMENT**

**Executive Officers**

Our executive officers and their ages as of May 13, 2005 are as follows:

| Name | Age | Position |
|------|-----|----------|
| Hong Liang Lu | 50 | President, Chief Executive Officer and Chairman of the Board |
| Ying Wu | 45 | Executive Vice President and Vice Chairman of the Board, Chairman and Chief Executive Officer for China |
| Michael Sophie | 47 | Senior Vice President of Finance, Chief Financial Officer and Assistant Secretary |
| William Huang | 42 | Senior Vice President and Chief Technology Officer |
| Shao Ning J. Chou | 43 | Senior Vice President, President and Chief Operating Officer for China |

*Hong Liang Lu* has served as our President, Chief Executive Officer and Director since June 1991. Mr. Lu has served as the Chairman of the Board since March 2003. In June 1991, Mr. Lu co-founded UTStarcom under its prior name, Unitech Telecom, Inc., which subsequently acquired StarCom Network Systems, Inc. in September 1995. From 1986 through December 1990, Mr. Lu served as President and Chief Executive Officer of Kyocera Unison, a majority owned subsidiary of Kyocera International, Inc. He served as President and Chief Executive Officer of Unison World, Inc., a software development company from 1983 until its merger with Kyocera in 1986. From 1979 to 1983, he served as Vice President and Chief Operating Officer of Unison World, Inc. Mr. Lu also serves as a director of Shanda Interactive Entertainment Ltd. Mr. Lu holds a B.S. in Civil Engineering from the University of California at Berkeley.

*Ying Wu* has served as our Executive Vice President and Vice Chairman of the Board since October 1995. Mr. Wu has also served as the Chairman and Chief Executive Officer, and, until February 2004, as President, of one of our subsidiaries, UTStarcom China Co., Ltd., beginning his duties there in October 1995. Mr. Wu was a co-founder, and from February 1991 to September 1995 served as Senior Vice President, of StarCom Network Systems, Inc., a company that marketed and distributed third party telecommunications equipment. From 1988 to 1991, Mr. Wu served as a member of the technical staff of Bellcore Laboratories. From 1987 through 1988, Mr. Wu served as a consultant at AT&T Bell Labs. Mr. Wu also serves as a director of AsiaInfo Holdings, Inc. He holds a B.S. in Electrical Engineering from Beijing Industrial University and an M.S. in Electrical Engineering from the New Jersey Institute of Technology.

*Michael Sophie* has been our Chief Financial Officer since August 1999, and was appointed Senior Vice President of Finance in January 2003. Prior to joining our Company, Mr. Sophie held executive positions at P-Com, Inc. from August 1993 to August 1999, including Vice President Finance, Chief Financial Officer and Group President. From 1989 through 1993, Mr. Sophie was Vice President of Finance at Loral Fairchild Corporation. Mr. Sophie also serves as a director of McData Corporation. He holds a B.S. from California State University, Chico and an M.B.A. from the University of Santa Clara.

*William Huang* has been our Chief Technology Officer since September 1999, and was appointed our Senior Vice President in September 2001. From December 1996 to September 1999, he was our Vice President of Strategic Product Planning. From June 1995 to December 1996, Mr. Huang served as our Vice President, China Operations. From 1994 to June 1995, Mr. Huang was our Director, Engineering. From 1992 to 1994, he was a member of the technical staff and project leader at AT&T Systems. Mr. Huang serves on the board of Shenzhen Gin De (Group) Ltd., a publicly listed real estate investment company in China. Mr. Huang holds a B.S. in Electrical Engineering from Huazhong University of Science & Technology, and an M.S. in Electrical Engineering and Computer Sciences from the University of Illinois.

12

*Shao—Ning J. Chou* has been our Executive Vice President and Chief Operating Officer for China since July 1996. He was appointed Senior Vice President in September 2001, and President of UTStarcom China Co., Ltd. in February 2004. From March 1997 to December 1998 he was Vice President of UTStarcom China Co., Ltd., and from February 1996 to March 1997 he served as Vice President of Engineering. From March 1995 to June 1996, he was Director of Engineering for wireless systems and software with Lucent Technologies Microelectronics IC group. From April 1993 to March 1995, he was a Technical Manager for the Global Wireless product group with AT&T consumer products where he led multiple development teams for handset and wireless personal base station products. From February 1985 to April 1993, Mr. Chou was team leader and a member of the technical staff for advanced digital communication research in AT&T Bell Laboratories where he led and engaged in data communication equipment and multimedia product development. Mr. Chou holds a B.S. in Electrical Engineering from City College of New York, an M.S. in Engineering from Princeton University and an M.B.A. from the State University of New Jersey, Rutgers.

## Executive Compensation

The table below sets forth information for the three most recently completed fiscal years concerning the compensation of the Chief Executive Officer and our other executive officers.(1)

### Summary Compensation Table

| Name and Principal Position | Fiscal Year | Annual Compensation | | Other Annual Compensation ($) | Long—Term Compensation Securities Underlying Options/SARs (#) | All Other Compensation(4) ($) |
|---|---|---|---|---|---|---|
| | | Salary ($) | Bonus ($) | | | |
| Hong Liang Lu | 2004 | $ 700,000 | $ — | $ — | 250,000 | $ 20,500 |
| President, Chief Executive | 2003 | $ 500,000 | $ 325,000 | $ — | 120,000 | $ 5,469 |
| Officer and Chairman of the Board | 2002 | $ 300,000 | $ 150,000 | $ — | 225,000 | $ 14,625 |
| Ying Wu | 2004 | $ 500,000 | $ — | $ — | 200,000 | $ 5,500 |
| Executive Vice President | 2003 | $ 400,000 | $ 250,000 | $ 81,007(2) | 85,000 | $ 5,500 |
| and Vice Chairman | 2002 | $ 250,000 | $ 125,000 | $ 78,697(2) | 150,000 | $ 13,682 |
| Shao—Ning J. Chou | 2004 | $ 400,000 | $ — | $ — | 150,000 | $ 5,500 |
| Senior Vice President | 2003 | $ 300,000 | $ 250,000 | $ 859,162(3) | 75,000 | $ 5,500 |
| | 2002 | $ 210,000 | $ 105,000 | $ 2,563,253(3) | 150,000 | $ 13,663 |
| Michael Sophie | 2004 | $ 400,000 | $ — | $ — | 150,000 | $ 13,000 |
| Chief Financial Officer | 2003 | $ 300,000 | $ 200,000 | $ — | 75,000 | $ 5,500 |
| and Senior Vice President | 2002 | $ 250,000 | $ 125,000 | $ — | 150,000 | $ 11,088 |
| William Huang | 2004 | $ 300,000 | $ — | $ — | 100,000 | $ 5,500 |
| Chief Technology Officer | 2003 | $ 250,000 | $ 100,000 | $ — | 50,000 | $ 2,334 |
| and Senior Vice President | 2002 | $ 200,000 | $ 100,000 | $ — | 120,000 | $ 9,863 |

(1)  We have provided full disclosure for all our Section 16 executive officers, which includes the "named executive officers" as defined in Item 402(a)(3) of Regulation S–K.

