Exhibit O

Part 1 of 2



# UTSTARCOM INC (UTSI)

1275 HARBOR BAY PARKWAY
STE 100
ALAMEDA, CA 94502
510. 864.8800
http://www.utstar.com/

# DEF 14A

**DEF 14A**
**Filed on 06/16/2006 − Period: 07/21/2006**
File Number 000−29661



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

<u>QuickLinks</u> —— Click here to rapidly navigate through this document

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.          )

Filed by the Registrant   ☒

Filed by a Party other than the Registrant   ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a−6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material Pursuant to §240.14a−12

**UTSTARCOM, INC.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a−6(i)(1) and 0−11.

  (1) Title of each class of securities to which transaction applies:

  (2) Aggregate number of securities to which transaction applies:

  (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0−11 (set forth the amount on which the filing fee is calculated and state how it was determined):

  (4) Proposed maximum aggregate value of transaction:

  (5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0−11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

  (1) Amount Previously Paid:

  (2) Form, Schedule or Registration Statement No.:

  (3) Filing Party:

  (4) Date Filed:



June 21, 2006

Dear Stockholder:

You are cordially invited to attend the 2006 annual meeting of stockholders of UTStarcom, Inc. (the "**Company**") to be held at the Hilton Oakland Airport, 1 Hegenberger Road, Oakland, California 94621, on Friday, July 21, 2006 at 10:00 a.m., Pacific Daylight Time. Enclosed are a notice of annual meeting of stockholders, a proxy statement describing the business to be transacted at the meeting, and a proxy card for use in voting at the meeting.

At the annual meeting, you will be asked to vote on the important matters described in detail in the notice of annual meeting of stockholders and proxy statement accompanying this letter. There also will be an opportunity for you to ask questions and receive information about the business of the Company.

Included with the proxy statement is a copy of the Company's annual report to stockholders. We encourage you to read the annual report. It includes information on the Company's operations as well as the Company's audited financial statements.

Please take this opportunity to participate in the affairs of the Company by voting on the business to come before this meeting. **WHETHER OR NOT YOU EXPECT TO ATTEND THE MEETING, PLEASE COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE ACCOMPANYING PROXY CARD IN THE ENCLOSED POSTAGE–PAID ENVELOPE SO THAT YOUR SHARES MAY BE REPRESENTED AT THE MEETING.** Returning the proxy card does not deprive you of your right to attend the meeting and to vote your shares in person.

We look forward to seeing you at the meeting.

Sincerely,

/s/ HONG LIANG LU

Hong Liang Lu
*President, Chief Executive Officer and Chairman of the Board of Directors*

**YOUR VOTE IS IMPORTANT. PLEASE COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE ENCLOSED PROXY CARD IN THE ENCLOSED POSTAGE–PAID ENVELOPE WHETHER OR NOT YOU PLAN TO ATTEND THE MEETING. IF YOU ATTEND THE MEETING AND DESIRE TO WITHDRAW YOUR PROXY, YOU MAY VOTE IN PERSON AND YOUR PROXY WILL BE WITHDRAWN.**

# UTSTARCOM, INC.

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To Be Held July 21, 2006

To the Stockholders:

NOTICE IS HEREBY GIVEN that the annual meeting of stockholders (the "**Annual Meeting**") of UTStarcom, Inc. (the "**Company**"), a Delaware corporation, will be held on Friday, July 21, 2006 at 10:00 a.m., Pacific Daylight Time, at the Hilton Oakland Airport, 1 Hegenberger Road, Oakland, California 94621, for the following purposes:

1.
   To elect two Class III Directors to serve for a term expiring on the date on which the annual meeting of stockholders is held in the year 2009.

2.
   To approve the 2006 Equity Incentive Plan, including approval of its material terms and performance goals for the purposes of Section 162(m) of the Internal Revenue Code of 1986, as amended.

3.
   To ratify and approve the appointment of PricewaterhouseCoopers LLP as the independent registered accounting firm of the Company for the fiscal year ending December 31, 2006.

4.
   To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

The foregoing items of business are more fully described in the proxy statement accompanying this notice.

Only stockholders of record at the close of business on May 25, 2006 are entitled to notice of, and to vote at, the Annual Meeting.

All stockholders are cordially invited to attend the Annual Meeting in person. However, to assure your representation at the Annual Meeting, you are urged to complete, sign and return the enclosed proxy card as promptly as possible in the postage–paid envelope enclosed for that purpose. Any stockholder attending the Annual Meeting may vote in person even if he or she returned a proxy.

By Order of the Board of Directors

/s/ FRANCIS P. BARTON

Francis P. Barton
*Executive Vice President and
Chief Financial Officer*

Alameda, California
June 21, 2006

## YOUR VOTE IS IMPORTANT

To assure your representation at the Annual Meeting, you are requested to complete, sign and date the enclosed proxy as promptly as possible and return it in the enclosed postage–paid envelope, which requires no postage if mailed in the United States.

# UTSTARCOM, INC.

## PROXY STATEMENT

### QUESTIONS AND ANSWERS ABOUT THE PROXY STATEMENT AND VOTING AT THE ANNUAL MEETING

**Q:** *Why am I receiving these materials?*

**A:**

The Board of Directors (the "**Board**" or "**Board of Directors**") of UTStarcom, Inc. (the "**Company**") is providing this proxy statement (the "**Proxy Statement**") prepared in connection with the Company's annual meeting of stockholders, which will take place on Friday, July 21, 2006 at 10:00 a.m., Pacific Daylight Time (the "**Annual Meeting**" or "**2006 Annual Meeting**") at the Hilton Oakland Airport, 1 Hegenberger Road, Oakland, California 94621. The Company's telephone number at that location is (510) 635−5000. As a stockholder, you are invited to attend the Annual Meeting and requested to vote on the proposals described in this Proxy Statement.

Only stockholders of record at the close of business on May 25, 2006 (the "**Record Date**") are entitled to notice of, and to vote at, the Annual Meeting. As of the Record Date, 121,089,996 shares of the Company's common stock, par value $0.00125 per share (the "**Common Stock**"), were issued and outstanding. No shares of the Company's preferred stock, par value $0.00125 per share, were issued and outstanding.

**Q:** *What information is contained in this Proxy Statement?*

**A:**

The information in this Proxy Statement relates to the proposals to be voted on at the Annual Meeting, the voting process, the compensation of our directors and most highly paid executive officers in 2005, and certain other required information.

**Q:** *How may I obtain a separate set of proxy materials or Annual Report for 2005?*

**A:**

If you share an address with another stockholder and previously consented to receiving one copy of the Proxy Statement on a voter instruction card submitted for last year's annual meeting of stockholders, only one copy of this Proxy Statement is being delivered to you. A stockholder at a shared address who received a single copy of this Proxy Statement may request a separate copy either by calling the number provided below or mailing a written request to the address below:

Corporate Secretary
UTStarcom, Inc.
1275 Harbor Bay Parkway
Alameda, California 94502
510−864−8800

The Company will promptly mail a separate copy of this Proxy Statement upon such request, but any such request should be made as soon as possible to ensure timely delivery.

Stockholders who share an address and received multiple copies of this Proxy Statement may also request that a single copy of the proxy statement be delivered in the future by filling out the applicable section of the voter instruction card for the Annual Meeting.

**Q:** *What proposals will be voted on at the Annual Meeting?*

**A:**

The proposals scheduled to be voted on at the Annual Meeting are:

- The election of two Class III Directors;

- The approval of the material terms and performance goals of the Company's 2006 Equity Incentive Plan; and

- The ratification and approval of the PricewaterhouseCoopers LLP as the independent registered accounting firm of the Company for the fiscal year ending December 31, 2006.

**Q:**

*How does the Board recommend that I vote?*

**A:**

The Company's Board of Directors recommends that you vote your shares (1) "FOR" each of the nominees to the Board of Directors, (2) "FOR" the approval of the 2006 Equity Incentive Plan, and (3) "FOR" the ratification and approval of the Company's independent registered public accounting firm for the 2006 fiscal year.

**Q:**

*How many votes do I have?*

**A:**

On each proposal to be voted upon, you have one vote for each share of the Common Stock of the Company you own as of the Record Date.

**Q:**

*What is the difference between holding shares as a stockholder of record and as a beneficial owner?*

**A:**

Many of the Company's stockholders hold their shares through a broker or other nominee rather than directly in their own name. As summarized below, there are some distinctions between shares held of record and those owned beneficially.

**Stockholder of Record:**  If your shares are registered directly in your name with our transfer agent, Computershare Trust Company, N.A., as of the Record Date, you are considered, with respect to those shares, the *stockholder of record*, and these proxy materials are being sent directly to you by the Company. As the *stockholder of record*, you have the right to grant your voting proxy directly to the Company or to vote in person at the Annual Meeting. The Company has enclosed a proxy card for your use.

**Beneficial Owner:**  If your shares are held in a brokerage account or by another nominee, you are considered the *beneficial owner* of shares held in *street name*, and these proxy materials are being forwarded to you together with a voting instruction card by your broker, trustee or nominee, as the case may be. As the beneficial owner, you have the right to direct your broker, trustee or nominee how to vote, and you are also invited to attend the Annual Meeting. Since a beneficial owner is not the *stockholder of record*, you may not vote your shares in person at the Annual Meeting unless you obtain a "legal proxy" from the broker, trustee or nominee that holds your shares giving you the right to vote the shares at the meeting. Your broker, trustee or nominee has enclosed or provided voting instructions for you to use in directing the broker, trustee or other nominee how to vote your shares.

**Q:**

*How can I vote my shares in person at the Annual Meeting?*

**A:**

Shares held in your name as the stockholder of record may be voted by you in person at the Annual Meeting. Shares held beneficially in street name may be voted by you in person at the Annual Meeting only if you obtain a legal proxy from the broker, trustee or nominee that holds your shares giving you the right to vote the shares. **Even if you plan to attend the Annual Meeting, we recommend that you also submit your proxy or voting instructions as described below so that your vote will be counted if you later decide not to attend the meeting.**

**Q:**

*How can I vote my shares without attending the Annual Meeting?*

**A:**

Whether you hold shares directly as the stockholder of record or beneficially in street name, you may direct how your shares are voted without attending the Annual Meeting. If you are a

2

stockholder of record, you may vote by submitting a proxy. If you hold shares beneficially in street name, you may vote by submitting voting instructions to your broker, trustee or nominee. For directions on how to vote, please refer to the instructions below and those included on your proxy card or, for shares held beneficially in street name, the voting instruction card provided by your broker, trustee or nominee.

**By Internet:**    Stockholders of record with Internet access may submit proxies by following the "Vote−Using−the−Internet" instructions on their proxy cards until 1:00 a.m., Central Time, on July 21, 2006. Most stockholders who hold shares beneficially in street name may vote by accessing the web site specified on the voting instruction cards provided by their brokers, trustees or nominees. Please check the voting instruction card for Internet voting availability.

**By Telephone:**    Stockholders of record who live in the United States or Canada may submit proxies by following the "Vote−Using−the−Telephone" instructions on their proxy cards until 1:00 a.m., Central Time, on July 21, 2006. Most stockholders who hold shares beneficially in street name may vote by phone by calling the number specified on the voting instruction cards provided by their brokers, trustees or nominees. Please check the voting instruction card for telephone voting availability.

**By Mail:**    Stockholders of record may submit proxies by completing, signing and dating their proxy cards and mailing them in the accompanying pre−addressed envelopes. Proxy cards submitted by mail must be received by the time of the meeting in order for your shares to be voted. Stockholders who hold shares beneficially in street name may vote by mail by completing, signing and dating the voting instruction cards provided by their brokers, trustees or nominees and mailing them in the accompanying pre−addressed envelopes.

