# Exhibit O
# Part 2 of 2

PROPOSAL NO. 2
APPROVAL OF THE 2006 EQUITY INCENTIVE PLAN

The stockholders are being asked to approve a new employee equity incentive plan, the 2006 Equity Incentive Plan (the "**Incentive Plan**"). The Company's 1997 Plan is set to expire in January 2007. The Company also maintains the Director Plan and the 2003 Nonstatutory Stock Option Plan (the "**2003 Plan**"). The Board has approved the Incentive Plan, subject to approval from the stockholders at the Annual Meeting. If the stockholders approve the Incentive Plan, it will replace the Company's 1997 Plan, Director Plan and 2003 Plan and no further awards will be made under such plans, but they will continue to govern awards previously granted thereunder. If the stockholders do not approve the Incentive Plan, the 1997 Plan, Director Plan and 2003 Plan will remain in effect through the remainder of their respective terms. Approval of the Incentive Plan requires the affirmative vote of the holders of a majority of the shares of the Common Stock that are present in person or by proxy and entitled to vote on the proposal at the Annual Meeting.

The Board believes that long-term incentive compensation programs align the interests of management, employees and the stockholders to create long-term stockholder value. The Board believes that plans such as the Incentive Plan increase the Company's ability to achieve this objective, especially, in the case of the Incentive Plan, by allowing for several different forms of long-term incentive awards, which the Board believes will help the Company to recruit, reward, motivate and retain talented personnel. The recent changes in the equity compensation accounting rules, which became effective for the Company on January 1, 2006, also make it important for the Company to have greater flexibility under its employee equity incentive plan. As the new equity compensation accounting rules come into effect for all companies, competitive equity compensation practices may change materially, especially as they pertain to the use of equity compensation vehicles other than stock options.

The Board believes strongly that the approval of the Incentive Plan is essential to the Company's continued success. In particular, the Company believes that its employees are its most valuable assets and that the awards permitted under the Incentive Plan are vital to the Company's ability to attract and retain outstanding and highly skilled individuals in the extremely competitive labor markets in which it competes. Such awards also are crucial to the Company's ability to motivate employees to achieve the Company's goals.

**Vote Required; Recommendation of the Board of Directors**

Approval of the Incentive Plan requires the affirmative vote of the holders of a majority of the shares of the Common Stock that are present in person or by proxy and entitled to vote on the proposal at the Annual Meeting.

**THE COMPANY'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS VOTING "FOR" THE ADOPTION OF THE 2006 EQUITY INCENTIVE PLAN AND THE NUMBER OF SHARES RESERVED FOR ISSUANCE THEREUNDER.**

**Summary of the 2006 Equity Incentive Plan**

The following is a summary of the principal features of the Incentive Plan and its operation. The summary is qualified in its entirety by reference to Incentive Plan itself set forth in Annex A.

The Incentive Plan provides for the grant of the following types of incentive awards: (i) stock options, (ii) stock appreciation rights, (iii) restricted stock, (iv) restricted stock units, (v) performance shares and performance units, and (vi) other stock or cash awards. (each, an "**Award**," collectively, "**Awards**"). Those who will be eligible for Awards under the Incentive Plan include employees, directors and consultants who provide services to the Company and its affiliates. As of June 1, 2006,

33

the Company had approximately 6540 employees, directors and consultants, all of whom would be eligible to participate in the Incentive Plan.

*Number of Shares of Common Stock Available Under the Incentive Plan.*    The maximum aggregate number of shares that may be awarded and sold under the Incentive Plan is 4,500,000 shares plus (i) any shares that have been reserved but remain unissued under the 1997 Plan, Director Plan, and 2003 Plan as of the date of stockholder approval of the Incentive Plan, and (ii) any shares subject to stock options or similar awards granted under the 1997 Plan, Director Plan, and 2003 Plan that expire or become exercisable without having been exercised in full and shares issued pursuant to awards granted under the 1997 Plan, Director Plan, and 2003 Plan that are forfeited to or repurchased by the Company. The shares may be authorized, but unissued, or reacquired Common Stock. As of March 31, 2006, the number of shares that were reserved and available for issuance but remained unissued under the 1997 Plan, Director Plan and 2003 Plan was 3,933,333. As of March 31, 2006, options to purchase 22,848,484 shares of the Common Stock were outstanding under the 1997 Plan, Director Plan and 2003 Plan. Also as of March 31, 2006, there were 200,000 shares of restricted stock awards outstanding under these plans.

If the Company declares a stock dividend or engages in a reorganization or other change in its capital structure, including a merger, the Board will have the discretion to adjust (i) the number of shares available for issuance under the Incentive Plan, (ii) the number of shares subject to outstanding Awards, and (iii) the number of shares specified as per-person limits on Awards, as appropriate, to reflect the change.

*Administration of the Incentive Plan.*    The Board, or a committee of directors or of other individuals satisfying applicable laws and appointed by the Board, will administer the Incentive Plan. To make grants to certain of the Company's officers and key employees, the members of the committee must qualify as "Non-Employee Directors" under Rule 16b-3 of the Securities Exchange Act of 1934, and as "outside directors" under Section 162(m) of the Internal Revenue Code (so that the Company can receive a federal tax deduction for certain compensation paid under the Incentive Plan). Subject to the terms of the Incentive Plan, the Board or its committee has the sole discretion to select the employees, consultants, and directors who will receive Awards, determine the terms and conditions of Awards, and to interpret the provisions of the Incentive Plan and outstanding Awards. Notwithstanding the foregoing, the Board or committee may not modify or amend an option or stock appreciation right to reduce the exercise price of that Award after it has been granted or to cancel any outstanding option or stock appreciation right and replace it with a new option or stock appreciation right with a lower exercise price. The Board or other committee administering the Incentive Plan is referred to below as the "**Administrator.**"

*Options.*    The Administrator is able to grant nonstatutory stock options and incentive stock options under the Incentive Plan. The Administrator determines the number of shares subject to each option, although the Incentive Plan provides that a participant may not receive options for more than 1,000,000 shares in any fiscal year, except in connection with his or her initial service with the Company, in which case he or she may be granted an option to purchase up to an additional 2,000,000 shares.

The Administrator determines the exercise price of options granted under the Incentive Plan, provided the exercise price must be at least equal to the fair market value of the Common Stock on the date of grant. In addition, the exercise price of an incentive stock option granted to any participant who owns more than 10% of the total voting power of all classes of the Company's outstanding stock must be at least 110% of the fair market value of the Common Stock on the grant date.

34

The term of an option may not exceed seven years, except that, with respect to any participant who owns 10% of the voting power of all classes of the Company's outstanding capital stock, the term of an incentive stock option may not exceed five years.

After a termination of service with the Company, a participant will be able to exercise the vested portion of his or her option for the period of time stated in the Award agreement. If no such period of time is stated in the participant's Award agreement, the participant will generally be able to exercise his or her option for (i) three months following his or her termination for reasons other than death or disability, and (ii) twelve months following his or her termination due to death or disability. In no event may an option be exercised later than the expiration of its term.

*Stock Appreciation Rights.*    The Administrator will be able to grant stock appreciation rights, which are the rights to receive the appreciation in fair market value of Common Stock between the exercise date and the date of grant. The Company can pay the appreciation in either cash or shares of Common Stock. Stock appreciation rights will become exercisable at the times and on the terms established by the Administrator, subject to the terms of the Incentive Plan. The Administrator, subject to the terms of the Incentive Plan, will have complete discretion to determine the terms and conditions of stock appreciation rights granted under the Incentive Plan, provided, however, that the exercise price may not be less than 100% of the fair market value of a share on the date of grant and the term of a stock appreciation right may not exceed seven years. No participant will be granted stock appreciation rights covering more than 1,000,000 shares during any fiscal year, except that a participant may be granted stock appreciation rights covering up to an additional 2,000,000 shares in connection with his or her initial service as an employee with the Company.

After termination of service with the Company, a participant will be able to exercise the vested portion of his or her stock appreciation right for the period of time stated in the Award agreement. If no such period of time is stated in a participant's Award agreement, a participant will generally be able to exercise his or her stock appreciation right for (i) three months following his or her termination for reasons other than death or disability, and (ii) twelve months following his or her termination due to death or disability. In no event will a stock appreciation right be exercised later than the expiration of its term.

*Restricted Stock.*    Awards of restricted stock are rights to acquire or purchase shares of the Common Stock, which vest in accordance with the terms and conditions established by the Administrator in its sole discretion. For example, the Administrator may set restrictions based on the achievement of specific performance goals. The Award agreement will generally grant the Company a right to repurchase or reacquire the shares upon the termination of the participant's service with the Company for any reason (including death or disability). The Administrator will determine the number of shares granted pursuant to an Award of restricted stock, but no participant will be granted a right to purchase or acquire more than 300,000 shares of restricted stock during any fiscal year, except that a participant may be granted up to an additional 600,000 shares of restricted stock in connection with his or her initial employment with the Company.

*Restricted Stock Units.*    Awards of restricted stock units result in a payment to a participant only if the vesting criteria the Administrator establishes is satisfied. For example, the Administrator may set restrictions based on the achievement of specific performance goals. Upon satisfying the applicable vesting criteria, the participant will be entitled to the payout specified in the Award agreement. Notwithstanding the foregoing, at any time after the grant of restricted stock units, the Administrator may reduce or waive any vesting criteria that must be met to receive a payout. The Administrator, in its sole discretion, may pay earned restricted stock units in cash, shares, or a combination thereof. Restricted stock units that are fully paid in cash will not reduce the number of shares available for grant under the Incentive Plan. On the date set forth in the Award agreement, all unearned restricted stock units will be forfeited to the Company. The Administrator determines the number of restricted

stock units granted to any participant, but during any fiscal year of the Company, no participant may be granted more than 300,000 restricted stock units during any fiscal year, except that the participant may be granted up to an additional 600,000 restricted stock units in connection with his or her initial employment to the Company.

*Performance Units and Performance Shares.*    The Administrator will be able to grant performance units and performance shares, which are Awards that will result in a payment to a participant only if the performance goals or other vesting criteria the Administrator may establish are achieved or the Awards otherwise vest. The Administrator will establish performance or other vesting criteria in its discretion, which, depending on the extent to which they are met, will determine the number and/or the value of performance units and performance shares to be paid out to participants. Notwithstanding the foregoing, after the grant of performance units or shares, the Administrator, in its sole discretion, may reduce or waive any performance objectives or other vesting provisions for such performance units or shares. During any fiscal year, no participant will receive more than 300,000 performance shares and no participant will receive performance units having an initial value greater than $2,000,000, except that a participant may be granted performance shares covering up to an additional 600,000 shares in connection with his or her initial employment with the Company. Performance units will have an initial dollar value established by the Administrator on or before the date of grant. Performance shares will have an initial value equal to the fair market value of a share of the Common Stock on the grant date.

