Mark Punzalan (State Bar No. 247599)
mpunzalan@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone:  (415) 398-8700
Facsimile:  (415) 398-8704

[Additional Counsel Listed on Signature Page]

Lead Counsel

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

PETER RUDOLPH, individually and on
behalf of all others similarly situated,

             Plaintiff,

      vs.

UTSTARCOM, HONG LIANG LU, YING
WU, MICHAEL SOPHIE, FRANCIS
BARTON, AND THOMAS TOY,

            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:07-CV-04578-SI

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED
CLASS ACTION COMPLAINT**

Date:  August 22, 2008
Time:  9:00 a.m.

Before:  Hon. Susan Illston

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................i

ISSUES TO BE DECIDED (LOCAL RULE 7-4(a)(3) ............................................... 2

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

ARGUMENT .............................................................................................................. 6

I.      LEAD PLAINTIFFS' SECOND AMENDED COMPLAINT COMPORTS WITH THE HEIGHTENED PLEADING REQUIREMENTS OF THE REFORM ACT ................... 6

II.     PLAINTIFF HAS ADEQUATELY PLED A SECTION 10(b) VIOLATION .................. 7

        A.      THE SAC ESTABLISHES A STRONG INFERENCE THAT UTSTARCOM AND THE INDIVIDUAL DEFENDANTS ACTED WITH SCIENTER .......................................................................... 7

                1.      The Magnitude of the Restatement and Pervasive GAAP Violations Support a Strong Inference of Scienter ................... 8

                2.      The SEC Consent Judgments Contribute to a Strong Inference of Scienter ......................................................................... 10

                3.      The Individual Defendants' Involvement In Issuing and Authorizing Backdated Options Creates a Strong Inference of Scienter ..................... 10

                4.      The Individual Defendants' Discretionary Grants Demonstrate A Pervasive Pattern of Options Backdating Occurring Over a Three Year Period ......................................................................... 12

                5.      Defendants' Self-Serving Internal Investigation Results Do Not Negate Scienter ................................................................... 13

                6.      Defendants Lu, Sophie and Barton's SOX Certifications Support a Strong Inference of Scienter ......................................... 14

                7.      The Individual Defendants Profited Handsomely from the Fraud ........... 15

                8.      The Confidential Witnesses Support a Strong Inference of Scienter ....... 17

                9.      There is a Strong Inference that The Company Acted with Scienter .... 19

        B.      PLAINTIFF HAS ADEQUATELY ALLEGED LOSS CAUSATION AS TO THE NOVEMBER 7, 2006 ANNOUNCMENT ................................................. 19

III.  PLAINTIFF'S SECTION 14(a) CLAIM CLEARLY SATISFIES THE  PLEADING
      REQUIREMENTS OF THE REFORM ACT ............................................................. 22

      A.  PLAINTIFF HAS CLEARLY ALLEGED THE "ESSENTIAL  LINK"
          ELEMENT ............................................................................................. 23

      B.  PLAINTIFF HAS ADEQUATELY PLED A STRONG INFERENCE
          OF  NEGLIGENCE ................................................................................. 24

IV.   PLAINTIFF HAS ADEQUATELY PLED CONTROL PERSON LIABILITY
      PURSUANT TO SECTION 20(a) ...................................................................... 24

V.    CONCLUSION ............................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

*Batwin v. Occam Networks, Inc.*, 07-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008) ----- 11

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) -------------------------------------- 20, 21, 22

*Franklin v. Ernst*, 571 F. Supp. 829 (N.D. Ohio 1983) --------------------------------------- 23

*Freeland v. Iridium World Communications*, 233 F.R.D. 40 (D.D.C. 2006)--------------------22

*Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000) ------------------------------- 11, 25

*In re Adaptive Broadband Sec. Litig.*, No. 01-1092,

   2002 WL 989478  (N.D. Cal. April 2, 2002) --------------------------------------------- 9

*In re Bradley Pharms. Sec. Litig.*, 421 F. Supp. 2d 822 (D.N.J. 2006)--------------------------20

*In re CNET Networks, Inc.*, 483 F. Supp. 2d 947 (N.D. Cal. 2007) ---------------------- 9, 12, 13

*In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069 (N.D. Cal. 2005)------------ 9

*In re Cylink Sec. Litig.*, 178 F.Supp. 2d 1077 (N.D. Cal. 2001)--------------------------------- 7, 9

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) --------------------------------- 6, 7, 9, 19, 21

*In re Ditech Networks, Inc. Derivative Litig.*, No. 06-5157,

   2007 WL  2070300 (N.D. Cal. July 16, 2007) -------------------------------------------- 24

*In re Immune Response Sec. Litig.*, 347 F.Supp. 2d 983, 1025 (S.D. Cal. 2005) --------- 6, 7, 15

*In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255, 2006

   U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006)--------------------------------------------14

*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000) -------- 7, 9, 24

*In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501 (N.D. Ill. 2007)------------------------------20, 21

*In re Netflix, Inc. Sec. Litig.*, 04-2978, 2005 WL 1562858 (N.D. Cal. June 28, 2005)---------16

*In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236 (S.D.N.Y. 2007) ------------------------ 12

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008)-----------------21

*In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 3d 1172 (N.D. Cal. 2007)----------------24

*In re Zoran Corp. Derivative Litig.*, 511 F. Supp.2d 986 (N.D. Cal. 2007) --- 11, 12, 15, 22, 24

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994)-------------------------------------------------25

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970)------------------------------------------- 22, 23

2  *No. 84 Employer-Teamster Join Council Pension Trust-Fund v. Am. West Holding Corp.*,

3     320 F.3d 920  (9th Cir. 2003)------------------------------------------------------------- 6, 7, 10

4  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,

5     380 F.3d 1226 (9th Cir. 2004) ------------------------------------------------------------------ 6

6  *Pareto v. F.D.I.C.*, 139 F.3d 696 (9th Cir. 1998)-----------------------------------------------19

7  *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480 (9th Cir. 1995)----------------------------20

8  *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697 (M.D.N.C. 1992)-------------------------23

9  *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) --------------------------------20

10 *Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185 (N.D. Cal. 2008)----------------17

11 *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007)-------------------------------------------------11

12 *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998 (N.D. Cal. 2006)------------------ 6

13 *Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001)-------------------------------19

14 *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007)--------------------------6, 15

15 *U.S. v. Reyes*, No. 06-00556, 2007 WL 1574540 (N.D. Cal. May 30, 2007) --------------------- 9

16 *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007) -----------------------------22

17 *Weitschner v. Monterey Pasta Co.*, 03-0632, 2003 WL 22889372

18      (N.D. Cal. Nov. 4, 2003)------------------------------------------------------------------16

19                                    **Statutes**

20 109 Stat. 737 ------------------------------------------------------------------------------- 6

21 Pub. L. No. 104-67 -------------------------------------------------------------------------- 6

1

### ISSUES TO BE DECIDED (LOCAL RULE 7-4(a)(3)

2        1.      Has Plaintiff alleged fraud with sufficient particularity where he has specified

3 each misstatement alleged to be misleading and the reason why the statement is misleading?

4        2.      Has Plaintiff alleged with particularity facts that give rise to an inference of

5 scienter that is cogent and compelling, or at least as compelling as any opposing inference one

6 could draw from the facts?

7        3.      Has Plaintiff provided Defendants with an indication of the loss and its causal

8 connection where he has specifically pled corrective disclosures and subsequent share price

9 drops?

10        4.      Has Plaintiff adequately alleged that the misrepresentations were material to

11 the shareholders in deciding to vote and that the proxy was necessary for the vote in

12 question?