(2)  Consists of (i) a housing and children's education allowance of $68,350 in 2002 and $68,350 in 2003 paid in connection with Mr. Wu's international work assignment, and (ii) a tax assistance payment of $10,347 in 2002 and $12,657 in 2003 paid in connection with our tax equalization policy whereby we provide qualified employees with tax assistance to mitigate the tax differential arising from an employee's international work assignment.

(3)  Consists of (i) a housing allowance of $36,000 in 2002 and $36,000 in 2003 paid in connection with Mr. Chou's international work assignment, and (ii) a tax assistance payment of $2,527,253 in 2002 and

13

$823,162 in 2003 paid in connection with our tax equalization policy whereby we provide qualified employees with tax assistance to mitigate the tax differential arising from an employee's international work assignment. $2,239,432 of the tax assistance payments made in 2002 and $691,771 of the tax assistance payments made in 2003 were paid in connection with the deferred payment of a tax levied by the People's Republic of China on gains realized from the exercise of stock options in 2001. While U.S. tax regulations require that these amounts be recorded as income, due to general limitation rules a portion of Mr. Chou's paid foreign tax has been recovered by us pursuant to our tax equalization policy.

(4)   All other compensation for 2004 consists of 401(K) match payments and tax and investment advice paid by us on behalf of certain of our executive officers.

## Option Grants

The following table sets forth certain information with respect to stock option grants to our executive officers during the fiscal year ended December 31, 2004.

### Option Grants in Last Fiscal Year

| Name | Number of Securities Underlying Options Granted(1) | % of Total Options Granted to Employees in Fiscal Year 2004(2) | Exercise Price Per Share | Expiration Date | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(3) | |
|---|---|---|---|---|---|---|
| | | | | | 5% | 10% |
| Hong Liang Lu | 250,000 | 4.3% | $  37.46 | 1/19/2014 | $  5,889,598 | $  14,925,398 |
| Ying Wu | 200,000 | 3.4% | $  37.46 | 1/19/2014 | $  4,711,679 | $  11,940,319 |
| Michael Sophie | 150,000 | 2.6% | $  37.46 | 1/19/2014 | $  3,533,759 | $  8,955,239 |
| Shao Ning J. Chou | 150,000 | 2.6% | $  37.46 | 1/19/2014 | $  3,533,759 | $  8,955,239 |
| William Huang | 100,000 | 1.7% | $  37.46 | 1/19/2014 | $  2,355,839 | $  5,970,159 |
| Total Grants in 2004 | 5,875,197 | | | | | |

(1)   All options were granted pursuant to our 1997 Stock Plan. The options have a ten-year term and vest and become exercisable over four years. In the event of a change in control of the Company, the options will be substituted by the successor corporation or will fully vest and become exercisable for a period of 15 days.

(2)   Based on an aggregate of 5,875,197 shares subject to options granted to our employees in 2004.

(3)   The potential realizable value represents amounts, net of exercise price before taxes, which may be realized upon exercise of the options immediately prior to the expiration of the terms of such options, assuming appreciation of 5% and 10% over the option term. The 5% and 10% rates are calculated based on rules promulgated by the SEC based upon a per share market price of the Common Stock underlying the options at the time the options were granted and do not reflect the Company's estimate of future stock price growth. The actual value realized may be greater or less than the potential realizable value set forth in the table.

## Option Exercises and Values

The following table sets forth information for our executive officers relating to the number and value of securities underlying exercisable and unexercisable options they held at December 31, 2004, and sets forth the number of shares of Common Stock acquired and the value realized upon exercise of stock options held as of December 31, 2004 by our executive officers.

14

**Aggregate Option Exercises in Last Fiscal Year and Fiscal Year End Option Values**

| Name | Number of Shares Acquired on Exercise | Value Realized(1) | Number of Securities Underlying Unexercised Options at December 31, 2004 | | Value of Unexercised In–the–Money Options at December 31, 2004(2) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Hong Liang Lu | — | $    — | 1,206,563 | 138,437 | $  10,776,788 | $   476,162 |
| Ying Wu | — | $    — | 660,362 | 94,995 | $    4,651,154 | $   325,840 |
| Michael Sophie | 9,839 | $  212,555 | 297,099 | 89,579 | $      671,949 | $   308,996 |
| Shao Ning J. Chou | — | $    — | 519,167 | 97,915 | $    1,795,369 | $   320,681 |
| William Huang | 9,582 | $  24,539 | 293,751 | 66,249 | $    1,077,833 | $   146,139 |

(1)  The "Value Realized" is based on the closing price of our Common Stock as quoted on The Nasdaq National Market on the date of exercise, minus the per share exercise price, multiplied by the number of shares issued upon exercise of the option.

(2)  The value of unexercised in–the–money options is calculated based on the difference between the closing price of $22.15 per share as quoted on The Nasdaq National Market on December 31, 2004, and the exercise price for the shares, multiplied by the number of shares underlying the option.

**Employment Contracts and Change of Control Arrangements**

We have entered into Change of Control Severance Agreements with Messrs. Sophie, Lu, Wu, Chou and Huang dated April 12, 2002, January 17, 2003, January 31, 2003, January 31, 2003 and January 31, 2003, respectively. These agreements provide that if the employee's employment with us terminates as a result of involuntary termination at any time within 12 months after a change of control, (i) such employee will be entitled to 24 months of base salary as in effect as of the date of such termination payable in a lump sum within 30 days of termination and 100% of the bonus for the year in which termination occurs, (ii) all stock options granted to such employee will become fully vested and exercisable as of the date of termination and all stock held by him that is subject to a right of repurchase by the Company that was purchased prior to the change of control will have such right lapse, and (iii) we will continue to provide such employee the same level of health coverage as in effect on the day immediately preceding the termination date until the earlier of the date such employee is no longer eligible to receive continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or 12 months from the termination date. In the event that the severance and other benefits provided pursuant to the Change of Control Severance Agreement between us and such employee constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code and would be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code, such employee's benefits under the Change of Control Severance Agreement shall be either delivered in full or delivered as to such lesser extent which would result in no portion of such benefits being subject to the excise tax, whichever results in the receipt by the employee, on an after–tax basis, of the greatest amount of benefits.

For the purpose of the Change of Control Severance Agreements for Messrs. Lu, Wu, Sophie, Chou and Huang, "involuntary termination" includes (i) without the employee's express written consent, a significant reduction of the employee's duties, position or responsibilities relative to the employee's duties, position or responsibilities in effect immediately prior to such reduction, or the removal of the employee from such position, duties and responsibilities, unless the employee is provided with comparable duties, position and responsibilities (as, for example, following a change of control, our Chief Financial Officer is made the Chief Financial Officer of the acquiring entity), (ii) without the employee's express written consent, a substantial reduction, without good business reasons, of the facilities and perquisites (including office space and location) available to the employee immediately prior to such reduction, (iii) a reduction by us of the employee's base salary as in effect immediately prior to such reduction, (iv) a material

15

reduction by us in the kind or level of employee benefits to which the employee is entitled immediately prior to such reduction with the result that the employee's overall benefits package is significantly reduced, (v) the relocation of the employee to a facility or a location more than 50 miles from his current location without the employee's express written consent, (vi) any purported termination of the employee by us which is not effected for cause or for which the grounds relied upon are not valid, or (vii) our failure to obtain the assumption of the Change of Control Severance Agreement by any successor to the Company.