**Q:**

*Can I change my vote?*

**A:**

You may change your proxy at any time prior to the proxy being used at the Annual Meeting by (i) delivering to the Corporate Secretary of the Company at UTStarcom, Inc., 1275 Harbor Bay Parkway, Alameda, California 94502 a written notice of revocation or a duly executed proxy bearing a later date, or (ii) attending the Annual Meeting and voting in person. The mere presence at the Annual Meeting of a stockholder who has appointed a proxy will not revoke the prior appointment. If not revoked, the proxy will be voted at the Annual Meeting in accordance with the instructions indicated on the proxy card, or if no instructions are indicated, will be voted "FOR" the slate of nominees for the Board described herein, "FOR" Proposal No. 2, "FOR" Proposal No. 3 and as to any other matter that may properly be brought before the Annual Meeting in accordance with the judgment of the proxy holders. For shares you hold beneficially in street name, you may change your vote by submitting new voting instructions to your broker, trustee or nominee following the instruction they provided, or, if you have obtained a legal proxy from your broker or nominee giving you the right to vote your shares, by attending the meeting and voting in person.

**Q:**

*How many shares must be present or represented to conduct business at the Annual Meeting?*

**A:**

The quorum requirement for holding the Annual Meeting and transacting business is that holders of a majority of the voting power of the issued and outstanding Common Stock of the Company as of the Record Date must be present in person or represented by proxy. Both abstentions and broker non−votes (described below) are counted for the purpose of determining the presence of a quorum.

3

Q:

**What is the voting requirement to approve each of the proposals?**

A:

In the election of directors, the two nominees receiving the highest number of "FOR" votes at the Annual Meeting will be elected.

The approval of the 2006 Equity Incentive Plan requires the affirmative "FOR" vote of a majority of the total number of shares present in person or represented by proxy and entitled to vote on the proposal at the Annual Meeting.

The proposal to ratify the appointment of PricewaterhouseCooper LLP as the Company's independent registered public accounting firm, requires the affirmative "FOR" vote of a majority of the total number of shares present in person or represented by proxy and entitled to vote on the proposal at the Annual Meeting.

Q:

**How are votes counted?**

A:

In the election of directors, you may vote "FOR" all or some of the nominees or your vote may be "WITHHELD" with respect to one or more of the nominees. Votes "WITHHELD" with respect to the election of directors will be counted for purposes of determining the presence or absence of a quorum at the Annual Meeting but will have no other legal effect upon election of directors. You may not cumulate your votes for the election of directors.

For the proposals to approve the 2006 Equity Incentive Plan and to ratify the appointment of PricewaterhouseCooper LLP as the Company's independent registered public accounting firm, you may vote "FOR," "AGAINST" or "ABSTAIN."

If you elect to "ABSTAIN," the abstention has the same effect as a vote "AGAINST." If you provide specific instructions with regard to certain proposals, your shares will be voted as you instruct on such proposals.

Q:

**What is the effect of broker non–votes?**

A:

If you hold shares beneficially in street name and do not provide your broker with voting instructions, your shares may constitute "broker non–votes." Generally, broker non–votes occur on a matter when a broker is not permitted to vote on that matter without instructions from the beneficial owner and instructions are not given. In tabulating the voting result for any particular proposal, shares that constitute broker non–votes are not considered entitled to vote or votes cast on that proposal. Thus, broker non–votes will not affect the outcome of any proposal being voted on at the Annual Meeting, but will count towards establishing quorum. Abstentions, however, as noted above, will have the same effect as votes against the proposal.

Q:

**Who will serve as inspector of elections?**

A:

The inspector of elections will be a representative from Computershare Trust Company, N.A.

Q:

**Who will bear the cost of soliciting votes for the Annual Meeting?**

A:

This solicitation is made by the Company, and all costs associated with soliciting proxies will be borne by the Company. In addition, the Company will reimburse brokerage firms and other persons representing beneficial owners of shares for their expenses in forwarding solicitation materials to such beneficial owners. Proxies may be solicited by certain of the Company's directors, officers and regular employees personally or by telephone, facsimile or electronic mail. No additional compensation will be paid to these persons for such services.

*Q:*

*What is the deadline for submission of stockholder proposals for consideration at the Annual Meeting?*

*A:*

For a stockholder proposal to be considered for this year's Annual Meeting, the stockholder must (i) deliver a proxy statement and form of proxy to holders of a sufficient number of shares of the Company's Common Stock to approve that proposal, (ii) provide the information required by the Company's bylaws (the "**Bylaws**") and (iii) give notice to the Corporate Secretary in accordance with the Bylaws, which requires that the notice be received by the Corporate Secretary within ten (10) days of the mailing date of this Proxy Statement, June 21, 2006. Notice of proposals should be addressed to:

Corporate Secretary
UTStarcom, Inc.
1275 Harbor Bay Parkway
Alameda, California 94502

*Q:*

*What is the deadline for submission of stockholder proposals for consideration at the 2007 annual meeting of stockholders?*

*A:*

**Stockholder Proposals Other Than Nomination of Directors.**    For a stockholder proposal to be considered for inclusion in the proxy statement for the 2007 annual meeting (the "**2007 Annual Meeting**"), the Corporate Secretary of the Company must receive the written proposal by such stockholder at the Company's principal executive offices no later than February 16, 2007. Such proposals also must comply with Securities and Exchange Commission (the "**SEC**") regulations under Rule 14a–8 regarding the inclusion of stockholder proposals in company–sponsored proxy materials. Notice of such proposals should be addressed to:

Corporate Secretary
UTStarcom, Inc.
1275 Harbor Bay Parkway
Alameda, California 94502

For a stockholder proposal that is not intended to be included in the Company's proxy statement under Rule 14a–8, the stockholder must (i) deliver a proxy statement and form of proxy to holders of a sufficient number of shares of the Company's Common Stock to approve that proposal, (ii) provide the information required by the Bylaws and (iii) give timely notice to the Corporate Secretary in accordance with the Bylaws, which generally require that the notice be received by the Corporate Secretary of the Company prior to May 2, 2007.

However, if the date of the 2007 Annual Meeting (the "**2007 Annual Meeting Date**") is moved more than 30 days before or after the anniversary of the 2006 Annual Meeting, then the Board shall determine an appropriate date by which notice of a stockholder proposal that is not intended to be included in the Company's proxy statement must be received by the Company (the "**Notice Deadline**"). The Company will publicize the Notice Deadline at least ten (10) days prior to the Notice Deadline by:

- a filing pursuant to the Securities Exchange Act of 1934, as amended; or

- a press release.

**Nomination of Director Candidates:**    The Bylaws permit stockholders to nominate directors for election at an annual stockholder meeting. To nominate a director, the stockholder must provide the information required by the Bylaws. To nominate directors for election at the 2007 Annual Meeting, the stockholder making such nomination must give timely notice to the Corporate

5

Secretary in accordance with the Bylaws, which must be received by the Corporate Secretary not less than one hundred twenty (120) days prior to the 2007 Annual Meeting.

However, in the event the Company fails to publicize the 2007 Annual Meeting Date at least one hundred thirty (130) days prior to the 2007 Annual Meeting, notice by the stockholder must be received by the Corporate Secretary within ten (10) days of:

- the first public disclosure of the 2007 Annual Meeting Date by the Company; or

- the date the notice of the 2007 Annual Meeting Date is mailed to the Company's stockholders.

**Copy of Company Bylaws:**    Copies of the provisions of the Bylaws governing the form and delivery requirements of stockholder nominations or proposals may be obtained by sending an email request to the Company's investor relations department at investorrelations@utstar.com. A copy of the entire Bylaws is available via the link entitled "Corporate Governance" on the Company's website at *http://investorrelations.utstar.com/governance.*

6

## PROPOSAL NO. 1
## ELECTION OF DIRECTORS

**Nominees**

The authorized number of directors of the Company is currently established at six. The Company's certificate of incorporation provides that directors shall be divided into three classes, with the classes serving for staggered, three-year terms (or less if they are filling a vacancy). Currently there are two directors in each of Class I, Class II and Class III. Each of the two Class II Directors, Allen Lenzmeier and Larry Horner, will hold office until the 2008 annual meeting or until the Class II Director's successor has been duly elected and qualified, and each of the two Class I Directors, Thomas Toy and Ying Wu, will hold office until the 2007 annual meeting or until the Class I Director's successor has been duly elected and qualified. The Company's nominees for election as the Class III Directors at this Annual Meeting are the current Class III Directors Hong Liang Lu and Jeff Clarke.

Unless otherwise instructed, the proxy holders will vote the proxies received by them for the Company's two nominees for Class III Directors, Hong Liang Lu and Jeff Clarke, each to hold office until the 2009 annual meeting or until either of the Class III Director's successor has been duly elected and qualified.

The Company expects that each nominee for election as a Class III Director at the Annual Meeting will be able to serve if elected. Mr. Lu has notified the Company of his resignation as the Company's President, Chief Executive Officer and Chairman of the Board, effective December 31, 2006. Mr. Toy will assume the position of Chairman of the Board effective January 1, 2007.

In the event that any nominee of the Company becomes unable or declines to serve as a director at the time of the Annual Meeting, the proxy holders will vote the proxies for any substitute nominee who is designated by the current Board to fill the vacancy.

**Required Vote**

The two nominees receiving the highest number of votes of the shares entitled to be voted for such nominees shall be elected as Class III Directors. Votes withheld from any nominee will be counted for purposes of determining the presence or absence of a quorum for the transaction of business at the Annual Meeting, but have no other legal effect upon election of directors under the Delaware General Corporation Law.

**THE COMPANY'S BOARD OF DIRECTORS RECOMMENDS VOTING "FOR" THE NOMINEES SET FORTH HEREIN.**

7

## BOARD OF DIRECTORS

The names of the two Class III nominees for director and the current Class I and Class II Directors with unexpired terms, their ages as of July 21, 2006 and certain other information are set forth below:

| Name of Director | Age | Principal Occupation | Director Since | Term Expires |
|---|---|---|---|---|
| *Nominees for Class III Directors:* | | | | |
| Jeff Clarke(1) | 46 | Chief Executive Officer and President of Travel Distribution Services (TDS) Division of Cendant Corporation | 2005 | 2006 |
| Hong Liang Lu(2) | 51 | President, Chief Executive Officer and Chairman of the Board | 1991 | 2006 |
| *Continuing Class II Directors:* | | | | |
| Larry Horner | 72 | Member of the board of directors of ConocoPhillips, Clinical Data, Inc., Novitron International, Inc., Technical Olympic USA, Inc. and New River Pharmaceuticals, Inc. | 2000 | 2008 |
| Allen Lenzmeier | 62 | Vice Chairman and member of the board of directors of Best Buy Co. Inc. | 2005 | 2008 |
| *Continuing Class I Directors:* | | | | |
| Thomas Toy(2) | 51 | Managing Director of PacRim Venture Partners, partner of Smart Forest Ventures and member of the board of directors of White Electronic Designs Corporation | 1995 | 2007 |
| Ying Wu(2) | 46 | Executive Vice President and Vice Chairman of the Board, and Chairman and Chief Executive Officer for China | 1995 | 2007 |

(1)

Mr. Clarke was appointed by unanimous written consent of the Board on January 17, 2005. Mr. Clarke is now the Company's nominee as a Class III Director to serve on the Board until 2009.

(2)

On May 5, 2006, Mr. Lu notified the Company of his resignation as the Company's President, Chief Executive Officer and Chairman of the Board, effective December 31, 2006. Mr. Wu will assume the position of Chief Executive Officer effective January 1, 2007. Mr. Toy will assume the position of Chairman of the Board effective January 1, 2007.