*Performance Goals.*    Awards of restricted stock, restricted stock units, performance shares, performance units and other incentives under the Incentive Plan may be made subject to the attainment of performance goals relating to one or more business criteria within the meaning of Section 162(m) of the Internal Revenue Code and may provide for a targeted level or levels of achievement including: annual revenue; cash collections; customer satisfaction MBOs; earnings per share; net income; new orders; operating profit; pro forma net income; return on designated assets; return on equity; return on sales; and product shipments. The performance goals may differ from participant to participant and from Award to Award and may be used to measure the performance of the Company as a whole or a business unit of the Company and may be measured relative to a peer group or index. Any criteria used may be measured in absolute terms, compared to another company or companies, measured against the performance of the Company as a whole or a segment of the Company, and/or measured on a pre−tax or post−tax basis.

*Grants to Non−Employee Directors.*    The Incentive Plan gives the Administrator authority to grant discretionary awards to Non−Employee Directors, but it does not provide for automatic or nondiscretionary awards to Non−Employee Directors. Prior to April 27, 2006, it was the Company's policy to provide each Non−Employee Director an annual grant of an option to purchase 25,000 shares under the 1997 Plan. Non−Employee Directors were also eligible to receive non−discretionary stock option grants under the Director Plan, as described in the section entitled "Director Compensation" in this Proxy Statement. On April 27, 2006, concurrently with the effectiveness of the Company's compensation plan for the Non−Employee Directors in the year 2006, the Board suspended until further action all future grants of stock options under the Director Plan. On April, the Board also suspended the policy of granting annual option grants to the Non−Employee Directors under the 1997 Plan, choosing instead to issue a specific number of options as part of each Non−Employee Director's annual compensation package. The absence of provisions in the Incentive Plan allowing automatic or nondiscretionary awards reflects the Board's current policy of favoring discretionary awards.

*Transferability of Awards.*    Awards granted under the Incentive Plan are generally not transferable, and all rights with respect to an Award granted to a participant generally may be exercised during a participant's lifetime only by the participant; provided, however, that with the Administrator's approval, a participant may (i) transfer an Award to a participant's spouse or former spouse pursuant to a court−approved domestic relations order which relates to the provision of child support, alimony payments or

36

marital property rights, or (ii) transfer an Award by gift to or for the benefit of the participant's immediate family.

*Change of Control.*    In the event of a change of control of the Company, each outstanding Award will be assumed or an equivalent option or right substituted by the successor corporation or a parent or subsidiary of the successor corporation. In the event that the successor corporation, or the parent or subsidiary of the successor corporation, refuses to assume or substitute for the Award, the participant will fully vest in and have the right to exercise all of his or her outstanding options or stock appreciation rights, including shares as to which such Awards would not otherwise be vested or exercisable, all restrictions on restricted stock will lapse, and, with respect to restricted stock units, performance shares and performance units, all performance goals or other vesting criteria will be deemed achieved at target levels and all other terms and conditions met. In addition, if an option or stock appreciation right is not assumed or substituted for in the event of a change of control, the Administrator will notify the participant in writing or electronically that the option or stock appreciation right will be fully vested and exercisable for a period of time determined by the Administrator in its sole discretion, and the option or stock appreciation right will terminate upon the expiration of such period.

*Amendment and Termination of the Incentive Plan.*    The Administrator will have the authority to amend, alter, suspend or terminate the Incentive Plan, except that stockholder approval will be required for any amendment to the Incentive Plan to the extent required by any applicable laws. No amendment, alteration, suspension or termination of the Incentive Plan will impair the rights of any participant, unless mutually agreed otherwise between the participant and the Administrator and which agreement must be in writing and signed by the participant and the Company. The Incentive Plan will terminate in June 2016, unless the Board terminates it earlier.

## Number of Awards Granted to Employees, Consultants, and Directors

*Number of Awards Employees, Directors or Consultants Would Have Received since January 2005 to March 2006 under the Incentive Plan*

If the Incentive Plan were in place last year, its terms would not have resulted in a different number of Awards being granted between the beginning of 2005 to March 31, 2006. The following table sets forth (i) the aggregate number of shares of Common Stock subject to options granted under the 1997 Plan, Director Plan, and 2003 Plan during this period, (ii) the average per share exercise price of such options, (iii) the aggregate number of shares issued pursuant to awards of restricted stock granted

37

under the 1997 Plan during this period, and (iv) the dollar value of such shares based on $7.64 per share.

### New Plan Benefits Table

| Name of Individual or Group | Number of Options Granted | | (Weighted) Average Per Share Exercise Price | Number of Shares of Restricted Stock(1) | | Dollar Value of Shares of Restricted Stock |
|---|---|---|---|---|---|---|
| Hong Liang Lu(2) President, Chief Executive Officer and Chairman of the Board | 260,000 | $ | 6.25 | 130,000 | $ | 812,500 |
| Ying Wu(3) Executive Vice President and Vice Chairman | 100,000 | $ | 6.25 | 50,000 | $ | 312,500 |
| Francis Barton Executive Vice President and Chief Financial Officer | 492,000(4) | $ | 8.34 | 146,000(8) | $ | 1,169,500(12) |
| William Huang Senior Vice President and Chief Technology Officer | 141,667(5) | $ | 7.33 | 33,333(9) | $ | 208,331 |
| Michael Sophie Executive Vice President and Chief Operating Officer | 183,600(6) | $ | 7.36 | 41,800(10) | $ | 261,250 |
| Shao-Ning Chou Former Senior Vice President | — | | — | — | | — |
| All executive officers, as a group | 1,177,267(7) | $ | 7.43 | 401,133(11) | $ | 2,764,081(13) |
| All directors who are not executive officers, as a group | 300,000 | $ | 11.60 | — | | — |
| All employees who are not executive officers, as a group | 8,657,879 | $ | 7.83 | — | | — |

(1)

Represents stock purchase rights that were originally granted on February 28, 2006 as restricted stock purchase rights. Except for the award of 100,000 shares of the restricted stock granted on August 1, 2005 to Mr. Barton, the restricted stock purchase rights were allowed to lapse unexercised, and in their place the stock purchase rights may be granted following the 2006 fiscal year-end, based upon management performance objectives.

(2)

Mr. Lu did not receive any Award during the fiscal year 2005. The figures reflect the options to purchase 260,000 shares of the Common Stock granted on February 28, 2006 and the right to purchase 130,000 shares of the restricted stock granted on February 28, 2006, which expired

38

unexercised on March 31, 2006, and the stock purchase rights may be granted in their place following the 2006 fiscal year–end, based upon management performance objectives.

(3)

Mr. Wu did not receive any Award during the fiscal year 2005. The figures reflect the options to purchase 100,000 shares of the Common Stock granted on February 28, 2006 and the right to purchase 50,000 shares of the restricted stock granted on February 28, 2006, which expired unexercised on March 31, 2006, and the stock purchase rights may be granted in their place following the 2006 fiscal year–end, based upon management performance objectives.

(4)

Reflects options to purchase (i) 400,000 shares of the Common Stock granted on August 1, 2005 and (ii) 92,000 shares of the Common Stock granted on February 28, 2006.

(5)

Reflects options to purchase (i) 75,000 shares of the Common Stock granted on November 15, 2005 and (ii) 66,667 shares of the Common Stock granted on February 28, 2006.

(6)

Reflects options to purchase (i) 100,000 shares of the Common Stock granted on November 15, 2005 and (ii) 83,600 shares of the Common Stock granted on February 28, 2006.

(7)

Reflects options to purchase (i) 575,000 shares of the Common Stock granted during the fiscal year 2005 and (ii) 602,267 shares of the Common Stock granted on February 28, 2006.

(8)

Reflects awards of (i) 100,000 shares of the restricted stock granted on August 1, 2005 and (ii) the right to purchase 46,000 shares of the restricted stock granted on February 28, 2006, which expired unexercised on March 31, 2006, and the stock purchase rights may be granted in their place following the 2006 fiscal year–end, based upon management performance objectives.

(9)

Reflects the restricted stock purchase right granted on February 28, 2006, which expired unexercised on March 31, 2006, and the stock purchase rights may be granted in their place following the 2006 fiscal year–end, based upon management performance objectives.

(10)

Reflects the restricted stock purchase right granted on February 28, 2006, which expired unexercised on March 31, 2006, and the stock purchase rights may be granted in their place following the 2006 fiscal year–end, based upon management performance objectives.

(11)

Reflects awards of (i) 100,000 shares of restricted stock granted on August 1, 2005 and (ii) the right to purchase 301,133 shares of restricted stock granted on February 28, 2006, which expired unexercised on March 31, 2006, and the stock purchase rights may be granted in their place following the 2006 fiscal year–end, based upon management performance objectives.

(12)

The closing sales prices of (i) $8.82 per share of the Common Stock as listed on the Nasdaq National Market on the grant date of 100,000 shares of the restricted stock to Mr. Barton, August 1, 2005, and (ii) $6.25 per share as listed on the Nasdaq National Market on the grant date of the right to purchase 46,000 shares of the restricted stock, February 28, 2006, have been used to determine the total dollar value of the restricted stock award granted Francis Barton from the beginning of 2005 to present.

(13)

The closing sales prices of (i) $8.82 per share of the Common Stock as listed on the Nasdaq National Market on the grant date of 100,000 shares of the restricted stock to Mr. Barton, August 1, 2005, and (ii) $6.25 per share as listed on the Nasdaq National Market on the grant date of the right to purchase 301,133 shares of the restricted stock to the named officers, February 28, 2006, have been used to determine the total dollar value of the restricted stock award granted to the named officers from the beginning of 2005 to present.

*Number of Awards Non–Employee Directors May Receive in 2006 under the Incentive Plan*

The number of Awards that an employee or consultant may receive under the Incentive Plan in 2006 is in the discretion of the Administrator and therefore cannot be determined in advance.

**Federal Tax Aspects**

The following paragraphs are a summary of the general federal income tax consequences to U.S. taxpayers and the Company of Awards granted under the Incentive Plan. Tax consequences for any particular individual may be different.

*Nonstatutory Stock Options.*    No taxable income is reportable when a nonstatutory stock option with an exercise price equal to the fair market value of the underlying stock on the date of grant is granted to a participant. Upon exercise, the participant will recognize ordinary income in an amount equal to the excess of the fair market value (on the exercise date) of the shares purchased over the exercise price of the option. Any taxable income recognized in connection with an option exercise by an employee of the Company is subject to tax withholding by the Company. Any additional gain or loss recognized upon any later disposition of the shares would be capital gain or loss.

*Incentive Stock Options.*    No taxable income is reportable when an incentive stock option is granted or exercised (except for purposes of the alternative minimum tax, in which case taxation is the same as for nonstatutory stock options). If the participant exercises the option and then later sells or otherwise disposes of the shares more than two years after the grant date and more than one year after the exercise date, the difference between the sale price and the exercise price will be taxed as capital gain or loss. If the participant exercises the option and then later sells or otherwise disposes of the shares before the end of the two− or one−year holding periods described above, he or she generally will have ordinary income at the time of the sale equal to the fair market value of the shares on the exercise date (or the sale price, if less) minus the exercise price of the option.

*Stock Appreciation Rights.*    No taxable income is reportable when a stock appreciation right with an exercise price equal to the fair market value of the underlying stock on the date of grant is granted to a participant. Upon exercise, the participant will recognize ordinary income in an amount equal to the amount of cash received and the fair market value of any shares received. Any additional gain or loss recognized upon any later disposition of the shares would be capital gain or loss.