13        5.      Has Plaintiff adequately alleged that the Defendants acted negligently by

14 pleading particularized facts establishing Defendants' scienter?

15        **6.**      Does Section 804 of Sarbanes-Oxley extend the statute of limitations for

16 Plaintiff's § 14(a) claim for fraudulent conduct?

17        **7.**      Has Plaintiff pled a cause of action under § 20(a)

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

In Defendants' Motion to Dismiss (the "MTD") Plaintiff James R. Bartholomew's Second Amended Complaint (the "SAC"), Defendants argue that Plaintiff has not adequately pled scienter, loss causation, proxy fraud and control person liability.  Defendants are wrong. To the contrary, Plaintiff's SAC has clearly set forth actionable claims for securities and proxy fraud arising from a pervasive, long term options backdating scheme.  Indeed, Defendants have consented to a judgment finding that they violated the federal securities laws in connection with this misdating of option grants.

In their Motion, Defendants attempt, once again, to defy well-established precedent by individually picking apart each factual allegation pled by Plaintiff in an effort to disavow scienter.  Contrary to Defendants' piecemeal arguments, precedent dictates not only viewing the facts alleged by Plaintiff as true, but also *in toto*.  Doing so, it is clear that Plaintiff has pled facts giving rise to a strong inference of scienter.  From 2000 through 2002, **all** grants to the Individual Defendants were on unusually favorable dates and appear to have been backdated.  Each Individual Defendant took part in implementing these option grants.  A Confidential Witness directly observed the intentional alteration of documents for the purposes of backdating options.  And, perhaps most significantly, the United States Securities and Exchange Commission (the "SEC") found that the Company, Lu and Sophie had violated sections of the Exchange Act and that Lu and Sophie caused those violations.  Despite all of this, Defendants still have the temerity to argue that Plaintiff's SAC fails to plead scienter.

Plaintiff's well-pled allegations also readily satisfy the requirement for pleading loss causation for the November 6, 2007 announcement.  The Company's revelation of a historic option grant review and the resulting delay in its financial statements alerted a market currently in the grip of a pervasive options backdating scandal that UTStarcom was exposed, prompting a 9% drop in the Company's share price.

Defendants' challenges to Plaintiff's § 14(a) claims are equally meritless.   The SAC adequately pleads that the Individual Defendants used the 2005 and 2006 proxy solicitations

1    to maintain their positions on the board enabling them to continue the backdating scheme that

2    harmed shareholders, thereby establishing the "essential link" element.  Further, Plaintiff has

3    adequately pled particular facts as to the Individual Defendants' negligence.

4         Finally, Plaintiff has appropriately alleged control person liability against the

5    Defendants under Section 20(a) of the Exchange Act.  The SAC is replete with facts showing

6    that the Individual Defendants controlled the public statements at the heart of this securities

7    fraud and controlled the underlying options backdating.

8         For these reasons, as more fully stated herein, Defendants' Motion to Dismiss should

9    be denied.

10                        **STATEMENT OF FACTS**

11                             **The Scheme**

12        In a five-year scheme to wrongfully increase the remuneration of the officers, directors

13   and employees of UTStarcom[1] and inflate the Company's net income by underreporting

14   compensation expenses, the Individual Defendants intentionally manipulated stock option

15   grants by falsely "backdating" the grants so that options granted were "in the money" at the

16   time they were authorized.   The Governance Committee of UTStarcom's Board of Directors,

17   established to investigate the backdating, concluded that "certain members of management

18   bear varying degrees of responsibility for the deficiencies in the process by which options

19   were granted [during the period from UTSI's initial public offering in 2000 through at least

20   2005, which resulted in accounting errors]."  Def. Ex. F at 12.  In fact, the Individual

21   Defendants directly and intentionally participated in this scheme, granting, authorizing and

22   covering up the backdated options.

23        The backdating scheme eventually forced the Company to restate its financial

24   statements increasing its reported expenses and decreasing its net income for the last seven

25   years by approximately $25.8 million.  As a result of Defendants' wrongful conduct, the

26   _____

27   [1] UTStarcom manufactures, integrates and supports IP-based, end-to-end networking and
     telecommunications solutions.  ¶ 47.

28

1    Company's stock price plummeted from a Class Period high of $45.36 per share on August

2    21, 2003 to a low of $3.88 per share on July 24, 2007, after the Company finally disclosed the

3    full truth about its manipulation of stock options.

4         Throughout the Class Period, Defendants repeatedly and consistently misrepresented

5    to the investing public that all option grants[2] were made at the fair market value of

6    UTStarcom stock on the date of the grant, *i.e.,* the closing price of UTStarcom common stock

7    on the date of grant.  ¶¶ 56, 59, 60, 89, 94, 98, 102, 106, 116, 126, 136.  However, contrary to

8    their representations, Defendants have now admitted that they granted options using exercise

9    prices tied to prior dates and that most of these grants were actually priced lower than they

10   should have been, and thus were wrongfully "in-the-money" at the time of their authorization.

11   ¶¶ 8, 9, 155-159, 203-204.   In addition, in proxy statements from 2003-2006, the Defendants

12   misrepresented officer and director compensation by stating that the exercise price of the

13   options granted was the same as the fair market price of the stock on that day, thereby

14   misrepresenting the true value of said compensation and concealing that option grants were in

15   fact backdated.  ¶¶ 87-104.

16        This pervasive scheme extended over a period of five years and was well-known

17   throughout the Company.  ¶¶ 2, 187-196, 57-60, 62, 63, 170.  Confidential Witness No. 1

18   (CW#1), a former UTStarcom Human Resources Coordinator from 2005 through 2007 (¶

19   187), ***directly witnessed defendants Barton and Sophie personally participating in the***

20   ***alteration and fabrication of documents backdating options***.  ¶¶ 190, 193.  CW#1, further,

21   was ***directly instructed*** to backdate employment documents, although it appears from the

22   Company's proxy statement and Form 3 that these particular backdates did not make it

23   through the general counsel.  ¶¶ 190-191.  At this point, the reporting requirements under

24   _____

25

26   [2] As do many companies, UTStarcom, at the direction of its Board of Directors, used stock
     options as a form of compensation to recruit and retain key executives and employees.  ¶50.
27   Each of the Company's stock option plans gave the Board of Directors the power to interpret
     and administer the plans, including the power to decide to whom grants would be awarded
28   and at what strike price.  ¶¶49-51.

1  Sarbannes-Oxley had taken effect, making it infinitely more difficult for Defendants to

2  backdate paperwork by two months without raising suspicion, particularly for something as

3  highly publicized as Barton's hiring.  As such, it appears that the concerns raised by CW#1

4  within the Company successfully convinced Defendants not to backdate those options.  Of

5  course, millions of other options *were* successfully backdated by Defendants throughout the

6  Class Period.

7       These backdated option grants directly led to a material overstatement of UTStarcom's

8  net income and earnings per share ("EPS").  For every quarter and fiscal year from the fiscal

9  year ended December 31, 2002 through the quarter ended March 31, 2005, UTStarcom

10  showed increasing net income and EPS.  ¶¶ 108, 112, 114, 119, 121, 123, 129.  However,

11  these financial numbers were falsely buoyed by the backdating of options granted to

12  UTStarcom officers, directors and employees.  Even the periods where UTStarcom showed a

13  net loss (¶¶ 131, 133) would have been substantially worse but for Defendants' manipulation

14  of option grants.