"Change of control" in these agreements is defined as (i) the approval by our stockholders of a merger or consolidation with any other corporation, other than a merger or consolidation which would result in our voting securities outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the total voting power represented by our voting securities or such surviving entity outstanding immediately after such merger or consolidation, (ii) the approval by our stockholders of a plan to complete liquidation or an agreement for the sale or disposition by the company of all or substantially all of our assets, (iii) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becoming the "beneficial owner" (as defined in Rule 13d–3 under said Exchange Act), directly or indirectly, of our securities representing 50% or more of the total voting power represented by our then outstanding voting securities, or (iv) a change in the composition of the Board, as a result of which fewer than a majority of the Directors are incumbent Directors.

## Compensation Committee Interlocks and Insider Participation

The Compensation Committee consisted of Messrs. Toy and Horner throughout the 2004 fiscal year, and Ms. Atkins joined the Compensation Committee in March 2004. Mr. Lenzmeier joined the Compensation Committee in April 2005. All members of the Compensation Committee during 2004 were independent directors in accordance with the applicable independence requirements of the Nasdaq Marketplace Rules, and none were employees or officers or former employees of the Company. During 2004, no executive officer of the Company served on the compensation committee (or equivalent) or board of directors of another entity whose executive officer(s) served on our Compensation Committee or Board.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires our Directors and executive officers, and persons who own more than 10% of a registered class of our equity securities ("**Section 16 Filers**"), to file with the SEC initial reports of ownership and reports of changes in ownership of Common Stock and other equity securities of the Company. Such Section 16 Filers are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file.

To the Company's knowledge, based solely on its review of the copies of such reports furnished to the Company and written representations that no other reports were required, during the fiscal year ended December 31, 2004, all Section 16 Filers complied with all Section 16(a) filing requirements except for the following inadvertent late filings: (i) Ms. Atkins, who is not standing for reelection, filed a Form 4 on February 2, 2004 reporting one transaction late; (ii) Mr. Chou filed a Form 4 on October 19, 2004 reporting one transaction late; (iii) Mr. Huang filed a Form 4 on September 27, 2004 reporting one transaction late; (iv) Mr. Lu filed a Form 4 on October 19, 2004 reporting one transaction late; (v) Mr. Sophie filed a Form 4 on October 19, 2004 reporting one transaction late; and (vi) Mr. Wu filed Form 4s on January 8, 2004 and October 19, 2004 reporting two transactions late.

## REPORT OF THE COMPENSATION COMMITTEE

**Introduction**

The Compensation Committee of the Board of the Company was established on January 31, 1997. Mr. Toy, the Chairman of the Compensation Committee, and Mr. Homer served on the Committee throughout 2004. Ms. Atkins joined the Compensation Committee on March 29, 2004, and Mr. Lenzmeier joined the Compensation Committee on April 11, 2005.

During 2004, the Compensation Committee was comprised solely of Non–Employee Directors who were each: (i) independent as defined under the Nasdaq Marketplace Rules, (ii) a non–employee director for purposes of Rule 16b–3 of the Securities Exchange Act of 1934, as amended, and (iii) an outside director for purposes of Section 162(m) of the Internal Revenue Code. During 2005, the Committee will be comprised of directors who meet these same standards.

The primary purpose of the Compensation Committee is to discharge the responsibilities of the Company's Board of Directors relating to all compensation, including equity compensation, of the Company's executives. The Compensation Committee also has overall responsibility for evaluating and making recommendations to the Board regarding equity–based and cash variable compensation plans, policies and programs of the Company.

**Compensation Philosophy**

The philosophy of the Compensation Committee is to create a system in which employee compensation is tied to the performance of the Company, thereby promoting stockholder value. The Company's compensation program consists of two principal components: cash–based compensation, both fixed and variable, and equity–based compensation. These two principal components are intended to attract, retain, motivate, increase the productivity of and reward, in a cost–effective manner, executives who are expected to manage both the short–term and long–term success and competitiveness of the Company. In addition, the Compensation Committee attempts to structure the compensation program to be regarded positively by the Company's stockholders, employees, the financial community and the public in general.

**Cash–based Compensation**

The Compensation Committee believes that the annual cash compensation paid to executives should be commensurate with the performance of both the Company as a whole and the individual executive in question. For this reason, the Company's executive cash compensation consists of base compensation (salary) and variable incentive compensation (annual bonus).

Base salaries for executive officers are established considering a number of factors, including the Company's profitability, the individual performance and measurable contribution to the Company's success of the executive in question and pay levels of similar positions with comparable companies in the industry. The Compensation Committee supports the Company's compensation philosophy of moderation for elements such as base salary and benefits. Base salary decisions are made as part of the Company's formal annual review process.

An executive's annual performance award generally depends on the financial performance of the Company relative to profit targets and the executive's individual performance with respect to the successful completion of objectives and goals deemed by the Company to be important in maximizing long–term return to the Company's stockholders. These targets, objectives and goals are reviewed at least annually to meet the changing nature of the Company's business. The incentive portion is set at a higher percentage for more senior officers, with the result that such officers have a higher percentage of their potential total cash compensation at risk.

17

**Equity−based Compensation**

The Compensation Committee administers an option program pursuant to which members of management, including the Company's executive officers, may receive annual option grants upon a yearly review from a pool of shares set aside by the Company. The purpose of the option program is to provide additional incentive to executives and other key employees of the Company to work to maximize long−term return to the Company's stockholders. The allocation of the option pool, other than the shares allocated to the President and Chief Executive Officer, is recommended by the President and Chief Executive Officer for approval by the Compensation Committee. The allocation of shares from the option pool to the President and Chief Executive Officer is determined solely by the Compensation Committee. In granting stock options to the executive officers and the President and Chief Executive Officer, the Compensation Committee considers a number of objective and subjective factors, including the executive's position and responsibilities at the Company, such executive's past and anticipated individual performance, current survey data with respect to market rates for option compensation and other factors that the Compensation Committee may deem relevant. Options generally vest over a four−year period to encourage optionholders to continue in the employ of the Company. The exercise price of options is the market price on the date of grant, ensuring that the option will acquire value only to the extent that the price of the Company's common stock increases relative to the market price at the date of grant. On December 31, 2004, the Company adopted an immediate and full acceleration of vesting of shares covered by all stock options outstanding under the 1997 Stock Plan with a per share exercise price greater than $22.15 to mitigate the potential impact of FASB Statement No. 123(R), which requires the Company to expense unvested options starting on July 1, 2005. The Committee previously decided to reduce the use of stock options as a means of compensation for all employees in 2004 to help limit the Company's anticipated future compensation cost with respect to equity incentives, once FASB Statement No. 123(R) becomes effective.