Except as set forth below, each nominee or incumbent director has been engaged in his principal occupation described above during the past five years. There is no family relationship between any directors or executive officers of the Company.

*Hong Liang Lu* has served as the Company's President, Chief Executive Officer and as a director since June 1991, and as Chairman of the Board since March 2003. In June 1991, Mr. Lu co-founded

8

the Company under its prior name, Unitech Telecom, Inc., which subsequently acquired StarCom Network Systems, Inc. in September 1995. From 1986 through December 1990, Mr. Lu served as President and Chief Executive Officer of Kyocera Unison, a majority−owned subsidiary of Kyocera International, Inc. Mr. Lu served as President and Chief Executive Officer of Unison World, Inc., a software development company from 1983 until its merger with Kyocera in 1986. From 1979 to 1983, Mr. Lu served as Vice President and Chief Operating Officer of Unison World, Inc. Mr. Lu holds a B.S. in Civil Engineering from the University of California at Berkeley.

*Jeff Clarke* has served as a director since January 17, 2005. Since May 2006, Mr. Clarke has served as Chief Executive Officer and President of Travel Distribution Services (TDS) Division of Cendant Corporation. From April 2004 to April 2006, Mr. Clarke served as the Chief Operating Officer of CA, Inc., a global provider of management software. From 2002 to 2004, Mr. Clarke was Executive Vice President of Global Operations of Hewlett−Packard Company, and prior to that he was the Chief Financial Officer of Compaq Computer Corporation. Mr. Clarke holds a B.A. in Economics from the State University of New York at Geneseo and an M.B.A. from Northeastern University.

*Larry Horner* has served as a director since January 2000. Mr. Horner has served as a director of ConocoPhillips from 1991 to May 2006, and he currently serves on the board of directors of Atlantis Plastics, Inc., Clinical Data Inc., Technical Olympic USA, Inc., New River Pharmaceuticals, Inc. and several private companies. From 1994 until 2001, Mr. Horner served as Chairman of Pacific USA Holdings Corp., and as Chairman and Chief Executive Officer of Asia Pacific Wire & Cable Corporation Limited. Mr. Horner formerly served as Chairman and Chief Executive Officer of KPMG Peat Marwick from 1984 to 1990. Mr. Horner, a Certified Public Accountant, holds a B.S. from the University of Kansas and is a graduate of the Stanford Executive Program.

*Allen Lenzmeier* has served as a director since March 15, 2005. Mr. Lenzmeier has served as the Vice Chairman of Best Buy Co. Inc. since December 2004. From 2002 to 2004, Mr. Lenzmeier served as the President and Chief Operating Officer of Best Buy Co. Inc. Mr. Lenzmeier served as the President of Best Buy Retail from 2001 to 2002. From 1991 to 2001 Mr. Lenzmeier served as the Executive Vice President and Chief Financial Officer of Best Buy Co. Inc. and began his employment with the company in 1984. Mr. Lenzmeier holds a B.S. from Minnesota State University Mankato.

*Thomas Toy* has served as a director since February 1995. Since March 1999, Mr. Toy has served as Managing Director of PacRim Venture Partners, a professional venture capital firm specializing in investments in the information technology sector. Since 2005, Mr. Toy has served as a partner of SmartForest Ventures, a professional venture firm specializing in the information technology sector. From 1987 until 1992, Mr. Toy was employed as a Vice President at Technology Funding and was a partner there from 1992 until 1999. Mr. Toy also serves as a director of White Electronic Designs Corporation and several private companies. Mr. Toy holds B.A. and M.M. degrees from Northwestern University.

*Ying Wu* has served as the Company's Executive Vice President and Vice Chairman of the Board since October 1995. Mr. Wu has also served as Chairman and Chief Executive Officer, and, until February 2004, as President, of one of the Company's subsidiaries, UTStarcom China Co., Ltd., beginning his duties there in October 1995. Mr. Wu was a co−founder, and from February 1991 to September 1995 served as Senior Vice President, of StarCom Network Systems, Inc., a company that marketed and distributed third party telecommunications equipment. From 1988 to 1991, Mr. Wu served as a member of the technical staff of Bellcore Laboratories. From 1987 to 1988, Mr. Wu served as a consultant at AT&T Bell Labs. Mr. Wu also serves as a director of AsiaInfo Holdings, Inc. Mr. Wu holds a B.S. in Electrical Engineering from Beijing Industrial University and an M.S. in Electrical Engineering from the New Jersey Institute of Technology.

9

**The Company's Director Nomination Process**

The Board's process for identifying and evaluating nominees for director consists mainly of evaluating candidates who are recommended by the Nominating and Corporate Governance Committee. The Nominating and Corporate Governance Committee identifies and recommends nominees for election or reelection to the Board, or for appointment to fill any vacancy that is anticipated or has arisen on the Board, in accordance with the criteria, policies and principles set forth in the Nominating and Corporate Governance Committee Charter, or otherwise approved by the Board.

The Board may also, on a periodic basis, solicit ideas for possible candidates from a number of sources, including current members of the Board, senior Company executives, individuals personally known to members of the Board, and employment of one or more third−party search firms. The Company engaged a third−party search firm in connection with the identification of Mr. Clarke, who is a Class III Director candidate.

Stockholder nominations of director candidates will be given the same consideration and evaluated with the same criteria as candidates that are recommended internally. For more information on stockholder nominations of director candidates, please see the section entitled "Nomination of Director Candidates" under "Deadlines for Submission of Stockholder Proposals for 2007 Annual Meeting" in this Proxy Statement. The form and delivery requirements of such stockholder nominations must comply with the relevant provisions of the Bylaws, copies of which may be obtained by sending an email to the Company's investor relations department at investorrelations@utstar.com. A copy of the entire Bylaws is also available via the link entitled "Corporate Governance" on the Company's website at *http://investorrelations.utstar.com/governance*.

**Stockholder Communications with the Board**

The Board has established a process for stockholders to communicate with members of the Board, which includes the creation of the Lead Director position. All concerns, questions or complaints regarding the Company's compliance with any policy or law, or any other Board−related communication, should be directed to the Board via the link entitled "Email Board of Directors" at *http://investorrelations.utstar.com/governance*. All substantive and appropriate communications received from stockholders will be received and reviewed by one or more independent directors, or officers acting under their direction, who will forward such communications to the Board or particular Board committees, as appropriate.

**Board Attendance, Director Independence and Financial Sophistication**

Of the Company's incumbent directors standing for reelection and those with continuing terms, Messrs. Horner, Toy, Clarke and Lenzmeier have been determined by the Board to be independent as set forth in Rule 4200(a)(15) of the Nasdaq Marketplace Rules, the listing standards of The Nasdaq Stock Market, as currently in effect. In addition, the Board has also determined that each of Messrs. Horner, Clarke and Lenzmeier possess the attributes to be considered financially sophisticated for purposes of applicable Nasdaq Marketplace Rules and has the background to be considered an "audit committee financial expert" as defined by the rules and regulations of the SEC and required by the Nasdaq Marketplace Rules.

The Board held a total of 13 meetings during the fiscal year ended December 31, 2005. During fiscal year 2005, each of the directors attended 75% or more of the aggregate number of meetings of the Board and the committees of the Board on which the director served subsequent to becoming a director or a member of such committee, except for Ms. Betsy Atkins, whose term as a director expired in May 2005, and Ying Wu, who missed 5 meetings for reasons related to his corporate duties. It is the

10

Board's policy to encourage directors to attend the Annual Meeting. Three (3) directors attended the 2005 annual meeting of stockholders.

The principal standing committees of the Board are the Audit Committee, the Compensation Committee and the Nominating and Corporate Governance Committee, each of which consists solely of independent directors. In addition to these committees, effective June 6, 2006, the Board appointed Mr. Toy as Lead Director. Mr. Horner had previously served as Lead Director. The Lead Director's responsibilities include, among other things, facilitating communications among directors, working with the Chief Executive Officer to ensure appropriate information flows to the Board, chairing an executive session of the independent directors at regularly scheduled meetings as required by Nasdaq Marketplace Rule 4350(c)(2), overseeing processes established for stockholder communication with members of the Board, and acting as a liaison between disinterested directors and interested parties in the case of related–party transactions or other such matters. The Lead Director is not an employee of the Company or a holder of 5% or more of the Company's issued and outstanding Common Stock.

**Board Committees and Related Functions**

*Audit Committee*

The Audit Committee of the Board, currently consisting of Mr. Horner, who chairs the committee, and Messrs. Clarke, Toy and Lenzmeier, held 30 meetings during the 2005 fiscal year. The Audit Committee, among other duties and responsibilities, (i) reviews and approves the annual appointment of the Company's independent registered public accounting firm; (ii) discusses and reviews in advance the scope and fees of the annual audit; (iii) reviews the results of the audit with the independent registered public accounting firm and discusses the foregoing with the Company's management; (iv) reviews and approves non–audit services of the independent registered public accounting firm; (v) reviews compliance with the Company's existing major accounting and financial reporting policies; (vi) reviews and approves in advance all related–party transactions that would require disclosure pursuant to the rules of the SEC and the policies and procedures related to such transactions; and (vii) provides oversight and monitoring of the Company's management and their activities with respect to the Company's financial reporting process. In connection with the execution of the responsibilities of the Audit Committee, including the review of the Company's quarterly earnings reports prior to public release, Audit Committee members communicated throughout 2005 with the Company's management and the independent registered public accounting firm.

Each member of the Audit Committee meets the applicable independence and financial literacy requirements of the Nasdaq Marketplace Rules and the SEC. Further, Messrs. Horner, Clarke and Lenzmeier have been determined by the Board to meet the "financial expert" requirements of the same SEC and Nasdaq Marketplace Rules. On March 29, 2004, the Board approved a revised charter of the Audit Committee, a copy of which was filed as an attachment to the Company's proxy statement for the 2004 annual meeting of stockholders. A copy of the Audit Committee Charter is available via the link entitled "Corporate Governance" on the Company's website at *http://investorrelations.utstar.com/governance*.

*Nominating and Corporate Governance Committee*

The Nominating and Corporate Governance Committee, currently consisting of Mr. Clarke, who chairs the committee, and Messrs. Horner and Toy, held three (3) meetings during the last fiscal year. Each member of the Nominating and Corporate Governance Committee meets the applicable independence requirements of the Nasdaq Marketplace Rules.

The Nominating and Corporate Governance Committee's responsibilities include the selection of director nominees for the Board and the development and annual review of the Company's governance principles. The Nominating and Corporate Governance Committee also (i) assists the Board by actively

11

identifying individuals qualified to become Board members; (ii) recommends director nominees to the Board for election at the next annual meeting of stockholders; (iii) monitors significant developments in the law and practice of corporate governance and of the duties and responsibilities of directors of public companies; (iv) leads the Board in its annual performance self−evaluation, including establishing criteria to be used in connection with such evaluation; (v) oversees compliance with the Company's Code of Business Conduct and Ethics; and (vi) develops and recommends to the Board and administers the corporate governance guidelines of the Company, including appropriate stock ownership guidelines for officers and directors.