*Restricted Stock, Restricted Stock Units, Performance Units and Performance Shares.* A participant generally will not have taxable income at the time an Award of restricted stock, restricted stock units, performance shares or performance units are granted. Instead, he or she will recognize ordinary income in the first taxable year in which his or her interest in the shares underlying the Award becomes either (i) freely transferable, or (ii) no longer subject to substantial risk of forfeiture. However, the recipient of a restricted stock Award may elect to recognize income at the time he or she receives the Award in an amount equal to the fair market value of the shares underlying the Award (less any cash paid for the shares) on the date the Award is granted.

*Tax Effect for the Company.*    The Company generally will be entitled to a tax deduction in connection with an Award under the Incentive Plan in an amount equal to the ordinary income realized by a participant and at the time the participant recognizes such income (for example, the exercise of a nonstatutory stock option). Special rules limit the deductibility of compensation paid to the Company's Chief Executive Officer and to each of its four most highly compensated executive officers. Under Section 162(m) of the Internal Revenue Code, the annual compensation paid to any of these specified executives will be deductible only to the extent that it does not exceed $1,000,000. However, the Company can preserve the deductibility of certain compensation in excess of $1,000,000 if the conditions of Section 162(m) are met. These conditions include stockholder approval of the Incentive Plan, setting limits on the number of Awards that any individual may receive and for Awards other than certain stock options, establishing performance criteria that must be met before the Award actually will vest or be paid. The Incentive Plan has been designed to permit the Administrator to grant Awards that qualify as performance−based for purposes of satisfying the conditions of Section 162(m),

40

thereby permitting the Company to continue to receive a federal income tax deduction in connection with such Awards.

*Section 409A.*    Section 409A of the Internal Revenue Code, which was added by the American Jobs Creation Act of 2004, provides certain new requirements on non–qualified deferred compensation arrangements. These include new requirements with respect to an individual's election to defer compensation and the individual's selection of the timing and form of distribution of the deferred compensation. Section 409A also generally provides that distributions must be made on or following the occurrence of certain events (e.g., the individual's separation from service, a predetermined date, or the individual's death). Section 409A imposes restrictions on an individual's ability to change his or her distribution timing or form after the compensation has been deferred. For certain individuals who are officers, Section 409A requires that such individual's distribution commence no earlier than six months after such officer's separation from service.

Awards granted under the Plan with a deferral feature will be subject to the requirements of Section 409A. If an Award is subject to and fails to satisfy the requirements of Section 409A, the recipient of that award may recognize ordinary income on the amounts deferred under the Award, to the extent vested, which may be prior to when the compensation is actually or constructively received. Also, if an Award that is subject to Section 409A fails to comply with Section 409A's provisions, Section 409A imposes an additional 20% federal income tax on compensation recognized as ordinary income, as well as interest on such deferred compensation. The Internal Revenue Service has not issued final regulations under Section 409A and, accordingly, the requirements of Section 409A (and the application of those requirements to Awards issued under the Plan) are not entirely clear.

THE FOREGOING IS ONLY A SUMMARY OF THE EFFECT OF FEDERAL INCOME TAXATION UPON PARTICIPANTS AND THE COMPANY WITH RESPECT TO THE GRANT AND EXERCISE OF AWARDS UNDER THE INCENTIVE PLAN. IT DOES NOT PURPORT TO BE COMPLETE, AND DOES NOT DISCUSS THE TAX CONSEQUENCES OF A PARTICIPANT'S DEATH OR THE PROVISIONS OF THE INCOME TAX LAWS OF ANY MUNICIPALITY, STATE OR FOREIGN COUNTRY IN WHICH THE PARTICIPANT MAY RESIDE.

41

## PROPOSAL NO. 3
## RATIFICATION OF APPOINTMENT OF INDEPENDENT
## REGISTERED PUBLIC ACCOUNTING FIRM

The Audit Committee of the Board has selected PricewaterhouseCoopers LLP, independent registered public accounting firm, to audit the financial statements of the Company for the fiscal year ending December 31, 2006 and recommends that the stockholders ratify this selection. PricewaterhouseCoopers LLP also audited the Company's financial statements for its fiscal year ended December 31, 2005. The Board expects that representatives of PricewaterhouseCoopers LLP will be present at the Annual Meeting, will be given an opportunity to make a statement at the meeting and will be available to respond to appropriate questions.

Stockholder ratification of this selection of PricewaterhouseCoopers LLP as the Company's Independent Public Accounting Firm is not required by the Bylaws or otherwise. However, the Board has elected to seek such ratification as a matter of good corporate practice. Should the stockholders fail to ratify the selection of PricewaterhouseCoopers LLP as independent registered public firm, the Audit Committee and the Board will consider whether to retain that firm for the year ended December 31, 2006. Even if the selection is ratified, the Audit Committee, at its discretion, may direct the appointment of a different independent registered public accounting firm at anytime during the year if it determines that such a change would be in the best interests of the Company and its stockholders.

**PricewaterhouseCoopers LLP Fees for the Fiscal Year Ended December 31, 2005**

*Audit Fees*

Fees for the fiscal year ended December 31, 2005 audit and interim reviews were $11,900,000. Fees for the fiscal year ended December 31, 2004 audit and interim reviews were $8,424,000.

*Audit−Related Fees*

Audit−related fees were $1,000,000 and $773,000 for fiscal years ended December 31, 2005 and December 31, 2004, respectively. Such services included due diligence and other procedures performed surrounding certain of the Company's acquisitions and accounting consultation.

*Tax Fees*

During the fiscal year ended December 31, 2005, fees related to tax advice, compliance and planning were $275,000. For the fiscal year ended December 31, 2004 fees for tax advice, compliance and planning totaled $3,135,000.

*All Other Fees*

Other fees during the year ended December 31, 2005 totaled $7,000 and consisted entirely of fees related to research tools. For the fiscal year ended December 31, 2004 other fees totaled $5,000 and consisted entirely of fees related to training.

The Audit Committee has determined that the provision by PricewaterhouseCoopers LLP of non−audit services to us in 2005 is compatible with PricewaterhouseCoopers LLP maintaining its independence.

*Audit Committee Pre−Approval Policies and Procedures*

The Audit Committee has direct responsibility for the appointment, retention, evaluation, compensation, oversight and termination of the independent registered public accounting firm

employed by the Company. In October 2003, the Audit Committee of the Board established a Non-Audit Services Subcommittee. The Non-Audit Services Subcommittee, consisting of Mr. Homer, is authorized to preapprove non-audit services to be performed by the Company's independent public accountants in amounts not to exceed $50,000 per engagement. Non-audit services to be performed by the Company's independent registered public accounting firm in amounts to exceed $50,000 per engagement will be approved by the Audit Committee. For the fiscal year 2005, there were no audit-related fees, tax fees, or any other non-audit fees that were approved by the Audit Committee pursuant to the "de minimis" exception under Regulation S-X Rule 2-01(c)(7)(i)(C).

**Required Vote**

The ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2006 requires the affirmative vote of the holders of a majority of the shares of the Common Stock that are present in person or by proxy and entitled to vote on the proposal at the Annual Meeting.

**THE COMPANY'S BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" RATIFICATION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM.**

43

### COMPANY'S STOCK PERFORMANCE

Set forth below is a line graph comparing the annual percentage change in the cumulative return to the stockholders of the Company's Common Stock with the cumulative return of the Nasdaq composite (U.S. and foreign) index and the S&P Wireless Telecommunication Services index for the period commencing on December 29, 2000 and ending on December 31, 2005. The information contained in the performance graph shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act or the Exchange Act, except to the extent that the Company specifically incorporates it by reference into such filing.

The graph assumes that $100 was invested on December 29, 2000 in the Company's Common Stock and in each index (based on the sales closing price of $15.50 per share on December 29, 2000), and that all dividends were reinvested. No cash dividends have been declared or paid on the Company's Common Stock. Stockholder returns over the indicated period should not be considered indicative of future stockholder returns. The Company operates on a 52-week fiscal year that ended on Friday, December 31, 2005. Under the assumptions stated above, over the period from December 29, 2000 to December 31, 2005 the total return on an investment in the Company would have been -48.00% as compared to 4.53% for the Nasdaq composite (U.S. and foreign) index and -10.05% for the S&P Wireless Telecommunication Services index shown below.

### STOCK PRICE PERFORMANCE GRAPH FOR
### UTSTARCOM, INC.

#### COMPARISON OF 5-YEAR CUMULATIVE TOTAL RETURN*
#### AMONG UTSTARCOM, INC., THE NASDAQ STOCK MARKET (U.S. & FOREIGN) INDEX
#### AND THE S & P WIRELESS TELECOMMUNICATION SERVICES INDEX



*    $100 invested in stock or in index on December 29, 2000—including reinvestment of dividends. Fiscal year ending December 31, 2005.

| Index | | Period Ending | | | | | |
|---|---|---|---|---|---|---|---|
| | | 12/00 | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 |
| UTSTARCOM, INC. | $ | 100.00 | $ 183.87 | $ 127.94 | $ 239.16 | $ 142.90 | $ 52.00 |
| NASDAQ STOCK MARKET (U.S. & FOREIGN) | $ | 100.00 | $ 83.93 | $ 63.03 | $ 84.88 | $ 87.28 | $ 104.53 |
| S & P WIRELESS TELECOMMUNICATION SERVICES | $ | 100.00 | $ 78.35 | $ 31.57 | $ 56.11 | $ 88.28 | $ 89.95 |

44

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

*Indemnification Agreements*

During 2005, the Company was party to indemnification agreements with certain of its directors and executive officers.

SOFTBANK CORP. is an affiliate of SOFTBANK America, Inc., one of the Company's significant stockholders. Since the beginning of the 2005 financial year, the Company has engaged, continues to engage or proposes to engage in the following transactions with entities affiliated with SOFTBANK CORP.:

- On December 26, 2005, the Company and SOFTBANK CORP. entered into a Stock Purchase Agreement, pursuant to which the Company agreed to sell, and SOFTBANK CORP. agreed to purchase, the Company's 10% ownership interest in SB CHINA HOLDINGS PTE LTD ("**SBCH**"), an investment fund established by SOFTBANK CORP., represented by 8,022 ordinary shares of SBCH (the "**Shares**"), for a purchase price of $56.9 million. The closing of the sale and purchase of the Shares occurred on December 28, 2005 (the "**Closing**"). Upon the Closing, the Company no longer held an ownership interest in SBCH, which caused the Joint Venture Agreement between the Company and SOFTBANK CORP., entered into as of May 29, 2000 to govern the parties' respective shareholdings in SBCH, to terminate pursuant to its terms effective as of December 28, 2005.

- On July 17, 2003, the Company entered into a Mezzanine Loan Agreement with BB Modem Rental PLC ("**BB Modem**"), an affiliate of SOFTBANK CORP. Under the terms of the agreement, the Company loaned BB Modem $10.1 million at an effective interest rate of 12.01% per annum, for the purpose of investing in a portfolio of ADSL modems and associated modem rental agreements, from Softbank BB Corporation ("**Softbank BB**"), formerly BB Technologies, an affiliate of SOFTBANK America, Inc.

- The Company has invested $2.0 million in Restructuring Fund No. 1, a venture capital investment limited partnership established by SOFTBANK INVESTMENT CORP., an affiliate of SOFTBANK CORP. The investment balance as of December 31, 2005 was $2.0 million.