15       In violation of GAAP, and contrary to Defendants' repeated assurances to the market

16  that options were granted at the market value of UTStarcom stock on the grant date,

17  Defendants routinely used exercise prices tied to prior dates when the stock price was lower

18  than the date on which Defendants were actually granting the option.  By doing so,

19  Defendants understated UTStarcom's compensation expenses which consequently -- and in

20  violation of Lu, Sophie and Barton's Sarbanes-Oxley Act certifications -- propped up the

21  Company's net income (loss) and earnings (loss) per share, which then led to the artificial

22  inflation of UTStarcom's stock price, throughout the Class Period.

23       The Individual Defendants directly and personally profited from the backdating of

24  options.  They were granted over 900,000 total options from 2000 to 2002 on dates when the

25  stock price was unusually low.  ¶¶ 72-82.  The Company's options review has confirmed that

26  the vast majority of options received.  ¶¶ 155-158.  As a result, the Individual Defendants

27  wrongfully reaped proceeds of over $38.8 million from stock sales during the Class Period. ¶¶

28  33-37.

1          **The Truth Emerges in a Series of Partial Disclosures**

2          In the wake of the growing options backdating scandals of late 2006 and early 2007,

3  on November 7, 2006, UTStarcom announced that it had begun a voluntary review of its

4  historical equity award grant practices and, significantly, that its third quarter financial results

5  would be delayed as a consequence of the investigation.  ¶¶ 202, 203.  On this news,

6  UTStarcom's stock price suffered a statistically significant drop of 9%, from $10.23 per share

7  on November 7, 2006 to a closing price of $9.32 per share on November 9, 2006.  ¶ 203.  On

8  July 24, 2007, the Company disclosed the results of this investigation.  As a result of

9  Defendants' manipulation of option grants, a restatement of Company financials of

10  approximately $28 million would be necessary.  ¶ 204.  Immediately following this

11  disclosure, UTStarcom's stock price dropped by 22%, from $4.73 per share on July 23, 2007

12  to $3.70 per share on July 25, 2007.  ¶ 204.

13          On October 10, 2007, upon issuing its Form 10-Q for the quarter ending on September

14  30, 2007 (the "2007 3rd Quarter 10-Q"), the Company announced that its Governance

15  Committee found that of the grant dates tested, 10.3 million stock options had been

16  backdated, resulting in an increase in additional non-cash stock-based compensation expenses

17  of $24.3 million.  ¶¶ 9, 157.

18          On May 1, 2008, the SEC filed a complaint against the Individual Defendants Lu and

19  Sohpie alleging that certain grants to UTStarcom officers were backdated.  ¶ 160.  That same

20  day,  Defendants Lu and Sophie settled with the SEC entering into consent judgments:  Lu

21  consenting to paying a civil penalty in the amount of $100,000 to the SEC, and Sophie

22  consented to paying a civil penalty in the amount of $75,000 to the SEC.  ¶¶ 163, 164.

23

24

25

26

27

28

## ARGUMENT

## I.    LEAD PLAINTIFFS' SECOND AMENDED COMPLAINT COMPORTS WITH THE HEIGHTENED PLEADING REQUIREMENTS OF THE REFORM ACT

When considering a motion to dismiss, a court must accept the allegations as true and construe them in the light most favorable to the plaintiffs.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 n.4 (2007); *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1011 (N.D. Cal. 2006) (citing *Schwarz v. U.S.*, 234 F.3d 428, 435 (9th Cir. 2001)).  These well-settled standards apply with equal force to cases brought under the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 ("PSLRA").[3] The basic purposes of the securities laws mandate that reasonable inferences suffice and that evidence need not be pleaded.[4]

The Ninth Circuit has consistently rejected, as did the Supreme Court in *Tellabs*, Defendants' formulaic approach, where only a "smoking gun" will suffice.  127 S. Ct. at 2510.  *Tellabs* seeks to preserve investors' ability to recover in meritorious claims."  *Id.* at 2509.  The Court must reject the piecemeal analysis advanced by Defendants here.  The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately

---

[3] *See, e.g.*, *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005) ("We accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs.") (citation omitted), *cert. denied*, 546 U.S. 1172 (2006); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1229 (9th Cir. 2004)("The general rule for 12(b)(6) motions is that allegations of material fact made in the complaint should be taken as true and construed in the light most favorable to the plaintiff).

[4]  *See No. 84 Employer-Teamster Joint Council Pension Trust-Fund v. Am. West Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003); *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005) ("Courts must be careful not to set the [post-PSLRA pleading] hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities laws.") (citation omitted).  Moreover, a complaint must be construed as a whole on a motion to dismiss.  *See Tellabs*, 127 S. Ct. at 2509 ("courts must consider the complaint in its entirety"); *see also Am. West*, 320 F.3d at 945 (reversing a district court dismissal because "although…some of Plaintiffs' allegations are individually lacking…the allegations in their totality are sufficient to meet the stringent pleading standard set forth in the PSLRA.").

1    prevail but whether the claimant is entitled to offer evidence to support the claims asserted.

2    *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir.1997).

3    **II.    PLAINTIFF HAS ADEQUATELY PLED A SECTION 10(b) VIOLATION**

In the SAC, Plaintiff has clearly asserted a violation of § 10(b) and SEC Rule 10b-5

4

5    promulgated thereunder.  Defendants argue that Plaintiff has not adequately pled Defendants'

scienter nor has he adequately pled loss causation as to the Company's November 7, 2006

6

7    partial disclosure.  MTD at 7.  Yet Plaintiff's SAC is replete with particularized facts that,

when viewed *in toto*, raise a strong inference of scienter.  Further, Plaintiff's SAC clearly

8

9    alleges that UTStarcom's announcement on November 7, 2006 constituted a partial disclosure

10   that forms an adequate premise for loss causation.

11           **A.    THE SAC ESTABLISHES A STRONG INFERENCE THAT
                     UTSTARCOM AND THE INDIVIDUAL DEFENDANTS ACTED WITH
12                   SCIENTER**

13           Plaintiff's allegations, when properly considered in their entirety, give rise to a strong

14   inference that Defendants acted with the requisite scienter throughout the Class Period.  To

15   plead scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a

16   strong inference that defendant acted with the required state of mind," 15 U.S.C. § 78u-

17   4(b)(2).  Both direct and circumstantial evidence, indicating either conscious misconduct or

18   deliberate recklessness, will suffice.  *Daou*, 411 F.3d at 1015; *Provenz v. Miller*, 102 F.3d

19   1478, 1490 (9th Cir. 1996).  The alleged facts must give rise to an inference of scienter that is

20   "at least as compelling as any opposing inference one could draw from the facts alleged."

21   *Tellab*, 127 S. Ct. at 2509.

22           This Court and others in this Circuit have recognized that a wide range of factors can

23   satisfy the scienter threshold.[5]  Among those detailed in the SAC are the following:

24       •  Significant violations of GAAP standards.  (¶¶ 69, 172, 176-177)

25   _____

26   [5]     *See America West*, 320 F.3d at 942-47; *Daou*, 411 F.3d at 1022; *In re McKesson
     HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Ca. 2000);  *In re Cylink Sec. Litig.*,
27   178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001);  *In re Lattic Semiconductor Corp. Sec. Litig.*,

28   _____

- Substantial and material financial restatements.  (¶¶ 155-159, 170)
- False certifications signed by senior officers pursuant to SOX.  (¶¶ 144,147, 178-181)
- Personal financial gain, including increased stock option compensation.  (¶¶ 33-37, 182-186).
- Failure to check information that defendants had a duty to monitor. (¶¶ 39-45)
- Administrative investigations and settlements.  (¶¶ 160-166)

Based on these factors and others, Defendants' suggestion that the Court should assume that UTStarcom's misrepresentations were the result of innocuous error is ludicrous. The magnitude, duration and materiality of UTStarcom's admitted GAAP violations, the Individual Defendants' knowledge of the faulty accounting practices and direct involvement in the stock option granting process, and the specific information provided by the confidential witnesses regarding the Company's options backdating all combine to provide a cogent and compelling inference of scienter.  This inference is not only "cogent" and "compelling" – *it is the only logical inference to be drawn*.  In fact, when viewing these facts as true, the inference of scienter is far more compelling than the meritless excuse of a mere accounting error.