**President and Chief Executive Officer Compensation**

The Compensation Committee generally uses the same factors and criteria described above for compensation decisions regarding the President, Chief Executive Officer and Chairman of the Board. During the fiscal year ended December 31, 2004, Mr. Lu received a base salary of $700,000 for serving as the President, Chief Executive Officer and Chairman of the Board of the Company. No bonus was awarded to Mr. Lu with respect to the fiscal year ended December 31, 2004. However, in the fiscal year ended December 31, 2004, the Compensation Committee granted Mr. Lu options to purchase 250,000 shares of the Company's Common Stock pursuant to the 1997 Stock Plan, based on his performance in the fiscal year ended December 31, 2003. As with other executives of the Company, Mr. Lu's compensation was set at the discretion of the Board, based on the achievement of certain performance objectives of the Company. Criteria considered in the determination of Mr. Lu's compensation included such factors as (i) the compensation provided to chief executive officers of companies comparable to the Company, (ii) specific benchmarks tied to the revenue, growth or profitability of the Company, (iii) decisions made by Mr. Lu in the past fiscal year that improved the business prospects or financial condition of the Company, and (iv) Mr. Lu's leadership role in accomplishing specific goals set for the Company in the past fiscal year. The performance objectives are reviewed annually by the Compensation Committee to ensure that they are consistent with the Company's compensation philosophy.

**Compliance with Internal Revenue Code Section 162(m)**

Section 162(m) of the Internal Revenue Code generally disallows a federal tax deduction to publicly held companies for compensation in excess of $1 million paid to the Company's President and Chief Executive Officer and to each of the other four most highly compensated executive officers. For this purpose, compensation can include, in addition to cash compensation, the difference between the exercise price of stock options and the value of the underlying stock on the date of exercise. The Company's policy

18

is to qualify, to the extent reasonable, its executive officers' stock option grants for deductibility under applicable tax laws. However, the Compensation Committee believes that its primary responsibility is to provide a compensation program that will attract, retain and reward the executive talent necessary for the Company's success because the Compensation Committee feels such objective is in the best interest of the Company's stockholders. Consequently, the Compensation Committee recognizes that the loss of a tax deduction may be necessary in some circumstances.

Subsequent to the annual shareholder meeting of 2004, awards granted under the 1997 Stock Plan no longer qualify as performance−based compensation for 162(m) purposes and therefore are subject to the $1 million limit. Assuming the shareholders approve the 2005 Equity Incentive Plan, the Company will once again be able to issue options and other forms of equity compensation that is considered performance−based compensation and therefore exempt from the application of the $1,000,000 162(m) limit. As a result, the Committee has decided to delay executive officer grants, if any, until after the 2005 shareholder meeting so that, if shareholders approve the 2005 Equity Incentive Plan, the grants will qualify as performance−based compensation for 162(m) purposes.

**Summary**

The Compensation Committee believes that its compensation program to date has been fair and motivating, and has been successful in attracting and retaining qualified employees and in linking compensation directly to the Company's success. The Compensation Committee intends to review this program on an ongoing basis to evaluate its continued effectiveness.

The Compensation Committee

Thomas Toy, Chairman
Betsy Atkins
Larry Horner
Allen Lenzmeier

19

## REPORT OF THE AUDIT COMMITTEE

The following is the report of the Audit Committee with respect to the Company's audited financial statements for the fiscal year ended December 31, 2004. The information contained in this report shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, except to the extent that the Company specifically incorporates the information by reference in such filing.

Established on January 31, 1997, the Audit Committee is currently comprised of five non-employee directors. Mr. Horner, the Chairman of the Audit Committee, Mr. Toy and Ms. Atkins served on the Audit Committee throughout 2004. Mr. Clarke joined the Audit Committee on January 17, 2005, and Mr. Lenzmeier joined the Audit Committee on March 15, 2005. The Board of Directors has determined that each of the members of the Audit Committee is independent as defined by Nasdaq Marketplace Rules and the SEC. The Board also determined that each member of the Audit Committee is "financially literate" and has accounting or related financial management expertise. The Board also determined that each of Messrs. Horner, Clarke, Lenzmeier and Toy is an "audit committee financial expert" as defined by SEC rules through his business and professional experience.

The purpose of the Audit Committee is to assist the Board of Directors in its general oversight of the Company's financial reporting, internal controls and audit functions. The Audit Committee is directly responsible for the appointment, retention, evaluation, compensation, oversight and termination of the Company's independent registered public accounting firm.

The Audit Committee reviews the results and scope of audit and other services provided by the independent auditors and reviews the accounting principles and auditing practices and procedures to be used in the Company's financial reporting process, including its systems of internal control, and in the preparation of consolidated financial statements in accordance with generally accepted accounting principles. The Company's independent registered public accounting firm for the last fiscal year, PricewaterhouseCoopers LLP ("PricewaterhouseCoopers"), is responsible for performing an independent audit of those financial statements. As more fully explained in the Audit Committee's charter, the Audit Committee's responsibility is to provide oversight of and to review those processes. The Audit Committee does not conduct auditing or accounting reviews or procedures, and relies on information and representations provided by management and the independent auditors. The Audit Committee has relied on management's representation that the financial statements have been prepared with integrity and objectivity and in conformity with accounting principles generally accepted in the United States of America and on the representations of the independent auditors included in their report on the Company's financial statements.

The Audit Committee held 23 meetings during the last fiscal year. The Audit Committee operates pursuant to a charter that it reviews annually.

### Audited Financial Statements

The Audit Committee has reviewed the audited financial statements prepared for the fiscal year ended December 31, 2004. The Audit Committee has discussed the audited financial statements with various members of the management of the Company.

Management is responsible for maintaining adequate internal control over financial reporting and for assessing the effectiveness of internal control over financial reporting. In addition to its independent audit of the Company's financial statements, PricewaterhouseCoopers has the responsibility for auditing management's assessment of, and the effectiveness of, internal control over financial reporting and expressing an opinion thereon based on its audit. The Audit Committee was kept apprised of the progress

of management's assessment of the Company's internal control over financial reporting and provided oversight to management during the process. In connection with this oversight, the Audit Committee received periodic updates provided by management and PricewaterhouseCoopers at meetings throughout the year. At the conclusion of the process, management provided the Audit Committee with a report on the effectiveness of the Company's internal control over financial reporting. The Audit Committee reviewed this report of management and Item 9A, "Control and Procedures," contained in the Company's Annual Report on Form 10–K for the fiscal year ended December 31, 2004 filed with the SEC, as well as PricewaterhouseCoopers' Report of Independent Registered Public Accounting Firm (included in the Company's Annual Report on Form 10–K) relating to its audit of (i) the consolidated financial statements, (ii) management's and the independent auditors' assessment of the effectiveness of internal control over financial reporting and (iii) the effectiveness of internal control over financial reporting. The Audit Committee also reviewed with management and PricewaterhouseCoopers (a) the Company's completed, current and planned initiatives to remediate material weaknesses in the Company's internal control over financial reporting as required by Section 404 of the Sarbanes–Oxley Act of 2002 and (b) the additional analyses undertaken and procedures performed by the Company to support certifications by the Company's Chief Executive Officer and Chief Financial Officer that are required by the SEC and the Sarbanes–Oxley Act to accompany the Company's periodic filings with the SEC.