On March 29, 2004, the Board adopted a formal charter of the Nominating and Corporate Governance Committee, addressing the nominations process and such related matters as may be required under federal securities laws and Nasdaq Marketplace Rule 4350(c)(4)(B). A copy of this charter was filed as an attachment to the Company's proxy statement for the 2004 annual meeting of stockholders. A copy of the Nominating and Corporate Governance Committee Charter is available via the link entitled "Corporate Governance" on the Company's website at *http://investorrelations.utstar.com/governance.*

### Compensation Committee

The Compensation Committee of the Board, currently consisting of Mr. Toy, who chairs the committee, and Messrs. Lenzmeier and Horner, held seven (7) formal meetings and one (1) subcommittee meeting during the last fiscal year. The authority and duties of the Compensation Committee include, among others, (i) approving and overseeing the total compensation package for the Company's executives; (ii) reviewing and approving corporate goals and objectives relevant to the compensation of the Company's Chief Executive Officer; (iii) reviewing and making recommendations to the Board regarding all new employment agreements or arrangements; (iv) reviewing and making recommendations to the Board regarding long−term incentive compensation or equity plans, programs or similar arrangements of the Company; and (v) preparing an annual report on executive compensation as required by the SEC to be included in the Company's annual proxy statement filed with the SEC. Each member of the Compensation Committee meets the applicable independence requirements of the Nasdaq Marketplace Rules.

The charter for the Compensation Committee provides that the purpose of such committee is to discharge the responsibilities of the Board relating to all compensation, including equity compensation of the Company's executives. The charter also generally provides the membership requirements, authority and duties of the Compensation Committee. The Compensation Committee shall consist of no fewer than three members, all of whom (i) meet the independence requirements of the Nasdaq Marketplace Rules, (ii) are "Non−Employee Directors" under the definition of Rule 16b−3 promulgated under Section 16 of the Exchange Act, and (iii) are "outside directors" for purposes of the regulations promulgated under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"). The chair of the Compensation Committee is appointed by the Board. The Compensation Committee must conduct a self−evaluation annually and report such findings to the Board. In addition, the Compensation Committee must periodically assess the adequacy of its charter and recommend changes to the Board. A copy of the Compensation Committee Charter is available via the link entitled "Corporate Governance" on the Company's website at *http://investorrelations.utstar.com/governance.*

### Director Compensation

Directors who are employees of the Company receive no additional compensation for serving on the Board. In 2005, Non−Employee Directors received a quarterly participation fee of $10,000 for

12

services rendered as to meetings of the full Board. In addition, Non−Employee Directors received annual retainer fees for committee membership and other duties as follows:

- Lead Director: $20,000;

- Audit Committee: $10,000 for chair, $3,500 for members;

- Compensation Committee: $5,000 for chair, $3,000 for members; and

- Corporate Governance and Nominating Committee: $5,000 for chair, $2,000 for members.

In January 2005, in recognition of services rendered in 2004, the Company also paid Mr. Horner, the Company's then Lead Director, a one−time compensation award of $25,000, and Mr. Toy and Ms. Atkins (whose term as a director expired in May 2005), both Non−Employee Directors, a one−time compensation award of $20,000.

The Company reimburses all directors for travel and other related expenses incurred in connection with the business of the Company, including attending stockholder meetings and meetings of the Board or any Board committee. For information on director compensation for the year 2006, please see the section entitled "2006 Director Compensation" under "Certain Relationships and Related Transactions" in this Proxy Statement.

Prior to April 27, 2006, Non−Employee Directors were eligible to receive stock option grants under the 2001 Director Option Plan (the "**Director Plan**"). Under the Director Plan, each Non−Employee Director, upon appointment, was automatically awarded options to purchase 80,000 shares of Common Stock (the "**First Option**"), which would vest in equal installments of 25% per year on each of the first four anniversaries of the date of grant. After the First Option has fully vested, each Non−Employee Director would have received an automatic annual grant of an option to purchase 20,000 shares of Common Stock (an "**Annual Option**"), which would vest in full on the first anniversary of the date of grant. On April 27, 2006, concurrently with the effectiveness of the Company's compensation plan for the Non−Employee Directors in the year 2006, the Board suspended until further action all future grants of stock options to the Non−Employee Director under the Director Plan.

The past grants made to the Non−Employee Directors under the Director Plan are as follows. On May 11, 2001, the Company granted a First Option to each of Messrs. Horner and Toy, on March 20, 2002, the Company granted a First Option to Ms. Atkins (whose term as a director expired in May 2005), on January 17, 2005, the Company granted a First Option to Mr. Clarke and on March 15, 2005, the Company granted a First Option to Mr. Lenzmeier. The First Option granted to each of Messrs. Horner and Toy has an exercise price of $22.71 and fully vested on May 11, 2005. Messrs. Horner and Toy were each granted an Annual Option on May 11, 2005 with an exercise price of $6.84. The First Option granted to Mr. Clarke has an exercise price of $16.96, the First Option granted to Mr. Lenzmeier has an exercise price of $13.14, and each will be fully vested on January 17, 2009 and March 15, 2009, respectively. The unvested and unexercised portion of the First Option granted to Ms. Atkins reverted back to the Director Plan upon the expiration of her term as a director in May 2005. If, following a change in control of the Company, a Non−Employee Director's status as a Director of the Company or the successor corporation is terminated (other than as a result of voluntary resignation), the options become fully exercisable for a period of 3 months from the date of such termination. The exercise price of all options granted under the Director Plan is 100% of the fair market value of the Common Stock on the date of grant. The options expire ten years after the date of grant, subject to earlier termination if the optionee ceases to serve as a director.

Prior to April 27, 2006, it was also the Company's policy to grant each Non−Employee Director an annual grant of an option to purchase 25,000 shares pursuant to the Company's 1997 Stock Plan (the "**1997 Plan**"). The Board suspended this policy on April 27, 2006, choosing instead to issue a specific number of options as part of each Non−Employee Director's overall annual compensation package.

13

During 2005, pursuant to this now suspended policy, certain option grants were made as follows. On October 28, 2005 (the "**Grant Date**"), the Company granted an option to purchase 25,000 shares of Common Stock to each of Messrs. Horner, Toy, Clarke and Lenzmeier (the "**Director Options**") with a vesting commencement date of August 23, 2005 (the "**Vesting Commencement Date**"). The Director Options have an exercise price per share of $7.98, which equals the greater of the closing sales prices of the Common Stock as listed on the Nasdaq National Market on (i) the Grant Date and (ii) the Vesting Commencement Date. The Director Options vest in equal monthly installments over a 12 month period from the Vesting Commencement Date and have an exercise term of 10 years. If, following a change in control of the Company, a Non−Employee Director's status with the Company or the successor corporation is terminated (other than as a result of voluntary resignation), the Director Options will become fully exercisable for a period of 3 months from the date of such termination. For further discussion on change of control arrangements regarding Director Options, please see the section entitled "Change of Control Arrangements in Option Agreements for Use under the 1997 Stock Plan" under "Employment Contracts and Change of Control Arrangements" contained in this Proxy Statement.

14

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS, DIRECTORS AND MANAGEMENT

The following table sets forth certain information with respect to beneficial ownership of the Common Stock as of May 12, 2006 (except as otherwise indicated), by: (i) each person who is known by the Company to own beneficially more than 5% of the Common Stock; (ii) each of the Company's President and Chief Executive Officer and each of the named executive officers as defined in Item 402(a)(3) of Regulation S−K, (iii) each of the Company's directors; and (iv) all directors and executive officers as a group. Except as indicated in the footnotes to this table, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them, subject to community property laws where applicable.

Calculations are based on a total number of outstanding shares of 121,089,996 shares as of May 12, 2006.

| Name and Address of Beneficial Owner | Shares Beneficially Owned(1) | Approximate Percent Owned(1) |
|---|---|---|
| Entities affiliated with SOFTBANK CORP.(2) | 14,651,630 | 12.10% |
| Brandes Investment Partners, L.P.(3) | 14,063,327† | 11.61% |
| FMR Corp.(4) | 8,273,850† | 6.83% |
| Donald Smith & Co., Inc.(5) | 7,417,738† | 6.13% |
| Ying Wu(6) | 4,676,965 | 3.84% |
| Hong Liang Lu(7) | 4,097,027 | 3.35% |
| William Huang(8) | 1,132,056 | * |
| Michael Sophie(9) | 405,166 | * |
| Francis Barton(10) | 100,000 | * |
| Larry Horner(11) | 239,208 | * |
| Thomas Toy(12) | 153,235 | * |
| Jeff Clarke(13) | 44,219 | * |
| Allen Lenzmeier(14) | 94,278 | * |
| Shao−Ning J. Chou(15) | 0 | * |
| All current directors and officers as a group (9 persons)(16) | 10,942,154 | 8.80% |

\*      Less than 1%.

†      Information based on Schedule 13G filed with the SEC by Brandes Investment Partners, L.P., FMR Corp. and Donald Smith & Co., Inc. on or about February 14, 2006. The Company cannot guarantee the accuracy of the information as of the date of this Proxy Statement.

(1)      Includes any shares issuable pursuant to options held by the person or group in question that may be exercised within 60 days of May 12, 2006.

(2)      Includes 14,651,630 shares registered in the name of SOFTBANK America Inc., a Delaware corporation. SOFTBANK America Inc. is a wholly owned subsidiary of SOFTBANK Holdings Inc., a Delaware corporation. SOFTBANK Holdings Inc. is a wholly owned subsidiary of SOFTBANK CORP., a Japanese corporation. Softbank America Inc. has sole power to vote or direct the voting of 14,651,630 shares and sole dispositive power over 14,651,630 shares. The business address for these entities is c/o SOFTBANK CORP., 24 1 Nihonbashi Hakozakicho, Chuoku, Tokyo 103 8501 Japan.

(3)      Includes 14,063,327 shares beneficially and jointly owned by Brandes Investment Partners, L.P., Brandes Investment Partners, Inc., Brandes Worldwide Holdings, L.P., Charles H. Brandes,

Glenn R. Carlson and Jeffrey A. Busby. Each of Brandes Investment Partners, L.P., Brandes Investment Partners, Inc., Brandes Worldwide Holdings, L.P., Charles H. Brandes, Glenn R. Carlson and Jeffrey A. Busby has shared power to vote or direct the voting of 12,168,716 shares and shared dispositive power over 14,063,327 shares. The business address for Brandes Investment Partners, L.P. is 11988 El Camino Real, Suite 500, San Diego, CA 92130.

*(4)*

Includes 8,273,850 shares beneficially owned by Fidelity Low Priced Stock Fund, a subsidiary of FMR Corp. Each of FMR Corp. and Edward C. Johnson, III, Chairman of FMR Corp., has sole dispositive power over the 8,273,850 shares through its/his control of Fidelity Low Priced Stock Fund. The Board of Trustee of Fidelity Funds has sole power to vote or direct the voting of 8,273,850 shares. The business address for FMR Corp. is 82 Devonshire Street, Boston, MA 02109.

*(5)*

Includes 7,417,738 shares beneficially owned by Donald Smith & Co., Inc. Donald Smith & Co., Inc. has sole power to vote or to direct the voting of 6,145,511 shares and sole dispositive power over 7,417,738 shares. The business address for Donald Smith & Co., Inc. is 152 West 57th Street, New York, NY 10019.

*(6)*

Includes (i) 1,505,500 shares registered in the name of Wu Partners, a California Limited Partnership, of which Mr. Wu is general partner, (ii) 1,080,000 shares registered in the name of Stonybrook Investors L.P., (iii) 4,868 shares registered in the name of Wu Living Trust, (iv) 4,873 shares registered in the name of Ashley Wu Trust—1998 and (v) 4,873 shares registered in the name of Richard Wu Trust—1998. Ashley Wu and Richard Wu are Mr. Wu's children. Mr. Wu may be deemed the beneficial owner of the shares. Also includes 686,564 shares issuable upon exercise of options that are exercisable within 60 days of May 12, 2006.