- In December 2002, a venture capital fund affiliated with SOFTBANK CORP. made a capital investment in MDC Holding Limited ("**MDC Holding**"). In December 2004, the Company exercised a warrant for ordinary shares of MDC Holding for which it paid approximately $0.8 million. In 2004, the Company received payments from Beijing MDC Telecommunications Co., Ltd. ("**Beijing MDC**"), an affiliate of MDC Holding, of approximately $0.8 million for purchases of equipment and the provision of consulting services, and in 2004 the Company paid to Beijing MDC approximately $0.5 million for PAS value added services and as rental payments. During the period from January 2005 to March 2005, the Company entered into an agreement to sell equipment to Beijing MDC with a value of approximately $2.3 million.

- The Company recognized aggregate revenue of $394.1 million during 2005 with respect to sales to affiliates of SOFTBANK CORP., including (i) sales of telecommunications equipment to Softbank BB, (ii) sales of equipment and services to Japan Telecom Co., Ltd, a wholly owned subsidiary of SOFTBANK CORP., and (iii) sales of equipment to BB Cable and BB Hikari Dept KK, affiliates of SOFTBANK CORP.

*Starcom Products, Inc.*

Yulan Wu, the spouse of Ying Wu, Executive Vice President and Vice Chairman of the Board, is the beneficial owner of approximately 31% of Starcom Products, Inc. ("**Starcom Products**"). In 2005

and during the period from January 2006 to March 2006, the Company paid Starcom Products approximately $0.7 million for engineering consulting and employee placement services.

*Acoustek Int'l Corp.*

The Company obtains consulting services from Acoustek Int'l Corp. ("**Acoustek**"), which employs Minnie Huang, spouse of William Huang, our Senior Vice President and Chief Technology Officer. The Company paid to Acoustek $0.1 million in 2005 and $0.1 million in 2004 for consulting services provided by Ms. Huang.

*2006 Executive Officer Equity Grants*

On February 28, 2006, the Compensation Committee granted stock options and committed to grant rights to purchase stock to the executive officers as follows:

| Name | Title | Number of Shares Underlying Option Grants | Number of Shares Underlying Stock Purchase Rights to Be Granted(1) |
|---|---|---|---|
| Hong Lu | Chief Executive Officer and President | 260,000 | 130,000 |
| Ying Wu | Executive Vice President; Chairman and Chief Executive Officer of China Operations | 100,000 | 50,000 |
| Francis Barton | Executive Vice President and Chief Financial Officer | 92,000 | 46,000 |
| Michael Sophie(2) | Former Executive Vice President and Chief Operating Officer | 83,600 | 41,800 |
| William Huang | Executive Vice President and Chief Technology Officer | 66,667 | 33,333 |

(1)
Represents stock purchase rights that were originally granted on February 28, 2006 as restricted stock purchase rights. The restricted stock purchase rights were allowed to lapse unexercised, and in their place the stock purchase rights may be granted following the 2006 fiscal year-end, based upon management performance objectives.

(2)
Effective May 5, 2006, the Securities granted to Mr. Sophie have been canceled or terminated pursuant to the Severance Agreement and Release dated April 13, 2006. For more information on the Severance Agreement and Release, see the section entitled "Severance Benefits" under "Certain Relationships and Related Transactions" in this Proxy Statement.

The options were issued to each executive officer under the 1997 Plan pursuant to the form of Stock Option Agreement approved for use under the 1997 Plan with respect to stock option grants to the Company's directors and executive officers, as previously filed with the Securities and Exchange Commission. Each option has an exercise price of $6.25 per share, which equals the closing price of the Common Stock on the Nasdaq Stock Market on the date of grant. The stock purchase rights, if granted, will entitle the executive officers to purchase Common Stock at par value. The options will vest, and the stock purchase rights will be granted, to each executive officer based upon management performance objectives established and tailored for such executive officer by the Compensation Committee for the Company's 2006 fiscal year, including (i) achievement of corporate financial measures such as bookings, gross margin, revenue, operating profit, cash flow, inventory turns, contribution margin and cash collections, (ii) achievement of corporate objectives relating to quality and organization and (iii) achievement by such executive officer of additional individualized

performance objectives reviewed and approved by the Compensation Committee. Performance will be measured against the established objectives and the options of each executive officer shall vest, and the stock purchase rights shall be granted, to the extent the established objectives have been achieved, on the date such a determination is made by the Compensation Committee, in its sole discretion, provided that such executive officer remains an employee of the Company on the date of determination. The Compensation Committee's determination as to the extent the established objectives have been achieved shall be made as soon as administratively practicable following the 2006 fiscal year-end.

*2006 Director Compensation*

On April 27, 2006, the Nominating and Corporate Governance Committee of the Board recommended to the Board, and the Board approved, the 2006 annual equity and cash compensation for the Non-Employee Directors, after a review of market trends and the changing level of responsibilities of the Non-Employee Directors. The changes in cash compensation, effective as of April 27, 2006, are as follows:

Cash and Incidental Compensation by Category:

| Annual Compensation | Effective April 27, 2006 | Prior to Change |
|---|---|---|
| Director Retainer | $ 50,000 | $ 40,000 |
| Lead Director Fee | $ 22,500 | $ 20,000 |
| Audit Committee Chair Fee | $ 12,500 | $ 10,000 |
| Compensation Committee Chair Fee | $ 7,500 | $ 5,000 |
| Nominating and Governance Committee Chair Fee | $ 7,500 | $ 5,000 |
| Audit Committee Member Fee | $ 5,000 | $ 3,500 |
| Compensation Committee Member Fee | $ 4,500 | $ 3,000 |
| Nominating and Governance Committee Member Fee | $ 3,500 | $ 2,000 |
| Credit towards Company Products | $ 1,000 | None |

47

Annual Cash Compensation by Non−Employee Director:

| Name | Annual Cash Compensation* |
|---|---|
| **Larry Horner** | |
| Director Retainer | $ 50,000 |
| Lead Director Fee | $ † |
| Audit Committee Chair Fee | $ 12,500 |
| Compensation Committee Member Fee | $ 4,500 |
| Nominating and Corporate Governance Committee Member Fee | $ 3,500 |
| One−time cash award for services in 2005 | $ 20,000 |
| **Thomas Toy** | |
| Director Retainer | $ 50,000 |
| Lead Director Fee | $ † |
| Compensation Committee Chair Fee | $ 7,5000 |
| Audit Committee Member Fee | $ 5,000 |
| Nominating and Corporate Governance Committee Member Fee | $ 3,500 |
| One−time cash award for services in 2005 | $ 15,000 |
| **Jeff Clarke** | |
| Director Retainer | $ 50,000 |
| Nominating and Corporate Governance Committee Chair Fee | $ 7,500 |
| Audit Committee Member Fee | $ 5,000 |
| One−time cash award for services in 2005 | $ 15,000 |
| **Allen Lenzmeier** | |
| Director Retainer | $ 50,000 |
| Audit Committee Member Fee | $ 5,000 |
| Compensation Committee Member Fee | $ 4,500 |
| One−time cash award for services in 2005 | $ 15,000 |

\*

 Effective April 27, 2006

†

 Mr. Horner will receive a pro−rated portion of the Lead Director Fee for his service as Lead Director prior to June 6, 2006. Mr. Toy will receive a pro−rated portion of the Lead Director Fee for his service as Lead Director from June 6, 2006.

 In addition to cash compensation, on April 27, 2006, the Board granted stock options and preapproved the grant of restricted stock purchase rights (collectively, the "**Non−Employee Grants**") to the Non−Employee Directors as follows:

| Name | Number of Shares Underlying Option Grants | Number of Shares of Restricted Stock* |
|---|---|---|
| Larry Horner | 20,675 | 11,376 |
| Thomas Toy | 19,905 | 10,952 |
| Jeff Clarke | 20,320 | 11,180 |
| Allen Lenzmeier | 20,675 | 11,376 |

\*

 The grant of restricted stock purchase rights was preapproved by the Board to be effective on the second trading day following the date the Company files its Annual Report on Form 10−K for the

48

year ended December 31, 2005 and any other periodic reports then required to be filed with the SEC, contingent upon each Non-Employee Director's continued service on the Board as of such date.

The Non-Employee Grants were issued to each Non-Employee Director under the Company's 1997 Plan pursuant to the (i) form of Stock Option Agreement approved for use under the 1997 Plan with respect to stock option grants to the Company's Non-Employee Directors and (ii) form of restricted stock purchase agreement approved for use under the 1997 Plan, each as previously filed with the SEC. Each option has an exercise price of $7.67 per share, which equals 110% of the closing price of the Company's common stock on the Nasdaq Stock Market on April 27, 2006. The restricted stock purchase rights, as preapproved by the Board, will entitle the Non-Employee Directors to purchase the Company's common stock at par value. The options vest in equal monthly installments over a 12-month period beginning on April 27, 2006. The shares underlying the restricted stock purchase rights, when issued, will vest in equal quarterly installments over a 12-month period beginning on April 27, 2006.

Effective January 1, 2007, Mr. Toy, currently a Non-Employee Director of the Company, will assume the position of Chairman of the Board. To promote and facilitate a smooth transition of the role of Chairman of the Board, Mr. Toy has assumed greater responsibility on the Board during the transition period and has been assigned additional duties on the Board. The Nominating and Corporate Governance Committee of the Board is currently considering a compensation award to Mr. Toy to compensate him for his additional services on the Board during the transition period. The compensation award, if approved, will be paid in addition to the regular annual cash retainer, fees and equity grants previously approved by the Board as compensation for Mr. Toy's services as a member of the Board and Board committees and as Lead Director.

*Severance Benefits*

On April 13, 2006, the Company and Mr. Sophie entered into the Severance Agreement in connection with Mr. Sophie's resignation as Executive Vice President and Chief Operating Officer of the Company effective May 5, 2006. The Severance Agreement replaces and supersedes all prior agreements concerning Mr. Sophie's employment relationship with the Company, with the exception of the confidentiality agreement and any applicable stock option agreement entered into by and between the Company and Mr. Sophie under the Company's existing stock plans. Under the terms of the Severance Agreement, the Company paid Mr. Sophie the equivalent of six (6) months of regular base salary in a lump sum of $220,000, less applicable withholdings. Mr. Sophie also received payments for his accrued but unpaid Paid Time Off and Floating Holiday Benefits (as described in the Severance Agreement). In addition, the Company paid the approximate equivalent of six (6) months of Mr. Sophie's COBRA premiums in a lump sum of $6,000, less applicable withholdings.

Pursuant to the terms of the Severance Agreement, Mr. Sophie's stock options that were not vested as of May 5, 2006 were canceled or terminated. Mr. Sophie will have the right to exercise vested options at any time within 120 days after May 5, 2006, but no later than the option expiration date. The Severance Agreement also provides for a mutual release of claims by the Company and Mr. Sophie.

## OTHER MATTERS

The Company knows of no other matters to be submitted to the Annual Meeting. If any other matters properly come before the Annual Meeting, it is the intention of the persons named in the enclosed proxy to vote the shares they represent as the Board may recommend.