### 1. The Magnitude of the Restatement and Pervasive GAAP Violations Support a Strong Inference of Scienter

In order to accept Defendants' argument that all of these backdated options grants were the result of innocent error, the Court would have to assume that Defendants made the same mistake, at least thirty different times, for a period of several years.  Indeed, to the extent that Defendants point out that not all options were backdated during this period, this fact is extremely damning: if all of these backdated grants were indeed the result of systemic procedural errors, one would expect the grants to have been consistently backdated rather than backdated for some grants (when it suited Defendants' purposes) and not for others (when

No. CV04-1255-AA, 2006 WL 538756, at *17-18 (D. Or. Jan. 3, 2006); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 83,1022 (S.D. Cal. 2005).

1    Defendants apparently feared detection).  The fact that the backdating appears to have been

2    curtailed after the passage of Sarbanes-Oxley further indicates that, prior to that time,

3    Defendants had been consciously backdating these grants and then grew more cautious due to

4    increased regulatory scrutiny.

5         The pervasive, long term, repeated financial misstatements which gave rise to

6    UTStarcom's GAAP violations and Restatement contribute mightily to a strong inference that

7    Defendants acted with intent or deliberate recklessness.[6]  As a result of the options

8    backdating, Defendants were forced to record an addition $24.3 million in compensation

9    expenses in connection with at least 31 option grants over a period of several years.  "When

10   significant GAAP violations are described with particularity in the complaint, they may

11   provide powerful indirect evidence of scienter.  After all, books do not cook themselves."

12   *McKesson*, 126 F. Supp. 2d at 1273.  This is particularly true in cases of options backdating,

13   which requires a conscious, intentional act to date such options on a day other than that in

14   which they are actually being authorized.  *See In re CNET Networks, Inc.*, 483 F. Supp. 2d

15   947, 956 (N.D. Cal. 2007).[7]   The misconduct and GAAP violations "constitute[d]

16   widespread and significant inflation of [earnings]" rather than the innocuous accounting errors

17

18
_____

19

20   [6] *See Cylink*, 178 F. Supp. 2d at 1084 (finding that the mere fact that the financials had to be
     restated supports an inference of scienter); *see also In re Cornerstone Propane Partners, L.P.*,

21   355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005)(holding that allegations of GAAP violations
     provide support for plaintiffs' allegations of scienter); *see also In re Adaptive Broadband Sec.*

22   *Litig.*, No. 01-1092, 2002 WL 989478, at *14 (N.D. Cal. April 2, 2002) (finding that a
     restatement is sufficient to support a scienter inference when coupled with strong evidence of

23   deliberately reckless accounting).

24   [7] The Individual Defendants were well aware of the requirements of APB No. 25.  For
     example, Defendants Lu, Sophie signed the Company's 2003 SEC Form 10-K and

25   Defendants Lu and Barton signed the Company's 2006 SEC Form 10-K, both of which
     contained financial statements explaining the rule and its effect on UTStarcom's financial

26   results.  As Judge Breyer recently noted: "If APB 25 precludes *anything*, it prohibits
     companies from deliberately choosing a strike price based on a favorable historical date and

27   then, even under circumstances where the intrinsic value of the grant is clear, pretending that
     the [in-the-money] option was granted earlier than it actually was."  *U.S. v. Reyes*, No. C06-

28   00556 CRB, 2007 WL 1574540, at *3 (N.D. Cal. May 30, 2007) (emphasis in original).

Plaintiff's Opposition to Defendants' MTD the SAC                                     9
3:07-CV-04578-SI

suggested by Defendants.  *Daou*, 411 F.3d at 1017 (quoting *McKesson*, 126 F. Supp. 2d at

1273).  As such, they strongly contribute to a compelling inference of scienter.

### 2.    The SEC Consent Judgments Contribute to a Strong Inference of Scienter

On May 1, 2008, the SEC filed a complaint in the United States District Court for the

Northern District of California, against Defendants Lu and Sophie alleging that "[c]ertain

grants to UTSI officers were backdated or accounted for with incorrect grant dates prior to the

proper authorization of the grant by the company's Compensation Committee.  This resulted

in an exercise price below market price on the date of the grant, yet no expense was recorded

by the company."  ¶ 160.  The SEC's complaint further alleges that "UTSI failed to establish

and implement adequate internal controls for the granting of employee stock options.  Among

other things, UTSI failed to maintain necessary documentation showing when the grants were

actually authorized by the Compensation Committee."  ¶ 161.

On that same day, Defendants Lu and Sophie settled with the SEC, both paying a civil

penalty.  ¶ 164.  The Court issued an administrative order finding that UTStarcom had

violated sections of the Exchange Act and that Defendants Lu and Sophie had caused those

violations. ¶ 165.  Both Lu and Sophie agreed to cease and desist from violating the corporate

reporting, books and records and internal controls provisions of the federal securities laws,

and to cease and desist from causing such violations and violating the certification provisions

of the federal securities laws.  *Id*.  These judicially established facts that the Company, Lu and

Sophie violated sections of the Exchange Act and that Lu and Sophie caused those violations

strongly support a compelling inference of scienter.  *See America West*, 320 F.3d at 942

### 3.    The Individual  Defendants' Involvement In Issuing and Authorizing Backdated Options Creates a Strong Inference of Scienter

Defedants assert that the allegations of scienter as to the Individual Defendants fail

since Plaintiff cannot allege scienter against defendants as an "undifferentiated group."  MTD

at 9.  However, Plaintiffs state clearly that each Individual Defendant played a role in the

1    option granting process.  The complaint specifically alleges that Defendants Lu, Wu, Sophie,

2    Barton and Toy, as members of the Board of Directors, had direct individual involvement

3    with the granting, authorizing and approving of stock option grants.  ¶¶ 33-37.  Further, since

4    Plaintiff's allegations do not depend entirely on defendants' signing of SEC filings, they are

5    not premised on the group pleading doctrine.  *Batwin v. Occam Networks, Inc.*, No. CV 07-

6    2750, 2008 WL 2676364, *10 (C.D. Cal. July 1, 2008).

7         The complaint details Defendants Lu, Wu, Sophie, Toy and Barton's specific

8    involvement with the Company's public statements that materially misrepresented the

9    Company's true financial results.  ¶¶ 33-37, 107-109, 111, 113, 117-119, 121, 123, 125, 127-

10   129, 131, 133, 135, 137-139, 141, 144-147.  Further, the complaint alleges the exact amounts

11   by which the Individual Defendants Lu, Wu, Sophie and Toy profited from sales of their

12   shareholdings while the backdating of options was concealed and UTStarcom's earnings were

13   inflated.  ¶¶ 182-186.

14        The Individual Defendants directed, authorized, and approved the backdated option

15   grants. ¶¶ 33-37.  It is sheer fantasy to suggest that the individuals who implemented the

16   stock option program, ran the committee and approved the stock options were oblivious to the

17   pervasive accounting violations:  *See Ryan v. Gifford*, 918 A.2d 341, 354 n.35 (Del. Ch.