In addition, the Audit Committee has discussed the audited financials with PricewaterhouseCoopers, including such items as Statement on Auditing Standards No. 61 and PCAOB Auditing Standard No. 2, "An Audit of Internal Control Over Financial Reporting Conducted in Conjunction with an Audit of Financial Statements." The Audit Committee has also received from PricewaterhouseCoopers a letter and other written disclosures required under Independence Standards Board Standard No. 1, and has had discussions with PricewaterhouseCoopers regarding the independence of PricewaterhouseCoopers as the Company's independent registered public accounting firm.

After review of all discussions and all written correspondence described above, as well as such other matters deemed relevant and appropriate by the Audit Committee, the Audit Committee recommended to the Board of Directors that the audited financial statements for the last fiscal year be included in the Company's Annual Report on Form 10–K.

The Audit Committee

Larry Horner, Chairman
Betsy Atkins
Jeff Clarke
Allen Lenzmeier
Thomas Toy

21

## PROPOSAL TWO
## APPROVAL OF 2005 EQUITY INCENTIVE PLAN

This section summarizes the proposal to adopt the 2005 Equity Incentive Plan (the "**Incentive Plan**").

We are asking stockholders to approve the Incentive Plan. Adoption of the Incentive Plan will enable the Company to (i) have greater flexibility in recruiting, motivating and retaining talented employees to help achieve the Company's business goals, and (ii) receive a federal income tax deduction for certain compensation paid under the Incentive Plan. The Board has approved adoption of the Incentive Plan, subject to stockholder approval at the Annual Meeting. Stockholder approval of the Incentive Plan requires the vote of a majority of Common Stock present in person or by proxy and entitled to vote on the proposal at the Annual Meeting. If stockholders approve adoption of the Incentive Plan, it will replace the 1997 Stock Plan.

The main substantive difference between the Incentive Plan and the 1997 Stock Plan is that in addition to stock options and restricted stock, the Incentive Plan also allows for the following new forms of awards: stock appreciation rights, restricted stock units, performance units and performance shares. In addition, the Incentive Plan contains a specific list of performance goals for the purposes of classifying awards as "performance–based" compensation within the meaning of 162(m) of the Internal Revenue Code. The Incentive Plan also provides for automatic, non–discretionary grants to our Non–Employee Directors, formalizing the Board's past practice of making annual discretionary grants to Non–Employee Directors under the 1997 Stock Plan.

We strongly believe that the approval of the Incentive Plan is essential to our continued success. The awards provided under the Incentive Plan are vital to our ability to attract and retain highly skilled individuals to work for the Company and serve on our Board.

Our proposed changes reflect the environment in which we operate. The proposed changes will provide us with needed flexibility to adopt our equity compensation practices to reflect changes in business conditions and the markets for labor in which we compete. Our employees and directors are our most important asset. We must continue to offer a competitive compensation package if we hope to continue our success in attracting outstanding talent. In the event stockholders do not approve the proposed changes, we will continue to provide equity compensation under our 1997 Stock Plan. However, our ability to provide the competitive compensation needed to attract, motivate, and retain outstanding talent may be hindered.

In connection with the adoption of the Incentive Plan, we propose the reservation of the number of Common Stock equal to the number of shares of Common Stock currently authorized and available for issuance under the 1997 Stock Plan as of May 13, 2005 plus (i) any shares of Common Stock that return to the 1997 Stock Plan after May 13, 2005 and (ii) an annual increase on the first day of each fiscal year, beginning in 2006, equal to the lesser of (a) 4% of the outstanding shares of Common Stock on the first day of the fiscal year, (b) 3,000,000 share of Common Stock; or (c) such lesser amount of Common Stock as determined by the Board. We generally are not asking stockholders to approve the issuance of any additional shares beyond the shares that we already would be permitted to issue under the 1997 Stock Plan, except that the automatic increase in available shares of Common Stock under the 1997 Plan (which generally is the same formula described in the preceding sentence) would have expired when the 1997 Plan was scheduled to expire in 2007 and now will expire in 2015.

### Description of the Incentive Plan

The following paragraphs provide a summary of the principle features of the Incentive Plan and its operation. The Incentive Plan is set forth in its entirety as Annex A to this Proxy Statement. The following summary is qualified in its entirety by reference to the Incentive Plan.

22

**Purpose**.  The Incentive Plan is intended to enhance our ability to attract and retain the best available personnel for positions of substantial responsibility, provide additional incentive to employees, directors and consultants, and promote the success of the Company's business.

**Eligibility**.  The Administrator (as defined below) selects the employees, directors and consultants who will be granted awards under the Incentive Plan. The actual number of individuals who will receive an award cannot be determined in advance because the Administrator has discretion to select the participants.

**Types of Awards**.  The Administrator is allowed to grant six types of awards under the Incentive Plan:

- stock options;
- stock appreciation rights;
- restricted stock awards;
- restricted stock units;
- performance share awards; and
- performance unit awards.

The Administrator currently intends to grant stock options and stock appreciation rights as our principal forms of awards. However, we believe that we need to have flexibility to grant other types of equity compensation awards in order to compete successfully for talented employees and in light of potential accounting, legal and other changes.

**Stock options**.  A stock option is the right to acquire shares of common stock at a fixed exercise price for a fixed period of time (usually ten years). The Administrator may grant nonstatutory stock options and/or incentive stock options (which entitle employees, but not the Company, to more favorable tax treatment).

The exercise price of each stock option is set by the Administrator but cannot be less than 100% of the fair market value (on the date of grant) of the stock covered by the option. (The 1997 Stock Plan permitted the Administrator to grant nonstatutory stock options with exercise prices less than fair market value.)  Thus, an individual will be able to profit from an option only if the fair market value of our Common Stock increases after the option is granted. In other words, the Incentive Plan does not allow for "discounted" stock options. An exception is made only for options that the Company grants to substitute for options held by employees of companies that we acquire (in which case the exercise price preserves the economic value of the employee's cancelled stock option from his or her former employer).

An option generally cannot be exercised until it becomes vested. Although the Incentive Plan does not prevent the Administrator from granting early exercisable options, the Administrator currently plans to continue the practice of permitting only vested options to be exercisable. The Administrator establishes the vesting schedule at the time the option is granted. Vesting usually requires continued employment by the participant for a period of years, usually four.

The Administrator determines the term of options, except that incentive stock options may have terms of no more than ten years. The Administrator intends to continue the practice that all options shall have a term of no more than ten years. Upon termination of service to the Company, an option usually remains exercisable, to the extent then vested, for three months, although the Administrator has the discretion to permit an option to remain exercisable for a longer period of time. Upon termination of service due to death or disability, an option usually remains exercisable, to the extent then vested, for twelve months. However, in no event may an option be exercised after the expiration of its term.