*(7)*

Includes (i) 229,000 shares owned by The Lu Family Limited Partnership, of which Mr. Lu is a general partner, (ii) 130,000 shares registered in the name of Lu Charitable Remainder Trust, of which Mr. Lu is the trustee, (iii) 5,332 shares registered in the name of Benjamin Lu, and (iv) 5,332 shares registered in the name of Melissa Lu. Benjamin Lu and Melissa Lu are Mr. Lu's children. Mr. Lu may be deemed the beneficial owner of the shares. Also includes 1,325,938 shares issuable upon exercise of options that are exercisable within 60 days of May 12, 2006.

*(8)*

Includes (i) 106,000 shares owned by the 2000 Huang Family Limited Partnership, of which Mr. Huang is a general partner, (ii) 6,600 shares registered in the name of Alexander Huang, and (iii) 6,600 shares registered in the name of Helen Huang. Alexander Huang and Helen Huang are Mr. Huang's children. Mr. Huang may be deemed the beneficial owner of the shares. Also includes 351,876 shares issuable upon exercise of options that are exercisable within 60 days of May 12, 2006.

*(9)*

Mr. Sophie resigned as the Company's Executive Vice President and Chief Operating Officer in May 2006. Includes 374,700 shares issuable upon exercise of options that are exercisable within 60 days of May 12, 2006.

*(10)*

Represents 100,000 shares of Common Stock subject to the Company's right of repurchase (the **"Restricted Shares"**). The Restricted Shares will vest in equal annual installments over a period of four (4) years beginning on August 1, 2005.

*(11)*

Includes (i) 1,775 shares owned by Donna Manning, who is Mr. Horner's spouse. Also includes 207,433 shares issuable upon exercise of options that are exercisable within 60 days of May 12, 2006.

*(12)*

Includes 153,235 shares issuable upon exercise of options that are exercisable within 60 days of May 12, 2006.

16

(13) Includes 44,219 shares issuable upon exercise of options that are exercisable within 60 days of May 12, 2006.

(14) Includes 44,278 shares issuable upon exercise of options that are exercisable within 60 days of May 12, 2006.

(15) Mr. Chou resigned as the Company's Senior Vice President and President and Chief Operating Officer for China in May 2005.

(16) Includes a total of 3,188,243 shares issuable upon exercise of options that are exercisable within 60 days of May 12, 2006.

17

# MANAGEMENT

## Executive Officers

The Company's executive officers as of the date of this Proxy Statement, and their ages as of July 21, 2006, are as follows:

| Name | Age | Position |
|------|-----|----------|
| Hong Liang Lu(1) | 51 | President, Chief Executive Officer and Chairman of the Board |
| Ying Wu(1) | 46 | Executive Vice President and Vice Chairman of the Board, Chairman and Chief Executive Officer for China |
| William Huang | 43 | Senior Vice President and Chief Technology Officer |
| Francis Barton | 59 | Executive Vice President and Chief Financial Officer |

*(1)*
      On May 5, 2006, Mr. Lu notified the Company of his resignation as the Company's President, Chief Executive Officer and Chairman of the Board, effective December 31, 2006. Mr. Wu will assume the position of Chief Executive Officer effective January 1, 2007. Mr. Toy, currently our Lead Director, will assume the position of Chairman of the Board effective January 1, 2007.

*Hong Liang Lu* has served as the Company's President, Chief Executive Officer and director since June 1991. Mr. Lu has served as the Chairman of the Board since March 2003. In June 1991, Mr. Lu co–founded UTStarcom under its prior name, Unitech Telecom, Inc., which subsequently acquired StarCom Network Systems, Inc. in September 1995. From 1986 through December 1990, Mr. Lu served as President and Chief Executive Officer of Kyocera Unison, a majority owned subsidiary of Kyocera International, Inc. Mr. Lu served as President and Chief Executive Officer of Unison World, Inc., a software development company from 1983 until its merger with Kyocera in 1986. From 1979 to 1983, Mr. Lu served as Vice President and Chief Operating Officer of Unison World, Inc. Mr. Lu holds a B.S. in Civil Engineering from the University of California at Berkeley.

*Ying Wu* has served as the Company's Executive Vice President and Vice Chairman of the Board since October 1995. Mr. Wu has also served as the Chairman and Chief Executive Officer, and, until February 2004, as President, of one of the Company's subsidiaries, UTStarcom China Co., Ltd., beginning his duties there in October 1995. Mr. Wu was a co–founder, and from February 1991 to September 1995 served as Senior Vice President, of StarCom Network Systems, Inc., a company that marketed and distributed third party telecommunications equipment. From 1988 to 1991, Mr. Wu served as a member of the technical staff of Bellcore Laboratories. From 1987 through 1988, Mr. Wu served as a consultant at AT&T Bell Labs. Mr. Wu also serves as a director of AsiaInfo Holdings, Inc. Mr. Wu holds a B.S. in Electrical Engineering from Beijing Industrial University and an M.S. in Electrical Engineering from the New Jersey Institute of Technology.

*William Huang* has been the Company's Chief Technology Officer since September 1999, and was appointed the Company's Senior Vice President in September 2001. From December 1996 to September 1999, Mr. Huang was the Company's Vice President of Strategic Product Planning. From June 1995 to December 1996, Mr. Huang served as the Company's Vice President of China Operations. From 1994 to June 1995, Mr. Huang was the Company's Director of Engineering. From 1992 to 1994, Mr. Huang was a consultant, Member of the Technical Staff and project leader at AT&T CellRelay Systems (part of Bell Labs). Mr. Huang serves on the board of Shenzhen Gin De (Group) Ltd., a publicly listed real estate investment company in China. Mr. Huang holds a B.S. in Electrical Engineering from Huazhong University of Science & Technology, and an M.S. in Electrical Engineering and Computer Sciences from the University of Illinois.

*Francis P. Barton* has been the Company's Executive Vice President and Chief Financial Officer since August 2005. From May 2003 to July 2005, Mr. Barton was Executive Vice President and Chief Financial Officer of Atmel Corporation. From May 2001 to May 2003, Mr. Barton was Executive Vice

18

President and Chief Financial Officer of BroadVision Inc. From 1998 to 2001, Mr. Barton was Senior Vice President and Chief Financial Officer of Advanced Micro Devices, Inc. From 1996 to 1998, Mr. Barton was Vice President and Chief Financial Officer of Amdahl. Corporation. From 1974 to 1996, Mr. Barton worked at Digital Equipment Corporation, beginning his career as a financial analyst and moving his way up through various financial roles to Vice President and Chief Financial Officer of Digital Equipment Corporation's Personal Computer Division. Mr. Barton holds a B.S. in Chemical Engineering from Worcester Polytechnic Institute and an M.B.A. with a focus in finance from Northeastern University.

**Executive Compensation**

The table below sets forth information for the three most recently completed fiscal years concerning the compensation of the Chief Executive Officer and other executive officers.(1)

### Summary Compensation Table

| Name and Principal Position | Fiscal Year | Annual Compensation | | | Long Term Compensation | | | All Other Compensation ($) (6) |
|---|---|---|---|---|---|---|---|---|
| | | Salary ($) | Bonus ($) | Annual Other Compensation ($) | Restricted Stock Award ($) | Securities Underlying Options/SARs (#) | | |
| Hong Liang Lu | 2005 | $ 700,000 | $ — | $ — | $ — | — | $ | 9,530 |
| President, Chief Executive Officer | 2004 | $ 700,000 | $ — | $ — | $ — | 250,000 | $ | 20,500 |
| and Chairman of the Board | 2003 | $ 500,000 | $ 325,000 | $ — | $ — | 120,000 | $ | 5,469 |
| Ying Wu | 2005 | $ 500,000 | $ — | $ — | $ — | — | $ | 10,502 |
| Executive Vice President and Vice | 2004 | $ 500,000 | $ — | $ 2,629,275(2) | $ — | 200,000 | $ | 5,500 |
| Chairman | 2003 | $ 400,000 | $ 250,000 | $ 81,007(2) | $ — | 85,000 | $ | 5,500 |
| William Huang | 2005 | $ 300,000 | $ 79,200 | $ 11,538(3) | $ — | 75,000 | $ | 6,537 |
| Chief Technology Officer and | 2004 | $ 300,000 | $ — | $ — | $ — | 100,000 | $ | 5,500 |
| Senior Vice President | 2003 | $ 250,000 | $ 100,000 | $ — | $ — | 50,000 | $ | 2,344 |
| Francis Barton* | 2005 | $ 167,667 | $ 250,000 | $ — | $ 882,000(5) | 400,000 | $ | 16,458 |
| Executive Vice President and | 2004 | $ — | $ — | $ — | $ — | — | $ | |
| Chief Financial Officer | 2003 | $ — | $ — | $ — | $ — | — | $ | |
| Michael Sophie† | 2005 | $ 400,000 | $ — | $ — | $ — | 100,000 | $ | 12,370 |
| Former Executive Vice President and Chief | 2004 | $ 400,000 | $ — | $ — | $ — | 150,000 | $ | 13,000 |
| Operating Officer | 2003 | $ 300,000 | $ 200,000 | $ — | $ — | 75,000 | $ | 5,500 |
| Shao~Ning J. Chou | 2005 | $ 300,000 | $ — | $ 223,226(4) | $ — | — | $ | 10,273 |
| Former Senior Vice President | 2004 | $ 400,000 | $ — | $ — | $ — | 150,000 | $ | 5,500 |
| | 2003 | $ 300,000 | $ 250,000 | $ 859,162(4) | $ — | 75,000 | $ | 5,500 |

\*   Mr. Barton joined the Company in August 2005.

†   Mr. Sophie resigned as the Company's Executive Vice President and Chief Operating Officer in May 2006.

(1)   The Company has provided full disclosure for all its Section 16 executive officers, which includes the "named executive officers" as defined in Item 402(a)(3) of Regulation S~K.

(2)   Consists of (i) a housing allowance of $48,000 in 2005 paid in connection with Mr. Wu's international work assignment, (ii) a tax assistance payment of $2,581,275 in 2005 paid in connection with the Company's tax equalization policy whereby the Company provides qualified employees with tax assistance to mitigate the tax differential arising from an employee's international work assignment, (ii) a housing and children's education allowance of $68,350 in 2003 paid in connection with Mr. Wu's international work assignment, and (iii) a tax assistance payment of $12,657 in 2003 paid in connection with the Company's tax equalization policy whereby the Company provides qualified employees with tax assistance to mitigate the tax differential arising from an employee's international work assignment.

(3)   Consists of a Paid Time Off cash out in the amount of $11,538.

(4)   Consists of a housing allowance of $27,000 in 2005 and $36,000 in 2003 paid in connection with Mr. Chou's international work assignment, (ii) a tax assistance payment of $116,229 in 2005 and $823,162 in 2003 paid in connection with our tax equalization policy whereby the Company provides qualified employees with tax assistance to mitigate the tax differential arising from an employee's international work assignment, and (iii) a Paid Time Off cash out payment made in 2005 in the amount of $79,997. $691,771 of the tax assistance payments made in 2003 were paid in connection with the deferred payment of a tax levied by the People's Republic of China on gains realized from the exercise of stock options in 2001. While U.S. tax regulations require that these amounts be recorded as income, due to general limitation rules, a portion of Mr. Chou's paid foreign tax has been recovered by the Company pursuant to the Company's tax equalization policy.