**BY ORDER OF THE BOARD OF DIRECTORS**

/s/ FRANCIS P. BARTON

Francis P. Barton
*Executive Vice President and*
*Chief Financial Officer*

Dated: June 21, 2006

50

*ANNEX A*

UTSTARCOM, INC.

**2006 EQUITY INCENTIVE PLAN**

1.  *Purposes of the Plan.*   The purposes of this Plan are:

- to attract and retain the best available personnel for positions of substantial responsibility,

- to provide incentives to individuals who perform services to the Company, and

- to promote the success of the Company's business.

The Plan permits the grant of Incentive Stock Options, Nonstatutory Stock Options, Restricted Stock, Restricted Stock Units, Stock Appreciation Rights, Performance Units, Performance Shares and other stock or cash awards as the Administrator may determine.

2.  *Definitions.*   As used herein, the following definitions will apply:

(a)  *"Administrator"* means the Board or any of its Committees as will be administering the Plan, in accordance with Section 4 of the Plan.

(b)  *"Affiliate"* means any corporation or any other entity (including, but not limited to, partnerships and joint ventures) controlling, controlled by, or under common control with the Company.

(c)  *"Annual Revenue"* means the Company's or a business unit's net sales for the Performance Period, determined in accordance with generally accepted accounting principles; provided, however, that prior to the Performance Period, the Administrator shall determine whether any significant item(s) shall be excluded or included from the calculation of Annual Revenue with respect to one or more Participants.

(d)  *"Applicable Laws"* means the requirements relating to the administration of equity−based awards under U.S. state corporate laws, U.S. federal and state securities laws, the Code, any stock exchange or quotation system on which the Common Stock is listed or quoted and the applicable laws of any foreign country or jurisdiction where Awards are, or will be, granted under the Plan.

(e)  *"Award"* means, individually or collectively, a grant under the Plan of Options, Restricted Stock, Restricted Stock Units, Stock Appreciation Rights, Performance Units, Performance Shares and other stock or cash awards as the Administrator may determine.

(f)  *"Award Agreement"* means the written or electronic agreement setting forth the terms and provisions applicable to each Award granted under the Plan. The Award Agreement is subject to the terms and conditions of the Plan.

(g)  *"Board"* means the Board of Directors of the Company.

(h)  *"Cash Collections"* means the actual cash or other freely negotiable consideration, in any currency, received in satisfaction of accounts receivable created by the sale of any Company products or services.

(i)  *"Change in Control"* means the occurrence of any of the following events:

(i)  Any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d−3 of the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the total voting power represented by the Company's then outstanding voting securities;

(ii) The consummation of the sale or disposition by the Company of all or substantially all of the Company's assets;

(iii) A change in the composition of the Board occurring within a two-year period, as a result of which fewer than a majority of the directors are Incumbent Directors. "Incumbent Directors" means directors who either (A) are Directors as of the effective date of the Plan, or (B) are elected, or nominated for election, to the Board with the affirmative votes of at least a majority of the Incumbent Directors at the time of such election or nomination (but will not include an individual whose election or nomination is in connection with an actual or threatened proxy contest relating to the election of directors to the Company); or

(iv) The consummation of a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity or its parent outstanding immediately after such merger or consolidation.

(j) "*Code*" means the Internal Revenue Code of 1986, as amended. Any reference to a section of the Code herein will be a reference to any successor or amended section of the Code.

(k) "*Committee*" means a committee of Directors or of other individuals satisfying Applicable Laws appointed by the Board in accordance with Section 4 hereof.

(l) "*Common Stock*" means the common stock of the Company.

(m) "*Company*" means UTStarcom, Inc., a Delaware corporation, or any successor thereto.

(n) "*Consultant*" means any person, including an advisor, engaged by the Company or its Affiliates to render services to such entity.

(o) "*Customer Satisfaction MBOs*" means as to any Participant, the objective and measurable individual goals set by a "management by objectives" process and approved by the Administrator, which goals relate to the satisfaction of external or internal customer requirements.

(p) "*Determination Date*" means the latest possible date that will not jeopardize the qualification of an Award granted under the Plan as "performance-based compensation" under Section 162(m) of the Code.

(q) "*Director*" means a member of the Board.

(r) "*Disability*" means total and permanent disability as defined in Section 22(e)(3) of the Code, provided that in the case of Awards other than Incentive Stock Options, the Administrator in its discretion may determine whether a permanent and total disability exists in accordance with uniform and non-discriminatory standards adopted by the Administrator from time to time.

(s) "*Earnings Per Share*" means as to any Performance Period, the Company's Net Income or a business unit's Pro Forma Net Income, divided by a weighted average number of Shares outstanding and dilutive common equivalent Shares deemed outstanding.

(t) "*Employee*" means any person, including Officers and Directors, employed by the Company or its Affiliates. Neither service as a Director nor payment of a director's fee by the Company will be sufficient to constitute "employment" by the Company.

(u) "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

(v)  "*Fair Market Value*" means, as of any date, the value of Common Stock as the Administrator may determine in good faith by reference to the price of such stock on any established stock exchange or a national market system on the day of determination if the Common Stock is so listed on any established stock exchange or a national market system. If the Common Stock is not listed on any established stock exchange or a national market system, the value of the Common Stock will be determined by the Administrator in good faith.

(w)  "*Fiscal Year*" means the fiscal year of the Company.

(x)  "*Incentive Stock Option*" means an Option that by its terms qualifies and is otherwise intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder.

(y)  "*Net Income*" means as to any Performance Period, the income after taxes of the Company determined in accordance with generally accepted accounting principles, provided that prior to the Performance Period, the Administrator shall determine whether any significant item(s) shall be included or excluded from the calculation of Net Income with respect to one or more participants.

(z)  "*New Orders*" means as to any Performance Period, the firm orders for a system, product, part, or service that are being recorded for the first time as defined in the Company's order recognition policy.

(aa) "*Nonstatutory Stock Option*" means an Option that by its terms does not qualify or is not intended to qualify as an Incentive Stock Option.

(bb) "*Officer*" means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(cc) "*Operating Profit*" means as to any Performance Period, the difference between revenue and related costs and expenses, excluding income derived from sources other than regular activities and before income deductions.

(dd) "*Option*" means a stock option granted pursuant to the Plan.

(ee) "*Parent*" means a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(ff) "*Participant*" means the holder of an outstanding Award.

(gg) "*Performance Goals*" will have the meaning set forth in Section 11 of the Plan.

(hh) "*Performance Period*" means any Fiscal Year of the Company or such other period as determined by the Administrator in its sole discretion.

(ii) "*Performance Share*" means an Award denominated in Shares which may be earned in whole or in part upon attainment of Performance Goals or other vesting criteria as the Administrator may determine pursuant to Section 10.

(jj) "*Performance Unit*" means an Award which may be earned in whole or in part upon attainment of Performance Goals or other vesting criteria as the Administrator may determine and which may be settled for cash, Shares or other securities or a combination of the foregoing pursuant to Section 10.

(kk) "*Period of Restriction*" means the period during which the transfer of Shares of Restricted Stock are subject to restrictions and therefore, the Shares are subject to a substantial risk of forfeiture. Such restrictions may be based on the passage of time, the achievement of target levels of performance, or the occurrence of other events as determined by the Administrator.

A–3

(ll)   "*Plan*" means this 2006 Equity Incentive Plan.

(mm) "*Pro Forma Net Income*" means as to any business unit for any Performance Period, the Net Income of such business unit, minus allocations of designated corporate expenses.

(nn) "*Product Shipments*" means as to any Performance Period, the quantitative and measurable number of units of a particular product that shipped during such Performance Period.

(oo) "*Restricted Stock*" means Shares issued pursuant to an Award of Restricted Stock under Section 8 of the Plan, or issued pursuant to the early exercise of an Option.

(pp) "*Restricted Stock Unit*" means a bookkeeping entry representing an amount equal to the Fair Market Value of one Share, granted pursuant to Section 9. Each Restricted Stock Unit represents an unfunded and unsecured obligation of the Company.

(qq) "*Return on Designated Assets*" means as to any Performance Period, the Pro Forma Net Income of a business unit, divided by the average of beginning and ending business unit designated assets, or Net Income of the Company, divided by the average of beginning and ending designated corporate assets.

(rr) "*Return on Equity*" means, as to any Performance Period, the percentage equal to the value of the Company's or any business unit's common stock investments at the end of such Performance Period, divided by the value of such common stock investments at the start of such Performance Period, excluding any common stock investments so designated by the Administrator.

(ss) "*Return on Sales*" means as to any Performance Period, the percentage equal to the Company's Net Income or the business unit's Pro Forma Net Income, divided by the Company's or the business unit's Annual Revenue.

(tt) "*Rule 16b−3*" means Rule 16b−3 of the Exchange Act or any successor to Rule 16b−3, as in effect when discretion is being exercised with respect to the Plan.

(uu) "*Section 16(b)*" means Section 16(b) of the Exchange Act.

(vv) "*Service Provider*" means an Employee, Director or Consultant.

(ww) "*Share*" means a share of the Common Stock, as adjusted in accordance with Section 14 of the Plan.

(xx) "*Stock Appreciation Right*" means an Award, granted alone or in connection with an Option, that pursuant to Section 7 is designated as a Stock Appreciation Right.

(yy) "*Subsidiary*" means a "subsidiary corporation," whether now or hereafter existing, as defined in Section 424(f) of the Code.

(zz) "*Successor Corporation*" has the meaning given to such term in Section 14(c) of the Plan.

3.   *Stock Subject to the Plan.*

(a)   *Stock Subject to the Plan.*   Subject to the provisions of Section 14 of the Plan, the maximum aggregate number of Shares that may be awarded and sold under the Plan is 4,500,000 Shares plus (i) any Shares that, as of the date of stockholder approval of this Plan, have been reserved but not issued pursuant to any awards granted under the Company's 1997 Stock Plan (the "*1997 Plan*"), the Company's Amended 2001 Director Option Plan (the "*2001 Plan*"), and the Company's 2003 Non−Statutory Stock Option Plan (the "*2003 Plan*") and are not subject to any awards granted thereunder, and (ii) any Shares subject to stock options or similar awards granted under the 1997 Plan, the 2001 Plan, and the 2003 Plan that expire or otherwise terminate without having been exercised in full and Shares issued pursuant to awards granted under the 1997 Plan,

the 2001 Plan, and the 2003 Plan that are forfeited to or repurchased by the Company. The Shares may be authorized, but unissued, or reacquired Common Stock.

(b) *Lapsed Awards.* If an Award expires or becomes unexercisable without having been exercised in full, or, with respect to Restricted Stock, Restricted Stock Units, Performance Shares or Performance Units, is forfeited to or repurchased by the Company, the unpurchased Shares (or for Awards other than Options and Stock Appreciation Rights, the forfeited or repurchased Shares) which were subject thereto will become available for future grant or sale under the Plan (unless the Plan has terminated). With respect to Stock Appreciation Rights, all of the Shares covered by the Award (that is, Shares actually issued pursuant to a Stock Appreciation Right, as well as the Shares that represent payment of the exercise price) will cease to be available under the Plan. However, Shares that have actually been issued under the Plan under any Award will not be returned to the Plan and will not become available for future distribution under the Plan; provided, however, that if unvested Shares of Restricted Stock, Restricted Stock Units, Performance Shares or Performance Units are repurchased by the Company or are forfeited to the Company, such Shares will become available for future grant under the Plan. Shares used to pay the tax and exercise price of an Award will not become available for future grant or sale under the Plan. To the extent an Award under the Plan is paid out in cash rather than Shares, such cash payment will not result in reducing the number of Shares available for issuance under the Plan. Notwithstanding the foregoing and, subject to adjustment provided in Section 14, the maximum number of Shares that may be issued upon the exercise of Incentive Stock Options will equal the aggregate Share number stated in Section 3(a), plus, to the extent allowable under Section 422 of the Code, any Shares that become available for issuance under the Plan under this Section 3(b).