18   2007).  "[S]ubstantial participation or intricate involvement in the preparation of fraudulent

19   statements is grounds for primary liability even though that participation might not lead to the

20   actor's actual making of the statements." *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1061 n.

21   5 (9th Cir.2000).

22        The Individual Defendants played an active role in effecting the option program while

23   simultaneously maximizing the company's reported revenues. ¶¶ 39-45, 58.  These facts alone

24   may give rise to a strong inference of scienter.  *Batwin*, 2008 WL 2676364, *10.  The

25   Individual Defendants "knew or were deliberately reckless in not knowing that the stock

26   options were not being issued at fair market value on the date of the grant." *In re Zoran Corp.*

27   *Derivative Litig.*, 511 F. Supp. 2d 986, 1013 (N.D. Cal. 2007).  Thus, their involvement in the

28

issuing and authorizing of the backdated stock option grants supports a strong inference of scienter.

### 4. The Individual Defendants' Discretionary Grants Demonstrate A Pervasive Pattern of Options Backdating Occurring Over a Three Year Period

Defendants once again make the argument that Plaintiff has "cherry-picked" grant dates and therefore cannot establish scienter. To the contrary, Plaintiff has focused on a subset of option grants to the Individual Defendants made pursuant to discretionary option plans of the Company. ¶ 56-60. The inherent flexibility in choosing grant dates for these options, and the Individual Defendants' obvious pecuniary interest in their own options, makes these grants susceptible to backdating manipulation, and thus particularly worthy of the Court's scrutiny. *Zoran*, 511 F. Supp. 2d at 1005.

As Plaintiff states in the SAC: "[a]ll of the options granted to executives, namely Defendants Lu, Wu and Sophie during the years 2000 to 2002 were granted by the Compensation Committee at unusually favorable dates, consistently made at or near yearly lows and/or were just before a large increase in the stock price – *every single one*." ¶ 86. These options constitute **all** of the grants to the Individual Defendants from 2000 through 2002. Completely random, with no apparent pattern, these grants are inherently suspect: the only determinant for the timing of their grants appears to have been that these were opportune dates and prices for Individual Defendants to backdate their options and receive instant paper profits. ¶¶ 73-82. Defendants provide no factual counterargument to explain away the fact that every option granted to the Individual Defendants in 2000 and 2002 occurred on an unusually favorable date. The fact that ***every single option grant*** to the Individual Defendants during this period appears to have been backdated indicates a pattern and practice that can only have been the result of intentional fraud. *See CNET*, 483 F. Supp. 2d at 957. This inference is further bolstered by the fact that this pattern abruptly ends immediately after the passage of Sarbanes-Oxley. *See Zoran*, 511, F. Supp. 2d at 1005; *see also In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007).

**5.**     **Defendants' Self-Serving Internal Investigation Results Do Not Negate Scienter**

UTStarcom's Governance Committee conducted a seriously flawed and biased investigation and that appears likely to have significantly underestimated the loss caused by the options backdating scheme.  Once the true problem was uncovered, they skewed the results of the restatement by examining all of the option grants in the categories where there were few problems, and selectively testing the "other merit" grants category where the largest percentage of the problem grants occurred.  *See* Def. Ex. F at 10.

First, the Review Committee found that there were 301 grants that occurred during the review period, yet they tested only 128 grants - less than half.   As reported, out of 128 grants tested, the Company was forced to change the measurement date for 53 grants.  *Id*.  Thirty-seven or 70% of the option grant dates changed were in the "other merit" category, a fully discretionary type of grant.  *Id*.  The fact that 70% of the option grants in this category required a changing of measurement date should have been a red flag to the Review Committee that the majority of the option grant date problems were in this category.  *Id*.  Adding to the warning signs that this category was a major problem, 21 of the 31 or 68% of the measurement dates changed that resulted in additional compensation expenses were from this category.  *Id*.  Furthermore, of the 41 "other merit" option grants tested, 37 or 90% of the option grants had their measurement dates changes.  *Id*.  Rather than continue testing at the source of the problem to ensure that their restatement would be accurate, the Review Committee was apparently satisfied with these results.  Nearly all of the option grants (90%) reviewed from this category, however, had grant date problems, and more than two-thirds (68%) of all of the option grants that required additional compensation expense were from this category.  Clearly this option grant class required the highest level of review, yet the Review Committee chose only to test 41 of 96 (or just 43%) of the option grants in this category in the internal investigation.  *Id*.  It seems Defendants were afraid of what they would find in a more thorough inquiry.

1    Almost 25 percent of all grants tested required additional compensation expenses.  Yet

2    the Review Committee provides no indicia of the years during which these misdated grants

3    occurred.  It is essential to consider that the review tested grants from February 29, 2000

4    through August of 2006.  The majority of this period followed the passage of Sarbannes-

5    Oxley.  Thus, a strong inference exists that a majority, if not all of the grants requiring

6    additional compensation expenses took place before the passage of Sarbannes-Oxley, when

7    Defendants could engage in the backdating practice without regulatory scrutiny.  By

8    extending the sample period, Defendants were effectively able to create the illusion that the

9    misdated grants formed a smaller percentage of all the grants issued.

10    Because the internal investigation ignored and failed to test the majority of the type of

11    grants that were most likely to be backdated, and skewed its sample so as to minimize the

12    appearance of intentional backdating, its results are of extremely limited significance and

13    cannot be offered up for exculpatory purposes by Defendants.  Rather, the skewed nature of

14    the investigation and its results serves only to confirm the likelihood that Defendants had

15    intentionally manipulated and backdated the Company's option grants.

16          **6.      Defendants Lu, Sophie and Barton's SOX Certifications
                      Support a Strong Inference of Scienter**

17

18    Defendants Lu, Sophie and Barton signed UTStarcom's financial statements, which

19    contained certifications pursuant to Section 906 of SOX, for *each* quarter from 3Q2002

20    through 2Q2005 as to Lu and Sophie and 3Q2005 through 2Q2006 as to Lu and Barton; *and*

21    for each annual report on SEC Form 10-K – 2002 through 2005 for Lu and Sophie and 2005

22    through 2006 for Lu and Barton.  These financial statements were materially false and

23    misleading, and each was restated by UTStarcom to correct the improper accounting for more

24    than 10.3 million options.  ¶¶105-142.

25    When a corporate officer with the explicit obligation to assess his company's internal

26    control certifies its financial reports, the company's later revelation that the reports were

27    materially false supports an inference that the officer either knew about the false statements,

28    or was reckless in not knowing that the company's disclosure controls were inadequate.

1   *Lattice Semiconductor*, 2006 WL 538756, at *17-18.  Lu, Sophie and Barton, three of

2   UTStarcom's most senior officers, are responsible for the fact, as UTStarcom belatedly

3   revealed, that "there were deficiencies with the process by which stock options were granted

4   during the period from our initial public offering in 2000 through at least 2005, which resulted

5   in accounting errors." ¶ 158.  Lu, Wu, Sophie, Barton and Toy, as members of the Board of

6   Directors who authorized and approved the option grant programs and Toy as a member of

7   the Audit and Compensation Committees were at least reckless in failing to discover and

8   disclose these deficiencies in the options granting process.  These facts raise a strong

9   inference that Lu, Sophie and Barton knowingly or recklessly issued false and misleading

10  SOX certifications representing that the Company's internal controls and procedures were

11  effective.  *E.g.  Immune Response*, 375 F. Supp. 2d at 1022 (citing *Novak v. Kasaks*, 216 F.3d

12  300, 308 (2d Cir. 2000).