23

The exercise price of each option must be paid in full at the time of exercise. Payment may be made in cash, by check, through a "cashless exercise program" or, if the Administrator permits, with a promissory note, reduction in our liabilities to the participant, in shares of our Common Stock that are already owned by the participant or by any other means that provides legal consideration for the shares and is consistent with the Incentive Plan's purpose.

**Non−Employee Director options.**  The Incentive Plan provides for the automatic, non−discretionary grant of nonstatutory stock options to purchase 25,000 shares of Common Stock to our Non−Employee Directors on the first market trading day on or after every August 23, if such Non−Employee Director has served as a director for at least the preceding five months. The exercise price is the fair market value of the covered shares on the date of grant and the option vests as to one−twelfth ($\frac{1}{12}$) of the covered shares each month, subject to the director continuing to serve as a director through each vesting date. Following termination of service, these options remain exercisable for twelve months, subject to the ten−year option term. Our Board previously approved similar grants each year under the 1997 Stock Plan. Assuming stockholders approve the Incentive Plan, our Board will discontinue the practice of making annual, discretionary Non−Employee Director grants every August.

**Stock appreciation rights.**  Stock appreciation rights are awards that grant the participant the right to receive an amount of money equal to (i) the number of shares exercised multiplied by (ii) the amount by which our stock price exceeds the exercise price. The exercise price cannot be less than 100% of the stock's fair market value on the date of grant. Thus, an individual will be able to profit from a stock appreciation right only if the fair market value of the stock increases after the stock appreciation right is granted. The Administrator generally will provide that a stock appreciation right may be exercised only if it becomes vested based on the vesting schedule established by the Administrator. Stock appreciation rights expire under the same rules that apply to options.

**Restricted stock awards.**  Restricted stock awards are shares that vest based on a schedule established by the Administrator. However, if stockholders approve this proposal, shares of restricted stock generally may not vest (i) at a rate of more than one−third ($\frac{1}{3}$) of the shares each year if vesting is subject solely to continued service and (ii) within twelve months of the date of grant if vesting is subject to satisfaction of specified performance objectives. Notwithstanding the foregoing, shares of restricted stock may vest sooner in the event of a participant's death, disability or retirement or a major capital change of the Company. The 1997 Stock Plan permitted the grant of restricted stock (these awards were called "stock purchase rights" in the 1997 Stock Plan), but the 1997 Stock Plan did not impose any limitations on the vesting schedule.

**Performance shares and performance unit awards.**  Performance shares and performance units may result in a payment to the participant in cash or shares if the performance goals and/or other vesting criteria established by the Administrator are achieved or the awards otherwise vest. Performance shares and performance units generally vest upon satisfaction of company−wide, business unit, or individual goals (including solely continued service), measured over a period of at least twelve months.

**Restricted Stock Units.**  Restricted stock units are awards of restricted stock, performance shares, or performance units that the Administrator permits to be paid out in installments or on a deferred basis.

**Administration, Amendment and Termination.**  The Incentive Plan may be administered by multiple committees under the Board (collectively, the "**Administrator**"). Currently, the Board has authorized the Compensation Committee to assume primary responsibility for the administration of all incentive compensation other than that of Non−Employee Directors, for whom the Disinterested Director Committee was created. To the extent we want certain compensation to qualify for an exemption under Rule 16b−3 of the Exchange Act or for federal tax deductions, members of the Administrator must qualify as non−employee directors under Rule 16b−3 or as outside directors under Section 162(m) of the Internal Revenue Code, as relevant.

Subject to the terms of the Incentive Plan, the Administrator has sole discretion to, in addition to other powers,:

- select the employees, directors and consultants who will receive awards;
- determine the number of shares of Common Stock covered by each award;
- determine the terms and conditions of awards (for example, the exercise price and vesting schedule);
- to modify or amend awards, including the discretionary authority to extend post–termination award exercisability or accelerate vesting; and
- interpret the provisions of the Incentive Plan.

If stockholders approve this proposal, the Administrator may not reduce the exercise or purchase price of an outstanding award (whether by (i) repricing the award or (ii) cancelling the award and granting a new award with a lower exercise or purchase price) without first obtaining stockholder approval. The 1997 Stock Plan permitted the administrator to institute an option exchange program without first obtaining stockholder approval.

The Board may amend or terminate the Incentive Plan at any time and for any reason. The Incentive Plan expires pursuant to its terms on May 13, 2015. Future amendments will be submitted for stockholder approval if necessary or appropriate to continue the Incentive Plan's compliance with applicable law, including, without limitation, Section 162(m) of the Internal Revenue Code, or with Nasdaq rules.

If an award expires or is cancelled without having been fully exercised or vested, the unvested or cancelled shares generally will be returned to the available pool of shares. In addition a number of shares equal to the number of shares tendered or withheld to pay award exercise or purchase prices or to cover applicable tax withholding will be returned to the available pool of shares. Also, if a stock dividend, reorganization, spin–off or other change in the Company's capital structure occurs, the Administrator has discretion to adjust the number of shares available under the Incentive Plan, the per person limits on grants and the number of shares automatically granted to Non–Employee Directors, as appropriate to reflect the stock dividend or other change.

**Limited Transferability of Awards.**   Unless otherwise determined by the Administrator, awards granted under the Incentive Plan may not be sold, transferred, pledged, assigned or otherwise alienated or hypothecated, other than by will or under applicable laws of descent and distribution. The Administrator may also, in its sole discretion, impose other transfer restrictions it deems advisable or appropriate.

**Options Granted to Certain Individuals and Groups.**   If the Incentive Plan were in place last year, its terms would not have resulted in a different number of option or awards being granted. The following table sets forth the total number of shares of the Company's Common Stock subject to options granted under the 1997 Stock Plan to the listed persons and groups for the 2004 fiscal year.

25

## New Plan Benefits

| Name and Position | Number of Options Granted | Average Per Share Exercise Price of Options | Number of Shares of Restricted Stock Granted |
|---|---|---|---|
| Hong Liang Lu, President, Chief Executive Officer and Chairman of the Board | 250,000 | $ 37.46 | — |
| Ying Wu Executive Vice President and Vice Chairman | 200,000 | $ 37.46 | — |
| Shao-Ning J. Chou Senior Vice President | 150,000 | $ 37.46 | — |
| Michael Sophie Chief Financial Officer and Senior Vice President | 150,000 | $ 37.46 | — |
| William Huang Chief Technology Officer and Senior Vice President | 100,000 | $ 37.46 | — |
| All current executive officers, as a group | 850,000 | $ 37.46 | — |
| All directors who are not executive officers, as a group | 75,000 | $ 16.34 | — |
| All employees who are not executive officers, as a group | 4,950,197 | $ 25.94 | — |

Directors and named executive officers have a financial interest in this proposal because they are eligible to receive awards under the Incentive Plan. Non–Employee Directors also have an interest in this proposal because they are provided annual, non–discretionary option grants.