(5)   Dollar value of 100,000 shares of Common Stock granted on August 1, 2005 subject to the Company's right of repurchase (the "**Restricted Shares**") and pursuant to the Restricted Stock Agreement (the "**Restricted Stock Agreement**") paid in between the Company and Mr. Barton. The closing sales price of $8.82 per share of the Common Stock as listed on the Nasdaq National Market on August 1, 2005 was used to determine the value of the Restricted Shares. Under the Restricted Stock Agreement, the Restricted Shares will vest in equal annual installments over a period of four (4) years beginning on August 1, 2005. Dividends are payable on the Restricted Shares, although historically the Company has never declared or paid cash dividends on the Common Stock.

(6)   All other compensation for 2005 consists of 401(K) match payments, tax and investment advice fees, health insurance premiums and driver's fee paid by the Company on behalf of certain of the Company's executive officers.

19

**Stock Ownership Guidelines**

Effective January 1, 2006, by the decision of the Nominating and Corporate Governance Committee of the Board, the Company imposed minimum stock ownership guidelines (the "**Guidelines**") for Non–Employee Directors and certain officers of the Company.

Each officer and Non–Employee Director is expected to acquire the number of shares of Common Stock as set forth below by the Guidelines before the later of (i) 4 years after the effective date of the Guidelines and (ii) 4 years after an officer's appointment to such office or a Non–Employee Director's appointment to the Board, as the case may be.

| Position | Minimum Share Ownership Requirements |
|---|---|
| Chief Executive Officer and President | 50,000 |
| Executive Vice Presidents | 25,000 |
| Senior Vice Presidents/Division Presidents | 10,000 |
| Non–Employee Directors | 10,000 |

The Company will review compliance with the Guidelines annually. Failure to comply with the Guidelines may result in a reduction in future long–term incentive grants and/or payment of future annual and/or long–term incentive payouts in the form of Common Stock. The Nominating and Corporate Governance Committee has the discretion to waive the Guidelines, if compliance would create severe personal hardship for an officer or Non–Employee Director or prevent an officer or Non–Employee Director from complying with a court order. The Nominating and Corporate Governance Committee expects that such instances will be rare.

**Option Grants**

The following table sets forth certain information with respect to stock option grants to the Company's executive officers during the fiscal year ended December 31, 2005.

**Option Grants in Last Fiscal Year**

| Name | Number of Securities Underlying Options Granted(1) | % of Total Options Granted to Employees in Fiscal Year 2005(2) | Exercise Price Per Share | Expiration Date | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(3) | |
|---|---|---|---|---|---|---|
| | | | | | 5% | 10% |
| Hong Liang Lu | — | — | — | — | — | — |
| Ying Wu | — | — | — | — | — | — |
| William Huang | 75,000 | 1.38% | $ 8.29 | 11/30/2015 | $ 391,015 | $ 990,909 |
| Francis Barton | 400,000 | 7.34% | $ 8.82 | 8/1/2015 | $ 2,218,740 | $ 5,622,723 |
| Michael Sophie* | 100,000 | 1.84% | $ 8.29 | 11/30/2015 | $ 521,354 | $ 1,321,212 |
| Shao Ning J. Chou | — | — | — | — | — | — |
| Total Grants in 2005 | 575,000 | | | | | |

\*  Pursuant to the Severance Agreement and Release dated April 13, 2006, all options granted to Mr. Sophie that were not vested as of May 5, 2006 have been canceled or terminated. For more discussion on the Severance Agreement and Release, please see the section entitled "Severance Benefits" under "Certain Relationships and Related Transactions" in this Proxy Statement.

(1)  All options were granted pursuant to the 1997 Plan. The options have a ten–year term and vest and become exercisable over four years as follows: 25% of the shares underlying the options vest 12 months after the grant date and 1/48 of the shares underlying the options vest each month thereafter, subject to the optionee's continuing employment with the Company.

(2)
      Based on an aggregate of 5,448,073 shares subject to options granted to the Company's employees in 2005.

(3)
      The potential realizable value represents amounts, net of exercise price before taxes, which may be realized upon exercise of the options immediately prior to the expiration of the terms of such options, assuming appreciation of 5% and 10% over the option term. The 5% and 10% rates are calculated based on rules promulgated by the SEC based upon a per share market price of the Common Stock underlying the options at the time the options were granted and do not reflect the Company's estimate of future stock price growth. The actual value realized may be greater or less than the potential realizable value set forth in the table.

## Option Exercises and Values

    The following table sets forth information for the Company's executive officers relating to the number and value of securities underlying exercisable and unexercisable options they held at December 31, 2005, and sets forth the number of shares of Common Stock acquired and the value realized upon exercise of stock options held as of December 31, 2005 by the executive officers.

### Aggregate Option Exercises in Last Fiscal Year and Fiscal Year End Option Values

| Name | Number of Shares Acquired on Exercise | Value Realized(1) ($) | Number of Securities Underlying Unexercised Options at December 31, 2005 | | Value of Unexercised in-the-Money Options at December 31, 2005(2) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Hong Liang Lu | 0 | — | 1,292,813 | 52,187 | $ 1,424,000 | — |
| Ying Wu | 0 | — | 663,756 | 36,244 | $ 284,800 | — |
| William Huang | 0 | — | 336,251 | 98,749 | — | — |
| Francis Barton | 0 | — | — | 400,000 | — | — |
| Michael Sophie | 0 | — | 353,350 | 133,328 | — | — |
| Shao Ning J. Chou | 0 | — | 539,376 | — | — | — |

(1)
      The "Value Realized" is based on the closing price of the Common Stock as quoted on The Nasdaq National Market on the date of exercise, minus the per share exercise price, multiplied by the number of shares issued upon exercise of the option.

(2)
      The value of unexercised in-the-money options is calculated based on the difference between the closing price of $8.06 per share as quoted on The Nasdaq National Market on December 31, 2005, and the exercise price for the shares, multiplied by the number of shares underlying the option.

**Equity Compensation Plan Information**

The following table sets forth information, as of December 31, 2005*, about equity awards under our equity compensation plans:

| Plan Category | Number of Securities to Be Issued upon Exercise of Outstanding Options, Warrants and Rights | Weighted Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance under Equity Compensation Plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders(1) | 18,868,666(2) $ | 17.80 | 7,939,418(3) |
| Equity compensation plans not approved by security holders | 1,073,086(4) $ | 28.55(5) | 470,540(6) |
| Total | 19,941,752 $ | 18.35 | 8,409,958 |

\*    As of March 31, 2006, the number of shares of the Common Stock available for issuance but remained unissued under existing plans which will be rolled into the 2006 Equity Incentive Plan, if adopted by the Company's shareholders, was 3,933,333. As of March 31, 2006, options to purchase 22,848,484 shares of the Common Stock were outstanding under the existing plans. Such outstanding options had a weighted average exercise price of $15.707 and an average remaining term of 7.5 years as of March 31, 2006. There were also 200,000 shares of restricted stock awards outstanding as of March 31, 2006.

(1)    Includes the 1997 Plan which provides for an annual increase in the number of shares available for issuance under the plan equal to the lesser of (i) 4% of the outstanding Shares on such date, (ii) 6,000,000 shares or (iii) a lesser amount determined by the Board, and the 2000 Employee Stock Purchase Plan, which provides for an annual increase in the number of shares available for issuance under the plan equal to (i) 2% of the outstanding shares on such date, (ii) 2,000,000 shares or (iii) a lesser amount determined by the Board.

(2)    Includes shares of Common Stock to be issued upon exercise of options granted under the Company's 1997 Plan and Director Plan.

(3)    Includes 1,914,934 shares of Common Stock available for issuance under the 2000 Employee Stock Purchase Plan, 5,272,484 shares of Common Stock available for issuance under the 1997 Plan and 752,000 shares of Common Stock available for issuance under the Director Plan.

(4)    Includes 1,021,510 options outstanding under the 2003 Non−Statutory Stock Option Plan, a maximum of 36,312 performance shares outstanding under the Advanced Communication Devices Corporation Incentive Program and a maximum of 15,264 performance shares outstanding under the Issanni Communications, Inc. Incentive Program. Does not include 9,254 shares and 8,580 shares of Common Stock subject to outstanding options with a weighted−average exercise price of $2.67 that were assumed in our acquisitions of Advanced Communication Devices Corporation and RollingStreams Systems, Ltd., respectively.

(5)    Represents the average weighted exercise price of 1,021,510 options outstanding under the 2003 Non−Statutory Stock Option Plan. Excludes performance shares outstanding under the Advanced Communication Devices Corporation Incentive Program and the Issanni Communications, Inc. Incentive Program because performance shares do not have an exercise price.

(6)    Includes 470,540 shares of Common Stock available for issuance under the Company's 2003 Non−Statutory Stock Option Plan.

22

**Employment Contracts, Termination of Employment and Change of Control Arrangements**

*Change of Control Arrangements in Employment Contracts*

The Company has entered into Change of Control Severance Agreements with each of Messrs. Lu, Wu and Huang dated January 17, 2003, January 31, 2003 and January 31, 2003, respectively (collectively, the "**Lu, Wu and Huang Employment Agreements**") and a Change of Control/Involuntary Termination Severance Agreement with Mr. Barton dated September 6, 2005 (the "**Barton Employment Agreement**" and, together with the **Lu, Wu and Huang Employment Agreements**, the "**Employment Agreements**"). The Employment Agreements provide that if the employee's employment with the Company terminates as a result of involuntary termination at any time within 12 months after a change of control, (i) such employee will be entitled to 24 months of base salary as in effect as of the date of such termination payable in a lump sum within 30 days of termination and 100% of the bonus for the year in which termination occurs, and (ii) the Company will continue to provide such employee the same level of health coverage as in effect on the day immediately preceding the termination date until the earlier of the date such employee is no longer eligible to receive continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or 12 months from the termination date.

Additionally, in connection with any such termination following a change of control, the Lu, Wu and Huang Employment Agreements provide that all stock options granted to such employee will become fully vested and exercisable as of the date of termination and the Company's right to repurchase any stock that was purchased by such employee prior to the change of control shall lapse. Similarly, the Barton Employment Agreement provides that all stock options granted to such employee will become fully vested and exercisable as of the date of termination, any share purchase rights granted to such employee will become fully vested and exercisable to the extent such share purchase rights are outstanding and unexercisable at the time of such termination and the Company's right to repurchase any stock that was purchased by such employee prior to the change of control shall lapse. In the event that the severance and other benefits provided to employees pursuant to the Employment Agreements constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code and would be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code, such employee's benefits under the Employment Agreements shall be either delivered in full or delivered as to such lesser extent which would result in no portion of such benefits being subject to the excise tax, whichever results in the receipt by the employee, on an after-tax basis, of the greatest amount of benefits.

For the purpose of the Employment Agreements, "involuntary termination" includes (i) without the employee's express written consent, a significant reduction of the employee's duties, position or responsibilities relative to the employee's duties, position or responsibilities in effect immediately prior to such reduction, or the removal of the employee from such position, duties and responsibilities, unless the employee is provided with comparable duties, position and responsibilities (as, for example, following a change of control, the Company's Chief Financial Officer is made the Chief Financial Officer of the acquiring entity), (ii) without the employee's express written consent, a substantial reduction, without good business reasons, of the facilities and perquisites (including office space and location) available to the employee immediately prior to such reduction, (iii) a reduction by the Company of the employee's base salary as in effect immediately prior to such reduction, (iv) a material reduction by the Company in the kind or level of employee benefits to which the employee is entitled immediately prior to such reduction with the result that the employee's overall benefits package is significantly reduced, (v) the relocation of the employee to a facility or a location more than 50 miles from his current location without the employee's express written consent, (vi) any purported termination of the employee by the Company which is not effected for cause or for which the grounds relied upon are not valid, or (vii) the Company's failure to obtain the assumption of the Change of Control Agreements by any successor to the Company.