4.  *Administration of the Plan.*

    (a)  *Procedure.*

        (i)  *Multiple Administrative Bodies.*  Different Committees with respect to different groups of Service Providers may administer the Plan.

        (ii)  *Section 162(m).*  To the extent that the Administrator determines it to be desirable to qualify Awards granted hereunder as "performance−based compensation" within the meaning of Section 162(m) of the Code, the Plan will be administered by a Committee of two or more "outside directors" within the meaning of Section 162(m) of the Code.

        (iii)  *Rule 16b−3.*  To the extent desirable to qualify transactions hereunder as exempt under Rule 16b−3, the transactions contemplated hereunder will be structured to satisfy the requirements for exemption under Rule 16b−3.

        (iv)  *Other Administration.*  Other than as provided above, the Plan will be administered by (A) the Board or (B) a Committee, which committee will be constituted to satisfy Applicable Laws.

    (b)  *Powers of the Administrator.*  Subject to the provisions of the Plan, and in the case of a Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator will have the authority, in its discretion:

        (i)  to determine the Fair Market Value;

        (ii)  to select the Service Providers to whom Awards may be granted hereunder;

        (iii)  to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted hereunder;

        (iv)  to construe and interpret the terms of the Plan and Awards granted pursuant to the Plan;

A−5

(v) to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub—plans established for the purpose of satisfying applicable foreign laws;

(vi) to modify or amend each Award (subject to Section 19(c) of the Plan). Notwithstanding the previous sentence, the Administrator may not modify or amend an Option or Stock Appreciation Right to reduce the exercise price of such Option or Stock Appreciation Right after it has been granted (except for adjustments made pursuant to Section 14), and neither may the Administrator cancel any outstanding Option or Stock Appreciation Right and immediately replace it with a new Option or Stock Appreciation Right with a lower exercise price;

(vii) to authorize any person to execute on behalf of the Company any instrument required to effect the grant of an Award previously granted by the Administrator;

(viii) to allow a Participant to defer the receipt of the payment of cash or the delivery of Shares that would otherwise be due to such Participant under an Award pursuant to such procedures as the Administrator may determine; and

(ix) to make all other determinations deemed necessary or advisable for administering the Plan.

(c)  *Effect of Administrator's Decision.*   The Administrator's decisions, determinations and interpretations will be final and binding on all Participants and any other holders of Awards.

5.  *Eligibility.*   Nonstatutory Stock Options, Restricted Stock, Restricted Stock Units, Stock Appreciation Rights, Performance Units, Performance Shares and such other cash or stock awards as the Administrator determines may be granted to Service Providers. Incentive Stock Options may be granted only to employees of the Company or any Parent or Subsidiary of the Company.

6.  *Stock Options.*

(a)  *Limitations.*   Each Option will be designated in the Award Agreement as either an Incentive Stock Option or a Nonstatutory Stock Option. However, notwithstanding such designation, to the extent that the aggregate Fair Market Value of the Shares with respect to which Incentive Stock Options are exercisable for the first time by the Participant during any calendar year (under all plans of the Company and any Parent or Subsidiary) exceeds $100,000, such Options will be treated as Nonstatutory Stock Options. For purposes of this Section 6(a), Incentive Stock Options will be taken into account in the order in which they were granted. The Fair Market Value of the Shares will be determined as of the time the Option with respect to such Shares is granted.

(b)  *Number of Shares.*   The Administrator will have complete discretion to determine the number of Options granted to any Participant, provided that during any Fiscal Year, no Participant will be granted Options covering more than 1,000,000 Shares. Notwithstanding the foregoing limitation, in connection with a Participant's initial service as an Employee, an Employee may be granted Options covering up to an additional 2,000,000 Shares.

(c)  *Term of Option.*   The Administrator will determine the term of each Option in its sole discretion. Any Option granted under the Plan will not be exercisable after the expiration of seven (7) years from the date of grant or such shorter term as may be provided in the Award Agreement. Moreover, in the case of an Incentive Stock Option granted to a Participant who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any Parent or Subsidiary, the term of the Incentive Stock Option will be five (5) years from the date of grant or such shorter term as may be provided in the Award Agreement.

A–6

(d)  *Option Exercise Price and Consideration.*

(i)  *Exercise Price.*  The per share exercise price for the Shares to be issued pursuant to exercise of an Option will be determined by the Administrator, but will be no less than 100% of the Fair Market Value per Share on the date of grant. In addition, in the case of an Incentive Stock Option granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price will be no less than 110% of the Fair Market Value per Share on the date of grant. Notwithstanding the foregoing provisions of this Section 6(c), Options may be granted with a per Share exercise price of less than 100% of the Fair Market Value per Share on the date of grant pursuant to a transaction described in, and in a manner consistent with, Section 424(a) of the Code. The Administrator may not modify or amend an Option to reduce the exercise price of such Option after it has been granted (except for adjustments made pursuant to Section 14 of the Plan) nor may the Administrator cancel any outstanding Option and replace it with a new Option, Stock Appreciation Right, or other Award with a lower exercise price, unless, in either case, such action is approved by the Company's stockholders.

(ii)  *Waiting Period and Exercise Dates.*  At the time an Option is granted, the Administrator will fix the period within which the Option may be exercised and will determine any conditions that must be satisfied before the Option may be exercised.

(iii)  *Form of Consideration.*  The Administrator will determine the acceptable form(s) of consideration for exercising an Option, including the method of payment, to the extent permitted by Applicable Laws.

(e)  *Exercise of Option.*

(i)  *Procedure for Exercise; Rights as a Stockholder.*  Any Option granted hereunder will be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the Administrator and set forth in the Award Agreement. An Option may not be exercised for a fraction of a Share.

An Option will be deemed exercised when the Company receives: (i) notice of exercise (in such form as the Administrator specify from time to time) from the person entitled to exercise the Option, and (ii) full payment for the Shares with respect to which the Option is exercised (together with an applicable withholding taxes). No adjustment will be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided in Section 14 of the Plan.

(ii)  *Termination of Relationship as a Service Provider.*  If a Participant ceases to be a Service Provider, other than upon the Participant's termination as the result of the Participant's death or Disability, the Participant may exercise his or her Option within such period of time as is specified in the Award Agreement to the extent that the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement). In the absence of a specified time in the Award Agreement, the Option will remain exercisable for three (3) months following the Participant's termination. Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan. If after termination the Participant does not exercise his or her Option within the time specified by the Administrator, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(iii)  *Disability of Participant.*  If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her Option within such

A–7

period of time as is specified in the Award Agreement to the extent the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement). In the absence of a specified time in the Award Agreement, the Option will remain exercisable for twelve (12) months following the Participant's termination. Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan. If after termination the Participant does not exercise his or her Option within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(iv)    *Death of Participant.*    If a Participant dies while a Service Provider, the Option may be exercised following the Participant's death within such period of time as is specified in the Award Agreement to the extent that the Option is vested on the date of death (but in no event may the option be exercised later than the expiration of the term of such Option as set forth in the Award Agreement), by the Participant's designated beneficiary, provided such beneficiary has been designated prior to Participant's death in a form acceptable to the Administrator. If no such beneficiary has been designated by the Participant, then such Option may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the Option is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. In the absence of a specified time in the Award Agreement, the Option will remain exercisable for twelve (12) months following Participant's death. Unless otherwise provided by the Administrator, if at the time of death Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will immediately revert to the Plan. If the Option is not so exercised within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(v)    *Other Termination.*    A Participant's Award Agreement may also provide that if the exercise of the Option following the termination of Participant's status as a Service Provider (other than upon the Participant's death or Disability) would result in liability under Section 16(b), then the Option will terminate on the earlier of (A) the expiration of the term of the Option set forth in the Award Agreement, or (B) the 10th day after the last date on which such exercise would result in such liability under Section 16(b). Finally, a Participant's Award Agreement may also provide that if the exercise of the Option following the termination of the Participant's status as a Service Provider (other than upon the Participant's death or disability) would be prohibited at any time solely because the issuance of Shares would violate the registration requirements under the Securities Act, then the Option will terminate on the earlier of (A) the expiration of the term of the Option, or (B) the expiration of a period of three (3) months after the termination of the Participant's status as a Service Provider during which the exercise of the Option would not be in violation of such registration requirements.

7.    *Stock Appreciation Rights.*

(a)    *Grant of Stock Appreciation Rights.*    Subject to the terms and conditions of the Plan, a Stock Appreciation Right may be granted to Service Providers at any time and from time to time as will be determined by the Administrator, in its sole discretion.

(b)    *Number of Shares.*    The Administrator will have complete discretion to determine the number of Stock Appreciation Rights granted to any Participant, provided that during any Fiscal Year, no Participant will be granted Stock Appreciation Rights covering more than 1,000,000 Shares. Notwithstanding the foregoing limitation, in connection with a Participant's initial service

A–8

as an Employee, an Employee may be granted Stock Appreciation Rights covering up to an additional 2,000,000 Shares.

(c)  *Exercise Price and Other Terms*.   The Administrator, subject to the provisions of the Plan, will have complete discretion to determine the terms and conditions of Stock Appreciation Rights granted under the Plan, provided, however, that the exercise price will be not less than 100% of the Fair Market Value of a Share on the date of grant. The Administrator may not modify or amend a Stock Appreciation Right to reduce the exercise price of such Stock Appreciation Right after it has been granted (except for adjustments made pursuant to Section 14 of the Plan) nor may the Administrator cancel any outstanding Stock Appreciation Right and replace it with a new Stock Appreciation Right, Option, or other Award with a lower exercise price, unless, in either case, such action is approved by the Company's stockholders.

(d)  *Stock Appreciation Right Agreement*.   Each Stock Appreciation Right grant will be evidenced by an Award Agreement that will specify the exercise price, the term of the Stock Appreciation Right, the conditions of exercise, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

(e)  *Expiration of Stock Appreciation Rights*.   A Stock Appreciation Right granted under the Plan will expire upon the date determined by the Administrator, in its sole discretion, and set forth in the Award Agreement. Notwithstanding the foregoing, the rules of Section 6(e) also will apply to Stock Appreciation Rights.

(f)  *Payment of Stock Appreciation Right Amount*.   Upon exercise of a Stock Appreciation Right, a Participant will be entitled to receive payment from the Company in an amount determined by multiplying:

(i)  The difference between the Fair Market Value of a Share on the date of exercise over the exercise price; times

(ii)  The number of Shares with respect to which the Stock Appreciation Right is exercised.

At the discretion of the Administrator, the payment upon Stock Appreciation Right exercise may be in cash, in Shares of equivalent value, or in some combination thereof.

8.  *Restricted Stock*.