13          **7.       The Individual Defendants Profited Handsomely from the Fraud**
            The Supreme Court emphasized in *Tellabs* that "personal financial gain may weigh

14  heavily in favor of a scienter inference."  127 S. Ct. at 2511.  Here, the option backdating

15  scheme was designed to overcompensate stock option recipients while avoiding reporting

16  material compensation expenses, which would have lowered earnings and exposed the illicit

17  compensation.  *See Zoran*, 511 F. Supp. 2d at 996-97.

18          The recipients of the backdated options – including Lu, Wu, Sophie and Toy –

19  benefited directly from the scheme because their options (a) had immediate value at the time

20  of issuance; (b) remained "in the money" even if UTStarcom's stock price declined; and (c)

21  were (or would have been) worth more upon exercise than they should have been.  Aside from

22  the fact that they completely ignore that the gains mentioned above were concrete and

23  quantifiable at the time the options were issued, Defendants' arguments that Plaintiff's Insider

24  Trading Allegations and Option Exercise Allegations do not evidence scienter are without

25  merit.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a.    A Rule 10b5-1 Trading Plan Does Not Negate Scienter

Defendants assert that the majority "of the identified sales… were made pursuant to Rule 10b5-1 trading plans."  MTD at 16.  They claim that because the sales are pursuant to such plans they "do not support a strong inference of scienter because they are planned well in advance, negating any inference that the trades were part of a fraudulent scheme to profit from high stock prices."  *Id.*  Yet, the Defendants provide us with no copy of these plans, nor can they be found in the Company's public filings.  Thus, Defendants' claim lacks sufficient detail to ascertain whether the insider sufficiently complied with the plan and whether the trades described in the complaint were covered by a then-existing plan.  *Cf. In re Netflix, Inc. Sec. Litig.*, No. C04-2978, 2005 WL 1562858, at *8 (N.D. Cal. June 28, 2005) (considering a **publicly disclosed trading plan** at the motion to dismiss stage)(emphasis added); *see also Weitschner v. Monterey Pasta Co*., No. 03-0632, 2003 WL 22889372 (N.D. Cal. Nov. 4, 2003).

Further, from as early as 2006, studies, news articles, and SEC investigations show that not only is it possible to manipulate 10b5-1 trading plans, but that it is a common occurrence.[8]  Experts have presented numerous methods by which executives can exploit the flexibility of 10b5-1 plans to gain larger profits.[9]  This is particularly true where, as here, the fraud and artificial inflation of the underlying securities are extraordinarily enduring in nature.  Regardless of when between 2000 and 2005 Defendants sold their stock, such sales were inevitably made during a period when the market was operating based upon false and misleading financial data.  *Id.*  Thus, the Defendants cannot claim that sales pursuant to a

---

[8] In December 2006, Stanford professor Alan Jaglinzer performed a study investigating 3,426 insider trades pursuant to 10b5-1 plans from 1,241 different companies. The "executives trading through such plans outperformed their peers who did not trade through a plan by 7.4% over a six-month period". These results suggest that it is possible, indeed a common occurrence, for executives to manipulate plans to maximize earnings.  Osterland, Andrew. "Next SEC target: Exec stock sales." Financial Week Online. 1 Oct. 2007. 8 July 2008. <http://www.financialweek.com/apps/pcs.dll/article?AID=/20071001/REG/70928029>

[9]  *See* Sasseen, Jane. "Insiders With a Curious Edge." BusinessWeek Online. 18 Dec. 2006. 8 July 2008. <http://businessweek.com/magazine/content/06_51/b4014045.htm>

1    trading plan negate an inference of scienter as it was indeed quite possible for the Individual

2    Defendants to trade in a "fraudulent" manner to "profit from high stock prices."  This is

3    exactly what Defendants did here – selling large quantities of shares during six months that

4    the stock was trading at the class period high (above $30) and stopping **all sales** immediately

5    before the share price started precipitously declining.  *See*  ¶¶ 183-185; *see also* Def. Ex. B at

6    11-14.

b.       **Defendants' Option Exercises Support a Strong Inference of Scienter**

9         Defendants suggest that motive is lacking on the part of the Individual Defendants

10   because while the Investigation was pending, the Individual Defendants who remained with

11   the Company signed agreements promising to forego any benefit in the event an accounting

12   error was found.  MTD  at 18.  This straw man completely ignores the fact that Plaintiffs

13   clearly allege in their complaint that the Individual Defendants actually exercised backdated

14   option grants and profited from them.  ¶ 183.  Further, Defendants' argument ignores the fact

15   that the gains were concrete and quantifiable at the time the options were issued, and the

16   Individual Defendants had no way of knowing they would be forced to forego any such

17   profits at a much later date.  This Court recently rejected a similar "no benefit" argument,

18   observing that a defendant's failure to exercise backdated options did not alter the fact "that

19   such benefit was available to him, depending on the movement of the stock price," and would

20   have been lost if the option practices had been exposed.  *CNET*, 483 F. Supp. 2d at 962.

8.       **The Confidential Witnesses Support a Strong Inference of Scienter**

22        Plainly, Plaintiff has alleged competent facts demonstrating that the confidential

23   witnesses personally and directly experienced events indicating that Defendants routinely

24   engaged in the intentional alteration and fabrication of documents for the purposes of

25   backdating options – particularly the Individual Defendants' own options – and that the

26   authorization for these actions came from upper management.  ¶¶ 188-196.  These allegations

27

28

1    obviously strongly support a compelling inference of scienter.  *See Rosenbaum Capital, LLC*

2    *v. McNulty*, 549 F. Supp. 2d 1185, 1192 (N.D. Cal. 2008) (holding that allegations of a

3    confidential witness described with sufficient particularity who personally witnesses the

4    alleged events support a strong inference of scienter).

5        Pursuant to the Court's order on the Motion to Dismiss the Amended Complaint,

6    Plaintiff's SAC pleads "the period during which the witness had been employed, a clearer

7    explanation of the witness' job duties, and how the witness came to know the information he

8    or she describes."  Order at 10.  With regards to CW#1, Plaintiff has described with detail the

9    period during which the witness was employed, to whom she reported during that time, her

10   job duties during that time, and her exposure to the Company's practices of backdating.

11   ¶187-189.  In fact, the complaint details that CW#1 was directed to and witnessed the

12   backdating of options by Company Executives.  ¶¶ 190-193.

13       Defendants devote much of their argument attempting to discredit CW#1's statements,

14   purporting that they contradict the Company's proxy statement and Form 3. Nevertheless,

15   these public filings simply do not contradict CW#1's allegations that she was instructed to

16   backdate documents.  At most, these documents indicate that these options may not have been

17   ultimately backdated, perhaps by virtue of the fact that CW#1 raised concerns within the

18   Company about these practices. ¶¶ 190-193.

19       In fact, CW#1 stated that all paperwork associated with backdated options went

20   through the approval of the Company's General Counsel Russell Boltwood and Stock

21   Administrator Daryl Wilke.   ¶ 189.  Thus, CW#1 did not have the final stamp of approval on

22   the options.  CW#1 also indicated that she verbally expressed her concerns regarding the

23   options backdating to her supervisor.  ¶ 191.  The inference that dissent in the ranks could

24   have caused upper management to re-evaluate and correct the backdated paperwork is far

25   more compelling then Defendants' argument that CW#1 is lying or otherwise fundamentally

26   wrong in her recollection.