### Federal Tax Aspects

The following is a summary of the general federal income tax consequences to U.S. taxpayers and the Company of awards granted under the Incentive Plan. Tax consequences for any particular individual may be different.

**Nonstatutory Stock Options and Stock Appreciation Rights.**   No taxable income is reportable when a nonstatutory stock option or a stock appreciation right is granted with an exercise price equal to or greater than fair market value. Upon exercise, the recipient will recognize ordinary income equal to the fair market value of the shares on the exercise date minus the exercise price. Any additional gain or loss upon the disposition of the stock will be capital gain or loss.

**Incentive Stock Options.**   No taxable income is reportable when an incentive stock option is granted or exercised (except for purposes of the alternative minimum tax, in which case taxation is the same as for nonstatutory stock options). If the recipient exercises the option and then sells the shares more than two years after the grant date and more than one year after the exercise date, the difference between the sale price and the exercise price will be taxed as capital gain or loss. If the recipient exercises the option and sells the shares before the end of the two or one–year holding periods, he or she generally will recognize ordinary income at the time of the sale equal to the fair market value of the shares on the exercise date (or

26

the sale price, if less) minus the exercise price of the option, and any additional gain or loss will be capital gain or loss.

**Restricted Stock, Performance Units and Performance Shares.**  A recipient of restricted stock, performance units or performance shares will not recognize taxable income upon grant. Instead, he or she will recognize ordinary income at the time of vesting equal to the fair market value on the vesting date of the shares (or cash) received minus any amount paid for the shares. For restricted stock only, a recipient may instead elect to be taxed at the time of grant. Any additional gain or loss upon the disposition of the stock, if any, will be capital gain or loss.

**Restricted Stock Units.**  A recipient of restricted stock units generally will not recognize taxable income on grant. Instead, so long as the settlement of the award complies with deferred compensation tax rules, the recipient will recognize ordinary income on the receipt of shares (or cash) equal to the fair market value of the shares (or cash) minus amounts paid. If the terms of settlement do not comply with deferred compensation tax rules, the recipient will recognize ordinary income on vesting, equal to the fair market value of the shares (or cash) minus amounts to be paid, and will be subject to an additional 20% exercise tax. Any additional gain or loss upon the disposition of the stock, if any, will be capital gain or loss.

**Tax Effect for the Company.**  The Company generally will receive a tax deduction for any ordinary income recognized by a participant from an award under the Incentive Plan (for example, the exercise of a nonstatutory stock option). Special rules limit the deductibility of compensation paid to our Chief Executive Officer and four other most highly compensated executive officers. Under Section 162(m) of the Internal Revenue Code, the annual compensation paid to each of these executives may not be deductible to the extent that it exceeds $1 million. However, we are able to preserve the deductibility of compensation over $1 million if the conditions of Section 162(m) are met. These conditions include stockholder approval of the Incentive Plan, setting limits on the number of awards that any individual may receive, and for awards other than options and stock appreciation rights, establishing stockholder approved performance criteria that must be met before the award actually will vest or be paid. The Incentive Plan has been designed to permit the Committee to grant awards that qualify as performance−based for purposes of satisfying the conditions of Section 162(m). For example, the Incentive Plan limits the number of shares that may be granted to any one participant in any one year as follows (the limits with respect to the first calendar year in which an individual joins the Company are twice the following amounts):

- 700,000 shares under options;
- 700,000 shares under stock appreciation rights;
- 700,000 restricted shares;
- 700,000 performance shares; and
- performance units with an initial value not greater than $2 million.

In addition, in setting the vesting schedule of an award, the Administrator may provide that the award will vest only upon the achievement of objectives for one or more of:

- annual revenue;
- operating profit;
- customer satisfaction MBOs;
- earnings per share;
- net income;
- new orders;

27

- pro forma net income;
- return on designated assets;
- return on sales;
- return on equity;
- cash collections; or
- product shipments.

Each of these performance measures is defined in the Incentive Plan.

### Summary

We are requesting that stockholders approve adoption of the Incentive Plan. The Incentive Plan would replace the 1997 Stock Plan, and would be materially different from the latter in that (i) in addition to stock options and restricted stock, the Incentive Plan allows for new forms of awards such as stock appreciation rights, performance units and performance shares and (ii) the Incentive Plan provides for a specific list of performance goals for the purposes of 162(m) of the Internal Revenue Code. The Incentive Plan also provides for automatic, non-discretionary grants to our Non-Employee Directors.

We believe strongly that the approval of the Incentive Plan is essential to our continued success. Awards such as those provided under the Incentive Plan constitute an important incentive and help us to attract and retain people whose skills and performance are critical to our success. Our employees and directors are our most important asset. We strongly believe that the Incentive Plan is vital to our ability to attract and retain outstanding and highly skilled individuals to work for the Company and serve on our Board.

**THE BOARD UNANIMOUSLY RECOMMENDS THAT YOU VOTE "FOR" THE APPROVAL OF THE ADOPTION OF THE 2005 EQUITY INCENTIVE PLAN.**

28

## PROPOSAL THREE
## RATIFICATION OF APPOINTMENT OF INDEPENDENT
## REGISTERED PUBLIC ACCOUNTING FIRM

The Audit Committee of the Board has selected PricewaterhouseCoopers LLP, Independent Registered Public Accounting Firm, to audit the financial statements of the Company for the fiscal year ending December 31, 2005 and recommends that the stockholders ratify this selection. PricewaterhouseCoopers LLP also audited the Company's financial statements for its fiscal year ended December 31, 2004. The Board expects that representatives of PricewaterhouseCoopers LLP will be present at the Annual Meeting, will be given an opportunity to make a statement at the meeting and will be available to respond to appropriate questions.

Stockholder ratification of this selection of PricewaterhouseCoopers LLP as the Company's Independent Public Accounting Firm is not required by the Bylaws or otherwise. However, the Board has elected to seek such ratification as a matter of good corporate practice. Should the stockholders fail to ratify the selection of PricewaterhouseCoopers LLP as Independent Registered Public Firm, the Audit Committee and the Board will consider whether to retain that firm for the year ended December 31, 2005. Even if the selection is ratified, the Audit Committee, at its discretion, may direct the appointment of a different independent registered public accounting firm at anytime during the year if it determines that such a change would be in the best interests of the Company and its stockholders.

**PricewaterhouseCoopers LLP Fees For The Fiscal Year Ended December 31, 2004**

*Audit Fees*

Fees for the fiscal year ended December 31, 2004 audit and interim reviews were $8,423,663.00. Fees for the fiscal year ended December 31, 2003 audit and interim reviews were $1,667,281.00.

*Audit−Related Fees*

Audit−related fees were $771,475.00 and $1,111,170.00 for fiscal years ended December 31, 2004 and December 31, 2003, respectively. Such services included due diligence and other procedures performed surrounding certain of the Company's acquisitions and accounting consultation.

*Tax Fees*

During the fiscal year ended December 31, 2004, fees related to tax advice, compliance and planning were $3,134,642.00. For the fiscal year ended December 31, 2003 fees for tax advice, compliance and planning totaled $1,736,928.00.