23

"Change of Control" in the Employment Agreements is defined as (i) the approval by the Company's stockholders of a merger or consolidation with any other corporation, other than a merger or consolidation which would result in the Company's voting securities outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the total voting power represented by the Company's voting securities or such surviving entity outstanding immediately after such merger or consolidation, (ii) the approval by the Company's stockholders of a plan to complete liquidation or an agreement for the sale or disposition by the company of all or substantially all of the Company's assets, (iii) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becoming the "beneficial owner" (as defined in Rule 13d−3 under said Exchange Act), directly or indirectly, of the Company's securities representing 50% or more of the total voting power represented by the Company's then outstanding voting securities, or (iv) a change in the composition of the Board, as a result of which fewer than a majority of the directors are incumbent directors.

*Severance Payment Arrangements for Termination Apart from Change of Control*

The Barton Employment Agreement also provides for certain severance benefits to be paid to the employee terminated without Cause (as defined below), even if such termination does not result from a Change of Control. Such employee will be entitled to 12 months of his base salary as in effect as of the date of such termination, less applicable withholding, payable in a lump sum within 30 days of such termination, (ii) 100% of his bonus for the year in which such termination occurs, and (iii) continued vesting in stock options and share purchase rights granted to such employee prior to the date of such termination, for a period of 12 months from the date of such termination, with the right to exercise said stock options and share purchase rights within 90 days from the end of said 12−month period. However, in the event of a termination for Cause, the terminated employee shall not be entitled to any of the foregoing benefits.

"Cause" in the Barton Employment Agreement is defined as (i) any act of personal dishonesty taken by the employee in connection with his responsibilities as an employee which is intended to result in substantial personal enrichment of the employee, (ii) employee's conviction of a felony which the Board reasonably believes has had or will have a material detrimental effect on the Company's reputation or business, (iii) a willful act by the employee which constitutes misconduct and is injurious to the Company, and (iv) continued willful violations by the employee of the employee's obligations to the Company after a delivery of a written demand by the Company to the employee for performance which describes the basis of the Company's belief that the employee has not substantially performed his duties.

On April 13, 2006, the Company and Mr. Sophie entered into a Severance Agreement and Release (the "**Severance Agreement**") in connection with Mr. Sophie's resignation effective May 5, 2006. The Severance Agreement replaces and supersedes all prior agreements concerning Mr. Sophie's employment relationship with the Company, with the exception of the confidentiality agreement and any applicable stock option agreement entered into by and between the Company and Mr. Sophie under the Company's existing stock plans. Under the terms of the Severance Agreement, the Company paid Mr. Sophie the equivalent of 6 months of regular base salary in a lump sum of $220,000, less applicable withholdings. Mr. Sophie also received payments for his accrued but unpaid Paid Time Off and Floating Holiday Benefits (as described in the Severance Agreement). In addition, the Company paid the approximate equivalent of 6 months of Mr. Sophie's COBRA premiums in a lump sum of $6,000, less applicable withholdings.

Pursuant to the terms of the Severance Agreement, Mr. Sophie's stock options that were not vested as of May 5, 2006 were canceled or terminated. Mr. Sophie will have the right to exercise vested options at any time within 120 days after May 5, 2006, but no later than the option expiration date.

The Severance Agreement also provides for a mutual release of claims by the Company and Mr. Sophie.

*Change of Control Arrangements in Restricted Stock Agreement*

On September 6, 2005, the Company entered into a restricted stock agreement (the "**Restricted Stock Agreement**") with Mr. Barton. The Restricted Stock Agreement provides for the purchase by Mr. Barton of 100,000 shares of the Common Stock (the "**Restricted Shares**") which will be released from the Company's repurchase right in equal annual installments over a period of 4 years beginning on August 1, 2005.

The Restricted Stock Agreement provides that, if, as a result of any merger, reorganization, consolidation, recapitalization, separation, liquidation, stock dividends, split-up, share combination, or other change in the corporate structure of the Company affecting the Common Stock, (i) the Restricted Shares will be increased, reduced or otherwise changed, (ii) Mr. Barton will be entitled to new or additional or different shares of stock, cash or securities (other than rights or warrants to purchase securities), and (iii) such new or additional or different shares, cash or securities will be considered to be the Restricted Shares not yet released from the Company's repurchase right and will be subject to all the restrictions of the Restricted Stock Agreement.

*Change of Control Arrangements in 2001 Director Option Plan and 1997 Stock Plan*

The Director Plan provides that, in the event of a proposed dissolution or liquidation of the Company, each outstanding option granted under the Director Plan that has not been exercised shall terminate immediately prior to the consummation of such proposed dissolution or liquidation. The Director Plan also provides that in the event of a merger of the Company with or into another corporation or the sale of substantially all of the assets of the Company, each outstanding option granted under the Director Plan may be assumed or substituted by the successor corporation. Following such assumption or substitution, if the optionee's status as a director or director of the successor corporation is terminated involuntarily, the option will become fully exercisable for a period of 3 months from the date of such termination. In the event the successor corporation refuses to assume or substitute the outstanding option, such option will become fully exercisable for a period of 30 days from the date the optionee is notified of such refusal by the Board.

The 1997 Plan provides that, in the event of a proposed dissolution or liquidation of the Company, the Board must notify each optionee under the 1997 Plan as soon as practicable prior to the effective date of such proposed dissolution or liquidation. The Board has the discretion to allow the optionee to exercise his or her option or stock purchase right until 15 days prior to the effective date of such dissolution or liquidation. In the event of a merger of the Company with or into another corporation, or the sale of substantially all of the assets of the Company, each outstanding option or stock purchase right under the 1997 Plan will be assumed or substituted by the successor corporation. In case the successor corporation refuses to assume or substitute the outstanding option or stock purchase right, such outstanding option or stock purchase right will become fully exercisable for a period of 15 days from the date the optionee is notified of such refusal by the Board.

In addition, both the 1997 Plan and the Director Plan (collectively, the "**Plans**") provide, in general, that an optionee whose status as a Service Provider (as defined in the 1997 Plan) or a director (as defined in the Director Plan) is terminated is entitled to exercise his or her option, to the extent such option has vested as of the date of termination, until the earlier of (i) expiration of the option according to its terms, (ii) expiration of a period of 3 months following termination, or (iii) expiration of a period of 12 months following termination as a result of death or disability (the "**Post-Termination Exercise Period**"). The 1997 Plan, unlike the Director Plan, allows the Post-Termination Exercise Period to extend beyond the default term, if the stock option agreement entered into by the Company and the optionee pursuant to the 1997 Plan provides for a longer term.

*Change of Control Arrangements in Option Agreements for Use under the 1997 Stock Plan*

Prior to October 28, 2005, the Board had approved a form of stock option agreement (the "**Existing Option Agreement**") for use under the 1997 Plan in connection with stock option grants to the Company's (i) Service Providers (as defined in the 1997 Plan), (ii) executive officers, and (iii) directors, which provides for the default Post−Termination Exercise Period designated in the 1997 Plan of 3 months or 12 months for termination as a result of death or disability. On October 28, 2005, the Board approved a plan to modify the Existing Option Agreement, to the extent that the Existing Option Agreement applies to the executive officers and directors, to provide for a longer Post−Termination Exercise Period of 12 months for termination following a Change of Control (as defined below) (such modified Existing Agreement, the "**Officer and Director Option Agreement**"). On November 30, 2005, the Compensation Committee of the Board approved the use of the Officer and Director Option Agreement in conjunction with granting Mr. Huang and Mr. Sophie options to purchase 75,000 shares and 100,000 shares of the Common Stock, respectively. Then on December 2, 2005, the Compensation Committee of the Board formally adopted the Officer and Director Option Agreement for use exclusively in connection with option grants to executive officers and directors of the Company. The Existing Option Agreement will continue to be used for option grants to Service Providers other than executive officers and directors.

Under the Officer and Director Option Agreement, if the optionee's status as a Service Provider or director is terminated following a Change of Control (as defined below), the optionee shall be entitled to exercise his or her option, to the extent such option has vested as of the date of such termination, until the earlier of (i) expiration of the option according to its terms, or (ii) expiration of a period of 12 months following the termination of the optionee's status as a Service Provider or director.

For the purpose of the Officer and Director Option Agreement, a "Change of Control" means (i) any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) is or becomes the "beneficial owner" (as defined in Rule 13d−3 under said Act), directly or indirectly, of securities of the Company representing 50% or more of the total voting power represented by the Company's then outstanding voting securities; or (ii) the date of the consummation of a merger or consolidation of the Company with any other corporation that has been approved by the stockholders of the Company, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the total voting power represented by the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or (iii) the date of the consummation of the sale or disposition by the Company of all or substantially all the Company's assets. All options granted to officers or directors are subject to the foregoing terms of the Plans and the applicable forms of option agreement. For information on options granted to officers or directors under the Plans during 2005, please see sections entitled "Director Compensation" under "Board of Directors" and "Option Grants" under "Management" in this Proxy Statement.

## Compensation Committee Interlocks and Insider Participation

The Compensation Committee consisted of Messrs. Toy and Horner throughout the 2005 fiscal year, and Mr. Lenzmeier joined the Compensation Committee in April 2005. Ms. Atkins also served on the Compensation Committee from the beginning of 2005 to May 2005, when her term as a director expired. All members of the Compensation Committee during 2005 were independent directors in accordance with the applicable independence requirements of the Nasdaq Marketplace Rules, and none were employees or officers or former employees of the Company. During 2005, no executive officer of the Company served on the compensation committee (or equivalent) or board of directors of another entity whose executive officer(s) served on the Company's Compensation Committee or Board.

26

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the Company's directors and executive officers, and persons who own more than 10% of a registered class of the Company's equity securities ("**Section 16 Filers**"), to file with the SEC initial reports of ownership and reports of changes in ownership of Common Stock and other equity securities of the Company. Such Section 16 Filers are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file.

To the Company's knowledge, based solely on its review of the copies of such reports furnished to the Company and written representations that no other reports were required, during the fiscal year ended December 31, 2005, all Section 16 Filers complied with all Section 16(a) filing requirements except for the following inadvertent late filings: (i) Mr. Horner filed a Form 4 on November 2, 2005 reporting one transaction late; (ii) Mr. Toy filed a Form 4 on November 2, 2005 reporting one transaction late; (iii) Mr. Clarke filed an amendment to a previously filed Form 4 on November 2, 2005 reporting one transaction late; and (iv) Mr. Wu filed a Form 5 on December 29, 2005 reporting one transaction late.

## REPORT OF THE COMPENSATION COMMITTEE

### Introduction

The Compensation Committee of the Board of the Company was established on January 31, 1997. Mr. Toy, the Chairman of the Compensation Committee, and Mr. Horner served on the Committee throughout 2005, and Mr. Lenzmeier joined the Compensation Committee on April 11, 2005.

During 2005, the Compensation Committee was comprised solely of Non−Employee Directors who were each: (i) independent as defined under the Nasdaq Marketplace Rules, (ii) a Non−Employee Director for purposes of Rule 16b−3 of the Securities Exchange Act of 1934, as amended, and (iii) an outside director for purposes of Section 162(m) of the Internal Revenue Code. During 2006, the Committee will be comprised of directors who meet these same standards.

The primary purpose of the Compensation Committee is to discharge the responsibilities of the Board of Directors relating to all compensation, including equity compensation, of the Company's executives. The Compensation Committee also has overall responsibility for evaluating and making recommendations to the Board regarding equity−based and cash variable compensation plans, policies and programs of the Company.