(a)  *Grant of Restricted Stock*.   Subject to the terms and provisions of the Plan, the Administrator, at any time and from time to time, may grant Shares of Restricted Stock to Service Providers in such amounts as the Administrator, in its sole discretion, will determine.

(b)  *Restricted Stock Agreement*.   Each Award of Restricted Stock will be evidenced by an Award Agreement that will specify the Period of Restriction, the number of Shares granted, and such other terms and conditions as the Administrator, in its sole discretion, will determine. Notwithstanding the foregoing sentence, during any Fiscal Year no Participant will receive more than an aggregate of 300,000 Shares of Restricted Stock; provided, however, that in connection with a Participant's initial service as an Employee, an Employee may be granted an aggregate of up to an additional 600,000 Shares of Restricted Stock. Unless the Administrator determines otherwise, Shares of Restricted Stock will be held by the Company as escrow agent until the restrictions on such Shares have lapsed.

(c)  *Transferability*.   Except as provided in this Section 8, Shares of Restricted Stock may not be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated until the end of the applicable Period of Restriction.

(d)  *Other Restrictions*.   The Administrator, in its sole discretion, may impose such other restrictions on Shares of Restricted Stock as it may deem advisable or appropriate.

(e)  *Removal of Restrictions*.   Except as otherwise provided in this Section 8, Shares of Restricted Stock covered by each Restricted Stock grant made under the Plan will be released from escrow as soon as practicable after the last day of the Period of Restriction. The Administrator, in its discretion, may accelerate the time at which any restrictions will lapse or be removed.

(f)  *Voting Rights*.   During the Period of Restriction, Service Providers holding Shares of Restricted Stock granted hereunder may exercise full voting rights with respect to those Shares, unless the Administrator determines otherwise.

(g)  *Dividends and Other Distributions*.   During the Period of Restriction, Service Providers holding Shares of Restricted Stock will be entitled to receive all dividends and other distributions paid with respect to such Shares unless otherwise provided in the Award Agreement. If any such dividends or distributions are paid in Shares, the Shares will be subject to the same restrictions on transferability and forfeitability as the Shares of Restricted Stock with respect to which they were paid.

(h)  *Return of Restricted Stock to Company*.   On the date set forth in the Award Agreement, the Restricted Stock for which restrictions have not lapsed will revert to the Company and again will become available for grant under the Plan.

9.  *Restricted Stock Units*.

(a)  *Grant*.   Restricted Stock Units may be granted at any time and from time to time as determined by the Administrator. Each Restricted Stock Unit grant will be evidenced by an Award Agreement that will specify such other terms and conditions as the Administrator, in its sole discretion, will determine, including all terms, conditions, and restrictions related to the grant, the number of Restricted Stock Units and the form of payout, which, subject to Section 9(d), may be left to the discretion of the Administrator. Notwithstanding the anything to the contrary in this subsection (a), during any Fiscal Year of the Company, no Participant will receive more than an aggregate of 300,000 Restricted Stock Units; provided, however, that in connection with a Participant's initial service as an Employee, an Employee may be granted an aggregate of up to an additional 600,000 Restricted Stock Units.

(b)  *Vesting Criteria and Other Terms*.   The Administrator will set vesting criteria in its discretion, which, depending on the extent to which the criteria are met, will determine the number of Restricted Stock Units that will be paid out to the Participant. After the grant of Restricted Stock Units, the Administrator, in its sole discretion, may reduce or waive any restrictions for such Restricted Stock Units. Each Award of Restricted Stock Units will be evidenced by an Award Agreement that will specify the vesting criteria, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

(c)  *Earning Restricted Stock Units*.   Upon meeting the applicable vesting criteria, the Participant will be entitled to receive a payout as specified in the Award Agreement. Notwithstanding the foregoing, at any time after the grant of Restricted Stock Units, the Administrator, in its sole discretion, may reduce or waive any vesting criteria that must be met to receive a payout.

(d)  *Form and Timing of Payment*.   Payment of earned Restricted Stock Units will be made as soon as practicable after the date(s) set forth in the Award Agreement. The Administrator, in its sole discretion, may pay earned Restricted Stock Units in cash, Shares, or a combination thereof.

A–10

Shares represented by Restricted Stock Units that are fully paid in cash again will be available for grant under the Plan.

    (e)   *Cancellation.*   On the date set forth in the Award Agreement, all unearned Restricted Stock Units will be forfeited to the Company.

10.   *Performance Units and Performance Shares.*

    (a)   *Grant of Performance Units/Shares.*   Performance Units and Performance Shares may be granted to Service Providers at any time and from time to time, as will be determined by the Administrator, in its sole discretion. The Administrator will have complete discretion in determining the number of Performance Units/Shares granted to each Participant provided that during any Fiscal Year, (a) no Participant will receive Performance Units having an initial value greater than $2,000,000, and (b) no Participant will receive more than 300,000 Performance Shares. Notwithstanding the foregoing limitation, in connection with a Participant's initial service as an Employee, an Employee may be granted up to an additional 600,000 Performance Shares and additional Performance Units having an initial value up to $2,000,000.

    (b)   *Value of Performance Units/Shares.*   Each Performance Unit will have an initial value that is established by the Administrator on or before the date of grant. Each Performance Share will have an initial value equal to the Fair Market Value of a Share on the date of grant.

    (c)   *Performance Objectives and Other Terms.*   The Administrator will set performance objectives or other vesting provisions (including, without limitation, continued status as a Service Provider) in its discretion which, depending on the extent to which they are met, will determine the number or value of Performance Units/Shares that will be paid out to the Participant. The Administrator may set performance objectives based upon the achievement of Company-wide, divisional, or individual goals, or any other basis determined by the Administrator in its discretion. Each Award of Performance Units/Shares will be evidenced by an Award Agreement that will specify the Performance Period, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

    (d)   *Earning of Performance Units/Shares.*   After the applicable Performance Period has ended, the holder of Performance Units/Shares will be entitled to receive a payout of the number of Performance Units/Shares earned by the Participant over the Performance Period, to be determined as a function of the extent to which the corresponding performance objectives or other vesting provisions have been achieved. After the grant of a Performance Unit/Share, the Administrator, in its sole discretion, may reduce or waive any performance objectives or other vesting provisions for such Performance Unit/Share.

    (e)   *Form and Timing of Payment of Performance Units/Shares.*   Payment of earned Performance Units/Shares will be made as soon as practicable after the expiration of the applicable Performance Period. The Administrator, in its sole discretion, may pay earned Performance Units/Shares in the form of cash, in Shares (which have an aggregate Fair Market Value equal to the value of the earned Performance Units/Shares at the close of the applicable Performance Period) or in a combination thereof.

    (f)   *Cancellation of Performance Units/Shares.*   On the date set forth in the Award Agreement, all unearned or unvested Performance Units/Shares will be forfeited to the Company, and again will be available for grant under the Plan.

11.   *Performance Goals.*   The granting and/or vesting of Awards of Restricted Stock, Restricted Stock Units, Performance Shares and Performance Units and other incentives under the Plan may be made subject to the attainment of performance goals relating to one or more business criteria within the meaning of Section 162(m) of the Code and may provide for a targeted level or levels of

achievement ("Performance Goals") including one or more of the following measures: (a) Annual Revenue, (b) Cash Collections, (c) Customer Satisfaction MBOs, (d) Earnings Per Share, (e) Net Income, (f) New Orders, (g) Operating Profit, (h) Pro Forma Net Income, (i) Return on Designated Assets, (j) Return on Equity, (k) Return on Sales, and (l) Product Shipments. Any Performance Goals may be used to measure the performance of the Company as a whole or a business unit of the Company and may be measured relative to a peer group or index. The Performance Goals may differ from Participant to Participant and from Award to Award. Any criteria used may be (i) measured in absolute terms, (ii) compared to another company or companies, (iii) measured against the performance of the Company as a whole or a segment of the Company and/or (iv) measured on a pre-tax or post-tax basis (if applicable). Prior to the Determination Date, the Administrator will determine whether any significant element(s) will be included in or excluded from the calculation of any Performance Goal with respect to any Participant.

12.    *Leaves of Absence/Transfer Between Locations.*    Unless the Administrator provides otherwise, vesting of Awards granted hereunder will be suspended during any unpaid leave of absence. A Service Provider will not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company and its Affiliates. For purposes of Incentive Stock Options, no such leave may exceed ninety (90) days, unless reemployment upon expiration of such leave is guaranteed by statute or contract. If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then three (3) months following the ninety-first (91st) day of such leave any Incentive Stock Option held by the Participant will cease to be treated as an Incentive Stock Option and will be treated for tax purposes as a Nonstatutory Stock Option.

13.    *Transferability of Awards.*    Unless determined otherwise by the Administrator, an Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the Participant, only by the Participant. With the approval of the Administrator, a Participant may, in a manner specified by the Administrator, (a) transfer an Award to a Participant's spouse or former spouse pursuant to a court-approved domestic relations order which relates to the provision of child support, alimony payments or marital property rights, and (b) transfer an Option by bona fide gift and not for any consideration, to (i) a member or members of the Participant's immediate family, (ii) a trust established for the exclusive benefit of the Participant and/or member(s) of the Participant's immediate family, (iii) a partnership, limited liability company of other entity whose only partners or members are the Participant and/or member(s) of the Participant's immediate family, or (iv) a foundation in which the Participant and/or member(s) of the Participant's immediate family control the management of the foundation's assets. For purposes of this Section 13, "immediate family" shall mean the Participant's spouse, former spouse, children, grandchildren, parents, grandparents, siblings, nieces, nephews, parents-in-law, sons-in-law, daughters-in-law, brothers-in-law, sisters-in-law, including adoptive or step relationships and any person sharing the Participant's household (other than as a tenant or employee).

14.    *Adjustments; Dissolution or Liquidation; Merger or Change in Control.*

(a)    *Adjustments.*    In the event that any dividend or other distribution (whether in the form of cash, Shares, other securities, or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase, or exchange of Shares or other securities of the Company, or other change in the corporate structure of the Company affecting the Shares occurs, the Administrator, in order to prevent diminution or enlargement of the benefits or potential benefits intended to be made available under the Plan, may (in its sole discretion) adjust the number and class of Shares that may be delivered under the Plan and/or the number, class, and price of Shares covered by each outstanding Award, and the numerical Share limits set forth in Sections 3, 6, 7, 8, 9 and 10.

A-12

(b)  *Dissolution or Liquidation.*  In the event of the proposed dissolution or liquidation of the Company, the Administrator will notify each Participant as soon as practicable prior to the effective date of such proposed transaction. To the extent it has not been previously exercised, an Award will terminate immediately prior to the consummation of such proposed action.

(c)  *Change in Control.*  In the event of a Change in Control, each outstanding Award will be assumed or an equivalent option or right substituted by the successor corporation or a Parent or Subsidiary of the successor corporation (the "*Successor Corporation*"). In the event that the Successor Corporation refuses to assume or substitute for the Award, the Participant will fully vest in and have the right to exercise all of his or her outstanding Options and Stock Appreciation Rights, including Shares as to which such Awards would not otherwise be vested or exercisable, all restrictions on Restricted Stock will lapse, and, with respect to Restricted Stock Units, Performance Shares and Performance Units, all Performance Goals or other vesting criteria will be deemed achieved at target levels and all other terms and conditions met. In addition, if the Successor Corporation refuses to assume or substitute an Option or Stock Appreciation Right in the event of a Change in Control, the Administrator will notify the Participant in writing or electronically that the Option or Stock Appreciation Right will be fully vested and exercisable for a period of time determined by the Administrator in its sole discretion, and the Option or Stock Appreciation Right will terminate upon the expiration of such period.