27       Indeed, it is worth noting that, by the time of CW#1's employment with UTStarcom,

28   the reporting requirements under Sarbannes-Oxley had taken effect, making it infinitely more

1    difficult for CW#1's backdated paperwork to avoid suspicion, particularly for something as

2    highly publicized as Barton's hiring.  It stands to reason that, once CW#1 raised her concerns,

3    and in light of the more scrutinizing regulatory environment they were facing, management

4    may have balked and decided not to backdate the options after all.  Certainly, Defendants are

5    not entitled to any inference to the contrary at the pleadings stage.[10]

6          With regards to the allegations made by CW#2, Plaintiff again has clearly complied

7    with the Court's order, providing the details of the period during which CW#2 was employed,

8    a clear explanation of CW#2's job duties, and the names and the manner in which she learned

9    her information. Order at 10.  Plaintiff has thus described CW#2 "with sufficient particularity

10   to support the probability that a person in the position occupied by the source would possess

11   the information alleged." *Daou,* 411 F.3d at 1015 (quoting *Nursing Home,* 380 F.3d at 1233)

12   (internal quotation marks omitted).

              **9.      There is a Strong Inference that The Company Acted**
13                    **with  Scienter**
14
15         The Individual Defendants concede that to the extent the SAC sufficiently pleads

16   scienter against any one of them their scienter is attributable to UTStarcom.  MTD at 21.

17   Plaintiff has adequately pled facts demonstrating a strong inference of scienter as to the

18   Individual Defendants, Lu, Wu, Sophie, Barton and Toy – and thus as to the Company.

     **B.      PLAINTIFF HAS ADEQUATELY ALLEGED LOSS CAUSATION AS**
19           **TO THE NOVEMBER 7, 2006 ANNOUNCMENT**
20
21         Defendants argue that the November 7, 2006 disclosure of the Company's backdating

22   investigation cannot form the basis for properly pled loss causation because it did not "fully"

23   apprise the market of the truth concerning the Company's financial status.  MTD 7-8.

24   Defendants are wrong.  In reality, the November 7, 2006 announcement began to inform the

25   _____

26   [10]   *Pareto v. F.D.I.C.,* 139 F.3d 696, 699 (9th Cir.1998) (holding that the court must accept as
     true all material allegations in the complaint as well as all reasonable inference to be drawn
27   from therm.  *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001) (finding
     that the complaint must be read in the light most favorable to the nonmoving party); *Parks*
28   *Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995).

1   market of the truth of UTStarcom's option granting practices, and as such, properly forms the

2   basis of loss causation.

3          A partial disclosure such as this may clearly form an adequate premise for loss

4   causation.  *See Daou*, 411 F.3d 1006, 1026 (finding that partial disclosures leading to the truth

5   being fully revealed about a Company's true financial condition were sufficient for loss

6   causation).  Courts have widely held that loss causation may be premised on partial

7   revelations that do not uncover the complete extent of the falsity of specific prior statements.

8   *See In re Motorola Sec. Litig.,* 505 F. Supp. 2d 501, 533 (N.D. Ill. 2007).[11]

9          Here, Plaintiff's SAC clearly alleges that on November 7, 2006, the Company

10  announced the commencement of a review of historical equity and grant practices that would

11  result in the delay of its third quarter earnings release.  ¶ 203.  Even more troubling, the

12  Company's press release raised the specter of "adjustments to its financial statements related

13  to prior equity grants" – that is, the possibility of restatements of the Company's financial

14  reports.  ¶ 148.  The options backdating investigation was the sole subject of this press

15  release, and the only news released that day concerning UTStarcom.  *Id.*  In response to this

16  news, the Company's share price fell by a statistically significant 9%.  ¶¶ 148, 149, 203.

17         The November 7, 2006 announcement was a partial disclosure that, for the first time,

18  put the public on notice of the likelihood that UTStarcom had been backdating its option

19  grants.  This disclosure informed the market for the first time that the Company was subject to

20  the material risks attendant to such options backdating, including a significant delay in its

21  financial reporting going forward, and the probability of a financial restatement.  A *Forbes*

---

23  [11]   *See also In re Bradley Pharms. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006)
24  (stating that "[w]e disagree with Defendants' rigid and dogmatic interpretation of
    *Dura*…[T]he revelation of the 'truth'…did not take the form of a single unitary disclosure but
25  occurred through a series of disclosing events"); *In re Seitel Inc. Sec. Litig.*, 447 F. Supp. 2d
    693, 710 (S.D. Tex. 2006) (holding that "[t]he Complaint further alleges a series of partial
26  disclosures that caused the truth to begin to 'leak out' and 'make its way into the marketplace'
    causing the stock price to fall significantly") (citing *Dura*, 544 U.S. at 342); *In re Enron
27  Corp. Sec. Deriv. & ERISA Litig.*, 439 F. Supp. 2d 692, 712 (S.D. Tex. 2006) ("[B]esides a
    formal corrective disclosure by a defendnat followed by a steep drop in the price of stock, the
28  market may learn of possible fraud through a number of sources…[including] newspapers and
    journals.").

1  article published in reaction to this disclosure stated as much.  ¶ 150.   This revelation of the

2  likelihood of financial misstatements, coupled with the attendant drop in the Company's share

3  price, demonstrates exactly the sort of causal connection between a material misrepresentation

4  and a loss required to demonstrate loss causation under *Dura*.  544 U.S. 336, 341-42.

5        More specifically, the question to consider in determining whether loss causation may

6  be premised on this partial disclosure is whether investors could have plausibly understood

7  the disclosure to reveal "at least part of the falsity of [defendants'] misstatement."  *In re Take-*

8  *Two Interactive Sec. Litig.*, 551 F. Supp.2d 247, 283 (S.D.N.Y. 2008); *see also Motorola*, 505

9  F. Supp. 2d at 533 (finding that "loss causation may be premised on partial revelations that do

10  not uncover the complete extent of the falsity of specific prior statements").  Here, given that

11  Defendants were raising the specter of a restatement of financials and had admitted that they

12  were taking the unusual and extreme measure of delaying the Company's financial reports in

13  light of an options backdating investigation, it is plainly apparent that the market perceived

14  this as a likely initial disclosure of a larger options backdating scandal within the Company.

15  The fact that this disclosure did not "fully" inform the market of the certainty of the options

16  backdating, or its extent, does not in any way negate the fact that it partially informed the

17  market of a new and troubling likelihood of material accounting misstatements.

18        Through the November 7, 2006 revelation, a partial truth was plainly revealed to the

19  market: Defendants were informing the market of an internal investigation relating to options

20  backdating that might (and eventually would) cause the Company to restate its financial

21  reports and result in SEC action.  The market was obviously aware that companies do not

22  announce such investigations, possible restatements and delays in future financial reports and

23  filings unless there is substantial cause for concern – and the drop in the share price reflected

24  this fact.  This was, plainly, a corrective disclosure under *Daou*, which merely requires the

25  allegations to provide "some indication that the drop in . . . stock price was causally related to

26  . . . financial misstatements."  *Daou*, 411 F.3d at 1026.  As one Court aptly noted: "[R]eading

27  *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to

28  immunize themselves with a protracted series of partial disclosures."  *Freeland v. Iridium*

1  *Word Communications*, 233 F.R.D. 40, 47 (D.D.C. 2006).[12]  Plainly, this was a corrective

2  disclosure under all of the operative standards of *Dura* and its progeny.  As such, the Motion

3  should be denied on this point.