*All Other Fees*

Other fees during the year ended December 31, 2004 totaled $5,000.00 and consisted entirely of fees related to training. For the fiscal year ended December 31, 2003 other fees totaled $4,200.00 and consisted entirely of fees related to research tools.

The Audit Committee has determined that the provision by PricewaterhouseCoopers LLP of non−audit services to us in 2004 is compatible with PricewaterhouseCoopers LLP maintaining its independence.

*Audit Committee Pre−Approval Policies and Procedures*

The Audit Committee has direct responsibility for the appointment, retention, evaluation, compensation, oversight and termination of the independent registered public accounting firm employed by the Company. In October 2003, the Audit Committee of the Board established a Non−Audit Services

29

Subcommittee. The Non−Audit Services Subcommittee, consisting of Mr. Horner, is authorized to preapprove non−audit services to be performed by the Company's independent public accountants in amounts not to exceed $50,000 per engagement. Non−audit services to be performed by the Company's independent registered public accounting firm in amounts to exceed $50,000 per engagement will be approved by the Audit Committee. During fiscal 2004, there were no audit−related fees, tax fees, or any other non−audit fees that were approved by the Audit Committee pursuant to the "de minimis" exception under Regulation S−X Rule 2−01(c)(7)(i)(C).

**Required Vote**

The affirmative vote of the holders of a majority of the Votes Cast will be required to ratify the selection of PricewaterhouseCoopers LLP as the Company's Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2005.

**THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" RATIFICATION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM.**

30

## COMPANY'S STOCK PERFORMANCE

　　Set forth below is a line graph comparing the annual percentage change in the cumulative return to the stockholders of the Company's Common Stock with the cumulative return of the Nasdaq composite (U.S. and foreign) index and the S&P Wireless Telecommunication Services index for the period commencing on March 3, 2000, the first day the Company's Common Stock was traded on The Nasdaq National Market, and ending on December 31, 2004. The information contained in the performance graph shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act or the Exchange Act, except to the extent that the Company specifically incorporates it by reference into such filing.

　　The graph assumes that $100.00 was invested on March 3, 2000 in the Company's Common Stock and in each index (based on the initial public offering price of $18 per share), and that all dividends were reinvested. No cash dividends have been declared or paid on the Company's Common Stock. Stockholder returns over the indicated period should not be considered indicative of future stockholder returns. The Company operates on a 52-week fiscal year that ended on Friday, December 31, 2004. Under the assumptions stated above, over the period from March 3, 2000 to December 31, 2004 the total return on an investment in the Company would have been 23.06% as compared to −30.94% for the Nasdaq composite (U.S. and foreign) index and −66.7% for the S&P Wireless Telecommunication Services index shown below.

### STOCK PRICE PERFORMANCE GRAPH FOR UTSTARCOM, INC.

#### COMPARISON OF 5-YEAR CUMULATIVE TOTAL RETURN*
AMONG UTSTARCOM, INC., THE NASDAQ STOCK MARKET (U.S. & FOREIGN) INDEX AND THE S & P WIRELESS TELECOMMUNICATION SERVICES INDEX



*　$100 invested on 3/3/00 in stock or on 2/29/00 in index—including reinvestment of dividends. Fiscal year ending December 31.

31

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

During 2004, the Company was party to indemnification agreements with certain of its Directors and executive officers.

One of the Company's previous Directors, Masayoshi Son, who resigned from the Board effective September 15, 2004, is the President and Chief Executive Officer and a director of SOFTBANK CORP. SOFTBANK CORP. is an affiliate of SOFTBANK America, Inc., also one of our significant stockholders. Since the beginning of the 2004 financial year, the Company has engaged, continues to engage or proposes to engage in the following transactions with entities affiliated with SOFTBANK CORP.:

- On July 17, 2003, the Company entered into a Mezzanine Loan Agreement with BB Modem Rental PLC ("**BB Modem**"), an affiliate of SOFTBANK CORP. Under the terms of the agreement, the Company loaned BB Modem $10.1 million at an effective interest rate of 12.01% per annum, for the purpose of investing in a portfolio of ADSL modems and associated modem rental agreements, from Softbank BB Corporation ("**Softbank BB**"), formerly BB Technologies, an affiliate of SOFTBANK America, Inc.

- The Company has invested approximately $10.0 million in Softbank China, an investment fund established by SOFTBANK CORP. focused on investments in Internet companies in China. The investment balance as of December 31, 2004 was $5.3 million. The Company has also invested $2.0 million in Restructuring Fund No. 1, a venture capital investment limited partnership established by SOFTBANK INVESTMENT CORP., an affiliate of SOFTBANK CORP. The investment balance as of December 31, 2004 was $1.8 million.

- In December 2002, a venture capital fund affiliated with SOFTBANK CORP. made a capital investment in MDC Holding Limited ("**MDC Holding**"). In December 2004, the Company exercised a warrant for ordinary shares of MDC Holding for which it paid approximately $0.8 million. In 2004, the Company received payments from Beijing MDC Telecommunications Co., Ltd. ("**Beijing MDC**"), an affiliate of MDC Holding, of approximately $0.8 million for purchases of equipment and the provision of consulting services, and in 2004 the Company paid to Beijing MDC approximately $0.5 million for PAS value added services and as rental payments. During the period from January 2005 to March 2005, the Company entered into an agreement to sell equipment to Beijing MDC with a value of approximately $2.3 million. For additional information regarding the Company's transaction with Beijing MDC, please read "Note 2—Summary of Significant Accounting Policies—Restatement of Consolidated Financial Statements" in our Annual Report on Form 10–K for the fiscal year ended December 31, 2004.

- We recognized revenue of $143.7 million during 2004 with respect to sales of telecommunications equipment to Softbank BB.

- During August 2004, the Company entered into several agreements with Japan Telecom Co., Ltd. ("**JT**"), a wholly owned subsidiary of SOFTBANK CORP., related to the sale of telecommunication equipment and promotional services. The terms of these agreements specify that JT was to remit 50 percent of the contract value in cash to the Company within one month of the execution of the contract, which was August 20, 2004. As of December 31, 2004, there was $217.5 million included in customer advance related to these agreements. The Company also entered into an agreement during the third quarter of 2004 with JT to supply chassis equipment with an approximate value of $75 million.

Yulan Wu, the spouse of Ying Wu, Executive Vice President and Vice Chairman of the Board, is the beneficial owner of approximately 31% of Starcom Products, Inc. ("**Starcom Products**"). In 2004 and during the period from January 2005 to March 2005, we paid Starcom Products approximately $1.1 million and $0.3 million, respectively, for engineering consulting and employee placement services.

## OTHER MATTERS

The Company knows of no other matters to be submitted to the Annual Meeting. If any other matters properly come before the Annual Meeting, it is the intention of the persons named in the enclosed proxy to vote the shares they represent as the Board may recommend.

**BY ORDER OF THE BOARD OF DIRECTORS**

/s/ MICHAEL J. SOPHIE

Michael J. Sophie
*Senior Vice President of Finance and Chief Financial Officer*

Dated: April 18, 2005

33