### Compensation Philosophy

The philosophy of the Compensation Committee is to create a system in which employee compensation is tied to the performance of the Company, thereby promoting stockholder value. The Company's compensation program consists of two principal components: cash−based compensation, both fixed and variable, and equity−based compensation. These two principal components are intended to attract, retain, motivate, increase the productivity of and reward, in a cost−effective manner, executives who are expected to manage both the short−term and long−term success and competitiveness of the Company. In addition, the Compensation Committee attempts to structure the compensation program to be regarded positively by the Company's stockholders, employees, the financial community and the public in general.

### Cash−based Compensation

The Compensation Committee believes that the annual cash compensation paid to executives should be commensurate with the performance of both the Company as a whole and the individual executive in question. For this reason, the Company's executive cash compensation consists of base compensation (salary) and variable incentive compensation (annual bonus).

Base salaries for executive officers are established considering a number of factors, including the Company's profitability, the individual performance and measurable contribution to the Company's success of the executive in question and pay levels of similar positions with comparable companies in the industry. The Compensation Committee supports the Company's philosophy by providing for moderation in fixed elements of compensation, such as base salary and benefits. Base salary decisions are made as part of the Company's formal annual review process.

The amount of an executive's annual bonus generally depends on the financial performance of the Company relative to profit targets and the executive's individual performance with respect to the successful completion of objectives and goals deemed by the Compensation Committee to be important in maximizing long−term return to the Company's stockholders. The Compensation Committee reviews these targets, objectives and goals at least annually to meet the changing nature of the Company's business. The incentive (bonus) portion of total cash compensation is set at a higher percentage for more senior officers, with the result that such officers have a higher percentage of their potential total cash compensation at risk.

28

**Equity-based Compensation**

The Compensation Committee administers the Company's equity incentive program, pursuant to which members of management, including the Company's executive officers, may receive annual stock option grants and/or restricted stock purchase rights from a pool of shares set aside by the Company on an annual basis. The purpose of the equity incentive program is to provide additional incentive to executives and other key employees of the Company to work to maximize long-term return to the Company's stockholders. The allocation of stock options and restricted stock purchase rights to the Company's employees, other than the President and Chief Executive Officer, are recommended by the President and Chief Executive Officer for approval by the Compensation Committee. The allocation of stock options and restricted stock purchase rights to the President and Chief Executive Officer is determined solely by the Compensation Committee. In granting equity incentive awards to the executive officers and the President and Chief Executive Officer, the Compensation Committee considers a number of objective and subjective factors, including the executive's position and responsibilities at the Company, such executive's past and anticipated individual performance, current market survey data with respect to equity compensation practices at other peer companies in the Company's industry and the level of achievement by such executive of the performance objectives (as described below) set by the Compensation Committee. Options and restricted stock purchase rights generally vest over a four-year period to encourage executive officers to continue in the employ of the Company. Beginning in 2006, options and restricted stock purchase rights granted to executive officers may also be subject to performance vesting, such that the shares underlying the equity award will only vest if the performance objectives set by the Compensation Committee are achieved, as described further below. The exercise price of options is the market price on the date of grant, ensuring that the option will acquire value only to the extent that the price of the Company's common stock increases relative to the market price at the date of grant. The restricted stock purchase rights entitle the executive officers to purchase the Company's common stock at par value.

**Management Performance Objectives**

Starting in 2006, the Compensation Committee will establish annual management performance objectives tailored for each executive officer. Under this regime, options or restricted stock awards granted to each executive officer will vest, or stock purchase rights will be granted, only to the extent that the established performance objectives for such officer have been achieved, upon achievement of pre-established performance objectives for each such executive officer, as determined by the Compensation Committee. The criteria for management performance objectives include (i) achievement of corporate financial measures such as bookings, gross margin, revenue, operating profit, cash flow, inventory turns, contribution margin and cash collections, (ii) achievement of corporate objectives relating to quality and organization, including improvement as to the Company's compliance efforts under Section 404 of the Sarbanes-Oxley Act of 2002, and (iii) achievement by executive officers of additional individualized performance objectives reviewed and approved by the Compensation Committee.

**President and Chief Executive Officer Compensation**

The Compensation Committee generally uses the same factors and criteria described above for compensation decisions regarding the President, Chief Executive Officer and Chairman of the Board. During the fiscal year ended December 31, 2005, Mr. Lu received a base salary of $700,000 for serving as the President, Chief Executive Officer and Chairman of the Board of the Company. No bonus was awarded to Mr. Lu with respect to the fiscal year ended December 31, 2005. As with the other executives of the Company, Mr. Lu's compensation was determined by the Compensation Committee, based on the achievement of certain performance objectives of the Company. Criteria considered in the determination of Mr. Lu's compensation included such factors as (i) the compensation provided to

29

chief executive officers of companies comparable to the Company, (ii) specific benchmarks tied to the revenue, growth or profitability of the Company, (iii) decisions made by Mr. Lu in the past fiscal year that improved the business prospects or financial condition of the Company, and (iv) Mr. Lu's leadership role in accomplishing specific goals set for the Company in the past fiscal year. The performance objectives are reviewed annually by the Compensation Committee to ensure that they are consistent with the Company's compensation philosophy.

**Compliance with Internal Revenue Code Section 162(m)**

Section 162(m) of the Internal Revenue Code generally disallows a federal tax deduction to publicly held companies for compensation in excess of $1 million paid to the Company's President and Chief Executive Officer and to each of the other four most highly compensated executive officers. For this purpose, compensation can include, in addition to cash compensation, the gain realized upon exercise of stock options and the vesting of restricted stock. The Company's policy is to qualify, to the extent reasonable, its executive officers' stock option grants for deductibility under applicable tax laws. However, the Compensation Committee believes that its primary responsibility is to provide a compensation program that will attract, retain and reward the executive talent necessary for the Company's success because the Compensation Committee feels such objective is in the best interest of the Company's stockholders. Consequently, the Compensation Committee recognizes that the loss of a tax deduction may be necessary in some circumstances.

Subsequent to the annual stockholder meeting of 2004, awards granted under the Stock Plan no longer qualify as performance–based compensation for 162(m) purposes and therefore are subject to the $1,000,000 limit. Assuming the stockholders approve the 2006 Equity Incentive Plan, the Company will again be able to issue options and other forms of equity compensation that qualify as performance–based compensation for 162(m) purposes and therefore excluded from the calculation of compensation for purposes of the $1,000,000 limit.

**Summary**

The Compensation Committee believes that its compensation program to date has been fair and motivating, and has been successful in attracting and retaining qualified employees and in linking compensation directly to the Company's success. The Compensation Committee intends to review this program on an ongoing basis to evaluate its continued effectiveness.

The Compensation Committee

Thomas Toy, Chairman
Larry Homer
Allen Lenzmeier

30

## REPORT OF THE AUDIT COMMITTEE

The following is the report of the Audit Committee with respect to the Company's audited financial statements for the fiscal year ended December 31, 2005. The information contained in this report shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, except to the extent that the Company specifically incorporates the information by reference in such filing.

Established on January 31, 1997, the Audit Committee is currently comprised of four Non-Employee Directors. Mr. Horner, the Chairman of the Audit Committee, and Mr. Toy served on the Audit Committee throughout 2005. Mr. Clarke joined the Audit Committee on January 17, 2005 and Mr. Lenzmeier joined the Audit Committee on March 15, 2005. The Board of Directors has determined that each of the members of the Audit Committee is independent as defined by Nasdaq Marketplace Rules and the SEC. The Board also determined that each member of the Audit Committee is "financially literate" and has accounting or related financial management expertise. The Board also determined that each of Messrs. Horner, Clarke and Lenzmeier is an "audit committee financial expert" as defined by SEC rules through his business and professional experience.

The purpose of the Audit Committee is to assist the Board of Directors in its general oversight of the Company's financial reporting, internal controls and audit functions. The Audit Committee is directly responsible for the appointment, retention, evaluation, compensation, oversight and termination of the Company's independent registered public accounting firm.

The Audit Committee reviews the results and scope of audit and other services provided by the independent auditors and reviews the accounting principles and auditing practices and procedures to be used in the Company's financial reporting process, including its systems of internal control, and in the preparation of consolidated financial statements in accordance with generally accepted accounting principles. The Company's independent registered public accounting firm for the last fiscal year, PricewaterhouseCoopers LLP ("**PricewaterhouseCoopers**"), is responsible for performing an independent audit of those financial statements. As more fully explained in the Audit Committee's charter, the Audit Committee's responsibility is to provide oversight of and to review those processes. The Audit Committee does not conduct auditing or accounting reviews or procedures, and relies on information and representations provided by management and the independent auditors. The Audit Committee has relied on management's representation that the financial statements have been prepared with integrity and objectivity and in conformity with accounting principles generally accepted in the United States of America and on the representations of the independent auditors included in their report on the Company's financial statements.

The Audit Committee held 30 meetings during the last fiscal year. The Audit Committee operates pursuant to a charter that it reviews annually.

**Audited Financial Statements**

The Audit Committee has reviewed the audited financial statements prepared for the fiscal year ended December 31, 2005. The Audit Committee has discussed the audited financial statements with various members of the management of the Company.

Management is responsible for maintaining adequate internal control over financial reporting and for assessing the effectiveness of internal control over financial reporting. In addition to its independent audit of the Company's financial statements, PricewaterhouseCoopers has the responsibility for auditing management's assessment of, and the effectiveness of, internal control over financial reporting and expressing an opinion thereon based on its audit. The Audit Committee was kept apprised of the progress of management's assessment of the Company's internal control over financial reporting and

31

provided oversight to management during the process. In connection with this oversight, the Audit Committee received periodic updates provided by management and PricewaterhouseCoopers at meetings throughout the year. At the conclusion of the process, management provided the Audit Committee with a report on the effectiveness of the Company's internal control over financial reporting. The Audit Committee reviewed this report of management and Item 9A, "Control and Procedures," contained in the Company's Annual Report on Form 10−K for the fiscal year ended December 31, 2005 filed with the SEC, as well as PricewaterhouseCoopers' report of independent registered public accounting firm (included in the Company's Annual Report on Form 10−K) relating to its audit of (i) the consolidated financial statements, (ii) management's and the independent auditors' assessment of the effectiveness of internal control over financial reporting and (iii) the effectiveness of internal control over financial reporting. The Audit Committee also reviewed with management and PricewaterhouseCoopers (a) the Company's completed, current and planned initiatives to remediate material weaknesses in the Company's internal control over financial reporting as required by Section 404 of the Sarbanes−Oxley Act of 2002 and (b) the additional analyses undertaken and procedures performed by the Company to support certifications by the Company's Chief Executive Officer and Chief Financial Officer that are required by the SEC and the Sarbanes−Oxley Act to accompany the Company's periodic filings with the SEC.

In addition, the Audit Committee has discussed the audited financials with PricewaterhouseCoopers, including such items as Statement on Auditing Standards No. 61 and PCAOB Auditing Standard No. 2, "An Audit of Internal Control Over Financial Reporting Conducted in Conjunction with an Audit of Financial Statements." The Audit Committee has also received from PricewaterhouseCoopers a letter and other written disclosures required under Independence Standards Board Standard No. 1, and has had discussions with PricewaterhouseCoopers regarding the independence of PricewaterhouseCoopers as the Company's independent registered public accounting firm.

After review of all discussions and all written correspondence described above, as well as such other matters deemed relevant and appropriate by the Audit Committee, the Audit Committee recommended to the Board of Directors that the audited financial statements for the last fiscal year be included in the Company's Annual Report on Form 10−K.

The Audit Committee

Larry Horner, Chairman
Jeff Clarke
Allen Lenzmeier
Thomas Toy