For the purposes of this subsection (c), an Award will be considered assumed if, following the Change in Control, the Award confers the right to purchase or receive, for each Share subject to the Award immediately prior to the Change in Control, the consideration (whether stock, cash, or other securities or property) or, in the case of a Stock Appreciation Right upon the exercise of which the Administrator determines to pay cash or a Performance Share or Performance Unit which the Administrator can determine to pay in cash, the fair market value of the consideration received in the merger or Change in Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Change in Control is not solely common stock of the Successor Corporation, the Administrator may, with the consent of the Successor Corporation, provide for the consideration to be received upon the exercise of an Option or Stock Appreciation Right or upon the payout of a Restricted Stock Unit, Performance Share or Performance Unit, for each Share subject to such Award (or in the case of an Award settled in cash, the number of implied shares determined by dividing the value of the Award by the per share consideration received by holders of Common Stock in the Change in Control), to be solely common stock of the Successor Corporation equal in fair market value to the per share consideration received by holders of Common Stock in the Change in Control.

Notwithstanding anything in this Section 14(c) to the contrary, an Award that vests, is earned or paid−out upon the satisfaction of one or more Performance Goals will not be considered assumed if the Company or its successor modifies any of such Performance Goals without the Participant's consent; provided, however, a modification to such Performance Goals only to reflect the Successor Corporation's post−Change in Control corporate structure will not be deemed to invalidate an otherwise valid Award assumption.

15.  *Tax Withholding*

(a)  *Withholding Requirements.*  Prior to the delivery of any Shares or cash pursuant to an Award (or exercise thereof), the Company will have the power and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy federal, state, local, foreign or other taxes required to be withheld with respect to such Award (or exercise thereof).

(b)  *Withholding Arrangements.*  The Administrator, in its sole discretion and pursuant to such procedures as it may specify from time to time, may permit a Participant to satisfy such tax withholding obligation, in whole or in part by (without limitation) (a) paying cash, (b) electing to have the Company withhold otherwise deliverable cash or Shares having a Fair Market Value equal to the amount required to be withheld, (c) delivering to the Company already−owned Shares having a Fair Market Value equal to the amount required to be withheld, or (d) selling a sufficient number of Shares otherwise deliverable to the Participant through such means as the Administrator may determine in its sole discretion (whether through a broker or otherwise) equal to the amount required to be withheld. The amount of the withholding requirement will be deemed to include any amount which the Administrator agrees may be withheld at the time the election is made, not to exceed the amount determined by using the maximum federal, state or local marginal income tax rates applicable to the Participant with respect to the Award on the date that the amount of tax to be withheld is to be determined. The Fair Market Value of the Shares to be withheld or delivered will be determined as of the date that the taxes are required to be withheld.

16.  *No Effect on Employment or Service.*  Neither the Plan nor any Award will confer upon a Participant any right with respect to continuing the Participant's relationship as a Service Provider with the Company, nor will they interfere in any way with the Participant's right or the Company's right to terminate such relationship at any time, with or without cause, to the extent permitted by Applicable Laws.

17.  *Date of Grant.*  The date of grant of an Award will be, for all purposes, the date on which the Administrator makes the determination granting such Award, or such other later date as is determined by the Administrator. Notice of the determination will be provided to each Participant within a reasonable time after the date of such grant.

18.  *Term of Plan.*  Subject to Section 22 of the Plan, the Plan will become effective upon its adoption by the Board. It will continue in effect for a term of ten (10) years unless terminated earlier under Section 19 of the Plan.

19.  *Amendment and Termination of the Plan.*

(a)  *Amendment and Termination.*  The Administrator may at any time amend, alter, suspend or terminate the Plan.

(b)  *Stockholder Approval.*  The Company will obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply with Applicable Laws.

(c)  *Effect of Amendment or Termination.*  No amendment, alteration, suspension or termination of the Plan will impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing and signed by the Participant and the Company. Termination of the Plan will not affect the Administrator's ability to exercise the powers granted to it hereunder with respect to Awards granted under the Plan prior to the date of such termination.

20.  *Conditions Upon Issuance of Shares.*

(a)  *Legal Compliance.*  Shares will not be issued pursuant to the exercise of an Award unless the exercise of such Award and the issuance and delivery of such Shares will comply with Applicable Laws and will be further subject to the approval of counsel for the Company with respect to such compliance.

(b)  *Investment Representations.*  As a condition to the exercise of an Award, the Company may require the person exercising such Award to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention

A−14

to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

21.   *Inability to Obtain Authority.*   The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, will relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority will not have been obtained.

22.   *Stockholder Approval.*   The Plan will be subject to approval by the stockholders of the Company within twelve (12) months after the date the Plan is adopted. Such stockholder approval will be obtained in the manner and to the degree required under Applicable Laws.

## Proxy — UTSTARCOM, INC.

Dear Stockholder:

Please take note of the important information enclosed with this Proxy. The issues discussed herein, related to the operation of the Company, require your immediate attention.

Your vote counts, and you are strongly encouraged to exercise your right to vote your shares.

Please mark the boxes on the proxy card to indicate how your shares will be voted. Then sign the card and return your proxy in the enclosed postage paid envelope.

Thank you in advance for your prompt consideration of these matters.

Sincerely,

UTStarcom, Inc.

**UTSTARCOM, INC.**
**1275 Harbor Bay Parkway**
**Alameda, California 94502**

**SOLICITED BY THE BOARD OF DIRECTORS FOR THE ANNUAL MEETING OF STOCKHOLDERS**

The undersigned hereby appoint(s) Hong Liang Lu and Francis P. Barton, or any one of the two, with the power to appoint their respective substitutes, and hereby authorize(s) them as proxies to represent and vote as designated on the reverse side, all shares of common stock of the UTStarcom, Inc. (the **"Company"**) held of record by the undersigned on May 25, 2006 at the Annual Meeting of Stockholders to be held on July 21, 2006 and any adjournments thereof.

**THIS PROXY WHEN PROPERLY EXECUTED WILL BE VOTED AS DIRECTED. IF NO DIRECTION IS GIVEN WITH RESPECT TO THE PROPOSAL, THIS PROXY WILL BE VOTED FOR SUCH PROPOSAL.**

**PLEASE COMPLETE, DATE, SIGN AND RETURN THIS PROXY CARD PROMPTLY, USING THE ENCLOSED ENVELOPE. NO POSTAGE IS REQUIRED IF MAILED IN THE UNITED STATES.**

**CONTINUED AND TO BE SIGNED ON THE REVERSE SIDE**

**SEE REVERSE SIDE**

**SEE REVERSE SIDE**

## Telephone and Internet Voting Instructions

**You can vote by telephone OR Internet! Available 24 hours a day 7 days a week!**
Instead of mailing your proxy, you may choose one of the two voting methods outlined below to vote your proxy.

**To vote using the Telephone (within U.S. and Canada)**

- Call toll free 1−800−652−VOTE (8683) in the United States or Canada any time on a touch tone telephone. There is **NO CHARGE** to you for the call.

- Follow the simple instructions provided by the recorded message.

**To vote using the Internet**

- Go to the following web site: **WWW.COMPUTERSHARE.COM/EXPRESSVOTE**

- Enter the information requested on your computer screen and follow the simple instructions.

**VALIDATION DETAILS ARE LOCATED ON THE FRONT OF THIS FORM IN THE COLORED BAR.**

If you vote by telephone or the Internet, please **DO NOT** mail back this proxy card.

Proxies submitted by telephone or the Internet must be received by 1:00 a.m., Central Time, on July 21, 2006.

**THANK YOU FOR VOTING**

**UTSTARCOM**

MR A SAMPLE
DESIGNATION (IF ANY)
ADD 1
ADD 2
ADD 3
ADD 4
ADD 5
ADD 6

000004

Least Address Line

000000000.000 ext
000000000.000 ext
000000000.000 ext
000000000.000 ext
000000000.000 ext
000000000.000 ext
000000000.000 ext

C  1234567890        J N T

☐  Mark this box with an X if you have made changes to your name or address details above.

---

**Annual Meeting Proxy Card**      123456      C0123456789      12345

---

A.  **Election of Directors**            **PLEASE REFER TO THE REVERSE SIDE FOR TELEPHONE AND INTERNET VOTING INSTRUCTIONS.**

1.  The Board of Directors recommends a vote FOR the listed nominees.

|  | For | Withhold |
|---|---|---|
| 01—Jeff Clarke | ☐ | ☐ |
| 02—Hong Liang Lu | ☐ | ☐ |

B.  **Proposals**

The Board of Directors recommends a vote FOR the following proposals.

|  |  | For | Withhold | Abstain |
|---|---|---|---|---|
| 2. | Adoption of the 2006 Equity Incentive Plan. | ☐ | ☐ | ☐ |
| 3. | Ratify the appointment of PricewaterhouseCoopers LLP as independent registered public accounting firm. | ☐ | ☐ | ☐ |

In their discretion, the Proxies are authorized to vote upon such other business that may properly come before the meeting.

C.  **Authorized Signatures—Sign Here—This section must be completed for your instructions to be executed.**

Please sign exactly as your name appears hereon. Joint owners should each sign. Executors, administrators, trustees, guardians or other fiduciaries should give full title as such. If signing for a corporation, please sign in full corporate name by a duly authorized officer.

| Signature 1—Please keep signature within the box | Signature 2—Please keep signature within the box | Date (mm/dd/yyyy) |
|---|---|---|
| | | /        / |

0 0 9 6 5 8 1        1 U P X                C O Y

QuickLinks

YOUR VOTE IS IMPORTANT
QUESTIONS AND ANSWERS ABOUT THE PROXY STATEMENT AND VOTING AT THE ANNUAL MEETING
PROPOSAL NO. 1 ELECTION OF DIRECTORS
BOARD OF DIRECTORS
SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS, DIRECTORS AND MANAGEMENT
MANAGEMENT
Summary Compensation Table
Option Grants in Last Fiscal Year
Aggregate Option Exercises in Last Fiscal Year and Fiscal Year End Option Values
REPORT OF THE COMPENSATION COMMITTEE
REPORT OF THE AUDIT COMMITTEE
PROPOSAL NO. 2 APPROVAL OF THE 2006 EQUITY INCENTIVE PLAN
PROPOSAL NO. 3 RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
COMPANY'S STOCK PERFORMANCE
STOCK PRICE PERFORMANCE GRAPH FOR UTSTARCOM, INC. COMPARISON OF 5-YEAR CUMULATIVE TOTAL RETURN* AMONG UTSTARCOM, INC., THE NASDAQ STOCK MARKET (U.S. & FOREIGN) INDEX AND THE S & P WIRELESS TELECOMMUNICATION SERVICES INDEX
CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
OTHER MATTERS
ANNEX A UTSTARCOM, INC. 2006 EQUITY INCENTIVE PLAN