4  **III.    PLAINTIFF'S SECTION 14(a) CLAIM CLEARLY SATISFIES THE**
   **PLEADING REQUIREMENTS OF THE REFORM ACT**

5

6      Plaintiff's SAC has more than adequately alleged each element of a §14(a) claim with

7  regards to the 2005 and 2006 proxy statements[13]– that is, "that: (1) defendants made a

8  material misrepresentation or omission in a proxy statement; (2) with the requisite state of

9  mind; and (3) that the proxy statement was the transactional cause of harm of which plaintiff

10 complains."  *Zoran.*, 511 F. Supp. 2d at 1015 (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S.

11 375, 384 (1970)).  Defendants conceded that Plaintiff has adequately pled the first element.

12 MTD at 22.  Yet, Defendants once again argue that Plaintiff has failed to establish the

13 "essential link" element and has failed to plead facts raising a "strong inference of

14 negligence" on the part of Defendants.

15      Defendants' arguments are without merit.  Plaintiff has adequately pled that the

16 Individual Defendants used the proxy solicitations to maintain their positions on the board

17 which enabled them to continue the backdating scheme that harmed shareholders, thereby

18 establishing the "essential link" element.  ¶¶ 217-225.  Further, Plaintiff has adequately pled

19 particular facts as to the Individual Defendant's negligence.  As such Defendants' Motion

20 must be denied on this count.

21

22

23 [12] *Weiss v. Amkor Tech., Inc.*, upon which Defendants rely, is inapposite as the court ruled
   there that plaintiffs could not allege loss causation based on an investigation of the stock
24 option grants because the real discussion in the press release was the second quarter financial
   results.  527 F. Supp. 2d 038, 047 (D. Ariz. 2007). Here,  Defendants' November 6, 2007 had
25 no discussion other than the stock option grant review.

26 [13]   Plaintiff concedes that pursuant to the Court's order on April 14, 2008, the §14(a) claims
   are time barred with respect to the 2003 and 2004 proxy statements, and thereby limits his
27 argument to the 2005 and 2006 proxy statement.  Plaintiff includes the 2003 and 2004 proxy
   misstatements in his complaint only to demonstrate the repetitious nature of the
28 misstatements.

**A.     PLAINTIFF HAS CLEARLY ALLEGED THE "ESSENTIAL LINK" ELEMENT**

Plaintiff's Complaint states that "Defendant negligently omitted the material facts about option grant backdating and negligently misrepresented the terms of the Individual Defendants' compensation and management integrity.  In reliance on the false and misleading proxy statements, Plaintiff and other members of the Class voted for the Individual Defendants as directors."  ¶¶ 221-222.  Here, Plaintiff has demonstrated that "the proxy solicitation itself, rather than the particular defect in the materials, was an essential link in the accomplishment of the transaction."  *Mills*, 396 U.S. at 385.

Plaintiff's SAC alleges that the Individual Defendants used the proxy solicitations to maintain their positions on the Board of Directors.  ¶ 220.  Further, the SAC alleges that shareholders continued to vote for the Individual Defendants while remaining entirely ignorant of the fact that the Company was backdating options and misrepresenting the terms of the Individual Defendants' compensation and management integrity. ¶ 221.  Finally, the SAC alleges that had shareholders known that the Company and the Individual Defendants had been misrepresenting material terms regarding compensation and internal controls, Plaintiff and the other members of the Class would not have voted for the Individual Defendants as directors.  ¶ 223.

Plaintiffs have clearly met the essential link element here, pleading that if the Individual Defendants had not falsely stated in UTStarcom's proxy statements that stock options were being granted properly under the respective stock option plans, and that the Individual Defendants were complying with the terms of the plans that shareholders approved, the shareholders would not have voted for the Individual Defendants.  Further, the Individual Defendants would no longer have had the means to grant backdated stock options and benefit from them. ¶¶ 220-223.[14]  As such, the Motion must be denied on this point.

---

[14] Where, as here, the board required shareholder approval for implementation of or an amendment to a stock option plan or similar compensation plan, the essential link element is established.   *See, e.g.. Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697 (M.D.N.C. 1992);

**B.    PLAINTIFF HAS ADEQUATELY PLED A STRONG INFERENCE OF NEGLIGENCE**

First, Plaintiff has pled particularized facts establishing the Individual Defendants' and the Company's scienter, as discussed above.  This higher standard covers negligence. *McKesson*, 126 F.Supp. 2d at 1268 n.10;  *Zoran*, 511 F. Supp.2d at 1015.   However, even if this Court finds that Plaintiff has not adequately pled scienter as to the Individual Defendants, the Court can and should find that he has pled facts giving rise to a strong inference of negligence.  *In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 11731211.

Plaintiff has alleged that each of the Individual Defendants had duties to ensure that the granting of stock options and the accounting practices of the Company complied with UTStarcom's stock option plans and other governing regulations.  ¶¶ 39-45.  Plaintiff's complaint demonstrates with overwhelming factual evidence that the Individual Defendants failed in these duties.  Thus, even if somehow these facts did not lead to an inference that the Individual Defendants acted with scienter, they certainly lead to the inference that the Individual Defendants failed in their duties and were thereby negligent.  *Zoran*., 511 F. Supp. 2d at 1016.  Therefore, Plaintiff has successfully pled this element of his claim.

**IV.    PLAINTIFF HAS ADEQUATELY PLED CONTROL PERSON LIABILITY PURSUANT TO SECTION 20(a)**

Plaintiff has adequately pled primary violations of the securities laws on behalf of Defendants Lu, Wu, Sophie, Barton and Toy, as control persons.  As such, Plaintiff has adequately stated a claim under Section 20(a).  *See In re Ditech Networks, Inc. Derivative. Litig.*, No 06-5157, 2007 WL  2070300, at *9 (N.D. Cal. July 16, 2007) (holding that "to state a claim under Section 20(a), a plaintiff must allege (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator.").

---

*Franklin v. Ernst*, 571 F. Supp. 829, 842 (N.D. Ohio 1983) ("In this case, the plan, by its terms, required shareholder approval.  The solicitation of proxies, therefore, was 'an essential link in the accomplishment of the transaction.'  Accordingly, if the proxy statement contains a material misstatement or omission, the causation requirement is met.").

1    Whether the Individual Defendants actually are "controlling persons" under § 20(a) is a

2    question for the jury.[15]

3    **V.    CONCLUSION**

            For the foregoing reasons, the motion to dismiss should be denied in its entirety.

4

5    Dated:  July 18, 2008                          Respectfully submitted,

6                                                   By:_____/s/_____
                                                    Mark Punzalan

7                                                   FINKELSTEIN THOMPSON LLP
                                                    100 Bush Street

8                                                   Suite 1450
                                                    San Francisco, California 94104

9                                                   Telephone: 415.398.8700
                                                    Facsimile: 415.398.8704

10

11                                                       - and -

12                                                  Donald J. Enright, Esq.
                                                    Elizabeth K. Tripodi

13                                                  FINKELSTEIN THOMPSON LLP
                                                    1050 30th Street, NW

14                                                  Washington, D.C. 20007

15                                                  Telephone: 202.337.8000
                                                    Facsimile: 202.337.8090

16

17                                                  *Counsel for Plaintiffs*

18

19

20

21

22

23

24

25    _____

26    [15] *See Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000)(quoting *Kaplan v. Rose*,
      49 F.3d 1363, 1382 (9th Cir. 1994) ("Whether [the defendant] is a controlling person is an
27    intensely factual question, involving scrutiny of the defendant's participation in the day-to-
      day affairs of the corporation and the defendant's power to control corporate actions." ).
28